UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————————

JAMES R. MERCER, JR.,

                                            Plaintiff,

                                                                    9:20-CV-0665
v.                                                                  (MAD/TWD)


M. KINDERMAN,

                                            Defendants.

———————————————————————————————

APPEARANCES:                                        OF COUNSEL:

JAMES R. MERCER, JR.
  *Plaintiff, pro se*
1001 W. Creek Drive
Niagara Falls, NY 14304

LETITIA JAMES                                       NICHOLAS LUKE ZAPP, ESQ.
Attorney General of the State of New York           Assistant Attorney General
  *Counsel for Defendants*
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

        James R. Mercer, Jr., ("Plaintiff"), a former innate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se*

civil rights action pursuant to 42 U.S.C. § 1983, asserting his constitutional rights were violated

at Marcy Correctional Facility ("Marcy").  (Dkt. No. 1.)  The Honorable Mae A. D'Agostino,

United States District Judge, reviewed the complaint in accordance with 28 U.S.C. § 1915, and

found Plaintiff's Eighth Amendment medical indifference and First Amendment retaliation

claims against Dr. Shehab Zaki, Nurse Administrator Colleen Coppola, Deputy Superintendent

for Programs Mark Kinderman, and Deputy Superintendent for Administration Daniel Crossway (collectively, "Defendants") required a response.  (Dkt. No. 5.)

Generally, Plaintiff alleges Zaki and Coppola were deliberately indifferent to his serious medical needs and retaliated against him for filing grievances and complaints when they issued and revoked Medical Permits that were inconsistent with his "disabling medical conditions." (Dkt. No. 1 at ¶¶ 173-79, 190-95.)  He claims Kinderman and Crossway acted with deliberate indifference and retaliated against him for filing grievances when they allowed him to be assigned to programs contrary to his Medical Permits and disabling medical conditions.  *Id*. at ¶¶ 180-85, 190-95.

Rather than answering Plaintiff's complaint, Defendants now move to dismiss the action for failure to state a claim.  (Dkt. No. 23.)  Plaintiff opposed the motion.  (Dkt. No. 25.)  This motion was referred to this Court for a Report-Recommendation.  For the reasons that follow, the Court recommends that Defendants' motion be denied.

I.    **DISCUSSION**

   A.    **Background**

On March 12, 2019, Lieutenant Whitmore[1] told Plaintiff that he would no longer be employed as a clerk in the Office of Mental Health and directed him to report to "Lawns & Grounds" in the morning.  (Dkt. No. 1 at ¶¶ 6-9.)  On March 14, 2019, Plaintiff reported the events that transpired with Whitmore to his mother.  *Id*. at ¶ 11. Plaintiff's mother contacted DOCCS and the Office of Special Investigations ("OSI") and lodged a formal complaint.  *Id*. Plaintiff was interviewed in relation to the OSI complaint.  *Id*. at ¶ 12.

---

[1]  All claims against Whitmore were dismissed without prejudice on initial review.  (Dkt. No. 5.)

On March 14, 2019, Plaintiff received an undated Medical Permit signed by Zaki with the restriction, "[n]o lawns and grounds." *Id*. at ¶ 10.  Nine days later, on March 25, 2019, Plaintiff received another Medical Permit issued by Zaki, indicating "[m]ay work lawns and grounds. Not able to operate heavy equipment." *Id*. at ¶ 14.  Plaintiff sought an explanation regarding the alteration of the Medical Permit and was advised by a nurse that, "someone called Medical to ask why he was not able to work L&G and there was a conversation between [Coppola] and Dr. Zaki.  Dr. Zaki determined [sic] no reason for Plaintiff's inability to work L&G, resulting in the new Permit." *Id*. at ¶ 16.

From April 2019 until May 2019, Plaintiff wrote letters to Kinderman and other officials objecting to his removal from his clerk position and his placement in Lawns & Grounds. *Id*. at ¶¶ 8, 20, 28.  Kinderman responded, "[m]edical has advised me that you are clear to be assigned to work in either Food Service [or] inside Lawns and Grounds.  You will be called out to Program Committee next week for a review of a possible change of assignment." *Id*. at ¶ 30.

On May 21, 2019, Plaintiff mailed a letter to DOCCS' Chief Medical Officer complaining about his medical care for disabling medical conditions and issues with programming. *Id*. at ¶ 32.  In response, Crossway interviewed Plaintiff and stated, "[s]o now your [sic] out of Lawns and Grounds, your [sic] satisfied with your medical care?" *Id*. at ¶ 33. Plaintiff responded, "Yes." *Id*.  Coppola also provided a written response to Plaintiff's letter and indicated, "[t]he appropriate medical care is being provided and the medical excuse is accurate according to your provider." *Id*. at ¶ 35.

On May 28, 2019, Plaintiff met with Zaki. *Id*. at ¶ 36.  Zaki issued a Medial Permit indicating that Plaintiff was unable to climb stairs or ladders/heights, and no pushing, pulling, bending, or shoveling activities (raking, mopping, sweeping, heavy outdoor work, etc.). *Id*.

Plaintiff also mailed a Request for Reasonable Accommodations seeking a mobility assistant, which Zaki and Kinderman denied. *Id*. at ¶¶ 37, 186.

On or around June 10, 2019, Plaintiff received a program sticker in the mail informing him that he was to begin "an a.m. module in Food Service-Non-Training." *Id*. at ¶ 39. Plaintiff wrote to Kinderman claiming the programming conflicted with his medical restrictions and, in response, Kinderman advised, "[y]our current assignment was worked out with both Medical and Food Service staff keeping in mind your medical limitations." *Id*. at ¶¶ 40, 44.

On June 27, 2019, Plaintiff discussed his current program assignment with Zaki. *Id*. at ¶ 47. Zaki told Plaintiff to display his Medical Permit if he was asked to perform a task that violated his restrictions. *Id*. Coppola provided a new Medical Permit, issued by Zaki, that included the restriction, "unable to stand for more than 20 minutes." *Id*. at ¶¶ 36, 47.

In June 2019 and July 2019, Plaintiff sent letters to Kinderman advising him of the new restrictions and asking for an assignment that "allows participation consistent with medical restrictions." *Id*. at ¶¶ 48, 57. Plaintiff claimed he was "a liability in the [m]ess [h]all" and requested an alternate assignment. *Id*. Kinderman responded that it was Plaintiff's responsibility to find an assignment in the mess hall that does not violate his medical limitations and accused Plaintiff of attempting to manipulate the situation to obtain his prior clerk position. *Id*. at ¶¶ 49, 59.

On July 22, 2019, Plaintiff told Zaki that working in the mess hall was contrary to his medical restrictions. *Id*. at ¶ 61. Zaki issued a new Medical Permit that indicated, "can not work [m]ess [h]all duty[.]" *Id*. The next day, Plaintiff was called to the infirmary and directed to bring his Medical Permit. *Id*. at ¶ 62. Coppola, after a meeting with Crossway, directed Plaintiff

to surrender that Medical Permit and supplied him with a copy of the previously issued Medical Permit and stated, "[y]ou have to go back to work in the mess hall." *Id.*

On August 6, 2019, Plaintiff reported to sick call and received a Medical Permit indicating, "no work in [m]ess hall may go to program." *Id.* at ¶ 67.  On August 12, 2019, during a meeting with Zaki, Plaintiff reiterated his complaints related to working in the mess hall.  *Id.* at ¶ 68.  Zaki issued a Medical Permit, effective August 2019 through January 2020, indicating, "[t]his inmate has been found to be: not eligible to work in the mess hall." *Id.*  On August 22, 2019, Plaintiff received a new Medical Permit from Zaki, effective August 2019 through February 2020, that indicated, "[t]his inmate has been found to be: eligible to work in the mess hall." *Id.* at ¶ 73.

On August 28, 2019, Plaintiff mailed a second Request for Reasonable Accommodations, requesting the use of a pushcart and an assistant to load and unload from the commissary and package room.  *Id.* at ¶¶ 76, 78.  Plaintiff did not receive a response to the request.  *Id.*

On September 23, 2019, Plaintiff began working in the mess hall.  *Id.* at ¶ 83.  On October 15, 2019, Zaki referred Plaintiff for an appointment with an orthopedist specialist for osteoarthritis in his hip.  *Id.* at  ¶ 94.  Zaki also issued a temporary Medical Permit indicating that Plaintiff was ineligible for mess hall duty until November 2019.  *Id.*

On October 22, 2019, Plaintiff reported to a scheduled meeting with Zaki and witnessed Zaki engaged in a conversation with Crossway.  *Id.* at ¶ 97.  Zaki then turned to Plaintiff and told him that the appointment was made in error, and that he would see Plaintiff after he saw an orthopedist.  *Id.*

On November 15, 2019, Plaintiff received a Medical Permit issued by Zaki, effective November 2019 through May 2020, indicating that, "[t]his inmate has been found: eligible to work in the mess hall." *Id*. at ¶ 105.

On December 11, 2019, Plaintiff wrote to officials, including Zaki and Crossway, complaining that his orthopedic consult had not been scheduled. *Id*. at ¶ 113.

On December 30, 2019, Plaintiff mailed a third Request for Reasonable Accommodations reiterating his request for the use of a pushcart. *Id*. at ¶ 120. The request was received on January 9, 2020, verified by Zaki, and denied. *Id*.

On January 6, 2020, during a meeting with Zaki, the doctor told Plaintiff, "since you are allowed to wipe down tables while sitting down, I do not see a problem with you working in the mess hall." *Id*. at ¶ 121. Plaintiff objected and Zaki responded, "[t]ake it up with Albany." *Id*.

On January 13, 2020, Plaintiff began working in the mess hall. *Id*. at ¶ 124. An officer told Plaintiff, "I don't know who you pissed off, but it is coming from the top." *Id*. The officer gave Plaintiff directions and told him that the "top" was Crossway. *Id*.

From March 2020 until May 2020, Plaintiff continued to object to his assignment in the mess hall. *Id*. at ¶¶ 146-161. On May 27, 2020, Plaintiff received a program sticker informing him that his program assignment was changed to porter. *Id*. at ¶ 169.

### B.    Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense [and] where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572

F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).

Additionally, while motions to dismiss are usually constrained to facts in the complaint, "in cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they 'are consistent with the allegations in the complaint.'" *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y.2004) (quoting *Donahue v. United States Dep't of Justice*, 751 F. Supp. 45, 49 (S.D.N.Y.1990)), *vacated in part on other grounds*, 317 F.Supp.2d 160 (N.D.N.Y.2004). Specifically, a *pro se* plaintiff's memorandum in opposition to a motion to dismiss should be seen as effectively amending the complaint, so far as there is no contradiction. *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 461 (N.D.N.Y. 2009); *see also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id*.

### C.    Analysis

#### 1.    Deliberate Indifference

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This includes punishments that "involve the unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  With respect to claims that job assignments are inappropriate given an inmate's medical condition, courts apply the standards for medical care.  *See Cooke v. Stern*, No. 9:07-CV-1292 (GLS/ATB), 2010 WL 3418393, at *6 (N.D.N.Y. Aug. 2, 2010); *see also Atkinson v. Fischer*, No. 9:07-cv-368 (GLS/GHL), 2009 WL 3165544, at *11 (N.D.N.Y. Sept. 25, 2009) (applying Eighth Amendment standards for medical care in analyzing claim that plaintiff was assigned to a prison job that was inappropriate given his medical condition).

To state a claim for deliberate indifference to a serious medical need, a plaintiff's claim must satisfy both objective and subjective elements.  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  First, the alleged deprivation "must be, in objective terms, sufficiently serious."  *Id.* (quotations and citations omitted).  "Second, the charged official must act with a sufficiently culpable state of mind."  *Id.*

Under the objective element, the inmate's medical need or condition must be "a serious one."  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

Under the subjective element, the defendant must act "with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2013) (citation omitted). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66 (citation omitted). "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester Cty. Dept. of Corr.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (citing *Salahuddin*, 467 F.3d at 280) (other citation omitted).

Here, construed liberally, Plaintiff alleges Zaki and Coppola were deliberately indifferent to his serious medical needs when they issued and revoked Medical Permits that were inconsistent with his "disabling medical conditions." (Dkt. No. 1 at ¶¶ 173-79.) He also claims Kinderman and Crossway acted with deliberate indifference when they allowed him to be assigned to programs contrary to his Medical Permits and "disabling medical conditions." *Id*. at ¶¶ 180-85.

Defendants argue Plaintiff's Eighth Amendment medical indifference claims must fail because he has not shown an objectively serious medical need. (Dkt. No. 23-1 at 7.[2]) According to Defendants, Plaintiff's verbose complaint does very little to describe his underlying medical conditions, which stems from "osteoarthritis" in his "right hip joint" and an unspecified spinal condition. *Id*.

To be sure, as this Court has already observed, the complaint contains few facts related to Plaintiff's medical condition or any actual diagnosis. (*See* Dkt. No. 5 at 12.) Plaintiff has plead

---

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

that he suffered from osteoarthritis and other orthopedic issues related to his right hip that

required treatment with a specialist, an MRI, and resulted in Plaintiff receiving Medical Permits

with various restrictions.  (Dkt. No. 1 at ¶¶ 10, 14, 36, 47, 61, 67, 68, 73, 80, 84, 88, 98, 94.)

   In response to Defendants' motion, Plaintiff has, *inter alia*, attached copies of the

Medical Permits, along with medical records, indicating that he suffered from "chronic pain"

related to his right hip and spinal conditions.  (*See generally* Dkt. No. 25.)  Specifically, on

September 17, 2019, diagnostic imaging of his right hip showed "Severe osteoarthritis in the

right hip joint with similar findings on the left.  This is associated with a superior labral tear and

a large complex perilabral cyst associated with a tear."  *Id*. at 17 (Exhibit A).  On March 11,

2020, Mitchell Rubinovich, M.D., observed that Plaintiff "has severe pain which is present all

the time.  He has an MRI which shows severe osteoarthritis of the right hip. . . .  I think that he

needs to see one of the orthopedic surgeons in the system who does total hip arthroplasty for

assessment. . . .  In the interim, it would be best if we could limit his ambulation as much as

possible."  *Id*. at 19 (Exhibit B).  On March 23, 2020, Plaintiff "received the use of a

wheelchair."  *Id*. at 8.  Thereafter, Plaintiff was for referred for evaluation by an orthopedic

surgeon based on subjective complaints of "5-6 year of pain that has increased.  Prolonged

activity = increased pain.  No relief [with] OTC meds, injections, PT."  *Id*. at 8-9 *see also id*. at

25-1 at 5-7 (Exhibit E).  The "ortho clinic" also noted "severe right hip pain making ambulation

and ADL's very difficult."  (Dkt. No. 25 at 9; *see also* Dkt. No. 25-1 at 7.)

   Additionally, on October 18, 2018, a MRI Spine radiology report for "chronic low back

pain," showed "Multilevel discogenic changes and related findings as described above[,]"

including, but not limited to, mild central canal stenosis at the L1-2 level, flatting and

straightening of the anterior thecal sac with mild central canal stenosis at the L2-3 level, broad

based bulge compressing L3 nerve root, moderate central canal stenosis at the L3-4 level, mild

bilateral foraminal narrowing at the L4-5 level, broad based annular bulge compressing the

exited L5 nerves, and mild bilateral foraminal stenosis at L5-S1 level.  (Dkt. No. 25-1 at 9-10

(Exhibit F); *see also* Dkt. No. 25 at 8-11.)

Courts have found similar arthritic hip problems and chronic pain to be objectively

serious at the motion to dismiss stage.  *See Bown v. Defrank*, No. 06-CV-2235 (AJP), 2006 WL

3313821, at *22 (S.D.N.Y. Nov. 15, 2006) (arthritic hip); *Rhames v. Fed. Bureau of Prisons*, No.

00-CV-4338, 2002 WL 1268005, at *6 (S.D.N.Y. June 6, 2002) (arthritic hip); *see also Guarneri

v. Hazzard*, No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) ("[s]evere back

pain, especially if lasting an extended period of time, can amount to a 'serious medical need'

under the Eighth Amendment").

Upon review, the facts in Plaintiff's opposition memorandum and exhibits are consistent

with the facts stated in the complaint related to Plaintiff's "disabling medical condition," and,

therefore, the additional information may be considered when deciding this motion to dismiss.

*See Cusamano*, 604 F. Supp. 2d at 461.  On this record, the Court finds Plaintiff has alleged

sufficient facts to show that he suffered from a "serious medical need" which satisfies the

objective prong of the deliberate indifference analysis.  *See Brock*, 315 F.3d at 162-63.

Therefore, the Court recommends that Defendants' motion to dismiss Plaintiff's

deliberate indifference claims be denied.

### 2.    Retaliation

"To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the

speech or conduct at issue was protected, (2) that the defendant took adverse action against the

plaintiff, and (3) that there was a causal connection between the protected conduct and the

adverse action.'" *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).  The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).  This is true because given the nature of a retaliation claim they are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Here, construed liberally, Plaintiff claims (1) Zaki and Coppolla issued and revoked Medical Permits that were inconsistent with his disabling medical conditions in retaliation for filing grievances and complaints; and (2) Kinderman and Crossway assigned him to programs that were inconsistent with his disabling medical conditions in retaliation for filing grievances. (Dkt. No. 1 at ¶¶ 190-95.)  Defendants argue Plaintiff's claims of retaliation fail because he has not stated any of the necessary elements.  (Dkt. No. 23-1 at 8-9.)  Under the applicable standards, the Court finds Plaintiff's allegations state viable retaliation claims against Defendants.

As to the first element, it is well-settled the filing of grievances is a constitutionally protected activity under the First and Fourteenth Amendments. *Graham*, 89 F.3d at 80 (citing *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988)).  The filing of a letter of complaint is also protected conduct. *See Carl v. Dirie*, 9:09-CV-0724 (GTS/RFT), 2010 WL 3338566, at *5 (N.D.N.Y. Mar. 29, 2010).  Here, Plaintiff filed ten grievances, between March 2019 and November 2019, against Zaki, Coppola, and Kinderman related to his Medical Permits, medical

treatment, programming, and requests for accommodations.  (Dkt. No. 1 at ¶¶ 17, 27, 34, 42, 54, 65, 66, 74, 77, 99, 104.)  Plaintiff also forwarded numerous letters to Kinderman, Crossway, and other officials, related to the aforementioned issues.  *Id.* at ¶¶ 8, 28, 31, 32, 40, 43, 48, 50, 56, 57, 64, 113.  Thus, at this juncture, and contrary to Defendants' assertions, Plaintiff has sufficiently plead facts suggesting that he engaged in protected conduct.

With respect to the second element, the Second Circuit has defined "adverse action," in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  The test is an objective one, and does not depend on whether the plaintiff himself was in fact deterred from continuing to file grievances. *Id.*  As noted, Plaintiff claims Defendants took two retaliatory actions against him: (1) Zaki and Coppola issued Medical Permits that were inconsistent with his medical conditions and revoked properly issued Medical Permits; and (2) Kinderman and Crossway assigned him to work programs that were inconsistent with his medical conditions.  At this juncture, Plaintiff has sufficiently plead facts suggesting adverse action.  *See Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) ("[I]t is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor."); *Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *10 (S.D.N.Y. April 6, 2018) (holding that the plaintiff's numerous allegations that prison doctor interfered with his medical passes, outright denied his requests for treatment recommended by another doctor, and denied him any treatment while forcing him to wait at sick call once a week for two months, were sufficient to state an adverse action); *Brandon v. Kitner*, 938 F.3d 21, 40 (2d Cir. 2019) (holding that the removal of

14

medical dietary restrictions would deter an inmate from filing grievances); *see also Vega v. Lareau*, No. 9:04-CV-0750 (GTS/ATB), 2010 WL 2682307, at *8 (N.D.N.Y. Mar. 16, 2010) ("A job reassignment or termination can under certain circumstances constitute adverse action necessary to support a claim of retaliation."); *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) ("assigning the inmate a less desirable work assignment satisfies the adverse action requirement").

As to the third element, a plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *See Espinal v. Goord*, 558 F.3d at 129 (citations omitted) (noting the court must exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases). While there is no "bright line" defining the limits of the temporal relationship, the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months. *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 203 (N.D.N.Y. 2015); *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003). Here, the temporal connection between Plaintiff's grievances and complaints and the issuing and revoking of Medical Permits and job reassignments is "sufficient to support an inference that the protected conduct played a substantial part in the adverse action," *see Baskerville*, 224 F. Supp. 2d at 732, for purposes of surviving a Rule 12(b)(6) motion.

Therefore, the Court recommends that Defendants' motion to dismiss Plaintiff's retaliation claims be denied.

## II.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court finds Plaintiff has plausibly alleged deliberate

indifference and retaliation claims against Defendants.  However, the Court expresses no opinion

as to whether the claims would survive a properly filed motion for summary judgment.

     **ACCORDINGLY**, it is hereby

     **RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 23) be **DENIED**; and

it is further

     **ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance

with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to

file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of

the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS</u>**

**<u>WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.


Dated: April 26, 2021
      Syracuse, New York

                                     Therese Wiley Dancks
                                     United States Magistrate Judge

---

[3] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2010 WL 3418393

2010 WL 3418393
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John COOKE, Plaintiff,

v.

STERN, Supt. Programs, Bare Hill Correctional
Facility,[1] and Ms. S. Flanagan, Defendants.

[1]    This defendant's last name is actually
"Stearns," and this court will refer to him as
such.

No. 9:07–CV–1292 (GLS/ATB).
|
Aug. 2, 2010.

**Attorneys and Law Firms**

John Cooke, pro se.

Christopher W. Hall, Ass't Attorney General, for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

*1    This matter was referred for Report and
Recommendation, pursuant to 28 U.S.C. § 636(b) and Local
Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe,
United States District Judge. On January 4, 2010, the case
was re-assigned to me, following the retirement of Magistrate
Judge Gustave J. Di Bianco.

In this amended civil rights complaint ("AC"), plaintiff
alleges that the two remaining defendants[2] were deliberately
indifferent to his health and safety when they improperly
assigned him to a particular work detail at Bare Hill
Correctional Facility ("Bare Hill") that was not appropriate,
given his physical disability. (Dkt. No. 7). Plaintiff, now
released from custody, seeks substantial monetary damages.
(*Id.*).

[2]    Judge Sharpe previously dismissed all claims
against defendant K. Mullerville, R.N. without
prejudice, because the amended complaint failed

to allege any involvement of Nurse Mullerville in
the purported violation of plaintiff's constitutional
rights. (Dkt. No. 8). In a Memorandum Decision
and Order dated March 4, 2009 (Dkt. No. 16),
Judge Sharpe partially granted defendants' first
summary judgment motion (Dkt. No. 14). He
dismissed, for failure to exhaust administrative
remedies, a claim that defendant Stearns further
violated plaintiff's Eighth Amendment rights
by assigning him to a housing unit that was
inappropriate, given that plaintiff had just returned
from the hospital following surgery.

Presently before this court is defendants' second motion for
summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt.
No. 24). Defense counsel argues that neither name defendant
was personally involved in the decision to assign plaintiff
to his work program, and that plaintiff cannot establish that
the defendants were deliberately indifferent to his health and
safety.

Plaintiff initially failed to respond to the second summary
judgment motion. Upon learning of the possibility that
plaintiff had not received the motion[3], the court took steps
to verify plaintiff's current mailing address and to serve him
(perhaps for a second time) with the relevant papers. (*See* Text
Orders dated 7/14/2010 & 7/20/2010). Only July 26, 2010,
plaintiff submitted a confirmation of his new mailing address
and provided some documents responsive to the summary
judgment motion. (Dkt. No. 29). On July 27, 2010, plaintiff
telephoned my chambers to confirm his receipt of defendants'
summary judgment motion, and to advise the court that he did
not intend to file any further response. (*See* Text Order dated
7/27/2010).

[3]    When plaintiff was deposed on August 13, 2009,
defense counsel questioned plaintiff, who had by
then been released from custody, about his plans
to move to a different apartment. Plaintiff was
reminded that he was required to notify the court
and the parties of any change of address. (Pltf.
Deposition ("Dep.") at 10–11, Dkt. No. 24–4). On
November 6, 2009, the defendants served their
second summary judgment motion on plaintiff
by mail, directed to a new address that plaintiff
provided to defense counsel by telephone, without
advising the court. (Notice of Motion, Dkt. No.
24 at 3–4; Hall Attorney Affirmation ¶¶ 2–14,
Dkt. No. 26). Although defense counsel had no

2010 WL 3418393

indication that the summary judgment motion had not been received by plaintiff, counsel was advised by telephone in early December 2009 that plaintiff had yet another new mailing address. (Hall Aff. ¶ 15). Although it was not his obligation to do so, defense counsel apparently did not follow up with plaintiff to ensure that he received the summary judgment motion. *Dumpson v. Goord,* 00–CV–6039, 2004 WL 1638183, at *3 (W.D.N.Y. July 22, 2004) ("The demand that plaintiffs provide contact information is ... the obvious minimal requirement for pursuing a lawsuit.").

Although this court originally gave plaintiff until August 20, 2010 to file a response to the summary judgment motion, it is ripe for decision now, given that plaintiff has indicated that he does not intend to file any further response. For the following reasons, this court recommends that the defendant's motion for summary judgment be granted and the sole remaining claim in the amended complaint dismissed in its entirety.

### DISCUSSION

**I. *Facts* [4]**

[4]    This court will review only the facts and procedural history relevant to the pending summary judgment motion. In his Memorandum Decision and Order dated March 4, 2009 (Dkt. No. 16), Judge Sharpe more fully discusses the facts and procedural history of this and the related case (No. 9:09–CV–74).

Plaintiff's right foot and some of his right leg were amputated and replaced by a prosthesis shortly before he was returned to state prison in August 2007, following a parole violation. (Pltf. Deposition ("Dep.") at 27–28, 31–33, Dkt. No. 24–4). Plaintiff claims that, on August 18, 2007, he was assigned to work as a cook in the mess hall at Bare Hill by defendant Sharon Flanagan, who was in charge of the Program Committee. (AC, Dkt. No. 7 at 1 [5]; Dep. at 22–25, 46–47, 56–61). Plaintiff states that he asked the Program Committee not to be assigned to the mess hall because it was difficult for him to stand and walk on his prosthetic leg, and because he didn't want "to move around and put pressure on [that] leg ...." (AC at 1, 7; Dep. at 22–24). Plaintiff asked to work in the commissary or at a job outside, but the sergeant stated that neither job was available. (Dep. at 60–61). One of the female committee members then told plaintiff there was

an opening for a cook in the mess hall, and "you take it or you do not take it." Plaintiff said he would take it because he knew he would not be at Bare Hill "for long." (Dep. at 61). [6]

[5]    Because the paragraph and page numbering of the amended complaint is inconsistent, the court will reference the page numbers created by the CM–ECF system, which appears in the header of the filed document.

[6]    Plaintiff had prior training and experience as a cook, both in and out of prison. (Dep. at 29–30). During his deposition, plaintiff stated he "did not mind working in the kitchen," (Dep. at 35); but he also was concerned that, if he turned down his work assignment, he would be assigned to segregated housing and subject to discipline and/or a delay in his eventual release (Dep. at 49–50, 53–54).

 *2   Defendants have submitted documentation indicating that plaintiff actually met with the Bare Hill Program Committee on August **16**, 2007, not Saturday, August **18th,** as plaintiff contended. (Flanagan Aff., Dkt. No. 24–3, ¶¶ 5–8, 11–13 & Ex. A; Stearns Aff., Dkt. No. 24–2, ¶¶ 13–16, 25–26 & Ex. A). [7] According to plaintiff, a male sergeant and two women were committee members that day. (Dep. at 24–25, 56–57). Plaintiff knew that "Ms. Flanagan was in charge of the program ..." (Dep. at 58), and believed that she was the woman who appeared to be running the committee meeting. (Dep. at 57–59, 63–64). Plaintiff could not describe the woman at the meeting he believes was Ms. Flanagan, except to note she was "Caucasian." (Dep. at 63–64).

[7]    This committee would not meet on weekends. (Flanagan Aff. ¶¶ 11–13; Stearns Aff. ¶ 26 & Ex. B)

Defendant Flanagan was, in fact, in charge of the program committee and would normally preside at meetings to make program assignments to inmates. (Stearns Aff. ¶ 20; Flanagan Aff. ¶ 10). However, defendants submitted extensive documentation indicating that defendant Flanagan was not at work on August 16, 2007, and did not participate in the meeting that resulted in plaintiff's assignment to work in the mess hall. (Flanagan Aff. ¶¶ 5–10, 14–19, & Exs. A, B; Stearns Aff. ¶¶ 13–16, 18–24, & Exs. A, B). [8] The record documenting the decision of the Program Committee assigning plaintiff to the mess hall detail was dated August 16, 2007 and was signed by someone other than defendant

2010 WL 3418393

Flanagan, who would, as the committee chair, sign such forms on days that she worked. (Flanagan Aff. ¶¶ 5–10 & Ex. A).

[8]     Defendant Flanagan submitted a copy of her employee time sheet showing she had taken eight hours of personal leave the day plaintiff met with the Program Committee. (Flanagan Aff. ¶¶ 14–16 & Ex. B). Defendant Stearns also noted her absence on August 16, 2007 on his personal calendar for that day. (Stearns Aff. ¶¶ 18–23 & Ex. B).

Defendant Stearns was the Deputy Superintendent for Program Services at Bare Hill, and supervised the Program Committee. However, he was "not a member [of that committee] and ha[d] no direct involvement in its meetings and decisions." (Stearns Aff. ¶ 9). He "was not present at the Committee meeting [on August 16th] and had nothing to do with the Committee's decision to assign Cooke to the mess hall." (Stearns Aff. ¶ 17). Plaintiff admitted as much during his deposition. (Dep. at 75, 82). [9]

[9]     *See* Dep. at 75 ("Mr. Sterns doesn't assign people to a program. He is the director of programs ...."); 82 (Stearns not at committee meeting and had no role in mess hall assignment).

About a week before plaintiff met with the Program Committee, he had been cleared by the medical department at Bare Hill to work in the mess hall. (Stearns Aff. ¶¶ 33–35 & Ex. E). Plaintiff recalled being interviewed and examined by a nurse, but opined that it was not a thorough examination, and he disagreed with her conclusion that he was physically able to do mess hall work. (Dep. at 34–42, 48). He told her about his recent surgery and said he could not do strenuous work. (Dep. at 37, 41). Plaintiff told the nurse he was able to participate in programs, but claims that neither he, nor the nurse, specifically discussed mess hall work. (Dep. at 36, 41).

On August 18, 2007, plaintiff submitted a handwritten "Request for Reasonable Accommodation," and was instructed to re-submit his request on the proper form, which plaintiff did on August 24th. (3/4/2009 Memo. Decision and Order of Judge Sharpe, Dkt. No. 16, at 12–13; AC at 10). Plaintiff requested a change in program and facility due to the problems with his right foot and leg. (*Id.* at 13–14; AC at 10). The request was forwarded to the medical staff for evaluation on or before August 28, 2007. [10] On September 11, 2007, Dr. Connally, a facility physician, told Defendant Stearns "that Mr. Cooke's leg was infected, that Cooke was

not caring for it properly and that he should be transferred to a wheel chair access facility." (Stearns Aff. ¶¶ 27–29 & Ex. C; AC at 10). On September 12th, defendant Stearns signed the "Determination" section of the form which stated that plaintiff's transfer to a wheelchair-accessible facility was being processed, and noted that the doctor had recommended removal from the mess hall work assignment. (3/4/2009 Memorandum Decision and Order at 14; AC at 10). In the "Inmate Receipt" portion of the form, plaintiff stated that he agreed with defendant Stearns's determination. (*Id.* at 14–15; AC at 10).

[10]    Plaintiff was initially advised in a 8/28/07 memorandum from defendant Stearns that his request for a program change needed to be addressed through defendant Flanagan. (*Id.* at 14; Dep. at 73). Plaintiff claims that he wrote defendant Flanagan to request a change of programs and was denied. (Dep. at 73, 75, 90–91). No copies of such correspondence have been provided to the court.

**\*3** Plaintiff believes that, on or about September 12, 2007, the medical staff at Bare Hill found that the area where his leg had been amputated was infected. (AC at 1; Dep. at 78, 87–88). Plaintiff has acknowledged that, as soon as defendant Stearns became aware of the infection in plaintiff's leg, plaintiff was removed from his mess hall work assignment. (Dep. at 79–80, 85; Stearns Aff. ¶¶ 27–30). Plaintiff also admitted that the woman who assigned him to work in the mess hall (whom the plaintiff believed to be defendant Flanagan), was not trying to harm him or cause him any physical pain. "She simply didn't know. She couldn't know because she didn't read the [medical] chart." (Dep. at 81).

On October 17, 2007, plaintiff was running a temperature of 104 degrees and was transferred to Alice Hyde Medical Center, and then to Albany Medical Center, for evaluation. (AC at 1; Dep. at 82). Apparently, the infected part of the leg was then surgically removed. (AC at 1; Dep. at 85). Plaintiff was returned to Bare Hill where he was required to walk on crutches to obtain follow-up medical care. On October 31, 2010, he fell on a walkway while en route to the infirmary to change the dressing on his leg, suffering further injury. (AC at 4; Dep. at 84–85).

## II. *Summary Judgment*

As noted above, plaintiff's only remaining claim is that defendants Stearns and Flanagan violated his Eighth Amendment rights by assigning him to a mess hall work

detail. Defendants seek summary judgment, arguing that they were not personally involved in plaintiff's program assignment, and that plaintiff cannot establish that they acted with deliberate indifference to plaintiff's health and safety. For the reasons stated below, this court agrees with the defendants' position and recommends that summary judgment be granted, and that the remaining claim in the amended complaint be dismissed in its entirety.

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*4** In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee*

*v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). [11]

[11]    The liberal pleading standards for *pro se* litigants do not excuse them from following the procedural formalities of summary judgment. *Govan v. Campbell,* 289 F.Supp.2d at 295. Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." This rule may be applied against *pro se* litigants; and a court is not obliged to conduct an independent review of the record to find proof of a factual dispute where, as here, a *pro se* plaintiff has failed to respond to the summary judgment motion in accordance with the applicable rules. *Id.* However, given the history relating to the service of the summary judgment motion, this court has considered plaintiff's amended complaint and his deposition testimony in determining whether there are material issues of fact in dispute.

### B. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing

subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009) (stating that defendant could be liable under section 1983 if he failed to remedy constitutional violation after learning of it or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### 1. Defendant Stearns

Defendant Stearns lacked personal involvement in the Program Committee's decision to assign plaintiff to the mess hall because, as noted above, he was not a member of the committee and had no direct involvement in its meetings and decisions. He cannot be deemed personally involved in the decisions of the Program Committee merely because he supervised it. *See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (doctor who oversaw the facility's medical staff could not be deemed personally involved in the decisions merely because of his supervisory status).

**\*5** When defendant Stearns first learned, from a staff physician, that plaintiff's work assignment was inappropriate given his medical condition, he promptly directed that plaintiff be removed from his mess hall job. Plaintiff has made no allegation, much less a plausible showing, that defendant Stearns created a relevant custom or policy or was grossly negligent in his supervision of subordinates who made plaintiff's job assignment. In short, defendant Stearns cannot be liable for plaintiff's job assignment because there is indication that he was "personally involved." *See, e.g., Wilson v. Johnson,* 999 F.Supp. 394, 400 (W.D.N.Y.1998) (facility superintendent was not personally involved in the work assignment of an inmate when there was no evidence indicating he was advised about any health risk connected to the job assignment, that he was so advised and failed to take corrective action, that he created or carried out a policy exposing inmates to unsafe work assignments, or that he was grossly negligent in supervising subordinates)

### 2. Defendant Flanagan

As discussed above, the defendants have submitted persuasive documentary evidence to corroborate defendant Flanagan's sworn affidavit that she did not participate in the assignment of plaintiff's work detail because she was not working on the day the Program Committee met with him. Plaintiff's claims that defendant Flanagan presided at the meeting during which he was assigned to work in the

mess hall are inconsistent and appear to be based on a mere assumption that she must have been present because she was the chair of the committee. (Dep. at 24, 57–59). [12] In light of the overwhelming contrary, documentary evidence, plaintiff's conclusory allegations of defendant Flanagan's personal involvement in his job assignment are not sufficient to create a material issue of fact. *See, e.g., Mccloud v. Roy,* 9:08–CV–839, 2010 WL 985731, at *7 (N.D.N.Y. Feb. 22, 2010) (plaintiff's conclusory allegation that he requested a bottom bunk placement from prison doctor is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (plaintiff's conclusory allegation that he was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")). [13] *See also Atkinson v. Fischer,* 9:07–CV–368 (GLS/GHL), 2009 WL 3165544 at * 11, 2009 (N.D.N.Y. Sept. 25, 2009) (granting summary judgment in favor of defendants who were not in any way involved in inmate plaintiff's job assignment).

[12]    *See e.g.,* Dep. at 24 ("I don't know the ... name [of the 'lady' who said 'you are going to be assigned in the mess hall']. I know she was assigned to, she was the head person at that program. I would say it would be Ms. Fine (phonetic) as far as I know going by what I wrote."; 57 ("I was introduced to everybody and I know that Ms. Flanagan was there.... Why I'm so keen on Ms. Flanagan is because she was the head person."); 58 ("... I don't remember the women, I don't remember the sergeant.... So Ms. Flanagan was in charge of the program and if you had any reason write Ms. Flanagan for change of program, that's what you would do.... I didn't just pull Ms. Flanagan's name out of a hat."; 59 ("the reason I named her because she is the one that assigned people.")

[13]    *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be

impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

In his deposition, plaintiff also makes conclusory and unsupported claims that, on several occasions after his meeting with the Program Committee, he wrote defendant Flanagan "requesting a change of programs due to the fact it's strenuous to me." (Dep. at 91). Given that none of this alleged correspondence has been submitted to the court, the court concludes that plaintiff's conclusory allegations are insufficient to establish defendant Flanagan's personal involvement in failing to change his program placement during the month or so he worked in the mess hall. *See, e.g., Wilson v. Johnson,* 999 F.Supp. at 400. In any event, as discussed below, there is no indication that, even if defendant Flanagan declined to change plaintiff's placement based on his general complaints, she could be found deliberately indifferent to his health and well-being.

### 3. Unnamed Potential Defendants

*6 Although defendants Stearns and Flanagan were not personally involved in the initial decision to assign plaintiff to a mess hall work assignment, there were clearly several other unidentified staff members at Bare Hill who were. In *Davis v. Kelly,* the Second Circuit discussed the circumstances under which a court should not dismiss otherwise colorable section 1983 claims against supervisory personnel who deny personal involvement until a *pro se* plaintiff has been afforded an opportunity, through at least brief discovery, to identify the subordinate officials who have personal liability. *Davis v. Kelly,* 160 F.3d 917, 920–21 (2d Cir.1998). The *Davis* court held:

> ... [W]hen a *pro se* plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur

without an opportunity for additional discovery.

*Davis v. Kelly,* 160 F.3d at 922.

