UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JAMES R. MERCER, JR.,

*Plaintiff,*

**DECLARATION**

**OF MARK KINDERMAN**

-*against*-

CV-0665

9:20-

MAD/TWD

M. KINDERMAN, *et al.*,

*Defendants.*

---

MARK KINDERMAN, on the date noted below and pursuant to §1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.  Prior to my retirement on July 29, 2019, I was employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). On July 22, 2004, I became a Deputy Superintendent of Programs and spent 15 years in this role. Beginning on April 28, 2006, I was employed as the Deputy Superintendent for Programs at Marcy Correctional Facility ("Marcy").

2.  As the Deputy Superintendent of Programs, my duties consisted of planning and providing facility wide programs and services for incarcerated individuals, managing labor relations with staff and personnel, conducting tier hearings, supervising the Substance Abuse Treatment Program, as well as the Prison Based Sex Offender

Treatment Program within Marcy. I also was the advisor of the special ops crisis intervention team and simultaneously oversaw the grievance program.

3. I submit this declaration based on my personal knowledge and upon review of the applicable regulations, DOCCS Directives, and records kept by DOCCS in the ordinary course of business.

4. I am a defendant in the above-captioned action and submit this declaration in support of defendant's motion for summary judgment.

5. It is my understanding that Plaintiff, James Mercer (DIN # 87-C-0688), alleges that I was deliberately indifferent to his medical needs when I allowed Plaintiff to be assigned to programs contrary to his medical permits and disabling medical condition. (Compl. at ¶¶ 182-85). It is also my understanding that Plaintiff alleges that I assigned him to programs that were inconsistent with his medical conditions in retaliation for filing grievances. (Compl. at ¶¶ 192, 194).

6. At the outset, I deny any wrongdoing and maintain that all interactions with the Plaintiff were professional and in accordance with DOCCS rules, regulations, directives, and procedures.

7. Plaintiff was incarcerated at Marcy from August 2016 through January 27, 2021, when he was released from DOCCS custody.

8. In 2013, Commissioner of the New York State Office of Mental Health ("OMH") entered into a contract with the New York State Department of Corrections and Community Supervision ("DOCCS") to provide a sex offender treatment program at Marcy.

9. The program, entitled the New York State Office of Mental Health Prison-

Based Sex Offender Treatment Program ("PBSOTP"), was a voluntary, outpatient program operated within certain DOCCS facilities, such as Marcy.

10. The PBSOTP operated without written or posted policies, procedures, rules, and regulations.

11. "The PBSOTP provides an intensive sex offender treatment program to inmates incarcerated with DOCCS who have been classified as high risk for committing a sexual offense upon release from prison. This program is operated by OMH clinical personnel within DOCCS facilities and is designed to address the multiple risk factors presented by this population." *See* https://omh.ny.gov/omhweb/forensic/bisot/ (last visited Apr. 18, 2019).

12. On August 8, 2016, the Plaintiff applied and began participating in Marcy's PBSOTP program.

13. In a memorandum sent to the Plaintiff on August 29, 2017, Plaintiff was advised that he was suspended from the PBSOTP, effective August 29, 2017, due to treatment interference behaviors being exhibited by the Plaintiff, including Plaintiff's noncompliance with Behavior Contracts in place as per the program and threatening Treatment Team Leaders. *See* Memorandum re: PBSOTP Suspension dated August 29, 2017, hereinafter **Exhibit "A"**.

14. On October 5, 2017, Plaintiff applied and was allowed to return to the PBSOTP after receiving and agreeing to an updated Behavior Contract.

15. Plaintiff was discharged from the PBSOTP on July 12, 2018, following a series of threatening statements made to female staff and an increase in treatment

interfering behaviors, which ultimately amounted to Plaintiff's poor participation within the program. *See* Memorandum re: PBSOTP Discharge dated July 12, 2018, hereinafter **Exhibit "B"**.

16. On September 18, 2018, Plaintiff sent a request to re-enter the program and on October 24, 2018, Plaintiff's request was granted.

17. On February 25, 2019, Plaintiff began an administrative clerk position with the law library.

18. Plaintiff was removed from the Administrative Clerk position on March 17, 2019 due to security concerns with Plaintiff's behavior including suspicion of drug trafficking and improper behaviors towards female civilian workers at Marcy.