In this case, the dismissal of plaintiff's claim should not be delayed, based on *Davis,* to provide him an opportunity to conduct further discovery to identify those who were personally involved in his job assignment. First, *Davis* involved the decision to transfer of an inmate from one facility to another. Because of security issues related to prison transfers, the decision-making process is not transparent to inmates; the identity of the decision makers and the reasons for the transfer are often not disclosed. Hence, inmate plaintiffs might understandably have difficulty identifying who was involved in their transfer. *See, e.g., Smith v. Greene,* 9:06–CV–505, 2010 WL 985383, at *5–8 & n. 7 (N.D.N.Y. Feb. 3, 2010). This case involves prison job assignments, for which the process is more transparent. The decision relating to plaintiff's job assignment was made in his presence by a committee of three individuals, who, plaintiff claims, introduced themselves to him. (Dep. at 57). With a level of diligence reasonable for a *pro se* litigant, the plaintiff could have correctly identified the facility staff members involved in his job assignment if he chose to do so.

Furthermore, for the reasons discussed below, plaintiff's pending claim that his Eighth Amendment rights were violated is not "colorable" because he cannot establish that the actual members of the committee acted with deliberate indifference to his health and welfare. As noted above, the medical staff at the prison had cleared plaintiff for a mess hall job assignment before the committee met, so they had no reason to know that such an assignment might be detrimental to his health.

### C. Eighth Amendment Claim

### 1. Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d

2010 WL 3418393

Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate working conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834. Plaintiff's claim may also be analogized to a claim for inadequate medical care, which similarly requires proof of deliberate indifference. *See, e .g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (prisoner alleged Eighth Amendment medical claim when he alleged that prison guards deliberately ignored doctor's order that prisoner pursue exercise in prison gym); *Atkinson v. Fischer,* 2009 WL 3165544 at *11 (applying Eighth Amendment standards for medical care in analyzing claim that plaintiff was assigned to a prison job that was inappropriate, given his medical condition).

*7 "The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). An inmate may satisfy the objective prong by alleging that his prison work duties created a substantial risk of serious injury or harm. *Howard v. Headly,* 72 F.Supp.2d 118, 123–124 (E.D.N.Y.1999) (collecting cases).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

**2. Application**
As discussed above, during the month or so he worked in the mess hall, the plaintiff developed an infection in the area above where his foot had previously been amputated. When he was re-examined by the medical staff, a prison doctor determined that the mess hall assignment was no longer appropriate given plaintiff's medical condition. Plaintiff

ultimately required surgery to remove another six inches or so of his leg stump. However, the prison doctor concluded that plaintiff's infection was caused, in part, by plaintiff's failure to properly care for his surgery wound. Furthermore, plaintiff admitted that, even before he returned to prison, he was advised that he would require additional surgery to remove another several inches of his leg stump. (Dep. at 28, 32–33). While it is unnecessary to decide the issue, this court will assume for the purposes of this decision that there was a material issue of fact regarding whether plaintiff's initial work assignment exposed him to a substantial risk of further injury and harm. However, to avoid summary judgment, there must also be a genuine issue of fact regarding whether the defendants were aware of a substantial risk of harm to plaintiff from his work assignment and knowingly disregarded that risk.

Plaintiff has not come forward with any evidence to overcome the defendants' showing that they, and the other prison officials who may have been involved in plaintiff's work assignment, did not act with deliberate indifference to his health and safety. When the members of the Program Committee (which did not include defendant Flanagan) initially assigned plaintiff to work in the mess hall, they relied upon the judgment of the prison medical staff, [14] which specifically cleared plaintiff for that job placement. [15] *See, e.g., Wilson v. Johnson,* 999 F.Supp. at 399–400 (finding no issue of fact suggesting deliberate indifference relating to plaintiff's job assignment where there was no significant evidence of medical (back) problems at the time of the initial assignment). Plaintiff admitted that the woman presiding at his Program Committee meeting was not trying "to kill me or cause me any physical pain." "She simply didn't know." (Dep. at 81).

[14]      *See* Dep. at 59 (the woman presiding at the Program Committee meeting who made plaintiff's job assignment had his medical charts).

[15]      While there are no remaining named defendants who might have been involved in the original medical clearance of plaintiff to work in the mess hall, there is no indication that the nurse who made that medical judgment acted with deliberate indifference to plaintiff's health. Plaintiff complains that the nurse did not perform a sufficiently thorough examination of him and he clearly disagreed with her ultimate decision. However, he alleges nothing to suggest that the

nurse knew of, and deliberately disregarded, a substantial risk of serious medical harm from his job assignment. (Dep. at 35–42, 48). Plaintiff told the nurse he could participate in programs and "walk around," although he claims they did not discuss the feasibility of mess hall work. (Dep. at 36, 42, 48). Even if the original examination of plaintiff and his work clearance constituted malpractice, that would not suffice to support an Eighth Amendment claim of deliberate indifference. *See, e.g., Estelle v. Gamble,* 429 U.S. at 100–101, 106–107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

**\*8** Plaintiff alleges that defendants Flanagan and Stearns ignored his appeals to remove him from his job assignment for health reasons after the initial assignment. Even if plaintiff's unsupported allegations regarding his written requests to defendant Flanagan are credited, he only told her that his work was "strenuous" (Dep. at 91), which hardly put her on notice that he was being exposed to a serious infection involving his amputated leg. *See, e.g., Wilson v.. Johnson,* 999 F.Supp. at 400 (corrections counselor was not involved in any constitutional violation involving inmate's job assignment when his complaints about his mess hall job did not mention the back problems that he now alleges were aggravated by the work). When defendant Stearns learned of plaintiff's infection, he promptly had him removed from the mess hall work detail.[16] Plaintiff conceded that Stearns "was pretty decent" in how he addressed his request for accommodations. (Dep. at 95). Even assuming that plaintiff's various claims about the defendants' intentions are true and accurate, he has

provided nothing to suggest that they acted with deliberate indifference. Hence, even if the named defendants were personally involved in plaintiff's job assignment, this court would still recommend dismissal of the pending Eighth Amendment claim.

[16]     *See, e.g., McCray v. Coughlin,* 101 F.3d 1392 (table), 1996 WL 368722 at \*2, (2d Cir.1996) (prison doctor who revoked plaintiff's "general pass," requiring him to seek specific permission before he would be excused from a work program, did not act with deliberate indifference, particularly when he subsequently issued a month-long direction excusing plaintiff from lifting more than 20 pounds)

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (Dkt. No. 24) be **GRANTED** and the remaining claim in the amended complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3418393

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3165544

2009 WL 3165544
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John R. ATKINSON, III, Plaintiff,

v.

Brian FISCHER, Acting Commissioner, N.Y. State
Department of Correctional Services; John J.
Donelli, Superintendent, Bare Hill Correctional
Facility; Dr. Ira Weissman, Facility Physician,
Bare Hill Correctional Facility, Defendants.

No. 9:07–cv–00368 (GLS/GHL).
|
Sept. 25, 2009.

West KeySummary

1    **Prisons** 🔑 Disability or Illness

**Sentencing and Punishment** 🔑 Medical
Care and Treatment

An inmate failed to state an Eighth Amendment
claim for deliberate indifference when he was
assigned a top bunk placement as there were
no facts available to prison officials from which
they could have drawn the inference that he
required a bottom bunk placement upon his
transfer to their facility. It was undisputed
that his transfer paperwork made no mention
of requiring a bottom bunk bed. The inmate
asserted he had reported vertigo to physicians but
that information did not appear on his transfer
records. Prison officials placed him into a bottom
bunk after he fell from the top bunk. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983; Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**Attorneys and Law Firms**

John R. Atkinson, III, Bayport, NY, pro se.

Hon. Andrew Cuomo, New York Attorney General, Steven H.
Schwartz, Assistant Attorney General, of Counsel, Syracuse,
NY, for the Defendants.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Steven H. Schwartz, Esq., of Counsel, Albany,
NY, for Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, District Judge.

**I. *Introduction***

 **\*1**  The above-captioned matter comes to this court
following a Report–Recommendation and Order (R & R) by
Magistrate Judge George H. Lowe, filed July 10, 2009. (Dkt.
No. 44.) The R & R [1] recommended that defendants' motion
for summary judgment be granted in its entirety. Pending are
Atkinson's objections to the R & R. (Dkt. No. 45.) For the
reasons that follow, the R & R is adopted in its entirety.

[1]     The Clerk is directed to append the R & R to this
decision, and familiarity therewith is presumed.

**II. *Background***

John R. Atkinson, III, a former inmate at Bare Hill
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983, alleging that defendants violated his constitutional
rights when he was: (1) assigned to a top bunk despite
a physical impairment allegedly entitling him to a bottom
bunk; [2] (2) assigned to a job requiring manual labor despite
his impairment; denied adequate medical care; and (4)
discriminated against in the provision of medical care. (*See
generally* Am. Compl., Dkt. No. 7.) Defendants moved
for summary judgment, arguing *inter alia* that Atkinson
failed to allege defendants' personal involvement in any
unlawful conduct, and that Atkinson's claims regarding bunk
placement, job assignment, and inadequate medical care are
meritless.

[2]     Atkinson was transferred from Downstate
Correctional Facility to Bare Hill Correctional
Facility in October 2005. (*See* Am. Compl. at ¶¶
8, 10, Dkt. No. 7.) Atkinson has conceded that

his transfer paperwork made no mention of him needing a bottom bunk. (*See* Objections at ¶ 4(a), Dkt. No. 45.)

On July 10, 2009, Magistrate Judge Lowe recommended dismissal of all of Atkinson's claims. The court will now review the R & R and the objections raised by Atkinson.

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan.18, 2006).* In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the magistrate judge's findings and recommendations for clear error. *See id.*

### IV. *Discussion*

#### A. *Bunk Placement Claim*

In recommending the dismissal of Atkinson's bunk placement claim, Judge Lowe explained that "there were no facts available to Defendants from which they could have drawn the inference that Plaintiff required a bottom bunk placement upon his transfer to Bare Hill Correctional Faciltiy" and that there "is no evidence that Defendants actually drew that inference." (*See* R & R at 20, Dkt. No. 44.) Atkinson responds that although defendants may not have initially known of his need for a bottom bunk, "other exhibits show that when the *facility* was made aware of the need for a bottom bunk ... it took two years to get it." (*See* Objections at ¶ 4(a), Dkt. No. 45 (emphasis added).) This two-year delay, he claims, "meets the deliberate indifference standard." (*Id.* at ¶ 4(g).) The court will review this portion of the R & R de novo. *See Almonte,* 2006 WL 149049, at *6–7.*

**\*2** Upon de novo review, the court concurs with Judge Lowe's findings as to Atkinson's bunk placement claim. Initially, Atkinson's claim that it took the facility two years to provide a bottom bunk is belied by the record.[3] Moreover, even crediting Atkinson's argument that the facility knew of and failed to address his need for a bottom bunk, there

is, as Judge Lowe explained, no evidence that defendants were personally aware of that need or that they deliberately disregarded it. Accordingly, the court adopts the portion of the R & R dismissing Atkinson's bunk placement claim.

[3]    CORC's records, as submitted by Atkinson, indicate that Atkinson, despite having no medical need for one, received a bottom bunk no later than December 12, 2006, less than one year after his January 16, 2006 injury. (*See* Am. Compl. at 28, Dkt. No. 7.) This was also less than two years from his October 2005 transfer to Bare Hill. (*See id.* at ¶ 10.)

#### B. *Job Assignment*

Judge Lowe next recommended the dismissal of Atkinson's job assignment claim, explaining that "there is no evidence ... that any of the named Defendants were involved at all in the decision to assign Plaintiff to the porter job, much less that in doing so they were deliberately indifferent." (R & R at 22, Dkt. No. 44.) In response, Atkinson contends that he was assigned to the porter job "after the *facility* knew Plaintiff was injured," thereby "showing deliberate indifference." (Objections at ¶ 4(e), Dkt. No. 45 (emphasis added).) The court will review this portion of the R & R de novo.

Upon de novo review, the court concurs with Judge Lowe's findings as to Atkinson's job assignment claim. Even crediting Atkinson's claim that the facility knew of his injury prior to the job assignment, there is no evidence that defendants were personally aware of the injury or involved in assigning the job to Atkinson. Accordingly, the court adopts the portion of the R & R dismissing Atkinson's job assignment claim.

#### C. *Inadequate Medical Care Claim*

Judge Lowe next recommended the dismissal Atkinson's medical care claim. (*See* R & R at 25, Dkt. No. 44.) He found that while the delays Atkinson experienced in receiving medical attention were "somewhat troubling," they did not rise to the level required by the "deliberate indifference" standard. (*Id.* at 24.) Despite the imperfections of the system, he explained, "Plaintiff was evaluated by medical personnel frequently, prescribed pain medication, and given X-rays," and that "Dr. Ferrari and Dr. Weissman periodically examined him and reviewed his medical records." (*Id.* at 25.)

Atkinson's objections to this conclusion are somewhat unclear. He appears to claim only that Judge Lowe mischaracterized certain time periods related to his injury and treatment. Specifically, Atkinson identifies three treatment dates set forth in the "Background" section of the R & R and details the number of months that had passed between the time of his injury and each of those three dates. (*See* Objections at ¶ 4(c), (d), (f), Dkt. No. 45 .) The court is unsure of what Atkinson is attempting to show with these statements. Upon comparing the time spans stated in Atkinson's objections with the chronology of Atkinson's treatment set out by Judge Lowe in the R & R, there is no meaningful discrepancy .[4] Moreover, Judge Lowe specifically acknowledged these delays and weighed their significance in drawing his final conclusion. (*See* R & R at 23–25, Dkt. No. 44.) And even if the medical care and treatment provided to Atkinson were in some way deficient, there exists no evidence in the record that defendants were in any way personally involved with providing or withholding that care and treatment.[5] Accordingly, the court adopts the portion of the R & R dismissing Atkinson's medical care claim. (*See* R & R at 25, Dkt. No. 44.)

[4]    The only discrepancy is one of computation. In his objections, Atkinson identifies a portion of the R & R which states that Dr. Weismann recommended physical therapy for Atkinson on January 31, 2007. The record indicates that this date is correct, and Atkinson does not appear to challenge its accuracy. Instead, after identifying this date in his objections, Atkinson states, *"Two years* after injury." (*See* Objections at ¶ 4(f), Dkt. No. 45 (emphasis in original).) Because Atkinson suffered his injury on January 16, 2006, a year and fifteen days prior to Dr. Weismann's recommendation, the two-year claim is erroneous and appears to be little more than an error in computation.

[5]    In his objections, Atkinson states that defendants Fischer and Donelli are personally involved because they were informed of the delays in Atkinson's medical treatment, yet did nothing to remedy it. (Objections at ¶ 4(I), Dkt. No. 45.) As noted above, however, there is no evidence that either defendant personally knew of or was involved with the delays Atkinson experienced.

**\*3**  Finally, Atkinson has not objected to the remaining portions of the R & R. After review of those portions for clear error, the court finds no error and adopts the R & R's recommendations as to those portions.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Lowe's July 10, 2009 Report–Recommendation and Order is adopted in its entirety; and it is further

**ORDERED** that the Clerk provide copies of this Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff John R. Atkinson III alleges that Defendants Brian Fischer (the commissioner of the New York State Department of Correctional Services), John J. Donelli (the superintendent of Bare Hill Correctional Facility), and Dr. Ira Weissman (a physician at Bare Hill) violated his constitutional rights by assigning him to a top bunk, assigning him to a job that required physical exertion, providing inadequate medical care, and providing preferential medical treatment to Jewish inmates. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 41.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. BACKGROUND

Plaintiff entered the New York State Department of Correctional Services ("DOCS") system on September 28, 2005. He was initially housed at Downstate Correctional Facility. (Dkt. No. 7 at ¶ 8.) Plaintiff alleges that he completed a brief medical history at Downstate in which he stated that he suffered from asthma, vertigo, and dizziness associated with his medication. (Dkt. No. 7 at ¶ 9.)

Plaintiff was transferred to Bare Hill Correctional Facility in October 2005. (Dkt. No. 7 at ¶ 10.) He alleges that he was assigned to a top bunk "even though history from Down[s]tate

Facility should have classified him as a 'Medical Bottom.' " (Dkt. No. 2 at ¶ 11.) Plaintiff's transfer paperwork [1] made no mention of Plaintiff requiring a bottom bunk. (Dkt. No. 41–3, Defendants' Rule 7.1(a)(3) Statement at ¶ 8; Dkt. No. 43–2, Plaintiff's Opposition to Motion for Summary Judgment at ¶ 8.)

[1]    Defendants' motion for summary judgment is supported by prison records, including grievance records and medical records. Motions for summary judgment must be supported by admissible evidence. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Hearsay evidence is not admissible unless it falls within an exception to the hearsay rule. Fed.R.Evid. 802. Medical and prison grievance records, although hearsay, may be admissible under the business records exception to the hearsay rule. That exception renders admissible records of "acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge" but only if such records are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Facts supporting admissibility must be supplied "by the testimony of the custodian or other qualified witness or by certification" that complies with Federal Rule of Evidence 902. Fed.R.Evid. 803(6). Here, none of the records are supported by any affidavit and have not been certified. Therefore, the records are not technically admissible. *See Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980). I have considered them, however, because Plaintiff relied on many of the same records in his complaint and in his opposition to the motion for summary judgment. I caution defense counsel that medical and grievance records should, in the future, be properly authenticated and accompanied by an affidavit or certification that complies with Rule 803.

On January 16, 2006, Plaintiff fell from the top bunk. (Dkt. No. 41–3 at ¶ 2.) He hit his head and neck. (Dkt. No. 7 at ¶ 12.) Plaintiff was escorted to the infirmary, where he was given ibuprofen and sent back to his cell. (Dkt. No. 7 at ¶¶ 14–15.) An inmate injury report was prepared, in which it was noted that there was no swelling, that the skin was intact, that Plaintiff was alert and oriented, that Plaintiff's pupils were equal and reacted to light, and that Plaintiff denied pain or injuries in his extremities or trunk. (Dkt. No. 41–4, Defendants' Ex. A.)

**\*4** Sometime after the fall, Plaintiff was assigned to a bottom bunk. (Dkt. No. 7 at 28 [2].)

[2]    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

Within a few days of the fall, Plaintiff alleges that he began experiencing severe headaches, neck aches, and dizziness. (Dkt. No. 7 at ¶ 16.) Plaintiff requested x-rays of his neck. (Dkt. No. 7 at ¶ 19.)

The chronology of Plaintiff's requests for x-rays and his receipt of results is somewhat unclear. Plaintiff alleges that his neck was not x-rayed until five months after the fall. (Dkt. No. 7 at ¶ 21 .) Attachments to the complaint indicate that Plaintiff had requested x-rays before he fell, and that he received at least some x-ray results within a few days of the fall. For instance, in a grievance filed by Plaintiff on the day after his fall, Plaintiff stated that he had waited four months for an x-ray, that he had been told it would be reviewed in 10 days, and that it had been 30 days. Plaintiff also complained that he was very dizzy and experienced headaches every day. He stated that he "was told I would be seeing a doctor" and requested a response in writing "as to how long I have to wait to see a physician." (Dkt. No. 7, Ex. A.) Plaintiff was instructed to come to sick call, where the nurse would give him the results of his x-ray. There was no response regarding his request to see a doctor. *Id.* Plaintiff's medical records show that he was given the results of the x-ray on January 20, 2006. (Dkt. No. 41–11, Defendants' Ex. H at 16.)

Plaintiff's medical records show that he was seen on January 31, 2006. At that time he complained of headaches and dizziness since his fall. It was noted that he was already scheduled to see the doctor. (Dkt. No. 41–11, Defendants' Ex. H at 15.)

On February 1, 2006, Plaintiff wrote another letter asking when he would see a doctor. (Dkt. No. 7, Ex. A1.) The response was that he was "scheduled to see the facility doctor ... We do not give exact dates for call outs, sorry!" *Id.*

On February 2, 2006, Plaintiff filed a "Request for Interview or Information." In the request, he stated that he had been told that there was no history of vertigo listed in his charts. He stated that he had compiled a more complete medical history. (Dkt. No. 7, Ex. B.)

Plaintiff's medical records show that on March 21, 2006, he complained of pain in the back of his neck. (Dkt. No. 41–11, Defendants' Ex. H at 15.)

On April 1, 2006, Plaintiff filed a grievance. (Dkt. No. 7 at ¶ 22.) He stated that when he fell out of his bunk, he had been placed on the "infamous 5 plus month waiting list to see the doctor ." He stated that his neck cracked each time he turned it and that he suffered daily headaches and dizziness. He complained that the only care he had received was motrin and ibuprofen. He stated that a nurse at sick call felt his neck and opined that there was something wrong with it and that he would probably be recommended for physical therapy. (Dkt. No. 7, Ex. C.)

 *5  Plaintiff's medical records show that on April 6, 2006, Plaintiff was seen by Dr. Ferrari, who ordered an x-ray of Plaintiff's spine. (Dkt. No. 41–11, Defendants' Ex. H at 14.)

In response to Plaintiff's April 1, 2006, grievance, Defendant Donelli stated that Plaintiff had been evaluated by a doctor on April 6, 2006. Donelli noted that "[x]-rays ordered at that time reveal degenerative changes at C6 and C7. No treatment was ordered at that time." (Dkt. No. 7 at ¶ 22, Ex. E.)

Plaintiff's medical records show that on June 2, 2006, Plaintiff complained of stiffness and pain in his neck that had lasted for several months. He claimed that his niece, who is a physical therapist, assessed his neck as being "distorted." Plaintiff was scheduled to see a doctor. (Dkt. No. 41–11, Defendants' Ex. H at 13.)

Plaintiff's medical records show that on July 21, 2006, Plaintiff complained of neck pain and stated that he had had some relief from ibuprofen. He was told to report to nurse sick call. A doctor's review regarding ibuprofen was ordered. (Dkt. No. 41–11, Defendants' Ex. H at 12.)

On August 11, 2006, Plaintiff filed a "Request for Interview or Information." He stated that since receiving Defendant Donelli's response to his April 1, 2006, grievance, he had been to the infirmary three times. Each time he was denied pain medication and told that a prescription had been ordered for

him. He asked "when something is going to be done for me with regards to an injury I sustained at this facility?" (Dkt. No. 7, Ex. I.) On August 14, 2006, staff responded that Plaintiff was scheduled to see the doctor "very soon." *Id.*

Defendant Dr. Weissman examined Plaintiff on August 14, 2006. Plaintiff had pain on neck flexing and minimal tenderness elsewhere. Based on the examination and Plaintiff's medical record, Dr. Weissman diagnosed Plaintiff with moderate to severe degenerative disc disease. Dr. Weissman prescribed Naprosyn (an anti-inflammatory drug), Robaxin (a muscle relaxant), and lab work. (Dkt. No. 41–15, Weissman Aff. at ¶ 6.) Plaintiff alleges that Dr. Weissman told Plaintiff to notify him if there were any adverse side effects or if the medication failed to relieve Plaintiff's symptoms. (Dkt. No. 7 at ¶¶ 26–27.)

Plaintiff's medical records show that on September 6, 2006, Plaintiff reported that the medication was not giving him any relief. He was scheduled for a doctor's call out. (Dkt. No. 41–11, Defendants' Exhibit H at 12.)

Plaintiff's medical records show that on September 19, 2006, Plaintiff again complained of constant neck pain and stated that the medications were not effective. The medical record states that Plaintiff "is scheduled to see MD." (Dkt. No. 41–11, Defendants' Ex. H at 11.)

In September 2006, Plaintiff was assigned a job that required him to sweep, mop, and shovel snow. The job caused him physical pain and he filed a grievance requesting a new assignment. (Dkt. No. 7 at ¶ 41, Ex. J.) The grievance was denied by R. Donaldson. The response stated that Plaintiff needed "to contact medical in order to be evaluated for potential restrictions. Without standing restrictions, [Plaintiff] must program as instructed. Failure to program may result in disciplinary sanctions." (Dkt. No. 7, Ex. L.)

 *6  On October 4, 2006, Plaintiff wrote to Dr. Lester Wright, the Chief Medical Officer, asking to be reclassified to a bottom bunk and limited work status. (Dkt. No. 7, Ex. H.) Dr. Wright's office responded that Plaintiff was "approved to see the facility physician" and that it "appears that your medical needs are being met." (Dkt. No. 7 at 26 [3] .) A month later, Dr. Wright's office sent Plaintiff an identical letter. (Dkt. No. 7 at 27 [4] .)

3    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

4    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

On December 6, 2006, the Central Office Review Committee noted that Plaintiff was no longer assigned to the porter position or to a top bunk, but that "there is no medical necessity for a program restriction or bottom bunk permit." (Dkt. No. 7 at 28 [5] .)

5    This exhibit to Plaintiff's complaint is not labeled with a letter. The page number in the citation refers to the page number assigned by the Court's electronic filing system.

Plaintiff's complaint alleges that he sent a letter to Defendant Fischer, who responded that Plaintiff's needs were being met. (Dkt. No. 7 at ¶¶ 35–36.) In his opposition to the motion for summary judgment, Plaintiff states that he actually sent this letter to and received a response from former DOCS Commissioner Glenn Goord. (Dkt. No. 43–2 at ¶ 7.)

Plaintiff's medical records show that he saw Dr. Weissman on January 31, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 8.) In an affidavit filed in support of Defendants' motion for summary judgment, Dr. Weissman states that Plaintiff's symptoms "were similar to those he revealed previously, and my diagnosis was similar, as well. Therefore, I continued the Naprosyn, but prescribed Flexeril in place of Robaxin, as it is a more powerful muscle relaxant." (Dkt. No. 41–15 at ¶ 7.)

Plaintiff alleges that the Flexeril did not relieve his pain and caused psychological side effects. (Dkt. No. 7 at ¶ 39.) Plaintiff's medical records show that on February 7, 2007, he directed a "Request for Interview or Information" to Dr. Weissman, requesting that he be allowed to return all of the medications in his possession and "move forward without drugs." (Dkt. No. 41–11, Defendants' Ex. H at 7.) Dr. Weissman discontinued the Flexeril on February 19, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 8; Dkt. No. 41–15 at ¶ 7.)

Dr. Weissman states that he recommended physical therapy for Plaintiff after seeing him on January 31, 2007. (Dkt. No.

41–15 at ¶ 7.) Plaintiff alleges that eighteen months after sustaining his injury, he was taken to Franklin Correctional Facility, where he was left shackled and handcuffed for four hours before seeing a therapist. (Dkt. No. 7 at ¶ 42.) He was then told to return in two weeks. (Dkt. No. 7 at ¶ 43.) Plaintiff alleges that the physical therapist told Plaintiff that he was recommending a neck brace. *Id.*

Plaintiff's medical records show that he attended physical therapy on February 28, March 26, March 28, April 4, April 9, April 11, April 18, and April 25, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 2–4, 6.)

Plaintiff's medical records show that on May 8, 2007, Plaintiff complained that he had not been to physical therapy since April 25. (Dkt. No. 41–11, Defendants' Ex. H at 2.)

**\*7** Plaintiff alleges that he went to sick call on May 24, 2007. (Dkt. No. 7 at ¶ 44.) He was told that there was no record of a prescription for a neck brace and that because he had one physical therapy session left, he could not apply for a renewal. *Id.* Plaintiff's medical records show that at this sick call session, Plaintiff complained that he had not been to physical therapy since April 25. The nurse noted that Plaintiff should have one physical therapy session remaining. (Dkt. No. 41–11, Defendants' Ex. H. at 1 .)

Plaintiff's medical records show that he reported continued neck pain on May 29, 2007. (Dkt. No. 41–11, Defendants' Ex. H at 1.)

Plaintiff alleges that throughout this period he was denied ibuprofen on numerous occasions. (Dkt. No. 7 at ¶ 32.)

Plaintiff alleges that a Jewish inmate told him that he never waited more than a few days to see a doctor because "Jews take care of their own." Plaintiff alleges that "[i]f the inmate's claim is true, Dr. Weismann ... would be guilty of discrimination." (Dkt. No. 7 at ¶ 47.)

Plaintiff's complaint requests a second opinion about his medical condition, an MRI, $400,000 in compensatory damages, $1 million in punitive damages, and payment for future medical needs. (Dkt. No. 7 at ¶ 55.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7] In determining whether a genuine issue of material [8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [9]

[6]     *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

[7]     *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

[8]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[9]     *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced their failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [10] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

[10]     The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [11] or (2) a challenge to the legal cognizability of the claim. [12]

2009 WL 3165544

11    See 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a) (2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

12    See *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b]

[6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion—one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [13] The main purpose of this rule is to "facilitate a proper decision on the merits." [14]  A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [15]

13    *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

14    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

15    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord,*

2009 WL 3165544

*Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not *shown*— that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [16] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [17] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

[16]    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[17]    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003)

[citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [18] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [19] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [20] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [21] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [22]

[18]    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering

2009 WL 3165544

subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

19    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

20    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

21    *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

22    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process—was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing—were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising

under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[23] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[24] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[25] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[26]

23    *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

24    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of

*Prezzi v. Schelter,* 469 U.S. 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

25      *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

26      *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Official Capacity

Plaintiff has sued Defendants in their individual and official capacities. (Dkt. No. 7, caption.) Defendants argue that the claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 41–16 at 2–3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens

or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacities.[27] All DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

27      *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons.

But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05–CV–0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

Here, the face of the complaint alleges that each Defendant has an official position with DOCS. (Dkt. No. 7 at ¶¶ 3–5.) Therefore, any claims against the Defendants in their official capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants in their official capacities.

**B. Claims Regarding Top Bunk Placement**

*10 Plaintiff claims that his constitutional rights were violated when he was assigned to a top bunk upon his transfer to Bare Hill Correctional Facility, resulting in his fall two months later. (Dkt. No. 7 at ¶ 11.) Defendants argue that Plaintiff has not raised a genuine issue of material fact that the top bunk placement violated Plaintiff's constitutional rights. (Dkt. No. 41–16 at 12–13.) Defendants are correct.

Plaintiff's claim regarding his top bunk placement can be analyzed either as an Eighth Amendment conditions of confinement claim or an Eighth Amendment medical care claim. In order for Plaintiff to succeed on either claim, he must show that the defendants acted with deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Deliberate indifference to a condition of confinement exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, to establish medical deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703.

Here, Plaintiff cannot raise a genuine issue of material fact that Defendants acted with deliberate indifference regarding his top bunk placement. It is undisputed that when Plaintiff transferred to Bare Hill Correctional Facility from Downstate Correctional Facility on October 21, 2005, his transfer paperwork made no mention of Plaintiff requiring a bottom bunk. (Dkt. No. 41–3, Defendants' Rule 7.1(a)(3) Statement at ¶ 8; Dkt. No. 43–2, Plaintiff's Opposition of Motion for Summary Judgment at ¶ 8.) Plaintiff asserts that he had reported vertigo to physicians at Downstate, but that information does not appear in his transfer records. *Id.* Rather, the transfer records show only that Plaintiff complained of pain in his lower back and shoulder. (Dkt. No. 41–10, Defendants' Ex. G at 3.) As a result, there were no facts available to Defendants from which they could have drawn the inference that Plaintiff required a bottom bunk placement upon his transfer to Bare Hill Correctional Facility. Further, there is no evidence that Defendants actually drew that inference. Moreover, Defendants placed Plaintiff in a bottom bunk sometime after the fall. (Dkt. No. 7 at 28.) Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim regarding his top bunk placement.

**C. Claims Regarding Porter Position**

*11 Plaintiff claims that his constitutional rights were violated when he was assigned to a porter position in September 2006. (Dkt. No. 7 at ¶ 41.) Defendants argue that Plaintiff has not raised a genuine issue of material fact. (Dkt. No. 41–16 at 13–14.) Defendants are correct.

Defendants have addressed this claim as a due process issue. Defendants correctly note that prisoners do not have a liberty

interest in the job of their choice. *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996). However, that fact is relevant only in cases where prisoners claim that they have been removed from a job against their will, for instance by being confined to the SHU. Here, Plaintiff's claim is *not* that he was removed from the job of his choice but rather that he was forced to do a job that he claims he was physically unable to perform. Therefore, I find that the claim is more appropriately addressed as an Eighth Amendment medical care issue.

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

At the time he was assigned to the porter position, Plaintiff had been diagnosed with degenerative disc disease. (Dkt. No. 41–15 at ¶ 6.) Degenerative disc disease can be classified as a serious medical condition, particularly if the pain associated with it lasts for an extended period of time. *Mendoza v. McGinnis,* No. 05–CV–1124 (TJM/DEP), 2008 WL 4239760, at *10 (N.D.N.Y. Sept.11, 2008); *Harris v. Morton,* No. 9:05–CV–1049 (LEK/RFT), 2008 WL 596891, at *3 (N.D.N.Y. Feb.29, 2008) [28]. Plaintiff alleges that he suffered from back and neck pain for an extended period of time.

[28]    The undersigned will provide a copy of these unpublished decisions to Plaintiff in light of the

Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Even if one classifies Plaintiff's condition as sufficiently serious, however, there is no evidence that the named defendants were deliberately indifferent to that condition. There is no evidence before the Court that any of the named Defendants were involved at all in the decision to assign Plaintiff to the porter job, much less that in doing so they were deliberately indifferent. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ) . [29] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [30] Here, there is no evidence that Defendants Donelli, Weissman, or Fischer were in any way involved with Plaintiff's job assignment. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claims regarding his job assignment.

[29]    *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

[30]    *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**D. Medical Care**

 *12  Plaintiff claims that Defendants violated his Eighth Amendment right to medical care. (Dkt. No. 7 at ¶¶ 45–46.) Defendants argue that Plaintiff's claim is not supported by evidence raising a genuine issue of material fact. (Dkt. No. 41–16 at 14–18.) Defendants are correct.

As discussed above, to prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). As discussed above, Plaintiff suffered from a serious medical need. The issue, then, is whether Defendants were deliberately indifferent to that need.

2009 WL 3165544

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Here, the two-and-a-half month lapse of time between Plaintiff's fall and the examination by Dr. Ferrari, the delays in Plaintiff's receipt of pain medication that had been ordered for him, the four-month lapse of time between the examination by Dr. Ferrari and the examination by Defendant Dr. Weissman, the four-month lapse of time between Plaintiff's report that the pain medication that he had received was not effective and Dr. Weissman's prescription of a stronger medication, and the apparent failure to ensure that Plaintiff attended his last remaining physical therapy session are somewhat troubling. However, as Defendants note, Plaintiff's claims are quite similar to those raised in *Crum v. Marini,* No. 06–CV–0513 (GLS/DRH), 2007 WL 3104750 (N.D.N.Y. Oct.22, 2007), in which Judge Sharpe granted summary judgment for the defendants on the prisoner's medical care claims [31].

[31]    The undersigned will provide a copy of this unpublished decision to Plaintiff in light of the

Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13**  In *Crum,* a prisoner suffering from degenerative cervical spondylosis alleged that the medical care provided to him violated the Eighth Amendment. The prisoner complained, in particular, that the defendants denied his numerous requests for an MRI and that he was only provided care by non-physicians. Judge Sharpe granted the defendants' motion for summary judgment dismissing the prisoner's Eighth Amendment claim. He noted that:

> Crum's medical records indicate that he was evaluated by various medical personnel on numerous occasions ...; that he was prescribed medication for his pain, that he was given x-rays and MRIs; and that defendant Dr. Marini periodically reviewed his medical records. There is no evidence, beyond Crum's conclusory allegations, that Crum's medical needs were ignored. That Crum may have preferred a system under which he had full and unfettered access to Dr. Marini, as opposed to a system under which the first line of contract was with [a Health Services Administrator] or [a physician's assistant], is not enough to establish deliberate indifference.

*Crum,* 2007 WL 3104750, at * 4.

Here, Plaintiff was evaluated by medical personnel frequently, prescribed pain medication, and given x-rays. Dr. Ferrari and Dr. Weissman periodically examined him and reviewed his medical records. Thus, as in *Crum,* Plaintiff has not raised a genuine issue of material fact that Defendants were deliberately indifferent to his serious medical need. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment medical care claim.

### E. Discrimination

Plaintiff claims that another inmate told him that Dr. Weissman provided care more promptly to Jewish inmates than to non-Jewish inmates. (Dkt. No. 7 at ¶ 47.) Defendants

argue that Plaintiff has not raised a triable issue of fact. (Dkt. No. 41–16 at 18–20.) Defendants are correct.

"To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). "He also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Id.*

Here, there is no evidence that Dr. Weismann treated any similarly situated individuals any differently than he treated Plaintiff. Plaintiff's complaint alleges that *if* what he was told by the other inmate is true, *then* Dr. Weissman would be guilty of discrimination. (Dkt. No. 7 at ¶ 47.) In his opposition to the motion for summary judgment, Plaintiff states that he was denied discovery of the other inmate's medical records but that "[d]ates of requests for doctor visit of this inmate compared with dates of actual visits would show that the Jewish inmate ... was seen by Dr. Weissman within two weeks of the request whereas Plaintiff had to wait a minimum of four months." (Dkt. No. 43–4, Plaintiff's Response to Declaration of Dr. Weissman at ¶ 10.) Even if Plaintiff had been granted the discovery he sought and there were evidence before the Court establishing that the other inmate was seen more promptly than Plaintiff, there is no evidence that the other inmate was similarly situated to Plaintiff. The other inmate's medical condition, for instance, may have been more serious or time-sensitive than Plaintiff's. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's equal protection claim against Dr. Weissman.

### F. Personal Involvement

**\*14** Plaintiff's claims against Defendants Fischer and Donelli are, essentially, that he was dissatisfied with their responses to his grievances. (Dkt. No. 7 at ¶¶ 22, 35–36, Ex. E.) Defendants argue that Plaintiff has failed to adequately allege that Defendants Fischer and Donelli were personally involved in any constitutional violation. (Dkt. No. 41–16 at 3–6.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [32] Here, as discussed above, there was no constitutional violation. Therefore, Defendants Fischer and Donelli were not personally involved in any violation and are not liable. Accordingly, I recommend that the Court grant Defendants' motion for summary judgment and dismiss all claims against Defendants Fischer and Donelli.

[32]   *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be *GRANTED;* and it is further

**ORDERED** that the Clerk serve copies of *Mendoza v. McGinnis,* No. 05–CV–1124 (TJM/DEP), 2008 WL 4239760, at \*10 & n. 16 (N.D.N.Y. Sept.11, 2008), *Harris v. Morton,* No. 9:05–CV–1049 (LEK/RFT), 2008 WL 596891, at \*3 (N.D.N.Y. Feb.29, 2008), and *Crum v. Marini,* No. 06–CV–0513 (GLS/DRH), 2007 WL 3104750 (N.D.N.Y. Oct.22, 2007) on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3165544

---

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1268005
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Harold RHAMES, Plaintiff,
v.
FEDERAL BUREAU OF
PRISONS, et al. Defendants.

No. 00 CIV.4338IAKH).
|
June 6, 2002.

MEMORANDUM AND ORDER GRANTING
AND DENYING MOTION TO DISMISS

HELLERSTEIN, District J.

*1  On April 26, 2000, Petitioner, Harold Rhames, filed a complaint seeking damages for medical neglect while he was confined by the United States Bureau of Prisons in the New York Metropolitan Correctional Facility ("MCC"). Defendants move for an order dismissing the Complaint for lack of legal sufficiency pursuant to Fed. R. Civ. Proc. 12(c), or, alternatively, for an order granting defendants summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons discussed below, the motions are partially denied and partially granted.