19. On April 29, 2019, Plaintiff was assigned to a food service position in the mess hall by the programs committee.

20. In response to an inquiry letter sent to me on May 12, 2019, I responded to the Plaintiff on May 16, 2019 by way of a memorandum. *See* Memorandum re: Letter of 5/12/19 dated May 16, 2019, hereinafter **Exhibit "C"**. In this memorandum, I explained to the Plaintiff that his removal from his Administrative Clerk position was within the purview of DOCCS Policy and Procedure, as Plaintiff presented a security concern. *Id.* I further explained that "it is at the discretion of the Program Committee to make any necessary assignments, and changes to assignments, when it is in the best interest of the facility." *Id.* However, I was willing to advocate on the Plaintiff's behalf with regards to the practicality of having the Plaintiff work in the Mess Hall while residing in a dorm at the far end of the compound. *Id.*

21. Following up on my May 16, 2019 letter to the Plaintiff, on May 17, 2019, I sent Plaintiff a memorandum advising that after conferring with Marcy's medical staff, Plaintiff was "clear to be assigned in either Food Service or Inside Lawns and Grounds," and his placement would be reviewed by the Program Committee for a possible change in assignment. *See* Memorandum re: Program Assignment dated May 17, 2019, hereinafter **Exhibit "D"**.

22. On May 26, 2019, Plaintiff was removed from his food services position in the mess hall.

23. Plaintiff was assigned to Lawns and Grounds on May 27, 2019 by the Programs Committee.

24. Given the information received by me from Marcy's medical department, Plaintiff's placement in Lawns and Grounds was appropriate.

25. On June 9, 2019, Plaintiff was removed from his program in Lawns and Grounds.

26. On June 10, 2019, Plaintiff was assigned to a Food Service position in the Mess Hall by the Programs Committee.

27. Given the information received from Marcy's medical department, Plaintiff's placement in Mess Hall was appropriate.

28. On August 18, 2019, Plaintiff was removed from his Food Service position as he was deemed "unemployed/unassigned" due to medical reasons.

29. Plaintiff returned to his placement in Food Services on September 23, 2019.

30. On October 27, 2019, Plaintiff was removed from his placement in Food

Services as he was deemed "unemployed/unassigned" due to medical reasons.

31. On January 13, 2020, Plaintiff returned to a Food Service position in the Mess Hall.

32. Plaintiff successfully completed the PBSOTP program on March 22, 2020.

33. Plaintiff returned to a Food Service position on March 23, 2020.

34. On May 3, 2020, Plaintiff's program was changed to Porter.

35. On August 2, 2020, Plaintiff was removed as a porter.

36. Plaintiff was released from DOCCS custody on January 27, 2021.

37. In my opinion, Plaintiff engaged in "permit shopping." He would request a sick call, meet with a member of the medical department, usually an RN, and complain of pain. Given his complaints, medical personnel, not Zaki or Coppolla, would issue a temporary medical permit/pass which would allow Plaintiff to skip or bypass his program for a certain period of time. Per policy at Marcy medical department, the temporary medical permits/passes were reviewed by Dr. Zaki for appropriateness. If Dr. Zaki disagreed with the temporary medical permit/pass, he would revoke or modify the temporary permits to meet Plaintiff's medical conditions. Plaintiff was simply attempting to avoid any work in any given placement.

38. Plaintiff's program assignments were consistent with the restrictions outlined in his medical permits and his ongoing medical condition.

39. Any placement to which Plaintiff was assigned was chosen by the Programs Committee.

40. I was not responsible for any medical determinations made by medical professionals with regards to medical permits issued to the Plaintiff.

41. The Programs Committee would assign such program assignments after a review of the medical restrictions set by Dr. Zaki.

42. I did not have the ability to choose Plaintiff's program assignment on my own volition.

43. Although I am a Programs Committee member, placement decisions from the programs committee are made as a committee, not solely by me.

44. I relied on the Programs Committee to assign the Plaintiff appropriate programs, based upon Dr. Zaki's medical opinion and evaluation.

45. Plaintiff's assignment to lawns and grounds was appropriate.

46. Plaintiff's assignment was changed to accommodate the Plaintiff, given the distance between his dorm located at the far end of the compound.

47. Plaintiff's assignment to the mess hall was appropriate.

48. Plaintiff's duties while he was assigned at mess hall were appropriate given his medical restrictions.

49. Plaintiff's duties consisted of wiping tabletops while sitting.

50. Plaintiff was allowed to sit at any time he needed a break.

51. Plaintiff's medical permits did not restrict the Plaintiff from performing these duties.

52. I was not involved in the issuance, modification, or revocation of medical permits, as I am not a medical professional, and such responsibility lies solely on the medical staff of the correctional facility.