Rhames' complaint is for deliberate indifference by corrections officials to his medical needs while he was incarcerated in the Metropolitan Correctional Facility, between May 23, 1998 and May 9, 2000, when he was released to state custody to serve a sentence imposed by the New York State courts. He sues the Federal Bureau of Prisons, the Metropolitan Correctional Facility, MCC Warden Dennis Hasty, MCC Medical Director Mark Glover, M.D., MCC Staff Physician Raymond Voulo, M.D., MCC Health Services Administrator Kevin McDonald, and Northwest Regional Director of the Bureau of Prisons David M. Rardin. Plaintiff complains that he has an "aseptic necrotic left hip" because of a "sickle cell trait;" that because of deliberate indifference to giving him appropriate medical and surgical treatment, he has had to favor his left leg and hip, causing him to limp and drag his right leg; and that improper "medical therapeutics" intensified the necrosis and arthritis of his left hip. He asks for a court order for surgical replacement of his right hip, non

steroidal medication, full physical therapy and occupational therapy, a dietician to help him lose weight and, "minimally," several thousand of dollars in damages.

Plaintiff sues his treating MCC physicial, Dr. Voulo, for "not pushing forward" with treatment when the department heads failed or refused to order treatment. Plaintiff sues Dr. Glover as the head of the medical department who, despite knowing plaintiff's case, allegedly refused to order proper care. Plaintiff sues Mr. McDonald as the administrative chief of the medical department. Plaintiff sues Warden Hasty as the person who is in overall control of the jail. And plaintiff sues Mr. Rardin because, as Northeast Regional Director of the Bureau of Prisons, he failed to supply the MCC with nursing staff.

Defendants now move to dismiss, on the pleadings under Federal Rule of Civil Procedure 12(c) for failure to state a legally sufficient claim and, alternatively, on the merits under Federal Rule of Civil Procedure 56 for failure to raise a triable issue of material fact.

*Discussion*

1. *Jurisdiction*
As a preliminary matter, I grant defendants' motion to dismiss the Bureau of Prisons and the Metropolitan Correctional Center. As agencies of the United States, these entities are immune from suit. *See FDIC v. Meyer,* 510 U.S. 471, 484-86 (1994); *Liffiton v. Keuker,* 850 F.2d 73, 77 (2d Cir.1988).

2. *Exhaustion*
*2  The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners first exhaust "such administrative remedies as are available" before bringing any action "with respect to prison conditions under section 1983 ... or any other Federal law." Since deprivation of medical attention to a prisoner's serious medical needs is considered a "prison condition," *see Cruz v. Jordan,* 80 F.Supp.2d 109, 116-17 (S.D.N.Y.1999); *Nussle v. Willette,* 244 F.3d 95 (2d Cir.2000), plaintiff's complaint is governed by the PLRA, and I therefore must evaluate whether plaintiff exhausted the available administrative remedies before I can consider the substance of his complaint.

Plaintiff first notified the prison of his hip problem in May of 1998. On May 25, 1998, on a form provided by

2002 WL 1268005

the U.S. Department of Justice entitled "Inmate Request to Staff Member" (Form BP-148(55)), plaintiff addressed a request to the "Medical Dep[artmen]t" to see an orthopedic specialist for his hip and leg, to see a dermatologist, and to receive a diet plate. On June 11, 1998, Dr. Vuolo, a staff physician, requested that plaintiff be seen by an orthopedist. Dr. Glover, MCC Medical Director, approved the request. Dr. Vuolo examined plaintiff on July 27, 1998, and diagnosed him with degenerative arthritis in his left hip. Also on July 27, Dr. Kahanowicz, an outside orthopedic surgeon, examined plaintiff and concluded that plaintiff had significant arthritis in his left hip with some decrease of function. Dr. Kahanowicz recommended that anti-inflammatory medication be continued, and discussed with plaintiff the potential benefits and complications of surgery. Dr. Glover and Dr. Kahanowicz thereafter discussed plaintiff's condition. Dr. Glover determined that plaintiff was no longer fit for manual labor or physical tasks, and submitted a "Medical Report of Duty Status" form prohibiting plaintiff from being required to perform any physical tasks.

A month later, on August 25, 1998, plaintiff was seen by Dr. Lusskin, another outside orthopedic surgeon. Dr. Lusskin confirmed that plaintiff suffered from osteoarthritis in his left hip, and determined that the condition was also affecting plaintiff's left knee. Dr. Lusskin recommended that plaintiff reduce his weight, receive a cane, perform certain exercises and continue anti-inflammatory medication. Dr. Lusskin's report stated that he did not recommend surgery, because at plaintiff's relatively young age (49 at the time), replacement hip surgery was not considered medically appropriate.

Six days later, on August 31, 1998, and again on September 15, 1998, plaintiff sent Inmate Request forms to the Medical Department, complaining that the cane recommended by the orthopedist had not yet been given to him, that he was still waiting to be seen by a dermatologist, that he was still waiting to receive a diet plate, and that he was not receiving therapeutic treatment for his hip condition. He again sent Inmate Request forms to the Medical Department on October 3, 1998 and on October 28, 1998, repeating his requests. The forms dated September 15 and October 3 were also "cc'd" to defendant Hasty, Warden of the MCC.

*3 Plaintiff was again examined by Dr. Vuolo on November 2, 1998. Dr. Vuolo reminded plaintiff of the need to lose weight, stated that an x-ray of plaintiff's knee would be performed, and informed plaintiff that he would be seen in three months to reevaluate his condition. Dr. Vuolo's notes

do not indicate whether plaintiff brought up the cane, the diet plate or the skin problem.

A week later, on November 9, 1998, plaintiff submitted a form entitled "Request for Administrative Remedy." The form number indicated is "BP-8," although the form looks identical to form BP-9. In the November 9 Request, plaintiff stated that he was not receiving therapeutic treatment as recommended by Dr. Lusskin, that he had not received a cane also as recommended by Dr. Lusskin, that his work assignment had not been changed, that he had not been seen by a dermatologist, and that he still was not receiving a diet plate. The form does not indicate to whom or to which office it was-or should have been-addressed. On December 28, 1998, Plaintiff, yet again, submitted an Inmate Request form to the Medical Department, repeating his previous requests, and asking for the hip replacement surgery that his doctors considered medically inadvisable. As with some of his earlier Inmate Request forms, plaintiff copied the December 28 form to Warden Hasty.

Plaintiff was next seen by Dr. Vuolo on March 3, 1999, approximately four months after his last visit. Dr. Vuolo again advised plaintiff that he needed to lose weight, and repeated Dr. Lusskin's conclusion that plaintiff was too young for hip replacement surgery. Dr. Vuolo's notes indicate that he was aware that the orthopedic consultant had recommended a cane and, presumably, that plaintiff did not have one. Dr. Vuolo's notes do not mention that plaintiff had brought up his skin condition or the diet plate.

Three months later, on June 3, 1999, plaintiff again was seen by Dr. Vuolo, and x-rays for plaintiff's left knee and hip were ordered. There is no evidence that the x-rays were ever taken. Dr. Vuolo recommended, and Dr. Glover approved, another consultation with an outside orthopedist. Accordingly, Dr. Kahanowicz visited with plaintiff on June 24, 1999, recommended that the treatment be continued, and added that, since plaintiff was insisting, a total hip replacement could be performed.

On June 29, 1999, plaintiff submitted a BP-9 Form requesting Administrative Remedy. He stated that he had not been seen by a specialist for a follow-up consultation despite six requests (thus neglecting to mention his visit with Dr. Kahanowicz), and that he had not received a response to the BP-9 form he had submitted November 9, 1998 (thus disregarding the fact that the November 8 form was actually a BP-8) or the BP-8 form that he had submitted June 21, 1999

(six days earlier). He complained that although a diet plate had been prescribed for him when he had earlier been confined at MDC-Brooklyn, none was given to him at the MCC. He also complained that his numerous requests to see a dermatologist had gone unanswered.

**\*4** On June 30, 1999, one day later, plaintiff wrote to Regional Director David Rardin, attaching the June 29 BP-9 and the submissions described above, complaining that his requests for administrative review of the inattention to his medical needs had not been answered. Plaintiff stated that he had been told by the Warden and the Medical Director that they had not received plaintiff's prior complaints.

Plaintiff's June 30 letter to Regional Director Rardin was returned to plaintiff on August 5, 1999, and he was told that his grievance had to be filed with the Warden of the MCC, and that only an appeal would lie directly to the Regional Director. Nevertheless, on September 1, 1999, plaintiff again made complaint directly to the Regional Director, essentially repeating his prior complaints but now requesting a hip replacement as the only way to correct his medical condition. Plaintiff claimed, as justification, that he had never before received a response from Warden Hasty, that he was "shunted off" to an Administrative Remedy Coordinator who was not helpful, and that a clause on the reverse of the BP-9 provides that "a BP-9 can be sent directly to the Regional Director." On September 8, 1999, the Regional Directed again rejected plaintiff's complaint for not exhausting the grievance remedies available at the institutional level, that is, by not submitting his complaint on a BP-9 form to the Warden of the MCC. The Regional Director rejected plaintiff's rationale for filing directly as "not a valid reason," and referred him to Legal Staff for assistance with form BP-9.

It appears, from the declaration filed by Dominique Raia, an attorney employed by the Bureau of Prisons ("BOP") and assigned to the Metropolitan Correctional Facility, that BOP's records do not contain any BP-9 forms filed by plaintiff, not even the form plaintiff allegedly submitted on June 29, 1999, with the exception of plaintiff's letters of June 30, 1999 and September 1, 1999 to Regional Director Rardin. An issue of fact is presented, between plaintiff's testimony in his affidavit that he sent the forms he discusses, and the absence of a corresponding record in BOP. On this motion, I must resolve this issue in favor of plaintiff.

There is another issue, whether plaintiff's persistent use of Inmate Request Forms addressed to BOP's Medical Department qualifies as proper exhaustion of administrative process. BOP provides a four-part grievance process, as we learn from the Raia declaration, which plaintiff failed to use, despite his persistent requests for medical attention, until June 29, 1999, when he filed his first BP-9, or possibly November 9, 1998, when plaintiff submitted a BP-8 seeking "Administrative Remedy." Under the four-part process, inmates must first seek informal resolution of their complaints. 28 N.Y.C.F.R. § 542.13. If the complaint is not resolved informally, the prisoner may then submit a formal written request, on a designated form (Form BP-9), to the facility's warden. 28 C.F.R. § 542.24(a). The deadline for completion of informal review or filing of a formal complaint is twenty days from the event giving rise to the grievance. *Id.* This time period may be extended "[w]here the inmate demonstrates a valid reason for delay." C.F.R. § 542.14(b). If an inmate's formal request is denied, the inmate has twenty days in which to appeal the decision to the appropriate BOP Regional Director, again using a particular form designated by BOP. C.F.R. § 542.15(a). Upon an adverse determination by the Regional Director, the inmate has thirty days in which to appeal to the BOP General Counsel. *Id.*

**\*5** I hold, on the facts presented to me, that plaintiff sufficiently exhausted administrative remedies to allow me to proceed to the substance of this lawsuit. The form "BP-8" which plaintiff testifies he submitted on November 9, 1998, and to which his BP-9 form submitted eight months later, on June 29, 1999, makes reference, adequately satisfies BOP's administrative requirements. These submissions, together with plaintiff's persistent complaints to BOP's Medical Department, afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case, *see Porter,* 122 S.Ct. at 988 (clear purpose of [Section 1997e](#)'s exhaustion requirement is "to reduce the quantity and improve the quality of prisoner suits," by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"); *Brown v. Sikes,* 212 F.3d 1205, 1208 (11th Cir.2000) (exhaustion requirement "give[s] the agency a chance to discover and correct its own errors") (quoting *Alexander v. Hawk,* 159 F.3d 1321, 1327 (11th Cir.1998)); *Wyatt v. Leonard,* 193 F.3d 876, 880 (6th Cir.1999) (plaintiff held to have "substantially complied with the exhaustion requirement by giving written notice on several occasions to prison officials," although he did not follow the precise requisite procedures).

While it is important that prisoners comply with administrative procedures designed by the Bureau of Prisons, rather than using any they might think sufficient, *see Brown, 212 F.3d at 1208* (one policy favoring exhaustion requirement is "to avoid the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore it procedures") (quoting *Alexander,* 159 F.3d at 1327), it is equally important that form not create a snare of forfeiture for a prisoner seeking redress for perceived violations of his constitutional rights. Plaintiff's persistence in his complaints, his use of BP-8 and BP-9 forms, and his letter to Regional Director Rardin (which could be considered an appeal), adequately show compliance with the BOP's procedures. Assuming that plaintiff's version of the facts can be proved, the prison authorities clearly knew or should have known of plaintiff's grievance, and his persistence in pursuing it. The cases cited by the State are distinguishable. *Compare Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (finding plaintiff did not exhaust administrative remedies where he did not utilize available administrative appeal after defendants failed to act on grievance filing); *Beeson v. Fishkill Correction Facility,* 28 F.Supp.2d 884, 887 (S.D.N.Y.1998) (finding prisoner did not satisfy exhaustion requirement where he withdrew grievances from administrative process before they were decided on their merits); *Hartsfield v. Vidor,* 199 F.3d 305, 309 (6th Cir.1999) (prisoner had not exhausted where he did not follow grievance to the final administrative appeal); *Freeman v. Francis,* 196 F.3d 641, 645 (6th Cir.1999) (prisoner had not exhausted administrative remedies where he filed suit before the time allotted to respond to his final administrative appeal had lapsed); *Williams,* 192 F.Supp.2d at 763 (dismissing for failing to exhaust where plaintiff failed to take available second appeal and finding that "a letter is not the same as a grievance appeal").

### 3. *Merits*

**\*6** Plaintiff has alleged a *Bivens* complaint against the five individuals named in the suit, all federal officers. Federal officers cannot be sued in their official capacity for alleged wrongdoing, for such suits are the equivalent of suits against the federal government. *See Armstrong v. Sears,* 33 F.3d 182, 185 (2d Cir.1994); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). Federal employees may be sued only in their personal capacity if they have performed their duties in such a way as intentionally to cause constitutional violations of a person's rights. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 411-12 (1971); *MacFarlane v. Grasso,* 696

F.2d 217, 225 (2d Cir.1982) ( "sovereign immunity does not bar a suit which seeks to prevent an official of the United States from acting in excess of his statutory authority, from exercising his statutory authority in an unconstitutional manner, or from exercising statutory authority which is itself unconstitutional ."). Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment to the United States Constitution, as it is the equivalent of "unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

For deliberate medical in attention to rise to the level of constitutional violation, two requirements must be met. First, the prisoner's medical need must be "serious." *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Second, the record must show, or the facts must give rise to a reasonable inference, that the prison officials charged with extending medical care knew of those medical needs and intentionally disregarded them. *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Plaintiff alleges that the named individuals ignored three medical conditions: an arthritic hip, an unspecified skin condition, and obesity. Since the record contains no information as to plaintiff's skin condition beyond plaintiff's statement that he suffered from some sort of rash, I cannot conclude that plaintiff's skin condition was serious. Plaintiff's obesity and arthritic hip, on the other hand, are serious medical conditions that demanded attention. The question, then, is whether the facts give rise to a reasonable inference that the named prison officials knew of plaintiff's medical needs in regard to his hip and weight problems and whether they nonetheless personally disregarded plaintiff's needs.

As recounted in the previous section, the record shows continuous care and attention by Dr. Voulo to plaintiff's conditions. Vuolo examined plaintiff fairly regularly and with skill, requested appropriate medical procedures and consultations with orthopedic specialists, and counseled plaintiff on losing weight. The record thus presents ample evidence that there was no indifference on his part. Plaintiff's complaint against Dr. Voulo must therefore be dismissed.

**\*7** Plaintiff's complaint, then, although alleging medical indifference, is more directed to operational and administrative indifference to recommendations made by the doctors. The doctors recommended a cane to ease the pressure on plaintiff's hip, but no cane was provided. Doctors

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 44 of 108
Rhames v. Federal Bureau of Prisons, Not Reported in F.Supp.2d (2002)
2002 WL 1268005

also recommended treatment of plaintiff's obesity, but none beyond counseling was provided. Plaintiff also complains about his degenerated hip, but there seems to be a lack of clarity whether or not surgery was the appropriate medical remedy, and a claim of indifference against the defendants on that issue therefore lacks merit.

The record is not clear which of the remaining defendants was allegedly responsible for the indifference to plaintiff's medical needs. In that connection, a supervisor can be sued under 42 U.S.C. § 1983 if his indifference to his supervisory responsibilities is the proximate cause of constitutional injury. *See Morrison v. Lefevre,* 592 F.Supp. 1052, 1075 (S.D.N.Y.1984).

The remaining defendants occupy different positions in the prison hierarchy. Dr. Glover was the Director of the MCC's Medical Department; McDonald was its Health Services Administrator; Hasty was the prison's warden; and Rardin was the Northeast Region Director of the Bureau of Prisons. Plaintiff alleges that each of these men had some level of responsibility for supervising plaintiff's medical care while he was a prisoner, and that each failed to do his job, as evidenced by plaintiff's claims that his serious medical needs were not treated. While Dr. Glover as head of the Medical Department approved requests for orthopedic specialists and submitted a form excusing plaintiff from any further manual labor or physical tasks, it is not clear whether he exercised the type of diligence demanded of a person in his position. Likewise, the record is not clear whether McDonald, who allegedly reviewed plaintiff's chart and followed plaintiff's treatment, exercised appropriate diligence. Similarly, the record is not

clear as to what role Hasty played as Warden in allowing the indifference to plaintiff's medical needs to continue. On the complaint and record submitted, I must therefore sustain the complaint against these three individuals.

On the other hand, I dismiss the claims against Regional Director Rardin. The complaint alleges breach only of his official supervisory duties by failing to staff the MCC with nurses. There is no evidence beyond plaintiff's bare suppositions that the lack of nurses at the prison facility played any part in the indifference plaintiff alleges to have suffered. *See Morrison,* 592 F.Supp. at 1075.

### Conclusions

For the reasons stated, defendants' motion for judgment on the pleadings is granted insofar as it makes claim against defendants Bureau of Prisons, Metropolitan Correctional Facility, Rardin, and Vuolo, and denied insofar as it makes claim against defendants Hasty, McDonald and Glover. The parties shall meet with me at Conference on July 9, 2002, at 9:30 A.M., in Courtroom 14D of the U.S Courthouse located at 500 Pearl Street, New York, New York, to discuss appropriate further proceedings.

**\*8** SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 1268005

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 552872

2008 WL 552872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph P Paul GUARNERI, Plaintiff,

v.

Lt. James HAZZARD; Cpl J. Cronk; Deputy Paul
Marsh, Jr.; Deputy Grippin; Deputy Howland;
Frederick C. Lamy, Commissioner; Francis
T. Sullivan, Commissioner; Deputy Mace;
John Doe, Deputy; and Dr. Weitz, Defendants.

No. 9:06-CV-0985.
|
Feb. 27, 2008.

**Attorneys and Law Firms**

Joseph P Paul Guarneri, Elmira, NY, pro se.

Girvin & Ferlazzo, P.C., Gregg T. Johnson, Esq., Jacinda Hall
Conboy, Esq., Scott P. Quesnel, Esq., of Counsel, Albany, NY,
for Defendants Hazzard, Cronk, Marsh, Grippin, Howland,
and Mace.

O'Connor, O'Connor, Bresee & First, P.C., Justin O. Corcoran,
Esq ., of Counsel, Albany, NY, for Defendant Weitz.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Bruce J. Boivin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendant Sullivan.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

 **\*1**  The above matter comes to me following a Report-
Recommendation by Magistrate Judge David R. Homer, duly
filed on the 6th day of February 2008. Following ten days
from the service thereof, the Clerk has sent me the file,
including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. Sullivan's motion to dismiss (Docket No. 43) is granted and
that the amended complaint is dismissed in its entirety as to
her.

3. Dr. Weitz's motion to dismiss (Docket No. 19) is:

   a. Granted as to his lack of personal involvement with the
   confiscation of the knee brace;

   b. Denied as to his lack of personal involvement in
   Guarneri's neck, back, and mental health treatments;

   c. Denied as to Guarneri's back and neck injuries sustained
   in 2003; and

   d. Granted as to Guarneri's back and neck injuries sustained
   in 2000.

4. The amend complaint is dismissed without prejudice as to
defendants Lamy and John Doe.

5. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for
       report and recommendation pursuant to 28 U.S.C.
       § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Joseph Paul Guarneri ("Guarneri"), presently
an inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants, [2]
six Schoharie County employees ("County defendants"), two
New York State Commissioners ("State defendants"), and one
physician, violated his First and Eighth Amendment rights
while Guarneri was incarcerated at the Schoharie County
Correctional Facility ("Schoharie"). Am. Compl. (Docket No.
13). Presently pending are the motions for summary judgment
of the physician (Docket No. 19) and the State defendants [3]
(Docket No. 43) pursuant to Fed.R.Civ.P. 12(b)(6). Guarneri

opposes both motions. Docket No. 46. For the following reasons, it is recommended that the physician's motion to dismiss be granted in part and denied in part and that the State defendant's motion be granted.

2    Guarneri initially named twelve defendants, two of whom were dismissed by an order dated March 6, 2007 (Docket No. 15) and one who remains unidentified. State Defs. Memorandum of Law (Docket No. 43, Pt. 4) at 3 n. 2.

3    Defendant Lamay has not been served or otherwise appeared in this action. *See* State Defs. Memorandum of Law at 3 n. 5. Likewise, defendant John Doe has neither been served nor further identified. More than 120 days have elapsed since the amended complaint was filed. Accordingly, it is recommended that the amended complaint be dismissed without prejudice as to both defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

## I. Background

The facts are related herein in the light most favorable to Guarneri as the nonmoving party. *See* subsection II(A) *infra.*

Guarneri was incarcerated at Schoharie from June 6 to August 2006 for a parole violation. Am. Compl. at ¶ 2. On June 16, 2006, Guarneri represented himself at his preliminary hearing. *Id.* at ¶ 2. Guarneri claims that the Schoharie law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system which delivered requested material, if at all, after the date of the preliminary hearing. *Id.* These deficiencies "infringed and undermined [Guarneri's] constitutional rights." *Id.* Additionally, Guarneri claims that his time in the library was "intentionally and unreasonably limited ...." *Id.* at ¶ 42. Guarneri also contends that defendant Hazzard failed to copy the appropriate Penal Law sections regarding the period of punishment and failed to provide him with the correct case law pertaining to his litigation. *Id.* at ¶ 45.

**\*2** Besides his legal difficulty, Guarneri also arrived at Schoharie in grave pain due to pre-existing injuries including herniated discs in his neck and lower back, torn ligaments in his knee, Post-Traumatic Stress Disorder (PTSD), bipolar disorder, and depression. *Id.* Guarneri claims that on July

21, 2006, he was "denied ... emergency medical care by [defendants] Weitz and [ ] Hazzard for a [knee] give-way episode...." *Id.* at ¶ 22. Furthermore, Guarneri contended that upon receiving medical attention in the emergency room, hours later and after suffering severe pain, the treatment was wholly inadequate. *Id.* at ¶ 32. Guarneri also makes reference to incidents occurring in 2000 and 2003 which resulted in herniated discs, alleging that at the time of the incident defendants Marsh and Hazzard delivered inadequate medical care that was further perpetuated by defendants Weitz and Hazzard with their decision to prohibit Guarneri from receiving a back brace. *Id.* at ¶ 30. Additionally, Guarneri contends that defendants Hazzard, Crook, Marsh, Grippin, Howland, Mace, John Doe, and Weitz all colluded against him "by not letting [Guarneri] speak to mental health counselors when [he was suffering from] mental health episodes ...." *Id.* at ¶ 35. Lastly, Guarneri contends that after arriving at Elmira Correctional Facility in August 2006, defendants Hazzard, Mace, and John Doe deliberately interfered with his medical treatment by precluding him from wearing the hinged knee brace which had subsequently been provided to him at Schoharie. *Id.* at ¶ 2.

In response to defendants repossessing his knee brace, Guarneri timely filed a grievance. *Id.* at ¶ 22, 25. Guarneri contends that the State defendants failed to respond to this grievance because they were acting in concert with the County defendants, "deliberately and intentionally tak[ing] advantage of ... [Guarneri]." *Id.* at ¶ 25. The State defendants lack of communication led Guarneri to the conclusion that "resort to an administrative remed[y] would be clearly futile ...." *Id.*

Additionally, Guarneri alleges that defendant Hazzard "deliberately and intentionally [attempted to] stop" Guarneri from practicing Catholicism while he was incarcerated. *Id.* at ¶ 36. Guarneri contends that "defendant ... has known for years that [he] has been Catholic and has known the Rev. Ferenezy is not of the Catholic faith;" therefore, Hazzard's actions of arranging meetings between the two when Guarneri requested religious counsel amounted to defendants "tr[ying] to force a different religion on [Guarneri] ... den[ying him] the opportunity to see clergy and Catholic Religious Advisors when requested." *Id.* at ¶ 39.

## II. Discussion

Guarneri asserts two causes of action under the First Amendment that he has been denied (1) meaningful access

2008 WL 552872

to the courts and (2) his religious freedom. Additionally Guarneri claims deliberate indifference to a serious medical need in violation of the Eighth Amendment because defendants (1) did not allow him to keep his hinged knee brace upon arrival at Elmira Correctional Facility, (2) provided delayed and inadequate emergency treatment on July 26, 2006, (3) received inadequate care at the time of his disc herniations in 2000 and 2003, and (4) was denied proper medical care when defendants refused to order him a back brace. The physician, Dr. Weitz, moves for summary judgment on the grounds that (1) there was no personal involvement, (2) the amended complaint fails to state a claim for deliberate indifference to serious medical needs, (3) the amended complaint is barred by res judicata and collateral estoppel, and (4) the medical claims relating to Guarneri's back are barred by the statute of limitations [4].[5] Defendant Sullivan contends dismissal is appropriate because there was no personal involvement.

[4]   Dr. Weitz advances this valid claim expressly, however briefly, in a footnote in his memorandum of law. Weitz Mem. of Law (Docket No. 19, Pt. 3) at 15 n. 2.

[5]   Der. Weitz also advances the claim that Guarneri failed to state a valid pendent state law claim. However, the amended complaint fails to allege any pendant state law claims. Thus this argument need not be addressed.

### A. Legal Standard

**\*3** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at \*3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Personal Involvement

Both defendants contend that Guarneri has failed sufficiently to allege their personal involvement.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*4** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Despite Guarneri's submission of an amended complaint, he has failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at Elmira Correctional Facility. Guarneri only references defendants Hazzard, Mace, and John Doe when discussing the events surrounding the confiscation of his knee brace. Am. Compl. at ¶ 19. Thus Guarneri fails to allege any facts indicating that Dr. Weitz was personally involved in those events.

However, Guarneri has contended that Dr. Weitz "denied [Guarneri] appropriate mental health care by not letting [him] speak to mental health counselors ..." and "refused [to] prescribe treatment for (herniated disk) in [sic] the lower back and neck [6] ... based on non-medical concerns like cost." Am. Compl. at ¶¶ 35, 30. These allegations specifically identify Dr. Weitz as a participant in the alleged medical indifference he suffered. Thus, Guarneri has succeeded in alleging facts, indicating that Dr. Weitz was personally involved in his medical care.

[6]     This allegation pertains solely to the neck and back injuries sustained in 2003. Those injuries occurring in 2000 have been dismissed as barred by the statute of limitations. *See infra* at subsection II(E).

Additionally, Sullivan has contended that Guarneri fails to allege her personal involvement. Guarneri alleges that the "State acted in concert with [County] defendants by not answering appeals of grievances submitted by [Guarneri] in a timely manner ...." Am. Compl. at ¶ 25. However, failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation." *Abbas v. Senkowski,* No. 03-CV-476 (GLS/DRH), 2005 WL 2179426, at \*2 (N.D.N.Y. Sept. 9, 2005). Additionally, Sullivan may not be held personally liable solely because of his supervisory position. Moreover, Guarneri does not allege the creation or execution of an unconstitutional policy or negligent supervision. Thus, Guarneri's conclusory assertions are insufficient to provide a factual basis to support the personal involvement of Sullivan.

Therefore, it is recommended that Dr. Weitz's motion to dismiss be granted as to his involvement in the confiscation of the knee brace but denied with respect to his involvement

in Guarneri's neck, back, and mental health treatments. Additionally, it is recommended that Sullivan's motion to dismiss be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v.. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*5** " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to

medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id*. at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV-1089 (GLS/ RFT), 2006 WL 681223 at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### 1. Knee

Guarneri may have offered evidence sufficient to conclude that the knee injury he sustained was serious. Generally, knee injuries have been "insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered as a result of a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* No. 03-CV-850 (DEP), 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion" which did not render plaintiff immobile was not a serious medical need; *see also Williamson v. Goord,* No. 02-CV-521(GLS/ GHL), 2006 WL 1977438, at *9, 14, 16 (N.D.N.Y. July 11, 2006) (holding that a prisoner's knee injuries including arthrosis, degenerative joint disease, and partially torn anterior cruciate ligament ("ACL"), did not constitute "death or degeneration, or [constitute the appropriate level of] extreme pain [contemplated by] the law").

 **\*6** In this case, it is unclear how significantly the deprivation of Guarneri's knee brace affected his mobility as he has subsequently indicated his ability to ambulate. Docket No. 46 at 3. However, construing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. *Id.* Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 2. Mental Health

Guarneri also alleges that he suffered from and received inadequate medical treatment for PTSD, bipolar disorder, and depression. "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, considering all of Guarneri's various complaints concerning his mental health, it is clear that he has alleged facts sufficient to provide relief as to whether he suffered a serious medical need as a result of his mental illnesses.

Moreover, Guarneri also contends that defendants have deliberately precluded him "from speaking to mental health counselors when hav[ing] mental health episodes ...." Am. Compl. at ¶ at 34-35. If proven, this constitutes deliberate indifference to Guarneri's mental health needs. Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 3. Back

Guarneri alleges sufficient evidence to present a serious medical need. Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/ AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); *see also, Farraday v. Lantz,* No. 03-CV-1520 (SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need). Therefore, with regard to the 2003 back injury, Guarneri has alleged a serious medical need.

2008 WL 552872

Additionally, Guarneri alleges that defendant Hazzard "deliberately and with malice denied adequate medical care ...." Am. Compl. at ¶ 23. Thus, construing these allegations in the light most favorable to Guarneri, he has alleged deliberate indifference to this medical need. Thus, it is recommended that defendant's motion on this ground be denied.

### D. Res Judicata/Collateral Estoppel

**\*7** "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (applying res judicata to a 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach in which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Id.*

Under the Full Faith and Credit Clause of the Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts located within the state. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81 (1984)). However, the bar of res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Id.; Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986). The Second Circuit has held that a plaintiff in a § 1983 action who is seeking damages will not be vulnerable to dismissal based upon res judicata, although, a similar plaintiff seeking injunctive relief will be. *Davidson,* 792 F.2d at 277-78; *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 30 (2d Cir.1986).

As a threshold matter, Dr. Weitz correctly notes that Guarneri's previous lawsuit, also filed in the Northern District of New York, is still pending. *See Guarneri v. Bates,* No. 05-CV-444 (GLS/DRH) (report-recommendation of magistrate judge pending final decision before district court). Because the previous action has not received an adjudication on the merits, Dr. Weitz cannot overcome the first prong of the analysis. Thus, it is recommended that Dr. Weitz's motion on this ground be denied without prejudice.

In the alternative, Dr. Weitz also raises the broader affirmative defense of collateral estoppel. "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (1980). Collateral estoppel is applicable:

> [I]f (1) there has been a final determination on the merits of the issue sought to be precluded; (2) the party against whom ... preclusion is sought has a full and fair opportunity to contest the decision ...; and (3) the issue sought to be precluded by the earlier suit is the same issue involved in the later action.

**\*8** *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted). The requirement of a full and fair opportunity to contest requires that the plaintiff "was fully able to raise the same factual or legal issues" in the prior litigation as asserted in the present case. *LaFleur v. Whitman,* 300 F.3d 256, 274 (2d Cir.2002).

However, it is clear that there has not been a final determination in the pending federal case and Dr. Weitz, again, cannot surmount the first prong of the test. Therefore, Dr. Weitz's motion should be denied without prejudice on this ground as well.

### E. Statute of Limitations

Dr. Weitz moves to dismiss Guarneri's Eighth Amendment allegations concerning inadequate treatment for his neck and back on the ground that they are barred by the statute of limitations. While there is no provision in § 1983, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a) (2003); *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,*

2008 WL 552872

488 U.S. 235, 249-51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); *N.Y. C.P.L.R.* 214(2) (McKinney 2003).

Federal law governs the determination of the accrual date for purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues "when the plaintiff knows or has reason to know" of the harm. *Id.* (citations omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980). With regard to medical indifference claims, the statute of limitations in a § 1983 suit is derived from personal injury case law, not medical malpractice. *See e.g. Owens,* 488 U.S. at 251.

Here, Guarneri's initial complaint was filed on August 14, 2006. Compl. (Docket No. 1). Thus, claims relating to medical indifference occurring in 2000 are clearly outside the three-year period. However, claims regarding deliberate indifference resulting in herniated discs occurring in 2003 may fall within the three-year statutory period depending on when in 2003 the conduct occurred. Therefore, claims relating to the second back injury in 2003 may present facts upon which relief may be granted depending on when in 2003 the claim is shown to have accrued. At this stage, liberally construing Guarneri's amended complaint, the allegations therein are deemed to assert that claim accrued after August 14, 2003.

Thus, Dr. Weitz's motion on this ground should be granted with regard to the neck and back injuries occurring in 2000 and denied with regard to the back injuries occurring in 2003.

## III. Conclusion

**\*9** For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Sullivan's motion to dismiss (Docket No. 43) be **GRANTED** and that the amended complaint be **DISMISSED** in its entirety as to her;

2. Dr. Weitz's motion to dismiss (Docket No. 19) be:

    a. **GRANTED** as to his lack of personal involvement with the confiscation of the knee brace;

    b. **DENIED** as to his lack of personal involvement in Guarneri's neck, back, and mental health treatments;

    c. **DENIED** as to Guarneri's back and neck injuries sustained in 2003; and

    d. **GRANTED** as to Guarneri's back and neck injuries sustained in 2000; and

3. The amended complaint be **DISMISSED** without prejudice as to defendants Lamy and John Doe.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 552872

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3338566
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kim CARL, Plaintiff,
v.
Arthur DIRIE, Deputy Security Superintendent,
Greene Correctional Facility; Peter

D. Behric,[1] Superintendent, Greene
Correctional Facility; Trudell, Sergeant,
Greene Correctional Facility, Defendants.

[1]     Based on the documents attached to Plaintiff's
Complaint, it is clear that the correct spelling
of Defendant Berhic's name is "Behrle." *See,
e.g.,* Dkt. No. 1, Compl., Ex. A, Sup't Resp.
to Pl.'s Grievance, dated Apr. 29, 2009. We
will use the correct spelling of this Defendant's
name.

Civ. No. 9:09–CV–724 (GTS/RFT).
|
March 29, 2010.

**Attorneys and Law Firms**

Kim Carl, Wilton, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, James Seaman, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Kim Carl filed this civil rights action,
pursuant to 42 U.S.C. § 1983, alleging violations of his
constitutional rights. Specifically, Plaintiff brings claims of
retaliation, due process, and cruel and unusual punishment.
*See generally* Dkt. No. 1. Presently before the Court
is Defendants' Motion to Dismiss the Complaint for failure
to state a claim upon which relief can be granted, pursuant to
FED. R. CIV. P. 12(b)(6). Dkt. No. 14, Defs.' Mot. to Dismiss.
Plaintiff opposes the Motion. Dkt. No. 15, Pl.'s Resp. in Opp'n
to Defs.' Mot. (hereinafter "Pl.'s Resp."). For the reasons that

follow, we recommend that Defendants' Motion be **granted**
in part and **denied** in part.

**I. BACKGROUND**

The following facts are derived from Plaintiff's Complaint,
which, in accordance with the applicable standard on a
motion to dismiss, must be accepted as true for the
purposes of deciding Defendants' Motion. *See infra* Part
II.A. In addition, "while courts generally do not consider
matters outside the pleadings, they may consider documents
attached to the pleadings, documents referenced in the
pleadings, or documents that are integral to the pleadings
in order to determine if a complaint should survive a
12(b)(6) motion." *See Smart v. Goord,* 441 F.Supp.2d 631,
637 (S.D.N.Y.2006) (internal citation and quotation marks
omitted). We therefore take judicial notice of the documents
attached to the Complaint, which include copies of Plaintiff's
Grievance, Misbehavior Report, and administrative appeals,
all of which are specifically referred to in the Complaint. *See
id.* ("The records of state administrative proceedings may be
considered.").

On April 4, 2009, Plaintiff's family came to visit him at
Greene Correctional Facility ("Greene") and brought him a
food package. Compl. at ¶ 1.[2] After the visit, Plaintiff picked
up the food package in the package room. *Id.* Upon returning
to his housing unit, Plaintiff noticed that the package did not
contain any cheese or fully-cooked meats, both of which items
his family customarily brought him. *Id.* Plaintiff called his
family, who informed him that the package room officer did
not accept those items and had returned them to his family. *Id.*

[2]     Plaintiff's factual allegations are laid out in four
lengthy paragraphs, the first of which begins on
page 2 of the Complaint under the "Facts" section
of the 42 U.S.C. § 1983 complaint form. *See*
Compl.

Later that week, Plaintiff went to the prison law library
in order to get a copy of a Memorandum concerning
food packages that was authored by Defendant Deputy
Superintendent of Security Arthur Dirie. *Id.* The law library
clerk gave Plaintiff a free copy of the Memorandum,
which stated that packages containing food labeled "keep
refrigerated" were not permitted, but items with the
label "refrigerate after opening" were allowed. *Id.* Dirie's
Memorandum changed the food package policy at Greene,

2010 WL 3338566

which had allowed "keep refrigerated" food items since 1990. *Id.* Moreover, DOCS Directive # 4911 states that inmates are allowed to receive precooked meats, fish, and sliced and block cheese, all of which bear the "keep refrigerated" label. *Id.*

 **\*2** Plaintiff alleges that Defendant Dirie issued the Memorandum in retaliation for other inmates' efforts to expose a Greene correctional officer who stole their incoming food packages. *Id.* The Central Office Correctional Service and the Inspector General are conducting investigations into that retaliation claim. *Id.*

Plaintiff wrote Assistant Commissioner Diane VanBuren [3] a letter concerning the change in policy and included Dirie's Memorandum. *Id.* On April 14, 2009, an officer approached Plaintiff in the messhall and told him to go to Defendant Sergeant (Sgt.) Trudell's office. Sgt. Trudell told Plaintiff that Dirie assigned him to investigate the letter Plaintiff had sent to Commissioner VanBuren. *Id.* Plaintiff explained to Trudell how he received a free copy of Dirie's Memorandum, and Trudell told Plaintiff that Dirie "was very mad because [Plaintiff] snitch[ed] on him" to the Commissioner. *Id.* Plaintiff protested to Defendant Trudell that he had done nothing wrong, stating that all he did was challenge Dirie's change in a long-established policy that had allowed inmates to receive food packages labeled "keep refrigerated." *Id.* Trudell told Plaintiff he had breached prison security. *Id.* On April 14, 2009, Dirie ordered Trudell to send Plaintiff to the Special Housing Unit ("SHU"). *Id.* The next day, Plaintiff received a Misbehavior Report charging him with Property Damage or Loss (Rule 116.10) and Counterfeiting or Forgery (Rule 116.12). *Id.*

[3]     VanBuren is not a named Defendant in this action.