53. At no time did I intervene or get involved with Plaintiff's medical permits or any medical decisions.

54. To my knowledge, Plaintiff never filed for a reasonable accommodation with regard to his assignment at the mess hall.

55. I did not act in concert with Marcy staff to deny, withhold, or delay Plaintiff's medical treatment.

56. I was never deliberately indifferent to Plaintiff's medical needs or otherwise ignored Plaintiff's medical symptoms. As set forth above, I had absolutely no involvement with the selection or modification of Plaintiff's programs, nor Dr. Zaki's decisions regarding Plaintiff's permit/passes.

57. I did not retaliate against the Plaintiff in any way.

58. To my knowledge, Plaintiff was assigned to programs which were consistent with his medical condition and with his medical permits.

59. I, therefore, respectfully request this Court grant summary judgment, dismissing Plaintiff's complaint against me.


Dated: 3/1/22
Marcy, New York

MARK KINDERMAN

# Exhibit A



**ANDREW M. CUOMO**
Governor

**ANN MARIE T. SULLIVAN, M.D.**
Commissioner

**MARTHA SCHAEFER**
Executive Deputy Commissioner

# Memorandum

**TO:**    J. Mercer, 87C0688
**FROM:**  G. Elder, Ph.D., Treatment Team Supervisor/B. Ballinger, Ph.D., Unit Chief
**DATE:**   08/29/2017
**RE:**     PBSOTP Suspension

We are writing to inform you that you that effective immediately, you are suspended from the OMH Prison-Based Sex Offender Treatment Program (PBSOTP) at Marcy Correctional Facility for 30 days. The treatment interfering behaviors that led to your suspension were consistently choosing not to use alternate strategies to manage your impulses to control PBSOTP staff interactions with you even though you have expressed an understanding that grievance thinking, passive-aggressive communication, and being challenging to staff are unhealthy attempts to manage your anxiety. Most recently, you refused to accept an assignment given to you by staff designed to help you address these problems.

You have been on active Behavior Contracts beginning 06/20/2017 to address your grievance thinking and related engagement in indirect and/or aggressive and passive-aggressive communication, and use of diversion (e.g., smokescreen issues, pointing out faults in others) and aggression (e.g., arguing, creating chaos) tactics in treatment groups. You made some notable progress on a number of goals in the Behavior Contract, and struggled with others; hence, the contract was continued on 07/21/2017 (and subsequently revised and dated 08/04/2017 following your submission of a statement of disagreement with the statements that you had continued difficulty with some goals, and your statement of signing the Behavior Contract under duress). During this period, you were placed in Phase III programming with the verbal statement that although you had gained considerable insight into your engagement in grievance thinking (e.g., power and control, playing "games", maintaining a need for safety), behavioral changes consistent with Phase III programming needed to be a focused goal for you if you are to remain in Phase III. Since this time, you have engaged in a number of violations of your Behavior Contract, including:
- Your attempt to deliver a legal document with an assignment on 08/15; when returned to you, your primary clinician redirected to what you know are the appropriate steps for submitting legal documents (submission through the mail and/or meeting with the team leader), and your response was to tear up the papers and state dismissively "I tried."
- An incident in your Empathic Communications skills group resulted in an assignment aimed at assisting you in examining your awareness of your frustration and asking you to identify what skills you could have employed to prevent engaging in inappropriate behavior, identifying what you are working on in treatment, and a faulty belief about Behavior Contracts; your response did not respond to any of these questions and instead was an expression of your grievances against staff and the program.
- An incident in your Empathic Communication skills group in which you appeared to engage in grievance thinking and subsequently became passive-aggressive, stating "Oh, now I've talked



**NEW YORK STATE OF OPPORTUNITY.** | **Office of Mental Health**

ANDREW M. CUOMO
Governor

ANN MARIE T. SULLIVAN, M.D.
Commissioner

MARTHA SCHAEFER
Executive Deputy Commissioner

about program stuff so I guess I just violated my behavior contract", and subsequently continuing to engage in passive-aggressive communication.

Additional concerns which have been communicated to you relate to the lack of clarity in your goals for treatment. In multiple areas, you appear to be able to develop insight into problematic areas, and to understand the emotional needs served by unhealthy behaviors; however, when staff attempt to assist you in facilitating behavioral change from the insight you have gained, it is often met with grievance thinking or "my way".