The Misbehavior Report states that Trudell was

> conducting an investigation into inmate Carl, Kim ... mailing a Facility Memorandum to Assistant Commissioner D. VanBuren in Albany, Building 2. Inmate Carl mailed a letter to Assistant Commissioner D. VanBuren with a Facility Memorandum written by Deputy Superintendent of Security A. Dirie dated February 10, 2009. The memorandum is regarding Directive

> 4911, Package Room refrigerated items. During the course of my interview inmate Carl freely admitted to receiving a copy of the memorandum from an unidentified inmate in the Law Library without paying the \$.10 per copy cost for photocopying the memorandum and mailing the memorandum to D. VanBuren, Assistant Commissioner, without permission. This is supported by inmate Carl's own admission.

Dkt. No. 15, Pl.'s Resp., Attach., Misbehavior Rep., dated Apr. 14, 2009.

Plaintiff alleges the Misbehavior Report contained false charges and was filed in retaliation for his letter to Commissioner VanBuren. Compl. at ¶ 3. Plaintiff also alleges that while in SHU, he was harassed by Dirie, who also had him moved to another cell. *Id.*

On April 21, 2009, Housing Commissioner Eric Gutwein [4] presided over a Tier III Disciplinary Hearing on the charges brought in the April 14th Misbehavior Report. *Id.* Plaintiff alleges Gutwein was partial and had prejudged his guilt despite a lack of evidence to support the convictions. *Id.* Plaintiff was sentenced to 120 days in SHU, loss of all privileges, and loss of good time credits. *Id.,* Ex. A, Sup't Hr'g Disposition Sheet, dated Apr. 21, 2009. Plaintiff received a copy of the written statement setting forth the bases for his conviction. *Id.*

[4]     Gutwein is not a party to this action.

 **\*3** Plaintiff filed a Grievance, dated April 27, 2009, alleging that Dirie had retaliated against him because of the letter he sent to the Commissioner, and requesting that the convictions rendered at the Tier III Hearing be overturned. *Id.,* Ex. A, Grievance, dated Apr. 27, 2009. On April 29, 2009, Superintendent Behrle responded to Plaintiff's Grievance, advising Plaintiff that "you cannot grieve a misbehavior report" and suggesting that Plaintiff file a direct appeal of the Tier III disposition. *Id.,* Ex. A, Sup't Resp. to Pl.'s Grievance, dated Apr. 29, 2009. On or about April 28, 2009, Plaintiff filed an administrative appeal of the Hearing disposition. *Id.,* Ex. A, Pl.'s Admin. Appeal, dated Apr. 28, 2009.

At some point during Plaintiff's SHU confinement, Superintendent Behrle told him that in writing the Memorandum, Defendant Dirie had relied on a decision of the Central Office Review Committee ("CORC"), CX–10998–05, a copy of which Behrle provided to Plaintiff. *Id.* at ¶ 4 & Ex. A, CORC Decision, dated June 22, 2005. That CORC decision clarified that

> smoked meat, poultry, or seafood is considered cooked, and is allowed. CORC asserts that vacuum sealed meats that are fully cooked, that do not require refrigeration should be permitted through the package room. Food items requiring refrigeration prior to opening are not allowed. However, items which indicate "refrigerate after opening" would be allowed.

*Id.*

Plaintiff also filed a complaint directly with Karen Bellamy, Director of the Inmate Grievance Program, on or about May 5, 2009. *Id.* at p. 6. In a letter, dated May 12, 2009, Bellamy advised Plaintiff that DOCS's policy does not allow inmates to file grievances directly with the Central Office, and directed him to submit a grievance directly with the Inmate Grievance Review Committee ("IGRC") at Greene. *Id.,* Ex. A, Lt., dated May 12, 2009.

On May 14, 2009, Plaintiff was transferred from Greene to another prison facility and, on that same date, Special Housing Director Norman Bezio reversed his Tier III convictions. *Id.,* Ex. B, Review of Sup't Hr'g, dated May 14, 2009. Thus, Plaintiff served thirty (30) days of his 120–day SHU sentence.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

**\*4** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* —— U.S. —— 129 S.Ct. at 1950 (citing *Twombly).* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U . S. —— 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged or that the defendants have violated the ... laws in ways that have not been alleged."

Carl v. Dirie, Not Reported in F.Supp.2d (2010)
2010 WL 3338566

*Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* ––– U.S. ––– 129 S.Ct. at 1950–51.

**B. Retaliation Claim**

Plaintiff asserts Defendant Deputy Superintendent Arthur Dirie ordered Defendant Sgt. Trudell to issue him a false Misbehavior Report in retaliation for the letter Plaintiff sent to Assistant Commissioner VanBuren concerning Dirie's change in the policy regarding food packages at Greene. *See generally* Compl. Plaintiff also alleges that Defendant Superintendent Behrle learned of this retaliation through Plaintiff's Grievance and disciplinary appeal, but did nothing to correct the situation. *Id.*

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

**\*5** In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

As retaliation claims may be easily fabricated by inmates, courts have scrutinized such claims with extra care. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467–68 (S.D.N.Y.1998). In *Flaherty v. Coughlin,* the Second Circuit described three different methods of pleading retaliation, each requiring separate analysis by the court. 713 F.2d at 13. First, a retaliation claim supported by "specific and detailed allegations" must be pursued with full discovery. *Id.* (cited

in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)). Whereas, a claim asserting retaliation in "wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* ("In such a case, the prisoner has no factual basis for the claim other than an adverse administrative decision and the costs of discovery should not be imposed on defendants."). The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In this case, Plaintiff alleges that he was retaliated against for filing a letter of complaint with Assistant Commissioner VanBuren. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has stated that he was engaged in constitutionally protected conduct. *See Rosales v. Fischer,* 2009 WL 928260, at *10–11 (S.D.N.Y. Mar. 31, 2009) (holding that the filing of a letter of complaint was protected conduct even though it was not a formal grievance).

As to the second prong, Plaintiff alleges that Defendants retaliated against him by filing a false Misbehavior Report against him, which lead to his disciplinary convictions and confinement in SHU for thirty (30) days, after which period his convictions were reversed and he was released from SHU. Finally, Plaintiff has alleged a plausible causal connection between his protected conduct the alleged retaliatory acts. Plaintiff alleges that on April 14, 2009, shortly after he wrote his letter to VanBuren, Defendant Trudell informed Plaintiff that Defendant Dirie assigned him to investigate Plaintiff's letter to VanBuren, and that Trudell told Plaintiff that Dirie "was very mad because [Plaintiff] snitch[ed] on him." Compl. at ¶ 2. Plaintiff alleges he was sent to SHU on that same day, and received the Misbehavior Report the next day. *Id.* Approximately one month later, after having spent a month in SHU, Plaintiff's convictions were overturned. *Id.,* Ex. B, Review of Sup't Hr'g, dated May 14, 2009.

**\*6** Defendants do not challenge the facial validity of Plaintiff's retaliation claim, but rather, appear to assert that because Plaintiff's disciplinary convictions were based on his allegedly improper possession of a copy of Dirie's Memorandum, Defendants would have taken the same actions absent any retaliatory motives. Dkt. No. 14, Defs.' Mem. of Law at p. 10. The Misbehavior Report accused Plaintiff of receiving a copy of Dirie's Memorandum without paying for it, and of sending a copy of the Memorandum to VanBuren without permission. Misbehavior Rep., dated Apr. 14, 2009. The Misbehavior Report charged Plaintiff with Property Damage/Loss (Rule 116.10) and Counterfeiting/ Forgery (116.12). *Id.*

Plaintiff maintains that inmates can properly obtain copies of DOCS directives through the law library, and that one of the clerks at the law library gave him a copy of the Memorandum free of charge because that particular copy was in bad shape. Pl.'s Resp. at p. 2. Plaintiff further asserts that such exchange occurred in plain view of Officer Kimberly Johnson,[5] who did not intercede. *Id.* Plaintiff denies that he participated in any counterfeiting and/or forgery. *Id.* Finally, Plaintiff notes that his convictions were overturned and alleged that while in SHU, Dirie harassed him by moving his cell and stating "who put you in the box[?]" Compl. at ¶ 3.

[5]    Officer Kimberly Johnson is not a named Defendant in this action.

We cannot say that, as a matter of law, Plaintiff has failed to state a retaliation claim upon which relief could be granted. Notwithstanding Defendants' argument that the same actions would have been taken absent the existence of any retaliatory animus, that is a factual issue unresolvable in the context of Defendants' current Motion to Dismiss.

Because Plaintiff has stated a plausible claim of retaliation against Defendants Dirie and Trudell, it is recommended that Defendants' Motion to Dismiss Plaintiff's retaliation claims be **denied.**

### C. Due Process Claims

Plaintiff alleges that his due process rights were violated during the course of his Tier III Disciplinary Hearing. Specifically, Plaintiff alleges that Housing Commissioner Eric Gutwein, a non-party to this action, conducted a partial

disciplinary hearing, convicted Plaintiff based on little or no evidence, and pre-judged his guilt. *See* Compl.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Thus, because Gutwein is not a Defendant and there are no due process claims alleged against any named Defendant, such claims should be properly dismissed for failure to allege personal involvement.

However, even if we were to consider the adequacy of Plaintiff's due process claims, they would still fail because Plaintiff has failed to identify a protected liberty interest. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

**\*7** Here, Plaintiff alleges that he spent thirty (30) days in SHU with loss of privileges, but alleges no additional aggravating circumstances present during that period of confinement. Courts in this Circuit have held that a thirty (30) day period in SHU, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Sealey v. Giltner,* 197 F.3d 578, 589–90 (2d Cir.1999) (101 days in normal SHU conditions was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at \*4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at \*3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed** on that ground as well.

### D. Eighth Amendment Claim

Plaintiff appears to bring a cause of action under the Eighth Amendment, although it is unclear whether such claim is

2010 WL 3338566

premised upon Dirie's alleged harassment during his stint in SHU, the allegedly false Misbehavior Report, the conditions of his confinement while in SHU, or all three. *See* Compl. at ¶ 3. Therefore, we will briefly address all three possible claims.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept. 2, 2005); *Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D .N.Y. Aug. 31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). As such, Plaintiff's allegations of harassment, even if true, do not state a valid cause of action under § 1983.

As per the allegedly false Misbehavior Report, as Defendants note, such an action does not constitute a violation of the Eighth Amendment's ban on cruel and unusual punishment. *See Guilbert v. Sennett,* 2009 WL 2381303, at *10 (W.D.N.Y. Aug. 3, 2009); *see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) for the proposition that there is "no general constitutional right to be free from being falsely accused in a misbehavior report."). [6]

[6] However, a false misbehavior report may be part of a valid retaliation claim brought under the First Amendment. *See supra* Part II.B.

**\*8** Finally, with respect to Plaintiff's conditions in SHU, it is settled law in this Circuit that "[t]he conditions of special housing units do not per se constitute cruel and unusual punishment in violation of the Eighth Amendment." *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (citing *Anderson v. Coughlin,* 757 F.2d 33, 34–35 (2d Cir.1985)); *see also Smith v. Fischer,* 2009 WL 632890, at * 11 (N.D.N.Y. Feb. 2, 2009). Because Plaintiff does not allege that he was subjected to anything beyond the normal SHU conditions, his Eighth Amendment claim must fail.

For all the above reasons, it is recommended that Plaintiff's Eighth Amendment claims be **dismissed.**

### E. Supervisory Liability

As previously mentioned, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d at 501 (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* —— U.S.——, 129 S.Ct. 1937, 1948 (2009).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff alleges he filed a Grievance with Defendant Superintendent Behrle that put Behrle on notice of the other Defendants' improper actions. Plaintiff also

states that Behrle approached him while he was in SHU and gave him a copy of the CORC decision upon which Dirie's Memorandum was based. Compl. at ¶ 3 & Ex. A, Grievance, dated Apr. 27, 2009. In his response to Plaintiff's Grievance, Behrle advised Plaintiff that an inmate "cannot grieve a misbehavior report," and suggested that Plaintiff file an appeal. *Id.,* Ex. A, Resp. to Pl.'s Grievance, dated Apr. 29, 2009. However, Behrle's response also stated that Plaintiff's "allegations of staff misconduct will be investigated." *Id.* It is unclear from the pleadings if an investigation ever took place and, if so, whether Behrle was involved. *Id.* at ¶ 3.

**\*9** Defendants assert that Behrle should be dismissed for lack of personal involvement because his only alleged involvement was responding to Plaintiff's Grievance. Defs.' Mem. of Law at pp. 11–12 (citing cases for the proposition that the mere denial of a grievance is insufficient to establish personal involvement). However, "there may be situations in which a supervisory official's receipt and review of a letter of complaint will, in combination with other factors, give rise to the official's personal involvement in the matters complained of." *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009). Namely, "if the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved." *Id.* (citing *Charles v. New York State Dep't of Corr. Servs.,* 2009 WL 980548, at \*6 (N.D.N.Y. Mar. 31, 2009)).

Accepting all of Plaintiff's allegations as true and in a light most favorable to him, he has alleged sufficient facts to implicate Behrle's personal involvement in the alleged retaliatory actions taken against him. Plaintiff alleges that his Grievance, and possibly Behrle's own investigations, put Behrle on notice of the other Defendants' alleged retaliatory acts and that Behrle failed to take remedial actions to correct the situation. We find these alleged facts sufficient to state a

facially valid constitutional claim against Defendant Behrle. Therefore, we recommend that Defendants' Motion be **denied** on this ground.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 14) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendations, the following claims will remain: (1) First Amendment retaliation against Defendants Dirie and Trudell; and (2) supervisory liability against Defendant Behrle. Plaintiff's due process and Eighth Amendment claims are recommended for dismissal; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3338566

---

**End of Document**           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1750320
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anthony ARRIAGA, Plaintiff,

v.

Dr. Dana GAGE (N.Y.S. D.O.C.C.S. Sing Sing C.F.
Health Care Provider) Individual and Official
Capacity; Dr. Razia K. Ferdous (N.Y. D.O.C.C.S.
Sing Sing C.F. Facility Health Services Director)
Individual and Official Capacity; C.O. Alvarado
(Sing Sing C.F. Correction Officer) Individual
and Official Capacity; Dr. Joshua Vernatter
(Montefiore Mount Vernon Hospital Doctor)
Individual and Official Capacity, Defendants.

16-cv-1628 (NSR)
|
Signed 04/06/2018

**Attorneys and Law Firms**

Anthony Arriaga, Ossining, NY, pro se.

Bruce J. Turkle, David John Galalis, New York State Office
of the Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Anthony Arriaga ("Plaintiff"), proceeding *pro
se*, commenced this action on March 3, 2016, pursuant to
42 U.S.C. § 1983 for alleged Eighth and First Amendment
violations, (*see* Complaint ("Compl."), (ECF No. 2) ), against
Defendants Dana Gage ("Dr. Gage"), Razia K. Ferdous
("Dr. Ferdous"), Corrections Officer Alvarado ("Alvarado")
(collectively, the "State Defendants"), and Joshua Vernatter
("Dr. Vernatter"), (*id.*)

Presently before the Court are four motions: (1) the State
Defendants' motion to dismiss for lack of subject matter
jurisdiction and for failure to state a cause of action pursuant
to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),
respectively; (2) Dr. Vernatter's motion to dismiss for failure
to state a cause of action pursuant to Federal Rule of Civil
Procedure 12(b)(6); (3) Plaintiff's motion for a preliminary
injunction; and (4) Plaintiff's motion for sanctions. (*See* The

State Defendants' Brief in Support of the Motion to Dismiss
("State Defs. Br.") (ECF No. 39), at 3-4; Dr. Vernatter's
Brief in Support of the Motion to Dismiss ("Def. V. Br.")
(ECF No. 47), at 1; Plaintiff's Brief in Support of the Motion
for Injunctive Relief ("Plf. Mot.") (ECF No. 56), at 2;
Plaintiff's Not. of Motion for Sanctions (ECF No. 65), at
5.) For the following reasons, the State Defendants' motion
is GRANTED in part and DENIED in part, Dr. Vernatter's
motion is GRANTED, and Plaintiff's Motions for Injunctive
Relief and Sanctions are DENIED.

**FACTUAL BACKGROUND**

**A. Facts Related to the Motions to Dismiss**

The following facts are taken from Plaintiff's Complaint and
are accepted as true for purposes of this motion. [1]

[1]    The Court assumes the truth of the facts alleged in
      Plaintiff's Complaint for purposes of this motion
      only. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff is a *pro se* inmate housed at Sing Sing Correctional
Facility ("Sing Sing"), a prison within the New York State
Department of Corrections and Community Supervision
("DOCCS"). Plaintiff initiated this action on or about March
3, 2016, for alleged violations of his Eighth and First
Amendment rights to adequate medical care and to be free
from retaliation, respectively. (*See* Compl. at 2-7.) [2] The
conduct that forms the basis of Plaintiff's Complaint occurred
between March 2015 and January 2016. (*Id.*)

[2]    As Plaintiff is proceeding *pro se* and his Complaint
      is the standard, fillable form amended complaint,
      all citations thereto will be to pages, not paragraphs.

Plaintiff alleges that he suffers from herniated and bulging
discs that cause him extreme back pain, for which he was
originally prescribed Naproxen. (*See* Compl. at 3, 7.) In early
April of 2015, Plaintiff began complaining of his back pain
to the nurses at sick call and was prescribed 200mg tablets
of Ibuprofen, which he alleged to be insufficient. (*Id.*) At
some unspecified time thereafter, Plaintiff sent letters to his
health care provider at the time, Dr. Ferdous, which went
unanswered. (*Id.*) In a grievance regarding this failure to
respond to his letters, Plaintiff took issue with Dr. Ferdous's
position of not entertaining inmate letters and recommending
that they go to sick call instead. (*Id.* at Ex. C.)

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 60 of 108

**\*2** On April 6, 2015, Plaintiff's pain became so intolerable that he was transferred outside of the facility to Montefiore Mount Vernon Hospital ("Montifiore") where he was admitted for three days, unable to move. (*Id.* at 3.) During his hospitalization, Plaintiff was treated by Dr. Vernatter and underwent a CAT Scan, blood tests, and was prescribed Percocet and Baclofen for the pain. (*Id.* at Ex. A.) Dr. Vernatter informed Plaintiff that he would be "given a shot due to [his] back spasm", but ultimately Plaintiff was discharged on April 9, 2015 without having received the shot or a discharge plan. (*Id.* at 3, Ex. A.)

When he returned to Sing Sing on April 9, 2015, Plaintiff was admitted to the facility's infirmary until April 22, 2015. (*Id.* at 3.) Upon his discharge, Dr. Muthra [3] issued Plaintiff a medically prescribed pass ("medical pass") which permitted him daily showers, the use of a cane, and relief from work and sports. (*Id.* at 3.) That pass expired on April 27, 2015, and in the days preceding its expiration, Plaintiff unsuccessfully attempted to meet with medical staff to have it renewed. (*Id.* at 4.) On May 1, 2015, Plaintiff was scheduled to see Dr. Ferdous, but that appointment was cancelled and Plaintiff filed a grievance. (*Id.* at 4, Exs. B-C.) On May 4, 2015, Plaintiff went to sick call regarding his medical passes, but "nothing was ever done." (*Id.* at 4.)

[3]    Dr. Muthra is not a party to this action.

In early May of 2015, Plaintiff was treated by Dr. John Galeeno, an outside orthopedic specialist, who discussed treatment options including "foot insoles, orthopedic sneakers, orthopedic boots, physical therapy", cortisone injections, and a double/medical mattress. (*Id.* at 5.) Plaintiff sent a letter to Dr. Gage, Facility Health Services Director ("FHSD") at Sing Sing, requesting this treatment, and Dr. Gage purportedly told Dr. Ferdous to inform Plaintiff that "security denied [his] medical mattress for security reasons", a statement Plaintiff believes was fabricated. (*Id.*) In response, Plaintiff filed a grievance and a complaint with the New York State Department of Health ("DOH") against Dr. Gage on May 6, 2015. (*Id.* at 4, Ex. D.) He also filed a "Reasonable Accommodations Request" to L. Malin (Deputy Superintendent for Programs) asking that Malin consult with Dr. Galeeno regarding the treatment. (*Id.* at 4, Ex. F.) Plaintiff alleges his request was denied when "Ms. Malin chose to consult with Dr. Gage." (*Id.*)

The day after Plaintiff filed the grievance against Dr. Gage, Dr. Ferdous authored a medical pass for Plaintiff that would include a bus pass, and permission to take daily showers, carry a cane, receive feed-up (where food is brought to the inmate's cell), and wear transition lenses. (*Id.* at 4.) As with his others, this medical pass required the approval of Dr. Gage. (*Id.*) Instead of immediately signing this medical pass—as was her custom—Dr. Gage purportedly stated that she would "think about signing the pass", (*id.*) and ultimately, on May 15, 2015, issued a medical pass for the use of a cane only, (*id.* at Ex. H; *see also* Declaration of Jeffrey Hale in Support of the State Defendants' Motion to Dismiss ("Hale Decl.") (ECF No. 37), at Ex. A.) [4] Plaintiff alleges that this conduct was done to deny and interfere with his medical treatment, (*id.* at 4), and in retaliation for filing a grievance, (*id.* at 4, Ex. H.)

[4]    The court is permitted to consider this document without converting this to a motion for summary judgment, as it is "integral" to Plaintiff's Complaint; indeed, an incomplete copy was attached thereto. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Chamberlain v. White Plains*, 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013).

**\*3** In November of 2015, Dr. Gage was purportedly demoted from the position of FHSD and assigned as Plaintiff's primary health care provider. (*Id.* at 6.) While in this position, during the months of December 2015 and January 2016, Dr. Gage gave Plaintiff "medical call out every week" for appointments with her. (*Id.*) During every single call out, Plaintiff would arrive and wait for hours, "causing severe back pain due to sitting on hard benches and standing." (*Id.*) Eventually, a corrections officer would approach Plaintiff and say that Dr. Gage "doesn't know when she's going to see you." (*Id.*) Dr. Gage did not see Plaintiff during any of these visits. (*Id.*)

With respect to Alvarado, Plaintiff alleges that he deliberately interfered with his medical treatment on two occasions. (*Id.* at 6-7.) On May 25, 2015, Alvarado confiscated Plaintiff's cane and cane pass while Plaintiff was attempting to walk through the metal detector. (*Id.* at 6.) Alvarado claimed to have authority from medical staff to do so. (*Id.*) On December 14, 2015, Alvarado confiscated Plaintiff's medically prescribed glasses during a search and wrote "a false misbehavior report against" Plaintiff. (*Id.* at 7.) In response to both instances, Plaintiff filed grievances, (*see id.* at Exs. K, L), alleging that Alvarado was interfering with his medical treatment and

Case 9:20-cv-00665-MAD-TWD   Document 28   Filed 04/26/21   Page 61 of 108

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

that his conduct was done "for purposes of harassment; and retaliation...." (*Id.*)

### B. Facts Related to the Motion for Injunctive Relief

Plaintiff's motion asserts that on April 25, 2017, a facility search was conducted and his "mattress and pillow were confiscated." (*See* Plf. Mot. at 2.) The mattress was returned on April 27, 2017, and on that day Plaintiff reportedly "sent in a sick call slip" but was not called to see a doctor until the following day. (*Id.* at 3.) During his visit on April 28, 2017, Plaintiff reportedly informed someone [5] that his back pain was "severe due to his mattress and pillow being wrongfully confiscated", that his medical pass was due to expire on May 3, 2017, that two of his prescriptions needed refills, and he needed to see an ophthalmologist for new lenses and frames. (*Id.*) He was informed that his concerns would be relayed to his health care provided "on that day." (*Id.*) During that visit, Plaintiff received the requested medication refills.

[5]     Plaintiff does not identify who he spoke with on April 28, 2017 at sick call.

On May 1, 2016 and May 3, 2016, Plaintiff sent slips to sick call regarding his medical passes and pillow. (*Id.*) He was called to sick call on May 4, 2017 and spoke with an unidentified nurse regarding the expiration of his medical pass and the fact that he still had no pillow. (*Id.*) Thereafter, on May 7, 2017, Plaintiff wrote to Dr. Ferdous regarding the expiration of his medical pass, the unreturned pillow, and other medical issues. (*Id.* at 4.) Plaintiff filed this motion on May 15, 2017, requesting a preliminary injunction ordering Dr. Ferdous to issue "a *temporary* medical pass for: bus pass, cane pass, daily showers, feed-up, and transition lenses to not expire until a disposition of this case is rendered." (*Id.*) Plaintiff did not file any grievances with respect to this request or otherwise avail himself of any administrative remedies. (*See* Plaintiff's Reply in Support of the Motion for an Injunction ("Plf. Reply") (ECF No. 65), ¶ 6.) [6] Ultimately, Plaintiff admits that his medical pass was renewed on May 31, 2017. (*Id.* ¶ 1.)

[6]     This document was not filed on ECF as a reply in further support of the motion for an injunction, but is indeed Plaintiff's Reply and is hereby deemed as such.

### DISCUSSION

#### I. Standard of Review

##### A. Rule 12(b)(6) [7]

[7]

In opposition to both motions, Plaintiff repeatedly refers to the summary judgment standard, arguing that a grant of summary judgment to the Defendants, in absence of discovery would be unjust. (*See* Plaintiff's Opp. to State Defs. Mot. (ECF No. 41), ¶¶ 4-7; Plaintiff's Opp. to Dr. Vernatter's Mot. (ECF No. 78), ¶¶ 1-2.) The Defendants have filed pre-answer motions to dismiss, not for summary judgment. The Court is not considering a summary judgment standard at this time. The Court further notes that Plaintiff's Opposition to Dr. Vernatter's motion should have been, but was not, filed by Dr. Vernatter along with the other motion papers. Accordingly, the Court had it filed on April 6, 2018.

**\*4** On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

Courts must construe *pro se* pleadings in a particularly liberal fashion, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them "to raise the strongest arguments that they suggest," *Harris v. City of N.Y.,* 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). Nevertheless, a *pro se* plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level," *Jackson v. N.Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 62 of 108

it," *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

A court's review is typically confined to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007). Where materials outside of the Complaint are offered in support or opposition to the motion to dismiss, the Court has a choice to make: "either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir. 1988) ) (internal quotations omitted). If the Court chooses the former approach, it must adhere to it strictly and not consider "affidavits and exhibits submitted" or "factual allegations contained in legal briefs or memoranda." *Id.* (quoting *Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir. 1999); *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir. 1991) ). Nevertheless, a court may consider documents attached to a motion to dismiss provided they are documents that are integral to the complaint without converting to a summary judgment motion. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *see also Chamberlain v. White Plains,* 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013).

Accordingly, the Court declines to convert this into a motion for summary judgment and will therefore only consider the factual allegations in Plaintiff's Complaint, the documents attached thereto, and the grievance attached to the Hale Declaration, as it is integral to Plaintiff's Complaint. The Court will consider no other documents or factual allegations *not* asserted in Plaintiff's Complaint.

### B. 12(b)(1)

**\*5** A challenge to a federal court's subject matter jurisdiction is properly raised by way of a 12(b)(1) motion. *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir. 2008), *aff'd,* 561 U.S. 247 (2010); *Alliance for Envt'l Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 87-88 (2d Cir. 2006). Without jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case." *Carter v. HealthPort Tech., LLC,* 822 F.3d 47, 55 (2d Cir. 2016). It is well-settled that the "plaintiff bears the burden of proving subject

matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir. 2005) (citing *Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir. 2002) ). If an official or entity is entitled to sovereign immunity, a court has no subject matter jurisdiction to hear the case. *See Cooper v. N.Y. State Dep't of Mental Health,* No. 01-CV-943 (AGS), 2001 WL 456348, at \*1 (S.D.N.Y. May 1, 2001); *see also Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 37-38 (2d Cir. 1977).

### II. Eleventh Amendment Immunity

The State Defendants move to dismiss all claims asserted against them in their official capacity. (*See* State Defs. Br. at 14.) Absent abrogation by Congress, a state is immune from suit in federal court. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54-56 (1996); *see also Dube v. State Univ. of New York,* 900 F.2d 587, 594 (2d Cir. 1990). This immunity extends to "arms of the state," which includes "officers employed by agencies such as" the DOCCS. [8] *Dube,* 900 F.2d at 594-95 (finding SUNY institution entitled to sovereign immunity); *see also Matteo v. Perez,* No. 16-CV-1837(NSR), 2017 WL 4217142, at \*7 (S.D.N.Y. Sept. 19, 2017). Section 1983 claims against state officers in their official capacity are ripe for dismissal, as those officials are not considered "person[s] within the meaning of the statute." *Id.* (citing *Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir. 2012); *Koehl v. Dalsheim,* 85 F.3d 86, 88-89 (2d Cir. 1996) for proposition that Section 1983 claims based on official capacity "barred by sovereign immunity"). Consequently, the Eighth Amendment claims against the State Defendants in their official capacity are hereby dismissed and the motion is granted in this regard.

[8]   Plaintiff's claims would not fall into the *Ex Parte: Young,* 209 U.S. 123 (1908), exception to the Eleventh Amendment as Plaintiff has not pled an "ongoing violation of federal law" seeking injunctive relief. *Aiken v. Nixon,* 80 Fed.Appx. 146 (2d Cir. 2003) (summary order). Though part of the requested relief is injunctive, Plaintiff's Complaint alleges facts related to separate instances of alleged constitutional conduct and does not amount to allegations of ongoing violations. (*See* Compl. at 3-7); *compare with Corbett v. Annucci,* No. 16-CV-4492(NSR), 2018 WL 919832, at \*8 (S.D.N.Y. Feb. 13, 2018); *Jude v. New York,* No. 07-CV-5890(RJS), 2009 WL 928134, at \*5 (S.D.N.Y. Mar. 30, 2009).

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 63 of 108

## III. Eighth Amendment Deliberate Indifference to Medical Needs [9]

[9]    Plaintiff asserts various other allegations of alleged deliberate indifference, including that he was given Ibuprofen instead of Naproxen (*see* Compl. at 3), that he was not provided a legible copy of his medical records (*id.* at 5), and that someone interfered with his physical therapy treatment (*id.* at 5-6.) Such allegations give rise to no colorable claims. First, Plaintiff has wholly failed to demonstrate that an alleged deprivation of legible medical records constitutes a constitutional violation. *Doe v. Conn. Dep't of Child and Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990); *Patterson v. City of New York*, No. 11-CV-7976(DLC), 2012 WL 3264354, at *4 (S.D.N.Y. Aug. 9, 2012) (noting that violations of regulations, alone, insufficient for constitutional violation). Further, in order to state a cognizable section 1983 claim, Plaintiff was required to plead personal involvement of each of the named Defendants, *see Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994), and has failed to state how, if at all, any of the Defendants were involved in these alleged deprivations; indeed, Plaintiff fails to even identify the individuals who allegedly interfered with his physical therapy or prescribed him Ibuprofen instead of Naproxen.

**\*6** A claim for inadequate medical care is born out of the Eighth Amendment's protection against cruel and unusual punishment. *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (citing *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).) To be entitled to relief, a plaintiff must plead and prove "deliberate indifference to his serious medical needs." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("*Hathaway II*") (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ) (alterations omitted).

Deliberate indifference is a dual-pronged analysis requiring proof of both an objective and subjective prong. *Hathaway II*, 37 F.3d at 66. The objective prong mandates the deprivation be, "in objective terms, sufficiently serious." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations omitted). To satisfy the subjective prong, the official must act with "a sufficiently culpable state of mind," *see Wilson v. Seiter*, 501 U.S. 294, 298 (1991), in that the official "must know of and disregard an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ).

### A. Objective Prong

The objective prong requires a two part inquiry. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). First, there must be an actual "deprivation of adequate medical care," *id.* at 279; reasonable care is not a deprivation, *see Farmer*, 511 U.S. at 844-47. Then, the Court must determine whether that deprivation is sufficiently serious, which requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("*Hathaway III*") ).

#### 1. State Defendants

Drawing all possible inferences from his Complaint, Plaintiff asserts both a denial of treatment and inadequate care provided. [10] (*See* Compl. 4-6.) For the categorical denial of treatment, the Court must examine whether the "medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. Plaintiff has alleged severe back pain which results from his herniated and bulging discs, (*see* Compl. 3, 7), a sufficiently serious condition; such condition is associated with extreme pain and leads to degeneration. *See Ceparano v. Suffolk Cnty. Dep't of Health*, 485 Fed.Appx. 505 (2d Cir. 2012) (summary order) (Eighth Amendment pled where deliberate indifference to "severely herniated spinal discs"); *Dobbin v. Artuz*, 143 F. Supp. 2d 292, 302 (S.D.N.Y. 2001); *Williams v. Smith*, No. 02-CV-4558(DLC), 2009 WL 2431948, at *8 (S.D.N.Y. Aug. 10, 2009) (noting persistent back pain sufficiently serious). Plaintiff's allegations that Dr. Gage participated in the denial of Plaintiff's request to obtain the treatment recommended by his orthopedic specialist, Dr. Galeeno and made Plaintiff wait for hours once a week without ever actually providing treatment during the months of December 2015 and January 2016, are sufficient for an actual deprivaiton. (*See* Compl. at 4-6.) The objective prong is satisfied.

[10]    Plaintiff's allegations regarding the issuance of a medical pass for a cane only, amount to inadequate care provided. (*See* Compl. at 4-5.) Such a claim requires a narrow approach, focused on "the

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 64 of 108

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)
2018 WL 1750320

challenged" interference or deprivation, rather than the nature of the condition. *Salahuddin*, 467 F.3d at 280. Defendants are correct in arguing that Plaintiff has failed to plead how this amounts to an objectively serious deprivation. Indeed, on the facts alleged, the conduct may amount to a difference of opinion between medical doctors, *see Chance*, 143 F.3d at 703 (noting difference between deliberate indifference and difference of opinion in matter of medical judgment); *Woods v. Goord*, No. 01-CV-3255(SAS), 2002 WL 31296325, at *5 (S.D.N.Y. Oct. 10, 2002) (same true as between doctors), which is insufficient for deliberate indifference, though sufficient in this case for retaliation, *see infra* IV.

**\*7** The central claim against CO Alvarado is that he interfered with Plaintiff's medical treatment when he confiscated Plaintiff's cane despite his having a medical pass for it. (*See* Compl. at 6-7.) In other words, by confiscating the cane, Alvarado denied him medical treatment. Accordingly, the question is whether the condition and deprivation were sufficiently serious. *Salahuddin*, 467 F.3d at 280. The Court need not linger on this issue; it has already determined that a herniated disc is sufficiently serious, and the denial of a medically prescribed cane constitutes an actual deprivation.[11]

[11]    The allegations regarding Alvarado's confiscation of the glasses do not meet the objective prong. Plaintiff has failed to demonstrate that the interference or his medical condition related to his vision were sufficiently serious; indeed, he does not even describe what his medical condition is.

As to Dr. Ferdous, Plaintiff explicitly states that he was "completely denied treatment", (*see* Plf. Opp. ¶ 18.) Plaintiff however, cannot sustain a claim for deliberate indifference against Dr. Ferdous. It is well settled that where an inmate has received adequate care, he has no Eighth Amendment claim. *Salahuddin*, 467 F.3d 279 (noting that initial inquiry is whether there was an actual deprivation). There was no deprivation here. The following are the only allegations related to Dr. Ferdous: (1) Plaintiff wrote letters to Dr. Ferdous that were unanswered, (*see* Compl. at 3); (2) Plaintiff was scheduled to see Dr. Ferdous on May 1, 2015, but his appointment was cancelled, (*id.* at 4, Ex. C); and (3) on May 7, 2015, Dr. Ferdous wrote a medical pass that was ultimately denied by Dr. Gage for "bus pass, cane, shower, feed-up, and transition lens[es]," (*id.*) There is no doubt

that unanswered letters cannot give rise to a constitutional violation, particularly where Plaintiff does not identify how many letters were sent or over what period of time they were sent *and* in light of the fact that Plaintiff was able to meet with Dr. Ferdous in person. Additionally, Plaintiff may be upset that Dr. Ferdous cancelled one appointment, but the doctor met with him less than a week later, ultimately amounting to a six day delay, already established by this Court as insufficient for deliberate indifference. *See Munoz v. Eliezer*, No. 16-CV-6049(NSR), 2018 WL 1626170, at *6 (S.D.N.Y. Mar. 30, 2018). Finally, Plaintiff's final allegation clearly does not assert a deprivation whatsoever, as Plaintiff was provided with a broad medical pass by Dr. Ferdous, to which he admits consenting. (*See* Compl. at 4.) Plaintiff's claims against Dr. Ferdous must be dismissed with prejudice.

### 2. Dr. Vernatter[12]

[12]    Dr. Vernatter does not work for DOCCS; he is a doctor at Mount Vernon Hospital. Dr. Vernatter does not to contest his ability to be sued under Section 1983 for constitutional violations as a state actor, so the Court assumes the same.

Plaintiff's claims against Dr. Vernatter allege that Dr. Vernatter violated his rights when he failed to administer a shot for Plaintiff's back spasm and failed to provide him with a discharge plan upon exiting Montifiore. (*See* Compl. at 3, Ex. A.) Where, as here, the allegations claim inadequate medical treatment provided, the inquiry focuses on the alleged inadequacy "rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280.

Plaintiff alleges that he was suffering from "a severely painful paralyzing" pain radiating down the left side of his body on April 6, 2015, for which he was transferred to Montifiore for treatment. (*See* Am. Compl. at 3.) Plaintiff was admitted to the hospital and received treatment from Dr. Vernatter for the next three days. (*Id.*) During this time, Plaintiff underwent a CAT Scan, had his blood tested, and was administered Percocet and Baclofen for the pain. (*Id.* at Ex. A.) Dr. Vernatter told him he would receive a shot for his back spasm, but never administered it and Plaintiff was discharged from the hospital without a discharge plan. (*Id.*) This treatment was not inadequate. He went to the hospital complaining of severe pain and was ultimately monitored for three days and prescribed pain medication. The fact that Dr. Vernatter chose not to give Plaintiff the shot for his alleged back spasm or a discharge plan are not sufficiently serious deprivations. *See Charles v. County of Orange*, no. 16-CV-5527(NSR),

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2017 WL 1750320

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 65 of 108

2017 WL 4402576, at *11 (S.D.N.Y. Sept. 29, 2017) (finding deprivation of discharge plan not sufficiently serious); *see also Farmer*, 511 U.S. at 844-47 (noting that reasonable care is not a deprivation). [13]

[13]    At best, the failure to administer the shot was a decision of medical judgment, not recoverable under the Eighth Amendment, *see Estelle*, 129 U.S. at 107, and at worst constitutes negligence or medical malpractice, equally insufficient for deliberate indifference purposes, *see Hill*, 657 F.3d at 123; *see also Williams v. Wright*, 162 Fed.Appx. 69, 71 (2d Cir. 2006) (summary order) (citing *Estelle*, 429 U.S. at 107) (internal quotations omitted); *see also Hill*, 657 F.3d at 123; *Rush v. Fischer*, No. 09-CV-9918(JGK), 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) (collecting cases and noting that "decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference....").