On 08/25/2017, you met with Ms. Thomas and Dr. Elder to discuss your recent difficulty keeping your behavior in accordance with your Behavior Contract and not meeting expectations following your transition to Phase III. During this meeting, clinicians informed you that to assist you in making progress, your Behavior Contract had been revised and would continue to be active, and you were being placed on an out-of-group Reflections period to allow you to focus solely on the areas that had been difficult to manage your behavior. In response, you replied by stating "you may as well throw me out of the program", and went on to state that for every action staff take (e.g., behavior contract, consequences), we are "digging a hole" that strengthens your case that the program is engaging in "retaliation" against you which will further your lawsuit against PBSOTP. This statement could reasonably be perceived as a threat and/or harassment (i.e., how can appropriate treatment responses including Behavior Contracts and Reflections be employed when you state that if the program follows through, it will add to your legal suit?). As a program, PBSOTP staff have attempted to work with you in regard to your grievance thinking by making themselves more available to meet to discuss your concerns about the program before you write a complaint letter and provide an opportunity to check the accuracy of your perceptions or assumptions about the given situation so that you might receive an answer directly, or a generate an alternate solution.

Finally, during the meeting on 08/25/2017, when given the first assignment for your Reflections period, you became argumentative and would not allow clinicians to articulate the expectations. You followed through when redirected, but stated your refusal to look at the assignment, take the assignment with you, to complete the assignment, or to submit the completed assignment on Monday, 08/28/2017. You were encouraged to take the assignment and think about the entire conversation over the weekend. You subsequently took the assignment and then left it on a table when you exited the building. Given that we have extended multiple opportunities to assist you in more effectively engaging with treatment, we are suspending you from PBSOTP for a 30 day period.

We believe that you could benefit from the program. To assist you in examining the behaviors noted above and developing a plan for making relevant behavioral changes, we will be providing you with weekly assignments, the first of which is included with this memo. You may request to re-enter the program in writing after 30 days. In this letter, please include the reasons you are requesting to return and provide a detailed description of how your behavior will be different if you are accepted for return to the program.

**OMH-Prison Based Sex Offender Treatment Program, Marcy Correctional Facility**
9000 Old River Road, P.O. Box 5000
Marcy, New York 13403| omh.ny.gov

# Exhibit B


| ANDREW M. CUOMO | ANN MARIE T. SULLIVAN, M.D. | CHRISTOPHER TAVELLA, Ph.D. |
| Governor | Commissioner | Executive Deputy Commissioner |

# Memorandum

**TO:**      **J. Mercer,  87C0688**

**FROM:**   **G. Elder, Ph.D., Treatment Team Supervisor/B. Ballinger, Ph.D., Unit Chief**

**DATE:**   **07/12/2018**

**RE:**      **PBSOTP Discharge**

---

We are writing to inform you that effective immediately, you are discharged from the OMH Prison-Based Sex Offender Treatment Program (PBSOTP) at Marcy Correctional Facility following a concerning a threatening statement to staff, an increase in treatment interfering behaviors, and questionable motivation for participation in PBSOTP.

First, in a recent assignment, you made a concerning statement that contained a threat to PBSOTP staff. In the assignment, you write at length about your perception that various behaviors of women staff involved in your treatment are "deceptive", and also state "Especially when staff knows that the deception of women is a High Risk Situation for me." This statement evokes the suggestion that if staff continue to engage in the behaviors you perceive as "deception", you may commit behaviors similar to your history of sexual offending. Any statements that could threaten staff are not tolerated.

Furthermore, you have increasingly returned to passive-aggressive treatment interfering behavior, similar to the behaviors you engaged in that we attempted to help you address through multiple Behavior Contracts (06/20/2017, 08/07/2017, 10/05/2017, 11/03/2017, 11/21/2017), multiple written assignments and individual meetings with staff and the Treatment Team Leader, and Suspension (08/29/2017). You have made concerning statements and engaged in concerning behavior in your group (e.g., leaving the room when receiving feedback, making statements to encourage divisiveness between participants and staff, stating that you would only give peers feedback outside of group and not within group, being unwilling to address conflict directly with peers or staff, directing staff how they "should" do their job). In each of these instances, you have been provided with feedback about how to appropriately communicate your concerns, and have been largely unreceptive to this feedback. You have continued to utilize treatment assignments as an avenue to convey grievances with staff instead of answering the questions directly.