**B. Subjective Prong**

**\*8**  Where deliberate indifference is concerned, negligence or medical malpractice will not "rise to the level of a constitutional violation unless the malpractice involves culpable recklessness." *Hill*, 657 F.3d at 123 (citing *Chance*, 143 F.3d at 703) (internal quotations and alterations omitted). Relatedly, so long as a prisoner "receives adequate treatment", he "does not have the right to choose" the treatment he receives. *Id.* (citing *Estelle*, 429 U.S. at 97); *see also Chance*, 143 F.3d at 703 (noting that a prisoner's preference for different treatment does not rise to the level of an Eighth Amendment violation).

*1. State Defendants*

Plaintiff has pled Dr. Gage's relevant mental state. Where there are allegations that the prison official knew of and disregarded the plaintiff's serious medical needs, the requisite mental state has been pled. *Farmer v. Brennan*, 511 U.S. at 837. The State Defendants' contention that Dr. Gage's decision to deny the treatment recommended by Dr. Galeeno constitutes an exercise in medical judgment is unavailing. While it is true that a disagreement in treatment, even between a prison doctor and outside specialist, typically reflects medical judgment, not deliberate indifference, *see Williams,*

2009 WL 2431948, at *9, Plaintiff's allegations call that standard into question. Considering all of the facts, including that Dr. Gage wanted Plaintiff to believe security would not permit a double mattress, (*see* Compl. at 5), Plaintiff has pled sufficient facts from which the inference can be drawn that the decision to deny the recommended treatment was not predicated on medical judgment, but on something more—a deliberate choice to deny the treatment.

Further, Plaintiff's allegations with respect to Dr. Gage's conduct in December of 2015 and January of 2016 are sufficient. Construing the Complaint liberally, as this Court must, Dr. Gage, who was originally the FHSD but since demoted and assigned Plaintiff's primary care provider, (*see* Compl. at 6), undoubtedly knew of Plaintiff's extreme pain associated with his herniated and bulging discs and that making Plaintiff wait hours for treatment could cause his condition to deteriorate, but ignored that risk when she called Plaintiff to sick call to wait for hours, (*id.*) The contention that this is no different than private individuals who must wait for physician care, (*see* State Defs. Br. at 10), grossly misconstrues the allegations and dismisses a key allegation which illuminates Dr. Gage's intentions; Plaintiff did not wait hours to be treated by Dr. Gage—Plaintiff waited hours, once a week, only to be told that Dr. Gage *could not* see him. (*See* Compl. at 6.) Plaintiff has met his burden.

Plaintiff has failed, however to allege sufficient facts for Alvarado's mental state. While deliberate indifference can be manifested "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed," *Estelle*, 429 U.S. 97, 104-05 (1976), such is true where, unlike here, there is no cause to interfere, *see Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors"); *Covington v. Westchester Cnty. Jail*, No. 96-CV-7551(SAS), 1997 WL 580697, at *3 (S.D.N.Y. Sept. 18, 1997) (confiscation without cause violates constitution), and the conduct occurs more than once, *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 270 (noting that a single occurrence likely is not sufficient). Plaintiff makes clear that Alvarado confiscated the cane because he was authorized to do so by medical staff, (*aee* Compl. at 6, Ex. K), and this interference only happened once. The claim must be dismissed. [14]

[14]    In a letter received by the Court on February 17, 2017, (ECF No. 43), which this Court deems Plaintiff's sur-reply to the State Defendants' motion

Case 9:20-cv-00665-MAD-TWD   Document 28   Filed 04/26/21   Page 66 of 108

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

to dismiss, Plaintiff alleges additional facts that Alvarado did not have authorization from medical staff to confiscate his cane or glasses. (*See* ECF No. 43, ¶ 2). These facts were not asserted in his complaint and thus cannot be considered in deciding the motion. *See LLM Bar Exam, LLC v. Barbri, Inc.*, No. 16CV3770, 2017 WL 4280952, at *21 (S.D.N.Y. Sept. 25, 2017) ("[A] complaint cannot be amended by the briefs in opposition to a motion to dismiss."); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *Williams v. Rosenblatt Secs. Inc.*, 136 F. Supp. 3d 593, 609 (S.D.N.Y. 2015). Since Plaintiff's failure amounts to a failure to plead enough facts, he will be granted leave to re-plead these claims against Alvarado.

### 2. Dr. Vernatter

*9 If the medical deprivation by Dr. Vernatter was considered sufficiently serious, Plaintiff's claim still fails to allege any facts whatsoever from which an inference can be drawn that Dr. Vernatter knew of a serious risk to Plaintiff's health and disregarded that risk. Deliberate indifference has not been established. Further, the decision not to administer the shot amounts to, at most, malpractice, as discussed *supra* III.A.2.

In consideration of the foregoing, the State Defendants' motion to dismiss the Eighth Amendment claims is granted in part and denied in part. The claims against Dr. Gage are the only to withstand the motion. Additionally, Dr. Vernatter's motion is granted. [15]

[15] Plaintiff also alleges violations of various state regulations resulting in a failure to provide legible medical records and a failure to receive a discharge plan prior to his exit from Montifiore. (*See* Compl. at 3, 5.) It is well settled that violations of state regulations, alone, do not raise a right to relief under Section 1983. *Doe v. Conn. Dep't of Child and Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990); *Patterson v. City of New York*, No. 11-CV-7976(DLC), 2012 WL 3264354, at *4 (S.D.N.Y. Aug. 9, 2012). Further, as evidenced above, the conduct which is alleged to violate these regulations, considered separate and apart from its categorization *as* a violation, is insufficient to give rise to a claim for deliberate indifference.

## IV. Retaliation

Construing the Complaint liberally, as this Court must, Plaintiff appears to assert a claim for retaliation against Dr. Gage—an issue addressed by the State Defendants in a footnote. (*See* State Defs. Br. at 9.) [16] Prison officials shall not retaliate against prisoners for exercising their constitutional rights. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Nevertheless, courts should consider retaliation claims with skepticism, *see Turner v. Sidorowicz*, No. 12-CV-7048(NSR), 2014 WL 641454, at *10 (S.D.N.Y. Feb. 18, 2014), as they are "prone to abuse since prisoners can claim retaliation for every decision they dislike," *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ) (internal quotations omitted). Contrary to the State Defendants' contention, while Plaintiff did not assert retaliation as a separate claim, the pleading is not wholly conclusory.

[16] Some of the statements in the grievances attached to Plaintiff's Complaint regarding Defendant Alvarado's conduct appear to allege that Alvarado confiscated his belongings for "harassment" or retaliation purposes. (*See* Compl. at Ex. K.) These allegations are "wholly conclusory" and cannot support a retaliation claim. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (noting that "complaint of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone").

A claim for retaliation is properly pled by allegations:"(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) ). It is well settled that "the filing of prison grievances is a constitutionally protected activity", *see id.*; thus, Plaintiff's allegations that he filed grievances against Dr. Gage that were met with retaliation satisfy the first prong.

### A. Adverse Action

*10 Plaintiff has pled adverse action. To be adverse, the retaliatory conduct must be such to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights;" if not, "the retaliatory act is simply *de minimis*...." *Davis*, 320 F.3d at 353. This test is objective and applies "even where[, as here,] a particular plaintiff was

Case 9:20-cv-00665-MAD-TWD   Document 28   Filed 04/26/21   Page 67 of 108

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

not himself subjectively deterred." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). In retaliation cases, plaintiffs must demonstrate harm, and where a prisoner is concerned, "the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks." *Id.* at 383.

Plaintiff's numerous allegations that Dr. Gage interfered with his medical passes, (*see* Compl. at 4-5), outright denied his requests for treatment recommended by Dr. Galeeno, (*id.*), and denied Plaintiff any treatment while forcing him to wait at sick call once a week for two months, which exacerbated his back pain, (*see id.* at 6), are sufficient for adverse action. *See Williams v. Fisher*, No. 02-CV-4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (finding revocation of necessary medical rehabilitative treatment enough for adverse action). Such conduct would be enough to deter a similarly situated individual of "ordinary firmness" from filing future grievances, despite not deterring Plaintiff from doing so.

### B. Causal Connection

Finally, Plaintiff has pled sufficient facts from which a causal connection between the filing of the grievance and the adverse action can be inferred. There must be facts suggesting that "the protected conduct was a substantial motivating factor in the prison official's decision to take action against" the plaintiff. *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009). Factors courts consider in determining whether a retaliatory motive has been pled include: "(i) the temporary proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Id.* at 367.

Considering the totality of Plaintiff's Complaint, he has met his burden. First, Plaintiff alleges that, on May 6, 2015, he filed a grievance and complaint with the New York State Department of Health against Dr. Gage. (*See* Compl. at 4, Ex. E.) The very next day, Dr. Ferdous authored a broad medical pass that required authorization by Dr. Gage who indicated that she would "think about signing the pass" and ultimately issued a pass for a cane only, on May 12, 2015, not even a week after Plaintiff filed his grievance. (*See* Compl. at 4, Ex. H; *see also* Hale Decl., Ex. A.) The short temporal distance between the filing of the grievance and Dr. Gage's conduct, *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (causal connection pled through demonstration that "protected activity was close in time to the adverse action"); *see also Turner*, 2014 WL 641454, at *11 (finding

causal connection where "alleged retaliatory action was taken directly in response to a grievance"), coupled with allegations that Dr. Gage typically "just sign[s] the pass", (*see* Compl. at 4), suggest a causal connection.

As further evidence of retaliatory motive, Plaintiff alleges two important facts with respect to the denial of the treatment recommended by Dr. Galeeno. Specifically, Dr. Gage told Dr. Ferdous to lie to Plaintiff, stating that security would not permit a double mattress in the facility, (*see* Compl. at 5, Ex. D,) and to bolster that allegation, Plaintiff contends that other inmates in the facility had double mattresses, (*id.*)

**\*11** Moreover, after Dr. Gage's demotion, she was assigned as primary care provider for Plaintiff, an inmate who had filed numerous grievances against her. (*See* Compl. at 5, Exs. D-H.) Plaintiff's allegations that, thereafter, he was made to appear at sick call, under the guise of having appointments with Dr. Gage, and forced to wait for hours, ultimately receiving no treatment whatsoever, (*see* Compl. at 6), are further evidence of retaliation. *Compare with Burton*, 664 F. Supp. 2d at 368 (causal connection pled where sufficient facts to "imply a retaliatory motive")

### V. Qualified Immunity

The Court need only consider qualified immunity for Dr. Gage, in light of its decision to dismiss all claims against Dr. Ferdous with prejudice and permit Plaintiff leave to re-plead claims against Alvarado.

State officials are entitled to qualified immunity provided "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Morgan v. Ward*, 14-CV-7921(GHW), 2016 WL 427913, at *7 (S.D.N.Y. Feb. 2, 2016) (citing *Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000) ); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Granting a 12(b)(6) motion for qualified immunity is appropriate where "the facts supporting the defense appear on the face of the complaint," *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998) ), *and* "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief," *id.* (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) ).

In finding that Plaintiff has properly pled claims for deliberate indifference and retaliation against Dr. Gage, this Court has

decided that Plaintiff has established the potential violation of a clearly established constitutional right. Further, the State Defendants argue that Dr. Gage could "have reasonably believed that granting Plaintiff use of a cane to move about the facility did not violate any clearly established federal right." (*See* State Defs. Br. at 14.) This argument ignores the remainder of allegations against Dr. Gage. Considering the totality of allegations, it is evident that Dr. Gage knew the severity of Plaintiff's herniated discs, and at the very least, could not have considered it reasonable to force Plaintiff to wait for hours, once a week and receive no treatment. Further, as to retaliation, the allegations that Dr. Gage made false statements during the grievance process are sufficient. *See Turner*, 2014 WL 641454, at *12 (noting "clearly established that prison personnel may not submit false reports in retaliation against prisoners").

## VI. Leave to Amend

The Court need not linger on whether to assert supplemental jurisdiction over Plaintiff's state law claims. To the extent that any state claims are cognizable on the facts of the Complaint, they are barred against all Defendants in their official capacity. *See Parris*, 947 F. Supp. 2d at 365; *Baker v. Coughlin*, 77 F.3d 12, 15-16 (2d Cir. 1996) (state law claims arising "from acts or omissions within the scope of their employment at DOCCS" dismissible for lack of subject matter jurisdiction); *see also* N.Y. Corr. Law § 24 (requiring that lawsuits related to DOCCS employees' conduct within the scope of their employment, be brought in New York Court of Claims against the State).

**\*12** Further, insofar as Plaintiff attempts to allege state law claims for negligence against the Defendants in their individual capacity, these claims too must fail as the Court has already determined that the Section 1983 claims are ripe for dismissal. *See Crique v. Magill*, No. 12-CV-3345(PAC) (GWG), 2013 WL 3783735, at *1, 4 (S.D.N.Y. Jul. 9, 2013) (adopting report and recommendation in entirety, including recommendation to not to "exercise supplemental jurisdiction over any state law claims for medical malpractice in light" of dismissal of 1983 claims). Such claims are dismissed without prejudice, and to the extent Plaintiff can cognizably plead same, he can do so in state court. [17]

[17]    Even under the most liberal reading, Plaintiff asserts no state law claims in the Complaint against Dr. Gage, the only Defendant against whom any Section 1983 claims remain.

## VII. Leave to Amend

Though "[l]eave to amend should be freely granted", this Court declines to allow Plaintiff leave to amend his claims against Dr. Vernatter and Dr. Ferdous, as an amendment would be futile. *See Nognou v. Mayrose*, 400 Fed.Appx. 617, 620 (2d Cir. 2010)(summary order) (quoting *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ). As in *Nognou*, Plaintiff's claims against Dr. Vernatter, if anything, amount to no more than negligence and malpractice, thus no amendment could render their conduct actionable. *See id.* (affirming denial of leave to amend on ground that "negligence and medical malpractice" not recoverable under Section 1983). Further, as stated, *supra*, there are no cognizable claims against Dr. Ferdous and this Court will grant Plaintiff leave to re-plead the claims against Alvarado.

## VIII. Plaintiff's Motion for Injunctive Relief [18]

[18]    Plaintiff also filed a second reply in support of his motion, a document entitled "Reply After Receiving Medical Documents" ("Plf. Reply 2") after he allegedly received certain medical records. (*See* ECF No. 66.) This Court has not been provided copies of any of these medical records, and nevertheless would not consider them in determining the merits of the motion for injunction, since Plaintiff has failed to exhaust his administrative remedies, as discussed *infra* VII.A. This Court has reviewed this second reply and finds that it fails to alter the result.

Plaintiff also moves for injunctive relief; specifically, requesting that this Court compel Dr. Ferdous to "issue a *temporary* medical pass for: bus pass, cane pass, daily showers, feed-up, and transition lenses" not to expire until a disposition of this matter. (*See* Plf. Mot., at 2.) In opposition, the State Defendants argue that the motion should be dismissed for failure to exhaust administrative remedies and that Plaintiff has otherwise failed to meet his burden of establishing entitlement to an injunction. (*See* The State Defendants' Opposition to Plaintiff's Motion ("Defs. Opp.") (ECF No. 58), at 1-2.) [19]

[19]    In his reply, Plaintiff makes the following additional assertions: (1) "Defendant's [sic] should automatically schedule follow-up appointments prior to the expiration of medical passes and

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 69 of 108

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

prescriptions for known medical concerns/issues that can cause extreme pain", (*See* Plaintiff's Reply in Support of Motion for Injunction ("Plf. Reply") (ECF No. 65), ¶ 2); (2) "Plaintiff was left without ... Naproxen and Claritin until June 20, 2017....", (*id.* ¶ 3); (3) "[t]here have been serious issues in Sing Sing C.F. when officer's [sic] get involved by interfering with prisoner's [sic] medical care and failing to perform specific job duties including coercion and retaliation by medical staff.... [and t]hree inmates have passed away in Sing Sing C.F. in the span of one week" (*id.* ¶ 5). The Court will not consider these assertions to the extent that they attempt to raise claims not asserted in the Complaint and are wholly unrelated to the conduct giving rise to the request for injunctive relief in the opening papers. *See United States v. East River Housing Corp.*, 90 F. Supp. 3d 118, 162 (S.D.N.Y 2015) (collecting cases noting that new arguments raised in reply papers will not be considered).

**\*13** Injunctive relief is "an extraordinary remedy", only appropriate in limited circumstances. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Where, as here, the injunctive relief requested is mandatory, in that it seeks compulsion of positive action, the standard is particularly high. *Almontaser v. New York City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where ... an injunction will alter ... the status quo, ...."). To be entitled to relief, the proponent must show, in addition to irreparable harm in absence of relief, a "clear or substantial showing" of entitlement to the relief requested, or that "extreme or very serious damage will result from a denial of preliminary relief." *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003).

Further, it is well settled in this Circuit that an inmate must exhaust all of his administrative remedies for every claim asserted. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see also Richardson v. Hillman*, 201F. Supp. 2d. 222, 228 (S.D.N.Y. 2002) (citing *Porter v. Nussle*, 534 U.S. 516 (2002) for proposition that any and all claims related to prison life must be exhausted). Indeed, exhaustion is required for claims for damages and claims for injunctive relief alike. *Amador v. Andrews*, 655 F.3d 89, 95 (2d Cir. 2011).

## A. Exhaustion [20]

[20]    Defendants also argue that Plaintiff's Motion is moot because his previous medical passes were renewed on May 31, 2017. (*See* Defs. Opp., at 3-4.) At the time Defendants opposed Plaintiff's motion, the existence of the issued medical pass did in fact moot the motion. Nevertheless, the new pass would have long expired by now and the larger issue is one of exhaustion, which this Court must address.

Contrary to Plaintiff's unsupported assertion that exhaustion is not necessary for injunctive relief, (*see* Plf. Reply ¶ 6), the motion is ripe for dismissal for lack of exhaustion. It is axiomatic that a prisoner alleging claims pursuant to 42 U.S.C. § 1983 must first exhaust all available administrative remedies before filing a lawsuit. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

Preliminarily, Plaintiff cannot rely on exhaustion of his claims in the Complaint as a means to say he has exhausted the claims in his motion for injunctive relief. While the claims alleged in the Complaint relate to deliberate indifference, the conduct alleged in support of the motion occurred at least a year after the conduct in the Complaint; thus, by definition they are unrelated to one another. If this Court granted this relief, it would in effect be permitting Plaintiff to proceed on a theory not alleged in the Complaint and subvert the exhaustion requirement. *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) (noting that "party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed" in the motion and conduct in the complaint); *Grullon v. Reid*, No. 97-CV-7616(RWS), 2000 WL 648891, at \*1 n.1 (S.D.N.Y. May 19, 2000) (same); *see also Dorsey v. Artus*, No. 9:09-CV-1011(GLS/DEP), 2013 WL 5463720, at \*4 (N.D.N.Y. Sept. 30, 2013) (denying motions for injunction unrelated to the allegations in the complaint). The fact that the conduct was unrelated leads to the conclusion that Plaintiff was required to exhaust his claims for this separate, unrelated conduct before requesting relief in federal court. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes ..."). Plaintiff has plainly admitted that he has not done so. His motion must be denied. *See Royster v. Spitzer*, No. 05-CV-6635(JSR)(LMS), 2011 WL 2020442, at \*3 (S.D.N.Y. Mar. 28, 2011) (denying motion for injunction for failure to exhaust administrative remedies). [21]

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

21   Plaintiff filed subpoenas duces tecum contemporaneously with his Reply. (*See* ECF No. 65.) Read in context with the Reply, Plaintiff appears to be requesting certain documents to rebut the contentions made by Sergeant John Ruane and Sergeant Gina Shibah in opposition to this motion. (*See* Plf. Reply, ¶¶ 12, 18.) Having decided Plaintiff's Motion without reference to the Declarations of either sergeants, this Court hereby declines to issue Plaintiff's subpoenas. To the extent the issuance of such subpoenas will prove fruitful in discovery, Plaintiff is permitted to request issuance of them at such time.

*14 Plaintiff is thus advised to address the issue of the renewal of his medical pass, to the extent it persists as an issue, through the available administrative procedures and then request an opportunity to amend the complaint, or file a separate action where appropriate.

This Court declines to consider the merits of Plaintiff's motion as exhaustion is a necessary prerequisite. The Court nonetheless notes that the motion would also fail on the merits because Plaintiff's medical pass was ultimately renewed on May 31, 2017, precluding his ability to demonstrate imminent, irreparable harm. *Compare Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996) (noting that, typically, pleading a constitutional violation suffices) *with McKenna v. Wright,* No. 01-CV-6571(WK), 2002 WL 338375, at *4 (S.D.N.Y. Mar. 4, 2002) (noting that imminent requirement compels courts to look beyond past injury).

## IX. **Plaintiff's Motion for Sanctions**

While not filed as a motion, Plaintiff seeks sanctions. (*See* Plf. Reply in Further Support of Motion for Injunction (ECF No. 65), at 5; *see also* ECF No. 68.) Plaintiff merely filed a "Notice of Motion" for sanctions which requests relief pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. (*Id.*) The motion fails for multiple reasons.

First, Rule 11(c)(2)'s safe harbor provision requires a twenty-one day window between service of the motion and filing, within which the party against whom sanctions is requested can withdraw or correct "the challenged paper, claim, defense, contention or denial." *See* Fed. R. Civ. P. 11(c)(2). Failure to adhere to the safe harbor provision mandates denial of a motion for sanctions. *See Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir. 1995); *Johnson v. Wolan,* No.

10-CV-1622(RJH), 2010 WL 5076821, at *5 (S.D.N.Y. Dec. 13, 2010). Plaintiff's notice of motion was dated July 6, 2017 and filed on July 10, 2017; Defendants were not provided the twenty-one days required by Rule 11. Plaintiff's July 24, 2017 notice of motion for sanctions, (*see* ECF No. 68), fares no better. It is dated on July 24, 2017 and received by the Court on July 28, 2017. Both must be denied.

Second, a Rule 11 motion "must be made separately from any other motion...." *See* Fed. R. Civ. P. 11(b); *see also Avent v. Solfaro,* 223 F.R.D. 184, 187 (S.D.N.Y. 2004). Plaintiff not only moves contemporaneously under Rule 11 and 28 U.S.C. § 1927, but also incorporates the motion for sanctions into his reply in support of his motion for an injunction; warranting denial. *See Avent,* 223 F.R.D. at 187 (denying motion where plaintiff "filed his Rule 11 motion in conjunction with a motion pursuant to 28 U.S.C. § 1927"); *Johnson,* 2010 WL 5076821, at *5 (denial where motion for sanctions made along with a motion to dismiss); *see also Eady v. Lappin,* No. 05-CV-0824, 2007 WL 1531879, at *4 (N.D.N.Y. May 22, 2007).

Any motion pursuant to 28 U.S.C. § 1927 is equally unavailing. The statute permits sanctions against "any attorney" or other admitted individual "who so multiplies the proceedings in any case unreasonably and vexatiously...." *See* 28 U.S.C. § 1927. Plaintiff simply makes no claims that Defense counsel unreasonably or vexatiously multiplied the proceedings. *Compare with Avent,* 223 F.R.D. at 188 (properly asserted under § 1927 where alleged that defendants made "false and groundless motions during discovery" and that such conduct "caus[ed] delay and multipl[ied] the proceedings"). Plaintiff's motion for sanctions is denied.

## CONCLUSION

*15 In light of the foregoing, the Court hereby resolves each of the motions as follows:

The State Defendants' motion to dismiss Plaintiff's Complaint is hereby **GRANTED** in part and **DENIED** in part. The motion is denied as to the claims against Dr. Gage since Plaintiff has alleged claims for deliberate indifference and retaliation for which Dr. Gage is not entitled to qualified immunity. The motion is granted as it relates to Dr. Ferdous and CO Alvarado and the Complaint is hereby dismissed against these Defendants. Plaintiff is granted leave to re-plead his claims against Alvarado. The motion is also granted insofar as it seeks dismissal of claims against the

2018 WL 1750320

State Defendants in their official capacities, by operation of sovereign immunity.

Dr. Vernatter's motion to dismiss is **GRANTED** and Plaintiff's Complaint as against him is dismissed with prejudice.

Plaintiff's Motion for a Preliminary Injunction is **DENIED** for failure to exhaust administrative remedies.

Plaintiff's Motion for Sanctions is **DENIED**.

This Court further notes that Plaintiff's motion for injunctive relief represents the third time Plaintiff has attempted to seek this Court's intervention for alleged constitutional violations unrelated to the conduct asserted in the Complaint. (*See* ECF Nos. 73 and 77.) On each occasion, the Court has had to remind Plaintiff of his obligation to exhaust all administrative remedies before asserting claims in federal court. (*Id.*) Plaintiff is cautioned to refrain from requesting further intervention from the Court that is unrelated to the conduct alleged in the Complaint. Any other alleged constitutional violations Plaintiff suffers must be asserted through the appropriate administrative channels before he can seek legal redress in a court of law.

Only the Eighth Amendment claim for deliberate indifference and the First Amendment claim for retaliation against Dr. Gage remain; he is thus directed to Answer the Complaint on or before May 4, 2018. Plaintiff may re-plead his claims against Alvarado. If he fails to do so on or before May 7, 2018, the claims against Alvarado will be dismissed with prejudice. The Court will thereafter set a schedule for the completion and submission of a case management plan. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 33, 45, and 56. The Clerk of Court is further respectfully directed to terminate Defendants Joshua Vernatter and Razia K. Ferdous, as all claims against them are dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1750320

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Vega v. Lareau, Not Reported in F.Supp.2d (2010)
2010 WL 2682307

2010 WL 2682307
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Alex VEGA, Plaintiff,

v.

Mr. LAREAU, Corrections Sergeant; G.
Labonte, Corrections Officer; and Mr.
Garbera, Corrections Counselor, Defendants.

No. 9:04–CV–0750 (GTS/ATB).
|
March 16, 2010.

**Attorneys and Law Firms**

Alex Vega, pro se.

Charles J. Quakenbush, AAG, for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Due to Judge Di Bianco's retirement on January 4, 2010, the case was reassigned to me. (Dkt. No. 70).

In his amended civil rights complaint, plaintiff alleges that he was harassed and discriminated against by defendants because of what defendants perceived to be plaintiff's sexual orientation. (Amended Complaint (AC)) (Dkt. No. 30). Plaintiff also alleges that, after he filed grievances regarding the harassment and discrimination, defendants retaliated against him by filing false misbehavior reports, not allowing him to attend his assigned program, and threatening to transfer plaintiff out of protective custody and into general population at another correctional facility. (*Id.*) Plaintiff seeks substantial monetary relief.

Presently before the court is a motion for summary judgment pursuant to FED. R. CIV. P. 56 submitted by defendants Lareau, LaBonte, and Garbera. [1] (Dkt. No. 66). Defendants assert that plaintiff cannot substantiate his claims of retaliation or equal protection and, even if he could substantiate his claims, that qualified immunity precludes liability for damages. (*Id.*) Plaintiff has responded in opposition to the motion. (Dkt. No. 68). Defendants have filed a reply. (Dkt. No. 69). For the following reasons, this Court will recommend that defendants' motion for summary judgment be granted.

[1] The defendants' names are spelled as set forth in defendants' Declarations. (*See* Dkt. Nos. 66–4, 66–6, and 66–8). The Clerk of the Court has corrected the docket report accordingly. As discussed below, plaintiff has withdrawn his claims against defendants Garbera and Lareau.

**DISCUSSION**

**I. *Facts***

Plaintiff Alex Vega commenced this action under 42 U.S.C. § 1983, alleging deprivation of his civil rights. The facts and procedural history of this case are set forth more fully in the Decision and Order of United States District Judge Suddaby filed on March 26, 2009, familiarity with which is assumed. (*See* Dkt. No. 65). In that Decision and Order, all defendants were dismissed except defendants Lareau, LaBonte, and Garbera, and all claims were dismissed except those alleging (1) retaliation by defendants LaBonte, Garbera, and Lareau and (2) violation of plaintiff's right to equal protection by defendant LaBonte. (*Id.* at 31–32). The facts pertinent to defendants' present motion for summary judgment are related herein in the light most favorable to plaintiff as the non-moving party.

**A. Uncontested Facts** [2]

[2] These facts were set forth in defendants' Statement of Material Facts provided in accordance with Local Rule 7.1(a)(3) of the Northern District of New York. The facts set forth as uncontested were included in defendants' Rule 7.1 Statement, supported by record citations, and admitted by plaintiff in his response to defendants' Rule 7.1 Statement. (*See* Dkt. No. 66–3 ("Defendants' Rule

7.1 Statement"); Dkt. No. 68 at 1–2 ("Plaintiff's Response to Defendants' Rule 7.1 Statement")).

During the times relevant to this action, plaintiff was housed in the Assessment and Program Preparation Unit ("APPU") at Clinton Correctional Facility ("Clinton"). (*See generally* AC; Defs.' Rule 7.1 Statement ¶ 2; Dkt. No. 66–4 ("Garbera Declaration") ¶ 10). The Clinton APPU is a transitional unit at which inmates receive counseling and services in order to prepare them for longer-term residence at other prison facilities. [3] (Defs.' Rule 7.1 Statement ¶ 3; Gabrera Decl. ¶ 10). While housed at Clinton APPU, plaintiff was assigned to the church cleaning work detail which was usually supervised by defendant LaBonte. (Defs.' Rule 7.1 Statement ¶¶ 4, 9; Dkt. No. 66–6 ("LaBonte Decl.") ¶¶ 4–6, 21; AC ¶¶ 3(f), 8–9).

[3]    APPU is also "a unit for those inmates who are considered 'victim prone' for various reasons." *Lewis v. Brooks,* 9:00–CV–1433, 2005 WL 928617, at *3 (N.D.N.Y. Mar. 10, 2005).

**\*2** Inmate Brooks was also incarcerated at Clinton during the time period relevant to plaintiff's claims. (Defs.' Rule 7.1 Statement ¶ 6; AC ¶¶ 8, 12, 21–22; LaBonte Decl. ¶¶ 9–11). As discussed below, defendant LaBonte and others suspected that plaintiff and Brooks were homosexual partners, which plaintiff disputes. Under Department of Correctional Services ("DOCS") Standards of Inmate Behavior, inmates are forbidden to engage in, encourage, solicit or attempt to force others to engage in sexual acts. (Defs.' Rule 7.1 Statement ¶ 7; 7 N.Y.C.R.R. § 270.2 (Disciplinary Rule 101.10)).

In January 2004, plaintiff was a low-ranking inmate on the Clinton church cleaning crew, in terms of seniority. (Defs.' Rule 7.1 Statement ¶ 10; LaBonte Decl. ¶¶ 6, 16). On January 28, 2004, plaintiff appeared before the APPU program committee and was advised that he and inmate Brooks would not be allowed to work together in a work assignment. (AC ¶¶ 14–25). On January 29, 2004, [4] plaintiff filed a grievance describing a conversation that he had with defendant LaBonte on or about January 15, 2004 and complaining of statements made by members of the APPU committee members during the January 28, 2004 meeting. (Defs.' Rule 7.1 Statement ¶ 15; AC ¶¶ 20–23). The January 29, 2004 grievance did not mention defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 17; Dkt. No. 66–9 ("Quakenbush Decl."), Ex. A).

[4]    While it appears that the grievance dated January 29, 2004 was not actually "filed" until February 2, 2004, in keeping with plaintiff's allegations as set forth in his amended complaint, the Court will refer to this grievance as the January 29, 2004 grievance. (*See, e.g.,* AC ¶¶ 23, 53).

During the winter and spring of 2004, there were occasions when plaintiff was not brought to his job with the Clinton church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 19; AC ¶ 85; LaBonte Decl. ¶¶ 14, 16–22). Even on the days when he was not allowed to attend his church work program, plaintiff received full pay for those days. (Defs.' Rule 7.1 Statement ¶ 22; LaBonte Decl. ¶ 23). On April 16, 2004, defendant Lareau issued a misbehavior report, charging plaintiff with giving items of personal property to inmate Brooks without first obtaining the required authorization. (Defs.' Rule 7.1 Statement ¶ 26; Dkt. No. 66–8 ("Lareau Decl.") ¶ 6; Quakenbush Decl., Ex. B).

On April 16, 2004, correctional officer Charland searched plaintiff's cell and found a pair of scissors, which Charland believed to be contraband, and therefore he issued plaintiff a misbehavior report. (Defs.' Rule 7.1 Statement ¶ 27; Quakenbush Decl., Ex. B). On April 22, 2004, at a Tier II hearing conducted by Lt. Lacy, the charges against plaintiff regarding the scissors were dismissed, and plaintiff entered a plea of guilty to the unauthorized exchange of property charge filed by defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 28; Quakenbush Decl., Ex. B). Plaintiff was sentenced to 15 days keeplock and 15 days loss of privileges. (*Id.*)

In the spring of 2005, plaintiff was transferred from Clinton to the Upstate Correctional Facility CADRE program. (Defs.' Rule 7.1 Statement ¶ 23; Garbera Decl. ¶¶ 10–14). The transfer came about via DOCS administrative processes over which none of three remaining defendants had any control. (Defs.' Rule 7.1 Statement ¶ 24; Garbera Decl. ¶¶ 13–16). At Upstate, plaintiff was placed in a selective and advantageous work program, for which plaintiff had to voluntarily sign a participation agreement. (Defs.' Rule 7.1 Statement ¶ 25; Garbera Decl. ¶¶ 14–15). [5]

[5]    In addition to the facts outlined herein, Defs.' Rule 7.1 Statement includes the following recitation: "There is no competent, relevant, admissible evidence in the record that C.O. LaBonte, Counselor Garbera, or Lt. Lareau were motivated by a grievance to inflict any adverse retaliatory action against the plaintiff." Rule 7.1 Statement ¶ 18. While plaintiff admits the information set forth,

(*see* Dkt. No. 68, ¶ 3), the Court will not consider this statement to be an uncontested fact, especially since retaliation is at the center of plaintiff's claims.

**B. Plaintiff's Additional Facts** [6]

[6]     This version does not include the uncontested facts set forth above.

**\*3**  On January 15, 2004, defendant LaBonte told inmate Peter Grieco, plaintiff's co-worker, that (1) LaBonte believed plaintiff was a homosexual because plaintiff associated with inmate Mark Brooks, and (2) plaintiff and Brooks would not be allowed to work in the same program at the same time. (AC ¶ 8). After inmate Grieco told plaintiff about Grieco's conversation with defendant LaBonte, plaintiff confronted LaBonte about the conversation, whereupon LaBonte repeated the statements to plaintiff, adding that "as long as plaintiff is assigned at the Church, inmate Brooks will 'NEVER' be assigned, for fear of 'homosexual acts' being committed between plaintiff and inmate Brooks." (*Id.* ¶¶ 9–11). In response, plaintiff told LaBonte that he was not homosexual; he had no record of homosexual acts in his file; and was only friends with Brooks. (*Id.* ¶ 12).

When plaintiff appeared before the APPU program committee on January 28, 2004, defendant Garbera told plaintiff that they all knew about plaintiff and inmate Brooks "being an[ ] item," and that plaintiff could not change his work program to be closer to Brooks. (AC ¶¶ 15, 16). Plaintiff told the committee that inmate Brooks was on the waiting list for the church and plaintiff was trying to leave his church job. (*Id.* ¶ 18). Moreover, while plaintiff made it clear to the committee members that he was not and never had been a homosexual, defendants Facteau, Ward and Garbera told plaintiff that he was *"guilty by association"* of being a homosexual, because plaintiff associates and is friends with a 'known' homosexual (inmate Brooks), so get use[d] to being treated like a homosexual is treated in prison." (*Id.* ¶¶ 21, 22). On January 29, 2004, plaintiff filed a grievance against defendants LaBonte, Facteau, Ward, and Garbera concerning LaBonte's statements of January 15, 2004 and the statements and actions of Facteau, Ward, and Garbera on January 28, 2004. (*Id.* ¶ 23). Plaintiff alleges that after these incidents and the filing of the January 29, 2004 grievance, he was subjected to several retaliatory acts, including the loss of his work assignment and four false misbehavior reports, before he was transferred to Upstate in March 2005.

On February 9, 2004, plaintiff wrote to Berg, Assistant Superintendent of Clinton, complaining that plaintiff was not being taken to his church job as a form of retaliation by defendant LaBonte. (AC ¶ 36). On the morning of February 18, 2004, plaintiff was not taken to his job at the church because he "was on call out, as an 'ADD ON' for the A.P.P.U. Law Library." (*Id.* ¶ 38). While at the library, plaintiff and inmate Brooks submitted a request for Brooks to assist plaintiff with his legal work. (*Id.* ¶ 38). While they were still in the library, they were informed by law library officer McLain that their request was denied pursuant to instructions from defendant Garbera that plaintiff and Brooks could not be on library call-out at the same time. (*Id.* ¶ 39). After the conversation between McLain, plaintiff, and Brooks was complete, Garbera stood at the law library window taunting plaintiff and Brooks. (*Id.*) Later that morning, while plaintiff was in line leaving the law library, defendant Garbera approached him and said "GOT YA." (*Id.* ¶ 42).

**\*4**  On the afternoon of February 18, 2004, defendant LaBonte did not take plaintiff to his assigned church job. (*Id.* ¶ 43). Plaintiff found out later that day that he had been placed on keeplock as a result of his being "out of place" in the law library. (*Id.* ¶¶ 44–45). Plaintiff claims that proper procedures for placing him in keeplock were not followed. (*Id.* ¶ 45). On February 18, 2004, plaintiff wrote a letter of complaint to Artus, the Superintendent of Clinton, and Berg outlining "the facts of incidents that occurred earlier in the day," claiming that the actions taken were harassment and retaliation for his January 29, 2004 grievance. (*Id.* ¶ 46). In response to that letter, Berg told plaintiff, among other things, that Berg could not control defendant Garbera's actions, and that law library officer McLain had given plaintiff false information about what Garbera had said about plaintiff and inmate Brooks. (*Id.* ¶ 49).

On February 19, 2004, plaintiff was served with a misbehavior report written by correctional officer Mayo charging plaintiff with, among other things, being out of place and violating rules related to inmate movement. (AC ¶ 47). At the subsequent Tier II hearing, defendant LaBonte testified that he did not take plaintiff to his assigned program that day because plaintiff was listed as an "ADD ON" for the law library for the day in question and was called out of the law library for a meeting with his counselor. (*Id.* ¶ 51). As a result of LaBonte's testimony, plaintiff was found not guilty of the charges contained in the misbehavior report. (*Id.*) Plaintiff wrote to Berg on March 1, 2004 requesting the status of his January 29, 2004 unlawful discrimination grievance

against LaBonte, Facteau, Ward, and Garbera which had been pending for 31 days. (*Id.* ¶ 53).

On March 27, 2004, plaintiff was not taken to his church job, although three other members of the church crew were. (AC ¶ 63). On March 29, 2007, when plaintiff asked defendant LaBonte why plaintiff was sometimes not taken to his church job, LaBonte said "because you are not allowed to work inside the Church and will only be used for outdoor work. Faggots, Queers, Homosexuals and Transsexuals are not allowed inside a house of God, and you surly [*sic* ] are one of those, since you are a friend with inmate Brooks." (*Id.* ¶ 64). On April 7, 2004, while plaintiff was working at the church, defendant LaBonte told plaintiff that he didn't want plaintiff working at the church and stated " 'I won't fire you, I won't refer you to the program Committee. You will resign before I do any of that.' " (*Id.* ¶ 68).