Your motivation for engaging in PBSOTP appears questionable. Recently, you made statements in your Arousal Management group that suggest your engagement in treatment was for ulterior motives, you stated: "On Friday I finally took my PPG ... I'm asking to get out of this group ... I accomplished what I wanted to accomplish, I took the PPG." Rather than utilizing the results of the



**NEW YORK STATE OF OPPORTUNITY.** | **Office of**
**Mental Health**

ANDREW M. CUOMO
Governor

ANN MARIE T. SULLIVAN, M.D.
Commissioner

CHRISTOPHER TAVELLA, Ph.D.
Executive Deputy Commissioner

assessment to proceed with making behavioral changes in treatment, your desire was to be removed from group, suggesting you had some other motivation for participating in the PPG.

Recently you made a statement to staff on your way out of a meeting: "Next month is 24 months." This comment was in the context of your repeated allegations that staff are delaying your progress in treatment, rather than the result of the time needed to adequately address your treatment needs. Staff have frequently reinforced that although there are times you demonstrate good insight into behaviors, you have difficulty making behavioral changes in these areas.

Finally, during the process of the Treatment Team's discussion of the above described behavior, you have engaged in some further concerning behavior relating to your report of a tattoo that you obtained on your back. First, you had no direct reason to engage Ms. Burdick in conversation, however, you chose to approach her, and report that you had obtained a tattoo related to an assignment you did in group, and to insinuate that you received it from a peer with whom you only cohabitated on J-2 recently and for approximately two months. You then made a formal complaint received today that security's response to the information you provided about your tattoo was evidence of Ms. Burdick attempting to retaliate against you; within this complaint, you report that you provided a different account to the investigating Sergeant in which you made statements that suggested you based the assignment on a pre-existing tattoo.

We have attempted to work with you on the above detailed patterns of behaviors through multiple treatment methods over your time in PBSOTP including Behavior Contracts, written assignments, individual meetings with you, and suspension. Additionally, making any statement which could be threatening to staff will not be tolerated. We continue to believe that you could benefit from the program, and encourage you to take time to reflect on your recent behaviors, and your motivation to engage in these behaviors. If you choose to write to request re-entry to PBSOTP, we will consider such a request after 60 days. In this letter, please identify specific changes that you need to make and your commitment to working on making these changes. Within 30-days of receiving your written request, we will make a decision regarding your eligibility to return and will notify you of the decision. At that time, you may be asked to complete specific assignments designed to help you gain insight into these problematic patterns and begin the process of making behavioral change.

# Exhibit C

## NEW YORK STATE – DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
## MARCY CORRECTIONAL FACILITY

### Memorandum

**TO:**   J. Mercer, 97C0688, H1-22B

**FROM:**   Mark D. Kinderman
Deputy Superintendent for Programs

**DATE:**   May 16, 2019

**SUBJECT:**   **Letter of 5/12/19**

---

In reviewing your letter, and the various assignments you have held since your appropriate, security-based removal as a Clerk in Building #26, I have determined that the assignment changes were all well within the purview of DOCCS Policy and Procedure. The fact that you would characterize yourself as an "Administrative Aide," in the PBSOTP, is indicative of a potential security problem which needed to be addressed. Your removal was not irrational, and I concur with Security that the decision to remove you was appropriate. The circumstances surrounding your removal did not require that you appear in person before the Program Committee.

I have requested information relative to your pay for Inside Lawns and Grounds. It is my understanding that you appeared for work briefly, went to sick call, and were granted a medical excusal of some type. I would agree that you should be paid for those days you actually worked at that location and in that assignment. We will check with the supervisor of that area for attendance information.

It is not necessary that you meet with the Program Committee in order to receive a change of assignment. However, the Program Committee Chair would normally notify an inmate, in writing, of a change. I will remind our Program Committee of the importance of this notification process.

As you know, it is at the discretion of the Program Committee to make any necessary assignments, and changes to assignments, when it is in the best interest of the facility. However, I will take a look at the practicality of having you work in the Mess Hall while residing in a dorm at the far end of the compound.

MDK:ds

cc:   Superintendent Reardon
Guidance and Parole Folders
Program Committee Chairperson
File

# Exhibit D

**Memorandum**

**TO:**       J. Mercer, 87C0688, H1-22B

**FROM:**    Mark D. Kinderman
             Deputy Superintendent for Programs

**DATE:**    May 17, 2019

**SUBJECT:** **Program Assignment**

---

In follow up to my previous correspondence, Medical has advised me that you are clear to be assigned to work in either Food Service or Inside Lawns and Grounds. You will be called out to Program Committee next week for a review of a possible change of assignment.

MDK:ds

cc:    Program Committee Chair
       File