On April 16, 2004, plaintiff was placed on keeplock status for two misbehavior reports. (AC ¶ 71). Plaintiff was then called to defendant Lareau's office, and accused of purchasing items for inmate Brooks. (*Id.* ¶¶ 72, 73). Plaintiff claims that defendant Lareau intimidated plaintiff into admitting that he made purchases for inmate Brooks. (*Id.* ¶ 74). When plaintiff returned to his cell, it was being searched. (*Id.* ¶ 75). Defendant Lareau informed plaintiff that inmate Brooks was told that plaintiff "snitched" on him, and Lareau threatened plaintiff with a transfer to Southport Correctional Facility Special Housing Unit. (*Id.* ¶ 76). Both plaintiff and inmate Brooks were keeplocked pending an investigation of the matter. (*Id.* ¶ 77). On April 17, 2004, plaintiff received two misbehavior reports. (*Id.* ¶ 78). On April 22, 2004, plaintiff was found guilty of purchasing items for inmate Brooks. (*Id.* ¶ 79). The hearing officer told plaintiff that he would not lose his church job as a result of the disciplinary hearing. (*Id.*)

**\*5** On April 23, 2004, defendant LaBonte came to plaintiff's cell to retrieve the inclement weather clothing that plaintiff was issued for his church job; LaBonte demanded that plaintiff give him the winter gloves; plaintiff told defendant LaBonte that the gloves were at the church. (AC ¶ 81). LaBonte told plaintiff that he would have to pay for the gloves. (*Id.* ¶ 82). When plaintiff asked LaBonte if he was fired from his church job, LaBonte said "yes." (*Id.* ¶ 83). Plaintiff asked LaBonte if he was being terminated from his job because of his recent disciplinary proceeding or because LaBonte didn't want him working there. (*Id.*) LaBonte replied "I don't want you there, no faggots, queers or transsexuals work at [his] church area or in a house of God, and the ticket

just gives me a reason to get rid of you." (*Id.*) LaBonte also threatened that he could have plaintiff transferred at any time. (*Id.* ¶ 84).

Beginning on January 29, 2004, defendant LaBonte did not allow plaintiff to attend his church job for 23 out of 36 working days. (AC ¶ 85). On May 4, 2004, plaintiff appeared before the APPU program committee and was told that he would not be assigned to any program except tailor shop, and therefore he should not ask to be re-assigned to the church. (*Id.* ¶ 89). Plaintiff claims that the church was understaffed, but there was a waiting list of six months to a year for the tailor shop. (*Id.* ¶¶ 90–91).

On October 28, 2004, plaintiff again appeared before the APPU program committee and was told that he would begin a new work program in the tailor shop on November 1, 2004. (AC ¶ 125). Plaintiff was warned that they would not tolerate any trouble from him at the tailor shop "like Plaintiff caused trouble at the Church Job," and plaintiff would be removed from the tailor shop if he caused trouble "and [would be] sent to SHU/Box for longer than he thought possible." (*Id.*) Prior to being assigned to work in the tailor shop, plaintiff was without programming for eight months. (*Id.* ¶ 126). On January 5, 2005, plaintiff appeared before the Clinton APPU Assessment Committee and was asked if he wished to be transferred out of Clinton APPU. (*Id.* ¶ 128). Because he had a list of more than twenty enemies, plaintiff stated that he did not want to be transferred out of APPU. (*Id.*) On January 5, 2005, defendant Garbera told plaintiff " 'You don't file law suits in my jail and expect not to have your ass thrown out of here by us Counselors.' " (*Id.* ¶ 133). On January 12, 2005, [7] Garbera told plaintiff " '[y]ou can't stop my method of getting you out of here, I Win.' " (*Id.* ¶ 135). Plaintiff was transferred to Upstate on March 16, 2005. (*See* Dkt. No. 37).

[7]     While plaintiff's amended complaint states that Garbera's statement was made on January 12, 200**4,** given the sequence of events set forth in plaintiff's amended complaint, it appears that this statement was made on January 12, 200**5.**

## II. *Summary Judgment*
Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary

Vega v. Lareau, Not Reported in F.Supp.2d (2010)
2010 WL 2682307

judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

**\*6** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

### III. *Retaliation*

Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in and of itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988). In order for plaintiff's retaliation claim to survive summary judgment, plaintiff must establish that

(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

**\*7** The court must keep in mind, however, that claims of retaliation are " 'easily fabricated' " and " 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration' " and thus, plaintiff must set forth non-conclusory allegations. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (quoting *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

### A. Defendants Lareau and Garbera

In his opposition to Defendants' motion for summary judgment, plaintiff states that he is withdrawing all claims against Lareau and Garbera. (Dkt. No. 68 ¶ 2). Therefore, with respect to all of the claims against Garbera and Lareau, defendants' motion for summary judgment should be granted. *See e.g. Rosen v. City of New York,* No. 07 Civ. 6018, 2009 WL 3489986, at \*2 (S.D.N.Y. Oct. 28, 2009) (granting summary judgment with respect to claims withdrawn by plaintiff).

### B. Defendant LaBonte

Plaintiff states that he filed a grievance on January 29, 2004 against defendant LaBonte complaining of comments made by defendant LaBonte on January 15, 2004 regarding plaintiff's sexual orientation, comments which plaintiff believed to be discriminatory. (AC ¶¶ 8–12, 22; *see also* Dkt. No. 66–10 at 12–14) ("January 29, 2004 grievance")). [8] Defendants have submitted a copy of the January 29, 2004 grievance. (Dkt. No. 66–10 at 12–14). Plaintiff captioned the grievance *"UNLAWFUL DISCRIMINATION GRIEVANCE AGAINST: SGT. FACTO, COUNSELOR GARBERRA & MR. WARD."* (*Id.* at 12). At first glance, the grievance does not appear to be filed against defendant LaBonte. (*Id.*) However, the body of the grievance does recount statements by defendant LaBonte as well as a conversation that plaintiff had with defendant LaBonte, clearly suggesting that plaintiff believed that defendant LaBonte was discriminating against plaintiff on the basis of what LaBonte perceived to be plaintiff's sexual orientation. (*Id.*) Moreover, Defendants' Rule 7.1 Statement concedes that plaintiff filed the January 29, 2004 grievance against LaBonte. (*See* Defs .' Rule 7.1 Statement ¶ 15). Therefore, despite its caption, the Court will consider the January 29, 2004 grievance to have been filed against defendant LaBonte. On February 9, 2004, plaintiff also submitted a letter to Berg complaining that defendant LaBonte was not taking plaintiff to his church job in "retaliation." (AC ¶ 36).

[8]   The grievance is actually dated January 28, 2004, however, for sake of consistency the Court will still refer to it as the January 29, 2004 grievance. (*See* Dkt. No. 66–10 at 12).

There is no dispute that plaintiff's complaint and grievance constitute protected activity. *See Davis,* 320 F.3d at 352–53 (filing a prison grievance is a constitutionally protected activity). *See also Chavis v. Struebel,* 317 F.Supp.2d 232, 237–38 (N.D.N.Y.2004) (finding that letter of complaint could be basis for retaliatory conduct). Therefore, plaintiff meets the first prong of the test for retaliation. Plaintiff must further show that he suffered adverse action, and that there was a causal connection between that adverse action and the protected activity. If plaintiff can make these two showings, the court must determine whether defendants have established that they would have taken the same action even in the absence of the protected conduct.

**\*8** Plaintiff claims that, in retaliation for plaintiff's grievance and complaint against defendant LaBonte, LaBonte reduced the number of hours plaintiff was allowed to work at his

church job. [9] (AC ¶ 85). Construing plaintiff's amended complaint with great liberality, plaintiff may also allege that defendant LaBonte had plaintiff terminated from his church job in retaliation for plaintiff's grievance against LaBonte. (AC ¶ 83). Neither party has addressed this claim in their papers in support of or in opposition to the present motion. Plaintiff has, however, provided the Court with a copy of DOCS Directive # 4803, Inmate Program Placement. (Dkt. No. 68 at 11–13). That directive provides that the Program Chairperson of the Inmate Program Assignment Committee "shall be responsible for all program assignments and removals." (*Id.* at 12). Since defendant LaBonte is not alleged to be the Program Chairperson of the Inmate Program Assignment Committee, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job.

[9]   In his amended complaint, plaintiff also alleged that defendant LaBonte retaliated against plaintiff by issuing plaintiff a false misbehavior report on April 24, 2004. (AC ¶ 86). LaBonte's misbehavior report claimed that plaintiff lost state issued gloves. (*Id.*) Plaintiff admitted that he lost the gloves and entered a plea of guilty to the charge. (*Id.* ¶ 95). In his March 26, 2009 Decision and Order, District Judge Suddaby noted that "[w]hen it is undisputed that an inmate has in fact committed prohibited conduct, no retaliatory discipline claim can be sustained." (Dkt. No. 65 at 25) (citing *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Since Plaintiff admitted that he lost the state issued gloves, Defendant LaBonte would have taken the adverse action even in the absence of the protected conduct, and that portion of plaintiff's retaliation claim against LaBonte was dismissed by Judge Suddaby. (Dkt. No. 65 at 25).

Plaintiff alleges that, beginning on January 29, 2004, defendant LaBonte refused to let plaintiff attend his church job for a total of 23 out of 36 working days. (AC ¶ 85). As discussed below, on some of those occasions, plaintiff did not attend due to reasons beyond defendant LaBonte's control. Further, defendant LaBonte points out that plaintiff received full pay even on the days that he was held back from his job. (LaBonte Decl. ¶ 22).

A job reassignment or termination can under certain circumstances constitute adverse action necessary to support a claim of retaliation. *Gill v. Mooney,* 824 F.2d 192, 194

Vega v. Lareau, Not Reported in F.Supp.2d (2010)

2010 WL 2682307

(2d Cir.1987) ("[A] claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights."); *Baker v.. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his [or her] legal rights ..."); *Gill v. Calescibetta,* No. 9:00–CV–1553, Report and Recommendation, 2009 WL 890661, at *11–12 (N.D.N.Y. Mar. 11, 2009) (Peebles, M.J.), *adopted* 2009 WL 890661, at *1–4 (N.D.N.Y. Mar. 31, 2009) (Suddaby, J.) (the termination of a job assignment can constitute adverse action for purposes of a retaliation analysis). As noted, defendant LaBonte was not in a position to terminate or change plaintiff's job assignment. This court doubts that plaintiff could establish that periodically keeping him from attending a job, with no monetary or other apparent penalty, constitutes the type of "adverse action" that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. We need not resolve whether plaintiff has demonstrated the existence of a genuine issue of material fact as to whether defendant LaBonte took adverse action against plaintiff because, as discussed below, summary judgment can be predicated more securely on other grounds.

**\*9**  To show retaliation in violation of the First Amendment, a plaintiff must demonstrate that constitutionally protected conduct was a substantial or motivating factor for a prison official's adverse action. *Bennett,* 343 F.3d at 137. Plaintiff claims that because LaBonte's adverse actions began *after* plaintiff filed a grievance against him, the actions were in retaliation for the grievance.

> However, more than conclusory allegations [of a causal connection] are required to survive a summary judgment motion. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Bartley v.. Collins,* No. 95 Civ. 10161, 2006 WL 1289256 (S.D.N.Y. May 10, 2006). Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives. *Colon,*

58 F.3d at 872–73; *Bartley,* 2006 WL 1289256, at *8.

*Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007) (Hurd, J.). Plaintiff asserts that because defendant LaBonte began excluding him from his assigned church job *immediately* after plaintiff filed a grievance against him, "it is clear that the only reason why plaintiff was excluded from the work crew was because of the grievance that he filed against Officer LaBonte." (Dkt. No. 68 at 7).

In this case, plaintiff filed a grievance against defendant LaBonte on January 29, 2004. (AC ¶ 23). Beginning on that date, plaintiff claims that defendant LaBonte did not take plaintiff to his church job for 23 out of the next 36 working days. (*Id.* ¶ 85). The close proximity in time between the filing of grievance and LaBonte's action in not taking plaintiff to his assigned job is evidence which could lead a reasonable factfinder to conclude that LaBonte's actions were causally related to plaintiff's grievance against him. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). *See also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation).

Plaintiff argues further that defendant LaBonte's conduct was retaliatory because "just prior to the grievance being filed" plaintiff had received "positive evaluations" from defendant LaBonte with respect to plaintiff's work at the church. (Dkt. No. 68 at 7). While evidence of plaintiff's **"prior** good discipline" might suggest that LaBonte's actions subsequent to the grievance were be retaliatory, in this case, one of the evaluations submitted by plaintiff was actually dated February 12, 2004—after plaintiff filed a grievance against LaBonte. (*Id.* at 9). Defendant LaBonte's February 12, 2004 evaluation actually praises plaintiff's work performance and in fact recommends that plaintiff receive a pay increase. (*Id.*) This evidence suggests that defendant LaBonte was *not* taking retaliatory action against plaintiff. If defendant LaBonte was truly intent on retaliating against plaintiff and keeping him from his church job for improper motives, LaBonte could have issued plaintiff an unsatisfactory evaluation and would not have recommended a pay increase.

**\*10**  Plaintiff's own statements provide further evidence to undercut his argument that LaBonte was retaliating against plaintiff on account of his January 29, 2004 grievance. When appealing another grievance, plaintiff stated that his misbehavior report for being "out of place" in the law library "was dismissed ONLY after Corrections Officer G. LaBonte, appeared at [plaintiff's] hearing and stated that [plaintiff] DID IN FACT" have library call out on the day in question. (Dkt. No. 66–10 at 10). LaBonte's conduct in this instance-in February 2004–is totally opposite to an act of retaliation.

This court doubts that, despite the evidence of temporal proximity, plaintiff could persuade a reasonable factfinder that his grievance against LaBonte was a substantial or motivating factor in LaBonte's decision to exclude plaintiff from the church work program. Again, however, we need not resolve this issue and will recommend summary judgment on other grounds.

Even though plaintiff has arguably presented some evidence to establish a link between the protected activity and the alleged retaliation,

> [a] defendant is entitled to summary judgment on a retaliation claim "if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," for two reasons. *Graham [v. Henderson],* 89 F.3d [75,] 79 [2d Cir.1996]. First, "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* Second, "we have been cautioned to recognize that prison officials have broad administrative authority." *Id.*

*Miller v. Loughren,* 258 F.Supp.2d 61, 62 (N.D.N.Y.2003) (Munson, S.J.). *See also Bennett,* 343 F.3d at 139 (Once plaintiff produces evidence sufficient to raise a material question of fact as to retaliation, the burden shifts to the defendant to demonstrate through admissible evidence that the challenged actions would have occurred in any event.).

The record contains the affidavit of defendant LaBonte wherein he asserts that plaintiff was not taken to his assigned job on numerous occasions for legitimate administrative reasons. *See generally* LaBonte Decl. Defendant LaBonte was the officer primarily charged with supervising the church work crew. (LaBonte Decl. ¶ 4; Defs.' Rule 7.1 Statement

¶ 4). Defendant LaBonte states, and plaintiff concedes, that plaintiff was a low-ranking inmate on the church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 10; Pl.'s Response to Defs.' Rule 7.1 Statement ¶ 3). In fact, LaBonte states that plaintiff was "one of the least senior members of the church crew, if not the lowest ranking." (LaBonte Decl. ¶ 6). As the supervising officer for the church work crew, it was LaBonte's responsibility to determine on a day to day basis how many inmates were needed to complete jobs at the church on any given day. (LaBonte Decl. ¶ 17). This determination was made based upon the amount of work to be done on a particular day. (*Id.*) If there were insufficient jobs to be completed on any given day, plaintiff, "[a]s the junior member of the church detail ... would be the first to be cut." (*Id.*)

**\*11**  Defendant LaBonte further states that during the period in question, plaintiff did not attend his work program at the church for various reasons beyond LaBonte's control. (LaBonte Decl. ¶¶ 21–22). For example, plaintiff missed some days because he had signed up to attend library call out. (*Id.* ¶ 21). In February 2004, plaintiff was keeplocked as a result of a disciplinary report issued by correctional officer Mayo. (*Id.*) On April 2, 2004, plaintiff had a medical call out; on April 8–9, 2004, the church crew did not work because the church was used for religious observances; and on April 16, 2004 plaintiff was keeplocked. (*Id.*) On other days, when defendant LaBonte was not scheduled to work, LaBonte's relief officer decided whether or not plaintiff attended his church job. (*Id.* ¶ 22). Defendant LaBonte points out that plaintiff received full pay for the days he was not included in the church work crew. (*Id.* ¶ 23).

LaBonte further states that "[t]ensions had developed between [plaintiff] and other church crew inmates because of the situation with inmate Brooks." (LaBonte Decl. ¶ 18; *see also* Dkt. No. 68 at 9 (Inmate Progress Report dated February 12, 2004 wherein LaBonte noted that "Inmate Vega has had minor disagreements with coworkers, but has been able to work through them.")). LaBonte states that members of the church crew reside in the same cell block, and other members of the crew were aware of Brooks' attempt to join the crew, and "resented that an inmate 'couple' might become part of their work crew." (LaBonte Decl. ¶ 12). Because plaintiff was attempting to get his friend Brooks assigned to the church crew, LaBonte believed that the other members of the church work crew felt that plaintiff "was pushing to get a benefit which other prisoners knew better than to seek." (*Id.* ¶ 13). Tensions among inmates present security concerns because they can give "rise to an increased potential for violence

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 80 of 108
Vega v. Lareau, Not Reported in F.Supp.2d (2010)
2010 WL 2682307

during work at the church" and present "a danger to inmates as well as to the single security officer attending the work detail." (*Id.* ¶ 18). Because of this tension, LaBonte states that "if the church job could be done with one less inmate [he] would choose to leave [plaintiff] behind." (*Id.*)

LaBonte states that, based upon his observations of the behavior of plaintiff and Brooks, as well as upon reports from security staff and other inmates, he believed that plaintiff and Brooks might be involved in a homosexual relationship.[10] (LaBonte Decl. ¶ 7). The existence of such a relationship is not relevant; rather, LaBonte's and Garbera's statements are evidence of LaBonte's state of mind or perception. The fact that LaBonte **perceived** that such a relationship may have existed between plaintiff and Brooks demonstrates only the **reasonableness** of LaBonte's actions and his concern that the security of the facility could be implicated by such a perceived relationship.[11]

[10]   Defendant Garbera, a Corrections Counselor at Clinton, has stated that during the time relevant to plaintiff's allegations, he "recall [ed] noting that [plaintiff's] attentive behavior toward inmate Brooks—who was making overt efforts to present himself as female—suggested [plaintiff's] interest in a homosexual relationship. Not only would this violate DOCS regulations, it carried a potential for physical danger. We were aware of the facts of the plaintiff's Broome County conviction, an extremely violent rape and homicide. We had to be concerned about the possibility of similar behavior." (Garbera Decl. ¶ 19).

[11]   A fact is "material" only if it has some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.*See also Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248

**\*12** Defendant LaBonte has thus provided permissible reasons for keeping plaintiff from his job assignment-namely staffing and security concerns.[12] *See, e.g., Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." (internal

quotation marks and citation omitted). Plaintiff has not submitted sufficient evidence to raise a question of fact as to the reasonableness of defendant LaBonte's actions, but relies only upon his own conclusory statement that "[b]ecause of the positive Work Performance Evaluations that plaintiff received during his period assigned to the Cleaning Crew, there is no other plausible excuse for LaBonte to hold back" plaintiff from the church cleaning crew except in retaliation for plaintiff's grievance against LaBonte. (Dkt. No. 68 at 5). Plaintiff's statement that there is no "other plausible excuse" for defendant LaBonte's actions is contradicted by the actual facts in this case, and plaintiff's retaliation claim fails because LaBonte has produced sufficient evidence that he would have taken the same action for valid reasons. *See Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996) (finding that even assuming that a retaliatory motive existed, defendant would still be entitled to summary judgment because there are "proper, non-retaliatory reasons" for the actions taken). *See also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (A finding of sufficient permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.") (quotation marks omitted).

[12]   Defendant LaBonte's decision to have only enough inmates present at the church on a given day to complete the required jobs is reasonable. It is also reasonable to assume that idle inmates would present more of a security concern than inmates who are kept busy performing required tasks.

Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the retaliation claim against defendant LaBonte. Thus, plaintiff's claim that defendant LaBonte retaliated against plaintiff for filing a grievance or complaint should be dismissed.

## IV. *Equal Protection*
Plaintiff claims that defendant LaBonte denied him equal protection by not allowing plaintiff to attend his prison job because the defendant LaBonte believed plaintiff to be a homosexual.

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.* 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with

other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.*' " *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (emphasis in original) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)).

**\*13** "Sexual orientation has been held to be a basis for an equal protection claim under Section 1983." *Emblem v. Port Authority of New York/New Jersey,* No. 00 Civ. 8877, 2002 WL 498634, at \*7 (S .D.N.Y. Mar. 29, 2002) (citing *Quinn v. Nassau County Police Dep't,* 53 F.Supp.2d 347, 356–57 (E.D.N.Y.1999) (noting that the Supreme Court has found that government discrimination against homosexuals, in and of itself, violates the Equal Protection Clause) (citing *Romer v. Evans,* 517 U.S. 620 (1996)). *See also Holmes v. Artuz,* 95 CIV. 2309, 1995 WL 634995, at \*1 (S.D.N.Y. Oct. 27, 1995) (removal from a prison job because of declared sexual orientation may state a claim under Section 1983) (citing *Kelley v. Vaughn,* 760 F.Supp. 161, 163 (W.D.Mo.1991) (denying motion to dismiss on ground that inmate who claims his bakery prison job was terminated solely because of sexual orientation may have a valid equal protection claim)); *Howard v. Cherish,* 575 F.Supp. 34, 36 (S.D.N.Y.1983) (recognizing in dicta that complaint might state claim under § 1983 if it alleged that individual was discriminated against solely because of sexual orientation).

Defendant LaBonte correctly contends that plaintiff has no right to his prison job. *See Gill v. Mooney,* 824 F.2d at 194. However, that is not the question presented on this equal protection claim. Instead, the question is whether plaintiff was protected from discrimination based upon his perceived sexual orientation. In this respect, District Judge Suddaby has already concluded that plaintiff stated an equal protection claim sufficient to survive a motion to dismiss or for judgment on the pleadings. [13] (Dkt. No. 65 at 24–25). *See also Bussey v. Phillips,* 419 F.Supp.2d 569, 588 (S.D.N.Y.2006) ("A '[p]laintiff has no right to any particular prison job, but prison officials cannot discriminate against him on the basis of [an impermissible consideration] in work assignments.' ") [14] (quoting *LaBounty v. Adler,* No. 89 Civ. 4242, 1999 WL 961776, at \*2 (S.D.N.Y. Oct. 21, 1999) (other citation omitted).

[13]    Despite the fact that plaintiff's equal protection allegations survived the pleading stage, the standard of proof at summary judgment is more demanding; plaintiff's allegations "must be supported by specific facts raising a genuine issue for trial." *Bussey,* 419 F.Supp.2d at 582.

[14]    In *Bussey,* the impermissible consideration was race. *Id* .

Plaintiff has alleged that defendant LaBonte did not allow plaintiff to attend his church job on multiple occasions, even though other inmates were taken to their church job on those days, because LaBonte perceived plaintiff to be homosexual. (AC ¶¶ 36, 52, 53, 63, 64, 83, 85). The fact that plaintiff asserts that he is not homosexual is irrelevant to his equal protection claim. *See Emblem,* 2002 WL 498634 at \*7 (when plaintiff alleges denial of equal protection on the basis of homosexuality, the fact that plaintiff is not a homosexual is "irrelevant").

In *Romer v. Evans,* the Supreme Court, without specifically examining whether homosexuals are a suspect class, used the rational basis test to invalidate an amendment to the Colorado constitution prohibiting all governmental action designed to protect homosexuals from discrimination. *Romer,* 517 U.S. at 631–35.*See also Anderson v. Branen,* 799 F.Supp. 1490, 1492 (S.D.N.Y.1992) ("An equal protection analysis of discriminatory acts against homosexuals must be conducted pursuant to a rational basis test."). Thus, in order to establish an equal protection violation, plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation and internal quotations omitted)

**\*14** As stated above, defendant LaBonte has set forth numerous legitimate penological reasons supporting his decision to exclude plaintiff from the church work crew on multiple occasions, the most important being the need to maintain prison security and order. *See Hudson,* 503 U.S. at 6 (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)).

[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require

limitation or retraction of the retained constitutional rights of ... convicted prisoners .... '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'

...

Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel .... Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

*Bell v. Wolfish,* 441 U.S. 520, 546–47 (1979) (internal citations and footnote omitted). *See also Griffin v. Donelli,* No. 05–CV–1072, Report–Recommendation and Order, 2010 WL 681394, at *11 (N.D.N.Y. November 24, 2009) (Homer, M.J.), *adopted* on *de novo* review, 2010 WL 681394, at *1 (N.D.N.Y. Feb. 24, 2010) (McAvoy, S.J.) (finding that "[o]rder [and] security ... are valid and substantial penological interests that staff in a prison environment are entitled to, and are in fact required to act upon.").

Based upon his observations of interactions between plaintiff and inmate Brooks as well as reports from security staff and other inmates, defendant LaBonte was concerned that conflicts might arise between plaintiff and other members of the church crew. (LaBonte Decl. ¶ 12–13). Defendant LaBonte's concerns were validated by LaBonte's receipt of a letter from inmate Brooks indicating that a member of the church work crew (not plaintiff) had made sexual advances to Brooks which were refused. (*Id.* Ex. A). A reasonable factfinder could conclude that this letter, coupled with LaBonte's suspicion that plaintiff and inmate Brooks might be involved in a relationship, provided a reasonable basis for LaBonte to believe that plaintiff's presence in the church work crew could present safety concerns.

Apart from defendant LaBonte's reasons for excluding plaintiff from his assigned job, plaintiff's own statements are fatal to his claim that defendant LaBonte discriminated against him on the basis of plaintiff's perceived sexual preference. In his January 29, 2004 grievance, plaintiff stated that "I was soon to learn that it *WAS NOT* Officer LaBonte who was DISCRIMINATING against me and Inmate Brooks, but a Superior Officer, who gives the orders. (Dkt. No. 66–10 at 13) (emphasis in original).

*15 Based upon the evidence, a reasonable factfinder could conclude that defendant LaBonte's concern for institutional safety, his attempt to maintain staffing on the church work crew at reasonable levels, and his policy of cutting the hours of more junior members of the work crew first, all suffice to satisfy the rational basis test and constitute legitimate reasons to exclude plaintiff from the church work crew on various days. Moreover, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job. Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the equal protection claim against LaBonte. Thus, plaintiff's claim that defendant LaBonte violated plaintiff's right to equal protection should be dismissed.

## V. *Qualified Immunity*

In the alternative, defendants argue that they are entitled to qualified immunity with respect to plaintiff's claims that he was retaliated against for engaging in a protected activity in violation of the First Amendment and denied equal protection in violation of the Fourteenth Amendment. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), *modified by Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). The Court may also examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. Since the Court has concluded in this case that no First or Fourteenth Amendment violations occurred, the Court need not address qualified immunity.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the motion for summary judgment filed on behalf of defendants Lareau, LaBonte, and Garbera (Dkt. No. 66) be **GRANTED** and the amended complaint be **DISMISSED WITH PREJUDICE AS TO ALL REMAINING DEFENDANTS AND CLAIMS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written

Vega v. Lareau, Not Reported in F.Supp.2d (2010)

2010 WL 2682307

objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of* *Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2682307

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 3313821

2006 WL 3313821
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Sherman BROWN, Plaintiff,
v.
Janice DeFRANK, et al., Defendants.

No. 06 Civ. 2235(AJP).
|
Nov. 15, 2006.

**Attorneys and Law Firms**

Sherman Brown, Middletown, NY, pro se.

Daniel A. Schulze, New York, NY, for Defendants.

### OPINION AND ORDER

ANDREW J. PECK, United States Magistrate Judge.

**\*1** Pro se plaintiff Sherman Brown, a former inmate of
the New York State Department of Correctional Services
("DOCS"), brings this action pursuant to 42 U.S.C. § 1983,
Title II of the Americans With Disabilities Act ("ADA"), 42
U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act,
29 U.S.C. § 794, and the Eighth and Fourteenth Amendments,
alleging violations of his constitutional rights by various
DOCS employees. (Dkt. No. 3: Am. Compl. at 2.) Brown
alleges that defendants: (1) were deliberately indifferent
toward his serious medical needs; (2) retaliated against him;
(3) discriminated against him; (4) ignored risks to his health
and safety; (5) intentionally submitted false official reports
and/or tampered with medical records; (6) denied and/or
unreasonably delayed medical treatment and specialty care
recommendations; and (7) deprived him of a transporting
medical service and a meaningful access permit that was
afforded to other prisoners similarly situated. (Am.Compl.¶
4.)

Presently before the Court is defendants' motion to dismiss
the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the
Federal Rules of Civil Procedure. (Dkt. No. 24: Defs. Notice
of Motion.) Defendants move to dismiss on the grounds
that: (1) the Court lacks subject matter jurisdiction over
Brown's claims for injunctive relief because he is no longer

incarcerated in any DOCS facility (Dkt. No. 25: Defs. Br.
at 4-5); (2) the Court lacks subject matter jurisdiction over
Brown's claims against defendants in their official capacities
(Defs. Br. at 6); (3) Brown's claims fail because he did not
suffer from a sufficiently serious medical condition (Defs.
Br. at 6-9); (4) Brown fails to state a claim under the ADA
or Rehabilitation Act (Defs. Br. at 9-10); (5) Brown's claims
against certain defendants fail for lack of their personal
involvement (Defs. Br. at 10-14); and (6) defendants are
entitled to qualified immunity (Defs. Br. at 14-16).

The parties have consented to the Court's decision of this case
pursuant to 28 U.S.C. § 636(c). (Dkt. No. 30.)

For the reasons set forth below, defendants' motion to dismiss
is GRANTED with respect to: (1) Brown's § 1983 claims
against defendants in their official capacity; (2) all of Brown's
claims for injunctive relief; (3) Brown's § 1983 deliberate
indifference to medical needs claims relating to his bunions;
(4) Brown's § 1983 retaliation claims; and (5) Brown's
ADA and Rehabilitation Act claims relating to his bunions.
Defendants' motion to dismiss is DENIED with respect to:
(1) Brown's § 1983 deliberate indifference to medical needs
claims relating to his arthritic hip condition; (2) Brown's ADA
and Rehabilitation Act claims relating to his arthritic hip
condition; and (3) defendants' claim of qualified immunity.

### FACTS

The facts alleged in the amended complaint and the exhibits
thereto (Dkt. No. 3), and in Brown's affidavit in opposition to
defendants' motion to dismiss and the exhibits thereto to (Dkt.
No. 29), are assumed to be true for purposes of this motion,
and will be set forth herein without use of the preamble
"Brown alleges."

**\*2** Brown was incarcerated at Woodburne Correctional
Facility ("Woodburne") at the time he filed his amended
complaint (Dkt. No. 3: Am. Compl. at 2), but has since been
released (Dkt.Nos.7, 8, 9, 12).

#### The Defendants

Defendant Janice DeFrank is a registered nurse at Woodburne
whose responsibilities are to "(a) monitor inmate's physical
signs & symptoms; (b) address inmates health problems
& complaints; and (c) implement the nursing intervention
parameters at said encounters, e.g., (d) make referrals for

inmates to be seen by the facilities medical doctor's and (e) make referrals for inmates to be seen at the in house clinics, e.g., asthma clinic, podiatry clinic, blood pressure clinic etc." (Dkt. No. 3: Am. Compl. at 2-3.)

Defendant Denise F. Boyd is a nurse administrator at Woodburne and is responsible for "implementing and maintaining quality nursing practices within the facility ... [i]ncluding all aspects of the nursing process, e.g., (a) screening direct health care services, and (b) taking analysis of all inmate's health problems." (Am. Compl. at 3.)

Defendant Dr. Frank Lancellotti is a facility physician at Woodburne and is responsible for providing "primary health care to inmate patients." (Am. Compl. at 3.)

Defendant Dr. Mervat Makram is Woodburne's Facility Health Service Director and is "the medical authority at the facility functioning as the supervisor to all health unit staff and is responsible for all aspects of inmate health care services." (Am. Compl. at 3.)

Defendant P.D. Early is a Corrections Captain at Woodburne and "exercises judgment on all special permits requiring security clearance at the facility." (Am. Compl. at 3.)

Defendant Jean G. King is the Woodburne Deputy Superintendent for Programs and serves as the "designated individual who over sees compliance of reasonable accommodations for inmates with disabilities within the facility." (Am. Compl. at 4.)

Defendant Raymond J. Cunningham is Woodburne's Superintendent and serves as "the chief administrative officer, who directs the work and defines the duties of all officers and subordinates of the facility." (Am. Compl. at 4.)

Defendant Pedro Diaz is DOCS' Regional Health Service Administrator, whose "primary function is to promote constitutionally adequate health care; detect & resolve inmate's health care needs and/or problems within the facilities of this region ...; assist in decision making on health related activities; advise the Superintendent on health care policy; and monitor facility compliance with all facially valid health care directives & policies." (Am. Compl. at 4, emphasis omitted.)

Defendant Jayne Molloy is DOCS' Senior Utilization Review Nurse, responsible for "contract[ing] hospitals for DOCS use

for specialty care patients; mak[ing] referrals for inmates who have been clinical[ly] approved for outside specialty care treatment; organiz[ing] the use of, and allocat[ing] department funds for the specific purposes thereof." (Am. Compl. at 4.)

**\*3** Defendant Dr. Lester Wright is DOCS' Associate Commissioner and Chief Medical Officer, and "is the medical authority for DOCS and directly responsible for implementing constitutionally adequate medical practice throughout the department." (Am. Compl. at 5.)

### *Brown's Bunions and Osteoarthritis of the Right Hip*

Brown was diagnosed with "bilateral hallux valgus," commonly known as bunions in both feet, and degenerative osteoarthritis of the right hip. (Dkt. No. 3: Am. Compl. ¶ 2 & Exs. A-2, B-1, B-7.) Because of these conditions, Brown had "difficulties with activities of daily living, 'especially stair climbing,' " and needed to use a walking cane. (Am. Compl. ¶ 2 & Exs. B-5, B-6, B-7, B-9, B-12.)

### *2004 Medical Records and Grievances*

On August 27, 2004, Brown was diagnosed with "[m]oderate degenerative osteoarthritic changes of right hip." (Am. Compl. ¶ 27 & Ex. B-1.) An August 27, 2004 X-Ray Requisition and Report noted that Brown complained of pain in his right hip "since bike accident > 30 yrs ago." (Am.Compl.Ex.B-1.)

On September 30, 2004, Brown went to sick call because he was experiencing bunion pain in his feet. (Am.Compl.¶ 9.) Brown told defendant Nurse DeFrank about the pain he was experiencing and requested a referral to a podiatrist and "medical boots." (Am.Compl.¶ 9.) After examining his feet, Nurse DeFrank told Brown: " 'nothing is wrong with your feet, you don't have bunions that's just the way your feet are. Besides there is nothing we can do because no foot doctor comes to Woodburne.' " (Am.Compl.¶ 10.) After this meeting with Nurse DeFrank, Brown submitted a formal grievance seeking medical treatment. (Am.Compl.¶ 12.)

On October 7, 2004, Brown went to sick call, again complaining of bunion pain in his feet. (Am.Compl.¶ 13.) Non-defendant Nurse Reddish ordered x-rays to be taken of Brown's feet. (Am.Compl.¶ 13.)

On October 13, 2004, the Inmate Grievance Review Committee ("IGRC") responded to Brown's grievance,

2006 WL 3313821

stating: "Depending on X-ray results, grievant will be reviewed for further treatment. Grievant is advised to follow-up at sick-call for any future problems with his feet." (Am. Compl. ¶ 15 & Ex. A1a.) Brown appealed this response to the Superintendent. (Am. Compl. ¶ 15 & Ex. A1a.)

On October 14, 2004, Brown's x-ray report showed "[b]ilateral hallux valgus with angle 30 degrees bilaterally. Remainder studies both feet unremarkable." (Am. Compl. ¶ 16 & Ex. A-2.) On October 15, 2004, Brown wrote a letter to defendant Nurse Administrator Boyd complaining of continuing bunion pain in his feet. (Am. Compl. ¶ 17 & Ex. A-3.) Nurse Administrator Boyd did not respond to Brown's letter. (Am.Compl.¶ 17.)

On October 22, 2004, Brown went to sick call and complained about the continuing bunion pain in his feet. (Am.Compl.¶ 18.) Later that day, Brown received the Superintendent's response to his grievance appeal. (Am. Compl. ¶¶ 18-19 & Ex. A-4.) The Superintendent responded: "Grievant's medical care is proper and ongoing. Treatment plan implemented and pending results of x-rays. A new treatment regimen would be prescribed if necessary. At present there is no medical indication that grievant should see a foot doctor. Grievant is advised to follow the treatment plan provided." (Am. Compl. ¶ 19 & Ex. A-4.) Brown appealed this response to the Central Office Review Committee ("CORC"). (Am. Compl. ¶ 20 & Ex. A-4.)

**\*4** On November 2, 2004, Brown met with defendant Dr. Makram and told her of the pain in his feet. (Am.Compl.¶ 103.) Dr. Makram reviewed Brown's medical records, acknowledged the bunion diagnosis, and recommended that Brown get orthotics, " 'providing approval of the Regional Medical Director.' " (Am.Compl.¶ 103.)

On November 10, 2004, the Central Office Review Committee upheld the Superintendent's decision: "Contrary to the grievant's assertions, CORC has not been presented with evidence of discrimination by medical staff. The grievant is receiving necessary treatment and appropriate care." (Am. Compl. ¶ 21 & Ex. A-5.)

Brown's foot condition became progressively worse over the next few months, causing him more pain and "emotional distress." (Am.Compl.¶ 23.) On November 19, 2004, Brown's health record states that he received ibuprofen to take until a prescription was received. (Am.Compl.Ex.B-2.)

On November 29, 2004, Brown went to sick call to complain of pain in his right hip and in his feet. (Am. Compl. ¶ 28 & Ex. B-2.) Brown told defendant Nurse DeFrank about the pain he was experiencing, and requested a referral to a medical doctor so that he could request first floor housing. (Am.Compl.¶ 30.) Brown explained to Nurse DeFrank that first floor housing would help him avoid stair climbing and therefore reduce his "pain, stress and strain" on Brown's arthritic right hip and the bunions in his feet. (Am.Compl.¶ 31.) Nurse DeFrank denied Brown's request to refer him to a medical doctor. (Am. Compl. ¶ 32 & Ex. B-2.) Brown asserts that Nurse DeFrank denied this request in retaliation for his earlier grievance against her. (Am.Compl.¶ 32.) Brown asked Nurse DeFrank why she would not refer him to a medical doctor, and she said " 'I ... don't need a reason, I'm the nurse and you're ... only an inmate.' " (Am.Compl.¶ 33.) Brown suggested that Nurse DeFrank read his medical file, and Nurse DeFrank became "very 'repulsive' and 'obnoxious' and responded in a 'hostile tone of voice,' telling Plaintiff ... 'listen inmate, don't tell me how to do my job.' " (Am.Compl.¶ 34.) Brown explained to Nurse DeFrank that he experiences pain when walking up and down stairs and "pleaded" with her for the medical doctor referral so that he could request first floor housing. (Am.Compl.¶ 35.) Nurse DeFrank replied " 'I ... don't feel you need to see the doctor, or be housed on the first (1st) floor just because your hip & feet are hurting, so I'm not referring you to the doctor. You're not a baby, learn to deal with the pain.' " (Am.Compl.¶ 36.) As Brown was on his way out, Nurse DeFrank said " 'the only way you ... will be moved down stairs to a first (1st) floor housing unit, is if your feet are amputated.' " (Am.Compl.¶ 37.) Brown experienced a "significant degree of emotional distress" from this comment. (Am.Compl.¶ 37.)

On November 30, 2004, Brown submitted a formal grievance regarding Nurse DeFrank's comments. (Am.Compl.¶ 39.) On December 3, 2004, Nurse DeFrank responded:

**\*5** Inmate Brown 02A5006 was seen by MD 11.2.04 for pain [in right] hip. He is going out for PT [physical therapy] and he is scheduled to see Podiatry. I did not tell Brown he did not have bunions, as I do not diagnose. Brown requested to see MD to lock on the lower level because his feet hurt.[ ] I did not feel as the sick call triage nurse [that] inmate Brown needs to see the doctor at this time. I did not tell Brown as he stated "his feet would have to be amputated to move to a flat gallery.["]

(Am. Compl. ¶ 39 & Ex. B-3.) By memo dated December 3, 2004, Nurse Administrator Boyd responded:

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 87 of 108
Brown v. DeFrank, Not Reported in F.Supp.2d (2006)
2006 WL 3313821

The grievant's complaints have been investigated and found to be unvalidated.

Grievant wants to lock on the flats [*i.e.,* to house on the first floor]. He has no medical indication to lock on the flats. The grievant's medical record was reviewed by Dr. Makram after his sick call encounter. His pain medication was increased and an additional medical was added. The grievant should take his medications as ordered. Nurse DeFrank was not insensitive nor totally disregarded the grievant's medical concerns for a lock on flats permit. Grievant was never told by Ms. DeFrank that his feet would have to be amputated to move to a flat gallery. (See memo from Ms. DeFrank.)

Regarding Action Requested:

The grievant has an appointment to see the Podiatrist for his feet. He is currently seeing the Physical Therapist for his right hip pain. The grievant has reported to the Physical Therapist that he feels better especially after a PT session but still complains of right hip cracking and pain. This inmate must continue with his physical therapy and medications as ordered.

(Am. Compl. ¶ 40 & Ex. B-3a.) Brown disputes the statement in Nurse Administrator Boyd's memo that his medical record was reviewed by a doctor and that he has no medical indication to have first floor housing. (Am. Compl. at ¶ 40 n. 3.)

On December 14, 2004, the IGRC responded to Brown's grievance, stating: "Grievant is advised to write facility MD about his medical concerns for a permit to lock on flats. In addition, Committee recommends grievant be scheduled for an MD appt. to address his concerns for a flat medical permit. Moreover, grievant is advised that grievance program is not an adversary process." (Am. Compl. ¶ 42 & Ex. B-4.)

On December 22, 2004, Brown was taken to Sullivan Correctional Facility ("Sullivan") for physical therapy. (Am.Compl.¶ 43.) The physical therapist at Sullivan, non-defendant Mohed Botroth, filled out a Request and Report of Consultation which was reviewed by defendant Dr. Frank Lancelotti, the facility physician. (Am. Compl. ¶ 43 & Ex. B-5.) The Request and Report of Consultation noted that Brown "still feels pain, sudden sever[e] pain during walking or climbing stairs ... pain radiates to medial side and lower back too ... all movement with pain," and that Brown had a "limping gait." (Am. Compl. ¶ 43 & Ex. B-5.) Physical

therapist Botroth also requested that the doctor check the procedure regarding a hot pack for Brown to use in his cell and also for getting an assistive device such as a cane or crutch to decrease the load on Brown's right hip. (Am. Compl. ¶ 43 & Ex. B-5.) The document noted that Brown requested an MRI or a referral to an orthopedist for more evaluation. (Am. Compl. ¶ 43 & Ex. B-5.)

**\*6** On December 23, 2004, Brown's hip condition "adversely progressed very rapidly" and he suffered pain during walking and climbing stairs. (Am.Compl.¶ 78.) Brown was issued a walking cane and a temporary permit to use it from December 23, 2004 until March 15, 2005. (Am.Compl.¶ 78.)

On December 27, 2004, Brown again was taken to Sullivan for physical therapy. (Am.Compl.¶ 44.) The physical therapist filled out another Request and Report of Consultation during the physical therapy session, which was reviewed by Dr. Lancellotti. (Am. Compl. ¶ 44 & Ex. B-6.) The physical therapist noted on the report that Brown "still feels pain and clicking in the [right] hip during walking and climbing stairs. Please check as the [patient] suffer[s] from climbing stairs so lock on a lower gallery if it's possible." (Am. Compl. ¶ 44 & Ex. B-6.) Brown claims that Dr. Lancellotti was deliberately indifferent to his serious medical needs because he "intentionally ignored" the physical therapist's recommendation. (Am.Compl.¶ 45.)

Later on December 27, 2004, Brown received the Superintendent's response to his grievance appeal concerning his request for first floor housing:
Grievant's medical care is proper and ongoing. Appointments are scheduled and medication has been prescribed. Per review of medical chart by the Nurse Administrator, there is no medical indication that the grievant needs to lock on "flats" (first floor).

As per the attending nurse, accusation made by grievant was totally refuted by staff member.

(Am. Compl. ¶ 46 & Ex. B-6a.)

On December 30, 2004, Brown asked Nurse Liciaga during sick call about the status of his medical boots, and she noted in the record that Brown had been told on November 2, 2004 that he would get medical boots. (Am. Compl. ¶ 104 & Ex. E-1.) She requested the boots and referred Brown to orthopedics. (Am. Compl. ¶ 104 & Ex. E-1.)

2006 WL 3313821

*2005 Medical Records and Grievances*

On January 13, 2005, Brown was taken to Coxsackie Correctional Facility ("Coxsackie") to be examined by non-defendant orthopedic specialist Dr. Rubinovich. (Am.Compl.¶ 48.) Dr. Rubinovich wrote a letter to Dr. Lancellotti regarding Brown's condition, stating in part:

[Brown] is a 45-year-old gentleman with 3 problems. The first is Osteoarthritis of his Right Hip. The second and third are Bilateral Bunions, which are quite painful. In actuality, the Bunions are the things that bother Sherman [Brown] the most right now. He has had these for quite some time and it is getting progressively worse. He has trouble wearing shoes. His hip has been going on for about 8 months now. It is getting progressively worse. The pain is in the groin and radiates down the leg, especially with walking and stairs.

...

Sherman [Brown] would like to start with his right foot. My plan would be to do a Metatarsal Osteotomy for him. This can be done as an outpatient at Alice Hyde. We will eventually get to the left foot. He feels he can live with his hip right now, but I think that at some point in the future, he is going to require a Total Hip Arthroplasty. If we can get clearance for the right foot, I would appreciate it.

**\*7** (Am. Compl. ¶ 48 & Ex. B-7.) A notation dated January 28, 2005 at the bottom of the letter states: "Procedure under review." (Am.Compl.Ex.B-7.)

On January 19, 2005, the CORC responded to Brown's grievance requesting first floor housing, stating:
Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

CORC notes that the grievant was seen by the physician after his sick call encounter. CORC also notes that there is currently no medical necessity for the grievant to lock on flats. CORC further notes that the grievant was provided with medication and referrals for physical therapy and podiatry were posted. Contrary to the grievant's assertions, CORC has not been provided with sufficient evidence to substantiate that the Nurse in question was insensitive toward the grievant and

his needs. CORC advises the grievant to continue to address his health care concerns via sick call.

(Am. Compl. ¶ 50 & Ex. B-8.)

On January 31, 2005, Brown met with defendant Dr. Mervat Makram, the Woodburne health service director. (Am.Compl.¶ 60.) Brown's health record from that meeting notes that Dr. Makram spoke with Jayne Molloy, from DOCS "central office," and that Brown would be referred to podiatry at Coxsackie for bunion surgery. (Am. Compl. ¶¶ 60-63 & Ex. C-1.) The record also notes that the previously scheduled orthopedic procedure to correct Brown's bunions at Hyde Hospital was cancelled; Brown was told that was because Hyde Hospital was too far away from Woodburne. (Am. Compl. ¶¶ 60-63 & Ex. C-1.)

On February 15, 2005, while Brown was going to get his medication, his hip gave out on him, causing him to fall down the staircase from the second floor landing of the B-2 housing unit. (Am.Compl.¶ 51.) Brown slammed into the wall at the bottom of the staircase, aggravating his hip condition. (Am.Compl.¶ 51.) Brown was in pain and was transported to the medical unit on a stretcher. (Am. Compl. ¶ 52 & Ex. B-9.) The medical staff took x-rays of Brown's right hip, issued him crutches and ibuprofen for pain, and instructed him to be on bed rest to recuperate from the fall. (Am.Compl.¶ 52.) During the days following the fall, Brown experienced pain in his left shoulder, collarbone, and neck areas, and went to sick call on February 16, 17, 24, and 28, 2005, at which the medical staff prescribed analgesic balm and warm compresses, and scheduled an MRI of his hip. (Am. Compl. ¶ 53 & Exs. B-10, B-11.)

On March 2, 2005, the medical staff reviewed Brown's "locking location" and determined that his current locking location was "acceptable [at] this time. If MRI abnormal, locking will be re-evaluat[ed]." (Am.Compl.Ex.B-11.)

On March 10, 2005, five days before Brown's permit for his walking cane was to expire, Brown's request for a renewal or extension of the permit was entered in his Ambulatory Health Record. (Am. Compl. ¶ 80 & Ex. D-1.) Brown later found out that someone wrote on the health record that Brown had "no need for cane." (Am. Compl. ¶ 84 & Ex. D-1.)

**\*8** On March 8, 2005, Brown wrote a letter to Nurse Administrator Boyd, stating:

Yesterday 3/7/05 I went out on medical trip for an M.R.I. for my right hip. For some unknown reason the M.R.I. was not taken, I stayed shackled for approximately 13 hours and received no medical treatment. The pain in my hip is unbearable and I continue to suffer from the injuries. My bunions are very painful also.

When am I gonna have the surgeries that were recommended by the specialist? With these delays I suffer more each day. I'm in a great deal of pain Nurse Boyd, can you please make sure that I get these surgeries done.

(Am. Compl. ¶ 64 & Ex. C-2.)

In March 2005, Brown learned that other inmates with medical conditions similar to his were provided with transportation from Woodburne to a correctional facility near Alice Hyde Hospital, driven the short distance to Alice Hyde Hospital to be treated with orthopedic surgical procedures, and returned to Woodburne. (Am. Compl. ¶ 65 & Ex. C-3.) After learning this, on March 9, 2005, Brown wrote a letter to Dr. Rubinovich at Hyde Hospital, stating:
It was a pleasure meeting you January 13th, 05. I was looking forward to having you do my surgery, on my feet and hip.

I know we decided to begin with my feet but Doc my hip is killing me, it hurts real bad. I can't take this pain no more. "Feet or hip."

Something must be done because I'm suffering, the medication I'm taking does not alleviate the pain.

You said back in January you were gonna do the surgery soon. What's taking so long? Are you still gonna do my surgery?

This delay is causing me to suffer each day, please let me know what you're gonna do Doc.

(Am. Compl. ¶ 66 & Ex. C-3a.) Brown's pain and suffering was " 'exasperated' by the unreasonable delay on part of the Defendant[s] ..., taking apparently four (4) months, ... as they 'shopped around' for a local surgeon." (Am.Compl.¶ 66.)

On March 17, 2005, Brown went to sick call to complain of pain in his hip and recurring headaches. (Am.Compl.¶ 81.) During this visit, Brown made another request for his walking cane permit to be renewed or extended. (Am. Compl. ¶ 81 & Ex. D-2.)

On March 18, 2005, Brown was moved to first floor housing. (Am.Compl.¶ 57.)

On March 22, 2005, Brown was taken from Woodburne to Albany Medical Center for an MRI on his right hip. (Am.Compl.¶ 82.) Dr. Makram's preliminary report after the MRI stated: "There is severe degenerative arthrosis of the right hip with marked joint space narrowing superiorly with complete loss of the articular cartilage, subchondral cyst formation, marrow edema, and moderate marginal osteophytosis arising from the femoral head." (Am. Compl. ¶ 82 & Ex. D-3.) Dr. Makram handwrote a note on the preliminary report that stated "[i]nmate doesn't want to take care of [right] hip now, wants to fix feet 1st." (Am. Compl. ¶ 82 & Ex. D-3.) Brown received a copy of this preliminary report and wrote to Dr. Makram requesting the definition of a certain medical term used in the report, but Dr. Makram did not respond. (Am.Compl.¶ 82.)

**\*9** On March 24, 2005, Brown was stopped in the corridor by a corrections officer who requested Brown's permit for the walking cane. (Am.Compl.¶ 83.) Brown explained that his walking cane permit was in the process of being renewed, and the officer let Brown go with a "stern warning to produce authorization 'next time' or face disciplinary action for unauthorized use." (Am.Compl.¶ 83.) On April 15, 2005 another corrections officer stopped Brown to ask him for his cane permit. (Am.Compl.¶ 85.) Brown went to the IGRC to ask the IGRC Supervisor to investigate the matter regarding the permit renewal. (Am.Compl.¶ 85.) When Brown found out that his permit had not been renewed or extended, he returned his cane to the medical unit to avoid disciplinary action. (Am.Compl.¶ 86.) Brown submitted a grievance regarding the non-renewal of his cane permit. (Am. Compl. ¶ 87 & Ex. D-4.)

On April 18, 2005, Brown went to sick call complaining about his right hip and feet, and requested that he be allowed to use a walking cane again. (Am.Compl.¶ 88.) The nurse checked Brown's records and told him that Dr. Makram had discontinued the authorization for a cane, and made an entry in Brown's records regarding his request for a cane. (Am. Compl. ¶ 88 & Ex. D-5.)

On April 22, 2005, Brown went to sick call complaining of pain in his right hip and feet and asked for a cane. (Am.Compl.¶ 89.) Nurse DeFrank told Brown that Dr. Makram indicated that he could have the cane back.

2006 WL 3313821

(Am.Compl.¶ 90.) Before handing the cane to Brown, Nurse Defrank "made a remark relating to the grievance complaint Plaintiff submitted regarding the cane." (Am.Compl.¶ 90.) Brown asked Nurse DeFrank for a permit for use of the cane, recounting his experiences of being stopped by corrections officers. (Am.Compl.¶ 91.) Nurse DeFrank told Brown that there was not a permit in the medical folder and said " 'either you take the cane, or you don't.' " (Am.Compl.¶ 92.) Because Brown needed the cane, he took it and then " 'immediately' wrote a letter to security requesting a permit for authorization to use the needed walking cane ." (Am. Compl. ¶ 92 & Ex. D-6a.)

On April 25, 2005, Nurse Administrator Boyd wrote a memo to the IGRC Supervisor, stating: "The grievant's complaints have been investigated and found to be unsubstantiated. On the grievant's medical record on 3/10/05 entry, MD wrote no need for cane & signed her name. MD reevaluated this request on 4/18/05 and okayed it ... Inmate has permit for a cane at this time." (Am. Compl. ¶ 93 & Ex. D-7.) On April 26, 2005, the IGRC responded to Brown's grievance about the cane permit, stating that "[g]rievant's action requested has been met." (Am. Compl. ¶ 98 & Ex. D10.) On May 2, 2005, the Superintendent responded to the grievance appeal, stating: "The cane was issued by the Medical Department and a notation was made in grievant's medical folder. A new permit was written and received by grievant." (Am. Compl. ¶ 98 & Ex. D-11.) On May 4, 2005, Brown appealed these decisions, stating that the cane and heating pad "should have never been taken away from grievant," and requesting a permanent permit for a cane and a heating pad. (Am.Compl.¶ 98 & Ex. D-12.) On May 25, 2005, CORC upheld the determinations of the Superintendent and the IGRC. (Am. Compl. ¶ 98 & Ex. D-13.)

**\*10** On April 27, 2005, a form was signed by a physician and a security officer stating that Brown had permission to permanently lock on the first floor in a lower bunk, to permanently use a cane, and temporarily use a heating pad until September 30, 2005. (Am. Compl. ¶ 96 & D-9.)

On April 29, 2005, Brown had "bunionectomy" surgery. (Am. Compl. ¶ 113 & Ex. E-5.)

On June 20, 2005, Brown met with Dr. Makram, complaining of pain in his feet. (Am.Compl.¶ 107.) During this meeting, Brown inquired as to when he would get the referral to orthotics for medical boots. (Am.Compl.¶ 108.) Dr. Makram told Brown that she did not make that referral and that he " 'has no need' " for medical boots. (Am.Compl.¶ 108.)

Dr. Makram noted in Brown's medical file that Brown had requested special shoes but that the request was denied because of "lack of medical necessity in the middle of operations on both feet." (Am. Compl. ¶ 109 & Ex. E-2.) Brown claims that Dr. Makram "ignored Plaintiff's course of direction and told Plaintiff ... [']You're getting surgery, what more do you want? You're not getting any medical boots, so stop bothering me about it and deal with the pain. [']" (Am.Compl.¶ 110.) During the next few days, Brown reviewed his medical files and noticed that someone had crossed out an entry from November 2, 2004 stating that Brown "needs other boots, will refer to orthotics if approved by RMD." (Am. Compl. ¶ 111 & Ex. E-3.)

On June 24, 2005, Brown submitted a grievance over the crossed-off entry regarding special boots. (Am. Compl. ¶ 112 & Ex. E-4.)

On July 6, 2005, Nurse Administrator Boyd responded to the grievance in a memo to the IGRC, stating:
The grievant's complaints have been investigated and found to be unsubstantiated.

Grievant had a bunionectomy on 4/29/05. He was seen by DR Makram on 6/20/05. He only had mild swelling over the area of his surgery. Per FHSD inmate's request for medical boots was denied due to lack of medical necessity. Dr Makram did not order boots for grievant on 11/2/04 as he requested an appointment for him to see the foot specialist. Per podiatry consult 12/17/04, podiatrist "discussed treatment options including wide footwear, injection surgery/ patient refuses treatment other than surgery." Grievant had the surgery (bunionectomy) and now has no medical need for medical boots.

(Am. Compl. ¶ 113 & Ex. E-5.) On July 7, 2005, the IGRC responded to Brown's grievance, stating: "The Committee finds, as per Nurse Administrator Boyd's response, that there is no need for medical boots." (Am. Compl. ¶ 114 & Ex. E-6.) On July 20, 2005, the Superintendent denied Brown's appeal, stating: "Grievant's action(s) requested were addressed appropriately by Nurse Administrator Boyd. As she stated, grievant was submitted to see the foot specialist. Treatment (surgical procedure) was administered and alleviated the need for medical boots." (Am. Compl. ¶ 115 & Ex. E-7.) On July 22, 2005, Brown appealed the Superintendent's decision to CORC. (Am. Compl. ¶ 116 & Ex. E-8.) On August 10, 2005, the CORC denied Brown's appeal, stating:

**\*11** Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employee referenced in this complaint.

CORC notes that the FHSD [Dr. Makram] crossed off an earlier entry in the grievant's [medical records] in front of him when she determined that a referral for surgical intervention was the best course of action to treat his symptoms instead. CORC also notes that, although the grievant is undergoing physical therapy and has a referral for another surgical procedure pending, the FHSD has determined that there is no medical necessity for prescription boots indicated at this time.

(Am. Compl. ¶ 117 & Ex. E-9.)

On September 7, 2005, Brown submitted a grievance about the cancellation of his surgery by the orthopedist at Hyde Hospital. (Am. Compl. ¶ 67 & Ex. C-4.) The grievance noted that instead of being sent back to Dr. Rubinovich at Hyde Hospital, Brown was referred to Dr. Lentini, which caused a three month delay in his surgery. (Am. Compl. ¶ 67 & Ex. C-4.) On September 14, 2005, Nurse Administrator Boyd responded to Brown's grievance, stating:
The grievant's complaints have been investigated and found to be unsubstantiated.

Grievant was seen by DR Rubinovich 1/05. Dr Rubinovich did not state the grievant's feet were em[ ]ergent in nature. He stated "We will eventually get to his left foot." Grievant had surgery on his right foot 7/13/05. He is currently attending PT for it & will have surgery on the left afterward.

Regarding Action Requested:

1. Bunionectomy surgery can be performed by local Orthopedic Specialists. This saves the grievant from excessive traveling to go to a hospital that the previous surgeon uses. The facility has no control over where the grievant is scheduled.

(Am. Compl. ¶ 68 & Ex. C-5.) Brown admits that the round trip distance between Woodburne and Hyde Hospital is approximately 625 miles, while the round trip distance between Woodburne and the local hospital in Albany where he eventually went for his surgery is approximately 180 miles. (Am. Compl. at ¶ 68 n. 5.)

On September 14, 2005, Brown wrote a letter to defendant Dr. Lester Wright, DOCS' Associate Commissioner and Chief Medical Officer, "to complain about on going medical issues at [Woodburne] and to voice Plaintiff's concerns for the needed meaningful access permit," *i.e.,* a permit that would allow Brown to walk through the courtyard on his way to the Medical Unit instead of walking "the long way around." (Am. Compl. ¶ 124 & Ex. F-1.)

On September 16, 2005, the IGRC responded to Brown's September 7, 2005 grievance, stating:

> The Committee finds that according to Nurse Administrator Boyd's response the scheduling of grievant's surgery is beyond the facility's control. We advise grievant to obtain copies of his medical records pertaining to the surgeon's recommendations and notes in his Ambulatory Health Record referring to his bunionectomy surgery. Grievant will be better informed about the actions being taken by the medical department concerning his medical problems.

**\*12** (Am. Compl. ¶ 69 & Ex. C-6.)

On September 18, 2005, Brown wrote to Dr. Makram, requesting a medical access permit "allowing use of the court yard when I must go for medication or to the Medical Unit. Due to my disability the access permit is deemed necessary." (Am. Compl. ¶ 125 & Ex. F-2.) On September 22, 2005, Brown at sick call again requested a medical access permit. (Am.Compl.¶ 126.) Dr. Makram denied Brown's request for a medical access permit because "bunions are not going to prevent him from walking." (Am. Compl. ¶ 127 & Ex. F-3.)

On September 29, 2005, the Superintendent responded to Brown's grievance appeal regarding the cancellation of his bunion surgery, stating:
The status of grievant's bunionectomy surgery is considered non-emergent by Dr. Rubinovich. Surgery has not been cancelled, but do to nature of ailment it will be considered at a later date. Per Nurse Administrator Boyd the right foot did have surgery in July 2005 and that the left foot would be done in the future.

Medical care is proper and ongoing.

(Am. Compl. ¶ 70 & Ex. C-7.)

On October 1, 2005, Brown appealed the Superintendent's decision " 'specifically requesting' justifiable reasons and/ or an explanation, as to why, Plaintiff was not temporarily moved to a facility near Alice Hyde Hospital in order to gain access to treatment from the orthopedic specialist, as was done for other inmate's 'similarly situated.' " (Am. Compl. ¶ 71 & Ex. C-8.) Brown only mentioned the problems with his left foot, which had not yet been operated on, but did not mention his hip. (Am. Compl. ¶ 71 & Ex. C-8.)

On October 2, 2005, Brown filed a formal grievance regarding the medical access (to the courtyard) permit denial. (Am. Compl. ¶ 128 & Ex. F-4.)

On October 5, 2005, Brown received a response to his September 14 letter from Pedro Diaz on behalf of Dr. Lester Wright, stating:
The Division of Health Services has investigated your concern regarding your allegation that you are receiving inadequate health services at Woodburne Correctional Facility. A review of your medical records indicates that you have repeatedly expressed the desire to have your bunions addressed prior to having your hip addressed. Since your left foot surgery you have been back to the specialist for follow-up, you are scheduled for physical therapy and have been referred to the specialist for your right foot problem. You have been seen and evaluated by the facility physician, who has determined that you do not require a permit for access through the courtyard. You have been provided a feed-in-cell permit through December 2005. Your medical needs are apparently being addressed.

You, also, allege that RNs DeFrank and Reddish are hostile towards you when you go to sick call. These health care staff have categorically denied your allegation and indicated that they have provided you with appropriate and necessary health care. Your allegations are unfounded.

 *13  You are urged to consult with the health care staff using the existing sick call procedures. I am certain they will make every effort to address your medical needs.

(Am. Compl. ¶ 129 & Ex. F-5.)

On October 11, 2005, Nurse Administrator Boyd wrote a memo in response to Brown's grievance about the courtyard access permit, stating:
The grievant's complaints have been investigated and found to be unsubstantiated.

Grievant saw Orthopedic specialist on 1/13/05. Inmate told MD that he wants his feet taken care of first & that "He feels he can live with his hip right now." Specialist gives recommendations not orders. Grievant is locking on the first floor, has a feed in cell permit till 12/1/05 & is attending Physical Therapy. Facility Health Services Director denied inmate's request for permit to access medical through court yard.

Regarding Action Requested:

Denied, no medical need at this time per Facility Health Services Director.

(Am. Compl. ¶ 130 & Ex. F-6.) On October 12, 2005, the IGRC responded to Brown, stating: "[T]he Facility Health Services Director has sole responsibility for grievant's health care. Hence, it is beyond the purview of this Committee to recommend a Court Yard permit. Grievant should write Deputy Superintendent for Programs, Ms. J. King, to request reasonable accommodations for the Court Yard crosswalk." (Am. Compl. ¶ 131 & Ex. F-7.) On October 13, 2005, Brown wrote to Ms. King requesting a court yard permit. (Am. Compl. ¶ 131 & Ex. F-8.) On October 14, 2005, Ms. King responded, stating: "My office is not in a position to grant this request. I will address your concerns to the Acting Deputy Superintendent for Security to inquire the possibility of obtaining such a permit." (Am. Compl. ¶ 132 & Ex. F-9.) On October 19, 2005, Captain and Acting Deputy Superintendent P.D. Early denied Brown's request, stating "Per Dr. Makram, a courtyard access permit is not medically necessary. As a result, your request is denied." (Am. Compl. ¶ 133 & Ex. F-10.) On October 24, the Superintendent responded to Brown's grievance appeal relating to the medical access permit, stating: "Grievant's requested action for a medical courtyard permit is not accepted. The Facility Health Services Director (FHSD) has denied the request and deemed it not warranted." (Am. Compl. ¶ 134 & Ex. F-11.) Brown appealed this decision to CORC. (Am. Compl. ¶ 134 & Ex. F-11.)

On October 26, 2005, CORC responded to Brown's appeal, stating in part: "CORC notes that the grievant's medical issues are being appropriately addressed. He has had surgery on his right foot and is going out for physical therapy ... CORC asserts that Coordinated Specialty Care determines which surgeon will be used based on availability and other factors." (Am. Compl. ¶ 72 & Ex. C-9.)

On November 4, 2005, Brown received the final bunion surgery on his feet. (Am.Compl.¶ 26.)

On November 16, 2005, CORC unanimously denied Brown's request for a medical access permit. (Am. Compl. ¶ 135 & Ex. F-12.)

 *14  Nevertheless, on December 15, 2005, Brown was issued a temporary pass (valid through June 30, 2006) that would allow him to pass through the F-wing on his way to the medical unit. (Am. Compl. ¶ 136 & Ex. F-14.)

### 2006 Medical Records

On February 10, 2006, Dr. Rubinovich wrote a letter to Dr. Makram that stated in part:

Mr. Brown is a 46 year old gentleman who presents with pain in his right hip. I followed him previously with a diagnosis of degenerative change in the right hip post slipped epiphysis as a child. Sherman [Brown] is getting more and more pain in his hip. He is having difficulties with activities of daily living especially going up and down stairs. He does get around using a cane at this time. He has had both of his bunions fixed previously by the podiatrist. His general health is otherwise good. He has recently started on medication for hypertension. Additionally, he is on Risperdal, Celexa, and one other mood altering medication.

...

I have had a long chat with Sherman [Brown] with regards to treatments. He feels that this time he would like to proceed with a hip arthroplasty. I have gone over risks, complications, and options with him and he agrees. I am going to get this organized for him as an inpatient at Rome Hospital. He will require 3 days of in house care and then be discharged back for rehabilitation. If we can get clearance from Department of Corrections I will get this scheduled for him.

(Am.Compl.Ex.B-12.)

### Brown's Claims and the Relief Sought

Brown asserts that defendants: (1) were deliberately indifferent to his serious medical needs; (2) retaliated against him; (3) discriminated against him; (4) ignored risks to his health and safety; (5) intentionally submitted false official reports and/or tampered with medical records; (6) denied and/or unreasonably delayed medical treatment and specialty care recommendations; and (7) deprived him of a transporting medical service and a meaningful access permit that was afforded to other prisoners similarly situated. (Dkt. No. 3: Am. Compl. ¶ 4.)

Brown's Amended Complaint requested, *inter alia,* the following relief: (1) a preliminary or permanent injunction prohibiting defendants from retaliating against him; (2) an order that Brown be issued a "meaningful access permit" authorizing him to use alternative routes to get to the Medical Unit; (3) a declaratory judgment that Brown's rights were violated under the ADA and the Eighth and Fourteenth Amendments; and (4) compensatory and punitive damages for deliberate indifference to Brown's medical needs in the sum of $6,168,000.00. (Dkt. No. 3: Am. Compl. at 31.)

### Defendants' Motion to Dismiss

Defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 24: Defs. Notice of Motion at 2), on the grounds that: (1) the Court lacks subject matter jurisdiction over Brown's claims for injunctive relief because he is no longer incarcerated in any DOCS facility (Dkt. No. 25: Defs. Br. at 4-5); (2) the Court lacks subject matter jurisdiction over Brown's claims against defendants in their official capacities (Defs. Br. at 6); (3) Brown's claims fail because he did not suffer from a sufficiently serious medical condition (Defs. Br. at 6-9); (4) Brown fails to state a claim under the ADA or Rehabilitation Act (Defs.Br.9-10); (5) Brown's claims against certain defendants fail for lack of their personal involvement (Defs. Br. at 10-14); and (6) defendants are entitled to qualified immunity (Defs. Br. at 14-16).

### ANALYSIS

### I. THE STANDARD GOVERNING A MOTION TO DISMISS [1]

[1]    For additional decisions by this Judge discussing the standard governing a motion to dismiss in

2006 WL 3313821

language substantially similar to that in this section of this Opinion, *see, e.g., Zhang v. U.S. Citizenship & Immigration Serv.,* 05 Civ. 4086, 2005 WL 3046440 at *3-4 (S.D.N.Y. Nov. 8, 2005) (Peck, M.J.); *Hseuh v. Bank of New York,* 05 Civ. 5345, 2005 WL 2842069 at *2-3 (S.D.N.Y. Oct. 31, 2005) (Peck, M.J.); *Brooks v. Von Lenthe,* 05 Civ. 3655, 2005 WL 2679716 at *8-9 (S.D.N.Y. Oct. 21, 2005) (Peck, M.J.), *report & rec. adopted,* 2006 WL 177146 (S.D.N.Y. Jan. 24, 2006) (Berman, D.J .); *Wong v. Health First,* 04 Civ. 10061, 2005 WL 1676705 at *1-3 (S.D.N.Y. July 19, 2005) (Peck, M.J.), *report & rec. adopted,* 2006 WL 2457944 (S.D.N.Y. Aug. 23, 2006) (Batts, D.J.); *Chase v. Czajka,* 04 Civ. 8228, 2005 WL 668535 at *4-5 (S.D.N.Y. Mar. 23, 2005) (Peck, M.J.), *report & rec. adopted,* 2005 WL 1352983 (June 8, 2005) (Kaplan, D.J.); *Amadasu v. Bronx Lebanon Hosp. Ctr.,* 03 Civ. 6450, 2005 WL 121746 at *3 (S.D.N.Y. Jan. 21, 2005) (Peck, M.J.), *report & rec. adopted,* 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005) (Kaplan, D.J.); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *5-6 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1080-81 (S.D.N.Y.1996) (Knapp, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 93 Civ. 0180, 1995 WL 571888 at *11 (S.D.N.Y. Sept. 20, 1995) (Peck, M.J.), *report & rec. adopted,* 936 F.Supp. 126 (S.D.N.Y.1996) (Knapp, D.J.).

**\*15** A district court should deny a Rule 12(b)(6) motion to dismiss "unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994). [2] A court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party-here, the plaintiff. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). [3]

[2]    *Accord, e.g., Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004); *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001); *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.), *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678 (2001);

*Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998).

[3]    *Accord, e.g., Freedom Holdings, Inc. v. Spitzer,* 357 F.3d at 216; *Weinstein v. Albright,* 261 F.3d at 131; *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 69.

The "standards for dismissal under [Rule] 12(b)(6) and 12(b)(1) are substantively identical." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.), *cert. denied,* 540 U.S. 1012, 124 S.Ct. 532 (2003); *see also, e.g., Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999); *Bishop v. Porter,* 02 Civ. 9542, 2003 WL 21032011 at *3 (S.D.N.Y. May 8, 2003); *Tennant v. United States Bureau of Prisons,* 02 CV 00558, 2003 WL 1740605 at *1 (D.Conn. Mar. 29, 2003). [4]

[4]    The only substantive difference is "that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof." *Lerner v. Fleet Bank, N.A.,* 318 F.3d at 128 (citing *Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir.1994)); *see also, e.g., Langella v. Bush,* 306 F.Supp.2d 459, 463 (S.D.N.Y.2004) ("On a motion to dismiss pursuant to Rule 12(b)(1), plaintiff carries the burden of establishing that subject matter jurisdiction exists over his complaint."); *Bishop v. Porter,* 2003 WL 21032011 at *3.

The other difference is that on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court "may refer to evidence outside the pleadings." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986)); *see also, e.g., Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, the court may inquire, by affidavits or otherwise, into the facts as they exist."); *Exchange Nat'l Bank v.. Touche Ross & Co.,* 544 F.2d 1126, 1130-31 (2d Cir.1976); *Masters v. Wilhelmina Model Agency, Inc.,* 02 Civ. 4911, 2003 WL 145556 at *1 (S.D.N.Y. Jan. 17, 2003).

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l Ltd.,* 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing

2006 WL 3313821

*Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir.1991)).[5]
The Court, however, may consider documents attached
to the complaint as an exhibit or incorporated in the complaint
by reference. *E.g., Chambers v. Time Warner, Inc.,* 282
F.3d 147, 153 (2d Cir.2002) ("Because this standard has
been misinterpreted on occasion, we reiterate here that a
plaintiff's *reliance* on the terms and effect of a document
in drafting the complaint is a necessary prerequisite to the
court's consideration of the document on a dismissal motion;
mere notice or possession is not enough."); *Yak v. Bank
Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001) (citing
*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47
(2d Cir.1991), *cert. denied,* 503 U.S. 960, 1125 S.Ct. 1561
(1992)); *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000)
("For purposes of a motion to dismiss, we have deemed a
complaint to include any written instrument attached to it as
an exhibit or any statements or documents incorporated in it
by reference...."); *see also, e.g., Paulemon v. Tobin,* 30 F.3d
307, 308-09 (2d Cir.1994); *Brass v. American Film Tech., Inc.,*
987 F.2d 142, 150 (2d Cir.1993).

[5]      *Accord, e.g., Faulkner v. Beer,* 463 F.3d 130, 2006
         WL 2588014 at *2 (2d Cir. Sept. 8, 2006); *Aniero
         Concrete Co. v. New York City Constr. Auth.,* 94
         Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June
         27, 2000); *Six West Retail Acquisition, Inc. v. Sony
         Theatre Mgmt. Corp.,* 97 Civ. 5499, 2000 WL
         264295 at *12 (S.D .N.Y. Mar. 9, 2000) ("When
         reviewing the pleadings on a motion to dismiss
         pursuant to Rule 12(b)(6), a court looks only to
         the four corners of the complaint and evaluates
         the legal viability of the allegations contained
         therein.").
         When additional materials are submitted to the
         Court for consideration with a 12(b)(6) motion, the
         Court must either exclude the additional materials
         and decide the motion based solely upon the
         complaint, or convert the motion to one for
         summary judgment under Fed.R.Civ.P. 56. *See*
         Fed.R.Civ.P. 12(b); *Friedl v. City of New York,*
         210 F.3d 79, 83 (2d Cir.2000); *Fonte v. Board of
         Managers of Cont'l Towers Condos,* 848 F.2d 24,
         25 (2d Cir.1988).

"However, before materials outside the record may become
the basis of a dismissal, several conditions must be met. For
example, even if a document is 'integral' to the complaint, it
must be clear on the record that no dispute exists regarding the
authenticity or accuracy of the document. It must also be clear

that there exists no material disputed issue of fact regarding
the relevance of the document." *Faulkner v. Beer,* 2006 WL
2588014 at *3 (citations omitted).

**\*16** In this case, the medical records and grievance
documents that Brown attached to the amended complaint
may be considered on the motion to dismiss, whether under
Rule 12(b)(1) or 12(b)(6), subject to the *Faulkner v. Beer*
proviso. (*See* cases cited in the immediately prior paragraphs.)

The Court's role in deciding a motion to dismiss " 'is merely
to assess the legal feasibility of the complaint, not to assay
the weight of the evidence which might be offered in support
thereof.' " *Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL
88108 at *2 (S.D .N.Y. Mar. 15, 1994) (quoting *Geisler v.
Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)); *accord, e.g.,
Watson v. McGinnis,* 964 F.Supp. 127, 130-31 (S.D.N.Y.1997)
(Kaplan, D.J. & Peck, M.J.). " '[T]he issue is not whether a
plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims.' " *Saunders v.
Coughlin,* 1994 WL 88108 at *2 (quoting *Scheuer v. Rhodes,*
416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974)). A Rule 12(b)
(6) motion will be granted " 'only if it is clear that no relief
could be granted under any set of facts that could be proved
consistent with the allegations.' " *Saunders v. Coughlin,* 1994
WL 88108 at *2 (quoting *Hishon v. King & Spalding,* 467
U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)).

When reviewing a pro se complaint, the Court must use less
stringent standards than if the complaint had been drafted by
counsel. *See, e.g., LaBounty v. Adler,* 933 F.2d 121, 123 (2d
Cir.1991); *Watson v. McGinnis,* 964 F.Supp. at 131; *Saunders
v.. Coughlin,* 1994 WL 88108 at *2 (citing *Hughes v. Rowe,*
449 U.S. 5, 101 S.Ct. 173 (1980)). However, "[d]ismissal
under Rule 12(b)(6) is proper if the complaint lacks an
allegation regarding an element necessary to obtain relief...."
2 *Moore's Federal Practice* § 12.34[4][a], at 12-72.7 (2005).
Thus, the " 'duty to liberally construe a plaintiff's complaint
[is not] the equivalent of a duty to re-write it.' " *Id.,* § 12.34[1]
[b], at 12-61; *see also, e.g., Joyner v. Greiner,* 195 F.Supp.2d
500, 503 (S.D . N.Y.2002) (action dismissed because pro se
plaintiff "failed to allege the facts tending to establish" that
defendants violated his constitutional rights).

## II. *BROWN'S § 1983 CLAIMS FOR DAMAGES AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE DISMISSED ON ELEVENTH AMENDMENT GROUNDS*

Case 9:20-cv-00665-MAD-TWD    Document 28    Filed 04/26/21    Page 96 of 108
Brown v. DeFrank, Not Reported in F.Supp.2d (2006)
2006 WL 3313821

" 'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment....' " *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (quoting *Jackson v. Johnson,* 30 F.Supp.2d 613, 618 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein); *accord, e.g., Dunn v. Carrier,* 137 Fed. Appx. 387, 389 (2d Cir.2005); *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (second hand smoke case); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *12 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); *Johnson v. Goord,* 01 Civ. 9587, 2004 WL 2199500 at *4 (S.D.N.Y. Sept. 29, 2004) ("Employees of DOCS and its facilities, when sued in their official capacities, have been held to be subject to the state's Eleventh Amendment immunity. Thus, to the extent that these plaintiffs assert section 1983 damage claims against defendants in their official capacities, they are dismissed from this action.") (citations omitted); *Baker v. Welch,* 03 Civ. 2267, 2003 WL 22901051 at *6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *5 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.).

**\*17** Accordingly, Brown's § 1983 claims for damages against the individual defendants in their official capacities are dismissed. Brown's § 1983 claims against the individual defendants in their official capacities for injunctive relief and in their individual capacities for damages, which are not barred by the Eleventh Amendment, are addressed below. *See, e.g., Davis v. New York,* 316 F.3d at 101-02 (Eighth Amendment deliberate indifference "claims for declaratory and injunctive relief and damages against defendants, in their individual capacities" for exposure to ETS not barred by Eleventh Amendment); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *12; *Johnson v. Goord,* 2004 WL 2199500 at *4 ("The Eleventh Amendment does not bar the claims against defendants in their official capacities for declaratory and injunctive relief.").

## III. *BROWN'S CLAIMS FOR INJUNCTIVE RELIEF ARE DISMISSED AS MOOT*

Because Brown is no longer incarcerated and under the supervision of any of the defendants, Brown's request for injunctive relief "[p]rohibiting the Defendant's from taking any form of retaliation (disciplinary, or otherwise), against Plaintiff," and ordering the defendants to "issue Plaintiff a meaningful access permit authorizing Plaintiff use of alternative routes to F-Wing & Medical Unit to accommodate

Plaintiff's disability" (Dkt. No. 3: Am. Compl. at 31) are moot. "Because plaintiff is no longer incarcerated and under the supervision of any of the named defendants, ... [Brown's] claims for injunctive relief are moot and the Court lacks jurisdiction to consider them." *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878 at *3 (S.D.N.Y. Nov. 17, 1997) (Sotomayor, D.J.). [6] Accordingly, the Court will review Brown's claims only to the extent they seek damages against the defendants.

[6]    *See also, e.g., Salahuddin v. Goord,* No. 04-3470, ---F.3d ----, 2006 WL 3041934 at *3 (2d Cir. Oct. 27, 2006) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Hill v. Zenk,* 115 Fed. Appx. 97, 97 (2d Cir.2004) ("Because [plaintiff] brought his action for relief against the warden of a facility in which he concedes he is no longer incarcerated, his petition for relief is moot."); *Thompson v. Carter,* 284 F.3d 411, 415-16 (2d Cir.2002); *Colman v. Goord,* 2 Fed. Appx. 170, 171 (2d Cir.2001); *Smith v. Westchester County,* No. 97-2371, 152 F.3d 920 (table), 1998 WL 433008 at *2 (2d Cir. May 20, 1998); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976) ("In view of the fact that appellant is no longer incarcerated at Auburn, his request for an injunction restraining the officials at Auburn from violating his civil rights is moot."); *Claudio v. Goord,* 03 Civ. 1234, 2006 WL 2290822 at *7 (S.D.N.Y. Aug. 8, 2006) ("It is well settled in this Circuit that being transferred from a prison moots any actions for injunctive relief available at that prison."); *Cain v. Jones,* 05 Civ. 3914, 2006 WL 846722 at *2 (S.D.N.Y. Mar. 30, 2006); *Kee v. Hasty,* 01 Civ. 2123, 2004 WL 807071 at *7 (S.D.N.Y. Apr. 14, 2004) ("[A]n incarcerated plaintiff's transfer out of the prison facility at which the cause of action arose moots his claim against that facility, insofar as it seeks injunctive and declaratory relief."); *Verley v. Goord,* 02 Civ. 1182, 2004 WL 526740 at *9 (S.D.N.Y. Jan. 23, 2004); *Moore v. Keane,* 01 Civ. 1139, 2002 U.S. Dist. LEXIS 1439 at *1 (S.D.N.Y. Jan. 31, 2002) ("[P]laintiff's request for injunctive relief

is now moot because he has been released from prison."); *Courts v. Coombe,* 95 Civ. 2350, 1996 WL 312357 at *2 (S.D.N.Y. June 11, 1996) ("The mere possibility that [plaintiff] may be returned to Woodburne at some point in the future does not present a sufficient case or controversy that the Court can presently adjudicate.").

## IV. *LEGAL STANDARDS GOVERNING § 1983 EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS CLAIMS* [7]

[7] For additional decisions by this Judge discussing the governing standard in § 1983 deliberate medical indifference claims, in language substantially similar to that in this entire section of this Opinion, *see, e.g., Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *12-15 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); *Doe v. Goord,* 04 Civ. 0570, 2005 WL 3116413 at *10-13 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.); *Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *13-15 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at * 12-13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J .); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *4-7 (S.D.N .Y. May 13, 2004) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *10-13 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v.. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993)

(citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976).

**\*18** To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *E.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291. [8]

[8] *See also, e.g., Salahuddin v. Goord,* No. 04-3470, ---F.3d ----, 2006 WL 3041934 at *10 (2d Cir. Oct. 27, 2006); *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* 17 Fed. Appx. 36, 37 (2d Cir.2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *Perkins v. Obey,* 00 Civ. 1691, 2004 WL 238036 at *8 (S.D.N.Y. Feb. 10, 2004).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [9] "Objectively, the alleged deprivation must be 'sufficiently serious.' " *Hathaway v. Coughlin,* 99 F.3d at 553; *see, e.g., Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "); *Smith v. Carpenter,* 316 F.3d at 183-84 ("The objective 'medical need' element measures the severity of the alleged deprivation ...."). [10] " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324

(1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [11] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

[9]   *Accord, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *10-11; *Smith v. Carpenter,* 316 F.3d at 183; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

[10]   *See also, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *10; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702; *Lumaj v. Williams,* 03 Civ. 1849, 2004 WL 1207894 at *4 (S.D.N.Y. June 2, 2004); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 339 (S.D.N.Y.2003).

[11]   The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *143 F.3d at 702.*

The Second Circuit recently reiterated that determining whether a deprivation is objectively serious entails two inquiries:

Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate health risk] cannot be found liable under the Cruel and Unusual Punishments Clause," and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Thus although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

 **\*19** *Salahuddin v. Goord,* 2006 WL 3041934 at *10 (citations omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553; *accord, e. g., Salahuddin v. Goord,* 2006 WL 3041934 at *11; *Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that the official ' "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994))). [12]

[12]   *See also, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *11 ("Deliberate indifference is a mental state equivalent to subjective recklessness.... This mental state requires that the

2006 WL 3313821

charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."); *Smith v. Carpenter,* 316 F.3d at 184; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702; *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger."); *Lumaji v. Williams,* 2004 WL 1207894 at *5.

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care.").[13] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S.Ct. at 292; *accord, e.g., Burton v. New York State Dep't of Corr.,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 21, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292.[14] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Smith v. Carpenter,* 316 F.3d a 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corr.,* 1994 WL 97164 at *2.

[13]    *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly seventy complaints of pain), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days); *Archer v. Dutcher,* 733 F.2d 14, 15-17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part

of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

[14]    *Accord, e.g., Salahuddin v. Goord,* 2006 WL 3041934 at *11; *Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Corr. Servs.,* No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But][c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.' "); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

**\*20**  "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Culp v. Koenigsmann,* 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct. 15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 250 F.Supp.2d 299, 308 (S.D.N.Y.1999) (citing cases), *aff'd,* 29 Fed. Appx. 762 (2d Cir.2002); *Negron v. Macomber,* 95 Civ.

4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug. 11, 1999);
*Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *3
(S.D.N.Y. June 14, 1999). [15]

[15]     Furthermore, a delay in medical treatment does not
necessarily invoke the Eighth Amendment:
Although a delay in providing necessary medical
care may in some cases constitute deliberate
indifference, this Court has reserved such a
classification for cases in which, for example,
officials deliberately delayed care as a form
of punishment; ignored a "life-threatening and
fast-degenerating" condition for three days; or
delayed major surgery for over two years. No
such circumstances are present here. At no point
was [plaintiff's] condition "fast-degenerating" or
"life-threatening," and there is no indication that
[defendant] delayed treatment in order to punish
him. Moreover, any delay in treatment in this case
does not rise to the egregious level identified in
*Hathaway.* That [plaintiff] feels something more
should have been done to treat his injuries is not a
sufficient basis for a deliberate indifference claim.
*Demata v. New York State Corr. Dep't of Health
Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999
WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations
omitted) (summary judgment for defendants where
plaintiff complained of knee injury in February
1994 and surgery not performed until March
1997); *accord, e.g., Smith v. Carpenter,* 316
F.3d at 185 ("When the basis for a prisoner's
Eighth Amendment claim is a temporary delay or
interruption in the provision of otherwise adequate
medical treatment, it is appropriate to focus on the
challenged *delay or interruption* in treatment rather
than the person's *underlying medical condition*
alone in analyzing whether the alleged deprivation
is, in 'objective terms, sufficiently serious,' to
support an Eighth Amendment claim.") (emphasis
in original); *Freeman v. Strack,* 2000 WL 1459782
at *9 (no Eighth Amendment claim against nurse
who scheduled inmate with appendicitis requiring
appendectomy for appointment two hours later
rather than seeing inmate immediately where
"[t]here was nothing in [the inmate]'s medical
history which would have put [the nurse] on notice
that [plaintiff] was suffering from the onset of
appendicitis ... and there is no evidence that [the
officer] gave [the nurse] any reason to believe

that there was an emergency on hand"); *Culp v.
Koenigsmann,* 2000 WL 995495 at *7-8 (rejecting
claim based on fact that one doctor recommended
arthroscopic surgery for knee injury in April 1999,
while another doctor concluded that surgery was
not warranted until more conservative measures
like physical therapy had been tried and failed).

"Just as the relevant 'medical need' can only be identified
in relation to the specific factual context of each case, the
severity of the alleged denial of medical care should be
analyzed with regard to all relevant facts and circumstances.
The absence of adverse medical effects or demonstrable
physical injury is one such factor that may be used to gauge
the severity of the medical need at issue. Indeed, in most
cases the actual medical consequences that flow from the
alleged denial of care will be highly relevant to the question
of whether the denial of treatment subjected the prisoner to a
significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d
at 187 (citations omitted).

A risk of future harm also is actionable under the Eighth
Amendment. *Helling v. McKinney,* 509 U.S. 25, 33-36, 113
S.Ct. 2475, 2480-82 (1993) (exposure to second hand smoke);
*Warren v. Keane,* 196 F.3d 330, 332-33 (2d Cir.1999) (same).
Determining whether "conditions of confinement violate the
Eighth Amendment requires "more than a scientific and
statistical inquiry into the seriousness of the potential harm
and the likelihood that such injury to health will actually
be caused by the exposure to [the harmful condition]. It
also requires a court to assess whether society considers the
risk that the prisoner complains of to be so grave that it
violates contemporary standards of decency to expose *anyone*
unwillingly to such a risk. In other words, the prisoner must
show that the risk of which he complains is not one that
today's society chooses to tolerate." *Helling v. McKinney,* 509
U.S. at 36, 113 S.Ct. at 2482. The threatened health problems
must be " 'sufficiently imminent' and 'sure or very likely
to cause serious illness and needless suffering in the next
week or month or year.' " *Atkins v. County of Orange,* 372
F.Supp.2d 377, 408 (S.D.N.Y.2005).

## V. *BROWN'S* § 1983 *CLAIMS RELATING TO HIS BUNIONS ARE DISMISSED FOR FAILURE TO STATE A CLAIM FOR DELIBERATE INDIFFERENCE*

**\*21** Brown has specified three deliberate indifference
claims relating to his bunions: (1) defendants unreasonably
delayed referral for needed podiatry services (Dkt. No. 3:
Am. Compl. ¶¶ 9-26); (2) defendants intentionally cancelled

and unreasonably delayed his bunion surgery because they prevented him from getting transport to Hyde Hospital (Am.Compl.¶¶ 58-76); and (3) defendants intentionally denied him a referral for prescription footwear (Am.Compl.¶¶ 102-22). None of these claims support a finding of deliberate indifference to his serious medical needs.

Brown's bunions are not a sufficiently serious medical issue as to warrant Eighth Amendment protection under a deliberate indifference theory. Unlike cases where injuries demonstrate the requisite urgency leading to "death, degeneration or extreme pain," the case law holds that prisoner complaints about bunions or other foot problems do not establish the objective prong of the deliberate indifference standard. *See, e.g., Hernandez v. Goord,* 02 Civ. 1704, 2006 WL 2109432 at *1, 5-6 (S.D.N.Y. July 28, 2006) (plaintiff's painful injured left foot diagnosed as hammertoe with an overlap not severe enough for deliberate indifference claim); *McKinnis v. Williams,* 00 Civ. 8357, 2001 WL 873078 at *3-4 (S.D.N.Y. Aug. 1, 2001) (painful toe injury did not "rise to the level of 'serious medical need' "); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (plaintiff's fracture, bone cyst and degenerative arthritis in feet not "sufficiently serious" medical condition); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S .D.N.Y.1996) (ankle injury not sufficiently serious to establish a constitutional violation); *Cole v. Scully,* 93 Civ.2066, 1995 WL 231250 at *1, 5-6 (S.D.N.Y. Apr. 18, 1995) (bunions and tender feet after bunion surgery not a sufficiently serious medical condition). Brown's bunions are therefore not sufficiently serious to establish a claim for deliberate indifference as a matter of law.

Additionally, based on the medical records attached to the complaint, no reasonable jury could find that defendants were subjectively deliberately indifferent to Brown's needs. Brown was examined and treated for his foot problems on numerous occasions by defendants. DOCS' medical personnel ordered x-rays to be taken of Brown's feet, gave him non-prescription and prescription pain medication, referred him to a podiatrist, and arranged for bunion surgery to be performed on both of his feet, which, once healed, relieved any need Brown had for special footwear. (*See* pages 5-25 above.) Brown does not deny that he has received all of this treatment, and appears to be complaining merely about the type of treatment he was receiving or the speed at which he was scheduled for specialist appointments and surgery. *See, e.g., Davidson v. Scully,* 155 F.Supp.2d 77, 83-84 (S.D.N.Y.2001) (No subjective deliberate indifference to plaintiff's foot problems where "plaintiff was examined

and treated ... on numerous occasions by DOCS medical personnel as well as by outside orthopedic doctors to whom plaintiff was referred by DOCS."); *Williams v. M.C.C. Inst.,* 97 Civ. 5352, 1999 WL 179604 at *9 (S.D.N.Y. Mar. 31, 1999) (No subjective deliberate indifference where plaintiff was examined for dental problems on eight separate occasions during one year and five different occasions the next year and was always given treatment when he sought it.), *aff'd,* 101 Fed. Appx. 862 (2d Cir .2004); *Keyes v. Strack,* 95 Civ. 2367, 1997 WL 187368 at *4 (S.D.N.Y. Apr. 16, 1997) ("The record shows that defendants were not deliberately indifferent to [plaintiff's] medical needs. The Fishkill medical staff made continual efforts to treat and care for plaintiff," with thirty visits to the facility's clinic over an eleven month period.); *Alston v. Howard,* 925 F.Supp. at 1040 (No deliberate indifference where plaintiff "was afforded consistent, attentive surgical and therapeutic medical care on about a weekly basis in a comprehensive attempt to remedy the source of [plaintiff's] ankle pain."); *Johnson v. Dep't of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar. 21, 1995) (No deliberate indifference where "[d]uring the nine month period that plaintiff was in DOC custody he was examined and treated on numerous occasions for his hip condition and a myriad of other ailments."). As discussed on page 40 above, disagreement over or delays in treatment do not create a constitutional claim. Because Brown has failed to adequately plead any constitutional deliberate indifference, objective or subjective, to his medical needs relating to his bunions, those claims relating to his bunions are dismissed. [16]

16    Since the only claim against defendant Nurse Molloy relate to bunion treatment (*see* page 13 above), all claims against her are dismissed.

## VI. DEFENDANTS' MOTION TO DISMISS IS DENIED AS TO BROWN'S ARTHRITIC HIP CONDITION § 1983 CLAIM

*22  Brown has specified three § 1983 deliberate indifference claims relating to his arthritic hip condition: (1) that his requests for first floor housing were denied (Dkt. No. 3: Am. Compl. ¶¶ 27-57); (2) that he was denied a walking cane (Am.Compl.¶¶ 77-101); and (3) that he was denied an access permit that would allow him to take an alternative route to the medical unit (Am.Compl .¶¶ 123-137). While defendants contend that they could not be found to have acted with deliberate indifference because Brown's hip condition was not a sufficiently serious medical condition, Brown's complaint adequately alleges that his hip condition was (objectively) very severe and that defendants

2006 WL 3313821

(subjectively) acted with deliberate indifference with regard to that condition.

First, although there is an indication in Brown's medical records that he has had pain in his right hip since a bicycle accident thirty years ago (Am.Compl.Ex.B-1), and notations from his doctors suggesting that Brown told them that "[h]e feels he can live with his hip right now" (Am. Compl. ¶ 48 & Ex. B-7), Brown's complaint disputes the accuracy of certain of the DOCS' records about his hip that are attached as exhibits to his complaint (*see* Am. Compl. ¶¶ 4, 19, 40 n. 3, 47, 95-97, 100, 118, 120). The Court therefore cannot fully accept all of the exhibits to Brown's complaint as true in considering the dismissal of these claims. *See Faulkner v. Beer,* --- F.3d ----, No. 05-1568-CV, 2006 WL 2588014 at *3 (2d Cir. Sept. 8, 2006). As a result, the medical evidence regarding Brown's arthritic hip in the exhibits attached to Brown's complaint are unclear as to the exact severity of his condition.

Additionally, Brown's complaint demonstrates that he was living with a great deal of pain in his hip for several months during 2004 and 2005, particularly after his fall down the stairs on February 15, 2005 (Am.Compl.¶¶ 51-53). Between August 27, 2004, when DOCS medical personnel first diagnosed the arthritis in his hip (Am. Compl. ¶ 27 & Ex. B-1), and December 15, 2005, when Brown was issued a medical access permit (Am. Compl. ¶ 136 & Ex. F-14), Brown complained about severe pain in his hip at least thirteen times (Am.Compl.¶¶ 27, 28, 43, 44, 51-53, 64, 78, 81, 88, 89, 124-26). Brown alleges that he informed defendants that pain in his hip was particularly acute when he was walking or climbing stairs. (Am.Compl.¶¶ 28-31, 43, 44,51-53, 78.) Therefore, Brown's complaint adequately alleges that his arthritic hip condition was sufficiently serious to satisfy the objective prong of a deliberate indifference inquiry. *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (degenerative hip condition prior to surgery and broken pins in hip after surgery, was sufficiently serious medical condition); *Rhames v. Fed. Bureau of Prisons,* 00 Civ. 4338, 2002 WL 1268005 at *6 (S.D.N.Y. June 6, 2002) (Plaintiff's "arthritic hip" was a "serious medical condition[ ] that demanded attention"); *Woods v. Goord,* 01 Civ. 3255, 2002 WL 731691 at *4 (S.D.N.Y. Apr. 23, 2002) (plaintiff's leukemia, degenerative joint disease, and rheumatoid arthritis were conceded to be sufficiently serious medical conditions).

**\*23** Brown also has adequately alleged subjective deliberate indifference on defendants' part. Brown's complaint specifies that, knowing that Brown's arthritic hip condition caused him

severe pain when walking and climbing stairs, defendants Nurse DeFrank, Nurse Administrator Boyd, Dr. Makram, and Dr. Lancellotti refused to grant him first floor housing, which would have eliminated Brown's need to climb stairs and therefore would have eased some of his hip pain. (Am. Compl. ¶¶ 27-57; *see* pages 7-15 above.) Brown was without first floor housing for approximately three and a half months after requesting it in November 2004, and was without first floor housing for approximately one month after the fall down the stairs injured his hip further. (Am. Compl. ¶¶ 27-57; *see* page 13 above.) Brown's complaint also specifies that, knowing of his painful hip condition, Nurse DeFrank, Nurse Administrator Boyd, and Dr. Makram did not allow Brown to have a cane, which would have greatly reduced Brown's hip pain when walking, for approximately one week, and allowed Brown's cane permit to lapse for approximately a month and a half, making Brown subject to discipline if he were caught with the cane but without a permit. (Am. Com pl. ¶¶ 77-101; *see* page 16 above.) Lastly, Brown's complaint asserts that, knowing of his painful hip condition, Dr. Makram and Nurse Administrator Boyd denied his requests for a medical access permit allowing him to use a shorter route to the medical unit, thereby decreasing the amount of hip pain associated with walking. (Am.Compl.¶¶ 123-37.) Brown was without a medical access permit for approximately three months after he initially requested it. (Am. Com pl. ¶¶ 123-37; *see* pages 20-24 above.) *See Rhames v. Fed. Bureau of Prisons,* 2002 WL 1268005 at *7 (dismissal denied where plaintiff needed a cane to ease the pressure on his degenerated hip, but no cane was provided); *Brady v. Griffith,* 95 Civ. 2364, 1998 WL 814630 at *3-4 (S.D.N.Y. Nov. 23, 1998) (summary judgment denied where facts tended to show that defendants deprived plaintiff of wheelchair even though plaintiff needed wheelchair to get around and to transport herself to the medical unit for treatment). Brown has stated a claim for deliberate indifference to his medical needs with regard to his arthritic hip condition against defendants Nurse DeFrank, Nurse Administrator Boyd, Dr. Makram and Dr. Lancellotti, and therefore these defendants' motion to dismiss Brown's claims relating to his hip are denied.

## VII. *THE COURT DENIES THE MOTION OF SUPERVISORY DEFENDANTS EARLY, KING, CUNNINGHAM, DIAZ AND WRIGHT TO DISMISS DUE TO ALLEGED LACK OF PERSONAL INVOLVEMENT*

### A. *Legal Standard* [17]

Brown v. DeFrank, Not Reported in F.Supp.2d (2006)

2006 WL 3313821

17    For additional decisions authored by this Judge discussing the supervisory liability standard for § 1983 claims in language substantially similar to that in this entire section of this Opinion, *see, e.g., Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *10-11 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *9 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *16 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *10 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr. 3, 2001) (Peck, M.J.) ( & cases cited therein); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Djonbalic v. City of New York,* 99 Civ. 11398, 2000 WL 1146631 at *11 (S.D.N.Y., Aug 14, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *6 (S.D.N.Y. June 13, 2000) (Peck, M .J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 462 (S.D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Gill v. Tuttle,* 93 Fed. Appx. 301, 302 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971 (2005); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 338-39 (S.D.N.Y.2003); *Zamakshari v. Dvoskin,* 899 F.Supp.1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions.").

**\*24**  "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873. [18]

18    *Accord, e.g., Samuels v. Selsky,* 166 Fed. Appx. 552, 556 (2d Cir.2006); *Patterson v. County of Oneida,* 375 F.3d 206, 229 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004); *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971 (2005); *Wright v. Smith,* 21 F.3d at 501; *Torres v. Mazzuca,* 246 F.Supp.2d at 339; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1109; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

**B.** *Application of the Legal Standards to The "Supervisory Defendants"*

While the "supervisory defendants" may prevail on summary judgment, the Court cannot say on a motion to dismiss that plaintiff Brown can prove no facts as to his arthritic hip entitling him to relief against the "supervisory defendants." Dr. Wright is DOCS' Chief Medical Officer, and plaintiff may be able to prove that Dr. Wright failed to remedy the (alleged) wrongs in Brown's medical treatment, or that Dr. Wright created the medical policies at issue, or was grossly negligent in supervising the prison medical staff. Similarly, while defendant Diaz's only involvement appears to be responding to Brown on behalf of Dr. Wright (*see* pages 22-23 above), the Court cannot say that there is no set of facts Brown can prove to show Diaz's involvement and liability. Defendants King and Early were involved in denial of Brown's request for a courtyard permit, and thus they effectively were directly involved in that aspect of Brown's hip claim. (*See* pages 23-24 above.) Supt. Cunningham denied all of Brown's grievances, and thus may prove to have failed to remedy wrongs or failed to adequately supervise subordinates. *See, e.g., McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (Prison officials who allegedly participated in denial of crucial medical treatment and rejected prisoner's administrative grievance were not entitled to qualified immunity at motion to dismiss stage from prisoner's claim of deliberate indifference to

Brown v. DeFrank, Not Reported in F.Supp.2d (2006)

2006 WL 3313821

medical claims.); *Smart v. Goord,* 441 F.Supp.2d 631, 643-44 (S.D.N.Y.2006) (denying motion to dismiss on basis of qualified immunity; prisoner successfully alleged supervisory personnel's personal involvement in the violation of her due process rights by alleging, *inter alia,* Superintendent's failure to release prisoner from involuntary protective custody); *James v. Aidala,* 389 F.Supp.2d 451, 452-53 (W.D.N.Y.2005) (motion to dismiss on qualified immunity grounds denied where prisoner stated claim of personal involvement of Commissioner where prisoner alleged that Commissioner created and upheld unconstitutional policy and failed to provide adequate training and supervision to corrections employees).

## VIII. *BROWN HAS FAILED TO ALLEGE FACTS DEMONSTRATING RETALIATION UNDER SECTION 1983*

### A. *Legal Standard Governing a § 1983 Retaliation Claim* [19]

[19] For additional decisions authored by this Judge discussing the plaintiff's burden of proof for a § 1983 retaliation claim in language substantially similar to that in this entire section of this Opinion, *see, e.g., Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *11-12 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.).

**\*25** The Second Circuit has clearly set forth a plaintiff's burden of proof in proving a § 1983 retaliation claim, as follows:

The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). [20]

[20] *See, e.g., Gill v. Tuttle,* 93 Fed. Appx. 301, 303 (2d Cir.2004); *Bennett v. Goord,* 343 F.3d 133, 137 (2d. Cir.2003); *Ebron v. CTO Huria,* No. 99-0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb. 1, 2000); *Davidson v. Chestnut,* 193 F .3d 144, 148-49 (2d Cir.1999); *Duamutef v. Hollins,* No. 97-2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir. July 7, 1998); *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Davidson v. Kelly,* No. 96-2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov. 24, 1997); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984); *see also, e.g., Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001), *aff'd,* 131 Fed. Appx. 775 (2d Cir .2005); *Williams v. Muller,* 98 Civ. 5204, 2001 WL 936297 at *3 (S .D.N.Y. Aug. 17, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363-64 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Campbell v. Kuhlmann,* 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15,1998).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* 2001 WL 936297 at *3 (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)); *see, e.g., Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002); *Gill v. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov. 1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

"While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim. Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001) (citations omitted); *accord, e.g., Morales v. Mackalm,* 278 F.3d at 131; *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999); *Thaddeus-X v. Blatter,* 175 F.3d 378, 396-98 (6th Cir.1999) (to be actionable, retaliation

2006 WL 3313821

against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *rev'd on other grounds,* 523 U.S. 574, 118 S.Ct. 1584 (1998). [21]

[21]    *See also, e.g., Walker v. Keyser,* 2001 WL 1160588 at \*6; *Wagnoon v. Gatson,* 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at \*6 (S.D.N.Y. June 25, 2001); *Rivera v. Goord,* 119 F.Supp.2d at 340.

Prisoners' claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord, e.g., Dawes v. Walker,* 239 F.3d at 491; *Colon v. Coughlin* 58 F .3d at 872; *Jackson v. Johnson,* 15 F.Supp.2d at 364 ( & cases cited therein).

### B. *Application to Brown's Retaliation Allegations*

 **\*26**  Brown's amended complaint asserts that defendant Nurse DeFrank retaliated against him after he filed a grievance relating to her treatment of his bunions. (Dkt. No. 3: Am. Compl. ¶¶ 4, 32-37.) However, Brown has failed to allege any retaliatory acts sufficiently serious to rise to a constitutional violation, *i.e.,* acts that would deter a prisoner of ordinary firmness from exercising constitutional rights. Indeed, Brown himself was not deterred, because he filed several more grievances against DOCS' staff, including Nurse DeFrank, after the alleged retaliation. (*See* pages 8-24 above.) Brown's § 1983 retaliation claim is dismissed.

## IX. *BROWN'S CLAIMS UNDER THE ADA AND REHABILITATION ACT*

### A. *Brown's ADA and Rehabilitation Act Claims for Damages Against the Individual Defendants In Their Individual Capacity Are Dismissed*

Damage claims against state officials in their individual capacities brought under the ADA and the Rehabilitation Act are not actionable. *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 107 (2d Cir.2001); *accord, e.g., Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at \*15 (S.D.N.Y. Dec. 10, 2004) (Peck,M.J.). "Insofar as [plaintiff] is suing the individual defendants in their individual capacities, neither Title II of the ADA, nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."

*Garcia v. S.U.N.Y. Health Sciences Ctr .,* 280 F.3d at 107 (citing cases); *accord, e.g., Doe v. Goord,* 2004 WL 2829876 at \*15. Accordingly, Brown's ADA and Rehabilitation Act damage claims against the individual defendants in their individual capacities are dismissed.

"Insofar as [plaintiff] is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent it shields [the State or State agencies]." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 107; *Doe v. Goord,* 2004 WL 2829876 at \*15. The Court therefore turns in the next subsections to the availability of ADA and Rehabilitation Act claims against the State under the Eleventh Amendment.

### B. *Brown's ADA Damage Claims Against the Individual Defendants In Their Official Capacity Are Not Barred By the Eleventh Amendment*

"[I]nsofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 882 (2006) (emphasis in original).

A damage claim under the ADA against a state (or state agency or official) that covers conduct that violates the Fourteenth Amendment is not barred by the Eleventh Amendment as long as the "plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 112 (2d Cir.2001); *accord, e.g., Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at \*15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.). The Second Circuit, in *Garcia,* recognized that "direct proof of this will often be lacking: smoking guns are rarely left in plain view," and that plaintiffs may establish "discriminatory animus" by relying on a "burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252-58, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 112; *accord, e.g., Doe v. Goord,* 2004 WL 2829876 at \*15.

### C. *Doe's Rehabilitation Act Damage Claims Against the Individual Defendants In Their Official Capacity Are Not Barred By The Eleventh Amendment*

Brown v. DeFrank, Not Reported in F.Supp.2d (2006)

2006 WL 3313821

**\*27** Congress enacted Section 504 of the Rehabilitation Act pursuant to its authority under the Spending Clause of Article I of the Constitution. *See Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 113 (2d Cir.2001). When Congress provides federal funding, it may require that a state agree to waive its sovereign immunity as a condition of accepting the funds. *Id.* The Second Circuit in *Garcia* recognized that Congress expressly intended such a condition to apply for Section 504 of the Rehabilitation Act, *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 113 (citing 42 U.S.C. § 2000d-7), but ruled that a state may only effectively waive its sovereign immunity through an " 'intentional relinquishment or abandonment of a *known* right or privilege.' " *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 114 (quoting *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 682, 119 S.Ct. 2219, 2229 (1999)). *Garcia* held that SUNY had not effectively waived its sovereign immunity because at the time it accepted federal funds, the Second Circuit had held that states did not have sovereign immunity under the essentially-similar provisions of the ADA. *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 114 (citing *Killcullen v. New York State Dep't of Labor,* 205 F.3d 77, 82 (2d Cir.2000) ( "Congress has validly abrogated the States' immunity from suit under both the ADA and Section 504 of the Rehabilitation Act."), *overruled by Garcia v. S.U.N.Y. Health Sciences Ctr.*

Since *Garcia,* state agencies in New York including DOCS have continued to accept federal funds and, therefore, waived immunity from suit under Section 504 of the Rehabilitation Act. (*See* cases cited immediately below.) The district court decisions in this Circuit disagree as to whether New York effectively waived its sovereign immunity only by accepting federal funds after *Garcia* was decided, on September 25, 2001, or whether the waiver occurred as early as February 25, 2001, when the U.S. Supreme Court handed down its decision in *Bd. of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955 (2001) (holding Title I of the ADA exceeded Congress' authority under § 5 of the Fourteenth Amendment and therefore suits against states were barred by the Eleventh Amendment). *Compare, e.g., Cardew v. New York State Dep't of Corr. Servs.,* 01 Civ. 3669, 2004 WL 943575 at \*8 (S.D.N.Y. Apr. 30, 2004) (holding sovereign immunity waived as of the decision in *Garrett); with Killcullen v. New York State Dep't of Labor,* No. 97-CV-484, 2003 WL 1220875 at \*3 n. 1 (N.D.N.Y. Mar. 13, 2003) (collecting cases holding sovereign immunity waived as of *Garcia); and with Wasser v. New York State Office of Vocational & Educ. Servs. for Individuals with Disabilities,* No. 01-CV-6788, 2003 WL

22284576 at \*10 (E.D.N.Y. Sept. 30, 2003) (dicta; finding an "arguable" basis that sovereign immunity may have been waived as of April 17, 2000, when the Supreme Court granted certiorari in *Garrett* ).

**\*28** This Court need not decide the exact date that sovereign immunity was effectively waived because Brown's claims arise out of conduct in 2004 through 2006, by which time New York was clearly subject to suit under Section 504 of the Rehabilitation Act. *See, e.g., Doe v.. Goord,* 04 Civ. 0570, 2004 WL 2829876 at \*15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.).

### D. *The ADA and Rehabilitation Act Standards*

To prove a violation of Title II of the ADA, [22] a plaintiff must demonstrate: "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont,* 340 F.3d 27, 34-35 (2d Cir.2003); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at \*15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); *K.M. v. Hyde Park Cent. Sch. Dist.,* 381 F.Supp.2d 343, 357-58 (S.D.N.Y.2005); *Blatch v. Hernandez,* 360 F.Supp.2d 595, 629 (S.D.N.Y.2005). Since "[t]hese requirements apply with equal force to plaintiffs' Rehabilitation Act claims," the Court will analyze the claims in tandem. [23] *See Hargrave v. Vermont,* 340 F.3d at 35; *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 85 (2d Cir.2004) ("Since the standards adopted by Titles II and III of the ADA are, in most cases, the same as those required under the Rehabilitation Act, ... we consider the merits of these claims together."); *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273 (2d Cir.2003) ( "[U]nless one of those subtle distinctions [between the Rehabilitation Act and the ADA] is pertinent to a particular case, we treat claims under the two statutes identically."), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658 (2004); *Doe v. Goord,* 2004 WL 2829876 at \*18; *K.M. v. Hyde Park Cent. Sch. Dist.,* 381 F.Supp.2d at 357; *Blatch v. Hernandez,* 360 F.Supp.2d at 630.

[22]     Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132.

23    Section 504 of the Rehabilitation Act provides in pertinent part: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

Pursuant to the ADA, a "qualified individual with a disability" means

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

### E. *Application to Brown's Claims*

Because Brown's Eighth Amendment claims relating to his bunions fail to state a claim for a deliberate indifference (*see* discussion at Point V above), those claims similarly fail under the ADA and Rehabilitation Act. Defendants' motion to dismiss Brown's ADA and Rehabilitation Act claims relating to his bunions is therefore GRANTED.

Because Brown's constitutional claims relating to his arthritic hip condition survive and the ADA and Rehabilitation Act claims relating to his arthritic hip condition do not expand the scope of discovery, it makes sense to let these claims proceed at this stage and revisit them after discovery via a summary judgment motion. *See Doe v. Goord,* 04 Civ. 0570, 2004 2829876 at *7 n. 13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.) (denying defendant's motion to dismiss prisoner's ADA claims where decision on the motion would not affect scope of discovery); *Metallia U.S.A. LLC, v. Stulpinas,* 98 Civ. 3497, 1998 WL 1039103 at *2 n. 3 (S.D.N.Y. Dec. 16, 1998) (Peck, M.J.) (citing cases). Defendants' motion to dismiss Brown's

ADA and Rehabilitation Act claims relating to his arthritic hip condition is therefore DENIED.

### X. *DEFENDANTS' MOTION TO DISMISS ON QUALIFIED IMMUNITY GROUNDS IS DENIED*

 **\*29**  Defendants have raised the affirmative defense of qualified immunity because, they contend, their actions were objectively reasonable and did not violate any clearly established rights. (Dkt. No. 25: Defs. Br. at 14-16.)

A Rule 12(b)(6) motion to dismiss is usually not the appropriate pleading in which to raise an affirmative defense. *See, e.g., McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004). However, the Second Circuit has recently recognized a caveat to this general rule; "we see no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint." *McKenna v. Wright,* 386 F.3d at 436.

The right to be free from deliberate indifference to serious medical needs is well established and was at the time of defendants' conduct. The issue thus is whether defendants' actions (or failure to act) with respect to Brown's hip condition were subjectively unreasonable so as to constitute deliberate indifference. The Court cannot say on a motion to dismiss that any defendant's actions were so clear as to entitle them to dismissal on qualified immunity grounds at this stage of the case. Defendants' motion to dismiss on qualified immunity grounds is denied. *See, e.g., Field Day, LLC v.. County of Suffolk,* 463 F.3d 167, 195 (2d Cir.2006) (County officials did not demonstrate an entitlement to qualified immunity at the motion to dismiss stage.); *Golio v. City of White Plains,* ---F.Supp.3d ----, 2006 WL 3199140 at *3 (S.D.N.Y. Nov. 2, 2006); *Roper v. Hynes,* 05 Civ. 7664, 2006 WL 2773032 at *6 (S.D.N.Y. Sept. 27, 2006); *see also* cases cited on page 51 above.

### CONCLUSION

For the reasons discussed above, defendants' motion to dismiss is GRANTED with respect to (1) Brown's claims under § 1983 against defendants in their official capacity; (2) all of Brown's claims for injunctive relief; (3) Brown's § 1983 deliberate indifference to medical needs claims relating to his bunions; (4) Brown's § 1983 retaliation claims; and (5) Brown's ADA and Rehabilitation Act claims relating

**Brown v. DeFrank, Not Reported in F.Supp.2d (2006)**

2006 WL 3313821

to his bunions. Defendants' motion to dismiss is DENIED
with respect to (1) Brown's § 1983 deliberate indifference to
medical needs claims relating to his arthritic hip condition; (2)
Brown's ADA and Rehabilitation Act claims relating to his
arthritic hip condition; and (3) defendants' claim of qualified
immunity.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3313821

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.