UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JAMES R. MERCER, JR.,

                                          Plaintiff,

                                                          9:20-cv-00665
v.                                                        (MAD/TWD)

M. KINDERMAN, D. CROSSWAY, S. ZAKI,
C. COPPOLA,

                                          Defendants.

---

APPEARANCES:                                OF COUNSEL:

JAMES R. MERCER, JR.
1001 W. Creek Drive
Niagara Falls, NY 14304
*Plaintiff, pro se*

LETITIA JAMES                               BRENDA T. BADDAM, ESQ.
Attorney General of the State of New York   Assistant Attorney General
The Capitol
Albany, NY 12224
*Attorney for Defendants*

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

This matter has been referred for a report and recommendation by the Hon. Mae A.

D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

At all times relevant, Plaintiff was an incarcerated individual in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS") at Marcy Correctional

Facility ("Marcy").  (Dkt. No. 1.)  On June 15, 2020, Plaintiff commenced this action pursuant to

42 U.S.C. § 1983.  *Id.*  By Decision and Order dated July 28, 2020, the Court found Plaintiff's

Eighth Amendment deliberate indifference and First Amendment retaliation claims against Dr. Shehab Zaki, Nurse Administrator Colleen Coppola, Deputy Superintendent for Programs Mark Kinderman, and Deputy Superintendent for Administration Daniel Crossway (collectively, "Defendants") survived initial review under 28 U.S.C. § 1915.  (Dkt. No. 5.)  On June 15, 2021, the Court denied Defendants' motion to dismiss for failure to state a claim.  (Dkt. No. 30.) Defendants filed an answer and discovery ensued.  (Dkt. Nos. 33, 34, 35.)

Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 38.)  On March 23, 2022, the Court granted Plaintiff's letter request for an extension of time to file a response.  (Dkt. No. 41.) Thereafter, on April 20, 2022, Plaintiff filed a letter stating that he "decided not to respond to Defendants' motion and will allow the Court to make any decision dismissing my action or allowing the action to move further.  I do believe that there is sufficient documentation that supports claims at least against Defendant Zaki amounting to deliberate indifference to my serious medical needs and my claims for retaliation against him[.]"  (Dkt. No. 42.)  Plaintiff did not otherwise substantively oppose Defendants' motion or respond to Defendants' statement of material facts, and the time to do so has expired.  (*See generally* Dkt. Report.)  For the reasons set forth below, the Court recommends granting Defendants' motion.

## II.    BACKGROUND

Plaintiff's claims arise from alleged incidents that occurred in 2019 and 2020, related to his "osteoarthritis" in his "right hip joint" and back pain.  (Dkt. No. 1 at ¶¶ 10, 14, 36, 47, 61, 67, 68, 73, 80, 84, 88, 98, 94.)  Generally, Plaintiff alleges Dr. Zaki and Coppola were deliberately indifferent to his serious medical needs and retaliated against him for filing grievances and complaints when they issued and revoked medical permits that were inconsistent with his

"disabling medical conditions." (Dkt. No. 1 at ¶¶ 173-79, 190-95.) He claims Dr. Zaki and

Coppola denied, withheld, and delayed medical treatment. *Id*. at ¶¶ 178-79, 190-95. Plaintiff

further alleges Dr. Zaki and Coppola failed to assign him to appropriate programs and/or should

have removed him from programming based on his serious medical needs. *Id*. He claims

Kinderman and Crossway acted with deliberate indifference and retaliated against him for filing

grievances when they allowed him to be assigned to programs contrary to his medical permits

and disabling medical conditions. *Id*. at ¶¶ 180-85, 190-95.

In support of their motion for summary judgment, Defendants submit Plaintiff's medical

records from 2018 through 2020, including Ambulatory Health Records, Medical Permits, a

letter from Mohawk Glen Radiology Associates of CNY, PLLC, ("Mohawk Glen Radiology")

dated May 8, 2018, and a letter from Mitchell Rubinovich, M.D., an orthopedist, dated March

11, 2020. (Dkt. No. 38-8 at ¶¶ 12, 13, 14.) The Court adopts Defendants' factual recitation of

Plaintiff's medical care, which is incorporated here by reference. (Dkt. No. 38-8.) Through their

sworn declarations and submissions, Defendants deny any wrongdoing and seek dismissal of the

complaint in its entirety. (Dkt. Nos. 38-5 through 38-8.)

As a physician at Marcy, Dr. Zaki is responsible for "evaluating and treating inmates

through sick call, emergency sick call, and in an infirmary setting," as well as providing care for

inmates' "chronic and episodic medical conditions." (Dkt. No. 38-8 at ¶¶ 1, 2.) From

approximately 2018 through 2020, Dr. Zaki was Plaintiff's primary care provider and regularly

saw him for medical appointments; evaluated his medical problems and pain symptoms; used his

medical judgment to make decisions as to the appropriate course of Plaintiff's treatment; ordered

diagnostic tests; and referred Plaintiff to specialists. *Id*. at ¶¶ 8, 9. Dr. Zaki never ignored

Plaintiff's medical problems or symptoms. *Id*. at ¶ 100. He never denied, withheld, or delayed

necessary medical care. *Id*. at ¶ 95. Further, at no time did he retaliate against Plaintiff. *Id*. at ¶ 96. In his professional medical opinion, the care and treatment he provided to Plaintiff was, at all times, medically appropriate and reasonable. *Id*. at ¶ 11.

Upon review of Plaintiff's medical records, Dr. Zaki states Plaintiff engaged in "permit shopping." *Id*. at ¶ 67. To that end, Plaintiff would request a sick call, meet with a member of the medical department, usually a registered nurse, and complain of pain. *Id*. Given his complaints, he was often given a temporary permit that allowed Plaintiff to skip or bypass his program for a certain period of time. *Id*. at ¶ 68. Per policy within Marcy's medical department, the temporary medical permits were reviewed by Dr. Zaki, and he would revoke or modify the medical permit to meet Plaintiff's medical needs. *Id*. at ¶ 69. Dr. Zaki avers any modification or changes to a medical permit was done only after he reviewed Plaintiff's medical records and determined that such permit was within Plaintiff's restrictions and accommodations. *Id*. at ¶ 70. In Dr. Zaki's professional medical opinion, all medical permits were issued consistent with Plaintiff's medical conditions. *Id*. at ¶ 97.

Further, Dr. Zaki explains that although he prescribes and requests appointments for inmates, DOCCS Central Office, located in Albany, schedules appointments with outside providers. *Id*. at ¶¶ 81, 82. Due to the COVID-19 pandemic, which began in March 2020, the scheduling of appointments for incarcerated individuals was delayed due to restrictions placed by Central Office. *Id*. at ¶ 83.

Lastly, Dr. Zaki explains he did not have the ability to modify or change Plaintiff's program assignment. *Id*. at ¶ 93. The Programs Committee was the only deciding body who could modify or change Plaintiff's program assignment. *Id*. at ¶ 94.

As a Nurse Administrator, Coppola supervised the nursing staff and investigated grievance complaints concerning their conduct.  (Dkt. No. 38-5 at ¶¶ 1-3.)  She generally did not provide direct care to inmates and never personally treated Plaintiff.  *Id*. at ¶ 3.  Coppola investigated six of Plaintiff's grievances, reviewed his medical record, and drafted responses to the Incarcerated Grievance Records Committee ("IGRC").  *Id*. at ¶ 13.

Coppola was not responsible for the issuance, revocation, or modification of medical permit, nor any aspect of Plaintiff's program assignment.  *Id*. at ¶¶ 25, 26.  She never denied, withheld, or delayed Plaintiff's medical treatment.  *Id*. at ¶ 27.  She was not responsible for scheduling appointments with outside providers.  *Id*. at ¶ 21.  Coppola explains Central Office schedules appointments with outside providers after they have been prescribed by a doctor.  *Id*. Due to the COVID-19 pandemic, the scheduling of appointments for incarcerated individuals was delayed due to restrictions placed by New York State and Central Office.  *Id*. at ¶ 22.

In sum, Coppola avers she was never deliberately indifferent to Plaintiff's medical needs or otherwise ignored Plaintiff's medical symptoms.  *Id*. at ¶ 33.  Further, she had absolutely no involvement with the selection or modification of Plaintiff's programs or Dr. Zaki's medical decisions regarding Plaintiff's permits.  *Id*.  She did not retaliate against Plaintiff in anyway.  *Id*.

As the Deputy Superintendent for Programs, Kinderman's responsibilities included planning and providing facility wide programs and services for incarcerated individuals; managing labor relations with staff and personnel; conducting tier hearings; and supervising the Substance Abuse Treatment Program and Prison Based Sex Offender Treatment Program ("PBSOTP")[1] within Marcy.  (Dkt. No. 38-7 at ¶¶ 1, 2, 11.)  He also was the advisor of the

---

[1]  The PBSOTP is a voluntary outpatient program that provides intensive sex offender treatment program to inmates incarcerated with DOCCS who have been classified as high risk for committing a sexual offense upon release from prison.  The program is operated by the OMH

special operations crisis intervention team and oversaw the grievance program.  *Id*. at ¶ 2.  He retired from DOCCS on July 29, 2019.  *Id*. at ¶ 1.

Kinderman states Plaintiff's program assignments were consistent with the restrictions outlined in his medical permits and his ongoing medical condition.  *Id*. at ¶ 38.  He further explains any placement to which Plaintiff was assigned was chosen by the Programs Committee after a review of the medical restrictions set by Dr. Zaki.  *Id*. at ¶ 39, 41.  Although he was a member of the Programs Committee, Kinderman did not have the ability to choose Plaintiff's program assignment on his own volition.  *Id*. at ¶ 42.  Like Dr. Zaki, Kinderman also suggests Plaintiff engaged in "permit shopping" at Marcy.  *Id*. at ¶ 37.

Kinderman was not responsible for any medical determinations made by medical professionals with regards to medical permits issued to Plaintiff.  *Id*. at ¶ 40.  He was not involved in the issuance, modification, or revocation of medical permits, as he is not a medical professional, and such responsibility lies solely on the medical staff.  *Id*. at ¶ 52.  At no time did he intervene or get involved with Plaintiff's medical permits or any medical decisions.  *Id*. at ¶ 53.  He did not deny, withhold, or delay Plaintiff's medical treatment.  *Id*. at ¶ 55.

In sum, Kinderman avers he was never deliberately indifferent to Plaintiff's medical conditions, nor did he otherwise ignore Plaintiff's medical needs.  *Id*. at ¶ 56.  He was not involved with the selection or modification of Plaintiff's programs, nor was he involved with Dr.

---

clinical personnel within DOCCS facilities and is designed to address the multiple risk factors presented by this population.  (Dkt. No. 38-4 at ¶ 4, n.1.)  On August 8, 2016, Plaintiff applied and began participating in Marcy's PBSOTP.  *Id*. at ¶ 12.  He was suspended from the PBSOTP on August 29, 2017.  *Id*. at ¶ 13.  On October 5, 2017, Plaintiff applied and was allowed to return to the PBSOTP.  *Id*. at ¶ 14.  However, Plaintiff was discharged less than a year later.  *Id*. at ¶ 17.  On September 18, 2018, Plaintiff asked to re-enter the PBSTOP, which was granted on October 24, 2018.  *Id*. at ¶ 18.  Plaintiff successfully completed the PBSOTP on March 22, 2020.  *Id*. at ¶ 80.

Zaki's decisions regarding Plaintiff's medical permits. *Id*. He did not retaliate against Plaintiff in any way. *Id*. at ¶ 57. To Kinderman's knowledge, Plaintiff was assigned to programs which were consistent with his medical condition and medical permits. *Id*. at ¶ 58.

As Deputy Superintendent of Administration, Crossway oversaw the medical department, business office, personnel, maintenance, construction, and food services. *Id*. at ¶ 2. He did not provide medical care to incarcerated individuals, nor was he responsible for any medical decisions made by medical professionals or any delay caused by Central Office scheduling Plaintiff's appointments. *Id*. at ¶¶ 2, 9.

Crossway explains the Programs Committee was responsible for choosing an inmate's placement, and would assign programs after a review of the medical permit restrictions set by Dr. Zaki. *Id*. at ¶¶ 10, 11. Crossway did not have the ability to choose Plaintiff's program assignments and at no time was he personally involved with Plaintiff's assignments. *Id*. at ¶ 12. Specifically, Crossway declares he was not involved in the issuance, modification, or revocation of Plaintiff's medical permits; he did not deny, withhold, or delay Plaintiff's medical treatment; he was never deliberately indifferent to Plaintiff's medical needs; he was not involved in Plaintiff's medical care; and he was not involved in the selection or modification of Plaintiff's programs. *Id*. at ¶¶ 14-17. He declares he did not retaliate against Plaintiff. *Id*. at ¶ 18. Further, to the best of Crossway's knowledge, Plaintiff was assigned to programs which were consistent with his medical condition and the limitations outlined in Plaintiff's medical permits. *Id*. at ¶ 19.

## III.   SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party

moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Moreover, it is well settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp.*, 477 U.S. at 324. Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

"When the opposing party fails to respond to the moving party's Rule 56.1 statement, the material facts contained in the moving party's statement are deemed admitted as a matter of law." *Antwi v. Health & Human Sys. (Ctrs.) F.E.G.S.*, No. 13-CV-0835, 2014 WL 4548619, at *4 (S.D.N.Y. Sept. 15, 2014); *see also Genova v. County of Nassau*, 851 F. App'x 241, 244 (2d Cir. 2021). However, "a district court must ensure that there is support in the record for facts contained in unopposed Rule 56.1 statements before accepting those facts as true." *United States v. Abady*, No. 03-CV-1683, 2004 WL 444081, at *3 (S.D.N.Y. Mar. 11, 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140-43 (2d Cir. 2003)). Moreover, a *pro se* plaintiff must be notified of the consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

In this case, Plaintiff was sent a specific warning by both Defendants and the Court of the consequences of a failure to respond:

> **WARNING:** If you do not submit a proper response to the defendants' statement of material facts, **the Court may deem you to have admitted the defendants' factual statements.** If you do not submit copies of record evidence in support of your denials, **the Court may deem defendants' factual statements to be true.** If you do not submit a proper response memorandum of law, the Court may deem you to have conceded the defendants' arguments. If you do not respond to this motion properly (or at all), summary judgment may be entered against you, meaning that **SOME OR ALL OF YOUR CLAIMS MAY BE DISMISSED.**

(Dkt. Nos. 38, 39.) Accordingly, the facts set forth in Defendants' statement pursuant to L.R. 56.1 (Dkt. No. 38-4) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified pleading and sworn testimony will be accepted

as true.  *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3

(N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to

controvert facts in statement of material facts on motion for summary judgment); *Douglas v.

Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013)

("Because Plaintiff has failed to raise any question of material fact, the Court will accept the

facts as set forth in Defendants' Statement of Facts . . . supplemented by Plaintiff's verified

complaint . . . as true.").

## IV.    DISCUSSION

Defendants argue summary judgment is warranted because Plaintiff's claims fail as a

matter of law; Coppola, Kinderman, and Crossway were not personally involved in the alleged

constitutional violations; and Dr. Zaki and Coppola are entitled to qualified immunity.  (*See

generally* Dkt. No. 38-1.)  As noted, Plaintiff has not properly responded to Defendants' motion.

(*See* Dkt. No. 42.)

### A.    Eighth Amendment Deliberate Indifference Claims

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on

those convicted of crimes, "which includes punishments that involve the unnecessary and

wanton infliction of pain."  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Gregg v.

Georgia*, 428 U.S. 153, 173 (1976) (internal quotation marks omitted).  "In order to establish an

Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove

'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698,

702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  With respect to claims

that job assignments are inappropriate given an inmate's medical condition, courts apply the

standard for medical indifference.  *See Cooke v. Stern*, No., 9:07-CV-1292 (GLS/ATB), 2010

WL 3418393, at *6 (N.D.N.Y. Aug. 2, 2010).  An Eighth Amendment claim for medical indifference has two necessary components, one objective and the other subjective. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

To meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id*.  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id*.  Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable because the officials' duty is only to provide "reasonable care."  *Id*. (citing *Farmer*, 511 U.S. at 844-47).  The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Id*. at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Id*. (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  If, as here, the inmate alleges the medical treatment received was inadequate, the inquiry is narrower.  It becomes a question of "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  *Smith*, 316 F.3d at 186.

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim."

*Chance*, 143 F.3d at 703.  Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id*. (citations omitted).  An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).

Under the subjective component, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F. 3d at 703 (quoting *Hathaway*, 99 F.3d at 553).  Thus, the defendant "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Framer*, 511 U.S. at 837.  Satisfying this standard "entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *see also Estelle v. Gamble*, 429 U.S. at 105-06 (holding that an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference"); *Chance*, 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate); *Hathaway*, 99 F.3d at 553 (holding that "mere medical malpractice" does not constitute deliberate indifference unless the malpractice involved "culpable recklessness").

Additionally, a defendant may not be held liable under Section 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights. *See Tangreti v. Bachmann*, 983 F.3d 609, 619-20 (2d Cir. 2020); *see also Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

### 1.    Dr. Zaki

Plaintiff claims Dr. Zaki was deliberately indifferent to his serious medical needs by issuing and rescinding medical permits which allowed Plaintiff to work in certain programs; refusing to issue medical permits restricting him from specific program assignments; and denying, withholding, or delaying medical treatment with orthopedic specialists. (Dkt. No. 1 at ¶¶ 173-79, 190-95.) Defendants argue summary judgment is warranted because Plaintiff cannot meet the objective or subjective component of his Eighth Amendment deliberate indifference claim. (Dkt. No. 38-1 at 7-11.)

Here, Defendants contend Plaintiff cannot meet the objective component of his deliberate indifference claim against Dr. Zaki because the record establishes the care provided to Plaintiff by Dr. Zaki was reasonable, and, therefore, adequate under the Eighth Amendment. (Dkt. No. 38-1 at 7-11.) The Court agrees. The record demonstrates Plaintiff received medical care following each complaint he made to Dr. Zaki and to other medical personnel during sick call. (*See, e.g.*, Dkt. No. 38- 8 at ¶¶ 32, 41, 59.) Indeed, from November 2018, through July 2020, Plaintiff was seen over 59 times by various medical professionals, and issued 19 medical permits to accommodate his medical conditions. *Id*. at ¶ 87.

Dr. Zaki prescribed Plaintiff pain medication and a wheelchair and referred him to outside medical professionals to attain MRIs, X-rays, and consultations with orthopedic specialists. *Id.* at ¶¶ 71, 74, 75. Following these appointments, Dr. Zaki would receive Plaintiff's imaging or documents from orthopedic specialists and would modify or change Plaintiff's medical permit, based on his medical opinion after a review of Plaintiff's medical record. *Id.* at ¶ 72. For example, in March of 2019, Dr. Zaki reviewed Plaintiff's X-rays and determined that while he could not operate heavy equipment, he could work in lawns and grounds. (Dkt. No. 38-4 at ¶ 31.) On April 19, 2019, after examining Plaintiff, Dr. Zaki cleared Plaintiff to work in the mess hall. *Id.* at ¶ 34. Plaintiff was seen again by Dr. Zaki in May of 2019, for his back pain radiculopathy issues. *Id.* at ¶ 44. Dr. Zaki issued the following restrictions: "Unable to lift greater than 10 pounds, unable to climb stairs or ladders/heights, unable to partake in sports activities, and unable to push/pull/bend or shove." *Id.* at ¶ 44. On June 26, 2019, Plaintiff attended a neurosurgery consult with an outside medical specialist. *Id.* at ¶ 49. The next day, Dr. Zaki met with Plaintiff and modified Plaintiff's restrictions to reflect that Plaintiff could not stand for more than 20 minutes, along with maintaining the previously stated limitations. *Id.*

On August 6, 2019, Plaintiff attended sick call complaining of right hip and groin pain. *Id.* at ¶ 55. Dr. Zaki examined Plaintiff on August 12, 2019, and issued a medical permit deeming him ineligible to work in the mess hall pending Plaintiff's MRI study results. *Id.* On August 18, 2019, Plaintiff was removed from his food service position as he was deemed "unemployed/unassigned" due to medical reasons. *Id.* at ¶ 57. On September 17, 2019, an MRI was performed on Plaintiff's right hip at Mohawk Glen Radiology, which showed Plaintiff suffered from severe osteoarthritis in the right hip joint. *Id.* at ¶ 60. On October 15, 2019,

Plaintiff was seen by Dr. Zaki to review the MRI study. *Id*. at ¶ 66. Given the MRI, Dr. Zaki referred Plaintiff to an orthopedic specialist for an updated opinion to be scheduled by Central Office. *Id*. Plaintiff was also issued a temporary medical permit deeming him ineligible for work in the mess hall. *Id*.

On January 6, 2020, Plaintiff requested to speak with Dr. Zaki regarding his medical permit. *Id*. at ¶ 73. Plaintiff admitted that he "didn't want to work in the mess hall" program and requested to be deemed medically unassigned to the program. *Id*. Dr. Zaki met with Plaintiff and determined he was: "Unable to lift 70 lbs, unable to stand > 20 mins, unable to climb stairs/ladders, unable to work with power tools, no pushing/pulling/bending[.]" *Id*. Following Dr. Zaki's medical assessment, Plaintiff was assigned to the mess hall with specific duties that complied with his restrictions, i.e., wiping down tables while sitting down. *Id*.

On March 11, 2020, upon a physical exam, Dr. Rubinovich noted Plaintiff was still walking fairly well and his range of movement remained fairly good. *Id*. at ¶ 77. Dr. Rubinovich opined Plaintiff needed to see an orthopedic surgeon for a total hip arthroplasty assessment and, in the interim, Plaintiff's ambulation should be limited as much as possible. *Id*. Thereafter, Plaintiff was issued a wheelchair. *Id*. at ¶ 81. On March 26, 2020, Dr. Zaki reviewed Dr. Rubinovich's letter, met with Plaintiff, and restricted Plaintiff's ability to work in the mess hall to three times a day. *Id*. In May of 2020, Plaintiff was issued a medial permit deeming him eligible to work as a porter. *Id*. at ¶ 85. Plaintiff attended sick call in June of 2020, and was advised the orthopedic appointment was approved but not yet scheduled by Central Office due to COVID-19 restrictions. *Id*. at ¶ 87. On July 2, 2020, Dr. Zaki also advised Plaintiff that orthopedic appointments were being delayed due to COVID-19 restrictions. *Id*. at ¶ 88.

On July 30, 2020, Plaintiff was seen by an orthopedic specialist; Plaintiff was advised that a total right hip replacement would be scheduled when COVID-19 restrictions were lifted. *Id.* at ¶ 90.  On August 2, 2020, Plaintiff was removed as a porter.  *Id.* at ¶ 91.  On August 7, 2020, and August 14, 2020, Plaintiff attended sick calls to check on the scheduling of his total right hip replacement as recommended by his orthopedic specialist.  *Id*. at ¶ 92.  Plaintiff was advised that a request was submitted on July 31, 2020, for his total hip replacement and the medical department was awaiting response from Central Office.  *Id*.  Plaintiff was released from DOCCS custody in January 2021.  *Id*. at ¶ 93.  During his deposition, Plaintiff testified he had the surgery in June 2021.  (Dkt. No. 38-3 at 110. )

Based on the foregoing, Plaintiff has not demonstrated Dr. Zaki deprived him of adequate medical care.  "Although a delay or interruption in medical care may amount to deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Moody v. Pickles*, No. 9:03 CV 850 (DEP), 2006 WL 2645124, at *8 (N.D.N.Y. Sept. 13, 2006). The record is devoid of any such evidence.

While Plaintiff faults Dr. Zaki for delaying his surgery, the record demonstrates Central Office schedules appointments with outside providers and the delays in scheduling any consult or appointment were due to the national COVID-19 pandemic, which affected the scheduling of appointments for incarcerated individuals.  (Dkt. No. 38-8 at ¶¶ 81, 82, 83, 86.)  During the four-month delay in the scheduling of Plaintiff's orthopedic specialist appointment, Plaintiff was seen multiple times by various medical professionals and was advised the medical department was waiting for Central Office to schedule the appointment.  *Id*. at ¶ 84.  "Courts have found that a

plaintiff's allegations fail to meet the objective prong where the alleged delay in providing medical attention is neither the underlying cause of a plaintiff's condition nor contributed to a worsening in the condition[.]" *Cuffee v. City of New York*, 15 Civ. 8916, 2017 WL 1232737, at *9 (S.D.N.Y. Mar. 3, 2017), *report-recommendation adopted*, 2017 WL 1134768 (S.D.N.Y. Mar. 27, 2017); *accord DeMeo v. Koenigsmann*, No. 11 Civ. 7099, 2015 WL 1283660, at *11 (S.D.N.Y. Mar. 20, 2015). Plaintiff has not demonstrated that any delay attributable to Dr. Zaki caused a worsening of his condition.

Regarding Plaintiff's medical permits, Dr. Zaki states, and the record demonstrates, any modification or changes to a medical permit were done only after he reviewed Plaintiff's medical records and determined that such permit was within Plaintiff's restrictions and accommodations. (Dkt. No. 38-8 at ¶ 70.) Specifically, after a review of Plaintiff's MRIs and orthopedic surgeon consult notes, Dr. Zaki decided, in his professional medical opinion, Plaintiff was able to work in the mess hall with the current accommodations that were in place. *Id*. at ¶ 90. Thus, in Dr. Zaki's professional medical opinion, all medical permits were issued consistent with Plaintiff's medical conditions. *Id*. at ¶ 97. Further, although Plaintiff claims otherwise, the record demonstrates the Programs Committee, and not Dr. Zaki, was responsible for program assignments. *Id*. at ¶ 94.

In sum, the record evidence demonstrates Plaintiff's medical needs were reasonably treated and monitored by Dr. Zaki. Inasmuch as Plaintiff cannot satisfy the objective prong of deliberate indifference, Dr. Zaki is entitled to summary judgment. *See, e.g.*, *Dobbins v. Pont*, No. 15-CV-3091, 2017 WL 3309726, at *6 (S.D.N.Y. Aug. 2, 2107) (granting summary judgment to prison official where undisputed facts showed the plaintiff received adequate medical treatment); *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *3

(N.D.N.Y. Apr. 15, 2015) (finding inmate was not actually deprived of adequate treatment where record demonstrated that the inmate was frequently treated, prescribed pain medication, tested with an X-ray and MRI, and referred to an orthopedic specialist); *Morgan v. Shivers*, No. 1:14-cv-7924, 2018 WL 618451, at *3 (S.D.N.Y. Jan. 29, 2018) (granting summary judgment to prison official where plaintiff could not satisfy the objective prong of the deliberate indifference claim); *Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (same).

Even assuming Plaintiff could satisfy the objective prong, Plaintiff fails to establish Dr. Zaki knew of and disregarded an excessive risk to his health.  In his sworn declaration, Dr. Zaki states he provided treatment to Plaintiff which he believed, in his professional medical opinion, was appropriate based on his evaluation of Plaintiff and after a review of Plaintiff's medical record, both of which were guided by the evidence-based Milliman Care Guidelines for best practices.  (Dkt. No. 38-8 at ¶ 77, 88, 89.)  Plaintiff's disagreement with Dr. Zaki's professional judgment cannot provide a basis for a deliberate indifference claim, because while he may be entitled to adequate treatment, he does not have a constitutional "right to [the] treatment of his choice."  *Perry v. Rupert*, No. 9:10-cv-01033 (LEK/TWD), 2016 WL 11478229, at *9 (N.D.N.Y. Apr. 19, 2016) (citing *Dean*, 804 F.2d at 215).  On this record, the evidence fails to establish Dr. Zaki engaged in any conduct, or inaction, evincing a conscious disregard of a substantial risk of serious harm.

To the extent Plaintiff faults Dr. Zaki for the delays in appointments with specialists, the record demonstrates Dr. Zaki did not and could not determine when Plaintiff would be seen by outside specialists.  (Dkt. No. 38-8 at ¶¶ 81-82.)  The scheduling of Plaintiff's surgery was beyond Dr. Zaki's control and impacted by the COVID-19 pandemic.  *Id*. at ¶¶ 83-86.  *See Crique v. Magill*, No. 12 Civ. 3345, 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("While

delays in providing necessary medical care may in some cases demonstrate deliberate indifference, the Second Circuit has reserved those instances to cases when prison officials deliberately delayed care as a form of punishment."); *see also Fenton v. Provow*, No. 9:20-CV-1564 (BKS/DJS), 2022 WL 3904110, at *8 (N.D.N.Y. Aug. 5, 2022) (finding no deliberate indifference where scheduled hernia surgery cancelled twice in response to the COVID-19 pandemic), *report- recommendation adopted*, 2022 WL 3908799 (N.D.N.Y. Aug. 30, 2022). Furthermore, Dr. Zaki continued to monitor and address Plaintiff's underlying medical issues in the interim such as by prescribing medication, a wheelchair, and wheelchair gloves, and modifying/restricting Plaintiff's permits as necessary. (Dkt. No. 38-8 at ¶¶ 80, 84, 97.) This too establishes the lack of deliberate indifference.

Lastly, even if Dr. Zaki's medical decisions caused Plaintiff unintended harm, negligence is not actionable under Section 1983. *See Ahlers v. Kaskiw*, No. 12-CV-501 (GLS/ATB), 2014 WL 4184752, at *7 (N.D.N.Y. Aug. 21, 2014) ("[N]egligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference.") (citing *Farmer*, 511 U.S. at 835); *Chance*, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.") (citing *Estelle*, 429 U.S. at 105-06). Based on the foregoing, Plaintiff also fails to satisfy the subjective prong of the deliberate indifference test.

Accordingly, the Court finds given the evidence of treatment Plaintiff received during the relevant time, no reasonable jury could find Dr. Zaki deliberately indifferent to Plaintiff's serious medical needs. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmovant failed to provide "evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a

claim.") (internal quotation marks omitted). Therefore, the Court recommends summary judgment be granted to Dr. Zaki on Plaintiff's Eighth Amendment claim.

### 2.    Coppola

Plaintiff alleges Coppola was deliberately indifferent to his medical needs by denying, withholding, or delaying medical treatment and participating in the issuance and revocation of medical permits that were inconsistent with his medical conditions. (Dkt. No. 1 at ¶¶ 173-79, 190-95.) At his deposition, Plaintiff testified, "[a]s the nurse administrator, she has a say so in what goes on in -- in the medical department. She knew I wasn't supposed to be in those positions [referring to lawns and grounds and mess hall] with the medical conditions that I had. She answered grievances." (Dkt. No. 38-8 at 140.) Defendants argue Plaintiff's Eighth Amendment claim fails on the merits and for lack of personal involvement. (Dkt. No. 38-1 at 7-21.)

Here, the record establishes Coppola did not personally treat Plaintiff and was not responsible for the issuance, revocation, or modification of medical permits. (Dkt. No. 38-5 at ¶¶ 9, 25.) She did not assign inmates to their programs, nor was she responsible for scheduling any outside appointments. *Id.* at ¶ 26. Rather, her involvement consisted solely of her responding to grievances addressed to the medical department and drafting investigative statements after reviewing Plaintiff's medical record. *Id.* at ¶ 11. Further, as discussed above, the record demonstrates Plaintiff received adequate care. In short, there is no evidence Coppola knew of and disregarded an excessive risk to Plaintiff's health or safety.

Accordingly, Plaintiff has failed to demonstrate Coppola was deliberately indifferent to a serious medical condition, and the Court recommends granting summary judgment to Coppola on this claim.

### 3.    Kinderman and Crossway

Plaintiff alleges Kinderman and Crossway were deliberately indifferent to his medical needs when they allowed Plaintiff to be assigned to programs contrary to his medical permits and disabling medical condition.  (Dkt. No. 1 at ¶¶ 182-85.)  As to Kinderman's personal involvement, Plaintiff stated he was deliberately indifferent

> "because as the chief officer at Marcy as far as programming is involved, he does -- did have a say so in me being assigned to certain programs.  So once it was known that I had medical issues, he had -- you know, he could have did something or at least attempted to do something to try to resolve the issues of me being in lawns and grounds and the mess hall.  Because overall, he is head of programs.  He's a head of the counseling unit, all that."

(Dkt. No. 38-3 at 128-29.)

Plaintiff testified Crossway "came into the picture" when Kinderman retired.  As such, Plaintiff's claims were brought against Crossway "because he oversaw medical -- the medical side of the facility."  *Id*. at 133.  Defendants argue they were not personally involved in Plaintiff's medical treatment or medical permits, and were not individually responsible for Plaintiff's program assignments.  (Dkt. No. 38-1 at 16-17, 21-26.)

The record establishes Kinderman and Crossway were not responsible for any medical determinations made by Dr. Zaki or other medical professionals.  (Dkt. No. 38-7 at ¶ 52; Dkt. No. at 38-6 at ¶ 14.)  Although "[n]on-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delay medical care[,]" *Crandell v. Ross*, No. 19-CV-6652, 2020 WL 134576, at *4 (W.D.N.Y. Jan. 13, 2020), the record is devoid of any such evidence.

As to Plaintiff's programming, the record demonstrates Kinderman and Crossway were not responsible for the programs to which Plaintiff was assigned.  (Dkt. No. 38-7 at ¶ 42; Dkt.

No. at 38-6 at ¶ 12.)  The Programs Committee gave out such work assignments after a review of the medical permit restrictions set by Dr. Zaki.  (Dkt. No. 38-7 at ¶ 41; Dkt. No. at 38-6 at ¶ 11.)

Plaintiff's belief that Kinderman and Crossway should have done "something" fails to establish deliberate indifference.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (holding that "[t]here is no evidence that [either the warden or the Health Services Administrator], neither one a medical doctor, had the authority to intervene in an admittedly medical decision"); *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so.").

Accordingly, Plaintiff has failed to demonstrate Kinderman and Crossway were deliberately indifferent, and, therefore, the Court recommends granting summary judgment to them.

### B.    First Amendment Retaliation Claims

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action."  *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up).  As the Second Circuit has repeatedly cautioned, "[c]ourts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.

2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see also Phelps v. Kapnolas*, 308 F.3d 180, 187 n.6 (2d Cir. 2002).

"[T]he use of the prison grievance system" is constitutionally protected conduct under the First Amendment. *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004); *see Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (holding that "retaliation against a prisoner for pursuing a grievance violates the right to petition the government for redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."). Furthermore, "adverse action" for the purposes of a retaliation claim has been defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights . . . [o]therwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis*, 320 F.3d at 353 (citing *Dawes*, 239 F.3d at 493).

To establish a causal connection between protected activities and the adverse action, the court may consider a number of factors, including "(1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and[ ] (4) the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller*, No. 98-CV-5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), *abrogated, in part, on other grounds by Tangreti*, 983 F.3d 609).  However, with respect to temporal proximity at the summary judgment stage, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).

"Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); *see Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

For retaliation claims, as with other Section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell*, 9:04-CV-724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008).

As set forth above, Plaintiff claims Dr. Zaki and Coppola retaliated against him by issuing and revoking medical permits that were inconsistent with his "disabling medical conditions" and Kinderman and Crossway retaliated against him by allowing Plaintiff to be assigned to programs contrary to his medical permits and disabling medical conditions. (Dkt. No. 1 at ¶¶ 173-79, 180-85, 190-95.) Defendants argue they are entitled to summary judgment because Plaintiff has failed to show that he suffered an adverse action and they had "legitimate non-retaliatory reasons for their actions." (Dkt. No. 38-1 at 26-29.)

Here, there is no question that filing grievances is a protected activity. Likewise, it is plausible the alleged retaliatory conduct would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance.[2] However, Plaintiff has

---

[2] *See, e.g.*, *Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *10 (S.D.N.Y. April 6, 2018) (plaintiff's numerous allegations that prison doctor interfered with his medical passes; outright denied his requests for treatment recommended by another doctor; and denied him any

failed to provide evidence of individual First Amendment retaliation violations by Coppola, Kinderman, or Crossway.  As detailed above, the record demonstrates Coppola, Kinderman, and Crossway did not have authority to issue and/or revoke medical permits and they did not assign Plaintiff to programs contrary to his medical permits and disabling medical conditions. Accordingly, they could not have taken the adverse action Plaintiff alleges.  Thus, Coppola, Kinderman, and Crossway are entitled to summary judgment on this claim.. *See Encarnacion v. Spinner*, No. 9:15-CV-01411 (BKS/ML), 2020 WL 2838559, at *25 (N.D.N.Y. June 1, 2020) (summary judgment granted to nurse on retaliation claim where she did not have the authority to engage in the alleged adverse action, i.e., discontinuing a medication).

Moreover, as set forth above, Defendants have established any modification or change to Plaintiff's medical permits was done after Dr. Zaki reviewed Plaintiff's medical record and, based on his professional medical opinion, determined such permit was within Plaintiff's restrictions and accommodations.  (Dkt. No. 38-8 at ¶¶ 70, 72, 90, 97.)  Thus, Dr. Zaki "had legitimate non-retaliatory reasons" for amending and issuing Plaintiff's medical permits.  *Id*. at ¶¶ 97, 98.  Plaintiff has not submitted sufficient evidence to raise a question of fact as to the reasonableness of Dr. Zaki's actions.  *See Graham*, 89 F.3d at 81 (finding that even assuming that a retaliatory motive existed, defendant would still be entitled to summary judgment because there are "proper, non-retaliatory reasons" for the actions taken).  Thus, Dr. Zaki is also entitled to summary judgment on this claim.

---

treatment while forcing him to wait at sick call once a week for two months, were sufficient to state an adverse action); *Vega v. Lareau*, No. 9:04-CV-0750 (GTS/ATB), 2010 WL 2682307, at *8 (N.D.N.Y. Mar. 16, 2010) ("A job reassignment or termination can under certain circumstances constitute adverse action necessary to support a claim of retaliation."); *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) ("assigning the inmate a less desirable work assignment satisfies the adverse action requirement").

Accordingly, the Court recommends granting Defendants' motion on this ground.

**C.    Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted).  Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990)).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendants'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 224 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory in all cases").  The court may also examine "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.  However, "[i]f no constitutional right would have been

violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*.

Here, Dr. Zaki and Coppola argue in the alternative they should be awarded summary judgment based on the doctrine of qualified immunity. (Dkt. No. 38-1 at 29-31.) As previously set forth, the Court is recommending that Plaintiff's claims against Dr. Zaki and Coppola do not rise to violations of constitutional proportions. In the absence of any constitutional violations by Dr. Zaki and Coppola, the Court need not proceed any further with the qualified immunity analysis, and dismissal of the claims is appropriate. *See Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022) ("A defendant official's motion for dismissal on this ground as a matter of law should be granted if either the facts do not support a finding that the plaintiff's federal rights were violated, or the plaintiff's right not to be subjected to the defendant's challenged conduct was, at that time of that conduct, not clearly established."); *Brown v. Keefer*, No. 9:20-CV-1192 (GLS/ATB), 2023 WL 1420916, at *8 (N.D.N.Y. Jan. 13, 2023) ("If a court determines that one prong establishes that a defendant is entitled to qualified immunity, then 'it need not reach the other' prong.") (quoting *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014) (other citation omitted)), *report-recommendation adopted*, 2023 WL 1421170 (N.D.N.Y. Jan. 31, 2023).

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 38) be **GRANTED**; and it is further

**RECOMMENDED** that the complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY**, and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**SO ORDERED.**

Dated: February 8, 2023
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[3]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 29 of 273

Antwi v. Health and Human Systems (Centers) F.E.G.S., Not Reported in F.Supp.3d...

2014 WL 4548619

2014 WL 4548619
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Beverly Diane ANTWI, Plaintiff,

v.

HEALTH AND HUMAN SYSTEMS
(CENTERS) F.E.G.S., Defendant.

No. 13 Civ. 835(ER)(FM).
|
Signed Sept. 15, 2014.

*AMENDED OPINION AND ORDER*

RAMOS, District Judge.

***1** This action arises from claims by Plaintiff Beverly Diane Antwi ("Plaintiff" or "Antwi"), a *pro se* litigant, that Defendant Health and Human Systems (Centers) F.E.G.S. ("FEGS" or "Defendant"), a private non-profit organization, unlawfully hospitalized her against her will, denied her benefits from government programs and misappropriated her money. Following a series of involuntary hospitalizations, Antwi received residential and counseling services from FEGS. Liberally construed, the Complaint asserts claims against FEGS for gross negligence, "psychological abuse" and violations of her human and constitutional rights, pursuant to 42 U.S.C. § 1983. *See* Doc. 1. In order to address the limited arguments set forth in Plaintiff's late-filed reply brief, Doc. 42, the Court issues the instant Amended Opinion and Order, which modifies the Court's previous Opinion and Order denying summary judgment, Doc. 41.

Presently before the Court is Plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Pl.'s Mot., Doc. 27. Defendant principally asserts that Plaintiff has failed to carry her burden of demonstrating that judgment as a matter of law is warranted. Def.'s Opp., Doc. 37. Defendant claims that Antwi agreed to pay FEGS a monthly fee for her residence at its facility, which would be deducted from funds she was entitled to pursuant to government programs; that FEGS had no role in forcing her to undergo court-ordered involuntary treatment; and that, as a private entity, FEGS cannot be sued under 42 U.S.C. §

1983. *Id.* For the reasons discussed below, Plaintiff's motion is DENIED.

**I. Background**

Plaintiff's hefty submission to the Court begins with a one-page "notice of motion" and a one-page "affirmation in support of motion," both of which state little more than that Plaintiff is entitled to summary judgment under Rule 56 because "supporting affidavits" and "court transcripts" prove that "the defense has no defense." Pl.'s Mot. 2. Rather than supporting affidavits, however, the balance of the motion papers filed by Plaintiff consist of more than 600 pages of "exhibits," including what appear to be notes from doctor's visits, Social Security Income ("SSI") statements, bills, credit reports, Supplemental Nutrition Assistance Program ("SNAP") recertification paperwork, hundreds of pages of FEGS "progress notes" written by social workers, and miscellaneous pleadings from the instant proceeding. The documents do not appear to have been organized in chronological or any obvious order. On certain of these pages Plaintiff has handwritten remarks and/or argument over, or alongside, the statements by the original authors of the documents. Plaintiff's annotations are generally inscrutable.

For example, immediately following the "affirmation in support of motion," Plaintiff attaches Magistrate Judge Maas's September 6, 2013 Order, Doc. 21, on which she writes: *"Respond* Mislead the Court served Adronaid Medina with all motions. Mov [sic] that at deposition attorneys for defense can't use any of my info[rmation] because I served them with [a] whole 'pile of papers' because you granted me a waiver of affidavit of service." Doc. 27 at 3 (emphasis in original).[1] The next document, "Exhibit 1," contains handwritten statements that "[t]heirs [sic] 2 numbers FEGS collected under, XXX–XX–XXXX–Mine, XXX–XX–XXXX–Illegal. Both are on my credit report (provided) comes up to 1.45 million dollars in Social Security money and I haven't seen even½ of it. Please take into consideration the debt. It's 1.45 million per social security number." Doc. 27–1 at 2. Plaintiff next attaches what appears to be a credit report from a company called TransUnion, issued on December 12, 2012, which states, *inter alia,* that the names reported, "Beverly D. Antwi and Beverly Antwy," owe $319 to "Sprint PCS (Cable/Cellular)." The document also lists "SSN XXX–XX–XXXX," which Plaintiff circled in pen. Regarding that number, Plaintiff writes: "Now, XXXX is my correct # but, now all of a sudden they're collecting under *XX* XX. But, my name HIPPA [sic], and former addresses. My social security

Case 9:20-cv-00665-MAD-TWD Document 43 Filed 02/08/23 Page 30 of 273

Antwi v. Health and Human Systems (Centers) F.E.G.S., Not Reported in F.Supp.3d...

2016 WL 4548619

# is untrue. Born in Abilene Kansas! Trailer park." Doc. 27–1 at 3 (emphasis in original). On the next document, an Experian credit report dated January 24, 2013, Plaintiff circled the number "XXX–XX–XXXX" in pen, but did not write additional notes. Doc. 27–1 at 9.

1    For clarity, the Court refers to the attachments to Plaintiff's motion by their ECF document and page numbers.

**\*2** On what appears to be a printed expenditure report dated March 25, 2011, which includes various itemized payment amounts and codes, including "EMRG IND," Doc. 27–4 at 70, Antwi writes, "notice it says emergency individual? They're stealing my food stamps every month!" The following page contains statements by Antwi that "Juanita Robinson had my food stamps taken for a 3–week hosp[italization]—I want reimbursement," "there was no collateral contract so I was probably hospitalized for somebody else's issue," and "when I complained to the 47th precinct (because I wasn't informed that my food stamps were taken until I went to the food stamp office), they had me readmitted for supposed delusionality [sic]. Not the police; FEGS." *Id.* at 71. The following page, an undated note by FEGS "To Whom It May Concern," states, *inter alia,* that police escorted Antwi to an ambulance to go to the hospital on December 18, 2010. Next to that entry, Antwi writes, "not true wasn't me." *Id.* at 72. Progress notes written by a FEGS caseworker, *id.* at 77, state that on November 1, 2010, "911 was called for B[e]verly Antwi. Beverly claimed that someone stole her food stamp card and used it, she stated that she also reported the matter to the 47th pct. Beverly exhibited bizarre behavior, calling names and accusing other staff of stealing her personal belongings. Beverly was taken to Montefiore North after being evaluated by EMS personnel."

The balance of the papers follow a similar format—copies of correspondence or FEGS progress notes accompanied by Plaintiff's disjointed and incomprehensible commentary. In short, a statement of facts is markedly absent from Plaintiff's motion. Nor does her reply brief contain a statement of facts.

## II. Procedural History

Plaintiff initiated this action in New York State Supreme Court, Bronx County, on or about January 4, 2013. Notice of Removal, Doc. 1. Defendant served its verified answer to the Complaint on January 31, 2013, and soon thereafter removed the case to federal court, on February 4, 2013. *Id.* Discovery, which included Plaintiff's deposition, has been concluded.

Plaintiff filed the instant motion on December 20, 2013. On June 13, 2014, Defendant filed under seal a cross-motion for summary judgment in its favor, pursuant to Rule 56, and to dismiss Plaintiff's complaint in its entirety, pursuant to Rule 12. Def.'s Opp. 3. On July 2, 2014, the Court approved a briefing schedule whereby Plaintiff's opposition to Defendant's motion and Defendant's opposition to Plaintiff's motion were due by July 30, 2014; and Defendant's reply in support of its motion and Plaintiff's reply in support of her motion were due by August 15, 2014. Doc. 33. On July 29, 2014, Defendant timely filed its opposition to Plaintiff's instant motion. *See* Docs. 37–39. Plaintiff's reply in support of the instant motion, and opposition to Defendant's motion, were due by July 30, 2014. On August 27, 2014, the Court issued an Order directing Antwi to file her reply and respond to Defendant's motion for summary judgment by no later than September 12, 2014. Doc. 40. On September 11, 2014, Plaintiff filed a reply brief in the form of a "notice of motion" and "affirmation in support of motion" requesting that the Court "please grant summary judgment" because "the facts in this case aren't disputable." Reply Br. 1–2, 4.[2] As of the date of the instant Amended Opinion and Order, the Court has yet to receive Plaintiff's opposition to Defendant's motion for summary judgment. Plaintiff is reminded that failure to comply with the Court's orders may result in dismissal of her case pursuant to Rule 41 of the Federal Rules of Civil Procedure.

2    The Court refers to the ECF page numbers for Plaintiff's reply brief, Doc. 42, as it lacks pagination.

## III. Legal Standard on Motion for Summary Judgment

### A. General Summary Judgment Standard

**\*3** Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden,

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 31 of 273

Antwi v. Health and Human Systems (Centers) F.E.G.S., Not Reported in F.Supp.3d...

2014 WL 4548619

"the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**B. Special Consideration Afforded to *Pro Se* Litigants**

The Court holds submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers," *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993) (quoting *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)), and is obligated to liberally construe their pleadings "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citations omitted). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

**C. Law of the Claims**

**i. 42 U.S.C. § 1983**

To prevail on a cause of action under 42 U.S.C. § 1983, a plaintiff must establish, by a preponderance of the evidence, that (1) the defendant deprived her of a right secured by the Constitution or the laws of the United States and (2) in doing so, the defendant acted under color of state law. *See, e.g., Byng v. Delta Recovery Servs. LLC,* No. 13 Civ. 2958, 2014 WL 2493779, at *1 (2d Cir. June 4, 2014) (citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).

**ii. Gross Negligence Under New York Law**

 *4  Under New York law, a *prima facie* case of gross negligence requires the plaintiff to show: (1) a duty to the plaintiff; (b) a breach of duty; (c) "a reasonably close causal connection between the contact and the resulting injury;" and (d) "actual loss, harm or damage." *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 495 (S.D.N.Y.2001) (citation omitted). To constitute gross negligence, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care," as gross negligence "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Id.* (citations and internal quotation marks omitted).

**IV. Plaintiff Fails to Establish That She Is Entitled to Judgment As A Matter of Law.**

Neither party has submitted a Rule 56.1 statement in connection with the instant motion. Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment under Rule 56 must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). Each statement must be accompanied by a citation to admissible evidence. Local R. 56.1(d); *see also* Fed.R.Civ.P. 56(c) (requiring reliance on admissible evidence in the record to support or controvert a purported material fact). When the opposing party fails to respond to the moving party's Rule 56.1 Statement, "the material facts contained in the moving party's statement are deemed admitted as a matter of law." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 177–78 (S.D.N.Y.2009) (citing *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); Local R. 56.1(c)).

The failure to file a Rule 56.1 Statement is, on its own, grounds for denial of a motion for summary judgment. *See* Local R. 56.1(a); *Purisima v. Tiffany Entm't,* No. 09 Civ. 3502(NGG)(LB), 2014 WL 3828291, at *1 (E.D.N.Y. June 20, 2014), *report and recommendation adopted,* No. 09 Civ. 3502(NGG)(LB), 2014 WL 3828376 (E.D.N.Y. Aug. 4, 2014) ("As courts in this district have observed repeatedly, the failure to file a Rule 56. 1 Statement is grounds for dismissal of a motion for summary judgment."); *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l,* 435 F.Supp.2d 285, 304–05 (S.D.N.Y.2006) (denying summary judgment motion where movant failed to submit required 56.1 statement). Yet,

district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001). As an alternative to ruling against the movant, "[w]here parties fail to file Rule 56.1 statements of fact, the court may choose to accept all factual allegations of the opposing parties as true for the purposes of deciding the motion ..., or may alternately 'opt to conduct an assiduous review of the record.' " *Osuna v. Gov't Employees Ins. Co.,* No. 11 Civ. 3631(JFB)(AKT), 2014 WL 1515563, at *2 (E.D.N.Y. Apr. 17, 2014) (citations omitted).

**\*5** Here, the Court finds that, due to her failure to submit a clear description of the relevant facts, either through a Rule 56.1 statement or otherwise, a review of the record imposes a significant burden upon the Court. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz,* 258 F.3d at 74. Accordingly, notwithstanding her status as a *pro se* litigant, the Court DENIES Plaintiff's motion based on her failure to comply with Local Rule 56.1. *Triestman,* 470 F.3d at 477 (*pro se* status does not excuse non-compliance with procedural rules); *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (holding that the trial court "is not required to consider what the parties fail to point out" in 56.1 statements); *see also Searight v. Doherty Enterprises, Inc.,* No. 02 Civ. 0604(SJF) (JO), 2005 WL 2413590, at *1 (E.D.N.Y. Sept. 29, 2005) (denying defendants' motion for summary judgment where they failed to submit the required 56.1 statement, as the Court could not "adequately assess" whether any genuine issues of material fact existed); *cf. Osuna,* 2014 WL 1515563, at *2 (overlooking failure to file Rule 56.1 statements where record "contain[ed] sufficient evidence that is easily reviewable").

Indeed, Plaintiff's failure to submit a Rule 56.1 statement compounds the more fundamental problem with her motion: her failure to establish the absence of any genuine factual disputes. Moreover, to the extent that the Court can comprehend them, Plaintiff's annotations almost exclusively highlight, rather than resolve, factual disputes regarding her claims that FEGS (1) inappropriately used her social security number, (2) stole or retained her money from federal benefits

programs or (3) forced her to be hospitalized against her will. *See generally* Pl.'s Mot. Thus, Plaintiff's assertions in her reply brief that "all evidence submitted ... couldn't be in dispute because [it] was all legal court documentation submitted from my chart ...," that she entered "non-disputable" Social Security documentation into evidence, and that "all points ... are one-sided for [her] win" fail to provide a basis on which to find in her favor. Reply Br. 3–4. [3]

> [3]
>
> The Court also notes that Plaintiff's reply brief appears to advance arguments about undisputed issues that do not have a bearing on summary judgment—for example, she notes that jurisdiction is not in dispute. Reply Br. 3–5. The lack of any dispute concerning jurisdiction does not establish a lack of genuine *factual* disputes, however.

It is well-established that, "where the movant 'fail[s] to fulfill [her] initial burden' of providing admissible evidence of the material facts entitling [her] to summary judgment, summary judgment must be denied,' 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo,* 322 F.3d at 140–41 (citations omitted). Given that Plaintiff has failed to adequately identify undisputed facts in the record, and because she only offers unverified and conclusory assertions in support of her claims, she has failed to carry her burden at this juncture, leaving the Court no choice but to rule against her. Accordingly, the Court DENIES her motion for summary judgment.

**V. Conclusion**
**\*6** For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is respectfully directed to mail a copy of the instant Amended Opinion and Order to Plaintiff and terminate the pending motion (Docs.27, 42).

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4548619

---

2004 WL 444081
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES OF AMERICA, Plaintiff

v.

Samuel A. ABADY, Defendant.

No. 03 Civ. 1683(SHS).
|
March 11, 2004.

**Synopsis**

**Background:** Government brought suit to recover amount owed by former student on student loan. Parties cross-moved for summary judgment.

**Holdings:** The District Court, Stein, J., held that:

[1] government was entitled to recover amount remaining due on student loan;

[2] discontinuance of earlier collection action pursuant to settlement did not present res judicata bar to recovery;

[3] previous litigation did not present collateral estoppel bar to issues in new proceeding; and

[4] government did not materially breach settlement agreement by failing to provide invoices and mailing envelopes for installment payments.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (7)

**[1]** **Federal Civil Procedure** 🔑 Hearing and Determination

Court would exercise its discretion not to deny motion for summary judgment based on movant's failure to file statement of material facts as to which the moving party contended there

was no genuine issue. Fed.Rules Civ.Proc.Rule 56.1, 28 U.S.C.A.

18 Cases that cite this headnote

**[2]** **Federal Civil Procedure** 🔑 Hearing and Determination

Statement of material facts as to which the moving party contended there was no genuine issue was to be deemed admitted where there was support in record for statement, in form of promissory note and payment record on which action was based, and party opposing motion filed no statement in opposition. Fed.Rules Civ.Proc.Rule 56.1(c), 28 U.S.C.A.

9 Cases that cite this headnote

**[3]** **Education** 🔑 Collection of loan debt in general

Government was entitled to recover amount remaining due on student loan absent dispute as to validity of original promissory note or as to amount actually paid.

**[4]** **Judgment** 🔑 Dismissal and nonsuit

**Judgment** 🔑 Matters which were not or could not have been adjudicated

Discontinuance with prejudice of earlier state court action to collect sums then due on student loan, pursuant to stipulation that restored "status quo under loan instruments," did not present res judicata bar to subsequent action for sums coming due after stipulation; claims were not, and could not have been, brought at time of earlier action.

**[5]** **Judgment** 🔑 Issues or Questions Presented

Previous state court proceeding for sums then due on promissory notes executed in connection with student loan, which resulted in stipulation of settlement as to those sums, did not present collateral estoppel bar to subsequent action to collect sums coming due after first action settled, as issues in proceedings were different.

**[6]** **Education**  Collection of loan debt in general

There was no evidence, as necessary to support defense to action to collect amounts due on student loan, that government forgave interest on amounts due at time of earlier collection action or that government accepted former student's partial payment at that time as payment in full.

**[7]** **Education**  Collection of loan debt in general

Government's breach, if any, in failing to provide invoices and mailing envelopes for payment of student loan installments was not material breach of stipulation of settlement in earlier collection action, and thus could not excuse student's failure to comply with obligation to repay remainder of loan.

3 Cases that cite this headnote

*OPINION & ORDER*

STEIN, J.

**\*1** The United States of America has brought this action to recover $21,287.61 loaned to defendant Samuel A. Abady while he was a student and which, according to the government, he has failed to repay. The parties have now each moved for summary judgment in their respective favors. For the reasons set forth below, plaintiff has shown that there is no triable issue of fact and that it is entitled to summary judgment as a matter of law.

I. Background

Samuel Abady received loans from the State of Virginia to attend the University of Pennsylvania law school from 1978 to 1981. (Def.'s Decl. Supp.), ¶ 2; Plt.'s Statement Pursuant to Local Rule 56.1 ("Plt.'s 56.1 Statement"), ¶ 1; Zebrowski Decl., Exh. B). Virginia Education Loan Authority ("VELA") was the original lender, and the loans were backed by, and then assumed

by, the Virigina State Education Assistance Administration ("VSEAA"). (Plt.'s 56.1 Statement, ¶ 3; Zebrowski Decl., Exh. B). They were then in turn reinsured by the United States Department of Education, and the United States of America now seeks to recover on behalf of the Department of Education. (*Id.*). Those loans, for a total sum of $14,300, became due nine months after the borrower's estimated date of graduation, with an annual interest rate of seven percent. (Plt.'s 56.1 Statement, ¶¶ 1, 2).

In April 1985—sometime subsequent to Abady's graduation from law school—the VSEAA filed a lawsuit in the Civil Court of the City of New York, based on unpaid promissory notes, to recover $17,875.00, which was comprised of principal plus interest and attorneys' fees. Abady raised several defenses, including lack of personal jurisdiction and the wrongful rejection of payment by him to VELA, which he claimed to have tendered in 1981. (Def.'s Decl., ¶¶ 18, 30). Abady also claimed that the sum of the loan was improperly calculated.

The state court action was resolved by a written stipulation and agreement that provided that the state court action was "hereby discontinued and settled with prejudice" on certain terms. (Def.'s Decl., Exh. 12). In that stipulation, in relevant part, Abady agreed to "bring[ ] the arrearages current, as if the loan had been paid to the date according to the terms of its instruments" by February 24, 1986 and that the "defendant shall continue to pay out the loan according to the periodic payment schedules set forth in the loan instruments." (Def.'s Decl., Exh. 12, ¶¶ 4, 5). VSEAA agreed to supply Abady with "mailing envelopes and notices" for him to make periodic payment. (Def.'s Decl., Exh. 12 ¶ 3). The stipulation also provided that the purpose of the stipulation was to "restore the status quo under the loan instruments as if no lawsuit had been started" and that "[it] shall not operate to or be construed as in any way altering the terms of the loan instruments between the parties." (*Id.*).

Abady paid the amount of $7,471.80 to bring the arrears current as of the date of the stipulation. (Def.'s Decl., ¶ 41, Exh. 13). He subsequently paid $166.04, bringing the total paid to $7,637.84. (Def.'s Decl., ¶ 41). Abady claims that VSEAA and its assignees are in breach of the settlement agreement because they did not mail him the appropriate "mailing envelopes and notices." (Def.'s Decl., Exh. 12). Abady moves for summary judgment on those grounds, because "the Government's assignor was paid all it was entitled to for the loan at issue" in February of 1986, and

because this suit is barred by collateral estoppel and res judicata based on the state court adjudication. (Def's Not. Mot., p. 1). When Abady moved for summary judgment on September 10, 2003 he neither served nor filed the required Rule 56.1 statement of disputed facts with that motion. The United States claims that Abady owes the sum of $21,287.61 on the original promissory note, and $1.35 per day after October 31, 2003. (Plt.'s 56.1 Statement, ¶ 9). Plaintiff cross-moves for summary judgment in that amount.

**\*2** On January 12, 2004, oral argument was held on these motions. At the commencement of the argument, Abady presented to the Court and plaintiff for the first time a document entitled "Defendant's Statement Made Pursuant to Local Rule 56.1." That Rule 56.1 statement was submitted four months after defendant's motion was made. Moreover, Abady was aware of his obligation to file such a statement because 1) he is an attorney and is presumed to be familiar with the local rules of this district and 2) opposing counsel notified him of his failure to file such a statement on the first page of the government's "Memorandum of Law in Opposition to the Defendant's Motion to Dismiss," dated October 31, 2003. Therefore, Abady's untimely Rule 56.1 statement will not be accepted in support of his motion and in opposition to the government's cross-motion.

At the time of the oral argument on January 12, 2004, this Court represented that no decision would issue on these motions for one week, in order to give the parties an opportunity to resolve the action consensually. Defendant requested additional time, and the Court agreed to reserve disposition on the motions until February 6, 2004. On February 4, 2004, Abady requested a further thirty days in order to attempt to resolve this action, and the Court granted the parties until March 5, 2004 to submit a stipulation of settlement; the parties were informed that a decision would issue thereafter if no stipulation of settlement were submitted for signature. To date, no consensual resolution has been submitted to the Court.

II. Analysis

A. *Motions To Be Treated as Summary Judgment Motions*
Although Abady styles his motion one "to dismiss this action and for summary judgment," he has filed an affidavit containing extrinsic materials outside the pleadings and has annexed almost a score of exhibits to that affidavit. Many of the exhibits Abady atttaches and refers to—such as handwritten phone messages and letters from non-parties to

Abady—cannot be presented in a motion to dismiss because they fall outside the pleadings. Because the Court cannot consider those materials in a motion to dismiss, this motion is converted to a motion for summary judgment. Fed.R.Civ.P. 12(b). Fed.R.Civ.P 56; see also *Barksdale v. Robinson* 211 F.R.D. 240, 242 (S.D.N.Y.2002); *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (quoting *Fonte v. Bd. of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988).

B. *Defendant's Failure to File a Rule 56.1 Statement in Support of His Motion for Summary Judgment, and in Opposition to Plaintiff's Cross–Motion for Summary Judgment*
**[1]**   Defendant failed to serve "a separate, short and concise statement of material facts as to which the moving party contends there is no genuine issue to be tried" until four months after his motion was served. Local Rules of the United States District Courts for the Southern and Eastern District of New York, 56.1. When a moving party fails to file such a Rule 56.1 statement, it is within the discretion of the court to either overlook the failure or to deny the motion. *See Stone v. 866 3rd Next Generation Hotel, L .L.C.,* No. 00 Civ. 9005, 2002 WL 482558, at \*1 n. 2 (S.D.N.Y. Mar.29, 2002); *see also Holtz v. Rockefeller & Co., Inc.,* 258 F.2d 62, 73 (2d Cir.2001); *AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.,* 2003 WL 21203503, at \*11 (S.D.N.Y. May, 22 2003). Defendant's motion will not be denied simply for failure to file a Rule 56.1 statement.

**\*3**   **[2]**   Abady has also failed to file the required Rule 56.1(c) statement in opposition to the plaintiff's cross-motion for summary judgment. Rule 56.1(c) requires a party opposing summary judgment to file a Rule 56.1 statement. (*Id.*). The consequence of this failure is that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." (*Id.*); *see e.g. Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998); *Versace v. Versace,* 2003 WL 22023946, at \*1 (S.D.N.Y. Aug.27, 2003). However, a district court must ensure that there is support in the record for facts contained in unopposed Rule 56.1 statements before accepting those facts as true. *Giannullo v. City of New York,* 322 F.3d 139, 140–43 (2d Cir.2003). Because plaintiff has supported its Rule 56.1 statement with the promissory notes signed by Abady, and with the calculation of Abady's present

indebtedness, the statement is supported by the record and the facts therein will be deemed admitted. [1]

[1] Moreover, if the Court were to accept Abady's belated Rule 56.1 statement, none of his factual assertions set forth in that document would alter the outcome of these motions.

### C. *Defendant Has No Valid Defenses to His Proven Indebtedness*

**[3]** The government has provided proof of Abady's indebtedness in the amount of $21,287.61 on the loans underlying this action. (Plt.'s 56 .1 Statement, Exh. A, B). This sum represents the payments due subsequent to his payment of $7,637.84 in 1986. Defendant does not claim to have paid any amount due on the promissory note after the two 1986 payments. The government's proof of indebtedness is sufficient to show defendant's obligation to pay. *Hannah v. Kittay,* 589 F.Supp. 1042, 1046 (S.D.N.Y.1984) (granting summary judgment on promissory notes showing indebtedness, notwithstanding defendant's attempts to "frolic and detour" in moving papers). Here, as in *Kittay,* there is no dispute as to the validity of the original promissory note, nor is there any dispute as to the amount actually paid by defendant. [2] The government has thereby shown execution and default, and summary judgment is appropriate. *See Nutmeg Fin. Serv., Inc. v. Cowden,* 524 F.Supp. 620, 621 (E.D.N.Y.1981) ( "[S]ummary judgment is appropriate upon a showing of execution and default.").

[2] Abady's moving papers and affidavits clearly represent that he has tendered only two payments, totaling $7,637.84, on this loan. (Def's Decl., ¶¶ 41–54, Exh. 13). Therefore this fact is not in dispute.

Abady has presented a number of defenses and justifications for his failure to pay this student loan. However, none of those defenses are legally sufficient to defeat the government's motion for summary judgment. The Court will address each of defendant's arguments in turn.

### 1. *VELA's Failure to Accept Payment or Adjust the Sums Due*

In his moving papers, Abady discusses at length the history of this loan, reciting his struggle to pay the loan in 1981, VELA's rejection of that payment and subsequent refusal to correct the sum due. (Def's Decl., ¶¶ 18–27). None of these statements

concerning the history of Abady's interactions with VELA is relevant to the present action. In 1986, when defendant entered into a settlement of the state court action with VSEAA, he agreed to continue paying the sums due on his loans. (Def.'s Decl., Exh. 12, p. 1). Moreover, the stipulation specifically reaffirms the operation of the promissory notes to govern Abady's duty to repay the loans. (*Id.*). Additionally, Abady does not claim that he actually paid the sums due at any time. Therefore, he does not contest the allegation that he owed the money at that time, and states that he has only paid $7637.84 to date. (Def's Decl., ¶ 53).

### 2. *Res Judicata and Collateral Estoppel Do Not Bar This Action*

**\*4** Abady believes that because the promissory notes formed the underlying basis for New York state court litigation in 1986 (*Virginia State Education Assistance Authority v. Abady,* Index No. 2648/81; Def.'s Decl., Exh. 9), the government cannot now use those loans to bring this lawsuit because it is barred by the doctrines of res judicata and collateral estoppel. Defendant's arguments fail because the present lawsuit does not raise the same issues as the 1986 lawsuit.

### a. *Res Judicata Does Not Bar this Action*

**[4]** Pursuant to the doctrine of res judicata, also known as "claim preclusion," " '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." ' *Storey v. Cello Holdings, L.L.C.* 347 F.3d 370, at 380 (2d Cir.2003); [3] (quoting *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir.2000)); *see also Israel v. Carpenter,* 120 F.3d 361, 365 (2d Cir.1997) (preclusive effect given to claims resolved in a stipulation). The New York state court action in 1986 was discontinued with prejudice as to the claims asserted in that action. The claims asserted in that action related to the principal and interest past due on the loan at that time. In resolving that action, the parties agreed that the stipulation restored the "status quo under the loan instruments." (Def.'s Decl. ¶ 6). The stipulation was not a waiver of the debt. Currently, plaintiff seeks repayment on the loan of sums due subsequent to the stipulation. Those claims were not, and could not have been, brought at the time of the 1986 state court lawsuit; therefore, res judicata does not operate to bar those new claims. *See Storey,* 347 F.3d at 380.

[3] The *Storey* court points out that the word "issues," frequently used by the Court of Appeals for the

Second Circuit, is misleading in the context of this oft-quoted definition of res judicata. To clarify, the court emphasized that res judicata bars relitigation of "claims" not "issues" that were or could have been raised in a prior action. 347 F.3d at 380 n. 7.

### b. Collateral Estoppel Does Not Bar This Action

**[5]**    As set forth above, the present lawsuit was brought because Abady failed to pay the sums due on the promissory notes subsequent to the 1986 lawsuit. The doctrine of collateral estoppel, or "issue preclusion," applies to bar the relitigation of issues of fact or law already fully litigated and determined between the same parties in a previous action. *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *Santini v. Conn. Hazardous Waste Mgm't*, 342 F.3d 118, 127 (2d Cir.2003). Collateral estoppel will only apply to bar relitigation of an issue already decided if (1) the issues in both proceedings are identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there was a full and fair opportunity for litigation, and (4) the issues were necessary to a valid judgment on the merits. *See Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir.1999); *Vega v. State Univ. of N.Y. Bd. of Trustees*, 67 F.Supp.2d 324, 335 (S.D.N.Y.1999). In this case, the issues in the prior proceeding are not identical to the issues now underlying plaintiff's claims. Therefore, collateral estoppel does not apply to bar this action.

### 3. Abady's Payments in 1986 Did Not Repay the Loans

**\*5**    Defendant states that he paid over $7000 in 1986, and that sum exceeded the principal he owed. He believes his payment exceeded the principal based on notices he received in 1994 for principal amounts of $2,472.44, $2,126.29, and 2,472.43. (Def.'s Decl. ¶ 44). He indicates a belief that the total of those notices, $7071.16, represents the total amount of his original indebtedness. (*Id.*). Based on those promissory notes, he believes the debt should be considered discharged, and he should be granted summary judgment. The 1994 promissory notes, however, represent the principal still due on his loans after the deduction of the 1986 payment of $7,471.80 from the principal.

**[6]**    Abady also seems to argue that VELA decided, in 1986, to forgive the interest on the loans and accept the $7000 as payment in full, but he offers no support for that surmise. (Def's Decl. ¶¶ 43, 54). Moreover, the government has provided three promissory notes for the original sum of $14,300. (Plt.'s 56.1 Statement, Exh. A). Therefore,

defendant's contention that he owed only $7000, unsupported by any other proof, is wholly inadequate to raise a reasonable doubt as to the sufficiency of the government's proof of indebtedness.[4]    At the summary judgment phase, the non-moving party must offer sufficient evidence on a factual dispute to allow a reasonable finder of fact to find in its favor. *Mandell v. The County of Suffolk*, 316 F.3d 368, 377 (2d Cir.2002). Abady has not offered any evidence at all that he owed less than $14,300 in 1981, nor has he offered any evidence to support his contention that VELA did forgive or should have forgiven the interest on that sum.

4      Defendant's unsupported contentions about the the size of his debt may be a misunderstanding following from the fact that the government only sought to recover the sums past-due in 1986, not the entire principal of the loan. The past due sum, as calculated by the government and paid by Abady, was $7471.80.

### 4. VSEAA's Failure to Provide Invoices and Mailing Envelopes Is Not a Material Breach of the 1986 Stipulation

**[7]**    Abady asserts that he does not need to repay his educational loans because VSEAA is in material breach of the settlement agreement. First, he states that it failed to change his loan status from "default to active" pursuant to clause two of that agreement. Second, he claims that it failed to send him any notices, as it was bound to do by paragraph three of the stipulation. Abady offers no proof of either contention. In fact, he states that he was sent notices in 1994, which indicates that he was made aware of his continuing indebtedness. (Def.'s Decl. ¶ 44). Even if VSEAA did breach the agreement by failing to send invoices to Abady, that breach would not excuse Abady's obligation to repay the loan. Although there is a general rule that a party who first breaches a contract cannot demand performance from the other party, "a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." *Restatement (Second) of Contracts* § 229. The non-performance of a contractual condition should be excused where "the condition would cause a disproportionate forfeiture" as long as the non-performance is not a material breach. *Williston on Contracts, § 43:13* (4th ed.2003).

**\*6**    VSEAA would suffer a disproportionate forfeiture if Abady is not required to repay his loans simply because he did not receive notices and the loan status was not reset.

Therefore, as long as VSEAA's breach is not material, it will not excuse Abady's non-performance of his obligation to repay those loans. *Publicker Chemical Corp. v. Belcher Oil Co.,* 792 F.2d 482 (5th Cir.1986). *Williston on Contracts § 43:5* (4th ed.2003). VSEAA's breach was not material. "Materiality goes to the essence of the contract. That is, a breach is material if it defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected." *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 416, 421 (S.D.N.Y.1999) (quoting E. Allen Farnsworth, *Farnsworth on Contracts § 8.16* (3d ed.1999)); *see also Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 103 F.Supp.2d 711, 731 (S.D.N.Y.2000). VSEAA's breach, if any, did not deprive Abady of any benefit of the original loan contract, nor of the settlement stipulation. First, he received the full amount of the loans VSEAA seeks repayment on some twenty years ago. Second, in 1986, he reaped the benefit of entering a settlement agreement to repay the loans instead of being subjected to a court judgment. Abady suffered little, if any, loss when VSEAA failed to mail him notices and invoices for a debt that Abady had already acknowledged.

Finally, even if those failures could be construed as material breaches of the settlement agreement, those breaches would not relieve Abady of his obligation to repay the sums owed on the original promissory notes. The terms of the settlement clearly state that the purpose of the settlement was to restore the status quo between the parties, and that payments in the future should be governed by the original instruments. (Def.'s Decl., Exh. 12, ¶ 6–7). Therefore, no breach of the settlement would relieve Abady of his obligation to continue to repay his loans, based on the original promissory notes, after the date of the settlement.

## III. Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment is granted. Defendant's motion to dismiss and for summary judgment is denied. The Clerk of Court is directed to enter judgment in the sum of $21,287.61 plus $1.35 per day since October 31, 2003 against defendant.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 444081

---

McAllister v. Call, Not Reported in F.Supp.3d (2014)

2014 WL 5475293

KeyCite Yellow Flag - Negative Treatment

Distinguished by McDonald v. Zerniak,  N.D.N.Y.,  November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, see Dkt. No. 81, and Plaintiff's objections thereto, see
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. See Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. See Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." See Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. See Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. See Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. See Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. See Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. See Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a de novo review of those recommendations. See
Trombley v. Oneill, No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. See Salmini v. Astrue, 3:06–CV–
458, 2009 WL 1794741, \*1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. See Linares v. Mahunik, No. 9:05–CV–
625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his pro se status, the Court has conducted
a de novo review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant —hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2]    McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4    Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

5    Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

2014 WL 5475293

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]    All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvement with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

 **\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

McAllister v. Calif. Not Reported in F.Supp.3d (2014)

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 46 of 273

2014 WL 5475293

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

#### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

2014 WL 5475293

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

 **\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii.  Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

 **\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii.  Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refusing to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based on some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 *17  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. Qualified Immunity

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996)* (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

  a. dismissing plaintiff's First Amendment claims;

  b. dismissing plaintiff's Eighth Amendment claims;

  c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

  d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

  a. plaintiff's Fourteenth Amendment procedural due process claims;

  b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**McAllister v. Cail, Not Reported in F.Supp.3d (2014)**

2014 WL 5475293

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corrr. Officer, Great Meadow C.F.;
Lawrence, Corr. Officer, Great Meadow C.F.;
Whittier, Corr. Officer, Great Meadow C.F.; Mulligan,
Corr. Officer, Great Meadow C.F.; Deluca, Corr.
Sergeant, Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the
Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING***
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

Douglas v. Ferrara, Not Reported in F.Supp.2d (2013)

2013 WL 5437617

---

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2**  *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]    Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3**  When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; FED. R. CIV. P. 56(c)*. Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

## B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8.[2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]      Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how

his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

Case 9:20-cv-00665-MAD-TWD Document 43 Filed 02/08/23 Page 57 of 273
Douglas v. Perrara, Not Reported in F.Supp.2d (2013)
2013 WL 5437617

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]  The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion,

he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

2013 WL 5437617

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

 **\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 59 of 273
Cooke v. Stern, Not Reported in F.Supp.2d (2010)
2010 WL 3418393

2010 WL 3418393
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John COOKE, Plaintiff,

v.

STERN, Supt. Programs, Bare Hill Correctional
Facility, [1] and Ms. S. Flanagan, Defendants.

[1]      This defendant's last name is actually "Stearns,"
and this court will refer to him as such.

No. 9:07–CV–1292 (GLS/ATB).
|
Aug. 2, 2010.

**Attorneys and Law Firms**

John Cooke, pro se.

Christopher W. Hall, Ass't Attorney General, for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

 *1  This matter was referred for Report and
Recommendation, pursuant to 28 U.S.C. § 636(b) and Local
Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe,
United States District Judge. On January 4, 2010, the case
was re-assigned to me, following the retirement of Magistrate
Judge Gustave J. Di Bianco.

In this amended civil rights complaint ("AC"), plaintiff
alleges that the two remaining defendants [2] were deliberately
indifferent to his health and safety when they improperly
assigned him to a particular work detail at Bare Hill
Correctional Facility ("Bare Hill") that was not appropriate,
given his physical disability. (Dkt. No. 7). Plaintiff, now
released from custody, seeks substantial monetary damages.
(*Id.*).

[2]      Judge Sharpe previously dismissed all claims
against defendant K. Mullerville, R.N. without
prejudice, because the amended complaint failed
to allege any involvement of Nurse Mullerville in

the purported violation of plaintiff's constitutional
rights. (Dkt. No. 8). In a Memorandum Decision
and Order dated March 4, 2009 (Dkt. No. 16),
Judge Sharpe partially granted defendants' first
summary judgment motion (Dkt. No. 14). He
dismissed, for failure to exhaust administrative
remedies, a claim that defendant Stearns further
violated plaintiff's Eighth Amendment rights
by assigning him to a housing unit that was
inappropriate, given that plaintiff had just returned
from the hospital following surgery.

Presently before this court is defendants' second motion for
summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt.
No. 24). Defense counsel argues that neither name defendant
was personally involved in the decision to assign plaintiff
to his work program, and that plaintiff cannot establish that
the defendants were deliberately indifferent to his health and
safety.

Plaintiff initially failed to respond to the second summary
judgment motion. Upon learning of the possibility that
plaintiff had not received the motion [3], the court took steps
to verify plaintiff's current mailing address and to serve him
(perhaps for a second time) with the relevant papers. (*See* Text
Orders dated 7/14/2010 & 7/20/2010). Only July 26, 2010,
plaintiff submitted a confirmation of his new mailing address
and provided some documents responsive to the summary
judgment motion. (Dkt. No. 29). On July 27, 2010, plaintiff
telephoned my chambers to confirm his receipt of defendants'
summary judgment motion, and to advise the court that he did
not intend to file any further response. (*See* Text Order dated
7/27/2010).

[3]      When plaintiff was deposed on August 13, 2009,
defense counsel questioned plaintiff, who had by
then been released from custody, about his plans
to move to a different apartment. Plaintiff was
reminded that he was required to notify the court
and the parties of any change of address. (Pltf.
Deposition ("Dep.") at 10–11, Dkt. No. 24–4). On
November 6, 2009, the defendants served their
second summary judgment motion on plaintiff
by mail, directed to a new address that plaintiff
provided to defense counsel by telephone without
advising the court. (Notice of Motion, Dkt. No.
24 at 3–4; Hall Attorney Affirmation ¶¶ 2–14,
Dkt. No. 26). Although defense counsel had no
indication that the summary judgment motion had

not been received by plaintiff, counsel was advised by telephone in early December 2009 that plaintiff had yet another new mailing address. (Hall Aff. ¶ 15). Although it was not his obligation to do so, defense counsel apparently did not follow up with plaintiff to ensure that he received the summary judgment motion. *Dumpson v. Goord*, 00–CV–6039, 2004 WL 1638183, at *3 (W.D.N.Y. July 22, 2004)* ("The demand that plaintiffs provide contact information is ... the obvious minimal requirement for pursuing a lawsuit.").

Although this court originally gave plaintiff until August 20, 2010 to file a response to the summary judgment motion, it is ripe for decision now, given that plaintiff has indicated that he does not intend to file any further response. For the following reasons, this court recommends that the defendant's motion for summary judgment be granted and the sole remaining claim in the amended complaint dismissed in its entirety.

# DISCUSSION

**I. *Facts*** [4]

[4]      This court will review only the facts and procedural history relevant to the pending summary judgment motion. In his Memorandum Decision and Order dated March 4, 2009 (Dkt. No. 16), Judge Sharpe more fully discusses the facts and procedural history of this and the related case (No. 9:09–CV–74).

Plaintiff's right foot and some of his right leg were amputated and replaced by a prosthesis shortly before he was returned to state prison in August 2007, following a parole violation. (Pltf. Deposition ("Dep.") at at 27–28, 31–33, Dkt. No. 24–4). Plaintiff claims that, on August 18, 2007, he was assigned to work as a cook in the mess hall at Bare Hill by defendant Sharon Flanagan, who was in charge of the Program Committee. (AC, Dkt. No. 7 at 1 [5]; Dep. at 22–25, 46–47, 56–61). Plaintiff states that he asked the Program Committee not to be assigned to the mess hall because it was difficult for him to stand and walk on his prosthetic leg, and because he didn't want "to move around and put pressure on [that] leg ...." (AC at 1, 7; Dep. at 22–24). Plaintiff asked to work in the commissary or at a job outside, but the sergeant stated that neither job was available. (Dep. at 60–61). One of the female committee members then told plaintiff there was an opening for a cook in the mess hall, and "you take it or you

do not take it." Plaintiff said he would take it because he knew he would not be at Bare Hill "for long." (Dep. at 61). [6]

[5]      Because the paragraph and page numbering of the amended complaint is inconsistent, the court will reference the page numbers created by the CM–ECF system, which appears in the header of the filed document.

[6]      Plaintiff had prior training and experience as a cook, both in and out of prison. (Dep. at 29–30). During his deposition, plaintiff stated he "did not mind working in the kitchen," (Dep. at 35); but he also was concerned that, if he turned down his work assignment, he would be assigned to segregated housing and subject to discipline and/or a delay in his eventual release (Dep. at 49–50, 53–54).

**\*2** Defendants have submitted documentation indicating that plaintiff actually met with the Bare Hill Program Committee on August **16,** 2007, not Saturday, August **18th,** as plaintiff contended. (Flanagan Aff., Dkt. No. 24–3, ¶¶ 5–8, 11–13 & Ex. A; Stearns Aff., Dkt. No. 24–2, ¶¶ 13–16, 25–26 & Ex. A). [7] According to plaintiff, a male sergeant and two women were committee members that day. (Dep. at 24–25, 56–57). Plaintiff knew that "Ms. Flanagan was in charge of the program ..." (Dep. at 58), and believed that she was the woman who appeared to be running the committee meeting. (Dep. at 57–59, 63–64). Plaintiff could not describe the woman at the meeting he believes was Ms. Flanagan, except to note she was "Caucasian." (Dep. at 63–64).

[7]      This committee would not meet on weekends. (Flanagan Aff. ¶¶ 11–13; Stearns Aff. ¶ 26 & Ex. B)

Defendant Flanagan was, in fact, in charge of the program committee and would normally preside at meetings to make program assignments to inmates. (Stearns Aff. ¶ 20; Flanagan Aff. ¶ 10). However, defendants submitted extensive documentation indicating that defendant Flanagan was not at work on August 16, 2007, and did not participate in the meeting that resulted in plaintiff's assignment to work in the mess hall. (Flanagan Aff. ¶¶ 5–10, 14–19, & Exs. A, B; Stearns Aff. ¶¶ 13–16, 18–24, & Exs. A, B). [8] The record documenting the decision of the Program Committee assigning plaintiff to the mess hall detail was dated August 16, 2007 and was signed by someone other than defendant Flanagan, who would, as the committee chair, sign such forms on days that she worked. (Flanagan Aff. ¶¶ 5–10 & Ex. A).

8   Defendant Flanagan submitted a copy of her employee time sheet showing she had taken eight hours of personal leave the day plaintiff met with the Program Committee. (Flanagan Aff. ¶¶ 14–16 & Ex. B). Defendant Stearns also noted her absence on August 16, 2007 on his personal calendar for that day. (Stearns Aff. ¶¶ 18–23 & Ex. B).

Defendant Stearns was the Deputy Superintendent for Program Services at Bare Hill, and supervised the Program Committee. However, he was "not a member [of that committee] and ha[d] no direct involvement in its meetings and decisions." (Stearns Aff. ¶ 9). He "was not present at the Committee meeting [on August 16th] and had nothing to do with the Committee's decision to assign Cooke to the mess hall." (Stearns Aff. ¶ 17). Plaintiff admitted as much during his deposition. (Dep. at 75, 82).[9]

9   *See* Dep. at 75 ("Mr. Sterns doesn't assign people to a program. He is the director of programs ...."); 82 (Stearns not at committee meeting and had no role in mess hall assignment).

About a week before plaintiff met with the Program Committee, he had been cleared by the medical department at Bare Hill to work in the mess hall. (Stearns Aff. ¶¶ 33–35 & Ex. E). Plaintiff recalled being interviewed and examined by a nurse, but opined that it was not a thorough examination, and he disagreed with her conclusion that he was physically able to do mess hall work. (Dep. at 34–42, 48). He told her about his recent surgery and said he could not do strenuous work. (Dep. at 37, 41). Plaintiff told the nurse he was able to participate in programs, but claims that neither he, nor the nurse, specifically discussed mess hall work. (Dep. at 36, 41).

On August 18, 2007, plaintiff submitted a handwritten "Request for Reasonable Accommodation," and was instructed to re-submit his request on the proper form, which plaintiff did on August 24th. (3/4/2009 Memo. Decision and Order of Judge Sharpe, Dkt. No. 16, at 12–13; AC at 10). Plaintiff requested a change in program and facility due to the problems with his right foot and leg. (*Id.* at 13–14; AC at 10). The request was forwarded to the medical staff for evaluation on or before August 28, 2007.[10] On September 11, 2007, Dr. Connally, a facility physician, told Defendant Stearns "that Mr. Cooke's leg was infected, that Cooke was not caring for it properly and that he should be transferred to a wheel chair access facility." (Stearns Aff. ¶¶ 27–29 &

Ex. C; AC at 10). On September 12th, defendant Stearns signed the "Determination" section of the form which stated that plaintiff's transfer to a wheelchair-accessible facility was being processed, and noted that the doctor had recommended removal from the mess hall work assignment. (3/4/2009 Memorandum Decision and Order at 14; AC at 10). In the "Inmate Receipt" portion of the form, plaintiff stated that he agreed with defendant Stearns's determination. (*Id.* at 14–15; AC at 10).

10   Plaintiff was initially advised in a 8/28/07 memorandum from defendant Stearns that his request for a program change needed to be addressed through defendant Flanagan. (*Id.* at 14; Dep. at 73). Plaintiff claims that he wrote defendant Flanagan to request a change of programs and was denied. (Dep. at 73, 75, 90–91). No copies of such correspondence have been provided to the court.

**\*3** Plaintiff believes that, on or about September 12, 2007, the medical staff at Bare Hill found that the area where his leg had been amputated was infected. (AC at 1; Dep. at 78, 87–88). Plaintiff has acknowledged that, as soon as defendant Stearns became aware of the infection in plaintiff's leg, plaintiff was removed from his mess hall work assignment. (Dep. at 79–80, 85; Stearns Aff. ¶¶ 27–30). Plaintiff also admitted that the woman who assigned him to work in the mess hall (whom the plaintiff believed to be defendant Flanagan), was not trying to harm him or cause him any physical pain. "She simply didn't know. She couldn't know because she didn't read the [medical] chart." (Dep. at 81).

On October 17, 2007, plaintiff was running a temperature of 104 degrees and was transferred to Alice Hyde Medical Center, and then to Albany Medical Center, for evaluation. (AC at 1; Dep. at 82). Apparently, the infected part of the leg was then surgically removed. (AC at 1; Dep. at 85). Plaintiff was returned to Bare Hill where he was required to walk on crutches to obtain follow-up medical care. On October 31, 2010, he fell on a walkway while en route to the infirmary to change the dressing on his leg, suffering further injury. (AC at 4; Dep. at 84–85).

## II. *Summary Judgment*

As noted above, plaintiff's only remaining claim is that defendants Stearns and Flanagan violated his Eighth Amendment rights by assigning him to a mess hall work detail. Defendants seek summary judgment, arguing that they were not personally involved in plaintiff's program

assignment, and that plaintiff cannot establish that they acted with deliberate indifference to plaintiff's health and safety. For the reasons stated below, this court agrees with the defendants' position and recommends that summary judgment be granted, and that the remaining claim in the amended complaint be dismissed in its entirety.

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

\*4 In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a

court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). [11]

[11] The liberal pleading standards for *pro se* litigants do not excuse them from following the procedural formalities of summary judgment. *Govan v. Campbell,* 289 F.Supp.2d at 295. Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." This rule may be applied against *pro se* litigants; and a court is not obliged to conduct an independent review of the record to find proof of a factual dispute where, as here, a *pro se* plaintiff has failed to respond to the summary judgment motion in accordance with the applicable rules. *Id.* However, given the history relating to the service of the summary judgment motion, this court has considered plaintiff's amended complaint and his deposition testimony in determining whether there are material issues of fact in dispute.

**B. Personal Involvement**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007),

2010 WL 3418393

rev'd on other grounds sub nom. *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009) (stating that defendant could be liable under section 1983 if he failed to remedy constitutional violation after learning of it or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### 1. Defendant Stearns

Defendant Stearns lacked personal involvement in the Program Committee's decision to assign plaintiff to the mess hall because, as noted above, he was not a member of the committee and had no direct involvement in its meetings and decisions. He cannot be deemed personally involved in the decisions of the Program Committee merely because he supervised it. *See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (doctor who oversaw the facility's medical staff could not be deemed personally involved in the decisions merely because of his supervisory status).

**\*5** When defendant Stearns first learned, from a staff physician, that plaintiff's work assignment was inappropriate given his medical condition, he promptly directed that plaintiff be removed from his mess hall job. Plaintiff has made no allegation, much less a plausible showing, that defendant Stearns created a relevant custom or policy or was grossly negligent in his supervision of subordinates who made plaintiff's job assignment. In short, defendant Stearns cannot be liable for plaintiff's job assignment because there is indication that he was "personally involved." *See, e.g., Wilson v. Johnson,* 999 F.Supp. 394, 400 (W.D.N.Y.1998) (facility superintendent was not personally involved in the work assignment of an inmate when there was no evidence indicating he was advised about any health risk connected to the job assignment, that he was so advised and failed to take corrective action, that he created or carried out a policy exposing inmates to unsafe work assignments, or that he was grossly negligent in supervising subordinates).

### 2. Defendant Flanagan

As discussed above, the defendants have submitted persuasive documentary evidence to corroborate defendant Flanagan's sworn affidavit that she did not participate in the assignment of plaintiff's work detail because she was not working on the day the Program Committee met with him. Plaintiff's claims that defendant Flanagan presided at the meeting during which he was assigned to work in the mess hall are inconsistent and appear to be based on a mere assumption that she must have been present because she

was the chair of the committee. (Dep. at 24, 57–59). [12] In light of the overwhelming contrary, documentary evidence, plaintiff's conclusory allegations of defendant Flanagan's personal involvement in his job assignment are not sufficient to create a material issue of fact. *See, e.g., Mccloud v. Roy,* 9:08–CV–839, 2010 WL 985731, at \*7 (N.D.N.Y. Feb. 22, 2010) (plaintiff's conclusory allegation that he requested a bottom bunk placement from prison doctor is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (plaintiff's conclusory allegation that he was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")). [13] *See also Atkinson v. Fischer,* 9:07–CV–368 (GLS/GHL), 2009 WL 3165544 at \* 11, 2009 (N.D.N.Y. Sept. 25, 2009) (granting summary judgment in favor of defendants when they were not in any way involved in inmate plaintiff's job assignment).

[12] *See e.g.,* Dep. at 24 ("I don't know the ... name [of the 'lady' who said 'you are going to be assigned in the mess hall']. I know she was assigned to, she was the head person at that program. I would say it would be Ms. Fine (phonetic) as far as I know going by what I wrote."; 57 ("I was introduced to everybody and I know that Ms. Flanagan was there.... Why I'm so keen on Ms. Flanagan is because she was the head person."); 58 ("... I don't remember the women, I don't remember the sergeant.... So Ms. Flanagan was in charge of the program and if you had any reason write Ms. Flanagan for change of program, that's what you would do.... I didn't just pull Ms. Flanagan's name out of a hat."; 59 ("the reason I named her because she is the one that assigned people.")

[13] *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ...

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

In his deposition, plaintiff also makes conclusory and unsupported claims that, on several occasions after his meeting with the Program Committee, he wrote defendant Flanagan "requesting a change of programs due to the fact it's strenuous to me." (Dep. at 91). Given that none of this alleged correspondence has been submitted to the court, the court concludes that plaintiff's conclusory allegations are insufficient to establish defendant Flanagan's personal involvement in failing to change his program placement during the month or so he worked in the mess hall. *See, e.g., Wilson v. Johnson,* 999 F.Supp. at 400. In any event, as discussed below, there is no indication that, even if defendant Flanagan declined to change plaintiff's placement based on his general complaints, she could be found deliberately indifferent to his health and well-being.

### 3. Unnamed Potential Defendants

**\*6** Although defendants Stearns and Flanagan were not personally involved in the initial decision to assign plaintiff to a mess hall work assignment, there were clearly several other unidentified staff members at Bare Hill who were. In *Davis v. Kelly,* the Second Circuit discussed the circumstances under which a court should not dismiss otherwise colorable section 1983 claims against supervisory personnel who deny personal involvement until a *pro se* plaintiff has been afforded an opportunity, through at least brief discovery, to identify the subordinate officials who have personal liability. *Davis v. Kelly,* 160 F.3d 917, 920–21 (2d Cir.1998). The *Davis* court held:

> ... [W]hen a *pro se* plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur without an opportunity for additional discovery.

*Davis v. Kelly,* 160 F.3d at 922.

In this case, the dismissal of plaintiff's claim should not be delayed, based on *Davis,* to provide him an opportunity to conduct further discovery to identify those who were personally involved in his job assignment. First, *Davis* involved the decision to transfer of an inmate from one facility to another. Because of security issues related to prison transfers, the decision-making process is not transparent to inmates; the identity of the decision makers and the reasons for the transfer are often not disclosed. Hence, inmate plaintiffs might understandably have difficulty identifying who was involved in their transfer. *See, e.g., Smith v. Greene,* 9:06–CV–505, 2010 WL 985383, at \*5–8 & n. 7 (N.D.N.Y. Feb. 3, 2010). This case involves prison job assignments, for which the process is more transparent. The decision relating to plaintiff's job assignment was made in his presence by a committee of three individuals, who, plaintiff claims, introduced themselves to him. (Dep. at 57). With a level of diligence reasonable for a *pro se* litigant, the plaintiff could have correctly identified the facility staff members involved in his job assignment if he chose to do so.

Furthermore, for the reasons discussed below, plaintiff's pending claim that his Eighth Amendment rights were violated is not "colorable" because he cannot establish that the actual members of the committee acted with deliberate indifference to his health and welfare. As noted above, the medical staff at the prison had cleared plaintiff for a mess hall job assignment before the committee met, so they had no reason to know that such an assignment might be detrimental to his health.

### C. Eighth Amendment Claim

#### 1. Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate working conditions, a plaintiff must establish that (1) he was incarcerated under

Cooke v. Stern, Not Reported in F.Supp.2d (2010)

2010 WL 3418393

conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834. Plaintiff's claim may also be analogized to a claim for inadequate medical care, which similarly requires proof of deliberate indifference. *See, e .g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (prisoner alleged Eighth Amendment medical claim when he alleged that prison guards deliberately ignored doctor's order that prisoner pursue exercise in prison gym); *Atkinson v. Fischer,* 2009 WL 3165544 at *11 (applying Eighth Amendment standards for medical care in analyzing claim that plaintiff was assigned to a prison job that was inappropriate, given his medical condition).

**\*7** "The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). An inmate may satisfy the objective prong by alleging that his prison work duties created a substantial risk of serious injury or harm. *Howard v. Headly,* 72 F.Supp.2d 118, 123–124 (E.D.N.Y.1999) (collecting cases).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

### 2. Application

As discussed above, during the month or so he worked in the mess hall, the plaintiff developed an infection in the area above where his foot had previously been amputated. When he was re-examined by the medical staff, a prison doctor determined that the mess hall assignment was no longer appropriate given plaintiff's medical condition. Plaintiff ultimately required surgery to remove another six inches or so of his leg stump. However, the prison doctor concluded that plaintiff's infection was caused, in part, by plaintiff's

failure to properly care for his surgery wound. Furthermore, plaintiff admitted that, even before he returned to prison, he was advised that he would require additional surgery to remove another several inches of his leg stump. (Dep. at 28, 32–33). While it is unnecessary to decide the issue, this court will assume for the purposes of this decision that there was a material issue of fact regarding whether plaintiff's initial work assignment exposed him to a substantial risk of further injury and harm. However, to avoid summary judgment, there must also be a genuine issue of fact regarding whether the defendants were aware of a substantial risk of harm to plaintiff from his work assignment and knowingly disregarded that risk.

Plaintiff has not come forward with any evidence to overcome the defendants' showing that they, and the other prison officials who may have been involved in plaintiff's work assignment, did not act with deliberate indifference to his health and safety. When the members of the Program Committee (which did not include defendant Flanagan) initially assigned plaintiff to work in the mess hall, they relied upon the judgment of the prison medical staff, [14] which specifically cleared plaintiff for that job placement. [15] *See, e.g., Wilson v. Johnson,* 999 F.Supp. at 399–400 (finding no issue of fact suggesting deliberate indifference relating to plaintiff's job assignment where there was no significant evidence of medical (back) problems at the time of the initial assignment). Plaintiff admitted that the woman presiding at his Program Committee meeting was not trying "to kill me or cause me any physical pain." "She simply didn't know." (Dep. at 81).

[14]   *See* Dep. at 59 (the woman presiding at the Program Committee meeting who made plaintiff's job assignment had his medical charts).

[15]   While there are no remaining named defendants who might have been involved in the original medical clearance of plaintiff to work in the mess hall, there is no indication that the nurse who made that medical judgment acted with deliberate indifference to plaintiff's health. Plaintiff complains that the nurse did not perform a sufficiently thorough examination of him and he clearly disagreed with her ultimate decision. However, he alleges nothing to suggest that the nurse knew of, and deliberately disregarded, a substantial risk of serious medical harm from his job assignment. (Dep. at 35–42, 48). Plaintiff

told the nurse he could participate in programs and "walk around," although he claims they did not discuss the feasibility of mess hall work. (Dep. at 36, 42, 48). Even if the original examination of plaintiff and his work clearance constituted malpractice, that would not suffice to support an Eighth Amendment claim of deliberate indifference. *See, e.g., Estelle v. Gamble,* 429 U.S. at 100–101, 106–107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

**\*8** Plaintiff alleges that defendants Flanagan and Stearns ignored his appeals to remove him from his job assignment for health reasons after the initial assignment. Even if plaintiff's unsupported allegations regarding his written requests to defendant Flanagan are credited, he only told her that his work was "strenuous" (Dep. at 91), which hardly put her on notice that he was being exposed to a serious infection involving his amputated leg. *See, e.g., Wilson v.. Johnson,* 999 F.Supp. at 400 (corrections counselor was not involved in any constitutional violation involving inmate's job assignment when his complaints about his mess hall job did not mention the back problems that he now alleges were aggravated by the work). When defendant Stearns learned of plaintiff's infection, he promptly had him removed from the mess hall work detail. [16] Plaintiff conceded that Stearns "was pretty decent" in how he addressed his request for accommodations. (Dep. at 95). Even assuming that plaintiff's various claims about the defendants' intentions are true and accurate, he has provided nothing to suggest that they acted with deliberate indifference. Hence, even if the named defendants were personally involved in plaintiff's job assignment, this court would still recommend dismissal of the pending Eighth Amendment claim.

[16]     *See, e.g., McCray v. Coughlin,* 101 F.3d 1392 (table), 1996 WL 368722 at \*2, (2d Cir.1996) (prison doctor who revoked plaintiff's "general pass," requiring him to seek specific permission before he would be excused from a work program, did not act with deliberate indifference, particularly when he subsequently issued a month-long direction excusing plaintiff from lifting more than 20 pounds)

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (Dkt. No. 24) be **GRANTED** and the remaining claim in the amended complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3418393

---

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1232737

2017 WL 1232737
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Hiawatha CUFFEE, Jr., Plaintiff,

v.

The CITY OF NEW YORK; Officer Squillaro (Shield #
18063); Officer Gonzalez (Shield # 17148), Defendants.

15cv8916 (PGG) (DF)
|
Signed 03/03/2017

**Attorneys and Law Firms**

Hiawatha Cuffee, Jr., Marcy, NY, pro se.

Eviana Linnea Frances Englert, NYC Law Department, New
York, NY, for Defendants.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge

*1  In this action brought under 42 U.S.C. § 1983, *pro
se* plaintiff Hiawatha Cuffee, Jr. ("Plaintiff") alleges that
his constitutional rights were violated by the actions of
two New York City correction officers, defendant Officers
Squillaro and Gonzalez (together, the "Correction Officer
Defendants"), in connection with their conduct during and
in the immediate aftermath of a motor vehicle collision that
occurred while Plaintiff was being transported on a New York
City Department of Correction ("DOC") bus. Plaintiff also
names the City of New York (the "City") as a defendant,
alleging that the circumstances give rise to municipal liability.

Currently before this Court for a report and recommendation
is a motion brought by the Correction Officer Defendants
and the City (collectively, "Defendants") to dismiss the
Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure. (Dkt. 16.) For the reasons set forth below, I
recommend that the motion be granted in part and denied in
part.

**BACKGROUND**

**A. Factual Background**

For purposes of this motion to dismiss, the factual allegations
in Plaintiff's Complaint must be taken as true. (*See*
Discussion, *infra*, at Section I(A).) Furthermore, as Plaintiff
is proceeding *pro se*, the allegations of his Complaint must
be liberally construed, and any additional facts that he has
alleged in opposition to Defendants' motion to dismiss may
be considered by the Court as supplementing those pleaded
in the Complaint. (*See id.*) Accordingly, the facts summarized
herein are derived from this Court's liberal construction of
Plaintiff's Complaint, dated October 17, 2016 ("Compl.")
(Dkt. 2), as well as from his various opposition submissions
(*see* Letter to the Court from Plaintiff (containing Plaintiff's
"Rebuttal" to Defendants' pre-motion letter), dated May 21,
2016 ("Pl. 5/21/16 Ltr.") (Dkt. 14); Letter to the Court from
Plaintiff (containing an "Addendum" to his prior letter),
dated May 24, 2016 ("Pl. 5/24/16 Ltr.") (Dkt. 15); Plaintiff's
opposition to Defendants' motion to dismiss (titled "Notice
of Motion"), dated Sept. 19, 2016 ("Pl. Opp.") (Dkt. 23);
and Plaintiff's supplemental opposition to Defendants' motion
(titled "Motion in Opposition"), dated Sept. 27, 2016 ("Pl.
Supp. Opp.") (Dkt. 26)).

Based on Plaintiff's submissions, the DOC transported him on
July 31, 2015, by bus, from Rikers Island ("Rikers"), where
he was being detained, to Bellevue Hospital Center, [1] where
he had a prostate examination and biopsy. (Compl., at 9. [2])
During the return trip to Rikers, Plaintiff was handcuffed,
shackled, and locked inside a three-and-a-half-foot-wide steel
cage situated directly behind the driver's seat of the bus. (*Id.*)
He did not have a seatbelt. (*Id.*, at 12.)

[1]  This Court takes judicial notice of the fact
that Bellevue Hospital Center is now known
as New York Health + Hospitals/Bellevue
("Bellevue"), and that male detainees at Rikers
are taken to Bellevue when they are in need
of medical care that cannot be provided at
Rikers. *See* http://www.nyc.gov/html/doc/html/
about/facilities-overview.shtml (last accessed Mar.
1, 2017).

[2]  Plaintiff utilized a form civil-rights complaint in
this action, filing out that form as indicated, in
numbered paragraphs. In paragraphs II(A-D) of the
form, however, which called for a statement of
his claim(s), Plaintiff wrote "see attached," and he
then attached to the form a four-page, handwritten
statement describing his factual allegations and the
claims he is asserting. To the extent this Court

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 68 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

cites to that attached statement, this Court will cite to the page numbers of the statement, as they are reflected on the Court's electronic case filing ("ECF") system.

**\*2** On that return trip, defendant Officer Gonzalez was driving the bus, and defendant Officer Squillaro was also on board. (*Id.*, at 9.) Plaintiff alleges that, soon after leaving Bellevue, he observed Officer Gonzalez "pull out into traffic ... at an unusually high rate of speed." (*Id.*) The bus then collided with another vehicle, causing Plaintiff to be "thrown forward" into the steel cage. (*Id.*; Pl. 5/21/16 Ltr., at 3.) The force of the impact allegedly caused injury to Plaintiff's knees, back, and neck, resulting in severe pain, and Plaintiff "immediately began screaming to Officer Gonzalez" for medical attention. (Compl., at 9; Pl. 5/21/16 Ltr., at 3.) Plaintiff states that he was also bleeding from his rectum as a result of the biopsy that he had received at Bellevue, and that, after the collision, he told the Correction Officer Defendants "over and over" that he was bleeding. (Pl. 5/21/16 Ltr., at 3; *see also* Compl., at 9.) Plaintiff also maintains that the Correction Officer Defendants knew that he had gone to Bellevue to obtain the biopsy because they had escorted him to that operation. (Pl. 5/21/16 Ltr., at 3.)

After the collision, the Correction Officer Defendants exited the bus, while, according to Plaintiff, he and the other detainees screamed for help, "complaining about their various injuries and pleading for medical assistance." (Compl., at 9.) The detainees "were told to hold on," as the Correction Officer Defendants got off of the bus, with their hands on their weapons, in order to confront the driver of the other vehicle involved in the accident. (*Id.*) Plaintiff did not receive medical attention on the scene. (*Id.*, at 10.) Instead, while correction officials completed their investigation of the collision, he and the other detainees sat on the bus for an extended period of time, claimed by Plaintiff, in the Complaint, to be about an hour and a half (*id.*, at 9), but then described in one of his subsequent submissions as three-and-one-half hours, plus another half hour "to be 'shackled in chain[s]' and loaded to another bus" (Pl. 5/21/16 Ltr., at 1). Eventually, Plaintiff was transported back to Rikers, where he received an X-ray and medical personnel gave him an ice pack, some pain medication, and a cane for his injuries. (Pl. 5/21/16 Ltr., at 1; *see also* Compl. ¶ 4(C); *id.* at 10.)

Plaintiff asserts that this incident put his life in danger. (*Id.*) He alleges that DOC buses are not equipped with seatbelts, airbags, or other means to protect passengers from injury in the event of an accident, and that it is dangerous for detainees

to be "shackled and handcuffed" on such a bus because they "fly out of their seats." (*Id.*, at 12.) Plaintiff further asserts that Officer Gonzalez caused the collision by driving recklessly (*see id.*, at 11) and that, after the collision, both Correction Officer Defendants knew that Plaintiff needed urgent medical care, but maliciously disregarded the injuries he had sustained. (Pl. 5/21/16 Ltr., at 1, 3.) He contends that these officers acted with "malicious intent" and "intent to cause duress," when they failed to obtain medical assistance for him in the immediate aftermath of the collision (Pl. Opp., at 2), and that their failure to return to Bellevue or to call emergency medical services to respond to the scene "caused [him] further harm" (Pl. 5/21/16 Ltr., at 3).

Plaintiff complains that, as a result of the incident, he is now in constant and extreme pain and "walking with a cain [*sic*, cane] and stomach belt." (Compl., at 10-12; *see id.*, at 11 (stating that, although he was, "at the age of 60 year[s,] in walking and running condition" and had "come into jail healthy," he would "leave by the will of God, twisted").) He also maintains that the injuries that he sustained to his neck, lower back, knees, and pelvic area caused a loss of mobility that will prevent him from performing his job as a "certified plant maintenance electrician." (*Id.*, at 12.)

**B. Procedural Background**

**1. Plaintiff's Complaint**

Plaintiff commenced this action in this Court on October 17, 2015, by filing his *pro se* Complaint. [3] In his Complaint, Plaintiff purports to assert three separate claims for relief under Section 1983: First, he claims that "being placed in a dangerous situation and position" violated his "rights under the [Fourth] Amendment to be secure in his person and not be denied life and liberty." (Compl., at 11.) Second, he claims that Correction Officer Defendants, by their reckless conduct, subjected him to "cruel and unusual punishment," in violation of the Eighth Amendment (*id.*)—a claim that, consistent with Plaintiff's opposition papers (*see* Pl. Opp., at 2) and this Court's assumption that Plaintiff was likely a pretrial detainee at the time of the incident, this Court construes as alleging deliberate indifference to Plaintiff's safety and to his serious medical needs, in violation of the Due Process Clause of the 14th Amendment. [4] Third, again invoking the language of the Eighth Amendment, Plaintiff claims that the City should be held liable for his injuries, apparently because of its failure to equip DOC buses with safety features (Compl., at 12); this

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 69 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

Court construes this as a claim for municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Plaintiff seeks compensatory damages and an order requiring the DOC to re-train its transportation officers in emergency procedures. (Compl., ¶ V; *id.*, at 11-12.)

3        Although the Court's Docket reflects a filing date of November 11, 2015, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack*, 487 U.S. 266, 270 (1988). Here, given that Plaintiff has declared, under penalty of perjury, that he delivered his Complaint to prison authorities on October 17, 2015, to be mailed to this Court (*see* Compl., at 8), the Court will deem the Complaint to have been filed on that date.

4        If Plaintiff was actually a convicted inmate, and was serving a prison sentence at the time of the incident, then a deliberate-indifference claim would in fact be appropriately pleaded under the Eighth Amendment. (*See* Discussion, *infra*, at Section II(B)(1).)

**2. Defendants' Motion To Dismiss**

**\*3** On May 16, 2016, Defendants filed a letter request for leave to move to dismiss the Complaint under Rule 12(b)(6). (Letter to the Court from Evania Englert, Esq., dated May 16, 2016 (Dkt. 12).) Defendants' letter included arguments and points of law, to which Plaintiff responded, by letter dated May 21, 2016. (Pl. 5/21/16 Ltr.) Three days later, Plaintiff submitted an addendum to his May 21 letter, informing this Court that a separate claim that he had lodged against the City (apparently arising out of the same incident) had been settled, and arguing that the settlement by the New York City Comptroller's Office "validat[ed] points of contention[ ]" on Plaintiff's federal Section 1983 claims. (Pl. 5/24/16 Ltr.)

On June 30, 2016, Defendants proceeded to file their motion to dismiss the Complaint (Dkt. 16), together with a copy of a Local Civil Rule 12.1 Notice[5] to Plaintiff (Dkt. 17), an attorney Declaration (Dkt. 18 (attaching a copy of the Complaint)), and a supporting memorandum of law (Memorandum of Law in Support of Defendants' Motion To Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), dated June 30, 2016 ("Def. Mem.") (Dkt. 19)). Plaintiff responded to the motion with opposition papers dated

September 19, 2016 (Pl. Opp.) and September 27, 2016 (Pl. Supp. Opp.).

5        Local Rule 12.1 requires that "a represented party moving to dismiss ... against a party proceeding *pro se*, who refers in support of the motion to matters outside the pleadings as described in Fed. R. Civ. P. 12(b) or 12(c), shall serve and file" a notice that warns the *pro se* party that the Court may convert the motion to a motion for summary judgment. Despite service of such a Notice in this case, Defendants do not appear to refer to any matters outside the pleadings in their Rule 12(b)(6) motion.

In his September 19 opposition, Plaintiff referred the Court to *Smith v. City of New York*, No. 15cv7910 (GHW) ("*Smith*"), a Section 1983 case similar to his, filed in this Court by another Rikers detainee (or inmate) who was apparently transported on the same bus from Bellevue, at the same time as Plaintiff, and who was also allegedly injured in the collision. (Pl. Opp., at 1-2.) Plaintiff asked the Court to consider the "amended complaint"[6] in *Smith* as a "witness" affidavit in this action. (*See id.*)

6        The plaintiff in *Smith* filed a First and a Second Amended Complaint, both captioned "Amended Complaint" and both dated prior to September 19, 2016. (*See Smith*, No. 15cv7910, Dkts. 14, 39.) As Plaintiff did not specify which of these two pleadings he was seeking to place before this Court, this Court liberally construes his submissions to refer to the Second Amended Complaint in *Smith*, which contains more detailed allegations than the earlier pleading. (*Id.* at Dkt. 39.) This Court notes that, on December 28, 2016, Judge Woods granted a motion to dismiss Smith's claims, with leave to amend. *See Smith v. City of New York*, No. 15cv7910 (GHW), 2016 WL 7471334, at \*6 (S.D.N.Y. Dec. 28, 2016).

**DISCUSSION**

**I. RULE 12(b)(6)**

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure where it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss, the Court must "accept as

2017 WL 1232737

true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *accord Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff's claim, as pleaded, is sufficient to afford him or her the opportunity to proceed on the evidence. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

**\*4** The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 666), *cert. denied*, 131 S. Ct. 901 (2011).

Additionally, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest*.' " *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting cases; emphasis in original); *see also Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980) (noting that a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers); *Lerman v. Bd. of Elections in the City of New York*, 232 F.3d 135, 139-40 (2d Cir. 2000) ("Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency."). This is especially true in the context of civil rights complaints. *See Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001); *see also Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (noting that a court must be "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations").

On a motion to dismiss a complaint, a court is generally constrained to look only to the pleadings. *See* Fed. R. Civ. P. 12(b); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 492 (S.D.N.Y. 2013). Nonetheless, the mandate that a *pro se* plaintiff's complaint be construed liberally makes it appropriate for the court to consider the factual allegations in a *pro se* plaintiff's opposition materials to supplement the allegations in the complaint. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002); *see also Sommersett v. City of New York*, No. 09cv5916 (LTS) (KNF), 2011 WL 2565301, at \*3 (S.D.N.Y. June 28, 2011) ("[W]here a *pro se* plaintiff has submitted other papers to the [c]ourt, such as legal memoranda, the [c]ourt may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations."). A court may also consider certain additional materials, including documents attached to the complaint as exhibits or incorporated therein by reference, matters of which judicial notice may be taken, and documents that are "integral" to the complaint. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016); *see also, e.g.*, *Samuels v. Fischer*, 168 F. Supp. 3d 625, 645 n.11 (S.D.N.Y. 2016) (finding that, in resolving motion to dismiss, it was "appropriate to consider allegations contained in [p]laintiff's [o]pposition"); *Goldson v. Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP*, No. 13cv2737 (GBD) (FM), 2014 WL 4061157, at \*3 (S.D.N.Y. July 11, 2014) (amended report and recommendation) ("When a plaintiff is proceeding *pro se*, the Court also may rely on any opposition papers in assessing the legal sufficiency of the plaintiff's claims"), *adopted*, 2014 WL 3974584 (Aug. 13, 2014).

**\*5** Although courts have not followed this approach in every case, *see, e.g.*, *Brunson v. Duffy*, No. 12cv9465 (KBF), 2015 U.S. Dist. LEXIS 29015, at \*4 (S.D.N.Y. Mar. 6, 2015) (citing *pro se* cases where courts declined to consider new facts included in opposition), it is certainly true that the papers submitted by a *pro se* plaintiff in opposition to a Rule 12(b)(6) motion may offer clarification or context that can aid the Court in understanding the plaintiff's pleading and in affording it a liberal construction, *see id.*, at n.4 (noting that "a district court needs to assess each case on an individual basis"). Applying the pleading rules permissively is particularly appropriate when, as here, a *pro se* plaintiff alleges civil rights violations. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Moreover, where the addition of allegations contained in opposition papers would be sufficient to enable an otherwise deficient *pro se* pleading to survive a Rule 12(b)(6) motion, a court

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 71 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)
2017 WL 1232737

may deem the pleading amended to include the additional allegations. *Johnson*, 234 F. Supp. 2d at 356.

In addition, the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco*, 222 F.3d at 112 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Where an amendment would be futile, however, leave to amend is not required. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *see also Cuoco*, 222 F.3d at 112 ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile.").

## II. PLAINTIFF'S CLAIMS

To state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). For any action under Section 1983, a plaintiff must also allege facts showing the defendants' direct and personal involvement in the alleged constitutional deprivation. *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). In general, a state actor's negligence does not create a cause of action under Section 1983. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012); *Medeiros v. O'Connell*, 150 F.3d 164, 170 (2d Cir. 1998).

The three claims that Plaintiff asserts in this case are addressed here, in turn.

### A. Fourth Amendment Claim

As noted above, in his first claim, Plaintiff refers to alleged "violations of his ... federal constitutional civil rights under the 4th Amendment to be secure in his person and not be denied life and liberty." (Compl., at 11.) The Fourth Amendment protects against unlawful searches and seizures, including unlawful arrests, but Plaintiff makes no allegations that he was either arrested or subjected to any unlawful search as a result of the motor-vehicle collision that is the subject of his Complaint. In the absence of such allegations, the Fourth Amendment is simply "inapplicable" to this case. *Smith*, 2016 WL 7471334, at *5 (dismissing purported Fourth Amendment claim on facts substantially similar to those alleged here).

Further, as Plaintiff has not shown that he could plausibly state a Fourth Amendment claim in this action, I recommend that his first claim be dismissed with prejudice.

### B. Deliberate-Indifference Claims

Plaintiff's second claim, liberally construed, can be read to plead that the Correction Officer Defendants violated his rights under the 14th Amendment (assuming Plaintiff was a pretrial detainee at the time) or the Eighth Amendment (if he was a convicted inmate), by their deliberate indifference to his safety or serious medical needs. (*See* Compl., at 11 (referring to "cruel and unusual punishment").)

### 1. Applicable Legal Standards

**\*6** The Constitution prohibits correction officials from acting with deliberate indifference to the "reasonable safety," *Farmer v. Brennan*, 511 U.S. 825, 844 (1994), and "serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), of prisoners. Where the plaintiff is incarcerated pursuant to a conviction, such a claim is grounded in the Eighth Amendment's prohibition of "cruel and unusual punishment," *see id.*, at 102-04, but, "[i]n the case of a person being held prior to trial," this proscription " 'does not apply,' because 'as a pre-trial detainee [the plaintiff is] not being 'punished,' " *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)). Rather, where the plaintiff is in custody as a pretrial detainee, a deliberate indifference claim is grounded in the Due Process Clause of either the Fifth Amendment (for a detainee in federal custody), or the 14th Amendment (for a detainee in state custody). *See id.*

Deliberate indifference is evaluated under a two-pronged test, which is comprised of both objective and subjective components. *See Jabbar*, 683 F.3d at 57; *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011); *see also Darnell v. Pineiro*, No. 15-2870, 2017 WL 676521, at *14 (2d Cir. Feb. 21, 2017) (characterizing the "subjective" component as a "*mens rea*" or "mental element prong"). To state a claim for the deprivation of a constitutional right based on a theory of deliberate indifference, a plaintiff must allege "(1) that the deprivation alleged [was] 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind.' " *Trammel v. Keane*, 338

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 72 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)
2017 WL 1232737

F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer*, 511 U.S. at 834).

As to the objective component, which is the same under both the Eighth and 14th Amendments, *Darnell*, 2017 WL 676521, at *9, "there is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency,' " *Jabbar*, 683 F.3d at 57 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). In general, however, the standard contemplates deprivations of " 'basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety.' " *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

The subjective component is analyzed differently depending on whether the claim is brought under the Eighth Amendment or 14th Amendment, because, although the Eighth Amendment prohibits cruel and unusual punishments of prisoners incarcerated pursuant to convictions, pretrial detainees, who would be protected under the 14th Amendment, "may not be punished at all." *Darnell*, 2017 WL 676521, at *14. For claims arising under the Eighth Amendment, a plaintiff must show that the defendants knew of and disregarded an excessive risk to his or her health or safety by failing to take reasonable measures to avoid the harm. *Caiozzo*, 581 F.3d at 69. The plaintiff must allege that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed," and also that they drew the inference. *Farmer*, 511 U.S. at 837. A defendant's knowledge of an excessive risk to the prisoner's health can be established through a showing that "the risk was obvious or otherwise must have been known to [the] defendant." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).

For claims arising under the 14th Amendment, on the other hand, the Second Circuit has determined that, in light of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), "the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Darnell*, 2017 WL 676521, at *14. Under this standard, a pretrial detainee need only show that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* In other words, "the Due Process Clause can be violated when an official does not have

subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

*7 As noted, it is unclear from Plaintiff's submissions whether, at the time of the alleged events, he was in custody at Rikers as a pretrial detainee, or had been convicted of a crime and was serving a sentence of incarceration. Accordingly, this Court analyzes Plaintiff's medical care claim under the deliberate-indifference standard of both the Eighth and 14th Amendments.

## 2. **Deliberate Indifference To Safety**

Plaintiff may be attempting to plead that the circumstances that led to his injuries manifest a deliberate disregard, by the Correction Officer Defendants, for an excessive risk to his safety.

Under the Eighth and 14th Amendments, a state actor "must not deprive prisoners of their 'basic human needs,' " including " 'reasonable safety,' " and must not "expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps*, 308 F.3d at 185 (quoting *Helling*, 509 U.S. at 35). The Second Circuit has held that the absence of seatbelts on a correctional facility vehicle, "when based on legitimate penological concerns rather than an intent to punish, is reasonable" and does not, in itself, constitute a denial of "reasonable safety" in violation of the Eighth or 14th Amendments. *Jabbar*, 683 F.3d at 58 (affirming the dismissal of a deliberate-indifference claim grounded in the failure of prison officials to provide seatbelts to prison inmates where the plaintiff neither alleged that "there was an intent to punish or other improper motivation for the lack of seatbelts" nor that the defendants "knew of any excessive risk to inmate safety"). Moreover, motor-vehicle accidents, by themselves, do not implicate the Constitution's protections, and "allegations of a public official driving too fast for the road conditions are grounded in negligence" and are therefore not actionable under Section 1983. *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 436 (S.D.N.Y. 2004); *see also Uhl v. Wendy*, No. 15cv6923 (VB), 2016 WL 7190584, at *4 (S.D.N.Y. Dec. 9, 2016).

An in-custody plaintiff injured during transport may, however, state a deliberate-indifference claim if he or she alleges facts in addition to the absence of seatbelts and reckless driving, that, taken as a whole, suggest that the

Case 9:20-cv-00665-MAD-TWD Document 43 Filed 02/08/23 Page 73 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

plaintiff was exposed to conditions posing an unreasonable risk of serious harm, and that the defendants were aware of those conditions. *See Torres v. Amato*, 22 F. Supp. 3d 166, 176 (N.D.N.Y. 2014) (distinguishing *Jabbar* and denying summary judgment on a deliberate-indifference claim where the plaintiff alleged, and put forth evidence demonstrating that, not only had the defendants failed to provide the plaintiff with a seatbelt in a prisoner van, but they also failed to latch the van's door properly, operated the van recklessly and at unsafe speeds with knowledge that the plaintiff was not restrained, and were aware of an earlier incident in which another inmate was injured while not wearing a seatbelt); *cf. Lynch v. Jane Doe Corr. Officer Blue*, No. 14cv6919 (VB), 2016 WL 831969, at *4 (S.D.N.Y. Feb. 29, 2016) (granting a motion to dismiss a deliberate-indifference claim grounded in a failure to provide seatbelts, but noting that the allegations presented a "closer call than *Jabbar*," where the plaintiff alleged that he was not provided a seatbelt in a prisoner van and a defendant officer ordered him to change seats while the van was moving).

**\*8** Here, in addition to alleging that he was not provided a seatbelt on the DOC bus and that Officer Gonzalez drove recklessly by "pull[ing] out into traffic ... at an unusually high rate of speed," Plaintiff has alleged that he was "handcuffed and shackled at the waist[,] and confined in a steel, locked cage approximately [three-and-a-half] feet wide," while the bus was moving. (Compl., at 9.) He has also alleged that "[b]eing shackled and handcuffed" on these types of buses is "dangerous because detainees fly out of their seats." (*Id.*, at 12.) Moreover, Plaintiff has alleged that the Correction Officer Defendants were aware of the conditions of his transport, as he was seated directly behind Officer Gonzalez and that Officer Squillaro was also present on the bus. (*See id.*, at 9.)

This Court finds it plausible that the act of a correction officer in driving recklessly, at excessive speed, with knowledge that a detainee is being transported in the vehicle—not just without a seat belt, but within a small steel cage, with hands in handcuffs that are linked at the waist and thus cannot be used to brace or otherwise protect himself—could rise to the level of deliberate indifference to an excessive risk to that detainee's safety. These facts, if proven, could reasonably establish more than negligence, and thus bring this case outside the ruling of *Jabbar*. Accordingly, this Court finds that Plaintiff has stated a claim under the Eighth and 14th Amendments that Officer Gonzalez, as the driver of the bus, and acting "with deliberate indifference, exposed [Plaintiff] to ... an unreasonable risk

of serious damage to his future health." *Helling*, 509 U.S. at 35; *see also Torres*, 22 F. Supp. 3d at 176. In particular, Officer Gonzalez's alleged act of driving recklessly, while Plaintiff was confined in a cage without any reasonable means to protect himself from impact, would satisfy the objective prong of the deliberate-indifference test. Moreover, given that Officer Gonzalez was the driver of the bus and that Plaintiff was seated right behind him, it is reasonable to infer that Officer Gonzalez was either actually aware of the excessive risk to Plaintiff's safety or that the risk was obvious, thereby satisfying the subjective prong of the test, under either the Eighth or 14th Amendments. *See Brock*, 315 F.3d at 164; *Darnell*, 2017 WL 676521, at *14.

Based on Plaintiff's pleading and other submissions, however, it cannot similarly be concluded that Plaintiff has stated a viable claim against Officer Squillaro for deliberate indifference to Plaintiff's safety. Plaintiff makes no allegation that this defendant personally acted in any way that contributed to the unsafe conditions in which Plaintiff was placed or to the collision itself, and thus any claim grounded in his alleged disregard for Plaintiff's safety should be dismissed. I recommend, however, that Plaintiff be permitted to replead his claim against Officer Squillaro to explain this officer's involvement, if any, in Officer Gonzalez's allegedly reckless driving and/or in Plaintiff's handcuffing, shackling, and caging on the bus. [7]

[7]     While, based on an evidentiary record, Defendants may be able to demonstrate a legitimate penological interest in keeping Plaintiff not seat-belted, handcuffed, shackled at the waist, and confined to a steel cage during transport, and thereby challenge whether the risk to Plaintiff's safety caused by the combination of these measures was "excessive," the Court must only focus, at this stage, on the adequacy of Plaintiff's pleading.

### 3. Deliberate Indifference To Serious Medical Needs

Plaintiff also appears to be alleging that, by acting to delay his access to medical care after the collision, the Correction Officer Defendants deliberately disregarded his serious medical needs.

**\*9** In the situation where a plaintiff receives medical treatment, but the treatment is delayed, "it is appropriate to focus on the challenged *delay* or *interruption* in treatment

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 74 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

rather than the prisoner's *underlying medical condition* alone" to determine whether the plaintiff has stated a claim for deliberate indifference to his medical needs. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis in original); *see also Smith*, 2016 WL 7471334, at *4. "[A] plaintiff may show delayed medical care warrants constitutional protection by alleging the delay worsened his condition or increased the risk of future injury." *Snyder v. Alam*, No. 15cv4033 (VB), 2016 WL 2642226, at *3 (S.D.N.Y. May 6, 2016) (finding that objective prong was met on motion to dismiss where plaintiff alleged that delay in hospitalization and surgery caused his foot and leg to become permanently swollen, and that he suffered "unnecessary pain" when he had to walk on broken bones for five days); *Bell v. Jendell*, 980 F. Supp. 2d 555, 560 (S.D.N.Y. 2013) (finding that objective prong was met on motion to dismiss where plaintiff alleged five-day delay in obtaining acid reflux prescription); *Lloyd v. Lee*, 570 F. Supp. 2d 556, 568 (S.D.N.Y. 2008) (finding that objective prong was met on motion to dismiss where plaintiff alleged that 16-month delay in receiving MRI contributed to his pain, discomfort, and loss of mobility, delayed his shoulder surgery, and increased the time required for his injuries to heal).

Short-term delays in medical care generally fall short of the level of "seriousness" that the deliberate indifference standard requires. *See DeMeo v. Koenigsmann*, No. 11cv7099 (HBP), 2015 WL 1283660, at *11 (S.D.N.Y. Mar. 20, 2015) (stating that, "[a]lthough a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years," although also noting that "[t]hese categories are not exclusive" (internal quotation marks and citations omitted)). Nonetheless, if the pain that a plaintiff is made to endure during a delay in care is "evidently *so* extreme that leaving the plaintiff in such a state, even for a short time, present[s] a denial of the 'minimal civilized measure of life's necessities,' " then even a relatively short delay could be "sufficiently serious." *Quinones v. City of New York*, No. 16cv985 (GBD) (DF), Dkt. 34, at 17 n.10 (S.D.N.Y. Jan. 6, 2017) (quoting *Farmer*, 511 U.S. at 834), *report and recommendation adopted*, 2017 WL 775851 (Feb. 28, 2017) (adopting view that a deliberate, one-day delay in surgery could be sufficiently serious, where plaintiff was allegedly experiencing "excruciating pain, bleeding, and urination from the stent remaining in his urethra" (*id.*, at *2)).

Courts have found that a plaintiff's allegations fail to meet the objective prong where the alleged "delay in providing medical attention is neither the underlying cause of a plaintiff's condition nor contributed to a worsening in the condition...." *Smith*, 2016 WL 7471334, at *4 (finding that objective prong not met on motion to dismiss where plaintiff failed to allege that almost four-hour delay in medical care after prison bus accident either caused or exacerbated his medical condition); *see also Mitchell v. N.Y. City Dep't of Corr.*, No. 10cv0292 (RJH), 2011 WL 503087, at *4 (S.D.N.Y. Feb. 14, 2011) (finding that objective prong not met on motion to dismiss where plaintiff alleged only additional pain associated with two-to-three-hour delay in provision of pain medication); *Frith v. City of N.Y.*, No. 15cv5688 (NRB), 2016 WL 4705155, at *2 (S.D.N.Y. Aug. 25, 2016) (finding objective prong not met on motion to dismiss where plaintiff alleged a one-day delay in treatment of an infection, but not "that the delay itself caused or exacerbated the infection, caused him extreme pain, or caused any permanent harm").

Here, Defendants argue that Plaintiff's claim for an unconstitutional denial of medical care should be dismissed because Plaintiff has failed to satisfy both the objective and subjective prongs of the deliberate-indifference test. (Def. Mem., at 11-12.) As to the objective prong, Defendants argue that Plaintiff has failed to allege that his injuries were "sufficiently serious." (*Id.*) On that point, Defendants contend that Plaintiff's allegation that "he was 'thrown forward,' which resulted in an injury to his knee, lower back, and neck" does not amount to "facts which would allow a Court to determine whether 'a reasonable doctor or patient would perceive the medical need in question as important.' " (*Id.*, at 12 (citing *Brock*, 315 F.3d at 162).)

**\*10** While, under the objective prong, it is appropriate to consider whether Plaintiff has alleged a sufficiently serious condition, such a consideration is not the sole focus in cases where the gravamen of the complaint is a delay, rather than a denial, of medical care. *See Smith*, 316 F.3d at 185; *Smith*, 2016 WL 7471334, at *4. Given allegations of a delay in medical care, the primary inquiry is whether the plaintiff has plausibly alleged that the delay caused or exacerbated his injuries. *Smith*, 316 F.3d at 185; *Smith*, 2016 WL 7471334, at *4. The actual medical consequences that result from the alleged delay, however, are "highly relevant" as well. *Smith*, 2016 WL 7471334, at *4; *see also Smith*, 316 F.3d at 188 n.14 (suggesting that the "seriousness determination" in medical deliberate-indifference cases "will often be ill-

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 75 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

suited for resolution at the pleading stage" without "a fully developed medical record").

Defendants move for dismissal under Rule 12(b)(6) relying solely on the facts presented in Plaintiff's Complaint (Def. Mem., at 7), which does not contain an allegation that the delay in receiving medical treatment caused or exacerbated Plaintiff's injuries. On the basis of the Complaint alone, Plaintiff's deliberate-indifference claim would thus fail, as a similar claim did in *Smith*, 2016 WL 7471334 at \*4-5 (noting that complaint "contain[ed] no allegations the delay caused or exacerbated [the plaintiff's] injury"). This case is somewhat different from *Smith*, though, as, in his opposition papers, Plaintiff has not only contended that the Correction Officer Defendants "acted [maliciously] and with no regard of ... serious injuries [sustained] on the bus," but has also alleged that the officers "*caused further harm* to the Plaintiff by not returning to Bellevue or calling E.M.S. to respond to the scene." (Pl. 5/21/16 Ltr., at 3 (emphasis added)).

This allegation that that the delay in Plaintiff's access to medical care caused him harm starts to move the needle towards a viable claim. At this point, however, that needle has moved not nearly far enough. Despite the fact that, at this stage, Plaintiff's factual allegations must be taken as true and extended every reasonable inference, Plaintiff's allegations with respect to the harm caused to him by the delay in medical treatment are insufficient, as they are entirely conclusory. *See Iqbal*, 556 U.S. at 678. Plaintiff has not offered any explanation as to how, or the extent to which, the alleged "further harm" occurred. Even considering his Complaint together with his various opposition submissions, Plaintiff appears to be alleging that his neck, lower back, knee, and pelvic injuries were caused by the collision itself, not by any delay in treatment. (*See* Compl., at 9-12; Pl. 5/21/16 Ltr., at 3; Pl. Opp., at 2.) He has given simply no indication as to how the delay in his treatment (even assuming, despite the lack of clarity in his papers, that this delay was up to four hours) worsened his condition. Moreover, although Plaintiff stated that he experienced rectal bleeding "do [*sic*, due] to [his] recent biopsy" while on the DOC bus (Compl., at 9), he has not alleged that the lack of immediate treatment for that bleeding demonstrated that the Correction Officer Defendants had "ignored a 'life-threatening and fast-degenerating' condition," *see DeMeo*, 2015 WL 1283660, at \*11 (citation omitted).

Nor has Plaintiff alleged that the delay in his medical treatment was a "form of punishment." *Id*. While he has alleged that the Correction Officer Defendants "maliciously" failed to provide him with "expeditious" medical treatment (Pl. 5/21/16 Ltr., at 3), Plaintiff, in explaining the facts of the incident, has variously attributed the delay in medical treatment not to an intent to punish him, but to the Correction Officer Defendants' indifference to his pain, their having been preoccupied with confronting the driver of the other vehicle in the collision, their having been unable to "respond well under 'pressure,' " and the length of time it took for correction officials to investigate the collision (*see* Compl., at 9-10; Pl. 5/21/16 Ltr., at 3; Pl. Opp., at 2).

**\*11** Accordingly, without more, Plaintiff's conclusory allegation that the delay in medical treatment "caused [him] further harm," does not satisfy the objective prong of either an Eighth or 14th Amendment deliberate-indifference claim against either of the Correction Officer Defendants. This Court therefore recommends that any claim grounded in a delay in medical treatment be dismissed. As it is possible, however, that Plaintiff may be able to allege additional facts demonstrating that the Correction Officer Defendants' delay in permitting Plaintiff to receive medical treatment caused or exacerbated Plaintiff's injuries, to the degree necessary to rise to the level of a constitutional violation, *see Snyder*, 2016 WL 2642226, at \*3, or that the Correction Officer Defendants deliberately delayed medical care despite knowing that Plaintiff was in extreme pain, *see, e.g.*, *Quinones*, 2017 WL 775851, at \*2, I recommend that Plaintiff be granted leave to replead this claim.

### C. Municipal Liability

Plaintiff's third claim is liberally read as a *Monell* claim, by which Plaintiff seeks to hold the City responsible for his injuries.

The language of Section 1983 allows a civil claim for damages to be asserted against any "person" who, as set out above, acts under color of state law to deprive another person of any "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." *See* 42 U.S.C. § 1983. Under *Monell*, a municipality qualifies as a "person" under Section 1983, such that it may be subject to suit. 436 U.S. at 690-91. To state a claim under Section 1983 against a municipality, however, a plaintiff must allege that an official policy, custom, or practice of the municipality caused the deprivation of his or her federal constitutional or statutory rights. *See id.* at 694. A municipality may not be held liable under Section 1983 solely because one of its employees violated a plaintiff's rights. *See id.* Instead, for

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 76 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

Section 1983 liability to attach, a plaintiff must plead and prove a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) ("[A] plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." (citation omitted)).

At the pleading stage, a plaintiff "must allege facts tending to support, at least circumstantially, an inference that [the alleged] municipal policy or custom exists." *Matthews v. City of New York*, No. 15cv2311 (ALC), 2016 WL 5793414, at *9 (S.D.N.Y. Sept. 30, 2016) (citations and internal quotation marks omitted). Allegations regarding a single incident of unconstitutional activity will generally be insufficient, "unless proof of the incident includes proof it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Okla. v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion).

Defendants contend that Plaintiff's claim against the City must be dismissed because Plaintiff has not alleged a City policy, custom, or practice that caused a violation of his constitutional rights. (Def. Mem., at 13.) Defendants note that, "[c]onstrued liberally, plaintiff's Complaint can be read to allege the existence of a municipal policy giving rise to § 1983 liability under *Monell*" in connection with the City's failure to provide seatbelts or airbags on the DOC bus. (*Id.*, at 15.) Defendants maintain, however, that the claim should nevertheless be dismissed because courts have held that the City's failure to provide seatbelts on prison buses does not violate the Constitution, and thus cannot be the basis for a claim under *Monell*. (*Id.*)

As noted above, the Second Circuit has indeed held that a failure to provide seatbelts does not, as a general matter, give rise to a constitutional violation. *Jabbar*, 683 F.3d at 58 ("[T]he failure of prison officials to provide inmates with seatbelts does not, without more, violate the Eighth or Fourteenth Amendments"); *see also Carrasquillo*, 324 F. Supp. 2d at 444 ("There is ... no *Monell* liability for the City's failure to provide seatbelts"). In arriving at this ruling, the Second Circuit stated that "[a] correctional facility's use of vehicles without seatbelts to transport inmates, when based on legitimate penological concerns rather than an intent to punish, is reasonable." *Jabbar*, 683 F.3d at 58. The Second Circuit also noted that "the absence of seatbelts on inmate bus transport is itself not an excessive risk ... to inmate

safety" under the Eighth or 14th Amendments. *Id.* Given this reasoning, this Court similarly cannot conclude that the absence of airbags or, for that matter, other unspecified safety measures on DOC buses implicate the Constitution either.

**\*12** It is a different question, though, whether a municipal policy or practice of transporting detainees (or inmates) in buses by placing them in small steel cages within the buses, with handcuffs shackled to waist chains, *and* without seatbelts or other protective devices, could give rise to *Monell* liability. Even assuming the City could successfully show that any of these measures individually—*i.e.*, the cage, the handcuffs, the shackles, or the lack of a seatbelt—could serve a legitimate penological interest during prisoner transport, the general risk to prisoner safety may become too great to pass constitutional muster, if such measures are routinely employed together. Accordingly, I recommend that Plaintiff's *Monell* claim be dismissed as it is currently pleaded, but that Plaintiff be granted leave to amend, in the event he is able to allege facts plausibly suggesting that it was the City's official policy, custom, or practice to combine these measures in a way that unduly compromised the safety of those being transported, and that this policy, custom, or practice had a "direct causal link" to his alleged injury. *See City of Canton*, 489 U.S. at 385.

Although not discussed by Defendants, Plaintiff also states in his Complaint that he would like to see a program put in place to "re-train" correction officers in emergency procedures because they did not "respond[ ] well under 'pressure' " in this instance. (Compl., at 5, 10.) Liberally construed, these statements could be read to invoke a failure-to-train claim under *Monell*. To maintain such a claim, however, a plaintiff must plead facts capable of supporting an inference that the "municipality's failure to train amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 391 (S.D.N.Y. 2013) (internal quotation marks and citations omitted). The plaintiff's allegations must also specifically identify training deficiencies that are "closely related to," or that "actually caused," the plaintiff's alleged injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). Conclusory allegations that re-training is needed are insufficient. *See Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 539-40 (S.D.N.Y. 2012) (collecting cases and dismissing failure to train claim where plaintiff did "no more than make conclusory assertions" that the defendant failed to train its employees properly, without "providing any supporting factual detail about alleged deficiencies in the training program"); *Johnson*

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 77 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1232737

*v. City of New York,* No. 06cv09426 (GBD), 2011 WL 666161, at *4 (S.D.N.Y. Feb. 15, 2011) (finding plaintiff's failure-to-train allegation insufficient where plaintiff "[did] not ple[a]d any facts that plausibly allege a specific deficiency in the training or supervision program that accounts for deprivation of [his] constitutional rights" (internal quotation omitted)). Moreover, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson,* 563 U.S. 51, 62 (2011).

As Plaintiff's failure-to-train allegations do not identify any specific training deficiencies that caused his injuries and relate only to the behavior of the Correction Officer Defendants in this one, particular incident, I recommend that the claim be dismissed. I further recommend, however, that Plaintiff be granted leave to amend this *Monell* claim, in the event he can add allegations that plausibly suggest specific training deficiencies that go beyond this particular incident, and that these deficiencies were closely related to or actually caused his injury. *See City of Canton, Ohio,* 489 U.S. at 391.

### CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Defendant's motion to dismiss (Dkt. 16) be granted in part and denied in part, as follows:

(1) Plaintiff's Fourth Amendment claim should be dismissed with prejudice;

(2) Defendants' motion to dismiss should be denied as to Plaintiff's claim that Officer Gonzalez was deliberately indifferent to Plaintiff's reasonable safety while Plaintiff was being transported on the DOC bus;

**\*13** (3) Plaintiff's claim that Officer Squillaro was deliberately indifferent to Plaintiff's reasonable safety should be dismissed, with leave to replead;

(4) Plaintiff's claim that both Officers Gonzalez and Squillaro were deliberately indifferent to Plaintiff's serious medical needs, by causing a delay in his medical treatment, should be dismissed, with leave to replead; and

(5) Plaintiff's *Monell* claim against the City should be dismissed, with leave to replead.

If this Report and Recommendation is adopted, then I further recommend that Plaintiff be given the opportunity to file an amended complaint within 21 days of the Court's order adopting the Report and Recommendation. I also recommend that Plaintiff be instructed to claify, in the amended complaint, whether, at the time of the incident, he was in custody at Rikers as a pretrial detainee, or had been convicted of a crime and was serving a sentence of incarceration. Finally, I recommend that Plaintiff be cautioned that any amended complaint will completely replace, not supplement, his original Complaint, and that it thus must contain all of the factual allegations that Plaintiff wishes to assert.

Pursuant to 28 U.S.C. § 636(b)(l) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, Thurgood Marshall United States Courthouse, 40 Foley Square, Room 2204, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardephe. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); JUE *AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).

If Plaintiff does not have access to cases cited herein that are reported only on Westlaw or LexisNexis, he may request copies from Defendants' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

### All Citations

Not Reported in Fed. Supp., 2017 WL 1232737

**Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)**

2017 WL 1232737

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2017 WL 1134768

KeyCite Red Flag - Severe Negative Treatment

Order Vacated on Reconsideration by  Cuffee v. City of New York,
S.D.N.Y., March 20, 2019

2017 WL 1134768
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Hiawatha CUFFEE, Jr., Plaintiff,

v.

The CITY OF NEW YORK, Officer
Squillaro (Shield No. 18063), and Officer
Gonzalez (Shield No. 17148), Defendants.

15 Civ. 8916 (PGG) (DF)
|
Signed 03/27/2017

**Attorneys and Law Firms**

Hiawatha Cuffee, Jr., Marcy, NY, pro se.

Eviana Linnea Frances Englert, NYC Law Department, New
York, NY, for Defendants.

**ORDER**

Paul G. Gardephe, United States District Judge

**\*1** Pro se Plaintiff Hiawatha Cuffee, Jr., brings this action,
pursuant to 42 U.S.C. § 1983, against the City of New York
(the "City") and New York City Department of Corrections
("DOC") Officers Gonzalez and Squillaro. Plaintiff—who is
incarcerated—alleges that the individual defendants violated
his constitutional rights in connection with a motor vehicle
accident involving a DOC bus that was transporting Plaintiff
to Rikers Island. (Cmplt. (Dkt. No. 2)) Plaintiff also brings a
Monell claim against the City. (Id.) Defendants have moved
to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).
(Dkt. No. 16)

On October 20, 2016, this Court referred Defendants' motion
to Magistrate Judge Debra Freeman for a Report and
Recommendation ("R & R"). (Dkt. No. 27) On March 3,
2017, Judge Freeman issued a 28-page R & R recommending
that Defendants' motion to dismiss be granted in part and
denied in part. (Dkt. No. 29) For the reasons stated below, this
Court will adopt the R & R in its entirety.

**BACKGROUND**

**I. FACTS** [1]

[1]
"[I]n deciding a motion to dismiss a pro se
complaint, it is appropriate to consider 'materials
outside the complaint to the extent that they are
consistent with the allegations in the complaint,'
including 'documents that a pro se litigant attaches
to [his] opposition papers.' " Pearson v. Walden
Univ., 144 F. Supp. 3d 503, 508 (S.D.N.Y. 2015)
(internal citations omitted); see also Walker v.
Schult, 717 F.3d 119, 122 n. 1 (2d Cir. 2013) (noting
that a court may consider "factual allegations made
by a pro se party in [his] papers opposing [a] motion
[to dismiss]"). In its factual summary, the Court
relies on the Complaint and documents Plaintiff
filed in opposing Defendants' motion to dismiss.
(See Dkt. Nos. 2, 14, 15, 23, 26)

On July 31, 2015, the DOC transported Plaintiff by bus
from Rikers Island—where Plaintiff was being detained [2] —
to Bellevue Hospital Center. (Cmplt. (Dkt. No. 2) at 9) [3] At
Bellevue Hospital, Plaintiff underwent a prostate examination
and biopsy. (Id.) After the procedure, Plaintiff got on a
DOC bus for transport back to Rikers Island. (Id.) Plaintiff
alleges that he "was handcuffed and shackled at the waist[,]
and confined in a steel, locked cage approximately 3½ feet
wide." (Id.) The cage "was positioned directly behind the
driver" of the bus. (Id.) Plaintiff did not have a seatbelt. (Id.
at 12) Defendant Gonzalez was driving the bus (id. at 9), and
Defendant Squillaro was present as a passenger. (See id. at
9-10; May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3)

[2]
The Complaint does not disclose whether Plaintiff
was held at Rikers Island as a pre-trial detainee or
as a convicted inmate.

[3]
All references to page numbers in this Order are
as reflected in this District's Electronic Case Filing
system.

At about 12:40 p.m., as the bus was returning to Rikers
Island, Defendant Gonzalez "pull[ed] out into traffic ... at
an unusually high rate of speed." (Cmplt. (Dkt. No. 2) at 9)
Plaintiff then "heard the screeching of tires," and the DOC
bus collided with another motor vehicle. (Id. at 9-11; May
21, 2016 Pltf. Ltr. (Dkt. No. 14) at 2) Plaintiff "was thrown

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 80 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1134768

forward" in the steel cage and, "upon impact," he "injured [his] knee, lower back, ... neck, and ... was also bleeding from [his] rectal area [due] to [his] recent biopsy." (Cmplt. (Dkt. No. 2) at 9) Plaintiff alleges that he "began screaming to [Defendant] Gonzalez ... to ... get [him] back to the hospital because [he] desperately needed medical assistance." (Id.) Plaintiff also alleges that he told Defendants Gonzalez and Squillaro "over and over" that he was bleeding. (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3) Other inmates on the bus also "scream[ed] for help" and "pleaded for medical assistance." (Cmplt. (Dkt. No. 2) at 9)

**\*2** Defendants Gonzalez and Squillaro told Plaintiff to "hold on" and hurriedly exited the bus to investigate the accident. (See id.) Although the bus was only "[five] minutes [away] from Bellevue Hospital" at the time of the accident (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 1), Plaintiff and the other inmates "sat on the bus for 1½ hours waiting for [DOC supervisors] to complete their investigation [of the accident]." (Id. at 9) Plaintiff and the other inmates—still in shackles and chains—were eventually loaded onto another DOC bus for transport back to Rikers Island. (See May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 1) Plaintiff "did not receive medical attention until he was returned back to Rikers [Island]." (Cmplt. (Dkt. No. 2) at 10) Plaintiff contends that the defendant officers' failure to return to Bellevue or to call medical personnel to the scene "caused further harm to Plaintiff." (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3)

At Rikers Island, Plaintiff received an X-ray and was given an ice pack, pain medication, and a cane. (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 1; Cmplt. (Dkt. No. 2) at 4) Plaintiff alleges that, as a result of the accident, he sustained injuries to his neck, lower back, knees and pelvis, and that he suffers "extreme[ ]" and "continued pain ... every day." (Cmplt. (Dkt. No. 2) at 10-11) Plaintiff continues to walk with a cane and a "stomach belt," and expresses concern that his loss of mobility will prevent him from performing his duties as a "certified plant maintenance electrician." (Id. at 10-12)

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 12, 2015. (Dkt. No. 2) The Complaint—considered liberally and together with Plaintiffs' other filings—asserts three causes of action: (1) a Fourth Amendment claim against Defendants Gonzalez and Squillaro, based on their "[ ]reckless" conduct that placed Plaintiff in a "dangerous position" and caused his injuries; (2) an Eighth Amendment or Fourteenth Amendment claim for deliberate indifference against Defendants Gonzalez and

Squillaro, based on "their cruel and unusual punishment and lack ... of ... medical response" to his injuries following the accident [4] ; and (3) a Monell claim against the City, based on its failure to equip DOC buses with seat belts or air bags, which creates a danger that "shackled and handcuffed" detainees may "fly out of their seats." (Id. at 11-12)

4    As Judge Freeman noted, "it is unclear from Plaintiff's submissions whether, at the time of the alleged events, he was in custody at Rikers [Island] as a pretrial detainee, or had been convicted of a crime and was serving a sentence of incarceration." (R & R (Dkt. No. 29) at 14) Accordingly, Judge Freeman considered Plaintiff's deliberate indifference claims under both the Eighth Amendment and Fourteenth Amendment. See Little v. Mun. Corp., 51 F. Supp. 3d 473, 488 n.7 (S.D.N.Y. 2014) ("A convicted prisoner's claim based on the conditions of his confinement is analyzed under the Eighth Amendment. In the case of a state pretrial detainee, however, the same claim is analyzed under the Fourteenth Amendment's Due Process Clause.") (internal citation omitted).

On June 30, 2016, Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 16) On October 20, 2016, this Court referred Defendants' motion to Magistrate Judge Debra Freeman for a Report and Recommendation ("R & R"). (Dkt. No. 27) On March 3, 2017, Judge Freeman issued a 28-page R & R recommending that Defendants' motion to dismiss be granted except as to Plaintiff's deliberate indifference claim against Defendant Gonzalez. (R & R (Dkt. No. 29) at 26) Judge Freeman further recommends that Plaintiff be granted leave to amend the remaining claims in the Complaint, with the exception of the Fourth Amendment claim, which Judge Freeman recommends be dismissed with prejudice. (Id.)

Judge Freeman's R & R gives notice that any objections are to be filed within fourteen days from service of the R & R, and that "FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW." (Id. at 27) No objections to the R & R have been filed. [5]

5    In a March 16, 2017 letter, Plaintiff states that he has received the R & R and that he will "submit the requested amended [complaint] once an order from

2017 WL 1134768

[this Court] is received." (Mar. 16, 2017 Pltf. Ltr. (Dkt. No. 30)) Plaintiff's letter does not raise any objections to the R & R.

## DISCUSSION

### I. LEGAL STANDARD

#### A. Review of Magistrate Judge's Report and Recommendation

**\*3** In reviewing a magistrate judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), a party may submit objections to the magistrate judge's R & R. Any objections must be "specific" and "written," and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1).

" 'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.' " Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at \*1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

#### B. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 545).

"Although a court in deciding a Rule 12(b)(6) motion is generally limited to considering the facts alleged in the complaint, a district court may also consider documents appended to the complaint, documents incorporated by reference, and matters of which judicial notice may be taken." Johnson v. Cty. of Nassau, 411 F. Supp. 2d 171, 178 (E.D.N.Y. 2006) (citing Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)). "In addition, a court may also consider documents outside the pleadings if they are 'integral' to the complaint and upon which the complaint relies." Id. at 178 (citing Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)).

A "pro se complaint ... [is] interpret[ed] ... to raise the 'strongest [claims] that [it] suggest[s].' " Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)); see Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145-46 (2d Cir. 2002) ("When considering motions to dismiss a pro se complaint such as this, 'courts must construe [the complaint] broadly....' " (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000))). "However, although pro se filings are read liberally and must be interpreted 'to raise the strongest arguments that they suggest,' a pro se complaint must still 'plead sufficient facts to state a claim to relief that is plausible on its face.' " Wilder v. United States Dep't of Veterans Affairs, 175 F. Supp. 3d 82, 87 (S.D.N.Y. 2016) (internal citations omitted). Moreover, "the court need not accept as true 'conclusions of law or unwarranted deductions of fact.' " Whitfield v. O'Connell, No. 09 Civ. 1925 (WHP), 2010 WL 1010060, at \*4 (S.D.N.Y. Mar. 18, 2010) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994)); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) ("[T]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief].").

### II. ANALYSIS

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 82 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)
2017 WL 1134768

**\*4**  Liberally construed, the Complaint asserts (1) a Fourth Amendment claim against Defendants Gonzalez and Squillaro; (2) an Eighth or Fourteenth Amendment claim against Defendants Gonzalez and Squillaro, due to their alleged deliberate indifference to Plaintiff's safety and serious medical needs; and (3) a Monell claim against the City. (See Cmplt. (Dkt. No. 2)) Judge Freeman's thorough and well-reasoned R & R concludes that Defendants' motion to dismiss should be granted on all claims, with the exception of the deliberate indifference claim against Defendant Gonzalez. (See R & R (Dkt. No. 29) at 26) The Court finds no clear error in Judge Freeman's recommendation.

**A. Fourth Amendment Claim**

The Complaint alleges that Defendants Gonzalez and Squillaro violated Plaintiff's right "under the 4th Amendment to be secure in his person and not be denied life and liberty." (Cmplt. (Dkt. No. 2) at 11) In support of this claim, Plaintiff alleges that the individual defendants' "[ ]reckless" conduct—which resulted in the July 31, 2015 motor vehicle accident—"placed [Plaintiff] in a dangerous situation" and caused him physical injury. (Id.)

Judge Freeman recommends dismissal of this claim, because "the Fourth Amendment is simply 'inapplicable' to this case." (R & R (Dkt. No. 29) at 11) (citing Smith v. City of New York, No. 15 Civ. 7910 (GHW), 2016 WL 7471334, at *1 (S.D.N.Y. Dec. 28, 2016)) This Court agrees with that assessment. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Here, however, "Plaintiff makes no allegations that he was either arrested or subjected to any unlawful search as a result of the motor-vehicle collision that is the subject of [the] Complaint." (R & R (Dkt. No. 29) at 11) Accordingly, Plaintiff's Fourth Amendment claim will be dismissed.

**B. Deliberate Indifference Claim**

The Complaint asserts a claim against Defendants Gonzalez and Squillaro based on "their cruel and unusual punishment and lack ... of care ... [or] medical response" after the July 31, 2015 motor vehicle accident. (Cmplt. (Dkt. No. 2) at 11) Interpreting the pro se plaintiff's pleading "to raise the 'strongest [claims] that [it] suggest[s],' " Hill, 657 F.3d at 122, Judge Freeman construed this cause of action as asserting a claim for deliberate indifference to Plaintiff's safety and to his serious medical needs under the Eighth Amendment—if he

was a convicted inmate at the time of the accident—or the Fourteenth Amendment—if he was a pretrial detainee at the time of the accident. (R & R (Dkt. No. 29) at 11)

**1. Applicable Law**

"A convicted prisoner's claim of deliberate indifference ... is analyzed under the Eighth Amendment." Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (citing Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)). However, "[a] pretrial detainee's claims ... are governed by the Due Process Clause of the Fourteenth Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). Because it is not clear from the Complaint whether Plaintiff was a pre-trial detainee or a convicted prisoner at the time of the July 31, 2015 accident, the Court considers the applicable standards under both the Eighth and Fourteenth Amendments.

"To adequately allege [a constitutional] violation [under the Eighth or Fourteenth Amendment], an inmate must satisfy objective and subjective elements of a two-pronged test." Lynch v. Jane Doe Corr. Officer Blue, No. 14 Civ. 6919 (VB), 2016 WL 831969, at *3 (S.D.N.Y. Feb. 29, 2016). Plaintiff "must show (1) that the [constitutional] deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.' " Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

**\*5**  With respect to the objective component, the legal standard is the same under both the Eighth and the Fourteenth Amendments. See Darnell, 849 F.3d at 30. The plaintiff "'must allege facts showing [he] was denied 'the minimal civilized measure of life's necessities.' " Lynch, 2016 WL 831969, at *3 (quoting Farmer, 511 U.S. at 834). " ' "When ... the claim is based on an alleged failure to prevent harm or provide safety, the inmate must show [he] 'is incarcerated under conditions posing a substantial risk of harm.' " Id. (quoting Farmer, 511 U.S. at 834). When the claim asserted is deliberate indifference to serious medical needs, the alleged deprivation of medical care must be "sufficiently serious." See Snyder v. Alam, No. 15 Civ. 4033 (VB), 2016 WL 2642226, at *3 (S.D.N.Y. May 6, 2016).

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 83 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1134768

With respect to the subjective component, the legal standards are different under the Eighth and the Fourteenth Amendments. See Darnell, 849 F.3d at 32-36. Under the Eighth Amendment, an inmate "must allege facts showing officials acted with 'deliberate indifference' to the inmate's 'health or safety.' " Lynch, 2016 WL 831969, at *3 (citing Farmer, 511 U.S. at 834). A prison official acts with deliberate indifference when he "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996). The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000).

Under the Fourteenth Amendment, however, "the 'subjective prong' ... of a deliberate indifference claim is defined objectively." Darnell, 849 F.3d at 35. A "pretrial detainee must prove that

> the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

Id. Thus, unlike the Eighth Amendment, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

## 2. Deliberate Indifference to Safety

As to Plaintiff's claim of deliberate indifference to safety, Judge Freeman recommends that Defendants motion to dismiss be granted as to Defendant Squillaro, but denied as to Defendant Gonzalez. (R & R (Dkt. No. 29) at 16-17)

With respect to the objective prong of the analysis, which is the same under both the Eighth Amendment and Fourteenth

Amendment, Judge Freeman found that Plaintiff pleaded facts raising a plausible inference of a "sufficiently serious" constitutional deprivation. (See R & R (Dkt. No. 29) at 14-16) In the context of prison transportation accidents, the Second Circuit has held that "the failure of prison officials to provide inmates with seatbelts [is] not, without more, ... 'sufficiently serious' to constitute a[ ] [constitutional] violation.' " Jabbar v. Fischer, 683 F.3d 54, 58 (2d Cir. 2012) (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)). Courts have similarly recognized that "[a]llegations of a public official driving too fast ... are grounded in negligence" and are not actionable under Section 1983. See Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 436 (S.D.N.Y. 2004).

Here, however, Plaintiff alleges more than the absence of a seat belt and driving too fast. As Judge Freeman observes, the Complaint alleges not only that Defendant Gonzalez " 'pull[ed] out into traffic ... at an unusually high rate of speed[,]' " but also that "Plaintiff ... was [at that time] 'handcuffed and shackled at the waist[,] and confined in a steel, locked cage approximately [three-and-a-half] feet wide.' " (R & R (Dkt. No. 29) at 15 (quoting Cmplt. (Dkt. No. 2) at 9)) Judge Freeman found that this combination of factors—"driving recklessly[ ] while Plaintiff was confined in a cage without any reasonable means to protect himself from impact"—was adequate to satisfy the objective prong on the analysis. (See id. at 15-16) This Court finds no clear error in her assessment. See Torres v. Amato, 22 F. Supp. 3d 166, 176 (N.D.N.Y. 2014) (denying defendant summary judgment on deliberate indifference claim where inmate being transported to a correctional facility fell out of the back of a van and sustained fatal injuries; inmate did not have a seatbelt, the door to the van was "improperly latched," and defendant operated the van "in a reckless manner"); see also Darnell, 849 F.3d at 30 ("[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation....'").

*6 With respect to the subjective prong of Plaintiff's deliberate indifference claim, Judge Freeman determined that—as against Defendant Gonzalez—Plaintiff had stated a claim under either the Eighth Amendment or Fourteenth Amendment. (R & R (Dkt. No. 29) at 16) Given that Defendant Gonzalez was the driver of the bus and that Plaintiff "was positioned directly behind him" (Cmplt. (Dkt. No. 2) at 9), Judge Freeman found it "reasonable to infer that [Defendant] Gonzalez was either actually aware of the

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 84 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1134768

excessive risk to Plaintiff's safety or that the risk was obvious [to him]." (R & R (Dkt. No. 29) at 16) Judge Freeman found

> it plausible that the act of [Defendant Gonzalez] in driving recklessly, at excessive speed, with knowledge that a detainee is being transported in the vehicle—not just without a seatbelt, but within a small steel cage, with hands in handcuffs that are linked at the waist and thus cannot be used to brace or otherwise protect himself— could rise to the level of deliberate indifference to an excessive risk to that detainee's safety.

(Id. at 16) This Court finds no clear error in that determination.

With respect to Defendant Squillaro, however, Judge Freeman recommends that the claim for deliberate indifference to safety be dismissed. (Id. at 16-17) The Complaint is silent as to the nature of Defendant Squillaro's involvement in the incident and where he was sitting in relation to Plaintiff. Indeed, as Judge Freeman notes, "Plaintiff makes no allegation that [Defendant Squillaro] personally acted in any way that contributed to the unsafe conditions." (Id. at 17) This Court agrees that the deliberate indifference to safety claim should be dismissed as to Defendant Squillaro.

Accordingly, Defendants' motion to dismiss the deliberate indifference to safety claim will be granted as to Defendant Squillaro, but denied as to Defendant Gonzalez.

### 3. Deliberate Indifference to Serious Medical Needs

Judge Freeman recommends that Plaintiff's claim of deliberate indifference to serious medical needs be dismissed, because Plaintiff's allegations "do[ ] not satisfy the objective prong of either an Eighth or [Fourteenth] Amendment deliberate indifference claim against either [individual defendant]." (R & R (Dkt. No. 29) at 21)

"When a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption

in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious....' " Snyder, 2016 WL 2642226, at *3 (quoting Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003)) (emphasis omitted). " '[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " Smith, 2016 WL 7471334, at *4 (quoting Bell v. Jendell, 980 F. Supp. 2d 555, 559-60 (S.D.N.Y. 2013)). "However, allegations that the defendant's delay in treating a minor or ordinary medical condition can nevertheless 'become a constitutional violation if the condition worsens [as a result of the delay] and creates a "substantial risk of injury." ' " Id. (quoting Graham v. Wright, No. 01 Civ. 9613 (NRB), 2004 WL 1794503, at *4 (S.D.N.Y. Aug. 10, 2004)).

Here, the "gravamen of the complaint is a delay, rather than a denial, of medical care" (R & R (Dkt. No. 29) at 19), because it is undisputed that Plaintiff received medical treatment upon his return to Rikers Island. (See Cmplt. (Dkt. No. 2) at 10) Moreover, Plaintiff has not offered factual allegations from which it can plausibly be inferred "that [this] delay caused or exacerbated his injuries." (R & R (Dkt. No. 29) at 20-22) As Judge Freeman notes, although Plaintiff alleges—in his opposition papers—that Defendants Gonzalez and Squillaro "caused further harm to the Plaintiff by not returning to Bellevue or calling E.M.S. to respond to the scene" (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3) (emphasis added), Plaintiff offers no allegations "as to how, or the extent to which, the alleged 'further harm' occurred." (R & R (Dkt. No. 29) at 21) Because Plaintiff's allegations concerning the alleged deprivation resulting from the delay in medical treatment are "entirely conclusory," Judge Freeman recommends dismissal of Plaintiff's claim for deliberate indifference to serious medical need. (Id. at 20-22) The Court finds no clear error in that recommendation.

### C. Monell Claim

**\*7** The Complaint asserts a Monell claim against the City. (Cmplt. (Dkt. No. 2) at 12) Plaintiff alleges that the City violated his constitutional right "to be absent or free from cruel and unusual punishment[,]" because "the DOC buses are not equipped with standard ... seat belts or ... air bags" or other "means to protect [one's] person from bod[i]ly injury." (Id.) Plaintiff contends that "[b]eing shackled and handcuffed [under such conditions] is dangerous[,] because detainees fly out of their seats." (Id.) As part of the relief sought in this action, Plaintiff asks this Court to order the

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 85 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1134768

City to implement a "program ... to re-train the transportation [officers] in emergency procedures so they are better trained to handle th[e] type of situation [that occurred on July 31, 2015]." (Id. at 5)

### 1. Applicable Law

"[A] municipality cannot be held liable [under Section 1983] solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (emphasis in Monell). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

The Second Circuit applies a two-prong test to Monell claims. A plaintiff "must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer[s]." Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). A plaintiff may satisfy this requirement by "alleg[ing] the existence of

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (internal citations omitted). Second, "the plaintiff must establish a causal connection—an 'affirmative

link'—between the policy and the deprivation of his constitutional rights." Vippolis, 768 F.2d at 44.

"[M]ere allegations of a municipal [policy,] custom[,] or practice ... are insufficient to demonstrate [its] existence ... unless supported by factual details," however. Triano v. Town of Harrison, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (citing Moore v. City of New York, No. 08 Civ. 8879 (PGG), 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010)). "[A] plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). " '[A] conclusory, boilerplate assertion of a municipal policy or custom [is] insufficient to survive a motion to dismiss.' " Plair v. City of New York, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (quoting Santiago v. City of New York, No. 09 Civ. 0856 (BMC), 2009 WL 2734667, at *7 (E.D.N.Y. Aug. 18, 2009)).

### 2. Analysis

Judge Freeman recommends dismissal of Plaintiff's Monell claim. To the extent that the Monell claim is premised on the theory that DOC buses are not equipped with adequate safety measures, Judge Freeman concludes that Plaintiff has failed to "allege facts plausibly suggesting ... [that an] official policy, custom, or practice" exists. (R & R (Dkt. No. 29) at 24) As Judge Freeman explains, the mere absence of seatbelts or airbags on DOC buses does not—in isolation—give rise to a constitutional violation supporting a Monell claim. (R & R (Dkt. No. 29) at 23-24) See Jabbar, 683 F.3d at 58 ("[T]he failure of prison officials to provide inmates with seatbelts does not, without more, violate the Eighth or Fourteenth Amendments."); Carrasquillo, 324 F. Supp. 2d at 436 ("There is ... no Monell liability for the City's failure to provide seatbelts [on prison buses]...."); see also Claudio v. Sawyer, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009) ("[A] prerequisite to municipal liability under Monell is an underlying constitutional violation by a state actor.").

*8 As discussed above, however, Plaintiff has plausibly alleged an underlying constitutional violation for deliberate indifference to safety arising from the combination of circumstances at the time of the July 31, 2015 accident. Judge Freeman acknowledges that "a municipal policy or practice of transporting detainees (or inmates) in buses by placing them in small steel cages within the buses, with handcuffs shackled to waist chains, and without seatbelts or other protective

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 86 of 273

Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1134768

devices[ ] could give rise to <u>Monell</u> liability." (R & R (Dkt. No. 29) at 24) (emphasis in original) Nonetheless, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." <u>Santos, 847 F. Supp. 2d at 576</u>. Here, the Complaint does not contain sufficient allegations as to the existence of any such policy or custom, or whether "it was the City's ... practice to combine these measures in a way that unduly compromised the safety of those being transported." (R & R (Dkt. No. 29) at 24) Plaintiff's allegations—even when construed liberally—address only the measures that were used by the individual defendants in this particular instance. <u>See</u> <u>Triano, 895 F. Supp. 2d at 538</u> ("[I]t is well settled that 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]."). Accordingly, this Court finds no clear error in Judge Freeman's recommendation to dismiss Plaintiff's <u>Monell</u> claim to the extent it is based on a theory of an official policy, custom, or practice.

To the extent that Plaintiff's <u>Monell</u> claim is premised on a theory of failure to train or supervise, Judge Freeman similarly recommends that the claim be dismissed for failure to "identify any specific training deficiencies that caused his injuries." (R & R (Dkt. No. 29) at 24-26) To survive a motion to dismiss, " 'a plaintiff must plausibly allege a specific deficiency in the municipality's training.' " <u>Calderon v. City of New York, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015)</u> (quoting <u>Tieman v. City of Newburgh, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015)</u>). "Because Plaintiff has done no more than make conclusory assertions [of inadequate training], he has not adequately alleged that the [City's] training policies caused Plaintiff's injuries." <u>Triano, 895 F. Supp. 2d at 541</u>. Accordingly, the Court finds no clear error in Judge Freeman's recommendation to dismiss Plaintiff's <u>Monell</u> claim to the extent it is based on a failure to train theory.

Plaintiff's <u>Monell</u> claim against the City will be dismissed.

## III. <u>LEAVE TO AMEND</u>

Judge Freeman recommends that Plaintiff be granted leave to amend, except as to his Fourth Amendment claim. (R & R (Dkt. No. 29) at 26; <u>see also id.</u> at 11, 16-17, 21-22, 24-26) The Second Circuit has cautioned that district courts "should not dismiss [a <u>pro se</u> complaint] without granting leave to amend at least once when a liberal reading of the complaint gives

any indication that a valid claim might be stated." <u>Cuoco, 222 F.3d at 112</u>. " 'Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.' " <u>Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002)</u> (quoting <u>Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993)</u>). "One appropriate basis for denying leave to amend is that the proposed amendment is futile. An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to <u>Fed. R. Civ. P. 12(b)(6)</u>." <u>Id.</u> (internal citations omitted).

With respect to Plaintiff's Fourth Amendment claim, this Court agrees that leave to amend should be denied. The Complaint—which concerns a motor vehicle accident involving a DOC bus—alleges no facts that implicate an unlawful search or seizure under the Fourth Amendment. Accordingly, there is no reason to believe that giving Plaintiff an opportunity to amend this claim would be anything other than futile.

For the reasons set forth in Judge Freeman's R & R (<u>see</u> R & R (Dkt. No. 29) at 11, 16-17, 21-22, 24-26), however, the Court cannot conclude that amendment would be futile with respect to Plaintiff's remaining claims. Accordingly, Plaintiff will be granted leave to file an Amended Complaint. [6]

[6]    Any Amended Complaint will specify whether—at the time of the accident—Plaintiff was a pretrial detainee or serving a sentence after conviction.

## <u>CONCLUSION</u>

**\*9** For the reasons stated above, this Court adopts Judge Freeman's Report & Recommendation in its entirety, and Defendant's motion to dismiss is granted in part and denied in part. The Clerk of the Court is directed to terminate the motion (Dkt. No. 16). Any Amended Complaint will be filed by April 30, 2017. The Clerk is further directed to mail a copy of this Order to <u>pro se</u> Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1134768

**Cuffee v. City of New York, Not Reported in Fed. Supp. (2017)**

2017 WL 1134768

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1283660
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frank A. DEMEO, Plaintiff,
v.
Carl J. KOENIGSMANN, MD, et al., Defendants.

No. 11 Civ. 7099(HBP).
|
Signed March 20, 2015.

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge.

**I.** *Introduction*

**\*1** Frank A. DeMeo, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), proceeding *pro se,* commenced this action against Drs. Carl J. Koenigsmann, Timothy Whalen, Mervat Makram, Jonathan Holder and Frank Lancellotti pursuant to 42 U.S.C. § 1983, alleging that the defendants were deliberately indifferent to injuries to his right biceps muscle and shoulder that were sustained during his incarceration at Woodbourne Correctional Facility ("Woodbourne"). Specifically, plaintiff alleges that defendants failed to provide him with "timely and adequate medical care" in violation of the Eighth Amendment (First Amended Complaint, dated May 15, 2012, (Docket Item 45) ("Am.Compl.") ¶ 1). Plaintiff also brings state law claims of medical malpractice and negligence against the defendants (Am.Compl.¶¶ 1, 8487). Plaintiff seeks damages, as well as declaratory and injunctive relief (Am. Compl. at 20). By notice of motion dated June 2, 2014 (Docket Item 62), defendants move to dismiss plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

The parties have consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) (Docket Item 38). For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

**II.** *Facts* [1]

[1] The facts set forth herein are drawn from plaintiff's First Amended Complaint, [Plaintiff's Opposition] to Defendant's Motion to Dismiss Plaintiff's Complaint—42 U.S.C. § 1983, dated July 25, 2014 (Docket Item 59) ("Pl.'s Opp.") and the exhibits attached to both submissions. I have also considered plaintiff's sur-reply (Letter of Frank A. DeMeo to the undersigned, dated August 12, 2014 (Docket Item 66)). In general, "[c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 122–23 (S.D.N.Y. Jan. 26, 2010) (Leisure, D.J.) (collecting cases). However, "the policy reasons favoring liberal construction of *pro se* complaints permit a court to consider allegations of a *pro se* plaintiff in opposition papers on a motion where ... those allegations are consistent with the complaint." *Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 246–47 (S.D.N.Y.1998) (Rakoff, D.J.) (adopting Report and Recommendation) (collecting cases). Thus, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walter v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013), *citing Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering *pro se* plaintiff's affidavit in opposition to a motion to dismiss for failure to state a claim). Accordingly, in resolving defendants' motion, I have considered the factual allegations made by plaintiff in his opposition papers that are consistent with the claims made in his amended complaint.

**A.** *The Injury*
On Wednesday, October 13, 2010, while incarcerated at Woodbourne and working as a "gym porter," plaintiff was storing dumbbell weights and allegedly ruptured his right biceps muscle and tore his right rotator cuff (Am. Compl. ¶ 15; Pl.'s Opp., at 4. [2] ; *see also* Ambulatory Health Record Progress Note, annexed as Exhibit A to Am. Compl., at 1). At the time, plaintiff heard a "pop" but did not feel any pain (Am. Compl., Ex. A, at 1).

[2] Because plaintiff includes attachments with inconsistent exhibit labels and pagination, I refer

Case 9:20-cv-00665-MAD-TWD Document 43 Filed 02/08/23 Page 89 of 273
DeMeo v. Koenigsmann, Not Reported in F.Supp.3d (2015)
2015 WL 1283660

to the page numbers assigned by the Court's ECF system for all citations to plaintiff's opposition.

Plaintiff allegedly informed Corrections Officer ("C.O.") Bivens of his injury (Am. Compl., Ex. A, at 1; Pl.'s Opp., at 4). Plaintiff claims that, at the direction of Area Sergeant Cohn, C.O. Bivens reported the injury to Nurse Baumgarten at Woodbourne's hospital; Nurse Baumgarten reportedly told C.O. Bivens not to send plaintiff to the hospital unless he was bleeding or had a compound fracture and that plaintiff should submit a sick-call request (Pl.'s Opp., at 4). Plaintiff claims that he submitted a "sick-call slip" that same day, but it was not "received" until Thursday, October 14, 2010, and he was not seen until Monday, October 18, 2010 (Pl.'s Opp., at 4).[3]

[3]　Plaintiff has also submitted his January 3, 2011 letter to Dr. Koenigsmann, the Deputy Commissioner and Chief Medical Officer of the Division of Health Services, in which he claims that after the incident on October 13, 2010, he reported the injury to C.O. Bivens, who asked if he wanted to go to emergency sick call (Pl.'s Opp., at 35). Plaintiff claimed in this letter that he declined to go to sick call because in the past Nurse Baumgarten instructed him to seek assistance only if he was bleeding or had a compound fracture (Pl.'s Opp., at 35). Instead, he stated that he "waited a day or two to see how [he] felt," experienced "discomfort" and significant loss in strength in his arm and shoulder and finally went to sick call on October 18, 2010 (Pl.'s Opp., at 35).

B. *The Diagnosis*

On October 18, 2011, plaintiff saw an unidentified nurse, Physician Assistant ("P.A.") Switz and Dr. Lancellotti at sick call (Am. Compl., at 5 & Ex. A, at 1). The nurse noted that plaintiff denied that his pain was severe, complained of a bruise on his right biceps and, stated that, at the time he sustained the injury, "[i]t felt like something separated" (Am. Compl., Ex. A, at 1). The nurse saw no "obvious deformity" but noted an ecchymosis[4] on plaintiff's right biceps that was approximately two inches in diameter (Am. Compl., Ex. A, at 1).

[4]　An ecchymosis is "a small hemorrhagic spot ... in the skin or mucous membrane forming a nonelevated, rounded or irregular, blue or purplish

patch." *Dorland's Illustrated Medical Dictionary,* (*"Dorland's"* ) at 525 (27th ed.1988).

**\*2** P.A. Switz concluded that plaintiff had a "possible proximal biceps rupture,"[5] ordered an MRI of plaintiff's right shoulder and directed plaintiff to wear a sling until the MRI results were available (Am. Compl., ¶ 17 & Ex. A, at 1). P.A. Switz also submitted a request for an MRI of the right biceps for review by Dr. Lancellotti and final approval by Dr. Makram, noting that the MRI should be conducted "soon" (Am. Compl. ¶¶ 10, 18–21, 72; Request and Report of Consultation, dated November 10, 2010, annexed as Exhibit C to Am. Compl.).

[5]　A rupture of the biceps muscle is a "forcible tearing or disruption of" the muscle tissue. *Dorland's* at 1476.

During the October 18 consultation with the medical staff, plaintiff's upper right arm was x-rayed. The x-ray revealed post-surgical[6] changes to the acromioclavicular joint[7] and humeral head[8] and degenerative glenoid humeral joint disease[9], but no acute bone injury (X–Ray Requisition and Report, dated October 18, 2010, annexed as Exhibit D to Am. Compl.).

[6]　One of plaintiff's shoulders was surgically repaired in 2003 and the other was surgically repaired in 2005 (Letter of Frank DeMeo to Dr. Rubinovich, dated June 20, 2011, annexed as Exhibit R to Am. Compl.). After dislocating his right shoulder and re-tearing his right rotator cuff, plaintiff's right shoulder was repaired again in 2007 (Am.Compl., Ex. R).

[7]　The acromioclavicular joint is the shoulder joint at which the spine of the scapula and the clavicle meet. *Dorland's* at 21.

[8]　The humeral head is where the humerus bone, the upper bone of the arm, intersects with the scapula/ shoulder. *Dorland's* at 779.

[9]　Degenerative joint disease, also known as osteoarthritis, is a form of arthritis that "causes pain, swelling, and reduced motion in" joints—here, the shoulder joint. U.S. National Library of Medicine, National Institutes of Health, Medline Plus Medical Encyclopedia, "Osteoarthritis," http://

www.nlm.nih.gov/-medlineplus/
osteoarthritis.html (last visited Feb. 10, 2015).

Plaintiff alleges that, on an unidentified date after October 18, 2010, Dr. Makram [10] denied the initial request for the MRI "based on purely financial considerations" and that an MRI was scheduled only after Dr. Lancellotti made a second request (Am. Compl. ¶ 21 & Ex. C; Pl.'s Opp., at 5).

[10]     Dr. Makram was the Facility Health Services Director at Woodbourne and was employed by DOCCS (Am.Compl.¶ 10). She was allegedly responsible for the final approval of elective procedures, distributed polices, procedures and guidelines for medical care and managed operations, reporting to Dr. Koenigsmann, the Chief Medical Officer (Am.Compl.¶ 10).

On November 15, 2010, approximately four weeks after the injury, an MRI was conducted (Am.Compl.¶ 22). It disclosed "a full thickness retracted proximal biceps tendon rupture with a large amount of surrounding fluid," "no evidence [of] muscle atrophy" or fracture, "a full thickness re-tear of the supraspin-atus tendon"[11] and "glenohumeral joint effusion"[12] (Albany Medical Center Final Report, dated November 22, 2010, annexed as Exhibit F to Am. Compl.). Plaintiff received the results on December 2, 2010, and Dr. Lancellotti scheduled a consultation with Dr. Holder, an orthopedic surgeon, on December 9, 2010 (Am.Compl.¶¶ 12, 24–25).

[11]     "The supraspinatus tendon attaches the supraspinatus muscle ... from the shoulder blade[ ] to the head of the arm bone at the shoulder joint." HealthHype.com, "Supraspinatus Tendon–Tendinitis, Tendinosis and Tear," http://www.health-hype.com/ supraspinatus-tendon-tendinitis-tendinosis-and-tear.html (last visited Feb. 10, 2015).

[12]     Glenohumeral joint effusion is the presence of fluid in the shoulder joint. *Dorland's* at 532.

Dr. Holder examined the plaintiff and reviewed his x-ray and MRI results; he noted that plaintiff had full range of motion with no restrictions in his right arm and no weakness upon abduction or flexion, although he did find a "biceps belly deformity" (Request and Report of Consultation, dated December 2, 2010, annexed as Exhibit H to Am. Compl.). Dr. Holder diagnosed plaintiff with a chronic right biceps rupture

but did not find a rotator cuff tear (Am.Compl., Ex. H). He also determined that the biceps rupture was "not surgically amenable [to] repair" (Am.Compl., Ex. H).

Plaintiff alleges that Dr. Holder explained that he could not conduct surgery because plaintiff's biceps muscle tissue was so degenerated that the tissue would shred, causing "extensive irreversible damage and loss of function to plaintiff's arm and shoulder" (Am.Compl.¶ 28). Plaintiff claims that Dr. Holder told him to expect a loss of one-third of the strength in his arm and that surgery of biceps and rotator cuff tears must be conducted within two to three weeks of injury to be effective (Am. Compl. ¶¶ 29–30; Pl.'s Opp., at 6). He also claims that Dr. Holder advised him to seek a second opinion (Am.Compl.¶ 30).

## C. *Plaintiff's Request for a Second Opinion and a Second MRI*

**\*3** On December 23, 2010, after reviewing Dr. Holder's report, Dr. Lancellotti allegedly informed plaintiff that a second opinion would not be provided and reiterated that surgery would be effective only if it was performed within two to three weeks of injury (Am. Compl. ¶ 31 & Ex. A, at 4).

On January 3, 2011,[13] plaintiff sent a letter to Dr. Koenigsmann requesting permission to seek a second opinion at his own expense (Am.Compl.¶¶ 8, 33). Plaintiff claims that he received no response and that on March 2, 2011 he sent a second letter to Dr. Koenigsmann (Am.Compl.¶¶ 34, 36).

[13]     In his opposition to the motion to dismiss, plaintiff claims he sent this letter on January 3, 2010 (Pl.'s Opp., at 6); plaintiff's alleged injury occurred in October 2010. I believe that plaintiff is referring to a letter he sent on January 3, 2011 but that he erroneously dated January 3, 2010 (*see* Pl.'s Opp., at 35–36).

Rita Grinbergs, the Regional Health Services Administrator, wrote to plaintiff on March 15, 2011,[14] stating that she had spoken with plaintiff's doctor at Woodbourne, who advised that the injury was not amenable to surgery (Letter of Rita Grinbergs to Frank DeMeo, dated March 15, 2011, annexed as Exhibit I to Am. Compl.). Grinbergs instructed plaintiff that he "must follow the procedure set forth in [Health Services Policy & Management ("HSPM") ] 7.02 'Inmate Provider of Choice' "[15] to request a second opinion and stated that it

appeared plaintiff had not yet submitted a proper request to Dr. Makram (Am.Compl., Ex. I).

14    Plaintiff refers to this letter by the date he claims that he received it, March 21, 2011, but his citation to Exhibit I of the Amended Complaint makes it clear that he is referencing the letter dated March 15, 2011 (*see, e.g.,* Am. Compl. ¶ 38).

15    HSPM 7.02 describes the procedure for requesting a consultation by a specialist at the inmate's expense and requires the inmate to submit a written request to the Facility Health Services Director, who must seek the approval of the Deputy Commissioner and/or Chief Medical Officer prior to the consultation (HSPM 7.02 annexed to Pl.'s Opp., at 39).

On March 28, 2011, plaintiff wrote to Dr. Makram formally requesting a second opinion and expressing his belief that his biceps could be repaired surgically (Letter of Frank DeMeo to Dr. Mervat Makram, dated March 28, 2011, annexed as Exhibit J to Am. Compl.). In response, Dr. Makram wrote, "This issue was discussed with you before[.] No recommendation from orthopedist for surgery" (Am.Compl., Ex. J). On March 31, 2011, plaintiff again wrote Dr. Makram to confirm that his request for a second opinion was denied (Am.Compl.¶ 41). On April 1, 2011, Dr. Makram responded that Woodbourne would follow Dr. Holder's recommendation against surgery [16] (Letter of Dr. Mervat Makram to Frank DeMeo, dated April 1, 2011, annexed as Exhibit K to Am. Compl.).

16    Dr. Makram wrote:
      After review of your medical file on 12/09/10 when you were seen by orthopedist[,] he diagnosed you [with a] "biceps rupture chronic"[;] he noted[,] "not surgically amenable at this time[.]" There was no notation of any delay in your care as the cause of not operating at this time. Please note that you injured the same shoulder back in 2007 [and it] was noted on the MRI of 11/15/10 [that you had a r]e-injury [and] re[-]tear of one of the muscles in your shoulder. Woodbourne is following the orthopedist['s] (specialist) recommendation for no surgery at this time
      (Am.Compl., Ex. K).

On April 11, 2011, plaintiff filed a grievance with Woodbourne's Inmate Grievance Review Committee (the "IGRC") based on the delay in diagnosis and treatment of his injuries, the permanent loss of function with respect to his arm and shoulder and the denial of permission to seek a second opinion and outside treatment (Letter of Frank DeMeo to the IGRC, dated April 11, 2011, annexed as Exhibit L–A to Am. Compl.). As a remedy, plaintiff sought permission to seek a second opinion based on a physical examination and outside treatment of his injuries (Am.Compl., Ex. L–A). On April 12, 2011, in response to plaintiff's grievance, Dr. Makram explained plaintiff's treatment history and diagnosis to the IGRC and stated that plaintiff had not requested a second opinion (Am.Compl., Ex. L–A).

On April 19, 2011, the IGRC recommended that plaintiff's request for a second opinion be granted and found that the request complied with all procedural requirements (IGRC Recommendation, dated April 19, 2011, annexed as Exhibit L–B to Am. Compl.). On May 10, 2011, plaintiff received a letter from the Inmate Grievance Program's Superintendent informing him that his request for a second opinion had been forwarded to the Regional Medical Director, Dr. Whalen (Letter of Inmate Grievance Program Superintendent to Frank DeMeo, dated May 10, 2011, annexed as Exhibit N to Am. Compl.).

**\*4**  In a letter to Woodbourne's Nurse Administrator, dated May 16, 2011, plaintiff requested that she mail a copy of plaintiff's November 15, 2010 MRI results from Woodbourne to Dr. Mitchell Rubinovich, an orthopedist from whom plaintiff planned to seek a second opinion (Am. Compl. ¶ 51; Letter of Frank DeMeo to Ms. J. Barrett, dated May 16, 2011, annexed as Exhibit P to Am. Compl.).

Plaintiff alleges that on May 19, 2011 he was informed at sick call that, notwithstanding the IGRC's recommendation, Drs. Whalen and Koenigsmann denied his grievance and his request for permission to seek a second opinion (Am.Compl.¶ 48). This allegation appears to be incorrect because it is contradicted by other allegations in the complaint. The complaint goes on to allege that on June 3, 2011, Grinbergs told plaintiff's wife that plaintiff's request for a second opinion had not been denied, and on June 20, 2011, plaintiff did in fact mail his MRI results to Dr. Rubinovich for a second opinion (Am.Compl.¶¶ 50–51). Dr. Rubinovich responded on July 21, 2011, confirming that plaintiff's biceps was torn but explaining that, because the MRI did not fully depict plaintiff's shoulder, he was unable to tell whether

plaintiff had a rotator cuff tear (Letter of Dr. Rubinovich to Frank DeMeo, dated July 21, 2011, annexed as Exhibit S to Am. Compl.). Dr. Rubinovich stated that in order to treat plaintiff he would need Dr. Holder's notes concerning plaintiff's 2007 shoulder surgery and a second MRI to better visualize the rotator cuff (Am.Compl., Ex. S). Because he lacked sufficient information, Dr. Rubinovich did not recommend a course of treatment, other than a second MRI (Am.Compl., Ex. S). Dr. Rubinovich emphasized it was plaintiff's responsibility to organize any diagnostic testing and treatment with Woodbourne (Am.Compl., Ex. S).

Plaintiff claims that on August 15, 2011, he discussed Dr. Rubinovich's letter with Dr. Lancellotti, who, in turn, sought permission from Dr. Whalen for plaintiff to be examined by Dr. Rubinovich (Am.Compl.¶ 53). In a letter to Dr. Whalen, dated August 22, 2011, plaintiff requested permission to undergo a second MRI and a consultation with Dr. Rubinovich at his own expense (Letter of Frank DeMeo to Dr. Whalen, dated August 22, 2011, annexed as Exhibit T to Am. Compl.).

Despite the fact that plaintiff was in fact seeking a second opinion, in May 2011, he also appealed to DOCCS' Central Office Review Committee ("CORC") what he apparently believed to be the decision of Drs. Whalen and Koenigsmann denying his request for a second opinion (Appeal Statement WB–15114–11, dated May 26, 2011, annexed as Exhibit Q to Am. Compl.). On August 31, 2011, the CORC approved plaintiff's request and concluded that there was insufficient "evidence to substantiate any malfeasance by staff or that [plaintiff was] not receiving appropriate medical care" (CORC Second Medical Opinion and Treatment decision, dated August 31, 2011, annexed as Exhibit U to Am. Compl.). The CORC noted that although outside specialists may make treatment recommendations, whether and how those recommendations are implemented is determined by the Facility Health Services Director, *i.e.,* Dr. Makram (Am.Compl., Ex. U).

 **\*5**  In a letter dated September 2, 2011, Grinbergs, on behalf of Dr. Whalen, informed plaintiff that he should see his primary care provider, Dr. Lancellotti, to request a second MRI and that he should continue to make any requests for medical treatment through Woodbourne's sick-call procedures (Letter of Rita Grinbergs to Frank DeMeo, dated September 2, 2011, annexed as Exhibit V to Am. Compl.). Plaintiff alleges that on September 12, 2011 he was able to schedule an appointment with Dr. Lancellotti

(Am.Compl.¶ 57). On October 20, 2011, plaintiff signed a contract agreeing that if a second MRI of his right shoulder was approved, he would attend all appointments (Contract for Specialty Care Appointment, dated October 20, 2011, annexed as Exhibit W to Am. Compl.).

Plaintiff's papers do not disclose the plaintiff's condition or treatment or any further events subsequent to October 20, 2011.

### D. *Plaintiff's Claims and Defendants' Arguments*

Plaintiff asserts claims against Drs. Koenigsmann, Whalen and Makram in their individual and official capacities and against Drs. Holder and Lancellotti in their individual capacities. Plaintiff alleges that defendants (1) were deliberately indifferent to his right biceps and shoulder injuries by delaying diagnosis and treatment of his injuries and by denying his request to seek a second opinion and second MRI, (2) were negligent and (3) committed medical malpractice (Am.Compl.¶ 1). Plaintiff also alleges that Dr. Koenigsmann is liable under a theory of *respondeat superior* (Am.Compl.¶¶ 84–87). Plaintiff seeks three million dollars in compensatory damages for physical and emotional injury, a declaratory judgment that defendants violated his Eighth Amendment rights and an injunction ordering defendants "to carry out without delay adequate medical care of [plaintiff's] injuries and to not impede in any manner [plaintiff's] physicians['] provision of adequate medical care" (Am. Compl., at 20).

Defendants argue that (1) Dr. Lancellotti should be dismissed from this action because he was not served; (2) plaintiff was not denied or given untimely medical treatment; (3) plaintiff's request for permission to seek a second opinion was granted without delay; (4) "defendants are entitled to qualified immunity since defendants' conduct does not rise to the level of a violation under the Eighth Amendment of the United States Constitution"; (5) *respondeat superior* and negligence claims are not cognizable under Section 1983 and (6) "medical malpractice does not apply here because there was no conscious disregard for plaintiff's medical care" (Memorandum of Law in Support of Defendants' Motion to Dismiss, dated June 2, 2014, (Docket Item 63) ("Defs.' Mem."), at 1–2).

### III. *Analysis*

#### A. *Legal Standards*

1. *Standard Applicable to Defendants' Motion to Dismiss Pursuant to* Rule 12(b)(6)

The standards applicable to a motion to dismiss pursuant to Rule 12(b)(6) are well settled and require only brief review.

**\*6** When deciding a motion to dismiss under Rule 12(b) (6), [the court] must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader. *See City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Mires v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to "well-pleaded allegations"); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). " '[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' " *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (*quoting Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)). The Court also may consider "matters of which judicial notice may be taken." *Leonard T. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (*citing Allen v. WestPoint–Pepperill, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)). In order to avoid dismissal, a plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (*quoting* 2 James Wm. Moore, *Moore's Federal Practice* ¶ 12.34[a] [b] (3d ed.1997)).

*Hoffenberg v. Bodell,* 01 Civ. 9729(LAP), 2002 WL 31163871 at *3 (S.D.N.Y. Sept. 30, 2002) (Preska, D.J.); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007); *Johnson & Johnson v. Guidant Corp.,* 525 F.Supp.2d 336, 345–46 (S.D.N.Y.2007) (Lynch, D.J.).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Ashcroft v. Iqbal, supra,* 556 U.S. at 678; *Johnson v. Priceline.com, Inc.,* 711 F.3d 271, 275 (2d Cir.2013). As a result, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal, supra,* 556 U.S. at 679.

The Supreme Court has clarified the mode of inquiry to be used in evaluating a motion to dismiss pursuant to Rule 12(b) (6), which uses as a starting point the principle that "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

[I]n *Bell Atl[antic] Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court disavowed the well-known statement in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 562. Instead, to survive a motion to dismiss under *Twombly,* a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

**\*7** *Talley v. Brentwood Union Free Sch. Dist.,* Civil Action No. 08–790, 2009 WL 1797627 at *4 (E.D.N.Y. June 24, 2009).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007) (citations, internal quotation marks and alterations omitted).

In evaluating a motion under Rule 12(b)(6), the court must determine whether the plaintiff has alleged any facially plausible claims. *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 290 (2d Cir.2013) (*per curiam*), *cert. denied,* 134 S.Ct. 831, 187 L.Ed.2d 687 (2013). A claim is plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal, supra,* 556 U.S. at 678 (internal quotation marks and citation omitted). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Ashcroft v. Iqbal, supra,* 556 U.S. at 679, *quoting* Fed.R.Civ.P. 8(a)(2).

Nevertheless, where, as here, a plaintiff proceeds *pro se,* the complaint must be liberally construed to raise the strongest claims the allegations suggest. *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir.2013); *Sims v. Blot,* 534 F.3d 117, 133 (2d Cir.2008); *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006); *see also Haines v. Kerner,* 404 U.S. 519, 520–21 (1972); *Tracy v. Freshwater,* 623 F.3d 90, 100–04 (2d Cir.2010) (observing that the requirement of "special solicitude" includes liberal construction of papers, "relaxation of the limitations on the amendment of pleadings," leniency in enforcing procedural rules, and "deliberate, continuing efforts to ensure that a *pro se* litigant understands what is required of him" (citations omitted)).

2. *Deliberate Indifference*

Under the Eighth and the Fourteenth Amendments, the states have a limited obligation to provide medical care to sentenced prisoners. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 433–34 (2001); *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976). " '[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.' " *Washington v. City of N.Y.,* 10 Civ. 389(LTS)(JLC), 2011 WL 566801 at *2 (S.D.N.Y. Feb. 15, 2011) (Swain, D.J.), *quoting Estelle v. Gamble, supra,* 429 U.S. at 104.

**\*8** Not every claim of inadequate medical treatment by a prisoner rises to the level of a constitutional violation. *Estelle v. Gamble, supra,* 429 U.S. at 105. The failure to provide medical care to a prisoner will give rise to a constitutional violation only if two elements are established:

The first requirement is objective: "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006)

(*quoting Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. *Id.* at 280. This means "that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result." *Id.* (emphasis added). Officials need only be aware of the risk of harm, not intend harm. *Id.* And awareness may be proven "from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

*Spavone v. N.Y. State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir.2013); *accord Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005). A plaintiff must establish both the objective and subjective prongs of the deliberate indifference standard in order to prevail. *See Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011).

A medical need is sufficiently serious if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright, supra,* 412 F.3d at 403 (internal quotation marks omitted). "Factors to consider in determining the existence of a serious medical condition include 'the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; the existence of chronic and substantial pain,' or 'the absence of adverse medical effects or demonstrable physical injury.' " *Edmonds v. Cent. N.Y. Psychiatric Ctr.,* 10 Civ. 5810(DAB) (KNF), 2011 WL 3809913 at *4 (S.D.N.Y. Aug. 25, 2011) (Batts, D.J.) (adopting Report & Recommendation) (internal footnote, citation and alterations omitted), *quoting Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) *and Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003). "The inquiry [with respect to the objective element of a deliberate indifference claim] is 'fact-specific' and 'must be tailored to the specific circumstances of each case.' " *Thomas v.. Westchester Cnty.,* 12 Civ. 6718(CS), 2013 WL 3357171 at *4 (S.D .Y. July 3, 2013) (Seibel, D.J.), *quoting Smith v. Carpenter, supra,* 316 F.3d at 185; *see also Hudson v. McMillian,* 503 U.S. 1, 8 (1992) ("[t]he objective component of [a deliberate indifference] claim is ... [necessarily] contextual" and fact-specific).

Where the claim is that medical diagnosis and/or treatment has been improperly delayed, the inquiry with respect to the objective element focuses on the sequelae of the delay rather than the underlying condition itself.

**\*9**  [W]here, as here, a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (*quoting Chance v. Armstrong,* 143 F .3d 698, 702 (2d Cir.1998)) (emphases in original).

*Bilal v. White,* 494 F. App'x 143, 145 (2d Cir.2012) (summary order) (first alteration in original). "Stated differently, 'it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [Section 1983] purposes.' " *Goris v. Breslin,* 402 F. App'x 582, 585 (2d Cir.2010) (summary order), *quoting Smith v. Carpenter, supra,* 316 F.3d at 186.

The subjective prong of a Section 1983 claim for inadequate medical care requires the plaintiff to prove that "the charged official [acted] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). A plaintiff must show that "the prison official was aware of, and consciously disregarded, the prisoner's medical condition." *Hernandez v. Goord,* 02 Civ. 1704(DAB), 2006 WL 2109432 at \*6 (S.D.N.Y. July 28, 2006) (Batts, D.J.), *citing Chance v. Armstrong, supra,* 143 F.3d at 703. " 'Deliberate indifference is a mental state equivalent to subjective recklessness.... This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result.' " *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir.2014) (first alteration in original), *quoting Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (*per curiam* ) (The standard is "equivalent to criminal recklessness, [where] the official knows of and disregards an excessive risk to inmate health or safety." (quotation marks omitted), *quoting Hathaway v. Coughlin, supra,* 99 F.3d at 553). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin v. Goord, supra,* 467 F.3d at 280.

A constitutional violation requires "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319 (1986). A Section 1983 claim does not lie for conduct that is merely negligent.

*County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998) ( "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."), *citing Daniels v. Williams,* 474 U.S. 327, 328 (1986); *accord Matican v. City of N.Y.,* 524 F.3d 151, 158 (2d Cir.2008); *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991); *Hudak v. Miller,* 28 F.Supp.2d 827, 831 (S.D.N.Y.1998) (Sotomayor, then D.J.). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the [Constitution]." *Estelle v. Gamble, supra,* 429 U.S. at 106; *accord Hill v. Curcione, supra,* 657 F.3d at 123. In addition, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to [a constitutional] violation." *Chance v. Armstrong, supra,* 143 F.3d at 703; *accord Thompson v. Racette,* 519 F. App'x 32, 34 (2d Cir.2013) (summary order).

### B. *Analysis of Plaintiff's Claim*

#### 1. *Dismissal of Dr. Lancelotti*

**\*10**  Dr. Lancellotti was named as a defendant in plaintiff's First Amended Complaint; however, Dr. Lancellotti has never been served (Defs.' Mem., at 1 n. 2). In my June 19, 2014 Order, I directed plaintiff to serve or explain his failure to serve Dr. Lancellotti no later than July 21, 2014, warning that noncompliance would result in dismissal of the complaint against him for failure to prosecute. In a letter dated July 23, 2014, plaintiff agreed that Dr. Lancellotti should be dismissed from the action (Pl.'s Opp., at 43).

Accordingly, I dismiss all claims against Dr. Lancel—lotti.

#### 2. *Eleventh Amendment*

"The Eleventh Amendment, where applicable, deprives a federal court of jurisdiction. Thus, prior to addressing the merits of [a] case [the Court] must first determine whether Eleventh Amendment immunity bars [its] jurisdiction." *In re 995 Fifth Ave. Assocs.,* 963 F.2d 503, 506 (2d Cir.1992) (citation omitted). "The Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *see also McMillian v.. Monroe Cnty.,* 520 U.S. 781, 785 n. 2 (1997); *Kentucky v. Graham,* 473 U.S. 159, 165–67 & n. 19 (1985); *Edelman v. Jordan,* 415 U.S. 651, 663 (1974).

Accordingly, because Drs. Koenigsmann, Whalen and Makram are New York State officials, plaintiff's damages claims asserted against them in their official capacities are dismissed.

### 3. *Deliberate Indifference*

Plaintiff claims that defendants were deliberately indifferent because (1) defendants delayed diagnosing and treating plaintiff's torn rotator cuff and ruptured biceps muscle and (2) defendants did not timely approve plaintiff's request to seek a second opinion or conduct a second MRI.

#### a. *Delayed Diagnosis and Treatment*

Plaintiff claims that his ruptured biceps and torn rotator cuff were not timely diagnosed and treated because Dr. Makram denied Dr. Lancellotti's first MRI request and, after the second request was approved, the MRI was not conducted until more than four weeks after plaintiff was injured (Am.Compl.¶¶ 21–22). Plaintiff was not definitively diagnosed with a ruptured biceps muscle until he saw Dr. Holder more than three weeks after the MRI and more than seven weeks after the injury (Am.Compl.¶¶ 25–26). Plaintiff claims that Dr. Holder was unable to repair his ruptured biceps surgically by the time Dr. Holder saw plaintiff, because the muscle had degenerated to the point that performing surgery would have shredded the muscle, most likely causing extensive and irreversible damage and loss of function to plaintiff's arm and shoulder (Am.Compl.¶¶ 27–28, 30, 72). As a result, plaintiff claims that he expects to lose one-third of the strength in his right arm because the injuries are now irreversible and permanent (Am.Compl.¶¶ 29, 74). He also alleges that he experienced "major pain for a very long period of time without much relief" (Pl.'s Opp., at 12).

#### i. *Serious Medical Need*

**\*11** "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233, 1999 WL 753142 at \*2 (2d Cir.1999) (citations omitted); *accord White v. Nassau Cnty. Sheriff Dep't,* 14–CV–5203 (JS)(SIL), 2014 WL 5091793 at \*3 (E.D.N.Y. Oct. 9, 2014). These categories are not exclusive.

[I]n *Brock v. Wright,* the Second Circuit held that a district court erred in ruling that only "extreme pain" or a "degenerative" condition would suffice to meet the legal standard for deliberative indifference. 315 F.3d 158, 163 (2d Cir.2003). The *Brock* court noted that "the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death but also less serious denials which cause or perpetuate pain." *Id.* (quoting *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977)). The *Brock* court stated that an inmate is not required "to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life threatening one." *Id.*

"There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Id.* at 162. However, the Second Circuit has set forth considerations that should guide the analysis. These considerations include (1) whether a reasonable doctor or patient would perceive the medical need in question as "important or worthy of comment or treatment," (2) whether the medical condition significantly effects daily activities, and (3) "the existence of chronic and substantial pain." *See Chance v. Armstrong,* 143 F.3d 698, 702–703 (2d Cir.1998) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 105960 (9th Cir.1992)).

*Sereika v. Patel,* 411 F.Supp.2d 397, 405–06 (S.D.N.Y.2006) (Marrero, D.J.).

Accepting plaintiff's allegations as true, plaintiff has alleged facts that could potentially show that the lost opportunity to repair plaintiff's muscle and the pain he experienced as a result of the alleged delay in diagnosis and treatment were objectively serious. Several cases in this District have involved similar allegations of injury based on delay, and each has found the allegations sufficient to meet the objective prong of a deliberate indifference claim. *See, e.g., Lloyd v. Lee,* 570 F.Supp.2d 556, 568 (S.D.N.Y.2008) (Chin, then D.J., now Cir. J.) (finding medical need sufficiently serious where plaintiff was denied MRI for months for rotator cuff tear and torn left shoulder tendon, resulting in degeneration, loss of mobility and extreme pain); *Sereika v. Patel, supra,* 411 F.Supp.2d at 406 (concluding that the objective prong was met by allegations of severe pain and reduced arm and shoulder mobility after eighteen-day delay of diagnosis of torn right pectoralis muscle that was no longer surgically reparable because of delay); *Benjamin v. Schwartz,* 299 F.Supp.2d 196,

200–01 (S.D.N.Y.2004) (McMahon, D.J.) (determining there was a sufficiently serious medical need where two-year delay in surgery to repair plaintiff's torn biceps muscle tendon and two other tendons resulted in muscle atrophy), *aff'd,* 204 F. App'x 979 (2d Cir.2006).

**\*12** Thus, plaintiff plausibly pled that his medical needs were sufficiently serious to satisfy the objective prong of a deliberate indifference claim.

### ii. *Culpable State of Mind*

In order to survive defendants' motion, plaintiff, must also plausibly allege facts demonstrating that "the charged official[s] act[ed] or fail[ed] to act while *actually aware* of substantial risk that serious inmate harm w[ould] result." *Salahuddin v. Goord, supra,* 467 F.3d at 280 (emphasis added); *accord Youmans v. City of N.Y.,* 12 Civ. 4071(KMK), 2014 WL 1612997 at \*6 (S.D.N.Y. Mar. 31, 2014) (Karas, D.J.).

### A. *Drs. Koenigsmann and Whalen*

Plaintiff alleges that Drs. Koenigsmann and Whalen were deliberately indifferent to his serious medical needs because they (1) failed to ensure there were adequate guidelines for timely and adequate diagnosis and treatment of torn muscles and (2) failed to adequately train, manage and supervise Woodbourne's medical staff concerning the proper medical procedures (Am.Compl.¶ ¶ 59–66, 68). Plaintiff argues that the guidelines should require prompt MRI's to ensure that surgery for torn muscles occurs within two to three weeks of injury (Am.Compl.¶ 62). Oddly, defendants do not address this aspect of plaintiff's claims against Drs. Koenigsmann and Whalen and make no argument that plaintiff's complaint fails to allege that they acted with the required mental state. Defendants' motion to dismiss with respect to these claims against Drs. Koenigsmann and Whalen is, therefore, denied.

### B. *Dr. Makram*

Plaintiff claims that Dr. Makram was deliberately indifferent to plaintiff's serious medical needs by approving an x-ray when only an MRI would reveal a ruptured biceps and denying the initial request for plaintiff's MRI "based on purely financial considerations" (Am.Compl.¶¶ 21, 66, 71–72). Plaintiff claims that HSPM 6.4 [17] required Dr. Makram to "promote constitutionally adequate health care as effectively and economically as possible"; as a result, he claims that Dr. Makram put financial considerations over

plaintiff's health, thereby denying the initial MRI request and delaying diagnosis and treatment of plaintiff's injuries (Pl.'s Opp., at 11, 37). Plaintiff argues that Dr. Makram did so even though the MRI request noted that the imaging should be performed "soon," and that she should have known that failure to treat a rotator cuff tear as an emergency could result in permanent damage (Pl.'s Opp., at 5–6, 10).

[17]   HSPM 6.4 describes the role of Regional Health Services Administrators who address administrative matters concerning health services within their assigned regions, assist in implementing health programs, advise on health services policies and balance budgetary concerns with prisoners' healthcare needs (Pl.'s Opp., at 37). Plaintiff has only provided the first page of the two-page policy.

Defendants argue that plaintiff's allegations are merely attacks on Dr. Makram's medical judgment as to when to schedule the MRI (Defs.' Mem., at 10, *citing Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (McMahon, D.J.)). In addition, defendants claim that plaintiff's allegations are "baseless," "speculative and conclus-ory" and that plaintiff has not alleged any facts supporting his contention that the alleged denial was financially-motivated (Defs.' Mem., at 10).

**\*13** Dr. Makram's approval of an x-ray while allegedly denying an MRI request, without more, would be a medical decision that would not meet the state of mind requirement for a deliberate indifference claim. *Estelle v. Gamble, supra,* 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment ... [which] does not represent cruel and unusual punishment."); *accord Joyner v. Greiner,* 195 F.Supp.2d 500, 504–05 (S.D.N.Y.2002) (McMahon, D.J.) (collecting cases).

However, I must accept as true plaintiff's claims that (1) an initial MRI request was denied by Dr. Makram, (2) the denial was financially-motivated and not based on sound medical judgment and (3) plaintiff's serious medical needs resulted from that delay. In *Chance v. Armstrong, supra,* 143 F.3d at 704, the Second Circuit addressed similar allegations of treatment decisions motivated by financial concerns:

This allegation of ulterior motives, if proven true, would show that the defendant[ ] had a culpable state of mind and that [defendant's] choice of treatment was intentionally

wrong and did not derive from sound medical judgment. It may be that [plaintiff] has no proof whatsoever of [defendant's] improper motive, and that lack of proof may become apparent at summary judgment. But even if [the court] think[s] it highly unlikely that [plaintiff] will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). [The court] cannot say at this stage that " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief.' " *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Accordingly, dismissal under Rule 12(b)(6) [is] inappropriate.

*See, e.g., Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't,* 557 F.Supp.2d 408, 415–16 (S.D.N.Y.2008) (McMahon, D.J.) (concluding that plaintiff's allegations that his hip surgery was cancelled and deemed non-urgent due to financial considerations must be taken as true and defendants "jumped the gun by filing a pre-answer motion to dismiss"); *Bob v. Armstrong,* No. 3:02CV1785 (RNC), 2003 WL 22682335 at *2 (D.Conn. Aug. 26, 2003) ("If financial considerations induced [defendant] to ignore a substantial risk of harm to [plaintiff], the subjective element of the deliberate indifference test may be met.").

Here, too, plaintiff's allegation that Dr. Makram denied the initial MRI request for purely financial reasons without regard to plaintiff's health or sound medical judgment, taken as true, satisfies the subjective prong at the pleading stage. Thus, defendants' motion to dismiss the deliberate indifference claim against Dr. Makram for the delay in diagnosis and treatment of plaintiff's injuries is denied.

### C. *Dr. Holder*
**\*14** Plaintiff alleges that Dr. Holder was deliberately indifferent by failing to immediately order a second MRI of plaintiff's shoulder, which was only partially visible on the initial scan, in order to diagnose the rotator cuff tear in a timely manner (Am.Compl.¶ 80). [18]

[18]   While Drs. John A. Mastrangelo and Phuong Vinh at Albany Medical Center read the initial MRI scan and saw a "[f]ull thickness re-tear of the supraspinatus tendon which [was] partially imaged," Dr. Holder, viewing the same image, determined there was no rotator cuff tear (Am. Compl., Exs. F & H).

As discussed above, the need for and timing of diagnostic tests are ordinarily medical determinations which, by themselves, cannot sustain a deliberate indifference claim. *Hathaway v. Coughlin, supra,* 37 F.3d at 70; *Sonds v. St. Barnabas Hosp. Corr. Health Servs., supra,* 151 F.Supp.2d at 312. Plaintiff does not argue that Dr. Holder's failure to schedule a second MRI was financially-motivated or the product of any other improper motive. Moreover, any allegation that Dr. Holder was deliberately indifferent because he failed to diagnose plaintiff's shoulder injury fails as a matter of law. *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) ("a delay in treatment based on a bad diagnosis or ... a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless" does not constitute an Eighth Amendment violation); *accord Williams v. Williams,* 13 Civ. 3154(RA), 2015 WL 568842 at *6 (S.D.N.Y. Feb. 11, 2015) (Abrams, D.J.).

Thus, defendants' motion to dismiss the deliberate indifference claim against Dr. Holder for the delay in diagnosis and treatment of plaintiff's shoulder injury is granted.

### b. *Delay in Permitting a Second Opinion and a Second MRI*
Plaintiff also claims that defendants were deliberately indifferent because (1) they initially denied his request for permission to seek a second opinion and (2) after plaintiff received Dr. Rubinovich's opinion, they did not timely authorize or conduct a second MRI. Defendants claim that (1) plaintiff did ultimately receive a second opinion, (2) a second MRI was requested as Dr. Rubinovich recommended, (3) the delay in obtaining the second opinion did not cause serious injury and (4) whether to allow a prisoner to seek a second opinion is a medical decision (Defs.' Mem., at 11).

### i. *Serious Medical Need*
Plaintiff does not allege that the delay in receiving a second opinion from Dr. Rubinovich and in scheduling a second MRI of his shoulder caused an exacerbation of plaintiff's injuries. Thus, this aspect of plaintiff's claim fails to satisfy the objective prong of a deliberate indifference claim. Nevertheless, even if this delay claim satisfied the objective

prong of a deliberate indifference claim, it fails to meet the subjective prong.

### ii. *Culpable State of Mind*

Plaintiff fails to allege that the defendants had a sufficiently culpable state of mind with respect to his claim that they improperly delayed his getting a second opinion and a second MRI.

"[C]ourts in the Second Circuit have held that failure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights." *Youmans v. City of N.Y., supra,* 14 F.Supp.3d at 363–64 (collecting cases). Whether and when a second opinion should be sought is a matter of opinion as to medical treatment and does not constitute deliberate indifference. See *Youmans v. City of N.Y., supra,* 14 F.Supp.3d at 364; *Wilson v. Med. Unit Officials at George R. Vierno Ctr. Jail at 09–09 Hazen St.,* No. 10–CV–1438 (ARR) (RML), 2011 WL 6780934 at *4 (E.D.N.Y. Dec. 27, 2011). Moreover, a prison doctor's disagreement with the assessment or treatment recommendation of a consulting physician is not, without more, deliberately indifferent conduct. *Williams v. Smith,* 02 Civ. 4558(DLC), 2009 WL 2431948 at *9 (S.D.N.Y. Aug. 10, 2009) (Cote, D.J.). Finally, plaintiff's claims that the delay was financially-motivated is implausible, because the requests were ultimately granted and plaintiff agreed to seek both the second opinion and the second MRI at his own expense (*See* Pl .'s Opp., at 11–12).

**\*15** Thus, defendants' motion to dismiss plaintiff's deliberate indifference claim based on the delay in seeking a second opinion and second MRI is granted.

### 4. Dr. Koenigsmann's Liability Under a Theory of *Respondeat Superior* for *His Employees' Constitutional Violations*

Plaintiff claims Dr. Koenigsmann is liable for the unconstitutional actions of his employees, namely their deliberate indifference, under a theory of *respondeat superior* (Am.Compl.¶¶ 84–87). [19] Plaintiff also claims that Dr. Koenigsmann was personally involved in the alleged constitutional violations because (1) he was made aware of the violation of plaintiff's rights through plaintiff's January 3, 2011 letter, plaintiff's CORC appeal and communications from "administrative sources"; (2) he ignored DOCCS policies, particularly HSPM 7.2 and (3) he failed to supervise subordinates (Pl.'s Opp., at 14, 38). Defendants claim Dr. Koenigsmann is not liable because he was not personally

involved, arguing that neither (1) Dr. Koenigsmann's receipt and referral of plaintiff's letters to a subordinate; (2) Dr. Koenigsmann's failure to investigate plaintiff's grievances nor (3) plaintiff's broad statements that Dr. Koenigsmann was informed of the violations are sufficient to prove personal involvement (Defs.' Mem., at 12–13; Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint, dated August 14, 2014, (Docket Item 65) ("Defs.' Reply"), at 4–6).

[19]   Plaintiff does not explicitly state whether this claim is brought pursuant to state or federal law; however, I construe the complaint broadly to assert *respondeat superior* liability under both state and federal law. I address the applicability of *respondeat superior* to plaintiff's state law claims in Part III.B.5.

A supervisor cannot be held liable under Section 1983 under the doctrine of *respondeat superior, Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 n. 58 (1978); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); personal involvement of the supervisor is required. *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980). "The personal involvement and liability of supervisory personnel is established when the supervisory official has 'actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.' " *Rahman v. Fisher,* 607 F.Supp.2d 580, 584–85 (S.D.N.Y.2009) (Cote, D.J.), *citing Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted), *and Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999).

For purposes of Section 1983, personal involvement can be shown by

(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information

indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003), *citing Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); [20] *see Avenue v. New York,* 157 F. App'x 375, 377 (2d Cir.2005) (summary order); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Lewis v. Fisher,* 08–CV–3027 (JG)(LB), 2009 WL 689803 at *3 (E.D .N.Y. Mar. 12, 2009); *Benitez v. Locastro,* 9:04–CV–423 (NAM), 2008 WL 4767439 at *12 (N.D.N.Y. Oct. 29, 2008); *Johnson v. Wright,* 234 F.Supp.2d 352, 263 (S.D.N.Y.2002) (Gorenstein, M.J.) ("[T]he second example listed in *Colon*-permitting supervisory liability where a 'defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,'-should not be too broadly construed."); *Morris v. Eversley,* 205 F.Supp.2d 234, 241–42 (S.D.N.Y.2002) (Chin, then D.J., now Cir. J.).

[20]    The five types of personal involvement set forth in the text were first set forth in *Colon v. Coughlin, supra,* 58 F.3d at 873. In *Ashcroft v. Iqbal, supra,* 556 U.S. at 677, decided in 2009, the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the constitution." There is, therefore, some question as to whether all the types of personal involvement described in *Colon* survive *Iqbal. See generally Aguilar v. Immig. & Customs Enforcement Div.,* 811 F.Supp.2d 803, 814–15 (S.D.N.Y.2011) (Koeltl, D.J.). The Court of Appeals has acknowledged that this issue remains unresolved. *Raspardo v. Carlone,* 770 F.3d 97, 117 (2d Cir.2014), *citing Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012).

**\*16** Plaintiff's letters to Dr. Koenigsmann do not satisfy the requirement of personal involvement; although plaintiff sent letters to Dr. Koenigsmann on January 3, 2011 and March 2, 2011, both of those letters were referred to subordinate, Grinbergs, who responded to plaintiff herself (Am. Compl. ¶¶ 33–34, 36 and Ex. I). In addition, the mere fact that plaintiff filed a grievance of which Dr. Koenigsmann was allegedly aware through either the CORC appeal or "administrative sources" does not amount to personal involvement.

Although, as noted above, the Second Circuit has expressly held that supervisory liability can be shown by a "failure to remedy the alleged wrong after being informed through a report or appeal," *Hernandez v. Keane, supra,* 341 F.3d at 145, both the Second Circuit and numerous district courts within the Circuit have repeatedly held that "[r]eceipt of letters or grievances [, alone,] ... is insufficient to impute personal involvement." *Woods v. Goord,* 01 Civ. 3255(SAS), 2002 WL 731691 at *7 (S.D.N.Y. Apr. 23, 2002). *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.2001) (finding no personal involvement where DOCCS Commissioner referred inmate's letter to subordinate); *Yearney v. Sidorowicz,* 13 Civ. 3604(CM), 2014 WL 2616801 at *8–*9 (S.D.N.Y. June 10, 2014) (McMahon, D.J.) (concluding that Dr. Koenigsmann's delegation of inmate's letter to Grinbergs requesting an MRI, among other things, and Grinbergs' subsequent response to inmate on Dr. Koenigsmann's behalf did not amount to personal involvement); *McNair v. Kirby Forensic Psychiatric Ctr.,* 09 Civ. 6660(SAS), 2010 WL 4446772 at *13 (S.D.N.Y. Nov. 5, 2010) (Scheindlin, D.J.) ("[M]ere notification of alleged wrongdoing does not establish personal involvement under Section 1983."). "Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison [officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor] ." *Thompson v. New York,* 99 Civ. 9875(GBD) (MHD), 2001 WL 636432 at *7 (S.D.N.Y. Mar. 15, 2001) (Daniels, D.J.) (internal citations omitted).

Plaintiff also claims that Dr. Koenigsmann was personally involved because he ignored "established policy" under HSPM 7.2, which states that an inmate's request to choose a "provider-of-choice [for consultation] *may be* granted" if certain conditions are met (Pl.'s Opp., at 14, 38). Plaintiff does not allege that Dr. Koenigsmann created the policy. *Hernandez v. Keane, supra,* 341 F.3d at 145 (personal involvement imputed where supervisor "creat[ed] a policy or custom that sanctioned conduct amounting to a constitutional violation"). Moreover, plaintiff's request pursuant to HSPM 7.2 was granted.

Finally, plaintiff claims Dr. Koenigsmann was personally involved because he "failed to supervise 'subordinates' " (Pl.'s Opp., at 14). In his complaint, plaintiff alleges that Dr. Koenigsmann "failed to adequately train, manage and supervise" Dr. Whalen as Dr. Whalen developed and updated "Clinical Practice Guidelines" and provided annual reports (Am.Compl.¶ 60). Personal involvement may be imputed where a supervisor engaged in "grossly negligent supervision of subordinates who committed a violation." *Hernandez v.*

*Keane, supra,* 341 F.3d at 145. Although this aspect of the complaint may not adequately set forth a factual basis for the allegation of "grossly negligent supervision" and may not adequately allege causation, defendants do not challenge this theory of liability. I decline to address the adequacy of this aspect of the complaint *mea sponte* because plaintiff has not had an opportunity to address the issue. Thus, because plaintiff's underlying Eighth Amendment claim against Dr. Whalen survives dismissal, plaintiff's failure to train, manage and supervise claim against Dr. Koenigsmann also survives with respect to Dr. Whalen's actions.

**\*17**  Thus, plaintiff's claim that Dr. Koenigsmann is liable for Dr. Whalen's alleged indifference on a theory of personal involvement for failure to train, manage and supervise survives the motion to dismiss; as for the other claims against Dr. Koenigsmann, plaintiff has failed to plead an Eighth Amendment claim under either the doctrine of *respondeat superior* or a viable theory of personal involvement, and they are dismissed.

### 5. *Plaintiff's State Law Claims*

Plaintiff also brings state law claims for medical malpractice and negligence against all defendants (Am.Compl.¶¶ 1, 76–84). In addition, plaintiff claims that Dr. Koenigsmann is liable on a theory of *respondeat superior* "for the individual torts and/or negligence of each and every one of his employees, committed within the scope of their employment" (Am.Compl.¶ 86). Defendants rather oddly argue that (1) a claim of negligence is not cognizable under the Eighth Amendment; (2) plaintiff has failed to allege that defendants' claims amounted to "culpable recklessness" as required to allege a claim of medical malpractice under the Eighth Amendment and (3) Dr. Koenigsmann was not personally involved as needed to impose Section 1983 liability.[21]

[21]
    Defendants fail to address plaintiff's pendent state law claims as such, and address them instead as if they were brought pursuant to Section 1983 as violative of the Eighth Amendment. Plaintiff clearly states his claims of negligence and medical malpractice are New York state law claims and he seeks to hold Dr. Koenigsmann liable for both the state torts and deliberate indifference of his employees under the theory of *respondeat superior* (Am.Compl.¶¶ 1, 83, 86–87).

Defendants' arguments do not make sense and appear to confuse the bases for Section 1983 liability with the bases for common law liability. For example, although defendants are correct that negligent conduct does not give rise to an Eighth Amendment claim, state law claims are, by definition, not Eighth Amendment claims. Similarly, "culpable recklessness"[22] is not an element of a common law medical malpractice claim. *DiGeronimo v. Fuchs,* 101 A .D.3d 933, 936, 957 N.Y.S.2d 167, 170 (2d Dep't 2012) ("In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries." (inner quotations omitted)).

[22]
    "Culpable recklessness" appears to be a seldom used articulation for the subjective element of an Eighth Amendment deliberate indifference claim. *See Hernandez v. Keane, supra,* 341 F.3d at 144.

Nevertheless, the Court lacks subject matter jurisdiction to entertain plaintiff's common law claims against defendants.

New York Corrections Law Section 24 provides, in pertinent part:

    1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

    2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*18**  Because a federal court hearing a claim under its supplemental jurisdiction sits as if it were a state court, Section 24 operates as a limit on a federal court's subject matter jurisdiction with respect to such claims. *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996). As a limit on my subject matter jurisdiction, I may (and should) raise it *mea sponte. Durant, Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont,* 565 F.3d 56, 62–63 (2d Cir.2009).

Section 24 does not bar Section 1983 claims against DOCCS employees. *See* *Haywood v. Drown,* 556 U.S. 729, 740–41 (2009). However, it does mandate that state law claims for damages for acts or omissions committed by DOCCS employees within the scope of their employment be brought exclusively in the New York Court of Claims as claims against New York State. *Baker v. Coughlin, supra,* 77 F.3d at 14–16; *accord Tavares v. New York City Health & Hosps. Corp.,* 13 Civ. 3148(PKC)(MHD), 2015 WL 158863 at *10 (S.D.N.Y. Jan. 13, 2015) (Castel, D.J.).

Thus, pursuant to Section 24, the plaintiff's common law claims against the defendants in their individual capacities are dismissed for lack of subject matter jurisdiction.

### 6. *Qualified Immunity*

Because plaintiff has failed to state claims on which relief can be granted against Dr. Holder, I need not address the defendants' argument that he is entitled to qualified immunity. *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 at *9 (W.D.N.Y. June 25, 2012) ("Given that no constitutional violation was found, this Court need not address defendants' alternative contention that they deserve qualified immunity for their actions."). However, because constitutional claims against Drs. Koengismann, Whalen and Makram survive dismissal, I shall address defendants' qualified immunity claims with regards to them.

Defendants claim that Drs. Koenigsmann and Whalen are entitled to qualified immunity because "their involvement was limited and associated with letters ... requesting permission to seek a second-opinion [sic]" (Defs.' Mem., at 14). However, defendants do not explain why Drs. Koenigsmann and Whalen are entitled to qualified immunity for plaintiff's claims which survive dismissal, i .e., that the doctors were deliberately indifferent in delaying diagnosis and treatment of plaintiff's injuries. Thus, defendants' motion to dismiss the claims against Drs. Koenigsmann and Makram on the ground of qualified immunity is denied.

Defendants claim that Dr. Makram is entitled to qualified immunity because she did not violate a clearly established constitutional right, and she made her decisions based on the medical evidence before her and her own medical judgment, making it "reasonable for her to believe her actions were not demonstrative [of] medical deliberate indifference" (Defs.' Mem., at 13, 15; Defs .' Reply, at 3, 4, 7–8). Plaintiff argues that Dr. Makram knew that denying the initial MRI request

was a violation of plaintiff's constitutional right (Pl.'s Opp., at 16).

> **\*19**  A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent.

*McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999); *accord Coggins v. Buonora,* 776 F.3d 108, 114 (2d Cir.2015). *See Anderson v. Creighton,* 483 U.S. 635, 638–39 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1998).

It was clearly established by 2010 that the Eighth Amendment prohibited prison officials from being deliberately indifferent to an inmate's serious medical needs. *See Estelle v. Gamble, supra,* 429 U.S. at 104; *LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir.1998); *Wright v. Dee,* 54 F.Supp.2d 199, 204 (S.D.N.Y.1999) (Cote, D.J.); *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 185 (N.D.N.Y.1996).

Accordingly, dismissal on the basis of qualified immunity can be granted only if the conduct of Dr. Makram was objectively reasonable. An official's conduct is "objectively reasonable" if reasonable, similarly-situated officials could disagree as to its legality. *Spavone v. N.Y. State Dep't. of Corr. Servs., supra,* 719 F.3d at 135; *Danahy v. Buscaglia,* 134 F.3d 1185, 1190 (2d Cir.1998).

2015 WL 1283660

Qualified immunity issues frequently arise in connection with false arrest and similar claims involving the legality of actions by law enforcement officers. This is a subject matter with which courts are familiar. It is frequently not difficult for a court to review a set of facts and determine whether probable cause existed or whether a police officer acted reasonably in concluding that his or her actions did not violate the Constitution.

This case involves issues of medical judgment which are foreign to me. Apart from the minimal allegations by plaintiff that Dr. Makram's denial of the initial MRI was financially-motivated, there is not enough information in the record to permit me to determine whether she acted reasonably or unreasonably. Without additional information, it is impossible to determine whether other physicians of reasonable competence could disagree on her conduct. *See Walter v. Schult, supra,* 717 F.3d at 130; *Paulin v. Figlia,* 916 F.Supp.2d 524, 536–37 (S.D.N.Y.2013) (Briccetti, D.J.); *Giambalvo v. Sommer,* 10 Civ. 6774(JPO), 2012 WL 4471532 at *7 (S .D.N.Y. Sept. 19, 2012) (Oetken, D.J.); *Edmonds v. Cent. N.Y. Psychiatric Ctr., supra,* 2011 WL 3809913 at *6–*7.

**\*20** Thus, I conclude that Dr. Makram's motion to dismiss on the ground of qualified immunity is denied.

IV. *Conclusion*

Accordingly, for all the foregoing reasons, defendants' motion to dismiss this action is granted in part and denied in part.

Defendants' motion to dismiss all claims against Drs. Lancellotti and Holder is granted.

All of plaintiff's claims against Drs. Whalen and Makram are dismissed except plaintiff's deliberate indifference claims for the delay in diagnosis and treatment of plaintiff's injuries.

All of plaintiff's claims against Dr. Koenigsmann are dismissed except plaintiff's claim of deliberate indifference for: (1) the delay in diagnosis and treatment of plaintiff's injuries and (2) plaintiff's claim of liability for Dr. Whalen's deliberate indifference under a theory of personal involvement for failure to train and supervise Dr. Whalen.

All of plaintiff's state law claims for negligence, medical malpractice and claims based on the doctrine of *responde-at superior* are dismissed.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1283660

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 104 of 273

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

2017 WL 3309726
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kashawn DOBBINS, Plaintiff,

v.

Commissioner Joseph PONTE et al., Defendants.

15-CV-3091 (JMF)
|
Signed 08/02/2017

**Attorneys and Law Firms**

Kashawn Dobbins, Jamaica, NY, pro se.

John L. Garcia, Tobias Eli Zimmerman, City of New York
Law Department, New York, NY, for Defendants.

OPINON AND ORDER

JESSE M. FURMAN, United States District Judge

**\*1** Plaintiff Kashawn Dobbins, a New York State prisoner
proceeding *pro se*, brings claims against the City of New York
(the "City"), several New York City Department of Correction
("DOC") officers, and a DOC Hearing Officer. (Docket No.
22 ("Second Am. Compl.")). Specifically, Dobbins alleges
that he was subjected to the use of excessive force, that
his Fourteenth Amendment due process rights were violated,
and that he was denied necessary medical treatment. (*Id.* at
2-4). The parties now cross-move, pursuant to Rule 56 of
the Federal Rules of Civil Procedure, for summary judgment.
(Docket No. 53; Docket No. 55 ("Defs.' Mem."); Docket No.
58 ("Pl.'s Mem.")). Additionally, Dobbins moves for leave
to amend his complaint to add claims against another DOC
Officer. For the reasons discussed below, Defendants' motion
for summary judgment is granted in part and denied in part,
Dobbins's motion for summary judgment is denied, and his
motion for leave to amend is denied.

**BACKGROUND**

The relevant facts, taken from the Second Amended
Complaint and admissible materials submitted by the parties,
are either undisputed or described in the light most favorable

to the non-moving party. *See* Costello v. City of Burlington,
632 F.3d 41, 45 (2d Cir. 2011). [1]

[1]     As required by Local Rule 56.1, Defendants filed
a Statement of Undisputed Facts with citations
to the record. (Docket No. 57 ("Defs.' Rule 56.1
SUF")). Pursuant to Local Rule 56.2, they also
served Dobbins with notice that, in opposing their
motion, he could not rely only on his Complaint,
but had to submit evidence to support his claims.
(Docket No. 56). Dobbins, however, did not file
his own statement of undisputed facts; instead,
he submitted a ten-page "Opposition" (Docket
No. 61 ("Pl.'s Opp'n")), and a seven-page letter
requesting summary judgment and leave to amend
his complaint. (Pl.'s Mem.). Nevertheless, in
light of the "special solicitude" owed to *pro
se* litigants, Tracy v. Freshwater, 623 F.3d 90,
101 (2d Cir. 2010), the Court has considered
the evidence submitted by Dobbins—as well
as the transcript of his deposition, which was
submitted by Defendants. *See* Wali v. One Source
Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)
("[W]here a *pro se* plaintiff fails to submit a
proper Rule 56.1 statement in opposition to a
summary judgment motion, the Court retains
some discretion to consider the substance of the
plaintiff's arguments, where actually supported
by evidentiary submissions."). Additionally, the
Court has independently reviewed Defendants'
Local Rule 56.1 statement to ensure that it is
supported by admissible evidence in the record. *See*
Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("[E]ven [if] plaintiff's Rule 56.1
counter-statement failed to specifically controvert
[defendant's Rule 56.1] assertions, the unsupported
assertions must nonetheless be disregarded and
the record independently reviewed."); Holtz v.
Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)
(noting that a court "may in its discretion opt
to conduct an assiduous review of the record
even where one of the parties has failed to file"
a Local Rule 56.1 statement (internal quotation
marks omitted)).

**\*2** In early 2014, Dobbins was in pretrial custody at the
Otis Bantum Correction Center ("OBCC"), a DOC facility
on Rikers Island. (Second Am. Compl. 2; Docket No. 54-1
("First Am. Compl."), at 2). On the evening of February

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 105 of 273

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

1, 2014, DOC Officers from the Emergency Services Unit ("ESU") conducted a search of Dobbins's housing area and cell. (Second Am. Compl. 2; Defs.' Mem. 2). During the search, Officer Rivera—a Defendant here—escorted Dobbins to his cell and began to search his person. (Defs.' Mem. 2). Officer Rivera came to believe that Dobbins was hiding something in his mouth and ordered him to spit it out. (*Id.* at 2-3). Defendants allege that Dobbins refused and that Officer Rivera, soon assisted by Officer Ortiz, began struggling with Dobbins to place him in handcuffs. (*Id.* at 3). Dobbins contends that after he turned around to be handcuffed, one of the Officers "slammed" him "on the bed," choked him, and hit him "about three times" in the ribs. (Docket No. 54-2 ("Dobbins Depo."), at 32-38). He alleges that he suffered injuries to his wrist, back, and ribs as a result. (*Id.* at 32).

Officers Boyd and Richardson—Defendants here as well—then removed Dobbins from his cell and escorted him out of the housing area, events that were captured on videotape by DOC personnel. (Docket No. 54-3 ("Video")). The videotape shows Officers Boyd and Richardson forcefully holding Dobbins's handcuffed arms behind him in what Defendants describe as "control holds ... to gain his compliance" and "to ensure that [he] did not escape them and run." (*Id.* at 21:10-22:35; Docket No. 57 ("Defs' Rule 56.1 SUF") ¶¶ 7-8). On the videotape, Dobbins is heard screaming "I'm not resisting nothing!" and, at one point, looks directly at the camera and says: "For the camera, they're breaking my wrists, seriously!" (Video 21:51-53). The officers then took him to a hallway right outside the housing area, where they secured him facing a wall for a few minutes, during which he continued to yell "My wrist!" and the like. (*Id.* at 22:05-25:34). The videotape then shows a group of officers escorting Dobbins away from the housing area, apparently to the intake unit. (*Id.* at 26:28-27:10). Notably, in his deposition, Dobbins testified that he was not "touch[ed]" by any officer on his way to intake, that it was "just walking and probably like holding me and making sure I don't run or something like that, and holding me while I am being handcuffed." (Dobbins Depo. 68-69).

In the intake unit, Dobbins was strip-searched by Officer Richardson. (Docket No. 54-8 ("Richardson Report")). Dobbins alleges that during the course of the strip-search —which was not captured by the camera, even though the videotape continued to run—Officer Richardson punched him until he was knocked unconscious and that he awoke bleeding from the head. (Second Am. Compl. 3). Defendants do not dispute that Officer Richardson punched Dobbins,

or that the latter was knocked unconscious, but insist that Officer Richardson defended himself after Dobbins "threw the first punch." (Defs.' Mem. 4; Richardson Report). Later the same day, Dobbins received medical treatment for a three-centimeter laceration to the right side of his scalp and a contusion to his left eye. (Docket No. 54-11 ("Feb. 1, 2014 Medical Records")). The records from that visit specifically note the absence of any "neck pain." (*Id.*). One week later, Dobbins returned to the OBCC medical clinic complaining of "chest discomfort" and "hand pain," citing the February 1, 2014 incident. (Docket No. 54-12 ("Feb. 8, 2014 and Feb. 12, 2014 Medical Records")). He received treatment for an abrasion on his right wrist. (*Id.*).

Defendants allege that during the search, a small plastic bag was found outside of Dobbins's cell, the contents of which later tested positive for crack cocaine. (Docket No. 54-13). On February 4, 2017, Dobbins received a notice charging him with three disciplinary infractions: assaulting staff, possession of a controlled substance, and refusing to obey a direct order. (Docket No. 54-15 ("Notice of Infraction")). Three days later, Hearing Officer Wiley—also a Defendant here—conducted a hearing. (Docket No. 54-18 ("Hearing Tr."), at 1). Despite repeated requests, Dobbins was not permitted to review any of the Officers' statements or other paperwork that was read into the hearing record. (Hearing Tr. 8-11). He was, however, allowed to call two witnesses. (*Id.* at 12-21). Following the hearing, Hearing Officer Wiley found Dobbins guilty of all three infractions and sentenced him to seventy days in the Central Punitive Segregation Unit ("CPSU"). (Docket No. 54-19 ("Disciplinary Disposition Notice")). Thereafter, the Bronx County District Attorney's Office prosecuted Dobbins for the substance recovered during the February 1, 2014 search. (Docket No. 54-21). On September 30, 2014, Dobbins pleaded guilty to one count of Promoting Prison Contraband in violation of New York Penal Law Section 205.20, and was sentenced to one year of imprisonment, to be served concurrently with his underlying sentence. (*Id.*).

**\*3** After exhausting the prison grievance procedures, Dobbins filed this action, naming as Defendants the DOC, the Commissioner of DOC, the Warden of OBCC, several named and unnamed DOC officers, and medical staff ("to[sic] many to name.") (First Am. Compl. 1). By Order dated May 4, 2015, this Court dismissed the claims against the DOC, the OBCC Warden, the DOC Commissioner, and medical staff for pleading deficiencies. (Docket No. 6 ("Order of Service")). The Court also construed the Complaint to

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

assert state law claims against the City under a theory of *respondeat superior*, but dismissed any claim against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). (Order of Service 2-3). Thereafter, Dobbins filed the operative complaint, the Second Amended Complaint, naming as Defendants the City; DOC Officers Ortiz, Rivera, Boyd, and Richardson; and Hearing Officer Wiley. (Docket No. 22).[2] Liberally construed, the Second Amended Complaint asserts against the DOC Officers or Hearing Officer Wiley claims under state and federal law for excessive force, violations of due process, and the deprivation of medical treatment; and asserts against the City a *respondeat superior* claim under state law. (*Id.*).[3]

[2] In a letter dated October 18, 2016, Dobbins requested that the Court "accept" his Second Amended Complaint, and referenced the document filed on August 5, 2015. (Docket No. 65). Attached to the letter, however, was another complaint—also labelled "Second Amended Complaint"—that is identical in substance, if not form, to that filed on August 5, 2015. For the purposes of this Opinion, the Court will treat the Second Amended Complaint filed on August 5, 2015, rather than the attachment to the October 18, 2016 letter, to be the operative complaint.

[3] It is not entirely clear whether Dobbins repleads a municipal liability claim against the City in the Second Amended Complaint. To the extent he does, however, it fails for the same reason that his earlier claim failed: He does not sufficiently plead the existence of an unconstitutional policy or practice. *See, e.g., Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) ("It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (internal quotation marks omitted)).

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson*

*v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

**\*4** To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 107 of 273

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)

2017 WL 3309726

"that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

It is well established that courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment. *Tracy*, 623 F.3d at 101. Thus, a *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to raise the strongest arguments that they suggest. *See, e.g.*, *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011). This special solicitude is not unlimited, however, and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). Nor is the "duty to liberally construe a plaintiff's opposition the equivalent of a duty to re-write it." *Johnson v. N.Y.C. Dep't of Correction*, No. 14-CV-8450 (JMF), 2016 WL 4030854, at *2 (S.D.N.Y. July 25, 2016) (internal quotation marks and alterations omitted).

### THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Dobbins's claims. Liberally construed, Dobbins's motion appears to seek summary judgment on his excessive force and due process claims. (Pl.'s Mem. 1-5). The Court will address each claim in turn.

#### A. Excessive Use of Force

Dobbins's excessive force claim is analyzed under the Due Process Clause of the Fourteenth Amendment, as he was a pretrial detainee at the time of the alleged incident. *See, e.g.*, *Holland v. City of New York*, 197 F. Supp. 3d 529, 545 (S.D.N.Y. 2016). For a pretrial detainee to establish an excessive force claim, he "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). To be unreasonable, the conduct at issue—judged "from the perspective and with the knowledge of the defendant officer[s]," *id.* at 2474, and evaluated "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks omitted)—must be "sufficiently serious ... to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted).

A court may consider, among other factors, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Musaid v. Manka*, No. 13-CV-7880 (PKC) (MHD), 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016) (applying this analysis). [4]

[4]    To the extent Dobbins also alleges claims for battery and assault under state law, those claims are subject to the same standard as his excessive force claim. *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 295 (S.D.N.Y. 2015) ("Assault and battery claims, when alleged against a police officer, are evaluated like excessive force claims.").

**\*5** Applying those standards here, the parties' cross-motions for summary judgment are borderline frivolous to the extent they relate to the incident in Dobbins's cell and in the intake unit. As to the former, there is a clear factual dispute: Defendants maintain that Officers Rivera and Ortiz used only the force necessary to restrain Dobbins, who resisted an order to reveal what was in his mouth, while Dobbins contends that the Officers body slammed, choked, and punched him—conduct that would be objectively unreasonable even if Dobbins had resisted a lawful order. (Defs.' Mem. 9-10; Dobbins Depo. 33-34, 37). Defendants contend that "no reasonable juror could credit Plaintiff's version" of the event because his allegations are "contradicted by Plaintiff's medical records." (Defs.' Mem. 11). But putting aside the question of whether the Court could grant summary judgment on that basis, it is not the case. Dobbins sought additional medical treatment only one week after the incident, complaining of "chest discomfort" and "hand pain," and he was treated for an abrasion on his right wrist. (Feb. 8, 2014 and Feb. 12, 2014 Medical Records). The fact that Dobbins sought additional treatment "only ... once, more than one week after the Incident" (Defs.' Mem. 11), and the fact that he was not diagnosed with serious injuries at any time, may well cast doubt on the veracity of Dobbins's claims. But those are factual issues of credibility for a jury to decide at trial, not for the Court on summary judgment.

As for the incident in the intake unit, the factual disputes are even more transparent. According to Defendants,

2017 WL 3309726

Dobbins initiated the physical alteration when he "threw a punch at Officer Richardson," "[struck] him in the shoulder," and "simultaneously rais[ed] his hands in a fighting stance." (Docket No. 54-4; *see also* Richardson Report). Defendants maintain that Richardson's punches were thus necessary to defend himself "from imminent physical assault." (Richardson Report). By contrast, Dobbins claims that Richardson threatened him during the walk to the intake unit and then punched him in the face at the end of the strip search, without reason or provocation. (Dobbins Depo. 75-76). Defendants assert that "the majority of evidence supports" their version of the incident. (Defs.' Mem. 14). But whether or not that is true, it is "axiomatic" that courts may not assess credibility or weigh the evidence on summary judgment, except in limited circumstances where the "evidence is so contradictory and fanciful that it cannot be believed by a reasonable person" and thus "may be disregarded." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476-77 (S.D.N.Y. 2003). Drawing all inferences in the non-moving party's or parties' favor, the Court cannot say that either side's account of the incidents in Dobbins's cell and in the intake unit cannot be believed by a reasonable person. Accordingly, summary judgment must be and is denied as to those incidents.[5]

[5]  Defendants' argument that they are entitled to qualified immunity fares no better as to the incidents in Dobbins's cell and in the intake unit. (Defs.' Mem. 15-18). As a general matter, qualified immunity protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On February 1, 2014, it was well established that the Constitution prohibited corrections officers from using objectively unreasonable force against pretrial detainees. *See, e.g., Toliver v. City of New York*, 530 Fed.Appx. 90, 92 n.1 (2d Cir. 2013); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17, 33-35 (2d Cir. 2017). Thus, if Dobbins's accounts of the two incidents are true, Defendants would not be entitled to immunity.

By contrast, to the extent Dobbins asserts an excessive force claim with respect to the conduct of the officers who escorted him from his cell to the intake unit, it fails as a matter of law. As an initial matter, it is not clear whether Dobbins

even asserts a claim as to that conduct. Although the Second Amended Complaint refers to "the walk out of the cell," it is not clear whether the conduct it describes took place in the cell or after. (Second Am. Compl. 2-3). And in his deposition, Dobbins testified that he was not "touch[ed]" by any officer on his way to intake, that it was "just walking and probably like holding me and making sure I don't run or something like that, and holding me while I am being handcuffed." (Dobbins Depo. 68-69). In any event, the period during which Dobbins was transferred from his cell to the intake unit was the one and only part of the February 1, 2014 events that was captured entirely on video, and the video makes clear that the force used to restrain Dobbins was not "objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. Dobbins was indisputably acting in a belligerent and defiant manner, and—"account[ing] for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' " and "appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security,' " *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979))—no reasonable jury could conclude that the force used was "sufficiently serious ... to reach constitutional dimensions." *Romano*, 998 F.2d at 105 (internal quotation marks omitted).

**B. Due Process**

**\*6**  Dobbins's due process claim can be addressed more swiftly. As a pretrial detainee, Dobbins was entitled under the Due Process Clause of the Fourteenth Amendment to (1) written notice of the charges against him at least twenty-four hours before the hearing, (2) a written statement of the factual allegations against him, and (3) at least a limited ability to present witnesses and evidence. *See Best v. N.Y.C. Dep't of Correction*, 14 F. Supp. 3d 341, 347-48 (S.D.N.Y. 2014) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)). Here, all three of those requirements were indisputably met. He was provided with written notice of the charges against him —assaulting staff, possession of controlled substances, and refusing to obey a direct order—on February 4, 2014, three days before his disciplinary hearing was held. (Defs.' Mem. 7; Notice of Infraction; Dobbins Depo. 91). The document included a statement (titled "Details of Incident"), derived from Officer Richardson's account of what had occurred, that sufficed to put Dobbins on notice of the factual allegations against him—even without the more complete reports and "paperwork" that he later requested. *See Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 607-08 (S.D.N.Y. 2009) (discussing adequate notice). And finally, Dobbins was allowed to call

Dobbins v. Ponte, Not Reported in Fed. Supp. (2017)
Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 109 of 273
2017 WL 3309726

two witnesses to testify at the hearing (Hearing Tr. 10, 12-21), although he himself was not permitted to question them. *See e.g.*, *Bullock v. Reckenwald*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5793974, at *11-14 (S.D.N.Y. Aug. 24, 2016), *report and recommendation adopted*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5719786 (S.D.N.Y. Sept. 30, 2016); *Sowell v. Bullis*, No. 13-CV-1482 (GLS) (DJS), 2016 WL 1696454, at *9 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, No. 13-CV-1482 (GLS) (DJS), 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016).

Liberally construed, the Second Amended Complaint also includes allegations that Hearing Officer Wiley was biased and "conducted an unfair hearing by [siding] with coworkers to cover up wrong doings." (First Am. Compl. 9; *see also* Second Am. Compl. 11; Pl.'s Opp'n 39). An inmate facing a disciplinary hearing is entitled to an impartial hearing officer who does not "prejudge the evidence" or an inmate's guilt. *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990) (citing *Wolff*, 418 U.S. at 570-71). But a claim of hearing officer bias requires more than an inmate's own subjective beliefs and conclusory allegations. *See Brooks v. Prack*, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014) (citing *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). In this case, Hearing Officer Wiley was not involved in the underlying incidents, and the undisputed facts show that she allowed Dobbins to state his version of facts on the record, considered the available documentary evidence, and questioned Dobbins's witnesses. (Hearing Tr. 1-21; Disciplinary Disposition Notice). That is, Dobbins's conclusory assertions of Hearing Officer Wiley's bias aside, there is no evidence in the record from which a reasonable jury could conclude that Dobbins was denied his right to an impartial hearing officer. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Dobbins's due process claims, and denies Dobbins's cross-motion as to those claims.

## C. Deprivation of Medical Care

Dobbins's final claim—for deprivation of mental health treatment—requires even less ink. To determine whether allegations of inadequate medical care are sufficient, a court must decide, among other things, "whether the prisoner was actually deprived of adequate medical care" and, if so, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006); *see also Darnell v. Pineiro*, 849 F.3d 17, 27 (2d Cir. 2017) (discussing the applicable standards for pretrial detainees). Here, the Court dismissed Dobbins's initial claim for deprivation of mental health treatment on the ground that he failed to identify anyone who was personally involved in the alleged deprivation of mental health care. (Order of Service 4-5). Dobbins repleaded the claim in the Second Amended Complaint, but he failed to remedy that fundamental defect. (*See* Second Am. Compl. 3 (stating only that Dobbins "was sent to the S.H.U. and was den[i]ed mental health for over 70 days")). In any event, the undisputed facts show that Dobbins did receive both medical treatment and mental health treatment during this period. (Docket No. 54-20; Feb. 1, 2014 Medical Records; Feb. 8, 2014 and Feb. 12, 2014 Medical Records; Pl.'s Opp'n 8). Thus, Defendants' motion for summary judgment with respect to Dobbins's deliberate indifference claim must be and is granted.

### MOTION FOR LEAVE TO AMEND

*7 In his motion for summary judgment, Dobbins also requests leave to add Captain O'Hara, the supervisor during the events described above, as a defendant. (Pl.'s Mem. 1-2). Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), Dobbins's request is denied, for two independent reasons. First, this case is now all but trial ready, and adding claims against Captain O'Hara would cause undue delay. Furthermore, Dobbins provides no good reason for not seeking to add claims against Captain O'Hara earlier in the case. Defendants identified Captain O'Hara as a witness to the incidents in question, and provided Dobbins with a copy of his witness report, as far back as March 2016. Yet, Dobbins inexplicably waited more than seven months, until discovery had closed and Defendants had filed their summary judgment motion, before proposing to add Captain O'Hara as a defendant. *See, e.g., Rodriguez v. Kittles*, No. 92-CV-1154 (SHS), 1996 WL 14442, at *2 (S.D.N.Y. Jan. 16, 1996) ("Permitting plaintiff to amend his complaint while the summary judgment motion is pending and on the eve of trial would be unduly prejudicial to the defendant."); *see also, e.g., Antrobus v. N.Y.C. Dep't of Sanitation*, No. 11-CV-5434 (CBA) (LB), 2016 WL 5394697, at *11 (E.D.N.Y. Feb. 25, 2016) ("Prejudice is generally found where the motion to amend comes on the eve of trial after many months or years of pre-trial activity; the amendment would cause undue delay in the final disposition of the case; the amendment brings entirely new and separate claims, adds new parties or at least entails more than an alternate claim or a change in the allegations of a complaint." (internal quotation marks omitted)).

2017 WL 3309726

Second, and in any event, Dobbins provides no indication that he possesses facts with which he could allege valid claims against Captain O'Hara. *See, e.g.*, *Rodriguez*, 1996 WL 14442, at \*2 (denying a motion for leave to add claims against two new defendants on the eve of trial where the plaintiff failed to "attach a copy of his proposed amended complaint to his declaration" and failed to "provide any grounds to suggest that plaintiff would even have a viable claim against" the two new defendants); *Hays v. City of New York*, No. 14-CV-10126 (JMF), 2017 WL 782496, at \*8 (S.D.N.Y. Feb. 28, 2017) (denying leave to amend where the *pro se* plaintiff had not "given any indication" that she was "in possession of facts" that would state a valid claim (internal quotation marks omitted)). The video of the February 1, 2014 incident shows that Captain O'Hara was walking upstairs during the time that Officers Rivera and Ortiz were allegedly assaulting Dobbins in his cell. (Video 19:26-20:08). And Dobbins does not suggest that Captain O'Hara participated in the alleged assault in the intake unit or had a "realistic opportunity to intervene" in what is alleged to have been only a brief and unprovoked attack by Officer Richardson. *Holland*, 197 F. Supp. 3d at 549-50 (describing the elements of a failure-to-intervene claim).[6]

6      Liberally construed, Dobbins's motion could also be read to propose adding a claim or claims relating to the drugs found near his cell, which he disputes. (Pl.'s Mem. 3-4). Any such claim, however, would be barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), as Dobbins pleaded guilty to charges stemming from those drugs.

## CONCLUSION

For the foregoing reasons, Dobbins's motions for summary judgment and leave to amend the Second Amended Complaint are DENIED in their entirety, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part. In particular, Defendants' motion is granted with respect to Dobbins's deliberate indifference claim, his due process claims, and his excessive force (and assault and battery) claim to the extent it is based on Defendants' alleged

conduct when Dobbins was escorted from his cell to the intake unit. By contrast, Defendants' motion and Dobbins's cross-motion are denied with respect to the excessive force claims relating to the conduct in Dobbins's cell and in the intake unit.

In light of the substance of Dobbins's surviving claims and the need for trial to resolve them, this Court exercises its discretion under Title 28, United States Code, Section 1915(e)(1), and will seek to obtain *pro bono* counsel for Dobbins. *See Cooper v. A. Sargenti Co.*, 877 F.2d 170, 174 (2d Cir. 1989). Further, the Court believes—in light of this ruling; the possibility that Dobbins will obtain counsel in short order; and the fact that, all things considered, Dobbins's injuries were relatively minor—that the parties should attempt to settle the case without the need for trial. To that end, by separate Order to be entered today, the Court is referring the case to the assigned Magistrate Judge (the Honorable James L. Cott) for settlement purposes only. **No later than one week after *pro bono* counsel enters a notice of appearance or September 15, 2016, whichever is earlier,** the parties shall contact the Chambers of Magistrate Judge Cott to schedule a settlement conference as soon as possible. In the event that the case does not settle, the Court will issue a further Order with respect to the timing and procedures leading up to trial (the details of which will depend on whether Dobbins is represented or not).

 **\*8**  The Clerk of Court is directed to terminate Docket No. 53; to terminate Officer Boyd and Hearing Officer Wiley (each of whom is named only in claims that have been dismissed) as Defendants; and to mail Dobbins a copy of this Opinion and Order.

This Court certifies, pursuant to Title 28, United States Code, Section 1915(a)(3), that any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is thus denied. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 3309726

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1724573
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwaine GRAY, Plaintiff,

v.

Doctor KANG LEE, Defendant.

No. 9:13–cv–258 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Dwaine Gray, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, The Capitol, Christopher W. Hall, Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

### I. Introduction

**\*1** Plaintiff *pro se* Dwaine Gray commenced this action against defendant Doctor Kang Lee,[1] pursuant to 42 U.S.C. § 1983, alleging that Lee was deliberately indifferent to Gray's serious medical needs in violation of the Eighth Amendment.[2] (*See generally* Compl., Dkt. No. 1.)

[1]    Gray also named Ms. Vonda L. Johnson as a defendant, (Compl.), but she has since been dismissed from this action, (Dkt. No. 10 at 6–7, 9).

[2]    In his complaint, Gray also asserted claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act, 29 U.S.C. §§ 701–796*l*, (Compl.), but those claims have been dismissed, (Dkt. No. 10 at 5–6, 9).

On August 12, 2014, Lee filed a motion for summary judgment, (Dkt. No. 32), which Gray opposed, (Dkt. No. 40). In a Report and Recommendation (R & R) issued on March 9, 2015, Magistrate Judge David E. Peebles recommended that Lee's motion for summary judgment be granted and Gray's

remaining Eighth Amendment claim be dismissed. (Dkt. No. 43.) Pending are Gray's objections to the R & R. (Dkt. No. 44.) For the reasons that follow, the R & R is adopted in its entirety.

### II. Background[3]

[3]    Gray specifically objects to Judge Peebles' recommendation that the court deem admitted all properly supported facts contained in Lee's statement of material facts. (Dkt. No. 43 at 3 n. 1; Dkt. No. 44 at 2.) The court reviews this portion of the R & R *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan.18, 2006). Under this District's Local Rules, the moving party must submit a statement of material facts, which "set[s] forth, in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue." N.D.N.Y. L.R. 7.1(a)(3). The opposing party must file a response to the statement of material facts, which must "mirror the movant's [s]tatement of [m]aterial [f]acts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." *Id.* If the opposing party fails to comply, "[t]he [c]ourt shall deem admitted any properly supported facts set forth in the [s]tatement of [m]aterial [f]acts that the opposing party does not specifically controvert," and, where the opposing party is *pro se,* the moving party must advise the pro se litigant about the consequences of his failure to respond. *Id.* Here, while Gray filed a response opposing Lee's summary judgment motion, (Dkt. No. 40), he did not file anything that even remotely resembles a response to Lee's statement of material facts, despite receiving notice of the consequences of his failure to do so, (Dkt. No. 32 at 3). In his defense, Gray argues that he "submitted various pieces of evidence annexed to his opposition to summary judgment, showing that [Lee]' s narrative was self-serving," and that he "introduced to the [c]ourt documentary evidence that [Lee] obviously did not have a planned course of medical treatment, as [Lee] routinely came to contradictory conclusions, and would often ignore [Gray's] needs." (Dkt. No. 44 at 2.) However, "a district court has no duty

to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding pro se," and an individual's pro se status does not relieve him of the ramifications associated with the failure to comply with the court's local rules. *Davis v. City of Syracuse,* No. 5:12–CV–0276, 2015 WL 1413362, at *12 (N.D.N.Y. Mar.27, 2015). Therefore, the court adopts Judge Peebles' recommendation to deem admitted all properly supported facts set forth in Lee's statement of material facts. Accordingly, unless otherwise noted, the facts are not in dispute.

Gray is an inmate in the custody of the Department of Corrections and Community Supervision (DOCCS), and, during the time relevant to his claims, was incarcerated at Clinton Correctional Facility. (Def .'s Statement of Material Facts (SMF) ¶¶ 1, 9, Dkt. No. 32, Attach. 1.) Prior to entering Clinton, Gray suffered a shoulder injury, for which he was prescribed Naproxen. (*Id.* ¶ 8.) After arriving at Clinton in or around April 2012, Gray met with Lee, a clinical physician, who asked Gray if he wished to continue taking Naproxen. (*Id.* ¶¶ 3, 10.) Gray declined the medication, claiming that it did not work. (*Id.* ¶ 10.) One month later, Lee again met with Gray, at which time Gray complained of continued shoulder pain and requested stronger pain medication. (*Id.* ¶ 11.) Lee obliged Gray's request and prescribed Flexeril, a muscle relaxer used to relieve acute pain, but not suitable for long-term use. (*Id.* ¶¶ 11, 12.)

Over the Summer of 2012, Gray frequently met with medical staff, including Lee and various nurses at Clinton. (*Id.* ¶¶ 13–17.) During these meetings, Gray continued to complain of pain in his right shoulder, reiterated his refusal of Naproxen, and requested stronger pain medications-including a continuation of Flexeril and/or a narcotic analgesic. (*Id.* ¶¶ 13–17.) Also during those examinations, Lee consistently found that Gray had a good range of motion in his shoulder, despite Gray's complaints that he was unable to move it. (*Id.* ¶¶ 15, 16.)

At the end of September 2012, Lee ordered an x-ray of Gray's right shoulder, which was completed in early October. (*Id.* ¶¶ 18, 19.) Lee discussed the results with Gray, which indicated that there was "early osteoporosis ... present" and "a large spur arising from the inferior aspect of the acromion," ordered a magnetic resonance imaging (MRI) for further testing, and prescribed Motrin for Gray's pain. (*Id.* ¶¶ 19, 20; Dkt. No. 32, Attach. 2 at 4.) The MRI was completed in January 2013, and, once the radiologist's report was received, Lee referred

Gray to an orthopedic specialist, as the MRI suggested that Gray may have a tendon tear. (Def.'s SMF ¶¶ 21, 23, 24.) During the time that Gray was waiting for his consultation with the specialist, Gray continued to meet with medical staff at Clinton, and Lee continued to prescribe Motrin for Gray's pain. (*Id.* ¶ 25.) Ultimately, in April 2013, Gray was transferred to Franklin Correctional Facility, where he now resides, and whose medical staff is now charged with his care. (*Id.* ¶ 26.)

### III. *Standard of Review*

 **\*2** Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *45.

### IV. *Discussion*

In his R & R, Judge Peebles recommended dismissal of Gray's Eighth Amendment deliberate indifference claim. (Dkt. No. 43 at 12–21.) Specifically, Judge Peebles first noted that Gray failed to satisfy the objective requirement of this cause of action because Gray's medical records reflect that he was provided with frequent treatment, and, therefore, "no reasonable factfinder could conclude that ... Lee's treatment of [Gray]'s shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious." (*Id.* at 16–19.) Judge Peebles further reasoned that, given the extensive treatment that Gray received, including frequent examinations, prescriptions for pain medications, x-rays, MRI testing, and referrals to orthopedic specialists, Gray also failed to prove the subjective component of a deliberate indifference claim. (*Id.* at 19–20.)

Here, Gray raises several objections to the R & R. First, Gray specifically objects to Judge Peebles' findings that Gray received consistent and adequate medical care and that Lee

did not act with deliberate indifference. (Dkt. No. 44 at 3–6.) Gray argues that Lee "often times came to different conclusions based on the same medical information" and failed to comply with both "accepted medical practice" and DOCCS policy by prescribing Motrin for long periods of time, which caused Gray stomach pains. [4] (*Id.*) The court reviews these objections *de novo. See Almonte,* 2006 WL 149049, at *3, *5.

[4]    The court notes that this is the first time that Gray has incorporated Lee's long-term prescription of Motrin as part of his Eighth Amendment claim. Indeed, both his complaint and response to Lee's motion for summary judgment are devoid of these allegations. (*See generally* Compl.; Dkt. No. 40.)

A prisoner's claim that he was provided insufficient medical care is analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 101–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted). "To show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." *Taylor v. Goorde,* 548 F. App'x 696, 697–98 (2d Cir.2013). The objective component asks whether the prisoner was actually deprived of adequate medical care and whether the denial in care was "sufficiently serious." *Id.* at 698 (internal quotation marks and citation omitted). The subjective component concerns the defendant's mental state, and requires a showing that the defendant acted "with deliberate indifference to inmate health"-"a mental state equivalent to subjective recklessness," which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

**\*3** Here, Gray has failed to satisfy both the objective and subjective components. In short, because Gray was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist, he was not actually deprived of adequate treatment-the objective component-and, further, this extensive treatment and care is evidence that Lee did not act with deliberate indifference-the subjective component. The fact that Gray was not prescribed the precise pain medication of his choosing is of no moment; " 'a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment.' " *Hanrahan v. Mennon,* 470 F. App'x 32, 33 (2d Cir.2012) (quoting *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011)). Similarly, Gray's contentions that Lee violated DOCCS policy and "accepted medical practice" by prescribing Motrin for long-term use are equally without merit. First, a failure to comply with DOCCS policy directives or regulations is not a constitutional violation. *See Sanders v. Gifford,* No. 9:11–CV–0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov.4, 2014). Second, Gray alleges, at best, a negligence or medical malpractice claim, which also does not give rise to an Eighth Amendment violation. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Accordingly, the court adopts Judge Peebles' findings that Gray was provided with adequate medical care, and that Lee did not act with deliberate indifference.

Second, Gray objects to Judge Peebles' findings of fact that Gray "could not be in severe pain because he worked at the Clinton ... mess hall" and that Gray ultimately "secured a less strenuous work detail at the facility mess hall for reasons other than [his] severe pain." (Dkt. No. 44 at 3 (referring to Dkt. No. 43 at 16–17, 16 n. 4.) Because these proposed findings of fact are not central, or even particularly relevant, to Judge Peebles' ultimate recommendation to dismiss Gray's complaint, the court construes these as general objections, which warrant review only for clear error. *See Almonte,* 2006 WL 149049, at *4–5.

At the outset of his analysis, Judge Peebles noted that the undisputed facts did not support a finding of that Gray's pain was severe. (Dkt. No. 43 at 16–17.) Judge Peebles observed that Gray's continued work as a server in the mess hall, and his testimony that he was relieved of certain work duties not because of his injury, but because he was friendly with the corrections officer who assigned job responsibilities, undermined his claims of severe pain. (*Id.* at 16 n. 4.) These facts, however, were but a few of the facts that Judge Peebles considered in determining that Gray's pain was not severe. (*Id.* at 16–17 (noting that Gray's medical records also did not support a finding of severe pain, as medical personnel often discerned no acute distress, and further noting that Gray's voluntary discontinuation of Naproxen also belied his claims of severe pain).) In any event, notwithstanding the severity, or lack thereof, of Gray's pain, Judge Peebles concluded that Gray's claim should be dismissed because he was provided with adequate medical care. (*Id.* at 16–19.) Accordingly, the court finds no clear error in either this portion of the R & R or the remainder of the R & R, and it is adopted in its entirety.

**\*4** Finally, the court notes that, in his objections to the R & R, Gray takes issue with Judge Peebles' denial of his motion to appoint counsel, arguing that, had he been appointed counsel, "summary judgment would not have been granted," and the failure to appoint counsel "may even rise to a violation of [Gray]'s right to Equal Protection." (Dkt. No. 44 at 6–7.) However, Gray's motion to appoint counsel was denied before the R & R was even issued, (Dkt.Nos.35, 37), and, therefore, Gray's dissatisfaction with the disposition of his motion to appoint counsel cannot appropriately be construed as an objection to the R & R at all. To the extent that Gray seeks to renew his motion to appoint counsel in his objections, that request is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' March 9, 2015 Report and Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Lee's motion for summary judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED** that Gray's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Gray's renewed motion to appoint counsel (Dkt. No. 44 at 6–7) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

In this civil rights action, commenced pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Dwaine Gray, a New York State prisoner, alleges that defendant Dr. Kang Lee, a prison physician, was deliberately indifferent to his serious medical needs by failing to provide him with proper pain medication and treatment for a shoulder injury suffered prior to his arrival at the correctional facility where defendant Lee was employed during the relevant time period. As relief, Gray seeks recovery of compensatory damages in the amount of $300,000, as well as injunctive relief directing the defendant to refer him for outside orthopedic consultation and prescribe for him appropriate pain medication.

Now that discovery in the action is closed, defendant has moved for summary judgment dismissing plaintiff's claim against him. In his motion, defendant Lee argues that plaintiff's claim represents little more than his disagreement with the course of treatment prescribed. For the reasons set forth below, I recommend that defendant's motion be granted.

I. *BACKGROUND* [1]

[1]    Although plaintiff has opposed defendant's motion for summary judgment, he did not file a response to defendant Lee's statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug.22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.). Here,

because plaintiff was warned of the consequences of failing to properly respond to defendant's statement of undisputed material facts, *Dkt. No. 32 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant Lee's statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's statement of undisputed material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generallyDkt. No. 1.* While he is currently confined elsewhere, at the times relevant to his claims in this action, Gray was incarcerated at the Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *Id.*

**\*5** In January 2012, while detained at the Westchester County Jail, Gray slipped and fell in the shower, injuring his right shoulder. *Dkt. No. 1 at 4; Dkt. No. 32–2 at 1.* Plaintiff entered into DOCCS's custody two months later, on or about March 2, 2012, and was initially designated to the Downstate Correctional Facility ("Downstate"). *Dkt. No. 32–3 at 16,* 20. On March 16, 2012, while Gray was at Downstate, an x-ray taken of his right shoulder revealed "no fracture, dislocation, soft tissue calcification or significant arthritic change. Large enthesophyte extending from anteroinferior port of acromium measuring about 1.5 cm."*Id.* at 20; *Dkt. No. 32–2 at 57.* The impression stated on the x-ray report by the attending roentgenologist was "NO ACUTE BONE INJURY IDENTIFIED RIGHT SHOULDER STUDY. NO DJD. LARGE ENTHESOPHYTE EXTENDING FROM INFERIOR PORTION OF ACROMIUM. THIS CAN CONTRIBUTE TO SHOULDER IMPINGEMENT SYNDROME IN PROPER CLINICAL SETTING. NO PRIOR STUDY." *Dkt. No. 32–2 at 57.* According to the plaintiff's health records, a physician at Downstate met with Gray on March 20, 2012, at which time he discussed the x-ray results with plaintiff and prescribed 500 milligrams of Naproxen twice daily for thirty days.[2] *Dkt. No. 32–2 at 55; Dkt. No. 32–3 at 20–21*

[2] Naproxen is a non-steroidal anti-inflammatory drug used to treat pain and inflammation associated with various medical conditions. *Dorland's Illustrated Medical Dictionary,* 1251 (31st ed.2007).

Plaintiff was transferred into Clinton on April 10, 2012. *Dkt. No. 32–3 at 19.* While at Clinton, his medical care was overseen by defendant Kang Lee, M.D., a prison physician employed at that facility. *Dkt. No. 32–2 at 1.*

Defendant Lee first met with Gray on April 13, 2012. *Dkt. No. 32–2 at 3, 5–52.* Plaintiff refused defendant Lee's offer to continue Naproxen at that time because, according to plaintiff, it did not help his pain. *Dkt. No. 32–2 at 3; Dkt. No. 32–2 at 51.*

Defendant Lee met with plaintiff again on May 31, 2012. *Dkt. No. 322 at 3,* 50. During that visit, plaintiff continued to complain of right shoulder pain. *Id.* Defendant Lee observed that Gray had a good range of motion and responded to his request for stronger pain medication with a short term prescription of Flexeril (cyclobenzaprine), a muscle relaxer commonly used to relieve skeletal muscle spasms and pain associated with acute musculoskeletal conditions. *Id.; also see Dorland's Illustrated Medical Dictionary,* 463, 725. During subsequent meetings with facility nurses on June 3, 2012 and June 26, 2012, Gray persisted in his refusal of Naproxen and indicated a desired to continue receiving Flexeril instead. *Dkt. No. 321 at 3; Dkt. No. 32–2 at 3,* 49.

On June 29, 2012, defendant Lee examined plaintiff's shoulder, again finding good range of motion. *Dkt. No. 32–2 at 3,* 48. According to defendant Lee, during this appointment, plaintiff requested a prescription for a narcotic analgesic. *Id.* Discerning no need for it, defendant Lee denied plaintiff's request. *Id.*

Plaintiff was next seen by defendant Lee on August 13, 2012. *Dkt. No. 32–2 at 4,* 47. At that time, despite plaintiff's claim that he could not move his right shoulder, defendant Lee continued to find that he had a good range of motion. *Id.*

**\*6** During plaintiff's visit with medical staff at Clinton on September 4, 2012, he was not in acute distress, did not ask for pain medicine, and was observed having full range of motion in his right shoulder. *Dkt. No. 32–2 at 4,* 46. On September 8, 2012, medical personnel attended to plaintiff for complaints about a twisted ankle, and notes from that visit do not include

any indication that plaintiff complained of shoulder pain or requested pain medication. *Id.*

On September 29, 2012, defendant Lee ordered a second x-ray of Gray's right shoulder. *Dkt. No. 32–2 at 4,* 45. The x-ray, which was taken on October 4, 2012, was interpreted by the attending radiologist as follows:

> EARLY OSTEOPOROSIS IS PRESENT AT THE GLENOHUMERAL JOINT. THERE IS A LARGE SPUR ARISING FROM THE INFERIOR ASPECT OF THE ACROMION. THIS MAY CONTRIBUTE TO IMPINGEMENT. CONSIDER CORRELATION WITH MRI EXAM.

*Id.* at 70. During his appointment with plaintiff on October 15, 2012, defendant Lee discussed the results of the x-ray and prescribed Motrin for plaintiff's pain. *Id.* at 4, 44.

Defendant Lee met with plaintiff again on November 8, 2012, at which time he referred Gray for magnetic resonance imaging ("MRI") testing. *Dkt. No. 32–2 at 4,* 42. The MRI testing, conducted on January 11, 2013, resulted in the following findings, rendered by the attending radiologist:

> FINDINGS: Abnormal signal is present in the anterior aspect of the supraspinatus portion of the rotator cuff tendon consistent with a tear. There is also a suggestion of extension to the center portion of the supraspinatus tendon. Abnormal signal in the subscapularis portion of the rotator cuff tendon suggests a tear. Glenoid labrum is intact. There is abnormal signal in the superolateral aspect of the head of the right humerus consistent with bone edema. The acromioclavicular joint is intact.

> IMPRESSION: FINDINGS SUGGESTING A TEAR TO THE ANTERIOR ASPECT OF THE SUPRASPINATUS PORTION OF THE ROTATOR CUFF TENDON. THESE ABNORMALITIES ARE LOCATED ADJACENT TO PROMINENT CORTICAL SPUR ON THE UNDERSURFACE OF THE RIGHT ACROMION. POSSIBLE SUBSCAPULARIS TENDON TEAR.

*Dkt. No. 32–2 at 72.*

After receiving the MRI report, defendant Lee commenced the process for referring the plaintiff to an outside orthopedic specialist on January 31, 2013. *Dkt. No. 32–2 at 5,* 38, 73–74. While Gray awaited his orthopedic consultation, he met with medical staff at Clinton on several occasions, and defendant Lee continued to prescribe Motrin for plaintiff's pain. *Dkt. No. 32–2 at 5,* 33–37.

Plaintiff was transferred out of Clinton and into the Franklin Correctional Facility on April 25, 2013. *Dkt. No. 32–2 at 5; Dkt. No. 32–3 at 31.* At that point, defendant Lee's responsibility for plaintiff's medical treatment was transferred to the medical staff at the new facility. *Dkt. No. 32–2 at 5.*

In general, plaintiff does not dispute the above-described facts. Instead, plaintiff complains that defendant Lee swiftly terminated each appointment without undertaking any examination of him and failed to refer him to an outside specialist. *See, e.g., Dkt. No. 1 at 5–6* ("Upon seeing [defendant Lee in April 2012,] I explained that I try to move my arm, my statement to him was it hurts whenever I try to move it, he then summoned for the officer that for [sic] me to leave.... Upon seeing him, never once did he look in my medical records, all he did was ask me my name, then he said that I'm done.... [Defendant] Lee acted deliberately to deny treatment, and or [sic] to make specialty care[ ] referrals[.]"); *Dkt. No. 32–3 at 50* ("[E]very time I went to [defendant Lee's] office, it was like maybe 30 seconds, I'd been there for 30 seconds."); *Dkt. No. 40 at 3* ("[Defendant Lee] routinely ignored [plaintiff]'s complaints and medical needs and provided only cursory examinations without reviewing his medical file.").

## II. *PROCEDURAL HISTORY*

**\*7** Plaintiff commenced this action on or about March 8, 2013. *Dkt. No. 1.* Although plaintiff's complaint names two defendants, Dr. Kang Lee and Ms. Vonda L. Johnson, the medical supervisor at Clinton, the claims asserted against defendant Johnson were dismissed by Chief Judge Gary L. Sharpe in a decision and order dated September 13, 2013. *Id.* at 1–2; *Dkt. No. 10.* Judge Sharpe's order, issued pursuant to 28 U.S.C. §§ 1915(e) and 1915A, also granted plaintiff's application to proceed in the action *in forma pauperis* and dismissed plaintiff's claims asserted under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, without prejudice. *Dkt. No. 10 at 8–9.*

Plaintiff's Eighth Amendment deliberate medical indifference claim asserted against defendant Lee survived Judge Sharpe's initial order, and is the subject of defendant Lee's pending motion for summary judgment, filed on August 12, 2014. *Dkt. No. 10 at 9; Dkt. No. 32.* In his motion, defendant Lee argues that no reasonable factfinder could conclude he was deliberately indifferent to plaintiff's serious medical needs. *See generally Dkt. No. 32–4.* Plaintiff responded in opposition to defendant's motion on September 26, 2014. *Dkt. No. 40.*

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477

U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Deliberate Medical Indifference Claim*

In his complaint, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct a full examination, refer him to outside specialist, and prescribe pain medication. *See generally Dkt. No. 1.* Defendant Lee, however, contends that his care and treatment of plaintiff was appropriate, and no reasonable factfinder could conclude otherwise based on the record evidence. *See generally Dkt. No. 32–4.*

#### 1. *Legal Standard Governing Deliberate Medical Indifference Claims*

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255,

2015 WL 1724573

268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

**\*9** *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain ." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40). [3]

> [3]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

  *2. Analysis*

Addressing first the objective element of the governing test, I note that the record evidence demonstrates defendant Lee and other DOCCS medical personnel at Clinton provided plaintiff with frequent treatment for his shoulder condition. *Dkt. No. 32–2 at 33–57*. Plaintiff's medical records, while indicating complaints of pain, do not support his claims that he suffered severe pain, and indeed, in some instances, medical personnel treating plaintiff discerned no acute distress. *See, e.g., id.* at 46. Moreover, despite plaintiff's allegations that he suffered severe pain, the evidence before the court reflects that he was able to work as a server in the facility mess hall for three hours per day, seven days a week, from approximately June 2012 until August of that year, when he began ASAT programing. *Dkt. No. 32–2 at 33–37*. In his job at the mess hall, plaintiff would fill pitchers with water, clean the tables, or disburse bread to inmates. [4] *Id.* at 34. The record also reflects that plaintiff voluntarily discontinued taking the pain medication Naproxen in or about the beginning of June 2012. *Dkt. No. 32–2 at 51; Dkt. No. 32–3 at 21*. At that time, rather than ignoring plaintiff's complaints of pain altogether, defendant Lee provided a prescription for

Flexeril, a muscle relaxer, for two weeks. *Dkt. No. 32–3 at 23*. Thereafter, plaintiff was prescribed Percocet, an analgesic comprised of oxycodone hydrochloride and acetaminophen, and over-the-counter medications for his pain. *Dkt. No. 32–2 at 33–47; Dorland's Illustrated Medical Dictionary*, 1377, 1429. Defendant Lee also thereafter ordered repeat x-rays of plaintiff's shoulder in September 2012, and ordered an MRI in January 2013, based on the x-ray results. *Id.* at 42, 45, 77–78. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that defendant Lee did not provide plaintiff with consistent and appropriate care.

4    At his deposition in connection with this matter, plaintiff first stated that he was removed from "table top" duty, involving filling water pitchers and cleaning table tops, due to the pain in his shoulder. *Dkt. No. 32–3 at 34*. Later, however, plaintiff testified that he began disbursing the bread not "because [his] shoulder was hurting him," but because he knew the corrections officer assigning jobs. *Id.* at 42.

 **\*10** Even if the court assumes, for purposes of this motion, that plaintiff's allegations are true, including that defendant Lee's examinations of plaintiff were superficial and short in duration, and that defendant Lee failed to prescribe the pain medication plaintiff requested, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what diagnostic techniques—including x-rays and MRIs—and treatments should be administered to an inmate are "classic example[s] of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). In this case, plaintiff's claim is based on his desire to be examined in a specific manner and provided specific pain medications. This constitutes a disagreement regarding the course of treatment, which does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

As described above, plaintiff's medical records reflect that he was seen by defendant Lee on four occasions between April 2012 and August 2012, before defendant Lee ordered

x-rays of plaintiff's shoulder in September 2012. *Dkt. No. 32–2 at 45,* 47, 48, 50, 52. In between his visits with defendant Lee, other medical personnel at Clinton monitored plaintiff's shoulder condition. *Id.* at 33–57. When a provider callout was requested, defendant Lee timely responded with an examination of plaintiff. *Id.* at 4749. Within six months of plaintiff's arrival at Clinton, and because plaintiff's pain persisted, defendant Lee ordered x-rays, thereafter ordered MRI testing, and then initiated a process for referral of the plaintiff to a specialist. *Id.* at 38, 45, 73–74, 77–78. Under these circumstances, even taking into consideration plaintiff's allegations, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was sufficiently serious to satisfy a deliberate medical indifference claim under the Eighth Amendment.

Similarly, based on defendant Lee's declaration submitted in support of the pending motion and the treatment afforded plaintiff by defendant Lee as documented in plaintiff's medical records, I find that no reasonable factfinder could conclude that defendant Lee acted with deliberate indifference to a serious medical condition. The record reflects that on each occasion he was seen by defendant Lee, plaintiff's range of motion was observed and medication consistent with defendant Lee's professional judgment was prescribed. *Dkt. No. 32–2 at 47,* 48, 50, 52. When plaintiff's shoulder pain persisted, a new x-ray was ordered and, based upon the findings of that x-ray, MRI testing was arranged. *Id.* at 45, 77–78. Upon receipt and review of the MRI report, defendant Lee referred Gray to an outside orthopedic specialist. *Id.* at 38, 73–74. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendant Lee turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

 **\*11** Accordingly, because I find that the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or subjective element of plaintiff's medical indifference claim, I recommend defendant Lee's motion for summary judgment be granted. [5]

5    Plaintiff's response in opposition to defendant Lee's summary judgment motion reflects his belief defendant Lee was negligent in providing him with treatment and liable for medical malpractice. *See generallyDkt. No. 40.* For example, in his memorandum of law, plaintiff states the following:

It is clear from Plaintiff's original claim, his response above and comprehensive exhibits that he presents a viable claim that Dr. Lee did not use reasonable care or best judgment in applying the knowledge and skill ordinarily possessed by practitioners in the field and that he deviated from accepted standards of medical practice, and that deviation was the proximate or aggravating cause of the injuries or damage to Petitioner.

*Dkt. No. 40 at 8–9.* Claims of negligence and medical malpractice, however, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ( "[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke,* No. 87–CV–7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct.21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983."). Accordingly, I recommend that, to the extent plaintiff's complaint could be construed as asserting state law negligence and medical malpractice claims, the court declines to exercise supplemental jurisdiction over those claims in the event my recommendation is accepted and plaintiff's federal claim against defendant Lee is dismissed.

## IV. *SUMMARY AND RECOMMENDATION*

Based upon a careful review of the evidence now before the court, including excerpts of plaintiff's medical records and the transcript of plaintiff's deposition, I conclude that no reasonable factfinder could find plaintiff can satisfy either the objective or subjective element of the governing test for establishing a deliberate medical indifference claim under the Eighth Amendment. Accordingly, it is therefore respectfully

RECOMMENDED that defendant Lee's motion for summary judgment (*Dkt. No. 32* ) be GRANTED, and that plaintiff's remaining deliberate indifference claim be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 9, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1724573

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 121 of 273

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

KeyCite Yellow Flag - Negative Treatment

Distinguished by Bueno Diaz v. Mercurio, S.D.N.Y., March 5, 2020

2018 WL 618451
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Johnny MORGAN, Plaintiff,

v.

Kimberly SHIVERS (Operations Lieutenant), Rashee
Graham (Senior Officer), Christopher Merrick (Senior
Officer), Keith Hardy (Activities Lieutenant), Jabraddrick
Durrant (Corrections Officer), Gregory Adams
(Corrections Officer), Mr. William Feliciano (Shu
Officer), and the United States of America, Defendants.

1:14-cv-7921-GHW
|
Signed 01/29/2018

**Attorneys and Law Firms**

Johnny Morgan, White Deer, PA, pro se.

Natasha Waglow Teleanu, United States Attorney's Office,
New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge

**I. INTRODUCTION**

**\*1** In February 2014, *pro se* Plaintiff Johnny Morgan was
a pre-trial detainee at the Federal Metropolitan Correctional
Center ("MCC") in New York. Following social contact
visits in the prison, inmates were required to submit to
a visual search. During one such search, prison officials
located contraband in one of Mr. Morgan's body cavities.
According to Mr. Morgan, the prison officials conducted an
unreasonable search and forcibly removed the contraband
from his body, causing him pain. Mr. Morgan brings a number
of constitutional claims pursuant to *Bivens v. Six Unknown
Named Agents*, as well as claims under the Federal Tort
Claims Act ("FTCA"). Mr. Morgan's FTCA claims related to
the search at issue here will be decided at trial; Defendants
move for summary judgment only as to Mr. Morgan's *Bivens*
claims, as well as his FTCA claim to the extent it is premised
on a violation of Bureau of Prisons ("BOP") policy. Because

it is not appropriate to imply a damages remedy for the
constitutional claims raised by Mr. Morgan, Defendants'
motion for partial summary judgment is GRANTED.

**II. FACTUAL BACKGROUND** [1]

[1]     The following facts are drawn from the Defendants'
Local Civil Rule 56.1 Statement and Plaintiff's
response in opposition. The Court cites to
Defendants' 56.1 statement, but only does so to the
extent the fact is undisputed. The citation to the
Defendants' statement therefore incorporates Mr.
Morgan's response. *See* Dkt. Nos. 229 & 242.

Plaintiff Johnny Morgan was incarcerated at the BOP's MCC
in New York, New York from March 5, 2012 until April 15,
2013, and again from October 1, 2013 until March 26, 2015.
Dkt. No. 212, Defendants' Statement of Material Undisputed
Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 1. While
at the MCC, Mr. Morgan had visits with friends and family.
*Id.* ¶ 2. Pursuant to BOP policy, upon the conclusion of
social contact visits, inmates are required to submit to a visual
search by a correctional officer. *Id.* ¶¶ 3-4. Such searches
generally involved the inmate removing his clothes, and
complying with various verbal orders that would facilitate the
correctional officer's search for contraband. *Id.* ¶¶ 5-6.

On February 10, 2014, Mr. Morgan participated in a social
visit. *Id.* ¶ 7. During the visit, he was given a "big," "fat" piece
of contraband that consisted of tobacco and K2, wrapped in
plastic, which he attempted to secret in his anal cavity. *Id.* ¶¶
8-9; Declaration of Natasha Teleanu ("Teleanu Decl."), Ex.
A ("Morgan Dep. Tr.") at 52:4-15, 53:17-54:16, 64:20-21.
Mr. Morgan admits that the contraband was only pushed
half-way into his anal cavity. Defs.' 56.1 ¶ 9. Following this
social visit, at around 6:30 p.m., MCC correctional officer
Rashee Graham started to conduct the required visual search
of Mr. Morgan. *Id.*   ¶ 11; Morgan Dep. Tr. at 72:4-74:10,
78:10-78:21. During the search, following two orders to squat
and cough and an order directing Mr. Morgan to spread his
butt cheeks, Officer Graham saw the contraband. Defs.' 56.1
¶¶ 12-14. Officer Graham ordered Mr. Morgan to turn the
contraband over, but Mr. Morgan refused to do so. *Id.* ¶ 15.
Officer Graham then radioed for assistance from other prison
officers, and while he did so, Mr. Morgan attempted to push
the contraband further inside him. *Id.* ¶ 17; Morgan Dep. Tr.
at 94:2-16. *Id.* Eventually Lieutenant Keith Hardy responded
to Officer Graham's request for assistance and came to the
search room. *Id.* ¶ 18. What happened next is in dispute.
Mr. Morgan contends that that the contraband was forcibly

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 122 of 273

removed from his anal cavity by Officer Graham, causing Mr. Morgan pain. *Id.* ¶ 19; Morgan Dep. Tr. at 135:6-7 ("Once he pulled [the contraband] from out of me I observed it from his hand."). According to a BOP report concerning the incident, the officers involved aver that no force was used in removing the bag from Mr. Morgan's rectum. Dkt. No. 221, Declaration of Anthony Pedone, Ex. A (Special Investigative Agent Investigative Report at 2-3).

**\*2** Pursuant to BOP procedure, when officers suspect an inmate is secreting contraband, that inmate is escorted to a "dry cell" in order for officers to observe the inmate's bowel movements to ensure that the inmate is not hiding additional contraband. Defs.' 56.1 ¶ 21. After the contraband was retrieved, Mr. Morgan was therefore handcuffed and escorted to a dry cell in the special housing unit. *Id.* ¶ 20. On his way to the dry cell, and again after some time in the dry cell, Mr. Morgan asked Lieutenant Hardy and one other officer to be taken to the medical department because he was in pain, and had observed blood on the contraband and on his underwear. Defs.' 56.1 ¶¶ 43-44. Mr. Morgan asked "nobody else" besides these two officers about receiving medical treatment. Morgan Dep. Tr. at 148:1-5. While in the dry cell, Mr. Morgan used tissues to wipe around his anal cavity, saw blood on the tissues after doing so, and showed officers the tissues. *Id.* at 150:6-17. Mr. Morgan testified that he eventually fell asleep in the dry cell, and that when he woke up, "by then the bleeding I think kind of slowed down, so I just left it like that. And then they took me [to get medical treatment] the next day." *Id.* at 151:4-10.

Less than twenty-four hours after the search, at around 1:00 p.m. on February 11, 2014, the MCC Chief Psychologist, Dr. Elissa Miller evaluated Mr. Morgan's condition. *See* Dkt. No. 217, Declaration of Elissa R. Miller, Psy.D ("Miller Decl."), Ex. A (February 11, 2014 Sexual Abuse Intervention Contact Note) ("The Chief Psychologist was contacted by the [Prison Rape Elimination Act ("PREA") ] Coordinator.... According to the [PREA Coordinator], Inmate Morgan reported he was 'violated' during a visual search.... Inmate Morgan was immediately interviewed at 1:00 p.m."). The psychologist reported that Mr. Morgan told her that the search caused him pain, and that he continued to wipe blood from his anus as a result of the search. Defs.' 56.1 ¶ 49. Dr. Miller responded to Mr. Morgan's complaints by directing a "complete medical evaluation" by the Health Services Department, and further referring him to the special investigation unit for further investigation of the incident. Miller Decl., Ex. A at 1.

Later that day, at around 3:45 p.m., Mr. Morgan received the directed medical evaluation when BOP mid-level medical practitioner Erwin Ramos performed an injury assessment. Defs.' 56.1 ¶¶ 51, 53. Mr. Ramos noted "no rectal/anal tears" and "no bleeding[,] redness, or swelling" during this exam. *Id.* ¶¶ 54-55, *see also* Dkt. No. 218, Declaration of Erwin Ramos ("Ramos Decl."), Ex. A (February 11, 2014 Health Services Clinic Encounter Report). In the two months following the February 10, 2014 incident, including twice within one week of the search, Mr. Morgan was seen by other BOP and independent medical practitioners on a number of occasions. Defs.' 56.1 ¶ 56. Specifically, Mr. Morgan was seen by Dr. Miller on February 12, February 20, and March 13; by a BOP mid-level practitioner on February 15; by an outside clinic on February 28, by a BOP psychiatrist on March 24; and by a BOP physician on March 25. *See* Miller Decl. ¶¶ 5-7, 9 & Exs. B, C, and D; Dkt. No. 219, Declaration of Robert Beaudoin, M.D. ("Beaudoin Decl.") ¶¶ 9-14 & Exs. B, C, D, and E.

Although Mr. Morgan testified that he is not aware of any internal damage to his anal cavity, Morgan Dep. Tr. at 164:3-5, in opposing summary judgment, he maintains that he "continues to bleed from his rectum" and "continues to believe that he sustained damage at the time of the incident," Dkt. No. 242, Plaintiff's Corrected Response In Opposition To Defendants['] Statement of Material Undisputed Facts, ¶¶ 54-55.

### III. PROCEDURAL HISTORY

Mr. Morgan filed his initial complaint on September 29, 2014, and amended his complaint multiple times. Defendants filed their motion for partial summary judgment on May 17, 2017, arguing that Plaintiff failed to timely exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), that certain Individual Defendants had no personal involvement with the alleged constitutional violations at issue, that any delay in medical treatment was not sufficiently serious to support liability, and that a violation of BOP policy is not actionable under the FTCA. Dkt. No. 222 ("Defs.' Mot."). Plaintiff opposed Defendants' motion on July 6, 2017. Dkt. No. 230 ("Pl.'s Oppn").

**\*3** Following the filing of Plaintiff's opposition, Defendants requested leave to file an extended reply in support of their motion for summary judgment in order to address the applicability of the recent Supreme Court decision in *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017). The Court granted Defendants' request, and Defendants filed their reply brief on July 21, 2017. Dkt. No. 234 ("Defs.' Reply"). Mr.

Morgan filed a sur-reply on August 10, 2017 to address the Defendants' additional arguments. Dkt. No. 244 ("Pls.' Sur-Reply").

## IV. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (quoting former Fed. R. Civ. P. 56(c))).

The party moving for summary judgment must first demonstrate the absence of any genuine dispute of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citing *Celotex*, 477 U.S. at 323). If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). If, on the other hand, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Preservation Soc'y v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).

If the moving party meets its burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial' " in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

**\*4** When the plaintiff is proceeding *pro se*, as Mr. Morgan is here, the Court is obliged to construe the plaintiff's submissions with "special solicitude" and interpret them "to raise the strongest arguments that they *suggest*." *Roman v. Donelli*, 347 Fed.Appx. 662, 663 (2d Cir. 2009) (summary order) (emphasis in original) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006)).

## V. DISCUSSION

### A. The Legal Framework for *Bivens* Claims

In 1971, in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, the Supreme Court held that a plaintiff had an implied private right of action for damages against federal officers who violated the plaintiff's Fourth Amendment rights against unreasonable search and seizure when they handcuffed him inside his home without a warrant. In the more than forty years since that decision, the Supreme Court has created a new implied right of action in only two other cases: (1) under the Fifth Amendment's due process clause for gender discrimination arising out of a Congressman's firing of his female secretary, *Davis v. Passman*, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's cruel and unusual punishment clause arising out of prison officials' failure to treat an prisoner's asthma, which resulted in the prisoner's death, *Carlson v. Green*, 446 U.S. 14 (1980).

In a recent decision, the Supreme Court underscored that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017) (citing

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 124 of 273

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

*Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). That is because "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* at 1857 (citing *Bush v. Lucas*, 462 U.S. 367, 380 (1983)) (internal quotation marks omitted). In *Ziglar*, the Court re-emphasized that the creation of a new private right of action under *Bivens* must be carefully scrutinized.

As the Supreme Court has instructed, this careful scrutiny requires courts to engage in a process to determine whether it is appropriate for the Judiciary to extend a *Bivens* remedy to the claims of a particular case. A court must first determine whether the claim "presents a new *Bivens* context." *Id.* at 1859. A new *Bivens* context will exist "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* The Court presented a non-exhaustive list of considerations to examine if a case is meaningfully different, including:

"[T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk or disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider."

*Id.* at 1860.

If the court determines that the claim at issue differs meaningfully from previous *Bivens* cases, the court must then determine if it is appropriate to imply a new private right of action to that claim. In *Ziglar*, the Supreme Court affirmed the long-held precedent that a *Bivens* remedy "will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Id.* at 1857 (citing *Carlson*, 446 U.S. at 18). The Court explained that the "special factors" inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1857-58. That is, a court begins with the premise that the Judiciary should not readily extend a *Bivens* remedy to new claims, and before a court does so, it should consider a number of factors to determine whether "Congress would want the

Judiciary to entertain a damages suit in a given case." *Id.* Among those factors is whether alternative remedies exist for addressing the constitutional violations raised by the claims of a particular case. The Supreme Court held that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

**\*5** Defendants have moved to dismiss several of the *Bivens* claims that Mr. Morgan's submissions can be construed to raise, contending that these claims differ meaningfully from previous *Bivens* cases, and that there are special factors counselling hesitation in extending a *Bivens* remedy to those claims. In particular, Defendants move to dismiss Plaintiff's (1) Fourth Amendment search and seizure claim; (2) Fifth Amendment excessive force claim; and (3) Fifth Amendment sexual assault claim.[2],[3]

[2]   As Defendants correctly note, and as Plaintiff concedes, because Plaintiff was a pre-trial detainee at the time of the search at issue in this case, his claims arise under the Fifth Amendment, not the Eighth. *See* Defs.' Reply at 14 n.4; Pl.'s Sur-Reply at 8-9; *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d. Cir. 2000).

[3]   Defendants do not move to dismiss Plaintiff's Fifth Amendment deliberate indifference claim using the special factors analysis reiterated by the Supreme Court in *Ziglar*. That claim is addressed separately below.

   B. Mr. Morgan's Claims Are Meaningfully Different from Prior *Bivens* Cases, and Special Factors Counsel Hesitation In Extending A *Bivens* Remedy Here

Each of Mr. Morgan's claims present new *Bivens* contexts. Mr. Morgan's Fourth Amendment claim differs meaningfully from the Fourth Amendment claim in *Bivens* because his claim arises out of allegations concerning a routine search for contraband, not a warrantless seizure of a person. In addition, the body cavity search was conducted by correctional officers, not narcotics agents. Importantly, the search took place in a prison. This difference is meaningful because the Supreme Court has long distinguished its analysis of the Fourth Amendment when raised in the context of a prison facility. In doing so, it has emphasized that "[a] detention facility is a unique place fraught with serious security dangers," and

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

therefore that an inmate's privacy interests must be balanced against the "significant and legitimate security interests of the institution." *Bell v. Wolfish,* 441 U.S. 520, 559-60 (1979). Mr. Morgan's Fourth Amendment search and seizure claim is therefore meaningfully different from the Fourth Amendment claim in *Bivens,* and thus presents a new *Bivens* context. *Ziglar,* 137 S.Ct. at 1860.

Similarly, although *Davis* concerned the Fifth Amendment, Mr. Morgan's Fifth Amendment excessive force and sexual assault claims are meaningfully different from gender discrimination claim raised in *Davis.* That claim concerned an employment action, not a physical search in the prison context. Mr. Morgan's Fifth Amendment claims also present a different context than the claims in *Carlson,* as that case concerned the cruel and unusual punishment clause of the Eighth Amendment as it related to a failure to provide medical treatment, while Mr. Morgan's claims relate to a search for contraband and arise under the Fifth Amendment. *See Ziglar,* 137 S.Ct. at 1864 ("The constitutional right is different here, since *Carlson* was predicated on the Eight Amendment and this claim is predicated on the Fifth."). Furthermore, the allegation that BOP officials forcibly removed contraband from Mr. Morgan's anal cavity is significantly different from the claims in *Carlson* concerning prison officials' indifference to a prisoner's medical need. Plaintiff's Fifth Amendment claims for excessive force and sexual assault therefore implicate a new context for the application of a *Bivens* remedy.

As the Supreme Court reiterated in *Ziglar,* once a court determines that a plaintiff's claim presents a new *Bivens* context, the court must then analyze whether "special factors counsel[ ] hesitation" in expanding *Bivens* "in the absence of affirmative action by Congress." *Id.* at 1857 (citing *Carlson,* 446 U.S. at 18). Here, the Court concludes that there are a number of special factors that caution against extending a *Bivens* remedy to Mr. Morgan's Fourth and Fifth Amendment claims relating to his body cavity search. First, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863. Contrary to Mr. Morgan's assertion, this is not a case in which the only remedy would be the court-created implied right of action—that is, it is not "damages or nothing." *Bivens,* 403 U.S. at 410. Importantly, Plaintiff had an alternative remedy for his claim that the body cavity search violated his constitutional rights—the FTCA. The FTCA provides for money damages for claims "arising ... out of assault, battery," and other torts with regard to acts or omissions of officers of the U.S. Government. 28 U.S.C.

§ 2680(h). Mr. Morgan is pursuing this remedy; his FTCA claim is not challenged in Defendants' motion for summary judgment, and will proceed to trial.

**\*6** Although the Supreme Court considered the existence of the FTCA remedy in *Carlson,* and nevertheless created an implied private right of action in that case, the Supreme Court's recent decision in *Ziglar* indicates that hesitation is nevertheless appropriate today. In emphasizing that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity," the Supreme Court observed that its conclusion in *Carlson* "might have been different if [it] were decided today." *Ziglar,* 137 S. Ct. at 1856-57 (noting that "the Court has refused to [extend *Bivens* to any new context] for the past 30 years"). Therefore, despite the fact that previously, the FTCA and *Bivens* were considered "parallel, complementary causes of action," *Carlson,* 446 U.S. at 20, the Court believes that, in light of the Supreme Court's recent decision in *Ziglar,* the existence of the alternative remedial structure is nevertheless a factor counselling hesitation in extending an implied damages remedy to Mr. Morgan's claims.

While the existence of an alternative remedial structure alone may be sufficient to counsel against the creation of a judicial remedy in this case, the fact that Mr. Morgan's claims arise in the prison context also counsels hesitation. The Supreme Court has opined on factual circumstances very similar to those raised in Mr. Morgan's lawsuit, and has instructed courts to give deference to prison officials in preventing the smuggling of contraband into prison facilities. In *Bell v. Wolfish,* the Court recognized that the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence" in detention facilities, "[a]nd inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases." 441 U.S. at 559. In holding that visual body cavity searches were not per se Fourth Amendment violations, the Court explained that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547.

This is particularly true for the policies and practices concerning prison officials' searches for contraband; the Supreme Court has "recognized that deterring the possession

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 126 of 273

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

of contraband depends in part on the ability to conduct searches without predictable exceptions." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 327-28 (2012). The creation of a damages remedy here could have the negative consequence of deterring prison officials from engaging in such searches. Fundamentally, Mr. Morgan's claims present a plethora of policy-related considerations that would require the Court to balance the challenges prison administrators and officers face in maintaining prison security against the expansion of private right of action for damages. This task is more appropriately suited for Congress, not the Judiciary. *See Bell*, 441 U.S. at 548 ("But judicial deference is accorded not merely because the [prison] administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."). The Supreme Court's acknowledgment that searches for contraband in prisons present issues that warrant judicial deference to prison officials is another factor counseling hesitation in extending *Bivens* to Mr. Morgan's claims concerning the body cavity search.

Furthermore, Congress has legislated in the arena of prisoner rights, suggesting that the courts should not extend a damages remedy in this sphere. As the Supreme Court explained in *Ziglar*, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." 137 S.Ct. at 1865. One such example of legislative action relevant to the claims raised in this case is the Prison Litigation Reform Act ("PLRA"). As the Court in *Ziglar* explained,

> **\*7** Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs ... [T]he Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to

extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id.* at 1865. The PLRA covers Plaintiff's claims here: "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This statutory scheme further causes the Court to hesitate in extending an implied damages remedy here.

In addition to the PLRA, in 2003, Congress enacted the Prison Rape Elimination Act ("PREA"). 34 U.S.C.A § 30301. The PREA was enacted to, among other things, "protect the Eighth Amendment rights of Federal, State, and local prisoners," 34 U.S.C. § 30302(7), in light of the Congressional finding that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," 34 U.S.C. § 30301(13). This statutory scheme has not, however, been interpreted to establish a private cause of action for allegations of prison rape. *See Amaker v. Fischer*, No. 10-CV-0977A, 2014 WL 4772202, at *14 (W.D.N.Y. Sept. 24, 2014) (collecting cases), *order superseded*, No. 10-CV-0977, 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015). This further suggests that, when Congress had the "specific occasion to consider the matter" of prison sexual assault, "and to consider the proper way to remedy those wrongs," it did not find the creation of a remedy for individuals appropriate. *Ziglar*, 137 S.Ct. at 1865. Congressional action in this area suggests that the Judiciary should hesitate before creating a remedy in this case.

Because there are numerous special factors counseling hesitation in extending *Bivens* to the factual circumstances of this case, the Court declines to do so. Defendants are therefore entitled to summary judgment on Mr. Morgan's Fourth Amendment search and seizure claim and his Fifth Amendment claims for excessive force and sexual assault.

## C. Mr. Morgan's Deliberate Indifference Claim Fails

Defendants do not move to dismiss Mr. Morgan's Fifth Amendment deliberate indifference claim based upon the analysis reiterated by the Supreme Court's decision in *Ziglar*.[4] Instead, Defendants contend that Mr. Morgan has not established the elements of a claim for deliberate

2018 WL 618451

indifference to medical needs. The Court agrees. Specifically, the record does not support a finding of a sufficiently serious delay or harm.

4    The Court notes that, even in light of the proscription against creating new *Bivens* remedies, it would be counterintuitive if a convicted prisoner could remedy a federal officer's failure to provide medical care amounting to punishment, but a pre-trial detainee—who, "unlike convicted prisoners[,] cannot be punished at all," could not. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015).

A claim of deliberate indifference to serious medical needs has typically been analyzed under a two-pronged standard. "The first requirement is objective: 'the alleged deprivation of adequate medical care must be 'sufficiently serious.' '" *Spavone v. New York State Dep't of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). The second requirement is that the charged officials must be "reckless in their denial of medical care." *Id.* As the Second Circuit has explained this two-prong standard as it applies to pre-trial detainees like Plaintiff, the second requirement—the "*mens rea* prong" of deliberate indifference to serious medical needs claims—must be analyzed objectively: courts must determine whether the official "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 32, 35 (2d Cir. 2017). Here, the Court need not reach the second prong of this standard, because there are no facts in the record to support a finding that the alleged deprivation was sufficiently serious.

**\*8** To meet the first prong of the deliberate indifference standard, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). As the Second Circuit explained,

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials

who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability. Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain.

*Salahuddin v. Goord*, 467 F.3d at 279-80 (internal citations and quotation marks omitted).

In cases such as this one, where some treatment was given but the plaintiff alleges that that treatment was inadequate, "the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks omitted)). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-cv-6181, 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012); *see also Feliciano v. Anderson*, No. 15-cv-4106, 2017 WL 1189747, at \*11 (S.D.N.Y. Mar. 30, 2017) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 128 of 273

reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years.") (citing *Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233 (2d Cir. 1999) (unpublished)).

Here, there are several reasons why Mr. Morgan's claim for deliberate indifference to serious medical needs fails. First, there is no dispute that Mr. Morgan received medical treatment less than twenty-four hours after he requested to be seen by the medical department. *See* Morgan Dep. Tr. at 151:10. The record indicates that Mr. Morgan asked for medical attention twice in the evening of February 10, 2014—when being escorted to the dry cell, and again after some time had passed while in the dry cell. Morgan Dep. Tr. at 144:5-15, 147:21-149:2. Mr. Morgan asserted that, while in the dry cell, he showed officers tissues he wiped around his anal cavity that had blood on them. There is no evidence that he otherwise informed officers of any urgent medical need. By the afternoon of the next day, on February 11, 2014, Mr. Morgan was seen by BOP psychologist and a BOP mid-level practitioner. Defs.' 56.1 ¶¶ 46, 51, 53. No reasonable jury could find that this temporary delay in treatment was "needlessly prolonged," or that this short waiting time amounted to a constitutional deprivation of care in light of the symptoms described by Mr. Morgan.

**\*9** Moreover, there is no evidence in the record that the delay caused "extreme pain" or exacerbated Mr. Morgan's existing pain. The pain was not so severe that it kept him awake in the dry cell; he testified that he fell asleep and when he woke up his condition had improved. *See* Morgan Dep. Tr. at 151:4-10 ("[B]y the [time I woke up] the bleeding I think kind of slowed down, so I just left it like that."). Mr. Morgan also testified that prior to seeing the mid-level practitioner the afternoon following the search, he was in pain, but that the pain was "a little better" than the day prior, "[m]eaning it wasn't hurting as bad as it was when the incident first happened." Morgan Dep. Tr. at 155:22-156:9. That is, even before receiving medical attention, his condition improved on its own. There is no evidence that Mr. Morgan's conditioned worsened as a result of the time he waited before being seen by the BOP psychologist and BOP mid-level practitioner, and the record therefore does not support a finding that BOP officials were deliberately indifferent to a serious medical need. *See Rodriguez v. City of New York,* 802 F. Supp. 2d 477, 482 (S.D.N.Y. 2011) (granting defendants summary judgment on a claim for deliberate indifference

where plaintiff "present[ed] no evidence that his condition worsened as a result of the three-day delay between his request and receipt of medical attention"); *see also Pabon v. Goord,* 99-cv-5869, 2003 WL 1787268, at \*11 (S.D.N.Y. Mar. 28, 2003) ("More importantly, there is no evidence that these lapses had any significant impact on the actual care that Plaintiff received, or on his course of treatment.").

Additionally, the medical records of the BOP medical staff who met with Mr. Morgan after the incident do not support a finding that the medical care Plaintiff received was so deficient that it amounted to a constitutional harm. The Sexual Abuse Intervention notes from BOP Chief Psychologist Dr. Miller indicate that he was sent to the Health Services Department "for a complete medical evaluation," and that he would be seen again by a psychologist "in light of this reported incident." Miller Decl., Ex. A (February 11, 2014 Sexual Abuse Intervention Contact Note). After meeting with Dr. Miller, Mr. Morgan was indeed examined by MLP Erwin Ramos. Ramos performed an external examination on Mr. Morgan, and noted that there were "no rectal/anal tears; no bleeding noted on visual exam; no redness or swelling." Ramos Decl., Ex. A (February 11, 2014 Health Services Clinic Encounter Report). Neither medical practitioner commented that Mr. Morgan required further medical treatment. *See Toliver v. City of New York,* No. 10 CIV. 5806 SHS JCF, 2013 WL 6476791, at \*5 (S.D.N.Y. Dec. 10, 2013) ("The minimal treatment that he ultimately received—treatment he does not complain about—leads to the conclusion that his injuries were not serious.") *report and recommendation adopted,* No. 10 CIV. 5806 SHS, 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014).

Furthermore, in addition to being seen by Dr. Miller and MLP Ramos on February 11, 2014, Mr. Morgan was seen by medical staff on numerous occasions following the February 10, 2014 incident: three times by Dr. Miller (February 12, February 20, and March 13); once by a BOP mid-level practitioner on February 15; by an outside clinic on February 28, by a BOP psychiatrist on March 24; and by a BOP physician on March 25. *See* Miller Decl. ¶¶ 5-7, 9 & Exs. B, C, and D; Dkt. No. 219, Beaudouin Decl. ¶¶ 9-14 & Exs. B, C, D, and E. Simply put, there is no evidence in the record to support a claim that there were delays or interruptions in his medical care—indeed, Mr. Morgan was seen by medical professionals multiple times within one week of the search. *See Pabon,* 2003 WL 1787268, at \*10 ("The [medical] history recited [ ] makes it apparent that Plaintiff's condition was not ignored."). Mr. Morgan did not complain of pain or bleeding

Morgan v. Shivers, Not Reported in Fed. Supp. (2018)

2018 WL 618451

during any of these visits; there is no evidence to support a finding that Mr. Morgan suffered the type of "life-threatening and fast-degenerating" condition that courts in this Circuit have held to be an adequate basis for a deliberate indifference claim.

Mr. Morgan asserts that the treatment provided by MLP Ramos was inadequate because Ramos "should have [done] an external examination." Morgan Dep. Tr. at 163:6-11. That contention is not sufficient for a reasonable jury to find that the treatment provided amounted to a constitutional harm. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998). In addition, MLP Ramos' sworn declaration states "[i]nternal examinations were performed only when it was suspected that an inmate possessed contraband; however, the normal practice of the Health Services Department was to not perform internal examinations." Ramos Decl. ¶ 15. [5] This further supports the conclusion that the treatment provided to Mr. Morgan did not rise to the level of a constitutional deprivation. Defendants' motion for summary judgment as to this claim is therefore granted.

[5]     The Court notes the irony in Mr. Morgan's contention that an internal examination would have been appropriate in these circumstances, given that such an examination "would have required [MLP Ramos] to insert a finger or instrument into Mr. Morgan's anal cavity." Ramos Decl. ¶ 15.

### D. Mr. Morgan's FTCA Claim Predicated on Violation of BOP Policy Fails

**\*10** Finally, Defendants move for summary judgment with respect to Mr. Morgan's FTCA claim to the extent it is predicated on an alleged violation of BOP policy. In opposing Defendants' motion for summary judgment, Mr. Morgan rejects the contention that his FTCA claim is based on a violation of BOP policy: "The Plaintiff is not forming the basis of his FTCA claim on the regulations propagated by the BOP. The basis of the Plaintiff's claim is the state law assault perpetrated upon him by defendants ..." Pl's. Opp'n at 21. Nevertheless, in the interest of completeness, the Court addresses Defendants' argument here.

The FTCA waives sovereign immunity of the United States against claims for property damage or person injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674. As such, a plaintiff's cause of action under the FTCA must be comparable to a cause of action that is recognized in the jurisdiction where the tort took place. "This 'private analogue' requirement asks 'whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred.' " *McGowan v. United States,* 825 F.3d 118, 125 (2d Cir. 2016) (quoting *Dorking Genetics v. United States,* 76 F.3d 1261, 1266 (2d Cir. 1996)).

Defendants read Mr. Morgan's SF-95 Form to state that his claim is based on Officer Graham "illegally and in defiance of B.O.P. policy, ... repeatedly forc[ing] his fingers into [Plaintiff's] rectum, while other officers restrained [Plaintiff], in an effort to retrieve the suspected contraband." *See* Defs.' 56.1 ¶¶ 74-75. To the extent the violation of BOP policy, standing alone, is the "private analogue" for Mr. Morgan FTCA claim, that claim fails. The Second Circuit has evaluated FTCA claims that purport to be based on a government official's failure to abide by federal regulations, and has held that a " 'violation of the government's duties under federal procurement regulations is action of the type that private persons could not engage in and hence could not be liable for under local law.' " *McGowan,* 825 F.3d at 127 (quoting *Chen v. United States,* 854 F.2d 622, 626 (2d Cir. 1988)) (internal quotation marks omitted). In *McGowan,* the Second Circuit further held that there is no "freestanding duty to abide by private regulations" under New York law. *Id.* Lacking a private analogue under New York law, Mr. Morgan cannot bring his FTCA claim on the basis of the officers' violation of BOP regulations. To the extent he does so, his claim fails as a matter of law, and Defendants' are therefore entitled to summary judgment on that claim.

### VI. CONCLUSION

Because Mr. Morgan has alternative remedies available to him, and because there are special factors counseling hesitation in extending *Bivens* to the context raised in this case, Defendants are entitled to summary judgment on Mr. Morgan's Fourth and Fifth Amendment claims. In addition, because the record does not show that Mr. Morgan suffered a

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 130 of 273
Morgan v. Shivers, Not Reported in Fed. Supp. (2018)
2018 WL 618451

"sufficiently serious" delay or harm, Defendants are entitled to summary judgment on his Fifth Amendment deliberate indifference claim. Finally, to the extent Mr. Morgan's FTCA claim is predicated on a violation of BOP policy, that claim fails as a matter of law because there is no private analogue for a violation of BOP policy under New York law. Defendants' motion for partial summary judgment is therefore granted.

 **\*11**  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 211.

Chambers will mail Plaintiff a copy of this order WRJHWKHU with copies of any unpublished cases cited in this opinion.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 618451

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 131 of 273
Perry v. Rupert, Not Reported in Fed. Supp. (2016)
2016 WL 11478229

2016 WL 11478229
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Howard PERRY, Plaintiff,

v.

Amanda RUPERT, Mary Coryer,

Lawrence Sears, Defendants.

9:10-CV-01033 (LEK/TWD)

|

Signed 04/19/2016

**Attorneys and Law Firms**

HOWARD PERRY, Plaintiff, pro se, 1760 Lexington Avenue, #4H, New York, New York 10029.

OF COUNSEL: RYAN E. MANLEY, ESQ., Assistant Attorney General, HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, Attorney for Defendants, The Capitol, Albany, New York 12224.

### REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

 **\*1**  This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Howard Perry, a former member of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges that Defendants Amanda Rupert ("Rupert"), Mary Coryer ("Coryer"), and Lawrence Sears ("Sears") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs. (Dkt. No. 32.) As relief, Plaintiff seeks compensatory and punitive damages in the amount of ten million dollars. *Id.*

This matter is now before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. Nos. 77, 80.) For the following reasons, the Court recommends granting Defendants' motion for summary judgment (Dkt. No. 77) and denying Plaintiff's cross-motion for summary judgment (Dkt. No. 80).

### I. BACKGROUND AND PROCEDURAL HISTORY

At all times relevant to this action, Plaintiff was an inmate in the custody and control of DOCCS and housed at Ogdensburg Correctional Facility ("Ogdensburg"). (Dkt. No. 32 at 8. [1]) Plaintiff alleges that nurses Rupert [2] and Coryer [3] repeatedly denied him medical care for painful abdominal injuries and that they were deliberately indifferent to his serious medical needs. *Id.* Specifically, Plaintiff claims that on July 9, 2008, after complaining of abdominal pain and vomiting, he was wrongly transferred to Clinton Correctional Facility ("Clinton") for psychiatric evaluation, instead of receiving emergent medical care for his abdominal pain. *Id.* [4] Plaintiff further claims that Sears, as Superintendent of Ogdensburg, was responsible for the actions of the medical staff. (Dkt. No. 32 at 2-3, 10.)

[1]  Page numbers in citations refer to the page numbers assigned by the Court's electronic filing system rather than to the page numbers in the original document.

[2]  Rupert declares that she is a Registered Nurse licensed to practice in the State of New York. (Dkt. No. 78-1 at 1.) In 2008, she held the position of Nurse II at Ogdensburg. *Id.*

[3]  Coryer declares that she is a Registered Nurse licensed to practice in the State of New York. (Dkt. No. 78-2 at 1.) In 2008, she held the position of Nurse II at Ogdensburg. *Id.*

[4]  Plaintiff refers to both July 8, 2008, and July 10, 2008, as the date of the onset of symptoms in his Amended Complaint. (Dkt. No. 32 at 8.) However, the medical records attached to the Amended Complaint indicate July 9, 2008, as the onset date. *Id.* at 19. Plaintiff correctly states July 9, 2008, as the onset date in his cross-motion for summary judgment. (Dkt. No. 80.)

In June 2007, while in DOCCS custody, Plaintiff underwent ventral hernia reconstructive surgery. (Dkt. No. 32 at 8.) Thereafter, on or about July 9, 2008, Plaintiff experienced severe stomach pains, vomiting, and fatigue. *Id.* He was escorted to Ogdensburg's infirmary by two inmates. *Id.* Plaintiff alleges that the medical staff treated him "unprofessionally" and that he was refused proper care. *Id.* Plaintiff claims that "in deliberate spite," his condition was

2016 WL 11478229

"treated like minor stomach pain." *Id.* Plaintiff alleges that the nursing staff had "indifferent attitudes" toward Plaintiff, and as a consequence, he received "poor treatment and disregard." *Id.* In addition, because Rupert and Coryer failed to promptly transfer Plaintiff to a medical doctor, Plaintiff alleges that he experienced major pain and suffering, including additional complications and surgeries, which "almost" cost him his life. *Id.* at 8, 10. Plaintiff further alleges that Rupert and Coryer were "unruly arrogant and deliberately manipulated the records and [their] colleagues to ensure the delay in his condition." *Id.* at 8.

**\*2** Plaintiff filed his original Complaint on August 26, 2010. (Dkt. No. 1. [5]) Plaintiff subsequently filed an Amended Complaint, which is the operative complaint in this action, on April 22, 2013. (Dkt. No. 32.) Rupert and Coyer filed an Answer on May 24, 2013. (Dkt. No. 37.) Sears filed an Answer on July 3, 2013. (Dkt. No. 43.)

[5]     The original Complaint named Ogdensburg Correctional Facility, Superintendent Carl Hunt, Upstate Medical University, Dr. Mustafa Hassan, and Ogdensburg Correctional Medical Staff as Defendants. *Id.* Upon initial review, the Court *sua sponte* dismissed all Defendants except for Defendant Superintendent Hunt. (Dkt. No. 4.) On August 31, 2012, the Court ordered Defendant Hunt to provide Plaintiff with the names of Ogdensburg's medical staff. (Dkt. No. 17.) On September 10, 2012, the Court denied Defendant Hunt's motion for summary judgement made on the grounds of lack of personal involvement subject to reconsideration after the completion of discovery. (Dkt. No. 26.) On April 22, 2013, the Court granted Plaintiff's motion to amend the Complaint naming Rupert, Coryer, and Sears as Defendants. (Dkt. No. 31.) The Court denied Plaintiff's request to further amend the Complaint to name Carl Hunt as a Defendant, and directed the Clerk to terminate Hunt from this action. *Id.*

On July 9, 2013, Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rule of Civil Procedure 12 on the grounds that Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act. (Dkt. No. 44.) By Report and Recommendation dated October 16, 2013, this Court recommended denying Defendants' motion for judgment on the pleadings and further recommended scheduling an evidentiary hearing on the exhaustion issue. (Dkt. No. 48.) Judge Kahn approved and adopted the October 16, 2013, Report and Recommendation in its entirety. (Dkt. No. 49.)

This Court conducted an evidentiary hearing on August 12, 2014. (Dkt. No. 67.) Plaintiff represented himself at the hearing, having been previously assigned pro bono counsel (Dkt. No. 50), but then later refusing the assigned counsel. (Dkt. Nos. 60, 61, 62.) By Report and Recommendation dated May 27, 2015, this Court recommended that Plaintiff be permitted to pursue the claims in his Amended Complaint (Dkt. No. 32) because Rupert was estopped from asserting the failure to exhaust defense and special circumstances existed preventing Plaintiff from exhausting his administrative remedies. (Dkt. No. 68.) Judge Kahn approved and adopted the May 27, 2015, Report and Recommendation in its entirety. (Dkt. No. 69.)

Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 77.) Plaintiff has opposed Defendants' motion and has cross-moved for summary judgment. (Dkt. Nos. 80, 81.) Defendants filed a reply brief, along with their opposition to Plaintiff's cross-motion for summary judgment. (Dkt. No. 84.) For reasons explained below, the Court recommends granting Defendants' motion for summary judgment (Dkt. No. 77), denying Plaintiff's cross-motion for summary judgment (Dkt. No. 80), and dismissing the Amended Complaint (Dkt. No. 32) in its entirety with prejudice.

## II. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505.

**\*3** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must

Perry v. Rupert, Not Reported in Fed. Supp. (2016)

2016 WL 11478229

do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 WHPJCF, 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 S.D.N.Y. Oct. 28, 1999 [6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted) ).

### III. DEFICIENCIES IN PLAINTIFF'S CROSS-MOTION AND OPPOSITION

**\*4** As required under Local Rule ("L.R.") 7.1, Defendants have filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 77-2.) Although Plaintiff has opposed Defendants' motion, Plaintiff failed to respond to the statement of material facts filed by Defendants as required under L.R. 7.1(a)(3). (*See* Dkt No. 81.) Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, [7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [8] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

[7]    L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's

[6]    The Court will provide Plaintiff with copies of unpublished decisions in accordance with the

Perry v. Rupert, Not Reported in Fed. Supp. (2016)

2016 WL 11478229

[Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

8    Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. Nos. 77, 77-1.)

However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

The Court has opted to review the entire record in this case. Moreover, because Plaintiff's Amended Complaint (Dkt. No. 32) is verified, the Court will treat it as an affidavit in opposition to Defendants' motion. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). However, Plaintiff's cross-motion for summary judgment (Dkt. No. 80) and opposition to Defendants' motion for summary judgment (Dkt. No. 81) are unsworn, and unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11, 2009 U.S. Dist. LEXIS 32126, at *5 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g.*, *Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at *7, 2013 U.S. Dist. LEXIS 2203, at *19-20 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718 (HBS), 2012 WL 2401574, at *7, 2012 U.S. Dist. LEXIS 87834, at *20-22 (W.D.N.Y. June 25, 2012).

*5    In deference to Plaintiff's *pro se* status, the Court will consider Plaintiff's unsworn opposition to Defendants' motion

for summary judgment (Dkt. No. 81), and unsworn cross-motion for summary judgment (Dkt. No. 80). Plaintiff's statement of material facts largely consists of legal arguments and conclusory allegations, with few specific facts and limited citations to the record. (*See* Dkt. No. 80 at 8-10.) Thus, it fails to comply with the requirements of L.R. 7.1(a)(3). Under the rule, "failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." L.R. 7.1(a)(3); *but see Holtz*, 258 F.3d at 73 (district court has broad discretion to overlook a *pro se* litigant's failure to fully comply with local rules). Given that Plaintiff, a *pro se* litigant, made a good faith effort to comply with L.R. 7.1, and Defendants were able to provide a response despite the deficiencies (Dkt. No. 84-2), the Court has concluded that Plaintiff's cross-motion should not be denied on the basis of failure to comply with the local rule.

However, the Court's review has revealed that Plaintiff's submissions contain very little in the way of admissible evidence. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998); *Smith v. Rosati*, No. 9:10-CV-1502 (DNH/DEP), 2013 WL 1500422, at *12, 2013 U.S. Dist. LEXIS 54402, at *39 (N.D.N.Y. Feb. 20, 2013) ("Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact."). Evidence must be based on personal knowledge. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988).

## IV. ANALYSIS

### A. Eighth Amendment Right to Receive Adequate Medical Care

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials must ensure that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The objective 'medical need' element measures the severity of the alleged deprivation, while the

Perry v. Rupert, Not Reported in Fed. Supp. (2016)

2016 WL 11478229

subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id.* at 72 (citation and internal quotation marks omitted). "[N]ot every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when the two requirements are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted); *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* The standard to which prison officials are held in that regard is one of reasonableness. *Id.*

*6 The second question is whether the purported inadequacy in the medical care was "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or is likely to cause the plaintiff. *Id.* "In cases where the inadequacy is in the medical treatment given, the seriousness of the inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (citation and internal quotation marks omitted).

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970.

An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106, 97 S.Ct. 285. Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). Disagreements over medication, diagnostics, forms of treatment, and the need for specialists are not adequate grounds for a § 1983 claim, since those issues implicate medical judgment and at worst negligence constituting malpractice. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F.Supp.2d 303, 312 (S.D.N.Y. 2001). Only medical malpractice that rises to the level of culpable recklessness constitutes deliberate indifference. *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith*, 316 F.3d at 185. Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective

Perry v. Rupert, Not Reported in Fed. Supp. (2016)

2016 WL 11478229

terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

The Second Circuit has made it clear that while whether or not a defendant acted with a specific state of mind is frequently a question for resolution by a jury, "summary judgment can be appropriate on the subjective prong of an inadequate-medical-care claim, and Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation." *Castillo v. Rodas*, No. 09 Civ. 9919(AJN), 2014 WL 1257274, at *6, 2014 U.S. Dist. LEXIS 41282, at *18 (S.D.N.Y. Mar. 25, 2014).

### B. The Events of July 9, 2008 to July 11, 2008

**\*7** Plaintiff's Ambulatory Health Records ("AHR"[9]) indicate that on July 9, 2008, at approximately 11:40 a.m., Plaintiff presented to the infirmary complaining of abdominal pain. (Dkt. No. 78 at 3.) Plaintiff informed Rupert that he had vomited three times. *Id.* The AHR indicates that Rupert attempted to examine Plaintiff and ask him questions about his symptoms, but Plaintiff demanded to see a sergeant. *Id.* Rupert advised Plaintiff that if this was an emergency, he needed to be examined and treated. *Id.* Plaintiff jumped up, and left the medical unit without being examined. *Id.*

[9] The AHR is a DOCCS document in which an inmate's medical care is recorded, based on the date of the services. (Dkt. No. 78-2 at 2.)

Plaintiff returned to the infirmary approximately one hour later, at 12:30 p.m. *Id.* He arrived via stretcher and was examined by Coryer. *Id.* The AHR indicates that Plaintiff was "vague" about his symptoms but did complain of vomiting. *Id.* Upon examination, Plaintiff had active bowel sounds, stable vital sounds, and no fever. *Id.* Plaintiff was admitted to an observation room. *Id.* At 1:10 p.m., Coryer observed Plaintiff resting quietly on his left side. *Id.* Coryer checked on Plaintiff again at 1:30 p.m., and noted that Plaintiff was not in distress, even though he claimed to have vomited six times. *Id.*

Later that day, while still in medical observation, Plaintiff screamed for help from staff, was crying uncontrollably, and begging people "not to leave him [there]." *Id.* at 4. The AHR indicates that Plaintiff was unable to control his emotions, was yelling, and appeared to be in a "manic state." *Id.* Plaintiff was crying "sounds," but did not form words. *Id.* Plaintiff then became very calm and requested to return to his

unit. *Id.* Plaintiff became increasingly agitated, was laughing hysterically, and refused to answer questions. *Id.* Plaintiff dozed for five minutes, then woke up and began pacing in the observation room. *Id.* Plaintiff continued to vary from being agitated to serene, and paced and slept intermittently. *Id.*

In light of Plaintiff's behavior, Rupert tried to conduct a suicide screening with Plaintiff. *Id.* However, Plaintiff refused to answer the suicide questionnaire, and refused to speak or acknowledge any staff. *Id.* Later that evening, Plaintiff was transferred to Clinton for a mental health evaluation. *Id.* Plaintiff was examined by mental health staff at approximately 7:13 p.m. *Id.* at 5. At that time, his vitals were stable, and no injuries were indicated or noted. *Id.* Plaintiff's history of ventral hernia repair was noted on the AHR. *Id.* Plaintiff complained of nausea. *Id.* Plaintiff was encouraged to rest, drink lots of fluids, and let staff know if his condition worsened. *Id.* The next day, on July 10, 2010, Plaintiff was discharged from Clinton and transferred back to Ogdensburg. *Id.* at 6.

Plaintiff was next seen by Ogdensburg medical staff on July 11, 2008, at approximately 7:45 a.m. *Id.* at 7. Plaintiff again complained of vomiting. *Id.* Upon examination, Coryer noted that Plaintiff's vital signs were normal. *Id.* He did not have a fever. *Id.* Coryer admitted Plaintiff to an observation room to be evaluated by a medical doctor. *Id.* Coryer observed Plaintiff sleeping at 8:30 a.m. *Id.*

Thereafter, Plaintiff was examined by Dr. Chalom, Ogdensburg's Facility Health Services Director. (Dkt. No. 78-1 at ¶ 23.[10]) The AHR indicates that Plaintiff was complaining of epigastric issues for three days, and that Plaintiff described his pain as "muscle pulling." (Dkt. No. 78 at 7.) Plaintiff stated that he had many episodes of vomiting, and that he had not had a bowel movement or eaten in three days. *Id.* Upon examination, Dr. Chalom noted Plaintiff's abdomen was soft and not tender, and that his bowel sounds were active. *Id.* Dr. Chalom ordered Plaintiff Zantac[11] and Dulcolax.[12] *Id.* Dr. Chalom observed Plaintiff drinking juice. *Id.*

[10] Dr. Chalom is not a party to this action. (Dkt. No. 32.)

[11] Zantac is commonly used to treat acid reflux. (Dkt. No. 78-1 at 5.)

2016 WL 11478229

12    Dulcolax is commonly used to treat constipation. (Dkt. No. 78-1 at 5.)

**\*8** At 10:15 a.m., Coryer observed Plaintiff drink approximately four ounces of apple juice. *Id.* at 8. As ordered, Coryer gave Plaintiff Zantac and Ducolax. *Id.* At that time, Plaintiff did not appear in any distress and had been sleeping. *Id.* At 10:30 a.m., Plaintiff vomited clear liquids onto the floor and at 10:40 a.m., was given a Compazine [13] suppository per the doctor's order. *Id.* The AHR indicates that Plaintiff was ordered to have clear liquids for twenty-four hours, Zantac two times per day, and Compazine three times per day as needed. *Id.*

13    Compazine suppository is commonly used to treat severe nausea and vomiting. (Dkt. No. 78-1 at 5.)

Plaintiff was transferred to Riverview Correctional Facility ("Riverview") to be admitted to their infirmary for evaluation and treatment. *Id.* Plaintiff was received by Riverview by 12:15 p.m. on July 11, 2008. *Id.* At that time, Plaintiff complained of abdominal discomfort and severe pain. *Id.* Plaintiff began writhing in bed and vomited green bile. *Id.* Plaintiff was then transferred from Riverview to Claxton-Hepburn Medical Center ("Claxton"). (Dkt. No. 78 at 9.)

Once admitted to Claxton, Plaintiff was examined by Dr. V. Prasad Yitta. (Dkt. No. 78 at 9. [14]) Upon examination, Plaintiff's abdomen was distended but soft. *Id.* He had no tenderness, no guarding, no rigidity, and no rebound tenderness. *Id.* He had hyperactive bowel sounds and no obvious hernia at that time. *Id.* Plaintiff's CT scan revealed evidence of small bowel obstruction. *Id.* at 10. Abdominal x-rays revealed "still persistent obstruction." *Id.*

14    Dr. Yitta is not a party to this action. (Dkt. No. 32.)

Dr. Yitta determined the best course of treatment was to treat Plaintiff with non-operative measures, including hospitalization, intravenous fluids, and nasogastric decompression. *Id.* Dr. Yitta explained to Plaintiff that it was "better to avoid surgery as long as possible." *Id.* Dr. Yitta further explained to Plaintiff that any surgery would be difficult because of Plaintiff's previous operations and potential adhesions. *Id.* The AHR reflects that Plaintiff understood and was agreeable to the plan. *Id.* Four days later, on July 15, 2008, Plaintiff underwent an exploratory laparotomy with a small bowel resection. *Id.* at 11. Plaintiff

was discharged from Claxton on August 14, 2008, in improved condition. *Id.* at 11-12. [15]

15    While at Claxton, Plaintiff also underwent (1) a laparotomy and end ileostomy on July 17, 2008, (2) an abdominal exploration and washout and packing for temporary closure on July 19, 2008, and (3) an abdominal wound washout and closure of large ventral hernia with biological mesh on July 23, 2008. (Dkt. No. 78 at 11.)

**C. Defendants Rupert and Coryer**

Defendants appear to concede that Plaintiff had a serious medical need. (*See* Dkt. No. 77-3.) Defendant dispute the allegations that Rupert and Coryer did not provide Plaintiff any medical treatment and that they were deliberately indifferent to Plaintiff's serous medical needs. *Id.* at 10.

Here, contrary to Plaintiff's claim that the medical staff at Ogdensburg did not provide adequate medical care, as detailed above, Plaintiffs' medical records are replete with instances of the medical staff tending to his complaints from July 9, 2008 to July 11, 2008. (*See* Dkt. No. 78 at 3-8.) Although Plaintiff describes the treatment that he received from Rupert and Coryer as lacking empathy and their attitude toward him indifferent and unprofessional, the record shows that Rupert and Coryer, along with other medical staff, were attentive to Plaintiff's needs, performing several examinations, keeping Plaintiff for observation, prescribing medications, transferring Plaintiff to a DOCCS facility for a mental health examination, and ultimately transferring Plaintiff to a DOCCS facility for further medical treatment. *Id.* Plaintiff's conclusory allegations that Rupert and Coryer denied him medical care cannot negate Plaintiff's medical records which show Defendants' almost continuous care of his abdominal issues. *See Wright v. Genovese*, 694 F.Supp.2d 137, 156-57 (N.D.N.Y. 2010) ("Plaintiff's ... conclusory allegations of deliberate indifference do not negate the extensive evidence that [the doctor] and others reasonably and diligently addressed plaintiff's medical needs over an extended period of time."); *Williamson v. Goord*, No. 9:02-CV-00521 (GLS/GHL), 2006 WL 1977438, at \*21, 2006 U.S. Dist. LEXIS 46828, at \*14 (N.D.N.Y. July 11, 2006) (recommending dismissal where the defendants "promptly and dutifully" provided care and requested necessary testing). In sum, no genuine issue of material facts exists that Rupert and Coryer withheld medical care from Plaintiff or delayed his treatment.

**\*9** Plaintiff argues that he should have received emergent medical care on July 9, 2008, when he first presented to the infirmary with abdominal pain, instead of being transferred to Clinton for mental health evaluation. (Dkt. No. 32 at 8.) However, a mere disagreement as to the medically proper course of treatment is not a sufficient basis for a deliberate indifference claims. *See Chance*, 143 F.3d at 703. An inmate does not have the right to treatment of his choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). "[D]eliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Cherry v. Edwards*, No. 01 Civ. 7886(FM), 2005 WL 107095, at \*8, 2005 U.S. Dist. LEXIS 702, at \*22-23 (S.D.N.Y. Jan. 18, 2005) (citation omitted), *aff'd*, 155 F. App'x 529 (2d Cir. 2005).

In support of Defendant's motion for summary judgment, Rupert declares that out of concern for Plaintiff's medical well-being, she attempted to conduct a suicide screening with Plaintiff. (Dkt. No. 78-2 at 3.) However, Plaintiff refused to answer the suicide questionnaire, and refused to speak or acknowledge any staff. *Id.* Rupert declares that Central New York Psychiatric Center ("CNYPC") does not have a satellite unit at Ogdensburg. *Id.* at 4. However, CNYPC does have a satellite unit located at Clinton. *Id.* Based upon Plaintiff's mental state, the lack of a mental health unit at Ogdensburg, Plaintiff's inability to cooperate with medical staff, and the fact that Plaintiff's only physical ailment appeared to be nausea, it was decided that CNYPC at Clinton was best equipped to treat Plaintiff. *Id.* Rupert contacted Clinton, and they advised that they had a bed available for Plaintiff. *Id.* Accordingly, Plaintiff was transported to Clinton for a mental health evaluation on July 9, 2008. *Id.*

In this case, Plaintiff disagrees with the medical decision to send him to Clinton on July 9, 2008. (Dkt. No. 32 at 8.) However, a difference of opinion between a prisoner and prison officials regarding medical treatment does not constitute deliberate indifference. *See Chance*, 143 F.3d at 709. Given the evidence of treatment Plaintiff received July 9, 2008 through July 11, 2008, no reasonable jury could find that either Rupert or Coryer had been deliberately indifferent to Plaintiff's serous medical needs. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmovant fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

Moreover, Plaintiff cannot show that the minimal delay in diagnosing his small bowel obstruction was deliberate, or caused a worsening of his condition. *See, e.g., Warren v. Corcoran*, No. 9:09-CV-1146 (DNH/ATB), 2011 WL 5599587, at \*6, 2011 U.S. Dist. LEXIS 135012, at \*17-18 (N.D.N.Y. Oct. 20, 2011) (finding no delay in treatment or care where an inmate complained of and was provided treated for abdominal pain with varying degrees of success over the course of a six-month period of time before the inmate was diagnosed with a small bowel obstruction and had surgery). Here, even though Plaintiff was diagnosed with a small bowel obstruction on July 12, 2008, immediate surgery was not recommended. (Dkt. No. 78 at 9-10.) Rather, Dr. Yitta recommend treating Plaintiff with nonoperative measures. *Id.* at 10. Plaintiff agreed with Dr. Yitta's treatment plan. *Id.* Accordingly, Plaintiff cannot show that Rupert or Coryer were responsible for any delay in diagnosis, or any resulting complications from the July 16, 2008, surgery.

**\*10** In light of the foregoing, the Court recommends that Defendants Rupert and Coryer be granted summary judgment on the merits on Plaintiff's Eighth Amendment claim.

### D. Defendant Sears

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). "Because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at \*6, 2012 U.S. Dist. LEXIS 25367, at \*22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) ). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Case 9:20-cv-00665-MAD-TWD Document 43 Filed 02/08/23 Page 139 of 273

Perry v. Rupert, Not Reported in Fed. Supp. (2016)

2016 WL 11478229

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. [16]

[16]    The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon*, 720 F.3d at 139.

Here, Plaintiff brings an Eighth Amendment supervisory liability claim against Sears. (Dkt. No. 32.) Plaintiff fails to allege that Sears was personally involved in any of the alleged events. Rather, Plaintiff claims that Sears, as Superintendent, is liable for the actions of Ogdensburg's medical staff. (Dkt. No. 32 at 10.) At his deposition, Plaintiff testified that he named Sears as a Defendant because he was the supervisor of Ogdensburg and "supervised somebody that supervised [Rupert and Coryer]." (Dkt. No. 77-7 at 15.) Plaintiff further testified that he had no interactions with Sears. *Id.* at 15-16.

 **\*11**  In support of Defendants' motion for summary judgment, Sears declares he held the position of Superintendent of Ogdensburg from July 2007, through June 2010. (Dkt. No. 77-8 at 1.) As Superintendent, he was responsible for the overall supervision of and management of the facility. *Id.* at 2. Sears declares that he delegated responsibility to Deputy Superintendents and subordinate staff. *Id.* Decisions made regarding the medical care and course of treatment for inmates were ultimately the responsibility of the Facility Health Services Director. *Id.*

In July 2008, Rupert and Coryer each held the position of Nurse II at Ogdensburg, and reported directly to the Facility Health Services Director. *Id.* Sears declares that he did not participate in decisions regarding whether an inmate should be transferred or moved out of Ogdensburg for medical reasons. *Id.* Finally, Sears declares that he did not participate

in any decision regarding Plaintiff's medical care in July 2008. *Id.*

Here, there is no evidence of any personal involvement by Sears under the *Colon* categories. Plaintiff concedes as much, and requests that Sears be dismissed from this action. (Dkt. No. 80 at 7; Dkt. No. 81 at 2.)

In light of the foregoing, the Court recommends that Defendant Sears be granted summary judgment on the merits on Plaintiff's Eighth Amendment claim.

### E. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's Eighth Amendment rights, they are entitled to qualified immunity. (Dkt. No. 77-3 at 14-17.) Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 77) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 80) be **DENIED**; and it is further

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 32) be **DISMISSED IN ITS ENTIRETIY WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**</u> *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Perry v. Rupert, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-00665-MAD-TWD     Document 43     Filed 02/08/23     Page 140 of 273

2016 WL 11478229

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11478229

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3783735
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Roger Jason CRIQUE, Plaintiff,

v.

Dr. Richard MAGILL et al., Defendants.

No. 12 Civ. 3345(PAC)(GWG).
|
July 9, 2013.

*ORDER*

HONORABLE PAUL A. CROTTY, District Judge.

**\*1** In this action, Plaintiff Roger Jason Crique ("Crique"), proceeding *pro se,* asserts a claim under 42 U.S.C § 1983, alleging that defendants Dr. Richard Magill and Mount Vernon Hospital violated his Eighth Amendment rights by delaying treatment for pain caused by a K-wire that became dislodged from his hand after surgery. (Dkt. No. 2.)[1] Defendants moved to dismiss for failure to state a claim, or in the alternative, for summary judgment. On May 1, 2013, Magistrate Judge Gabriel W. Gorenstein issued a Report and Recommendation ("R & R") that the defendants' motion to dismiss should be granted. (Dkt. No. 56.) No objections have been filed. For the reasons set forth below, the Court adopts Magistrate Judge Gorenstein's R & R in its entirety.

[1]    Crique also identified Dr. Kun–Young Chung, medical director at Mount Vernon Hospital, as a defendant in his complaint, but on December 28, 2012, Magistrate Judge Gorenstein granted the plaintiffs request to dismiss Dr. Chung as a party. (Dkt. No. 47.)

*BACKGROUND*

**A. Factual Background and Procedural History**
The factual background of this dispute is set forth in the May 1, 2013 R & R. (R & R at 1–2.) Crique is currently imprisoned at Green Haven Correctional Facility. (Dkt. No. 2, Compl.¶ I.A.) On January 25, 2012, Crique underwent hand surgery at Mount Vernon Hospital, during which a K-wire was put

into Crique's "hand/thumb." (*Id.* ¶ II.D.) After the surgery, the wire "slipped/dislodged from its initial setting," causing Crique "immense pain and suffering." (*Id.*) Crique does not state the precise date that the wire became loose. Crique was scheduled to have a "follow[-]up procedure" with Dr. Magill on February 8, 2012; however, that appointment was rescheduled for February 16, 2012 "due to cancellation." (*Id.*) At a time unspecified in the complaint, Crique "pleaded with Dr. Magill to remove the displaced K-wire that was lodged in [his] thumb." (*Id.*) Dr. Magill did not immediately remove the wire or provide antibiotics. (*Id.*) On February 28, 2012, medical staff at Green Haven prescribed antibiotics. (*Id.*) On March 8, 2012, 43 days after the original surgery, Dr. Magill removed the K-wire. (*Id.*)

The procedural history of the action is set forth in the R & R on pages three and four and footnotes one and two of this order. In relevant part, Crique filed his complaint on April 26, 2012. (Dkt. No. 2.) On November 21, 2012 and January 31, 2013, Dr. Magill and Mount Vernon each respectively filed a motion to dismiss or in the alternative, for summary judgment. (Dkt.Nos.29, 41.) On January 31, 2013, Crique moved for a default judgment, and also requested an order "issuing a stipulation settlement for the total of $9,500.00." (Dkt. No. 52.)

**B. Magistrate Judge Gorenstein's Report and Recommendation**
In the R & R dated May 1, 2013, Magistrate Judge Gorenstein recommended that the defendants' motions to dismiss be granted. First, the Magistrate Judge declined to convert the defendants' motions to dismiss into motions for summary judgment. Since both defendants withdrew their exhaustion defense,[2] the Magistrate Judge did not have occasion to consider any accompanying materials outside the pleadings. (R & R at 8.) With respect to the § 1983 claim, Magistrate Judge Gorenstein concluded that Crique failed to satisfy the subjective element of the deliberate indifference analysis because at most, Crique's allegations sounded in ordinary negligence, not criminal recklessness. (*Id.* at 9–12.) He opined that the plaintiff's factual allegations with respect to timing and any delays in treatment did not plausibly show that the defendants deliberately provided inadequate medical care. (*Id.*) Further, Magistrate Judge Gorenstein recommended denying the plaintiff's motion for a default judgment because Crique lacked any basis for requesting such relief. (*Id.* at 13.) Finally, he recommended that the Court decline to exercise supplemental jurisdiction over any

2013 WL 3783735

state law claims for medical malpractice in light of the recommended dismissal of the § 1983 claim. (*Id.* at 12.)

2  Defendant mentioned that Crique failed to exhaust his administrative remedies and attached matters outside the pleadings in support of their affirmative defense. The defense was later withdrawn. (R & R at 8.)

## DISCUSSSION

## I. STANDARD OF REVIEW

**\*2** The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C § 636(b)(1). A district court reviews those portions of the R & R to which no timely objections have been made for clear error. *See La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). While the Court is aware of Crique's *pro se* status and gives his complaint all requisite latitude, Crique is "not exempt from the rules of procedural and substantive law." *DiPilato v. 7–Eleven, Inc.,* 662 F. Supp 2d 333, 343 (S.D.N.Y.2009) (quotation omitted).

## II. APPLICABLE LAW

### A. Legal Standard Governing a Motion to Dismiss
A party may move to dismiss a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) when the opposing party's pleading "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A court must determine if a complaint "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868. The court draws all reasonable inferences from the facts alleged in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of N.Y.,* 458 F.3d 150, 154 (2d Cir.2006). In the case of *pro se* plaintiffs, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations and internal quotation marks omitted). Even *pro se* pleadings, however, must contain factual allegations that raise a "a right to relief above the speculative level." *Dawkins v. Gonvea,* 646 F, Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Because Crique is proceeding *pro se,* the Court may consider the factual allegations contained in his opposition papers. *See Andino v. Fischer,* 698 F.Supp.2d 362, 376 (S.D.N.Y.2010).

### B. Deliberate Indifference Standard Under 42 U.S.C. § 1983
To be entitled to relief pursuant to § 1983, Crique must show that he was denied a constitutional or federal statutory right under color of state law. *See* 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Section 1983 itself is not a source of any substantive rights, but rather "provides only a procedure for redress for the deprivation of rights established elsewhere." *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

Medical malpractice alone does not amount to an Eighth Amendment violation. Instead, the prisoner is required to prove "deliberate indifference to his serious medical needs." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011). The deliberate indifference standard contains both objective and subjective requirements. *Id.* To show that a prison official was deliberately indifferent toward a prisoner's health, a plaintiff must establish: (1) that the plaintiff objectively "had a serious medical condition," and (2) that the prison official was subjectively "deliberately indifferent" to that condition. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (internal quotation marks omitted).

**\*3** Objectively, the alleged medical condition must be "sufficiently serious" such that it constitutes "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation and internal quotation marks omitted). Subjectively, the prison official alleged to have been deliberately indifferent must have acted with a "sufficiently culpable state of mind." *See Wilson v. Setter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In other words, "the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Hill,* 657 F.3d at 122 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The Second Circuit has analogized the subjective mental state requirement of the deliberate indifference standard to that of criminal recklessness, that is, a failure to act that demonstrates a "conscious disregard of a substantial risk of serious harm." *Hernandez v. Keane,* 341

2013 WL 3783735

F.3d 137, 144 (2d Cir.2003), *cert. denial,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (quotation omitted). The mere fact that an inmate feels that he did not receive adequate attention, or would have preferred some other form of treatment, does not constitute deliberate indifference. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citations omitted).

**C. Analysis**

The Court agrees with the Magistrate Judge's recommendation that the objective standard need not be reached due to plaintiff's failure to adequately plead that defendants had a subjectively culpable state of mind. (R & R at 9–12.) Crique's complaint alleges that Dr. Magill "neglected to provide ... ordinary care and expressed/ displayed indifference." (Compl.¶ II.D.) Accusations of ordinary negligence, however, do not rise to the recklessness standard necessary to prove deliberate indifference under § 1983. *See Farmer,* 511 U.S. at 835 ("Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety.") (quotation omitted).

Aside from Crique's conclusory assertions of indifference, Crique has failed to plead any facts that would plausibly show that Dr. Magill knowingly or intentionally provided improper treatment. While delays in providing necessary medical care may in some cases demonstrate deliberate indifference, the Second Circuit has reserved those instances to cases when prison officials "deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Demata v. New York State Correctional Dep't of Health Servs.,* 1999 U.S.App. LEXIS 22955, at *5, 1999 WL 753142 (2d Cir. September 17, 1999) (citations omitted). Section 1983 does not exist to empower courts to second guess ordinary medical practices at prisons. *Sonds,* 151 F.Supp.2d at 311. Crique has not alleged that Dr. Magill personally and recklessly caused the delay in removing the K-wire, but merely asserts that the initial appointment was "rescheduled due to cancellation." (Compl. ¶ II .D); *see Oliver v. Haddock,* 2009 WL 4281446, at *6 (S.D.N.Y.

Dec.1, 2009) (recommending dismissal of complaint where plaintiff failed to demonstrate that the doctor, as opposed to another individual, selected the date for surgery, and did so with deliberate indifference to the plaintiff's medical need), adopted, 2010 WL 305282 (S.D.N.Y. Jan.22, 2010).

**\*4** Furthermore, Dr. Magill ultimately removed the K-wire "43 days after surgery," and Crique was prescribed antibiotics by Green Haven Medical Staff 12 days after his appointment with Dr. Magill. (Compl.¶ II.D.) The alleged delays are de minimis and do not remotely suggest deliberate indifference. *E.g., Glover v. Greenman,* 2013 U.S. Dist. LEXIS 47318, at *25, 2013 WL 1294698 (S.D.N.Y. April 1, 2013) (finding that a two-and-a-half month delay in the provision of dental treatment does not constitute deliberate indifference); *White v. Sears,* 2011 WL 2728443, at *6 (N.D.N.Y. June 20, 2011) (concluding that the plaintiff's two-month wait to see a physician did not rise to level of deliberate indifference), adopted, 2011 WL 2728431 (N.D.N.Y. July 12, 2011). Nor has the plaintiff alleged any circumstances from which the Court can infer that any delay was inflicted deliberately as a form of punishment, ignored a time-sensitive condition or excessively delayed major surgery. *Demata,* 1999 U.S.App. LEXIS 22955, at *5, 1999 WL 753142.

**III. CONCLUSION**

Finding no clear error in Magistrate Judge Gorenstein's analysis, the Court adopts the R & R in its entirety. Specifically the Court grants the defendants' motions to dismiss and denies the plaintiff's motion for a default judgment. Any outstanding motions on the docket should be terminated. The Clerk of Court is directed to enter judgment and to close this case. Pursuant to 28 U.S.C § 1915(a), I find that any appeal from this order would not be taken in good faith.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3783735

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3904110
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul FENTON, Plaintiff,

v.

Cynthia PROVOW [1] and Kristen Deep, Defendants.

[1]    Plaintiff's initial Complaint names Cynthia "Provel." Dkt. No. 1, Compl. However, it appears from the submissions that the correct spelling is "Provow." *See* Dkt. No. 19, Declaration of Cynthia Provow ("Provow Decl."). The Clerk shall update the docket accordingly.

9:20-CV-1564 (BKS/DJS)
|
Signed August 5, 2022

**Attorneys and Law Firms**

PAUL FENTON, Plaintiff, Pro Se, 42671604, CNYPC, P.O. Box 300, Marcy, New York 13403.

HON. LETITIA JAMES, New York State Attorney General, ADRIENNE J. KERWIN, ESQ., Assistant Attorney General, Attorney for Defendants, The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION and ORDER** [2]

[2]    This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Pro se Plaintiff Paul Fenton ("Plaintiff") brought this action under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights under the Fourteenth Amendment while he was civilly confined at Central New York Psychiatric Facility. Dkt. No. 1, Compl. Following initial review, United States District Judge Brenda K. Sannes ordered that Plaintiff's Fourteenth Amendment due process claims against both Defendant Cynthia Provow and Defendant Kristen Deep proceed. Dkt. No. 3. Defendants have now moved for summary judgment requesting that

the Court dismiss Plaintiff's claims. Dkt. No. 18. Plaintiff's response to the Motion consists only of a letter setting forth his factual allegations. Dkt. No. 21. Defendants then submitted a Reply to Plaintiff's letter. Dkt. No. 22, Reply. For the following reasons, this Court recommends that the Motion for Summary Judgment be granted.

**I. BACKGROUND**

Plaintiff has been civilly confined at Central New York Psychiatric Facility since May 2017. Dkt. No. 19, Declaration of Cynthia Provov ("Provov Decl.") at ¶ 6; Dkt. No. 19-1, Declaration of Kristin Deep ("Deep Decl.") at ¶ 6. He has a history of ulcerative colitis and associated stomach issues dating back at least fifteen years. Dkt. No. 18-3, Reiner Decl., Ex. A, Plaintiff's Deposition ("Pl.'s Dep.") at p. 14. Although the exact timeline is unclear, sometime after he arrived at CNYPC from DOCCS custody, Plaintiff began having increased stomach pain and requested to see a gastrointestinal ("GI") specialist. Compl. at ¶¶ 2, 3. At various points during the relevant time period, Defendant Kristen Deep, a Nurse Practitioner, and Defendant Cynthia Provow, M.D., were responsible for Plaintiff's medical care at CNYPC. Deep Decl. at ¶ 6; Provow Decl. at ¶ 6. Plaintiff claims that he waited for more than two and a half years, in severe pain every day, but was never sent out to see a GI specialist. Compl. at p. 3. Instead of his complaints being addressed, Plaintiff alleges that he was "passed on from doctor to doctor" while he continued to experience a lack of adequate medical treatment. *Id.* On initial review, Plaintiff's Complaint was liberally construed by the Court to assert a claim for medical indifference based upon the allegations that Defendants refused to send him to a specialist despite his repeated complaints of pain. Dkt. No. 3 at p. 7.

Within this claim for medical indifference, Plaintiff asserts several ways in which he alleges that the medical care provided was inadequate. First, he asserts that he was not provided with regular colonoscopies. Pl.'s Dep. at pp. 52-53. Second, he alleges that he was denied surgery for a hernia. Pl.'s Dep. at p. 22. Third, he asserts that a particular medication given for treatment of his colitis was not administered as frequently as it should have been. Pl.'s Dep. at pp. 51-52. He has also asserted that Defendants failed to send him to a GI specialist even though he was "bleeding very badly" and felt that he should be seen on an emergency basis rather than having to wait for an appointment. Pl.'s Dep. at pp. 33, 44.

## II. STANDARD OF REVIEW

**\*2** Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(C); see also *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). In considering a summary judgment motion, the Court's role "is carefully limited to discerning whether there are any genuine issues of material fact to be tried." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), accord, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"A party opposing summary judgment is required to submit admissible evidence." *Perry v. Rupert*, 2016 WL 11478229, at \*3 (N.D.N.Y. Apr. 19, 2016) (citing *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010)). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). As a result, in order to defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

## III. DISCUSSION

**\*3** Defendants Provow and Deep seek summary judgment on the sole ground that Plaintiff has failed to establish deliberate indifference to his medical needs as a matter of law. Dkt. No. 18-1, Defs.' Mem. of Law at pp. 2-9. Defendants argue that Plaintiff's GI conditions were carefully and regularly monitored, that he was consistently provided with adequate treatment, and that at no point was there cause to believe that an emergency condition existed which necessitated more urgent treatment. *Id.* Because the Court concludes that the undisputed evidence in the record demonstrates the lack of deliberate indifference on the part of both Defendants, it recommends that the Motion be granted on that basis.

### A. Deficiencies in Plaintiff's Opposition

As required under Local Rule ("L.R.") 56.1, Defendants have filed a statement of material facts which includes specific citations to the summary judgment record. Dkt. No. 18-2, Def.'s Rule 56.1 Statement. Plaintiff has not formally responded to this statement. Instead, his only response was a short letter which reiterates many of the same assertions contained within the Complaint. Dkt. No. 21. He has not

2022 WL 3904110

provided the Court with any additional facts or admissible evidence aside from those allegations contained within the initial Complaint and subsequent Letter. [3]

[3]    The Court notes that Plaintiff's letter references "witness testimony" of a Kimberly Brown, which he indicates he sent to Defendants' counsel. Dkt. No. 21 at pp. 1-2. However, he has not provided the Court with a copy of that testimony.

Where, as here, a party has failed to respond in the manner required under L.R. 56.1(b), the rule "provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion." *Perry v. Rupert*, 2016 WL 11478229, at *4 (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)). However, courts also have "broad discretion to determine whether to overlook a failure to comply with local rules." *Id.* To that end, the only materials that the Court has available to consider in opposition to the Motion are the unsworn statements contained within Plaintiff's submissions. Although "unsworn statements are generally inadmissible in opposition to a motion for summary judgment," courts have nonetheless "been known to consider unsworn statements in opposition" on motions involving pro se plaintiffs. *Id.* As a result, such unsworn statements may be considered, but only to the extent that they are based on Plaintiff's personal knowledge or are otherwise supported by admissible evidence in the record. *Id.* Accordingly, the Court has considered the unsworn statements contained in Plaintiff's submissions, subject to the previously referenced caveats, in an effort to afford special solicitude given his pro se status.

**B. Merits of Plaintiff's Claim**

Plaintiff's claim for medical indifference as a civilly confined individual is governed by the Due Process Clause of the Fourteenth Amendment, rather than by the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Charles v. Orange Cnty.*, 925 F.3d 73, 85 (2d Cir. 2019); *Williams v. Sykes*, 2019 WL 2374116, at *2 (N.D.N.Y. May 10, 2019), *report and recommendation adopted*, 2019 WL 2369882 (N.D.N.Y. June 5, 2019). The standard under the Due Process Clause is similar in this context to that under the Eighth Amendment, requiring the plaintiff first to satisfy "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of [constitutional rights]" and second, to satisfy a " 'mental element prong' - showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *see also Bell v. Carson*, 2018 WL 5993686, at *2 (N.D.N.Y. Nov. 15, 2018).

**\*4** The first prong is evaluated under an objective standard and considers whether the alleged deprivation of adequate medical care was "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "In the medical care context, analyzing this objective requirement involves two inquiries: whether the [plaintiff] was actually deprived of adequate medical care, and whether the inadequacy in medical care is sufficiently serious, which in turn requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the [plaintiff]." *Johnson v. Schiff*, 2019 WL 4688542, at *11 (quoting *Salahuddin v. Goord*, 467 F.3d at 279-80) (quotation marks omitted). Defendants have conceded for purposes of this Motion that Plaintiff's "ulcerative colitis and associated issues demonstrate a sufficiently serious medical condition," and instead dispute that Dr. Provow and Nurse Practitioner Deep were deliberately indifferent to Plaintiff's medical needs. Defs.' Mem. of Law at pp. 4-5.

Consideration of Defendants' Motion, therefore, turns primarily upon the second prong, referred to as the mens rea or mental element prong. In contrast to the standard under the Eighth Amendment, in the Fourteenth Amendment context, it is not necessary for a plaintiff to establish subjective "proof of a malicious or callous state of mind" on the part of the defendant. *Charles v. Orange Cnty.*, 925 F.3d at 86 (citing *Darnell v. Pineiro*, 849 F.3d at 33-34). Instead, in the context of a Fourteenth Amendment Due Process claim, deliberate indifference "can be shown by something akin to recklessness." *Id.* The Second Circuit has explained that " 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Darnell v. Pineiro*, 849 F.3d at 29 (citing *Farmer v. Brennan*, 511 U.S. at 836-37). As a result, deliberate indifference can be proven by "showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to [the plaintiff's] health or safety.' " *Charles v. Orange Cnty.*, 925 F.3d at 87.

Fenton v. Provow, Slip Copy (2022)

2022 WL 3904110

Despite a somewhat-lessened threshold, evidence of mere negligence will not suffice. *Id.* "Thus, mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (quoting *Cuoco v. Moritsugo*, 222 F.3d 99, 107 (2d Cir. 2000)). Accordingly, a plaintiff "asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to [his] health." *Id.* (emphasis in original).

Plaintiff's complaints largely stem from what he views as a failure to send him to appropriate specialists to treat his ongoing ulcerative colitis and hernia, fault for which he attributes to Defendants Deep and Provow. *See, e.g.*, Compl. In response, Defendants assert that Plaintiff received regular medical treatment for his conditions, and that difficulty in scheduling appointments with specialists was a result of the ongoing COVID-19 pandemic and therefore outside of their control. Defs.' Mem. of Law at p. 5. Defendants also argue that Plaintiff's history of noncompliance with treatment has exacerbated his symptoms. *Id.* Per Plaintiff's own statements, his history of ulcerative colitis and associated stomach issues predate his time at CNYPC, going back more than fifteen years. Pl.'s Dep. at p. 14. Ulcerative colitis "is a chronic inflammatory bowel disease that causes inflammation and ulcers in the large intestine (colon)." Provow Decl. at ¶ 8. The disease can "range from mild to severe" with symptoms that include "rectal bleeding, bloody diarrhea, abdominal cramps, and pain" and may be subject to intermittent flare-ups. *Id.* Ulcerative colitis has no cure, although symptoms and flare ups "can be maintained through diet changes, medications, or, in rare cases, surgery." *Id.*

 **\*5**  Defendant Kristen Deep, a Nurse Practitioner at CNYPC, was Plaintiff's primary care provider from October 2018 until October 2019. Deep Decl. at ¶ 6. Plaintiff alleges that he informed Deep of his stomach pain, hernia, and rectal bleeding, and she told him that she would put in a referral to a GI specialist. Compl. at p. 2, ¶ 6. However, Plaintiff claims he waited for two and a half years, in severe pain every day, and "never once" saw a GI specialist. *Id.* at p. 3, ¶ 7. Instead, he was "passed on from doctor to doctor" and now has Dr.

Provow as a care provider. *Id.* at ¶ 9. Plaintiff began treating with Dr. Provow in October of 2020, just two months prior to the filing of the suit. *See* Provow Decl. at ¶ 6; Compl. (filed December 16, 2020).

Despite Plaintiff's allegations to the contrary, medical records demonstrate that both Defendants provided consistent care and treatment for his abdominal issues. As part of that treatment at CNYPC, Plaintiff was prescribed medications to manage ulcerative colitis and constipation including dicyclomine, docusate sodium, hydrocortisone acetate, mesalamine, psyllium, and various vitamin supplements. Provow Decl. at ¶ 9. Although Plaintiff was provided with these prescribed medications and repeatedly counseled on the importance of medication compliance to minimize symptom flare ups, the undisputed record shows that he often failed to take them. Provow Decl. at ¶ 12, Ex. A. For example, the record demonstrates that Plaintiff refused approximately 121 doses of medication for ulcerative colitis and other stomach issues in the time period from October 5, 2020 to November 22, 2020 alone. *Id.* Plaintiff's own statements confirm this documented noncompliance. When asked at his deposition how often he refused to take his medication, Plaintiff's response was that he "refused all the time." Pl.'s Dep. at p. 66 ("Q: But while you were treating with Nurse Deep and Dr. Provow, how frequently would you say that you refused to take your medication? A: I refused all the time, but I do take it.").

In addition to those medications administered at CNYPC, Plaintiff received regular Remicade infusions at Faxton St. Luke's Healthcare and St. Elizabeth Medical Center. *Id.* at ¶ 10. Remicade is a treatment for moderate to severe ulcerative colitis that is administered intravenously with "maintenance doses" provided every eight weeks, following a more frequent schedule of initial doses. *Id.* Plaintiff claimed during his deposition that he should be receiving infusions every four weeks, rather than every eight. Pl.'s Dep. at pp. 47-48. To the extent that Plaintiff believed those infusions should have happened more frequently, "a mere disagreement as to the medically proper course of treatment is not a sufficient basis for a deliberate indifference claim[ ]." *Perry v. Rupert*, 2016 WL 11478229, at \*9 (citing *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).

Moreover, Dr. Provow explained that the generally prescribed schedule for a patient receiving Remicade is as follows: "Three starter doses are administered to the individual: the initial dosage, followed by a dose two weeks after the

initial dose and a third dose six weeks after the initial dose. After the starter doses, one maintenance dose is administered every 8 weeks." Provow Decl. at ¶ 10. In response to Plaintiff's continued symptoms, Dr. Provow subsequently updated Plaintiff's infusion schedule to receive infusions every six weeks instead. Provow Decl. at ¶ 16. As is the case with his other medications, Plaintiff's own noncompliance undercuts his conclusory claims of deliberate indifference against Defendants with respect to the Remicade infusions, too. For example, a medical note from August 25, 2020 documents that Plaintiff was "argumentative" and claimed he had not received his Remicade infusion, however, the writer of that note stated that Plaintiff had previously refused his Remicade infusion on July 6, 2020. Deep Decl., Ex. D at p. 30; Provow Decl. at ¶ 15. Dr. Provow also noted that Plaintiff was scheduled to receive a Remicade infusion in November 2021, but refused to comply with the required pre-infusion blood draw, which resulted in that infusion being cancelled. Provow Decl. at ¶ 16.

**\*6** Rather than demonstrating evidence of deliberate indifference, the record instead shows that Plaintiff received regular attention and care despite his frequent refusal to cooperate with treatment. For example, on June 27, 2019, Deep changed the dosage of Plaintiff's mesalamine prescription for ulcerative colitis in accordance with the recommended guidelines. Deep Decl., Ex. B, p. 13. On July 22, 2019, Deep met with Plaintiff to review lab results, and ordered supplements based on the results of those labs. *Id.* at p. 14. On August 13, 2019, she reviewed Plaintiff's CT scan and thyroid lab results and discussed with him the importance of medication compliance. *Id.* at p. 15. On October 7, 2019, Deep brought Plaintiff in to again discuss the importance of medication compliance with medications provided for his ulcerative colitis. *Id.* at p. 16. Plaintiff also stated during his deposition that he saw Defendant Deep weekly to discuss his medical concerns. Pl.'s Dep. at p. 29.

Plaintiff asserts, in a wholly conclusory manner, that Defendants Deep and Provow refused to send him to a GI specialist while he experienced "constant pain and suffering." Dkt. No. 21 at p. 1. Plaintiff also asserts that "Nurse Deep told Dr. Provow not to send [him] out for medical attention" and that he was instructed to stay in his room while he was bleeding. *Id.* at pp. 1-2. However, he has set forth no evidence in support of these assertions. "Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact." *Smith v. Rosati,* 2013 WL 1500422, at \*12 (N.D.N.Y. Feb. 20, 2013). Nor

has Plaintiff alleged any personal knowledge regarding the basis for this assertion. Evidence in opposition to a motion for summary judgment "must be based on personal knowledge." *Perry v. Rupert,* 2016 WL 11478229 (citing *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004)).

At the time Plaintiff's suit was filed, he had only been treating with Dr. Provow for approximately two months. *See* Compl.; Provow Decl. at ¶ 6. Like Defendant Deep, Defendant Provow detailed the difficulties experienced when trying to schedule appointments with outside providers, particularly during the COVID-19 pandemic. Provow Decl. at ¶¶ 18-22; Deep Decl. at ¶ *9.* Deep and Provow, as providers at CNYPC, are not personally responsible for scheduling patients with outside providers. Deep Decl. at ¶ 9; Provow Decl. at ¶ 18. Instead, CNYPC providers make referrals to specialists, and appointments are then scheduled through the Office of Mental Health in Albany. *Id.* Deep states that Plaintiff's medical file shows that on August 21, 2018, non-party CNYPC nurse practitioner Josephine Slifka ordered a gastrointestinal consult for Plaintiff with an outside provider. Deep Decl. at ¶ 8. That appointment was scheduled for April 10, 2019. *Id.* However, on February 15, 2019, Plaintiff left CNYPC and was brought to Manhattan Psychiatric Center to attend mandatory court appearances in New York City. Deep Decl. at ¶ 10. As a result, the April 10 appointment was cancelled, and Plaintiff was instead seen in the GI clinic at MPC. *Id.*, Ex. A, p. 7. A colonoscopy was scheduled for April 30, 2019 while Plaintiff was at MPC, *id.*, although Plaintiff refused to attend that appointment, reportedly because he knew he would be returning to CNYPC. Deep Decl. at ¶ 12 & Ex. B at p. 11. Plaintiff's documented refusal to attend a scheduled colonoscopy seriously undermines his conclusory allegation that he failed to receive regular colonoscopies as the result of deliberate indifference from his medical providers. *Wright v. Genovese,* 694 F. Supp. 2d 137, 157 (N.D.N.Y. 2010).

Moreover, the record shows that Plaintiff has in fact received colonoscopies, although perhaps not as frequently as he would have liked. When Dr. Provow took over Plaintiff's care in October 2020, his originally scheduled GI appointment had already been cancelled. Provow Decl. at ¶ 20. In November 2020, Dr. Provow called to inquire about the status of a GI consult for Plaintiff, but by winter of 2020/2021 an increase in cases of COVID again led to non-emergent appointments being cancelled. *Id.* at ¶¶ 21-22. Plaintiff did receive a colonoscopy on February 26, 2020, but in 2021 Dr. Provow again encountered difficulties scheduling Plaintiff for a colonoscopy due to the pandemic. *Id.* at ¶ 26. He was

seen on June 8, 2021 for a GI consult by way of video teleconferencing, *id.* at ¶ 23, and in the interim, Dr. Provow regularly tested Plaintiff's hemoglobin levels to ensure that he was not experiencing excessive bleeding which could indicate a need for emergency treatment. Provow Decl. at ¶ 27. To the extent that Plaintiff believes his condition warranted more urgent emergency treatment, Dr. Provow clearly stated that in her professional medical opinion, emergency treatment was not warranted at any point. *Id.* Plaintiff's disagreement with Dr. Provow's professional judgment cannot provide a basis for a claim of deliberate indifference, because while he may be entitled to adequate treatment, he does not have a constitutional "right to [the] treatment of his choice." *Perry v. Rupert*, 2016 WL 11478229, at *9 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

**\*7** Next, Plaintiff has alleged that the Defendants failed to schedule him to see a GI specialist for hernia surgery. Pl.'s Dep. at p. 22. He testified at his deposition that during his time at MPC he was diagnosed with a hernia and hospitalized for an exacerbation of his ulcerative colitis. Pl.'s Dep. at pp. 19-20. During the three months that Plaintiff was at another facility, Deep could not be fairly said to be responsible for any inadequacies in his medical care. Plaintiff did return to CNYPC after May 15, 2019, at which time Deep resumed responsibility for his care. Deep Decl. at ¶ 10. However, the records do not support that either Defendant displayed deliberate indifference to his medical needs upon his return.

Plaintiff complained of rectal bleeding on June 8, 2019, Ex. B. at p. 10, but refused his annual physical examination with Deep on June 18, 2019. *Id.* at p. 12. On June 25, 2019, Plaintiff's annual physical exam was completed during which time Defendant Deep noted a tennis-ball sized bulge and ordered abdomen and pelvis CAT scans to rule out an umbilical hernia. Deep Dep. Ex. B. at p. 13; Provow Decl. at ¶ 30. The scans were performed on July 31, 2019 and confirmed the presence of a midline ventral hernia. Provow Decl. at ¶ 30. On August 13, 2019, Deep reviewed the CAT scan results with Plaintiff during a follow-up visit. Deep Decl. Ex. B at p. 16. Treatment notes from October 16, 2019 document the presence of an abdominal wall hernia which was not incarcerated, and further note that a GI consult was pending. *Id.* at p. 17. Dr. Provow ordered a repeat scan of Plaintiff's hernia on November 13, 2020, after she had taken over his care. Provow Decl. at ¶ 31. The hernia had increased in size at that time but showed "no evidence of incarceration or strangulation"[4] which might necessitate a more urgent course of treatment. *Id.* Despite

frequent education and counseling from his providers on the importance of treatment compliance, Plaintiff continued to refuse medication regularly, including those prescribed to prevent constipation related to his colitis. *See* Provow Decl. at ¶¶ 9, 12 (noting that Plaintiff was prescribed psyllium and docusate sodium to treat constipation, but that he frequently refused to take medications as prescribed). Dr. Provow opined, and Plaintiff acknowledged, that the straining associated with constipation can cause a hernia to increase in size. Provow Decl. at ¶ 29; Pl.'s Dep. at p. 18.

4    Provow notes that "[a] hernia is incarcerated if part of the intestine or abdominal tissue becomes trapped in the sac of the hernia, producing a bulge in the weak spot of the abdominal wall, whereas a strangulated hernia can cut off blood flow to part of the intestine." Provow Decl. at ¶ 28.

Plaintiff was scheduled to have hernia surgery on at least two occasions, but those appointments were cancelled when elective surgeries were paused in response to the COVID-19 pandemic. Provow Decl. at ¶ 32. However, he did eventually undergo hernia surgery on December 30, 2021. *Id.* at ¶ 33. The hernia was routinely monitored by Dr. Provow in the interim to ensure that it had not elevated to an emergency condition. Provow Decl. at ¶ 32. That Plaintiff may have preferred more prompt surgical intervention does not, on this record, provide the basis for a constitutional violation. *Jamel L. Jenkins v. Dr. Trachtman*, 2017 WL 7163935, at *4 (N.D.N.Y. Dec. 21, 2017), *report and recommendation adopted sub nom.*, *Jenkins v. Trachtman*, 2018 WL 626303 (N.D.N.Y. Jan. 30, 2018), *see also Johnson v. Wright, 477* F. Supp. 2d 572, 576 (W.D.N.Y. 2007). Dr. Provow continued to monitor Plaintiff following his return to CNYPC after surgery and noted that he was "responding well." Provow Decl. at ¶ 33. However, Plaintiff continued to be non-compliant with recommended treatment by medical professionals, ignoring post-operative instructions to wear an abdominal binder at all times following the surgery. *Id.* Where, as here, there is no evidence that a delay in treatment was motivated by disregard for Plaintiff's care, no evidence that the delay had any significant impact on the eventual course of treatment, and ample documentation that his medical needs were otherwise addressed during the delay, deliberate indifference has not been established. *Pabon v. Goord*, 2003 WL 1787268, at *10-11 (S.D.N.Y. Mar. 28, 2003).

**\*8** To the extent that Plaintiff faults Defendants Deep and Provow for the delays in his appointments with specialists, the record demonstrates that Defendants, as referring providers

2022 WL 3904110

from CNYPC, did not and could not determine when Plaintiff would be seen by outside specialists. As a result, even if the Court were to find the delay unduly long, the delays were not attributable to Defendants and thus cannot provide a basis for the type of "conduct necessary to establish deliberate indifference." *Byrd v. Miller*, 2018 WL 5493036, at *4 (N.D.N.Y. Sept. 27, 2018). Furthermore, by all accounts, Defendants Provow and Deep made reasonable efforts to obtain specialist appointments for Plaintiff and continued to monitor and address his underlying medical issues in the interim. This too establishes the lack of deliberate indifference. *Bennett v. Care Correction Sol. Med. Contracter*, 2017 WL 1167325, at *8-9 (S.D.N.Y. Mar. 24, 2017). A difference of opinion between Plaintiff and his medical providers "regarding medical treatment does not constitute deliberate indifference." *Perry v. Rupert*, 2016 WL 11478229, at *9 (citing *Chance v. Armstrong*, 143 F.3d at 709). Nor will deliberate indifference be found when a plaintiff "simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Id.* (citation omitted). Finally, Plaintiff's own refusal to comply with treatment seriously undermines his conclusory claims that the treatment provided by Defendants was constitutionally inadequate. *See Wright v. Genovese*, 694 F. Supp. 2d at 157.

Accordingly, the Court finds that given the evidence of treatment Plaintiff received while at CNYPC, no reasonable jury could find that either Deep or Provow was deliberately indifferent to Plaintiff's serious medical needs. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmovant failed to provide "evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim.") (internal quotation marks omitted). The Court therefore recommends that summary judgment be granted due to Plaintiff's failure to establish deliberate indifference on the part of either Defendant.

## IV. CONCLUSION

For the reasons stated above, it is hereby

**RECOMMENDED**, that the Motion for Summary Judgment (Dkt. No. 18) be **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days [5] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[5]     If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2022 WL 3904110

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3908799
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul FENTON, Plaintiff,

v.

Cynthia PROVOW and Kristen Deep, Defendants.

9:20-cv-1564 (BKS/DJS)
|
Signed August 30, 2022

**Attorneys and Law Firms**

Plaintiff pro se: Paul Fenton, 42671604, CNYPC, P.O. Box 300, Marcy, NY 13403.

For Defendants: Letitia James, Attorney General of the State of New York, Adrienne J. Kerwin, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 *1 Plaintiff pro se Paul Fenton brought this action under 42 U.S.C. § 1983, asserting Fourteenth Amendment deliberate medical indifference claims against Defendants Cynthia Provow and Kristen Deep arising during his civil confinement at the Central New York Psychiatric Facility. (Dkt. No. 1). On January 18, 2022, Defendants filed a motion for summary judgment under Federal Rule of Civil Procedure 56 seeking dismissal of Plaintiff's complaint. (Dkt. No. 18). This matter was referred to United States Magistrate Judge Daniel J. Stewart who, on August 5, 2022, issued a Report-Recommendation recommending that Defendants' motion for summary judgment be granted. (Dkt. No. 26). Plaintiff has filed a timely objection to the Report-Recommendation. (Dkt. No. 27). For the following reasons, the Report-Recommendation is adopted.

**II. STANDARD OF REVIEW**

The Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. Petersen v. Astrue, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the

specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." Kruger v. Virgin Atl. Airways, Ltd., 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. Molefe v. KLM Royal Dutch Airlines, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." Machicote v. Ercole, No. 06-cv-13320, 2011 WL 3809920, at *2, 2011 U.S. Dist. LEXIS 95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. Molefe, 602 F. Supp. 2d at 487.

**III. DISCUSSION**

Plaintiff's objection to the Report-Recommendation reads, in its entirety: "I object to the decision of being den[ied]. I want an appeal. Under reasons Court did not get helpful Counsel discovery." (Dkt. No. 27, at 2). Plaintiff has failed to properly preserve an objection to the Report-Recommendation. His letter objecting to "the decision" in its entirety fails to identify any portion of the Report-Recommendation that Plaintiff asserts to be error and the basis for that assertion. Machicote, 2011 WL 3809920, at *2, 2011 U.S. Dist. LEXIS 95351; see also Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002). Moreover, to the extent Plaintiff's reference to "helpful Counsel discovery" challenges the denial of his motions for the appointment of pro bono counsel, such a challenge is not an objection to the Report-Recommendation. [1] The Court's review is therefore for clear error. The Court has reviewed the Report-Recommendation and finds no clear error in Magistrate Judge Stewart's finding that "no reasonable jury could find that either Deep or Provow was deliberately indifferent to Plaintiff's serious medical needs" and recommendation that Defendants' motion for summary judgment be granted. (See Dkt. No. 26, at 19–20). Accordingly, the Court adopts the Report-Recommendation.

---

[1]     In any event, the Court finds no error in Magistrate Judge Stewart's denial of Plaintiff's requests for pro bono counsel given Plaintiff's failure to substantiate those requests. (See Dkt. Nos. 12, 13, 23, 24).

**IV. CONCLUSION**

 *2 For these reasons, it is hereby

Fenton v. Provow, Slip Copy (2022)

2022 WL 3908799

**ORDERED** that the Report-Recommendation (Dkt. No. 26) is **ADOPTED**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 18) is **GRANTED**, and the Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3908799

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2014 WL 4184752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Karl AHLERS, Plaintiff,
v.
Richard KASKIW, Defendant.

No. 9:12–cv–501 (GLS/ATB).
|
Signed Aug. 21, 2014.

**Attorneys and Law Firms**

Karl Ahlers, pro se.

C. Harris Dague, Ass't Att'y Gen., for the Defendant.

### SUMMARY ORDER

GARY L. SHARPE, Chief Judge.

**\*1** Plaintiff *pro se* Karl Ahlers commenced this action against defendant Dr. Richard Kaskiw,[1] pursuant to 42 U.S.C. § 1983, alleging violations of his Fourteenth Amendment due process rights. (*See generally* Am. Compl., Dkt. No. 6.) Specifically, Ahlers, who is a civilly committed sex offender, confined at the Central New York Psychiatric Center (CNYPC), and in the custody of the New York State Office of Mental Health (OMH), alleged that, between July 2011 and September 2012, Kaskiw denied him an adequate diet and appropriate medical care. (*Id.*) In a Report–Recommendation (R & R) issued on July 9, 2014, Magistrate Judge Andrew T. Baxter recommended that Kaskiw's motion for summary judgment be granted and Ahlers' amended complaint be dismissed in its entirety. (Dkt. No. 21.) For the reasons that follow, the R & R is adopted in its entirety.

---

[1]   Ahlers originally named several additional defendants, all of whom have since been dismissed. (Dkt. No. 8.)

Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate

judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*4–5.

Here, neither party has filed objections to the R & R, and the court, therefore, has reviewed it for clear error. *See id.* While the thoughtful and well-reasoned R & R is free of clear error and is adopted in its entirety, the court takes this opportunity to comment on the proper legal framework for analyzing constitutional medical care claims filed by civilly committed sex offenders, which, as Judge Baxter noted, is an area of uncertainty in this District and Circuit. (Dkt. No. 21 at 6–12.) The confusion arises over whether the courts should apply the same deliberate indifference standard that is employed when such claims are raised by convicted prisoners and pretrial detainees, or whether a more plaintiff-friendly reasonable-professional judgment standard is warranted. (*Id.*)

For substantially the same reasons as articulated in the R & R, this court agrees with the majority of our sister courts, and concludes that the appropriate standard for constitutional medical claims asserted by civilly committed sex offenders is the same deliberate indifference standard that applies to convicted prisoners and pretrial detainees. (*See id.* at 8 (collecting cases).) To the extent that this court has hinted otherwise, and inadvertently contributed to the confusion, *see Treat v. Cent. N.Y. Psychiatric Ctr.,* No. 9:12–cv–602, 2013 WL 6169746, at \*2 n. 4, \*3 (N.D.N.Y. Nov. 20, 2013) (noting the different standards, and indicating that individuals who have been involuntarily committed may be entitled to more considerate treatment and conditions of confinement than prison inmates, but not squarely or definitively deciding the appropriate standard), the court now clarifies which standard it finds appropriate.

**\*2** Accordingly, having found no clear error in the R & R, the court adopts it in its entirety.

### V. Conclusion

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 9, 2014 Report–Recommendation (Dkt. No. 21) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Kaskiw's motion for summary judgment (Dkt. No. 17) is **GRANTED;** and it is further

**ORDERED** that Ahlers' amended complaint (Dkt. No. 6) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendant Kaskiw's motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.Nos.17, 18), which plaintiff has opposed (Dkt. No. 20). This matter was referred to me for Report and Recommendation on January 31, 2014 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff Karl Ahlers is a civilly-committed sex offender, confined at the Central New York Psychiatric Center ("CNYPC"), in the custody of the New York State Office of Mental Health ("OMH"). Liberally construed, the amended complaint ("AC," Dkt. No. 6) alleges that, between July 2011 and September 2012, Dr. Kaskiw denied plaintiff an adequate diet and appropriate medical care, in violation of the Due Process Clause of the Fourteenth Amendment.[1] For the reasons set forth below, this court recommends that defendant's summary judgment motion be granted, and that the remaining claim set forth in plaintiff's amended complaint be dismissed.

[1]     Chief Judge Sharpe's Decision and Order dated April 19, 2013, dismissed various other claims against five additional defendants who were named in the amended complaint. (Dkt. No. 8 at 17).

### FACTS

The amended complaint alleges that, based on an improper diagnosis that plaintiff suffered from a nut allergy, he was kept on a restricted diet at CNYPC, which deprived him of certain foods that were provided to other residents. (AC ¶¶ 2–9, 26–27, 46–48). Plaintiff's requests to be taken off the restrictive diet and to be scheduled for allergy testing, to determine whether he was allergic to nuts, were denied by Dr. Kaskiw and others. (AC ¶¶ 10–18, 21, 28–35, 38). The amended complaint states that, as a result of the restricted diet, plaintiff lost an average of one pound per month since December 2010. (AC ¶¶ 45, 48). Plaintiff also alleges that the medical staff refused to continue to prescribe Lidex cream to address a persistent itchy rash on plaintiff's legs and feet. (AC ¶¶ 39, 41 & Exs. 23, 25; Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4).[2]

[2]     The amended complaint also alleges that Dr. Kaskiw ignored (1) a complaint from plaintiff on March 26, 2012 "concerning pain that had developed" in his arms, legs, and abdomen (AC ¶¶ 24–25 & Ex. 15); (2) a request on July 13, 2012 concerning a prescription for an ophthalmologist which plaintiff never received (AC ¶ 40 & Ex. 24); and (3) a July 22, 2102 letter noting plaintiff's problems climbing multiple flights of stairs, and requesting an elevator pass (AC ¶ 42 & Ex. 26). Neither plaintiff's amended complaint, nor his motion papers, provide further information regarding any negative impact on plaintiff's health or well-being resulting from the alleged lack of response to these complaints; hence, they clearly do not support a constitutional claim for inadequate medical care based on the legal standards discussed below.

When plaintiff was transferred to CNYPC in May 2009, his prior medical records from other facilities contained numerous references to his nut allergies and the fact that his diet was not to include, *inter alia,* nuts and honey. (Kaskiw Aff. ¶¶ 17, 18, Dkt. No. 17–4; AG DEF–1–3, 11–12, Dkt. No. 18).[3] Based upon plaintiff's documented medical history, the CNYPC staff imposed an allergy-tailored diet plan that excluded foods to which plaintiff was allergic, including nuts and honey.[4] (Kaskiw Aff. ¶ 20, AG DEF–12, 13).

2014 WL 4184752

3        For example, an August 8, 2007 Nursing
         Assessment from the Manhattan Psychiatric Center
         noted that plaintiff had allergies to honey, rice, and
         nuts, which resulted in abdominal discomfort and
         vomiting. (AG DEF–2).

4        "Examples of products that might contain
         tree nuts include ... [h]oney ...."
         USDA Food Allergy Fact Sheet,
         http:// www.nfsmi.org/documentlibraryfiles/
         PDF/20130227020259.pdf. Plaintiff's medical
         records also indicate that he was allergic to bee
         stings, which may have influenced the exclusion of
         honey in his restricted diet. (AG DEF–12–13, 20).

*3 On or about November 7, 2011, plaintiff attended a medical appointment with Dr. Kaskiw, during which he objected to his allergy-tailored diet plan and requested to have the plan discontinued so that he could regulate his own diet. Dr. Kaskiw advised plaintiff that eliminating his dietary restrictions was not medically appropriate, would be in violation of facility policy, and would present a danger to plaintiff. Plaintiff also requested further allergy testing, which Dr. Kaskiw refused as medically unnecessary, given plaintiff's well-documented allergy history. (Kaskiw Aff. ¶ 21; AG DEF–15).

Plaintiff thereafter made repeated complaints to Dr. Kaskiw and other OMH officials, claiming that he had no food allergies, objecting to his restricted diet, and demanding allergy testing. (AC ¶¶ 12–23, 26–38). OMH consistently responded that a change in plaintiff's dietary restrictions and re-testing for allergies were not medically indicated given his history of nut allergies. (Kaskiw Aff. ¶¶ 22–23; AG DEF 31–38).

On or about November 13, 2012, two months after plaintiff filed this lawsuit, he was given a Radioallergosorbent ("RAST") test by an outside allergy testing laboratory. The RAST test was positive for a "Class III" peanut allergy, indicating a "moderate to strong" food allergy. (Kaskiw Aff. ¶¶ 24–26; AG DEF–16–17). Based on the re-testing results, CNYPC continued plaintiff on a restrictive diet, excluding peanuts and peanut by-products. (AG DEF–28–30).

Medical records from the Manhattan Psychiatric Center indicated that, as of August 2007, plaintiff weighed 236 pounds, and that the nursing staff was tasked with educating him about the importance of better dietary choices. (AG DEF–7–8). Upon his transfer to CNYPC on May 28, 2009,

plaintiff's height was 75.5 inches and his weight was 260 pounds, placing him in the "obese" category on the American Medical Association's Body Mass Index ("BMI") scale. (Kaskiw Aff. ¶¶ 34–35 & Ex. 2). Plaintiff's weight was gradually reduced to 216 pounds ("overweight" on the BMI scale) as of September 28, 2011; to 203 pounds (still "overweight") as of September 29, 2012; and to 194 pounds (a normal and healthy weight on the BMI scale) as of December 28, 2013. (Kaskiw Aff. ¶¶ 36–38 & Ex. 2). Dr. Kaskiw observed that plaintiff's "gradual and steady" weight loss over the course of four years "placed him in a vastly improved, medically desirable, healthy place." Dr. Kaskiw concluded that "there has been no need for treatment or medical intervention to curb or other[ ]wise address [plaintiff's] weight loss or dietary restrictions." (Kaskiw Aff. ¶ 39).

Dr. Kaskiw prescribed Lidex cream to plaintiff on January 9, 2012, based on his complaints of dry, scaly skin on his ankles/feet. (Kaskiw Aff. ¶ 43; AG DEF 20–22).[5] On July 30, 2012, CNYPC medical staff examined plaintiff, following his request for Lidex cream, and found dry and itchy skin on his legs, with four to five scattered small scabs. A nurse practitioner determined that a prescription for Lidex cream was not indicated, and suggested plaintiff use an over-the-counter skin moisturizer available through the facility's commissary. (Kaskiw Aff. ¶ 44; AG DEF–23). Plaintiff was examined again on August 21, 2012 and presented with a raised rash on his arm and scabbed areas on his calves. A nurse practitioner advised plaintiff to try a lower-potency steroid cream first, instead of Lidex. (Kaskiw Aff. ¶ 45; AG DEF–24–25). Plaintiff was seen again on November 27, 2012, still complaining of dry, itchy skin and a raised rash on his legs. Plaintiff was treated by a nurse practitioner with Benadryl, Bacitracin and Lac–Hydrin. (Kaskiw Aff. ¶ 46; AG DEF–26–27).

5        Lidex cream is a topical steroid anti-inflammatory
         medication often prescribed to relieve symptoms
         of eczema, such as itching or skin dryness. (Kasiw
         Aff. ¶ 42).

## DISCUSSION

### I. Summary Judgment

*4 Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Salahuddin v. Goord, 467 F.3d 263,

272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## II. Medical Care

### A. Applicable Law

In analyzing the contours of the constitutional standard applicable to medical care claims of civilly committed sex offenders, it is helpful to discuss first the standards applied by the courts when such claims are raised by convicted prisoners and pretrial detainees. In order to state a claim for cruel and unusual punishment under the Eighth Amendment, based on constitutionally inadequate medical treatment, a sentenced prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's cruel and unusual "punishment" clause is not directly applicable to prisoners who have not been convicted. *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2d Cir.2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994) [6], should be applied to constitutional medical care claims of pretrial detainees under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 F. App'x at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n. 4.[7]

[6] Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

[7] As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates.' " 581 F.3d at 71–72 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 649 (5th Cir.1996) (en banc)).

**\*5** Civilly committed sex offenders are neither convicted inmates, nor "pretrial detainees." However, most of the judges in the Northern District of New York who have analyzed constitutional medical care claims by civilly committed sex offenders at CNYPC have relied upon *Caiozzo* in applying the same deliberate indifference standard applied by the Second Circuit to sentenced prisoners and pretrial detainees. *See, e.g., James v. Morgan,* 9:13–CV–526 (DNH/CFH), 2014 WL

841344, at *2 (N.D.N.Y. March 4, 2014)[8]; *Ali v. Hogan,* No. 9:12–CV–0104 (DNH/RFT), 2013 WL 5466302, at *4 (N.D.N.Y. Sept. 30, 2013); *Smith v. Carey,* No. 9:10–CV–1247 (NAM/TWD), 2012 WL 6923338, at *7 (N.D.N.Y. Dec. 28, 2012) (Rep't–Rec.), *adopted,* 2013 WL 237722 (N.D.N.Y. Jan. 22, 2013); *Balkum v. Sawyer,* No. 6:06–CV–1467 (NPM), 2011 WL 5041206, at *11 (N.D.N.Y. Oct. 21, 2011); *Smith v. Hogan,* No. 9:09–CV–554 (GTS/GHL), 2011 WL 4343978, at *8 (N.D.N.Y. Aug. 1, 2011) (Rep't–Rec .), *adopted,* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011). Some of our judges, however, have noted uncertainty as to whether a different standard for medical care claims of civilly committed persons should be applied, at least in the alternative, based on the Supreme Court's case in *Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982) and its progeny. *See, e.g., Groves v. New York,* No. 9:09–CV–412 (GLS/DEP), 2010 WL 1257858, at *6, *8 (N.D.N.Y. Mar. 1, 2010) (persons in nonpunitive detention have a right to "reasonable medical care," a standard demonstrably higher than the Eighth Amendment standard that protects prisoners-"deliberate indifference to serious medical needs") (citing *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd,* 60 F.3d 812 (2d Cir.1995) (table)) (Rep't–Rec.), *adopted,* 2010 WL 1257942 (N.D.N.Y. Mar. 26, 2010).

[8]   "Because plaintiff was civilly committed at the time of the incident, his medical care claims are analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment..... Despite this distinction, the same standard applies to Fourteenth Amendment medical care claims involving non-prisoners as to Eighth Amendment medical claims regarding prisoners." *Id.* (citing, *inter alia, Caiozzo,* 581 F.3d at 72).

*Youngberg* considered the legal standard that should be applied to assess the claim asserted on behalf of a "mentally retarded" individual, who was involuntarily committed to a state institution, and whose substantive due process rights to safe conditions of confinement, freedom from bodily restraint, and training or "habilitation" were allegedly violated. *Youngberg,* 457 U.S. at 309. The Supreme Court noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. The Youngberg court

held that the standard articulated by Chief Judge Seitz in the lower court opinion under review

> ... affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."

**\*6** *Id.* at 321 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (en banc) (Seitz, C.J., concurring).

It does not appear that the Supreme Court or the Second Circuit have explicitly ruled on whether *Youngberg* would require the application of a different standard for constitutional medical care claims for civilly committed persons than is now applied to sentenced prisoners and pretrial detainees.[9] There is disagreement among other courts on this question. *See, e.g., Battista v. Clarke,* 645 F.3d 449, 453 & n. 4 (1st Cir.2011) (the opinions as to whether a different, more plaintiff-friendly reasonable-professional-judgment standard applies to civilly committed individuals, based on *Youngberg v. Romeo,* are "not uniform") (collecting cases).

[9]   In *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012), the Second Circuit discussed *Youngberg* in assessing prior civil rights claims of the plaintiff in this action relating to the seizure of certain of his DVDs by officials at CNYPC:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22.... However, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." ... The state also has an interest in treating the civilly committed individual.... The reasonableness of the seizure in this case depends on a balance of interests: the state's interests in order, security, and treatment, and Ahlers's property interest in his discs..... In striking the appropriate balance, decisions

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 158 of 273

made by the Defendants are entitled to a " 'presumption of correctness.' "

This panel decision indicates the Second Circuit may still adhere to the general proposition that civilly committed individuals are entitled to more considerate conditions of confinement than convicted prisoners. However, it does not shed much light on the appropriate standard to apply to medical care claims of a civilly committed sex offender following the decision in *Caiozzo* that the deliberate indifference standard applies to pretrial criminal detainees.

This court is persuaded by the opinions in other circuits that *Youngberg,* when construed in light of subsequent Supreme Court cases, does not compel a different standard for medical care claims for civilly committed individuals and prisoners or pretrial detainees. *See, e.g., Scott v. Benson,* 742 F.3d 335, 339 (8th Cir.2014) (because the Supreme Court later said that *Youngberg* "did not deal with decisions to administer or withhold medical treatment[ ]," *Cruzan by Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 279–80 (1990), we apply the deliberate indifference standard from the Eighth Amendment to the medical care claims of a civilly committed plaintiff); *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 646–47 (5th Cir.1996) (although *Youngberg* announced a distinct standard to be applied in measuring the state's constitutional duties to mental incompetents, the Court's later decision in *DeShaney,* called into question the constitutional significance of the *Youngberg* decision) [10] (citing *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199–200 (1989)). *See also Serna v. Goodno,* 567 F.3d 944, 949 (8th Cir.2009) (applying the Fourth Amendment standard applicable to a pretrial detainee to a civil detainee, based on an analogy drawn by the *Youngberg,* 457 U.S. at 320–21, between pretrial detainees and civilly committed persons, as two groups that could be subjected to liberty restrictions "reasonably related to legitimate government objectives and not tantamount to punishment") [11]. However, like the Fifth Circuit in *Hare,* 74 F.3d at 647, I need not resolve whether the professional judgment standard suggested by *Youngberg* has continuing vitality in the context of medical care claims, because, as discussed below, the standard is not substantially different from "deliberate indifference," and both would produce the same outcome on the facts of this case.

[10]      "*DeShaney* clarified that '[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions

of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.' 489 U.S. at 200.... In other words, *DeShaney* suggests that a State's declared intent to confine incompetents for their own benefit, as opposed to its announced purpose to punish convicted criminals, should have no bearing on the nature of the constitutional duty owed to either group.... Since the State restrains the individual liberty of both mental incompetents and convicted inmates in a like manner, the State should incur the same duties to provide for the basic human needs of both groups." *Hare,* 74 F.3d at 647. In holding that the "deliberate indifference" standard applies to claims that a pretrial detainee was deprived of basic human needs, including medical care, the Fifth Circuit also noted that subsequent Supreme Court cases such as *Farmer,* which articulated the deliberate indifference standards for prisoners, "cast doubt on the vitality of *Youngberg." Id.* As noted above, the Second Circuit in *Caiozzo* relied on *Hare* and *Farmer* in deciding to apply the deliberate indifference standard to pretrial detainees asserting medical care claims.

[11]      "The similarity in the grounds for detaining persons awaiting trial and persons determined to be sexually dangerous supports application of the analogy to pretrial detainees ...." *Serna v. Goodno,* 567 F.3d at 948.

### 1. Deliberate Indifference

The objective prong of the deliberate indifference standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining

when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

\*7 The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

### 2. Professional Judgment

Chief Judge Seitz's concurring opinion in the Third Circuit elaborated on the professional judgment standard adopted, on review, by the Supreme Court in *Youngberg:*

[T]he defendants are liable if their conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment.... By "accepted professional judgment" I do not mean some standard employed by a reasonable expert or a majority of experts in the community, as state malpractice actions would require, but rather that the choice in question was not a sham or otherwise illegitimate.... The 'substantial departure from accepted professional judgment' standard effectively distinguishes between conduct that violates the minimum requirements of the Constitution and conduct, such as ordinary malpractice, that does not.

\*8 *Romeo v. Youngberg,* 316 F.3d at 178. I agree with the judges who have parsed this standard and have concluded that it is not "all that far apart" from the deliberate indifference standard articulated in *Farmer.* See, e.g., *Battista v. Clarke,* 645 F .3d at 453 ("[b]oth the *Farmer* and *Youngberg* tests leave ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"). *See also Groves v. New York,* 2010 WL 1257858, at \*6 (concluding that "[a]t a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed" and focusing on the "deliberate indifference" standard in reviewing the medical care claim of the civilly-committed CNYPC sex offender).

I would respectfully disagree with the 1993 Eastern District of New York opinion in *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. at 1043, and other cases to the extent they suggest that *Youngberg* imposed a "reasonable medical care" standard for civil detainees that is "demonstrably higher" than the Eighth Amendment deliberate indifference standard.[12] Such a "reasonable medical care" "is easily confused" with a negligence or medical malpractice standard that was clearly not intended by the Court in *Youngberg. Hare v. City of Corinth, Miss.,* 74 F.3d at 646.

---

12 *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/ DEP), 2007 WL 737320, at \* 1 (N.D.N.Y. Feb. 20, 2007) distinguished *Haitian Centers* because it dealt with immigration issues and was "wholly outside the context of prisoner litigation." *Owens v. Colburn,* 860 F.Supp. at 974, a 1994 Northern District of New York case which applied the

"reasonable medical care" standard to pretrial detainees, was clearly overruled by the Second Circuit's 2009 opinion in *Caiozzo,* which held that the "deliberate indifference" standard should apply in that context.

**B. Analysis**

Pursuant to the legal analysis above, this court will evaluate plaintiff's complaints about his medical care primarily under the "deliberate indifference" standard applicable both to prisoners under the Eighth Amendment and to persons in non-punitive detention under the Due Process Clause. However, in the alternative, I will also assess how plaintiff's claims would fare under the "professional judgment" standard, to the extent that applies to civilly committed individuals.

**1. Restrictive Diet/Weight Loss**

"The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health .... While prison officials are duty bound to provide inmates with nutritionally adequate food, 'absent religious or medical [ly] peculiar circumstances, a prisoner does not have a right to a specialized diet while incarcerated[.]' " *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/DEP), 2007 WL 527320, at *10 (N.D.N.Y. Feb. 20, 2007) (citations omitted). Prison officials have the discretion to control a prisoner's diet within these constitutional constraints, and " '[p]reference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.' " *Collado v. Sposato,* No. 12–CV–2151, 2012 WL 3113837, at *4 (E.D.N.Y. July 24, 2012) (quoting *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001)). To establish a deliberate indifference claim with respect to a medically prescribed diet, " 'one must establish that there was a sufficiently serious condition that resulted from the food not being received.' " *Gaines v. Armor Health Care, Inc.,* No. 12–CV–4666, 2012 WL 5438931, at *5 (E.D.N.Y. Nov. 2, 2012) (citing, *inter alia, Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400 (GTS/DEP), 2009 WL 1401645, at * 9 (N.D.N.Y. May 14, 2009)).

**\*9** As discussed above, plaintiff Ahlers was placed on a restricted diet based on nut allergies that were clearly documented in his medical records and that were eventually confirmed by independent laboratory testing, albeit after plaintiff filed this action. The only medical consequence of the restricted diet imposed on plaintiff was that, over the course of more than four years, he gradually lost 66 pounds,

going from a body weight that was classified as "obese" on the BMI scale, to a normal and healthy weight of 194 pounds. While "rapid weight loss or weight loss coupled with other conditions may present a serious medical condition[,]"[13] plaintiff's gradual transformation from obesity to a healthy body weight clearly does not satisfy the objective prong of the deliberate indifference standard. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at *10 (even assuming that plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period the court concludes that there is no evidence in the record from which a reasonable fact finder could conclude that plaintiff's " 'weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation' ") (citing *Bost v. Bockelmann,* 2007 WL 527320, at *8).

13   *See, e.g., Anderson v. Kooi,* No. 9:07–CV–1257 (DNH/GHL), 2011 WL 1315721, at * 12 (N.D.N.Y. Jan. 24, 2011) (citing *Kaminsky v. Rosenblum,* 929 F.2d 922, 924, 926–27 (2d Cir.1991) (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss)) (Rep't Rec.), *adopted,* 2011 WL 1256942 (N.D.N.Y. Apr. 1, 2011).

The defendant and the OMH staff did not violate plaintiff's constitutional rights by imposing a diet on plaintiff that was contrary to his medical needs. Rather, they restricted plaintiff's diet in a manner that was reasonably consistent with his documented food allergies. As noted above, Dr. Kaskiw made a medical judgment that the restricted diet was medically necessary and that the resulting weight loss greatly improved plaintiff's overall health. Plaintiff's disagreement with Dr. Kaskiw's treatment decisions, even if it had some factual support (which it does not), clearly is not sufficient to create an issue of fact about whether plaintiff could establish the subjective element of the deliberate indifference standard. *See, e.g., Bost v. Bockelmann,* 2007 WL 527320, at *10 ("[t]o the extent that plaintiff complains about having been prescribed a high protein diet, as distinct from the high calorie intake diet which he sought in order to secure extra portions of food, the claim fails to rise to a level of constitutional significance, instead merely representing the sort of disagreement with a prescribed course of treatment that does not establish a defendant's deliberate indifference"). Even if there were occasional issues as to how plaintiff's restricted diet was implemented by food services workers

at CNYPC (who are not, in any event, defendants in this action), such arguably negligent oversight of plaintiff's food choices would not constitute deliberate indifference. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at * 11 (the evidence is lacking that any prison medical personnel or food service providers were cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed diet would result in a substantial risk of serious harm); *Gaines v. Armor Health Care, Inc.,* 2012 WL 5438931, at *5–6.

**\*10** Moreover, no reasonable fact finder could conclude that Dr. Kaskiw's medical care of plaintiff reflected such a "substantial departure from accepted professional judgment" as to make his treatment choices "a sham or otherwise illegitimate." [14] Hence, even if the "professional judgment" standard suggested by *Youngberg* applied to plaintiff's medical claims, defendant is still entitled to summary judgment.

[14]    This is part of Chief Judge Seitz's formulation of the "professional judgment" standard that was adopted by reference by the Supreme Court in *Youngberg. Romeo v. Youngberg,* 316 F.3d at 178; *Youngberg v. Romeo,* 457 U.S. at 321.

**2. Lidex Cream**

No rational fact finder could conclude, on the record in this case, that plaintiff's complaints about the treatment of his skin rash and eczema at CNYPC met either the objective or subjective prongs of the deliberate indifference test. [15] Plaintiff's skin condition is clearly not a sufficiently serious medical condition to meet the objective element of this standard. *See, e.g., Melendez v. Costello,* No. 6:12–CV–6226, 2013 WL 5937052, at *7 (W.D.N.Y. Nov. 1, 2013) ("[p]laintiff cannot establish the 'serious medical need' component of a deliberate indifference claim based on his eczema" (citing *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) ("Sledge failed to produce sufficient evidence that any one of the conditions complained of [i.e., eczema, back pain, stomach disorders, allergies, and asthma] qualified as a 'serious medical need.' ")); *Samuels v. Jackson,* 97–CV–2420, 1999 WL 92617, at *1–3 (S.D.N.Y. Feb. 22, 1999) (prisoner's "[p]apules, vesicles, pustules, burrows, and intense itching resulting in eczema" did not constitute a sufficiently "serious medical need" for purposes of Eighth Amendment). Nor, based on the authority cited above, is plaintiff's disagreement with his medical care providers about

the appropriate medication for his skin condition sufficient to create a factual issue as to whether they harbored subjective deliberate indifference to his serious medical needs. [16] To the extent that the "professional judgment" standard suggested by *Youngberg* applies to plaintiff's medical care claim, the treatment of plaintiff's skin condition with more conservative medications than the one he preferred certainly does not constitute a "substantial departure from accepted professional judgment."

[15]    Plaintiff's response to defendant Kaskiw's summary judgment motion suggests that he may dispute that his skin condition was treated at various times, albeit with medications other than those he requested. (Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4 ("it took almost one full year to treat my itchy rash on both legs and feet!")). Given the affidavits submitted by defendant Kaskiw and the supporting medical records, plaintiff's unsupported suggestion that he may have not received the documented treatment for his skin condition does not create an issue of fact that would defeat the summary judgment motion. *See, e.g., Benitez v. Pecenco,* No. 92 Civ. 7670, 1995 WL 444352 at *7 n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record). *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and

thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

16    As discussed in the factual summary above, the nurse practitioners who denied plaintiff the Lidex cream originally prescribed by Dr. Kaskiw, are not named defendants in this case. Although Dr. Kaskiw may have supervised the nurse practitioners at CNYPC, it does not appear that he was personally involved in denying Lidex cream to plaintiff, which would provide further support for granting defendant Kaskiw's motion for summary judgment with respect to this aspect of plaintiff's medical care claim. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff alleged that Dr. Kaskiw ignored two letters that plaintiff wrote requesting treatment with Lidex cream. (AC ¶¶ 39, 41). It is well-settled that the failure of a supervisory official to respond to a letter of complaint written by an inmate is not sufficient to show personal involvement. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)

(collecting cases); *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant Kaskiw's motion for summary judgment (Dkt. Nos.17, 18) be **GRANTED** on the grounds stated herein, and that the remaining claims in plaintiff's amended complaint be **DISMISSED** in their entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

 **\*11**  **Dated: July 9, 2014.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4184752

---

**End of Document**                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 134576
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Chiwana CRANDELL, Plaintiff,

v.

Kevin ROSS, et al., Defendants.

Case # 19-cv-6552
|
Signed 01/13/2020

**Attorneys and Law Firms**

Laurence Warshaw, Laurence Stuart Warshaw, Richard Alan Sulzman, Jay H. Tanenbaum, Law Offices of Jay H. Tanenbaum, New York, New York, for Plaintiff.

Frank L. LoTempio, III, LoTempio P.C. Law Group, Buffalo, NY, for Defendant Kevin Ross.

David J. Pajak, Alden, NY, for Defendant Gary Cooper.

David A. Rosenberg, New York State Attorney General, Albany, NY, for Defendants Anthony J. Annucci, Sheryl Zen Zen, Duane Artus, Leigh Collins.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

**\*1** Plaintiff Chiwana Crandell ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983, alleging that Department of Corrections and Community Supervision ("DOCCS") employees Kevin Ross and Gary Cooper, DOCCS Acting Commissioner Anthony J. Annucci, Albion Correctional Facility Superintendent Sheryl Zenzen, DOCCS supervisors Duante Artus and Leigh Collins, and John Does 1-10 violated her rights to due process and equal protection under the Fourteenth Amendment and her right to be free from cruel and unusual punishment under the Eighth Amendment. ECF No. 38.

Defendants Annucci, Zenzen, Artus, and Collins (hereinafter "Defendants")[1] now move to dismiss the Second Amended Complaint[2] for failure to state a claim pursuant to Federal Rule of Procedure ("Rule") 12(b)(6). ECF No. 47. The United States District Court for the Northern District of New York transferred the case to this Court and declined to reach the merits of the motion to dismiss. ECF No. 60. For the reasons that follow, the Court GRANTS Defendants' motion to dismiss.

[1]   Defendants Kevin Ross and Gary Cooper are not represented by the New York State Attorney General's Office and do not move to dismiss the Second Amended Complaint.

[2]   Defendants moved to dismiss the original complaint and the parties stipulated to the filing of an amended complaint. ECF No. 21. Defendants moved to dismiss the amended complaint, and Plaintiff made a letter request to amend. The Court allowed Plaintiff to amend again, resulting in the Second Amended Complaint. The motion to dismiss currently before the Court raises many of the same arguments Defendants presented in their first two motions to dismiss.

**BACKGROUND**[3]

[3]   The following facts are taken from the Second Amended Complaint and the Court accepts as true for purposes of this motion.

Between 2011 and August 2015, Plaintiff was an inmate at New York State Albion Women's Correctional Facility ("Albion"). ECF No. 38 ¶ 16. In early 2015, Plaintiff learned that she may be eligible for "early release" in September 2015, instead of September 2016. *Id.* ¶ 25.

At some point in 2015, Plaintiff "was assigned to a prison job" where Cooper—"a civilian non uniformed employee"—and Ross—a uniformed corrections officer—supervised inmates, including Plaintiff. *Id.* ¶¶ 4-5, 24. From March to July 2015, Cooper and Ross forced Plaintiff to go to secluded areas in Albion without surveillance and "repeatedly sexually harassed, raped and assaulted" her. *Id.* ¶ 17-23. She "was blackmailed, harassed, and terrorized into engaging in sex acts" with Cooper and Ross, who claimed that they could "see to it that she would receive early release in exchange for sex." *Id.* ¶¶ 16, 26. They threatened that, "unless she went along and kept quiet about it," they would "sabotage her hearing" to ensure that she did not obtain early release. *Id.* ¶ 26. Cooper and Ross also warned that even if Plaintiff received an early

release, they would "see to it that the early release would be revoked if she ever reported or otherwise complained about it." *Id.*

**\*2** In May 2015, after the abuse had begun, "Plaintiff made repeated requests to see a gynecologist as she was not feeling well." *Id.* ¶ 29. Her requests were denied, she was "compelled to file a written grievance," and a hearing was set for August 25, 2015. *Id.*

In June 2015, Plaintiff was notified that her request for early release was granted. *Id.* ¶ 27. Shortly thereafter, Cooper "caused the Plaintiff to be fired from her prison job when she finally refused to have sex with him again." *Id.*

Plaintiff reported the assaults to Artus, the deputy of administration at Albion, and Collins, a "ranking corrections officer." *Id.* ¶¶ 9-10, 20, 28. Artus and Collins "intimidated and threatened" retaliation against Plaintiff, stating that it would be "best for her if she did not complain about it." *Id.* ¶ 28. Artus warned Plaintiff "that she was putting her early release in jeopardy by complaining," while Collins "began to chant 'SHU' to intimidate Plaintiff by referring to special housing unit as a disciplinary measure for even mentioning what happened to her." *Id.* ¶ 20.

At some point in August 2015, Plaintiff was examined by a gynecologist, who diagnosed chlamydia. *Id.* ¶ 30. Plaintiff alleges that she had never tested positive for any disease during her incarceration, nor had she had any sexual relations while in prison, except with Cooper and Ross. *Id.* ¶ 34. Thereafter, Plaintiff's medical records—including her chlamydia diagnosis—were circulated in the prison as an apparent "campaign of intimidation and retaliation against her." *Id.* ¶ 31. Plaintiff filed a grievance regarding the publication of her medical information and a hearing was set for August 25, 2015. *Id.*

The hearing never occurred because on August 24, 2015, Plaintiff "was abruptly and summarily transferred to Bedford Hills Correctional Facility, where she remained until her release from prison on September 3, 2015." *Id.* ¶ 32.

Plaintiff alleges that Annucci and Zenzen "facilitated th[e] harassment, rape and other recurrent sexual victimization by permitting supervisory officers such as Ross and Cooper to operate" as they did "by failing to monitor (through cameras or otherwise) known at-risk areas where the rapes and assaults took place," and by "permitting male only on [sic] female

supervision." *Id.* ¶ 36. Further, Plaintiff claims that Annucci and Zenzen "failed to employ obvious measures to reduce the risk of rape and sexual abuse of incarcerated women by corrections officers," despite knowing of the risk. *Id.* ¶¶ 39, 42.

## DISCUSSION

At the outset, the Court recognizes that it is exceedingly difficult to parse out what claims Plaintiff is trying to bring and against whom she is trying to bring them. She often makes sweeping, conclusory assertions of conduct by "Defendants," without any factual basis to infer that all Defendants participated in such conduct. Aside from identifying claims for denial of due process and equal protection and for cruel and unusual punishment, Plaintiff does not specify which claims or legal theories apply to which Defendants. The only guidance comes from the parties' moving and response papers, from which the Court is reluctant to read claims not contained in the Second Amended Complaint. *See Mosby v. Bd. of Educ. City of Norwalk*, 754 F. App'x 34, 37 (2d Cir. 2018) (summary order) ("[T]o the extent that Mosby seeks to pursue retaliation claims that were not part of his original complaint ... the district court properly refused to entertain such arguments because Mosby neither asserted those claims in a proper amended pleading nor moved for leave to file an amended complaint that would raise them or augment his existing claim. Instead, Mosby first raised these new claims in his opposition to the Board's motion for summary judgment."). Nevertheless, the Court will analyze each Defendant separately to determine whether the allegations contained in the Second Amended Complaint state a claim for violation of Plaintiff's due process, equal protection, or Eighth Amendment rights.

## I. Legal Standard

**\*3** In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quoting another source), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

Plaintiff admits that Defendants are sued in their individual capacities. ECF No. 58 at 17. To establish liability against an official under § 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Moreover, the theory of *respondeat superior* is not available in a § 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). But a supervisory official can be found to be personally involved in an alleged constitutional violation in one of several ways, described more fully below. *See Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015) *rev'd in part and vacated in part on other grounds sub nom. Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017); *Colon*, 58 F.3d at 873.

## II. Artus and Collins

Plaintiff's legal claims against corrections officers Artus and Collins are not entirely clear, but they seem to boil down to this: upon learning of Plaintiff's alleged sexual abuse, Artus and Collins harassed and threatened Plaintiff, and failed to report her allegations to superiors. ECF No. 38 ¶ 20. It is unclear whether Plaintiff attempts to make out a due process or Eighth Amendment claim. Either way, Plaintiff's claims against Artus and Collins fail for lack of personal involvement in a constitutional deprivation.

Plaintiff's claims that Artus and Collins harassed and threatened [4] her do not amount to a constitutional violation.

Notably, Plaintiff does not attempt to make out a First Amendment claim for retaliation. Rather, she appears to allege that the behavior of Artus and Collins amounts to some sort of due process violation or cruel and unusual punishment. But "[i]t is well settled law in this Circuit that 42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Carl v. Dirie*, No. 09-CV-724 (GTS/RFT), 2010 WL 3338566, at *7 (N.D.N.Y. Mar. 29, 2010) (quoting another source). "[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting another source); *see Burroughs v. Petrone*, 138 F. Supp. 3d 182, 204 (N.D.N.Y. 2015) (collecting cases); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 364 (N.D.N.Y. 2010) ("[V]erbal harassment itself does not rise to the level of a constitutional violation[,]" and "verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." (quoting another source)). Moreover, "threats do not amount to violations of constitutional rights." *Moncrieffe*, 2000 WL 949457, at *3 (quoting another source). Therefore, Artus and Collins's alleged threats to Plaintiff, alone, do not violate Plaintiff's constitutional rights.

[4]     Although the Second Amended Complaint states that Plaintiff's medical records were widely disseminated, she makes no factual allegation that Artus or Collins were to blame.

**\*4** Neither does Artus and Collins's alleged failure to report or intervene in the alleged abuse. [5] "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Allen v. City of New York*, 480 F. Supp. 2d 689, 694 (S.D.N.Y. 2007) (quoting another source). To state a claim against a corrections officer for his or her failure to intervene, a plaintiff must allege facts demonstrating that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) [the officer knew] that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

Crandell v. Ross, Slip Copy (2020)

2020 WL 134576

5      To the extent Plaintiff seeks to hold Artus and Collins liable on a theory of supervisory liability, the claim fails for the same reasons.

The problem is that Plaintiff reported the abuse in August 2015—one month *after* the abuse ended in July 2015. *See Jordan v. Fischer*, 773 F. Supp. 255, 278 (N.D.N.Y. 2011) ("In the case of an alleged assault, finding out about the assault after the fact does not render DSS Racette liable for the constitutional violation."); *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). In other words, by Plaintiff's own admission, the abuse was not ongoing at the time Plaintiff reported it to Artus and Collins, and thus, there was no longer an opportunity to prevent or remedy the harm. Undoubtedly, Plaintiff's allegations of Artus and Collins's behavior, if true, are unacceptable, but they are not unconstitutional in the absence of Plaintiff articulating a wrong Artus or Collins could have remedied.

To the extent Plaintiff attempts to assert a claim that Artus or Collins were indifferent to her medical need, such a claim also fails. "To establish an Eighth Amendment violation based on inadequate medical care, a prisoner must demonstrate both an objectively serious medical deprivation and subjective deliberate indifference on the part of the charged official." *Alvarez v. Wright*, No. 18-274-PR, 2019 WL 6903973, at *2 (2d Cir. Dec. 18, 2019). The objective component "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). For the subjective component, the plaintiff must show that the defendant had "a state of mind that is the equivalent of criminal recklessness." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "As a general matter, non-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delayed access to medical care." *Starling v. Syracuse Police Dep't*, No. 519CV1458DNHTWD, 2019 WL 6974731, at *5 (N.D.N.Y. Dec. 20, 2019).

Plaintiff does not meet either prong. Rather, she conclusorily states that beginning in May 2015 she "made repeated requests to see a gynecologist as she was not feeling well." ECF No. 38 ¶ 29. Plaintiff does not allege that she had an objectively serious medical need at the time she complained, nor does she allege that she communicated any such medical need to Artus or Collins. It follows that Plaintiff has not pled that Artus or Collins had a sufficiently culpable state of mind in delaying her access to medical care.

## III. Annucci and Zenzen

Plaintiff alleges that supervisors Annucci and Zenzen created a culture where sexual abuse could thrive and did nothing to prevent or remedy such abuse, despite knowing of it. Specifically, Plaintiff claims that Annucci—acting superintendent of DOCCS—and Zenzen—superintendent at Albion—"facilitated ... harassment, rape and other recurrent sexual victimization by permitting supervisory officers such as Ross and Cooper" by (1) "failing to monitor (through cameras or otherwise) known at-risk areas where the rapes and assaults took place," ECF No. 28 ¶¶ 36, 40-41; (2) failing "to protect women from retaliation for reporting rape and sexual abuse by corrections officers, giving correction officers an actual and perceived free hand to retaliate against these women," *id.* ¶ 37; (3) acting "with deliberate indifference to the substantial risk of harm to Plaintiff and other women in its custody thereby denying the plaintiff due process and subjecting her to" cruel and unusual punishment, *id.* ¶ 38; (4) permitting "the assignment of male correction officers to guard women at Albion without adequate safeguards to prevent rape and other recurrent sexual abuse," *id.* ¶ 39; and (5) failing "to employ obvious measures to reduce the risk of rape and sexual abuse of incarcerated women by corrections officers," *id.* ¶ 42. Plaintiff supports these allegations by referring to DOCCS directives and United States Department of Justice reports on sexual abuse in female prisons. *See id.* ¶ 49. Yet Plaintiff does not explain details contained in the reports, nor does she attach the reports to the amended complaint. She does, however, note that the reports indicate that "staff on inmate sexual assault or harassment" increased over the past several years. *Id.* ¶ 50. At bottom, Plaintiff seems to be arguing that supervisory liability should attach because Annucci and Zenzen perpetuated customs or practices that allowed sexual abuse to flourish at Albion and that Annucci and Zenzen were deliberately indifferent to sexual abuse at Albion.

**\*5** The Court disagrees. To establish supervisory liability for failure to protect, a plaintiff must establish facts that show that

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed

of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). However, a claim for supervisory liability can only survive a motion to dismiss if a plaintiff plausibly alleges facts that a defendant supervisor's *own actions* violated the constitution. *See Turkmen*, 789 F.3d at 250.

Plaintiff has not alleged that Annucci or Zenzen participated directly in the constitutional violation or that they were ever aware of Plaintiff's sexual abuse at a time they could remedy it. But "[e]ven where a plaintiff does not allege any facts suggesting that prison officials were aware of a particular risk to his or her safety, the 'plaintiff may also state a claim for deliberate indifference based on a failure to protect [her] against a general risk of harm to all inmates at the facility.' " *Stephens v. Venettozzi*, No. 13-CV-5779 (RA) (DF), 2016 WL 929268, at *21 (S.D.N.Y. Feb. 24, 2016) (quoting another source), *report and recommendation adopted sub nom. Stephens v. Venetozzi*, No. 13 CIV. 5779 (RA), 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016). To do so, however, Plaintiff must allege Defendants "knew of a history" of conduct "similar to that suffered by the plaintiff and that measures they should have taken to prevent the reoccurrence of such attacks would have prevented the harm to the plaintiff." *Id.* A claim based on generalized risk of assault, as here, requires facts demonstrating "longstanding, pervasive, well-documented history of similar attacks, coupled with circumstances suggest[ing] that the defendant-official being sued had been exposed to [this] information." *Hicks v. Woods*, No. 9:09cv0051 (GLS)(DRH), 2011 WL 5974973, at *3 (N.D.N.Y. Nov. 28, 2011) (quoting another source).

Here, Plaintiff has not pled facts establishing that there was a widespread, longstanding occurrence of sexual abuse of female prisoners at Albion, that Defendants knew about any such widespread abuse, or that they failed to do anything about it. Simply stating, as Plaintiff does, that sexual abuse occurred or was increasing in prevalence in undisclosed federal and state prisons is not the same as a widespread custom or policy of deliberate indifference to sexual assault at Albion. These general assertions [6] do not amount to a practice of indifference to sexual abuse so widespread as to be considered a custom. *See Smith v. Martuscello*, 602 F. App'x 550, 552 (2d Cir. 2015) ("Though Smith's amended complaint contains allegations of widespread abuse in the prison system, and at Coxsackie in particular, it contains no allegations that the abuse was the result of a policy or custom of deliberate indifference to inmate abuse."); *see also White v. City of New York*, 206 F. Supp. 3d 920, 938 (S.D.N.Y. 2016) (plaintiff failed to state a claim of a widespread custom of police abusing transgender people when plaintiff only pointed to general reports of police brutality and excessive force).

[6]      The only remotely specific allegation in the Second Amended Complaint is that "records obtained by Plaintiff" in response to a FOIL request "note numerous instances of sexual assault, prohibited relationships or harassment directed at Albion by prison staff before, during and after the time that the Plaintiff was an inmate there." ECF No. 38 ¶ 51. Without elaboration, this general, vague language hinting at "numerous" assaults is insufficient to demonstrate that Annucci or Zenzen perpetuated a pervasive sexual assault or a custom of indifference to it. *See Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 487 (S.D.N.Y. 2014) ("The Amended Complaint catalogues a number of incidents that Plaintiffs understandably find objectionable, but it does not explicitly identify a policy, custom, or practice promulgated by the City or Commissioner Schiro that would form the basis for a valid claim.").

**\*6** To the extent Plaintiff attempts to assert a failure to supervise claim, such a claim must also fails because Plaintiff's Second Amended Complaint "lacks any hint" that Annucci or Zenzen "acted with deliberate indifference to the possibility that their subordinates would violate [Plaintiff's] constitutional rights." *Accord Holland v. City of New York*, 197 F. Supp. 3d 529, 551 (S.D.N.Y. 2016).

## IV. Other Claims

Plaintiff vaguely mentions a possible due process claim for denial of grievance procedures and an equal protection claim,

but does not link either claim to a specific defendant or group of Defendants. With respect to the due process claim, Defendants argue that their conduct does not amount to a denial of Plaintiff's grievance procedures. Plaintiff does not appear to allege that she had a right to a specific grievance procedure or that Defendants violated such a right. In any event, Plaintiff does *not* have such a right to a grievance procedure under the due process clause of the Fourteenth Amendment. *Pine v. Seally*, No. 09-CV-1198, 2011 WL 856426, at \*8 (N.D.N.Y. Feb. 4, 2011) ("[T]he law is well-settled that inmates do not have a constitutional right to grievance procedures.... Furthermore, a violation of the inmate grievance procedures does not give rise to a claim under section 1983."). Plaintiff also seems to suggest some nebulous "protected liberty interest and subsequent procedural right" relating to her transfer that arose from a combination of various other constitutional violations. ECF No. 58 at 28-29. Again, there is no support for this contention. *See Montanye v. Haymes*, 427 U.S. 236 (1976) (noting that DOCCS is empowered to transfer inmates).

Nor has Plaintiff stated a claim for a violation of her Equal Protection rights. A State and its instrumentalities may not deny "any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. At its core, equal protection prohibits the government from treating similarly situated persons differently. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Sound Aircraft Services, Inc. v. Town of East Hampton*, 192 F.3d 329, 335

(2d Cir. 1999). Plaintiff has not alleged that she was treated differently than other inmates similarly situated.

Finally, although Defendants have not argued for their dismissal, Plaintiff has made no factual claim that any John Doe 1-10 committed any unconstitutional act. Nor does it appear Plaintiff served any John Doe. Consequently, John Does 1-10 will also be dismissed. *Muka v. Murphy*, 358 F. App'x 239, 241 (2d Cir. 2009) ("A district court's ability *sua sponte* to dismiss a complaint that lacks a basis in law or fact is well-established.").

## CONCLUSION

For the reasons stated above, Annuci, Zenzen, Artus and, and Collins's motion to dismiss (ECF No. 47) is GRANTED. The claims in the Second Amended Complaint against Defendants Annucci, Zenzen, Artus, Collins, and John Does 1-10 are DISMISSED WITH PREJUDICE. The Clerk of Court shall terminate them as defendants in this action. The case may proceed only with respect to Defendants Ross and Cooper.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 134576

2001 WL 936297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,

v.

Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).
|
Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility, Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

**\*1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"), proceeding *pro se,* is currently an inmate at Orleans Correctional Facility in Albion, New York. From late 1997 until early 1998, the time period relevant for this lawsuit, plaintiff was incarcerated at Fishkill Correctional Facility ("Fishkill"). On December 12, 1997, plaintiff filed a grievance alleging that Officer C. Madura ("Madura") and Officer Robert Muller ("Muller" or "defendant") "spread malicious rumors to the inmate population that [plaintiff] was illegally selling Inmate Liaison Committee ("ILC") supplies" in retaliation against prior grievances that plaintiff had allegedly filed against the officers. *See* Ex. A. On January 15, 1998, the Superintendent of the Inmate Grievance Program denied plaintiff's grievance seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February 20, 1998, reasserts his December 12, 1997 retaliation claim against Muller, pursuant to 42 U.S.C. § 1983. In addition, plaintiff complains of a second act of retaliation under § 1983 by Muller, allegedly made in response to plaintiff's filing of the December 12, 1997 grievance. On January 9, 2001, Muller moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Because plaintiff has failed

to establish either of his retaliation claims, defendant's motion for summary judgment is granted in its entirety.[1]

[1]   Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

*FACTS*

On December 12, 1997, plaintiff filed a grievance against correction officers Madura and Muller, alleging that they had spread rumors that plaintiff had been illegally selling supplies from the ILC—an inmate organization within the facility—to other inmates. *See* Ex. A. Furthermore, plaintiff claims that he "encountered several confrontations with other inmates due to such rumors; in which could have ended in physical conflict." *See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such rumors with the intention of provoking such "confrontations." *Id.* Plaintiff does not deny that he was found in possession of ILC supplies, but he alleges that he was in charge of issuing such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled that plaintiff's grievance was baseless. *See* Ex. A. The Superintendent stated that prison officials had found "excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff appealed the Superintendent's findings, and on January 28, 1998, the New York State Department of Correctional Services ("DOCS") Central Office Review Committee ("CORC") upheld the Superintendent's denial of the grievance.

Plaintiff alleges that a little over a month after he filed the December 12, 1997 grievance, Muller retaliated against him by filing a meritless Inmate Misbehavior Report. *See* Ex. F. Muller contends that on January 14, 1998, while stationed on the stairwell of Fishkill's A–Floor monitoring inmate traffic, he questioned plaintiff as to the contents of the bag which plaintiff was carrying. Allegedly, plaintiff refused to answer his questions. Furthermore, Muller contends that plaintiff yelled at him. According to defendant, this confrontation blocked inmate traffic in the hallway for fifteen minutes. *See* Ex. G. Muller alleges that he gave plaintiff a direct order to step to the side and to stop yelling. Plaintiff allegedly refused to do so and demanded to see a sergeant "right now." A

2001 WL 936297

sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

**\*2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with search procedures, disobeying a direct order, threatening an officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a). *See Williams v. Muller,* 2000 WL 487954 at \*3 (S.D.N.Y. Apr. 25, 2000). Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

## LEGAL STANDARD

*A. Summary Judgment* [2]

[2]

> When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice." [3] *Williams,* 781 F.2d at 323.

[3]

> Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response to a prisoner's exercise of a constitutional right is actionable. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

*DISCUSSION*

*A. Plaintiff's Retaliation Claim for "Spreading Rumors"*
Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See Dawes,* 239 F.3d at 492; *see also Graham,* 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

*B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report*
Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. E, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not

yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation.[4] *See* Ex. H at 127–28.

[4]  Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well.[5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

[5]  As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

**\*5**  The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing.[6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

[6]  Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff

was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at \*6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C.A. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

---

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,

v.

P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase,[1] T. LaValley, R. Paquette–Monthie,[2] and Eric Gutwein[3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

[1] Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3).

[2] While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonthie. (Dkt. No. 42, Attach.12.)

[3] Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.)

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5).

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7.) According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8.)

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays

2014 WL 1292232

attributable to Brooks before service of process occurred, (Dkt No. 7 at 7–10; Dkts. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he [could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court, Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted.[4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

[4]   Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error.[5] *See id.*

[5]   "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 WL 149049, at *6.

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when] they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals,[6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton-to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants were dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint.[7]

[6]   Brooks writes "I'am adding deffendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .)

[7]   Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend.

### A. *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at *6–7, even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

**B.** *Leave to Amend*

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the court's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking

leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See Jolley v. Meachum,* 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original complaint."); *Smith v. Yonkers Police Dep't,* 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); *Jones v. Fischer,* No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in the [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

**V.** *Conclusion*

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED** that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

**ORDERED** that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

**ORDERED** that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013, this court converted the Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

## BACKGROUND

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5). [1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (*Id.*).

[1]   Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header.

**\*5** C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (*Id.;* Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase [2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O. Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to

2014 WL 1292232

Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

[2]      Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste.**" The court will use this defendant's correct name.

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette–Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein [3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

[3]      The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein.

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie, [4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary

charges at Coxsackie; and (4) he was denied due process in connection with the adjudication of the disciplinary charges at Coxsackie. [5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

[4]      The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette–Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action.

[5]      To avoid dismissal of his due process claims under *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). See *Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and plaintiff was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her

2014 WL 1292232

to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know-or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the

defendants violated plaintiff's various constitutional rights, as he alleges.

### DISCUSSION

#### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

#### II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

2014 WL 1292232

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValley with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse

decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. [7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

[6]     *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[7]   *See, e.g., Newman v. Duncan,* 04–CV–395 (TJM/ DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

**B. Analysis**

**\*9** Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValley, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValley. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16).[8]

[8]   According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8).

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he

submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes.[9]

[9]   As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g., Goodson v. Silver,* 9:09– CV–494 (GTS/DRH), 2012 WL 4449937 at *9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/ DEP), 2007 WL 2693526, at *9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases).

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia,* to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14).[10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8– 9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia,* June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The

2014 WL 1292232

memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

10     The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff.

**\*10** There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2).[11] In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-*i.e.,* Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

11     Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5).

Under applicable regulations,[12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-*i.e.,* within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension suggests the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g., Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

12     *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence).

**\*11** It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit

a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at *4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

[13] The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord, Murray*

*v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010).

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July 14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

 *12 Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"- the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the

2014 WL 1292232

Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

[14]     N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

> An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.
>
> (emphasis supplied).

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response")** (emphasis added); 701.5(d)(1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards. [15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

[15]     Absent an extension, which would require the written consent of the grievant, N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance.

N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(3)(I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g., Goodson v. Silver,* 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance process is contemplated-to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated

June 26th is backdated because it purports to be an appeal of the grievance plaintiff states that he filed on approximately the same date and it references events, including plaintiff's misconduct charge at Coxsackie on July 7, 2013 (Paquette–Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June 26th. As noted above, the documents submitted by plaintiff indicate that his submission was not received in the office of the IGP Director in Albany until early September 2011. The court concludes that no reasonable fact finder could conclude that plaintiff filed an initial grievance with respect to the conduct of defendants Chase and LaValley until August 26, 2011, which is considerably longer than 21 or 45 days after the relevant "occurrences"-the adjudication of the misbehavior report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or plaintiff's transfer out of Clinton, which occurred on or about June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the court concludes that these claims against defendants Carr and LaValley may be dismissed, on summary judgment, because of plaintiff's failure to exhaust his administrative remedies by filing a timely initial grievance.

### III. Eighth Amendment Claims

*13 Plaintiff alleges that defendant Rock violated his Eighth Amendment rights in two ways on June 15, 2011, by inflicting cruel and unusual punishment when she hit him in the head with the bathroom door, and by refusing to allow him to get immediate medical treatment for his purported injuries. As discussed above, C.O. Rock denies that she opened the bathroom door or caused it to hit plaintiff in the head, and she alleges that plaintiff did not request medical care or appear to require it. Plaintiff was seen, at his request, two days later by the Clinton medical staff, who found no evidence of bruising or swelling on plaintiff's head and treated him with Ibuprofen and a bag of ice.

Notwithstanding these factual disputes, the court concludes that, even accepting plaintiff's version of the relevant events, no reasonable fact finder could conclude that his Eighth Amendment rights were violated by defendant Rock. Accordingly, for the following reasons, this court recommends dismissal of those claims.

### A. Excessive Force

#### 1. Applicable Law

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. Hudson v. McMillian,

503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " Whitely v. Albers, 475 U.S. 312, 327 (1986) (citation omitted); Hudson, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Analysis

*14 In connection with defendants' summary judgment motion, plaintiff and C.O. Rock present very different versions of the events of June 15th. Plaintiff alleges that, on the day before the incident, C.O. Rock threatened to "put her size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant

Rock denies ever threatening plaintiff. (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at * 13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton

or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6 (S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013).

### B. Denial of Medical Care

#### 1. Applicable Law

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation

Brooks v. Rock, Not Reported in F.Supp.3d (2014)

2014 WL 1292232

or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

**2. Analysis**

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff

two days later. (Compl., Dkt. No. 1 at 5). [16] In connection with defendants' initial Rule 12(b)(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b) (6) Mot. at 22–23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

[16]    In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42–10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in the head. *Farmer v. Brennan,* 511 U.S. at 844; *Salahuddin v. Goord,* 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

"Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

2014 WL 1292232

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in Smith also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with due to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) .[17] He also challenges the quality of his medical care after leaving Clinton.[18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of

the overwhelming documentary medical evidence to the contrary.[19]

[17] Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

[18] Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

[19] *See also Brown v. White,* 9:08–CV–200, 2010 WL 985184, at \*8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at \*2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints

involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical effects or demonstrable physical injury" that resulted from what was in any case-at most—a two delay in treatment). [20]

[20]   See also *Brown v. White,* 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos,* 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon,* 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

## IV. Retaliation

**\*18** Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett*

*v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. [21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or

verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

21    Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not personally involved in any adverse action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the

2014 WL 1292232

misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValle, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in Clinton and at DOCCS—presumably in the central office-in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

### 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges

at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more selfserving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated. [22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on a prison disciplinary charge, [23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b)(6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

[22]     *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish

one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23     *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

**\*22** The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g .,* *Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at \* 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims)[24]; *Jeffreys v. City of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare

circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

24     The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at \*4.

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g.,* *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51

2014 WL 1292232

(2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

 **\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValley Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany-much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValley's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValley Decl. ¶¶ 8–13; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValley conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValley's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValley Decl. ¶¶ 13–15; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein
Defendants' initial Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton

defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because she "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40).[25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she was initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42–15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1).[26]

[25]    Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

[26]    Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

 **\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15).

Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–Monthie that she issued the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at * 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at * 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary

hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff-*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

**\*25**  The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–Monthie at Coxsackie, and during the disciplinary hearing, plaintiff acknowledged that he had telephonic contact with his wife from other DOCCS facilities before he was transferred to Coxsackie, at the number listed under his aunt's name on his emergency contact list. [27]  (Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the disciplinary charges because he believed that he should not be charged with misconduct by Coxsackie officials for calls he made to his wife from other institutions. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff also asserted that the exception for "correspondence" in the order of protection should be interpreted to include telephonic contact, notwithstanding the explicit, prior prohibition in the order against communications by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45, 49). Plaintiff claimed that his wife, who was willing to speak with him by phone, and the District Attorney and Judge who caused the order of protection to be entered, would agree that telephonic contact was permissible, notwithstanding the clear language of the order of protection. [28]  (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

[27]   Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was

allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28    The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

The court finds that, although plaintiff made several frivolous arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl,* 20 F.3d at 534–35. Accordingly, I would recommend that summary judgment be granted in favor of the Coxsackie defendants on plaintiff's retaliation claim, based, *inter alia,* on *Mt. Healthy* and its progeny.

## V. Due Process

### A. Legal Standards

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*26    The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable

evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

### B. Analysis

The complaint alleges that, in conducting the disciplinary hearing at Coxsackie and finding plaintiff guilty, defendant Gutwein was motivated by a desire to retaliate against plaintiff for his complaint against defendant Rock at Clinton. Plaintiff also alleges that Hearing Officer Gutwein also improperly denied plaintiff's requests to call key witnesses or obtain documents that would have established his innocence. (Dkt. No. 1 at 7). In plaintiff's prior motion to amend his complaint, which this court denied (Dkt. No. 38 at 7, 9–10), he attempted to supplement his due process claim by alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)

(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

**\*27** The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which plaintiff impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct

committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

**\*28** Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55). [29]

[29]    Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary

hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing. [30]

[30]   See *Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior order of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

[31]   On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not due so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script,

2014 WL 1292232

and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. *Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing *Ponte v. Real,* 471 U.S. at 497).

32    Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id* .)

33    Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

34    The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

### 3. Sufficiency of the Evidence

**\*30** As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and

Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99).[35]

[35]    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

### 4. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v.. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of

bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

 **\*31   RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4186334
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lawrence TOOLE, Plaintiff,

v.

Susan A. CONNELL, et al., Defendant.

No. 9:04–CV–0724 (LEK/DEP).
|
Sept. 10, 2008.

**Attorneys and Law Firms**

Lawrence Toole, pro se.

Hon. Andrew Cuomo, New York State Attorney General,
David L. Cochran, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants.

## DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 **\*1** This matter comes before the Court following a Report–
Recommendation filed on August 1, 2008, by the Honorable
David E. Peebles, United States Magistrate Judge, pursuant to
28 U.S .C. § 636(b) and L.R. 72.3(c) of the Northern District
of New York. Report–Rec. (Dkt. No. 62).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report–Recommendation, the party "may serve and file
specific, written objections to the proposed findings and
recommendations," FED. R. CIV. P. 72(b), in compliance
with L.R. 72.1. No objections have been raised in the allotted
time with respect to Judge Peebles' Report–Recommendation.
Furthermore, after examining the record, the Court has
determined that the Report–Recommendation is not subject
to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 62)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that Defendant's Motion for summary judgment
(Dkt. No. 53) is **GRANTED;** and it is further

**ORDERED,** that the remaining claims contained within the
Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED;** and it is
further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Lawrence Toole, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983,
claiming deprivation of his civil rights. In his complaint,
plaintiff alleges that 1) he was sexually harassed by
Corrections Officer Prusinowski; 2) the remaining defendants
failed to fulfill their responsibilities to investigate and
remediate the constitutional deprivation associated with that
sexual harassment, including by their failure to properly
address his grievances concerning the matter; and 3) a
misbehavior report was issued against him in retaliation for
complaining of the sexual harassment, all in violation of his
constitutional rights.

Having already succeeded in securing dismissal of plaintiff's
sexual harassment claim against defendant Prusinowski,
based upon a finding that the factual allegations offered
in support of that cause of action, even if proven, do not
rise to a level sufficient to establish an Eighth Amendment
violation, defendants now move for summary judgment in
their favor dismissing the balance of plaintiff's complaint as
a matter of law. In their motion, defendants assert that because
the underlying sexual harassment did not rise to a level of
constitutional significance, there can be no corresponding
liability on the part of the other defendants for failing to
investigate the matter and remedy the claimed harassment.
Noting that plaintiff has no constitutional right of access to
the internal prison grievance process, and that the record is
lacking in any evidence linking the issuance of the disputed
misbehavior report—authored by an individual who is not a
party to the action—to plaintiff's efforts to obtain redress for

Corrections Officer Prusinowski's behavior, defendants seek dismissal of plaintiff's remaining claims.

**\*2** Having carefully reviewed the record now before the court, considered in light of the arguments raised by the defendants and in plaintiff's opposition to their motion, I conclude that no reasonable factfinder could determine that plaintiff's constitutional rights were abridged based upon the acts complained of in his complaint. Accordingly, I therefore recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. *See Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005).

At the times relevant to his complaint plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and designated to the Oneida Correctional Facility ("Oneida"). *See generally* Complaint (Dkt. No. 1). On February 5, 2004, while confined within a dormitory unit at Oneida, plaintiff awoke to someone, later identified as Corrections Officer H. Prusinowski, shaking his buttocks and standing over him, smiling. [2] Complaint (Dkt. No. 1) Exh. A. Defendant Prusinowski, who according to Toole at the time was acting in a sexually provocative manner, asked the plaintiff to accompany him to the laundry room, ostensibly to engage in sexual activity. *Id.* After being asked by plaintiff to leave his cell, defendant Prusinowski stated, "you don't know what you're missing", and left the area. *Id.* In his complaint, plaintiff alleges that Officer Prusinowski had previously appeared in Toole's cube on February 3, 2004, and again on February 4, 2004, in an intoxicated condition "seeking homosexual liaison." *Id.* Following the February 5, 2004 incident plaintiff attempted to apprise the area supervisor of the situation, but was directed by defendant Prusinowski to "get the f___ ___k away from the desk." *Id.*

[2]    While Corrections Officer Prusinowski was initially sued as C. Prusinowski, a subsequent application by plaintiff to amend his complaint to identify the intended defendant as H. Prusinowski was granted on March 1, 2005. Dkt. No. 10.

On February 20, 2004 plaintiff filed a grievance with the Inmate Grievance Resolution Committee ("IGRC") at Oneida, claiming that defendant Prusinowski had sexually harassed him on February 3, 4, and 5, 2004. Complaint (Dkt. No. 1) Exh. A. In addition to detailing his encounters with defendant Prusinowski, in that grievance plaintiff also complained that his attempt to report the February 5, 2004 incident to the desk sergeant had been unsuccessful, and asserted that defendant Prusinowski had arranged to have Toole transferred to a different prison dormitory unit on February 6, 2004. [3] *Id.*

[3]    That transfer was later rescinded. Complaint (Dkt. No. 1) Exh. A.

Because Toole's grievance alleged harassment by a staff member, it bypassed the IGRC stage of the normal grievance process and was forwarded directly to the superintendent's office for a determination. Debejian Decl. (Dkt. No. 53–7) ¶ 6. Toole's grievance was subsequently denied by Oneida Superintendent Connell on March 12, 2004. Complaint (Dkt. No. 1) Exh. B. As a basis for her determination, defendant Connell relied principally upon Prusinowski's denial of having engaged in any inappropriate behavior and the lack of any evidence tending to independently substantiate Toole's allegations. *Id.*

Plaintiff appealed the denial of his grievance to the Central Office Review Committee ("CORC"). Complaint (Dkt. No. 1) Exhs. B, C. By decision dated April 14, 2004, Toole's appeal was "unanimously denied with clarification." In its decision the CORC found that the sexual harassment complaint was properly investigated at the facility level, and that substantiation of plaintiff's allegations was lacking. [4] *Id.* Exh. C.

[4]    The CORC decision also noted that DOCS Directive No. 4040 precludes the taking of any action in reprisal for an inmate having resorted to the grievance process, and advised the plaintiff that he was free to "write to anyone he wishes regarding the instant grievance." Complaint (DKt. No. 1) Exh. C.

**\*3** Plaintiff was issued an inmate misbehavior report on March 13, 2004 by Corrections Sergeant J. Allison, accusing him of lying regarding the February 5, 2004 incident in violation of prison rules . [5] *Id.* Exh. D. In that misbehavior report, Sergeant Allison alleged that as the desk supervisor to

whom plaintiff allegedly tried to complain, he did not observe either any attempt on the part of plaintiff to lodge a complaint or defendant Prusinowski making the statement which the plaintiff now attributes to him, adding that Toole "was not at the desk, but in a doorway." Complaint (Dkt. No. 1) Exh. D. A disciplinary hearing was convened by Corrections Lieutenant Santos on March 19, 2004 to address the charge set forth in the March 13, 2004 misbehavior report. Deposition Transcript of Lawrence Toole (Dkt. No. 53–10) Exh. A at 19–20. Upon learning from defendant Debejian that the charge was related to a grievance filed by the plaintiff regarding Corrections Officer Prusinowski, Lt. Santos adjourned the hearing. *Id.* at 13–14; *see also* Debejian Decl. (Dkt. No. 53–7) ¶ 11. The hearing was never reconvened, and the disciplinary charge against the plaintiff arising from the incident was eventually dismissed. Deposition Transcript of Lawrence Tool (Dkt. No. 53–10) Exh. A at 12.

5    Although the misbehavior report also charged the plaintiff with harassing employees, that accusation was not pursued. Deposition Transcript of Lawrence Toole (Dkt. No. 53–10) Exh. A at 12.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on June 23, 2004. Dkt. No. 1. Listed as defendants in plaintiff's complaint are Oneida Superintendent Susan A. Connell; IGS David DeBejian; Corrections Officer Prusinowski; and K. Bellamy, the Assistant Director of New York's Inmate Grievance Program. Although plaintiff's claims are less than artfully stated, they appear to include his assertions that 1) he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment, based upon defendant Prusinowski's actions; 2) the remaining defendants are implicated in that constitutional violation based upon their awareness of the relevant events and failure to conduct a proper investigation and remediate the violation; 3) plaintiff's rights were violated based upon defendants' failure to properly process and address his inmate grievance concerning the sexual harassment allegations; and 4) the defendants unlawfully retaliated against him, in violation of his First Amendment rights, by arranging for the issuance of a misbehavior report in retaliation for his complaint regarding the matter.

As their initial response to plaintiff's complaint, defendants Connell, Debejian and Bellamy moved to dismiss his claims for failure to satisfy the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Dkt. No. 13. Defendant Prusinowksi filed a separate motion

seeking dismissal of the sexual harassment claims against him for failure to state a legally cognizable claim that Toole's constitutional rights were violated by his conduct. Dkt. No. 18.

By order filed March 20, 2006, acting upon a report issued by me recommending that relief, District Judge Lawrence E. Kahn granted defendant Prusinowski's motion to dismiss plaintiff's sexual harassment claim against him. Dkt. No. 29. Defendants' companion motion to dismiss the complaint, however, was denied based upon the court's finding that while not a model of clarity, plaintiff's complaint sufficiently apprised the defendants of the nature of plaintiff's claims to permit a meaningful investigation of those claims and formulation of a defense. *Id.* at 2.

**\*4** Following the close of pretrial discovery, defendants have now moved seeking the entry of summary judgment dismissing the remaining portions of plaintiff's complaint. Dkt. No. 53. In their motion, defendants argue that because the court has already determined that plaintiff's allegations against defendant Prusinowski, even if true, are nonetheless insufficient to support a finding of sexual harassment, none of the remaining defendants can be held accountable for constitutional deprivations based upon that conduct. Defendants further submit that plaintiff cannot maintain a cognizable constitutional claim bottomed upon their alleged failure to properly process and address his grievance regarding the matter, and additionally assert that because none of them was involved in the issuance of the misbehavior report upon which plaintiff's retaliation claim is predicated, they bear no liability for any alleged retaliation. Plaintiff has since submitted papers in opposition to defendants' motion. Dkt. No. 59.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Thus, " 'the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.' " *Jeffreys,* 426 F.3d at 553 (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-

movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted).

### B. *Retaliation*

When liberally construed, plaintiff's complaint could be deemed to include a retaliation cause of action. The potential retaliation claim discerned from plaintiff's allegations stems from the issuance by Corrections Sergeant James Allison of the March 12, 2004 misbehavior report, and plaintiff's contention that it was prompted by his having complained of Corrections Officer Prusinowski's actions towards him. Defendants seek dismissal of this claim, citing the lack of evidence suggesting their involvement in the issuance of that disciplinary charge.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the

proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*6** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04–CV–1401, 2008 WL 268366, at \*10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D .J. and Lowe, M.J.).

In support of their motion, defendants have submitted a declaration from Corrections Sergeant Allison, the author of the misbehavior report in issue, in which he states that the decision to issue the charge was his, and his alone, and was based upon his own personal observations and determination that plaintiff had committed one or more disciplinary infractions. *See* Allison Decl. (Dkt. No. 53–4) ¶ 4. In addition, defendants Connell and Prusinowski have submitted declarations attesting to their official duties and responsibilities as DOCS employees, and expressly disavowing any involvement in the issuance of the misbehavior report by Sergeant Allison. [6] *See* Connell Decl. (Dkt. No. 53–6) ¶ 9; Prusinowski Decl. (Dkt. No. 53–9) ¶ 3. In response to these submissions, plaintiff has cited no evidence linking the issuance of that report to the remaining defendants in the action.

[6]  The record contains no evidence even remotely tending to suggest that defendants DeBejian, the IGS at Oneida, or Bellamy, the DOCS Assistant Director of the Inmate Grievance Program, were in any way involved in the issuance of the misbehavior report.

It may be that plaintiff's retaliation claim, particularly as against Oneida Superintendent Connell, is predicated upon the defendants' positions as supervisors, and his assertion that in light of their positions they should be held accountable for any retaliation committed by Corrections Sergeant Allison. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor—there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways; 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). None of these circumstances apply in this instance, based upon the evidence now before the court. [7]

[7]  When liberally construed, plaintiff's complaint could be considered to contain a claim of retaliation based on his transfer from one dormitory to another upon being made aware of his intentions to pursue his sexual harassment claims. *See* Complaint (Dkt. No. 1) Exh. A. Based on the record before the court, however, no reasonable factfinder could conclude that this transfer amounted to adverse action, particularly in light of the fact that the transfer was rescinded a short time after plaintiff was moved and there being no proof in the record that plaintiff lost any privileges or suffered any negative consequences as a result of the transfer. *Contrast Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040, at \*8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J), *adopted,* Dkt. No. 50 (S.D.N.Y. Oct. 2,

2002) (Daniels, D.J.) (considering inmate's transfer from one housing unit to another an adverse action given that the transfer resulted in prisoner losing his prison job). Accordingly, any retaliation claim stemming from plaintiff's threatened dormitory transfer must also fail.

**\*7** Having carefully reviewed the record, I find no evidence from which a reasonable factfinder could conclude that any of the defendants were personally involved in the issuance of the misbehavior report forming the underpinnings of plaintiff's retaliation claim. I therefore recommend dismissal of that claim as a matter of law.

### C. *Failure To Investigate*

In an argument which also implicates personal involvement, at least tangentially, defendants assert that based upon the court's earlier finding that Corrections Officer Prusinowski's actions did not rise to a level of constitutional significance, any claim against the remaining defendants based upon their failure to investigate his allegations of unlawful harassment also fails to state a constitutional claim.

Undeniably, where a supervisory employee knows or reasonably should know of the existence of facts revealing a constitutional deprivation and, by virtue of his or her failure to properly investigate and remediate the matter, perpetuates or fails to prevent additional constitutional violations despite authority to do so, that defendant may face liability under section 1983. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (indicating that supervisory liability was proper where "an official has actual or constructive notice of unconstitutional practices" by his or her subordinates "and demonstrates gross negligence or deliberate indifference by failing to act"). This principle applies equally to claims of sexual harassment; accordingly, a supervisory prison official who fails to address and take appropriate remedial actions, upon finding the existence of actionable sexual harassment of a prison inmate, bears legal responsibility for a resulting violation of the inmate's Eighth Amendment rights. *See Doe v. Barrett,* No. 3:01–CV–519, 2006 WL 3741825, at \*8–9 (D.Conn., Dec. 19, 2006); *Safadi v. Almanzar,* No. 98 Civ. 7995, 2000 WL 1738403, at \*3 (S.D.N.Y. Nov. 22, 2000). The mere failure to investigate an allegation of unconstitutional activity, without more, however, does not provide a basis for finding liability under section 1983. *Wingate v. Horn,* No. 05–Civ.2001, 2007 WL 30100, at \*6 (S.D.N.Y. Jan. 4, 2007) (citing cases).

In this instance, the court has already determined that Officer Prusinowski's actions, however boorish or offensive they may have been, if substantiated, did not rise to a level of constitutional significance. It logically follows, based upon that finding, that neither could the defendants now accused of failing to investigate and remediate that conduct, already found not to be actionable under section 1983, be held liable for a constitutional deprivation. *See Linares v. Mahunik,* No. 05 Civ. 625, 2006 WL 2595200, at \*11 (N.D.N.Y. Sept. 11, 2006) (Sharpe, D.J. and Treece, M.J.) (holding plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation"). I therefore recommend dismissal of plaintiff's failure to investigate claims against the defendants.

### D. *Failure To Process Plaintiff's Grievance*

**\*8** In a related but arguably distinct claim, plaintiff contends that his constitutional rights were violated based upon the defendants' failure to properly process and investigate his grievance regarding defendant Prusinowski's actions. This claim is asserted against defendant David Debejian, the Inmate Grievance Supervisor at Oneida; defendant Connell, the Superintendent at Oneida; and defendant Bellamy, the Assistant Director of the DOCS Inmate Grievance Program. Defendants also seek dismissal of this claim as a matter of law.

Since New York's inmate grievance program ("IGP"), provides a vehicle to permit inmates to seek internal remedial action within the relevant prison facility before commencing legal action complaining of their conditions of confinement, *see* 7 N.Y.C.R.R. § 701 *et. seq.* (setting forth the stages of the inmate grievance resolution process); *see also Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347 (S.D.N.Y.2002) (requiring New York State prison inmates to avail themselves of the DOCS IGP three step administrative process for the resolution of grievances), and allows them to satisfy their exhaustion requirement under 42 U.S.C. § 1997e, in order to bring an action such as this. *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S .D.N.Y.2004) (An inmate must first exhaust administrative remedies that are available before he may file an action in federal court). It is well-established, however, that a prison inmate has no constitutional right of access to such an internal grievance process. *Rhodes v. Hoy,* No. 05–CV–836, 2007 WL 1343649, at \*6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi,* No. 01 CV0285, 2005 WL 1174088, at

2008 WL 4186334

*3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right.") (citations omitted). Accordingly, plaintiff's allegations to the effect that the defendants failed to afford him an adequate investigation and remedial action under section 1983 response to his grievance, provides no basis for finding liability against them. *Cancel v. Goord,* No. 00. CIV.2042, 2001 WL 303713, at *3 (S.D .N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under section 1983). I therefore recommend dismissal of this remaining claim against the defendants, as a matter of law, based upon the lack of any underlying constitutional obligation on their part to afford plaintiff meaningful access to the internal grievance procedure, and to investigate and properly determine any such grievance.

IV. *SUMMARY AND RECOMMENDATION*

Pivotal to the plaintiff's claims in this case are actions of Corrections Officer Prusinowski, characterized by him as constituting unlawful sexual harassment, but already found by the court not to rise to a level of constitutional significance, and defendants' alleged failure to properly address and remediate those actions. In light of the court's finding that Corrections Officer Prusinowski's actions, as alleged by the plaintiff, did not constitute cruel and unusual punishment or otherwise result in a cognizable unconstitutional deprivation, and the fact that the Constitution does not guarantee him access to the internal grievance process, I recommend dismissal of plaintiff's claims.

*9 To the extent that plaintiff has also asserted a retaliation cause of action claiming that the issuance by Correction Sergeant Allison, who is not a party to the action, of a misbehavior report accusing Toole of misconduct was motivated by plaintiff's filing of a grievance concerning Corrections Officer Prusinowski's actions, plaintiff has offered no evidence from which a reasonable factfinder could determine that the defendants were involved in, or in any way prompted, the issuance of that misbehavior report. Plaintiff's retaliation claim is therefore also subject to dismissal as a matter of law. It is therefore hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, and that the remaining claims contained within the plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

The Clerk of the Court is directed to serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4186334

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2838559
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernabe ENCARNACION, Plaintiff,

v.

J. SPINNER, et al., Defendants.

9:15-cv-01411 (BKS/ML)
|
Signed 06/01/2020

**Attorneys and Law Firms**

For Plaintiff: Elmer Robert Keach, III, Maria K. Dyson, Law Offices of Elmer Robert Keach, III, PC, One Pine West Plaza, Suite 109, Albany, NY 12208.

For Defendants: Letitia James, Attorney General for the State of New York, Kostas Leris, The Capitol, Albany, New York 12224-0341.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 *1  Plaintiff Bernabe Encarnacion, a New York state inmate, brings this civil rights action under 42 U.S.C. § 1983, raising claims arising out of his incarceration at the Upstate and Clinton Correctional Facilities.[1] Following review under 28 U.S.C. § 1915, the following claims survived: (1) Eighth Amendment excessive force claims against Defendants James Spinner, Guy Soucia, and Adam Ripa; (2) Eighth Amendment failure to intervene claim against Defendant Jon Oropallo (3) Eighth Amendment medical indifference claims against Defendants Richard Adams, Vincent Somalis, and Rebecca Waldron; (4) Fourteenth Amendment due process claims against Defendant Spinner, and (5) First Amendment retaliation claims against Defendants Ripa, Adams, and Waldron. (Dkt. No. 10, at 27).[2] Defendants now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 103). The parties have filed responsive briefing. (Dkt. Nos. 124, 130). For the reasons that follow, Defendants' motion is granted in part.

[1]  Plaintiff initially proceeded pro se. On November 27, 2017, Plaintiff was appointed counsel. (Dkt. No. 69).

[2]  Claims against certain unidentified Doe Defendants survived § 1915 review but were dismissed by Text Order on June 5, 2019. (Dkt. No. 96). Claims also survived against Anthony Annuci, David Rock, and Albert Prack; those claims were dismissed by stipulation on July 9, 2019. (Dkt. No. 98).

**II. RECORD BEFORE THE COURT**

Defendants argue that, with the exception of deposition transcripts, Plaintiff's exhibits, which are "annexed" to Plaintiff's attorney affirmation, "are improperly submitted and should not be deemed as part of the record before the Court." (Dkt. No. 130, at 4). The depositions and other exhibits, however, primarily appear to be records generated in discovery. (Dkt. No. 124, at 2–3).[3] Defendants do not appear to dispute the source or authenticity of the exhibits apparently generated in discovery; Defendants argue that the exhibits should have been authenticated by Plaintiff, not his counsel. (Dkt. No. 130, at 4 n.1). While "attorney affidavits are not part of the record for purposes of a motion for summary judgment," *Hines v. City of Albany*, No. 06-cv-01517, 2011 WL 2620381, at *3, 2011 U.S. Dist. LEXIS 68548, at 10 (N.D.N.Y. July 1, 2011), *aff'd sub nom. Hines v. Albany Police Dep't*, 520 F. App'x 5 (2d Cir. 2013), the Court will consider the attached record evidence in resolving the present motion. *See e.g., Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1044 (2d Cir. 1991) (holding "that the district court has power to interpret the Local Rules as well as the discretion to determine when fairness demands that departure from the Local Rules be excused").

[3]  The one exception appears to be the "sample witness statements and assistance forms," which Defendants argue are irrelevant because they relate to a more serious Tier III disciplinary hearing, not the Tier II disciplinary hearing at issue here. (Dkt. No. 130, at 10) (referencing Dkt. Nos. 124-26, 124-27 and 124-28). The Court has not considered those sample forms.

**III. FACTS**[4]

[4]  The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 103-40, 126), their

responses thereto, (Dkt. Nos. 126, 130-1), and the evidence attached to the parties' submissions, including Plaintiff's verified complaint. (Dkt. No. 1). The Court has also reviewed the surveillance videos in the record. (*See* Dkt. Nos. 103-9, 124-9). The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

### A. Misbehavior Report for Scratches on Cell Window

**\*2** Plaintiff testified that he speaks "very little English." [5] (Dkt. No. 103-2, at 5). On January 24, 2013, Plaintiff was transferred from another prison to Upstate Correctional Facility ("Upstate"). (Dkt. No. 103-14). Apart from a temporary stint at Attica Correctional Facility ("Attica"), Plaintiff remained at Upstate from January 24, 2013 until September 30, 2013. (Dkt. No. 126, ¶ 1; Dkt. No. 103-13, ¶ 14).

[5]     Plaintiff also testified that he is legally blind, having been diagnosed with muscular atrophia, in late 2015 or 2016, after the events in this case. (Dkt. No. 103-2, at 11, 14, 25-26). The parties dispute the extent of Plaintiff's ability to speak English. (*E.g.*, Dkt. No. 126, ¶ 15); *see also* (Dkt. No. 103-2, at 5; Dkt. No. 103-23, ¶ 14; Dkt. No. 124-4, at 2; Dkt. No. 124-20, at 2; Dkt. No. 124-21, at 2).

On March 11, 2013, Plaintiff was moved to a new cell. (Dkt. No. 103-26, at 1; Dkt. No. 126, ¶ 4). On March 14, 2013, Plaintiff's cell was inspected by Corrections Officer Schrader. (Dkt. No. 124-3). According to the Cell Inventory Checklist, which Plaintiff signed, Plaintiff's cell window was not scratched. (*Id.*; Dkt. No. 124-4, at 14, 20–21). On May 12, 2013, Officer Schrader issued Plaintiff an inmate misbehavior report for allegedly scratching the cell window. (Dkt. No. 103-24, at 1). Plaintiff testified that he was given a copy of the misbehavior report the next day but never in Spanish. (Dkt. No. 103-2, at 110, 111–12). Plaintiff denied the allegations in the report and maintained that the window was scratched when he moved into the cell. (*Id.* at 111; Dkt. No. 124-4, at 11–12).

### B. Disciplinary Hearing Related to Scratches on Cell Window

Plaintiff's disciplinary hearing related to the misbehavior report was initially scheduled for May 23, 2013, with Defendant James Spinner serving as the hearing officer. (Dkt.

No. 126, ¶ 12; Dkt. No. 124-2, at 2). According to Spinner, he had a long conversation with Plaintiff in English before the hearing began, and did not believe that Plaintiff needed an interpreter, but adjourned the hearing to May 28th to give Plaintiff a Spanish-speaking interpreter after Plaintiff requested one. (Dkt. No. 103-23, at 2-3; Dkt. No. 124-4 at 2-3). Spinner did not appoint an assistant for Plaintiff. [6]

[6]     Under New York regulations, "an inmate is only entitled to an assistant at a Tier II disciplinary hearing if the inmate is (1) illiterate or Limited English Case Proficient, (2) 'sensorially disabled' and requires assistance such as a sign language interpreter, or (3) charged with drug use." (Dkt. No. 126, ¶ 14); *see* 7 N.Y.C.R.R. § 251-4.1.

At the hearing, when asked to explain the signed inspection checklist, Plaintiff contended that Officer Schrader had presented him with a blank form with "[j]ust check marks." (Dkt. No. 124-4, at 21–22). However, at an earlier point during the hearing, Plaintiff testified that he signed the form without looking at it. (*Id.* at 8). Plaintiff also contends that he was only shown an English checklist and that no one translated it for him. [7] (*E.g.*, Dkt. No. 126, ¶¶ 5–8). Spinner found Plaintiff guilty of "destroying and damaging state property." (Dkt 124-4, at 25; Dkt. No. 103-23, ¶ 40). Spinner found Plaintiff guilty based on Officer Schrader's testimony, her written report, the cell inspection sheet, and the photographs of Plaintiff's cell window. (Dkt. No. 103-24, at 2–4; Dkt. No. 103-23, ¶ 40; Dkt. No. 124-4, at 25; Dkt. No. 126, ¶¶ 38–39, 46).

[7]     Plaintiff did not testify to this effect at his disciplinary hearing or at his deposition, but the only form in the record is in English. (*See* Dkt. No. 124-3).

**\*3** Spinner imposed the following penalties: first, Spinner reinstated a sentence stemming from a 2012 incident that had been suspended. (Dkt. No. 126, ¶¶ 40–14; Dkt. No. 124-4, at 24). That sentence included three months of Special Housing Unit ("SHU") confinement, as well as three months' loss of packages, commissary, and phone privileges. (Dkt. No. 126, ¶ 40; Dkt. No. 124-4, at 24). In addition, as a result of the May 12th misbehavior report, Spinner sentenced Plaintiff to 30 days of keeplock, 30 days' loss of packages, 30 days' loss of commissary, and $52 in restitution for the damaged cell window. (Dkt. No. 126, ¶ 45; Dkt. No. 124-4, at 24).

In November 2013, an assistant attorney general in the New York Attorney General's office opined that "a reversal [was] warranted on the grounds that Plaintiff was not afforded a tier assistant," as required for an inmate who is either illiterate or non-English speaking." (Dkt. No. 124-7; *see also* Dkt. No. 103-26, at 2 (charges from March 2013 incident absent from Plaintiff's disciplinary history)).

### C. Alleged May 28, 2013 Excessive Force Incident Following Disciplinary Hearing

According to Plaintiff, after the hearing, while Plaintiff's hands and feet were handcuffed and his face was up against a wall, Spinner, Defendant Guy Soucia, and two other corrections officers jumped on Plaintiff, "thr[e]w [him] against the wall and ... start[ed] hitting" him "all over [his] body." (Dkt. No. 103-2, at 36–39). Because he was facing the wall, Plaintiff could not see who was hitting him. (*Id.* at 41).

Plaintiff testified that he grieved this alleged use of force to the Inmate Grievance Resolution Committee (the "IGRC"). (*Id.* at 55–56, 58). However, according to Defendants—by way of declarations submitted by the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program staff—no timely record of any grievance from this incident exists, even though Plaintiff filed other unrelated grievances from January 24, 2013 through September 30, 2013, including grievances that post-dated this alleged use of force. (Dkt. No. 103-13, ¶¶ 13–20; Dkt. No. 103-16, ¶¶ 14–20 Dkt. No. 103-20, ¶¶ 11–12).

On July 23, 2013, while temporarily confined at Attica, Plaintiff filed a grievance complaining that he was being improperly confined in the SHU. (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 48). In that grievance, Plaintiff complained that his SHU release date was moved from "5/30/13 to 8/30/13 after [Spinner] and three other [corrections officers] beat[ ] me up on 5/28/13 ... without reasons." (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 49). That grievance was appealed to the Central Office Review Committee (the "CORC"). (Dkt. No. 103-22, at 1). With respect to Plaintiff's complaint related to the alleged May 28th use of force incident, the CORC responded that the "allegations are untimely and will not be addressed." (*Id.*).

### D. Plaintiff's Time in the SHU

Following the May 28, 2013 hearing Plaintiff testified that he spent 126 days in disciplinary housing. [8] (Dkt. No. 103-2, at 114; Dkt. No. 130-1, ¶ 11). Plaintiff further testified that he

was confined to his cell for 23 hours per day with one hour for recreation but that "[m]any times they did not open the door for [Plaintiff]," and that he was denied recreation the "majority of the time" that he was in disciplinary housing. (Dkt. No. 103-2, at 116). Further, the water in Plaintiff's cell sink and toilet was not always working. (*Id.* at 114–15). Plaintiff further testified that he was denied meals, that "[m]any times, lots of times" he would be served a plate that was empty, (*id.* at 118), or that there would be spit and "other stuff" on his plate. (*Id.* at 119). Plaintiff further testified that he was generally permitted two showers per week but some weeks was only given one. (*Id.*).

[8]    Defendants claim Plaintiff spent only 122 days in disciplinary housing. (*See* Dkt. No. 130-1, ¶ 11).

### E. Alleged September 30, 2013 Excessive Force and Sexual Assault Incident

**\*4**  On September 30, 2013, Plaintiff was scheduled to be transferred from Upstate to Clinton. (Dkt. No. 126, ¶ 65; Dkt. No. 103-2, at 71). Plaintiff was brought to Upstate's draft room in preparation for transfer. (Dkt. No. 103-9; Dkt. No. 126, ¶ 65). Within the draft room, there is a strip frisk room where prisoners are strip frisked prior to being transferred. (Dkt. No. 124-38, at 42; Dkt. No. 103-9). Diagonally across from the strip frisk room is an ID room where prisoners go to have an updated photograph taken, if necessary, prior to being transferred. [9] (Dkt. No. 126, ¶ 66; Dkt. No. 124-38, at 36–37, 60; Dkt. No. 103-9). There are two holding cells in the draft room: one on the same side of the room as the ID room ("the holding cell next to the ID room") and one across the room from that holding cell. (*Id.*).

[9]    A new photo would be required if the prisoner's appearance had changed since the prior photo had been taken. (Dkt. No. 124-36, at 16–17).

Based upon a surveillance video Defendants produced of the draft room, the process that morning appeared to be as follows: prisoners were taken from the holding cell across from the ID room to a place near the strip frisk room where the prisoners' handcuffs were removed, the prisoners were placed in a BOSS chair near the strip frisk room, brought into the strip frisk room, and then either placed directly into the holding cell next to the ID room or taken to the ID room for an updated photograph before being placed in the holding cell next to the ID room. (*Id.*; Dkt. No. 124-38, at 36–37, 60).

Plaintiff testified to the following events. Plaintiff was going through a "strip inspection" in preparation for the transfer. (Dkt. No. 103-2, at 71). Defendant Adam Ripa "started taking off [Plaintiff's] chains" and handcuffs while "another officer was with him." (*Id.*). All three were standing "next to the sergeant who is the area supervisor." [10] (*Id.*). As Ripa was taking off Plaintiff's handcuffs he told Plaintiff, "I'm going to do you dirty because [Plaintiff has] complaint [sic] against [Ripa]." (*Id.*). Plaintiff had grieved Ripa on March 3, 2013 and testified that he files "a lot of grievances against him and his coworkers." (Dkt. No. 124-1; Dkt. No. 103-2, at 122).

| [10] | Defendant Jon Oropallo was Draft Supervisor that day. (Dkt. No. 103-32, ¶ 7). |

After Plaintiff's strip inspection, he was taken to the ID room. (*Id.* at 71). With the door to the ID room open, Ripa and another officer "start[ed] beating" Plaintiff. (*Id.* at 71–72). Ripa struck Plaintiff first "in the stomach" with a "[c]losed fist" while wearing gloves. (*Id.* at 75). Plaintiff testified that if prisoners and staff were "looking they would be able to see" the assault. (*Id.* at 89). Plaintiff could not recall how many times he was hit in the stomach but that "with the first blow" Plaintiff fell to the floor and lost consciousness. (*Id.* at 72, 75). When Plaintiff regained consciousness, his pants and underwear were "halfway by [his] knees." (*Id.* at 72, 76). "As soon as [Plaintiff] recovered consciousness," he felt pain in his buttocks, which he described as though "something was burning [him] in that region." (*Id.* at 77). Plaintiff has no recollection of being raped or sodomized "because [he] was unconscious on the floor." [11] (*Id.* at 78). When he awoke, Plaintiff was on his side as Ripa and the second officer stood in front of him. (*Id.* at 75–76). According to Plaintiff, Oropallo heard Ripa's alleged remark about doing Plaintiff dirty, and he—along with other prisoners and staff—"stood back outside of the ID room watching." (*Id.* at 88–89).

| [11] | In his opposition to summary judgment Plaintiff suggests that he may have been sodomized with an officer's baton. (*See* Dkt. No. 125, at 11, 17). |

**\*5** The video of the draft room establishes that Plaintiff was inside the ID room for approximately 90 seconds. [12] (Dkt. No. 103-9, 06:27:18–06:28:47; Dkt. No. 126, ¶¶ 69–70). At approximately 6:19 a.m., a guard unlocks the holding cell across from the ID room; Plaintiff exits that cell and makes his way near the outside of the strip frisk room where he appears to be searched by two corrections officers. (Dkt. No. 103-9, 06:19:07). After that, Plaintiff sits in the BOSS chair before entering the strip frisk room. (*Id.*, 06:20:04–27; Dkt. No. 124-38, at 47). Plaintiff exits the strip frisk room at approximately 6:27 a.m. (Dkt. No. 103-9, 06:26:48). As Plaintiff emerges from the strip frisk room there appear to be four officers gathered around a desk in the middle of the draft area. (*Id.*, 06:26:48). Plaintiff exits the room along with five officers and another prisoner. (*Id.*, 06:26:54). The video shows a corrections officer open the door to the holding cell next to the ID room for a moment before closing it; an officer wearing gloves then appears to direct Plaintiff, pointing to the ID room. (*Id.*, 06:27:10). Plaintiff enters the ID room at approximately 6:27:18 a.m. with one and possibly another officer, although the video is not clear. [13] (Dkt. No. 126, ¶ 69; 103-9, 06:27:18). While Plaintiff is in the ID room, some movement within the ID room appears to be visible. (*Id.*, 06:27:22–06:28:45). Prisoners can be seen sitting in the holding cell next to the ID room during this time. (*Id.*). Plaintiff exits with a corrections officer's hand on his back at about 6:28:47. (*Id.*, 06:28:47). Plaintiff enters the cell next to the ID room at 06:29:00. [14] (Dkt. No. 126, ¶ 70; Dkt. No. 103-9, 06:29:00). There are several officers in the draft room visible in video. While the outside door of the ID room is not clearly visible on the video, there is no indication of any commotion among any of the officers in the draft room at any time during the time Plaintiff was in the ID room or during the time he was returned to the holding cell from the ID room.

| [12] | The surveillance footage shows four panels depicting different parts of the draft room on September 30th. (Dkt. No. 103-9). Ripa testified that the outside of the ID room is shown in the lower-left panel (which is just to the left of the holding cell shown in the bottom-right panel). (Dkt. No. 124-38, at 37; Dkt. No. 126, ¶ 68). The outside of the ID room is difficult to make out because of brightness in the video. (Dkt. No. 103-9). The upper-left panel shows the holding cell across from the ID room, and the upper-right panel shows people coming and going from the strip frisk room. (*Id.*). |

| [13] | Although Ripa did not identify himself at his deposition as being shown in the surveillance video, he acknowledged that a corrections officer in the video depicted coming out of the strip frisk room was "approximately [his] height", and that the physical description of the officer with his hands on Plaintiff's back after leaving the ID room "looks like" it matches Ripa's physical description. |

*(E.g.,* Dkt. No. 124-38, at 51–52, 64; Dkt. No. 103-9). This officer was wearing gloves, (Dkt. No. 124-38, at 46), and Ripa further testified that "it did not look like" that person was carrying a baton in the surveillance footage. *(Id.* at 68).

14    Plaintiff remained in that cell until 6:50:23, when it appears that Plaintiff, along with two other inmates, was moved to the holding cell on the opposite side of the draft room. (Dkt. No. 103-9, 6:50:23). Plaintiff did not show signs of any distress when he walked across the draft room to the other holding cell. Plaintiff asserts that after he left the ID room, the video shows him walking "in an unsteady manner, and in manner different than he walked into the [ID] room," (Dkt. No. 126, ¶ 70), but there does not appear to be any difference in how Plaintiff is walking in any part of the video, before or after he went to the ID room. *Compare* (Dkt. No. 103-9, 06:20:00 (Plaintiff walking to the strip frisk room) *with* (*id.* at 06:26:46, 06:28:48 (Plaintiff walking to and from ID room) *and* (*id.* at 06:50:23) (Plaintiff walking across the draft room to the holding cell on the other side of the room). Plaintiff walks with a limp as a result of knee surgery that predates the alleged incident. (Dkt. No. 103-2, at 94).

Plaintiff testified that after he was allegedly assaulted, he was returned to "the holding cell"; that other prisoners "saw everything"; and that when Plaintiff returned, they "told [Plaintiff] what happened." (Dkt. No. 103-2, at 82). Plaintiff testified that they could "see through the door because they [were] in front, front to front." *(Id.* at 82–83). It does not appear from the video that inmates in this holding cell, which was *next to the ID room,* could see the ID room. Plaintiff testified that he told them that his "whole body was in pain" and that the witnesses "called [Sergeant Oropallo] and told him how [Plaintiff] was and what they saw." *(Id.* at 82).

**\*6** According to Plaintiff, after Oropallo called to get Plaintiff to the medical unit, an officer wheeled Plaintiff to the facility hospital. *(Id.* at 83–84). The surveillance footage corroborates that Plaintiff was taken in a wheelchair by a nurse and a corrections officer at about 7:35 a.m., approximately one hour after exiting the ID room. (Dkt. No. 103-9, 7:35:30). According to Plaintiff, when he arrived, he reported that the officers had jumped on him and given him "a beat down," and the officer who "wheeled [Plaintiff] in told the nurse not to report anything," at which point he was

pulled out of the medical wing and "sent back to the draft room." (Dkt. No. 103-2, at 84). The video shows that Plaintiff returned to the draft area about ten minutes after he had left, still in a wheelchair, and put back into one of the holding cells at about 7:45 a.m. (Dkt. No. 103-9, 7:44:44). Although Upstate medical staff cleared Plaintiff to be transferred, (Dkt. No. 126, ¶ 75), no medical records reflect any interaction between Plaintiff and the medical staff that morning. (Dkt. No. 130-1, ¶ 16).

Two prisoners who were in a holding cell with Plaintiff that day provided written statements during a subsequent Inspector General investigation into this incident. (Dkt. Nos. 124-20, 124-21). Neither inmate reported having seen a sexual assault or having been told by Plaintiff that he had been sexually assaulted.

The first witness said that Plaintiff was "escorted to the I.D. room for a new photo" and while Plaintiff was in the ID room, the witness "heard a commotion." (Dkt. No. 124-20, at 1). The witness further stated that he "couldn't see into the I.D. room," that he "wasn't really paying attention," and that Plaintiff was in there for "a few minutes." *(Id.*). The witness further stated that when Plaintiff "came back he told me that his ribs and chest hurt." *(Id.* at 1–2). After Plaintiff told the Sergeant, a nurse came and took him in a wheelchair to medical. *(Id.* at 2). According to that witness, when Plaintiff came back from medical, Plaintiff told him that "they didn't do anything for him in medical." *(Id.*). Five to ten minutes after he returned from medical, Plaintiff was "holding his hand on his chest and ribs." *(Id.*). That witness said that he "didn't see anyone assault or sexually assault" Plaintiff or see "any staff acting inappropriately." *(Id.* at 3).

The second witness's description of how he was in a position to see into the ID room does not appear to be consistent with the video or the procedure followed in the draft room. This witness stated that after he was strip frisked, he was placed in a holding cell "*across* from the holding cell" next to the ID room. (Dkt. No. 124-21, at 1). This witness stated that he "saw an officer escort [Plaintiff] into the ID room" and while in the ID room, he "saw the officer (unknown, unable to describe) swing his arm." *(Id.* at 1–2). The witness stated that he "assume[d] that [the officer] was hitting" Plaintiff but did not see the officer strike him. *(Id.* at 2). This witness stated that Plaintiff "was in the ID room for about fifteen minutes" and that he "didn't see anyone sexually assault" Plaintiff. *(Id.*). According to this witness, after Plaintiff was "done in the ID room," Plaintiff entered the holding cell that the witness

was in and "started complaining that he was hurt" but that he could not recall where Plaintiff was hurt, stating that it was "maybe his chest." (*Id.*). The video, however, establishes that immediately after Plaintiff exited the ID room, he was placed in the holding cell *next to* the ID room and that from there an inmate could not see into the ID room. (Dkt. No. 103-9).

Ripa testified at his deposition that he had no recollection of being in the ID room with Plaintiff. (Dkt. No. 124-38, at 67). He further testified that he has never seen a prisoner assaulted by a corrections officer. (*Id.* at 67–68). Oropallo states that he "did not witness [P]laintiff being assaulted, sexually or otherwise, by any staff at Upstate." (Dkt. No. 103-32, ¶ 21). Instead, Oropallo states that Plaintiff never told him about any assault, that Plaintiff complained of chest pains, that Oropallo contacted medical staff, that a nurse took Plaintiff to medical for evaluation, and that Plaintiff returned to the draft area ten minutes later.[15] (*Id.* ¶¶ 16–21).

[15]    Non-party witness Sergeant Robert Gill also testified that he did not recall seeing Plaintiff sexually or physically assaulted in the draft or ID room on September 30, 2013, and that if he had seen any corrections officer assault Plaintiff, he would have been required to intervene in the moment to protect Plaintiff and that he also would have been required to notify a lieutenant. (Dkt. No. 124-36, at 31–32).

**\*7** As a result of the alleged incident, Plaintiff testified that he suffered the following injuries: rectal bleeding, pain in "the whole body," pain in his jaw, and blood in his "fecal matter." (Dkt. No. 103-2, at 79). Plaintiff had rectal burning for "[a]bout a month or so" and that going to the bathroom was "very painful." (*Id.*). He also had difficulty eating and sleeping. (*Id.* at 81). Plaintiff also suffered chest pains, which he had never before. (*Id.*).

### F. Plaintiff's Arrival at Clinton on September 30th

On the way to Clinton, Plaintiff testified that he complained about "[c]hest pain and pain in the whole entire body" and that the transfer officers "saw what happened." (*Id.* at 85).

### 1. Medical Care

It is undisputed that when Plaintiff arrived at Clinton, he was sent to the emergency room complaining of chest and back

pain. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶ 9; Dkt. No. 103-34, at 5). Plaintiff testified that he saw Defendant Dr. Richard Adams and "another nurse." (Dkt. No. 103-2, at 95). Plaintiff claims he told Adams what happened and that he had chest pains, but Adams "didn't [take] any notes." (*Id.* at 91, 95). Plaintiff testified that the "only thing [the medical staff] did" that day was check his blood pressure. (*Id.* at 96). Plaintiff testified that once he raised the topic of the assault, "they stop[ped] doing everything." (*Id.*).[16]

[16]    In addition to taking Plaintiff's blood pressure, medical records from that day indicate notations for his pulse rate and his temperature. (Dkt. No. 103-36, at 1). Nurse Fitzgerald also testified, while reviewing the medical record from that visit, that he listened to Plaintiff with a stethoscope and measured his "blood level of oxygen." (Dkt. No. 124-35, at 41). When asked whether the notations on the medical records reflecting these measurements were made up, Plaintiff responded, "I could not answer to that, I don't know what they did" and that they "didn't do any of that." (Dkt. No. 103-2, at 97).

According to the prison medical records, it appears that Plaintiff was first seen by Nurse Robert Fitzgerald,[17] and that Nurse Fitzgerald referred him to Adams. (Dkt. No. 103-34, at 5; Dkt. No. 124-35, at 41–42). The medical records reflect that Plaintiff's temperature, blood pressure, pulse, and breathing were measured. (Dkt. No. 103-34, at 5; Dkt. No. 103-33, at 2). None of the medical or security records generated at Clinton on September 30th reflect that Plaintiff complained about an assault.

[17]    The relevant medical record, dated September 30, 2013, does not state a time at which Nurse Fitzgerald assessed Plaintiff. (*See* Dkt. No. 103-34, at 5).

Adams evaluated Plaintiff in the emergency room and concluded that Plaintiff's heart and lungs were functioning normally and that he should be seen for a follow up for chest pain, if needed. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶¶ 12–13). Adams states that it was his "assessment" that Plaintiff "appeared to be seeking pain medication with complaints of general pain" without "any specifics as to the cause or extent of his pain." (*Id.* ¶ 14). Adams further states that at no time during this evaluation "did [Plaintiff] allege that he had been physically and sexually assaulted at Upstate." (*Id.*

¶ 16). Nurse Fitzgerald testified that, based on looking at the medical record he generated that day, Plaintiff did not report that he had been assaulted or sexually assaulted because he "would have noted it." (Dkt. No. 124-35, at 45). Adams identified his handwritten notes on the medical records; one such note by Adams states, "No English." (Dkt. No. 103-36, at 5; Dkt. No. 124-34, at 80).

**\*8** Plaintiff testified that after he was evaluated by Adams and the nurse, he was then sent to his cell at Clinton where Defendant Nurse Rebecca Waldron came to interview him. (*Id.* at 97–98). Plaintiff testified that he told Waldron that he "was assaulted and raped ... and she totally disregard[ed] that, she ignored that," saying "I don't care." (*Id.* at 92, 95, 99; Dkt. No. 124-8, at 1). Plaintiff denies that Waldron asked him the general questions about his health and medications that are reflected in a two-page health screening form completed that day. (Dkt. No. 103-2, at 98; Dkt. No. 103-36, at 3–4). According to Plaintiff, Waldron discontinued Naproxen and Neurontin prescriptions as soon as he "report[ed] the assault. Right on the spot she cross[ed] it [off]." [18] (Dkt. No. 103-2, at 124).

[18]    In the grievance dated October 16, 2013, Plaintiff asserted that it was Adams who discontinued the medication. (Dkt. No. 124-31). Waldron states that Adams discontinued the medications "until Plaintiff could be examined by a primary care physician" and that, as a registered nurse she was "not authorized to discontinue an inmate's prescriptions." (Dkt. No. 103-35, ¶ 31–32).

Records reflect that Waldron gave Plaintiff a health screening. (Dkt. No. 126, ¶ 82; Dkt. No. 103-35, ¶¶ 8, 12; Dkt. No. 103-36, at 1–4). During the evaluation, Waldron asked Plaintiff to list every medical problem he had; according to Waldron, and as reflected in the screening form, Plaintiff indicated that his only medical issues were lower back pain, acid reflux, and glaucoma. (Dkt. No. 103-35, ¶¶ 16–17; Dkt. No. 103-36, at 1, 3–4). As part of this evaluation, Plaintiff was asked to list every medication he was taking so that the "primary care physician at Clinton" can "examine the inmate and review his medications" and decide to "either refill the inmate's prescriptions or discontinue them." (Dkt. No. 103-35, ¶¶ 18, 20–22). Plaintiff told Waldron that he was taking five medications, and she referred him to a primary care physician to have his medications reviewed. (Dkt. No. 126, ¶¶ 83–84; Dkt. No. 103-35, ¶¶ 22–23). Waldron states that at no time during this evaluation did Plaintiff allege that

he had been physically or sexually assaulted at Upstate. (Dkt. No. 130-35, at 4).

## 2. Initial Security Interview

After Plaintiff spoke to Waldron on September 30, 2013, he was interviewed by Defendant Sergeant Vincent Samolis. (Dkt. No. 103-2, at 92; Dkt. No. 126, ¶ 85). According to Plaintiff, he told Samolis that he "was attacked physically and sexually" and that he was bleeding "[b]y the anus." (Dkt. No. 103-2, at 92, 100). Somalis "totally disregarded" Plaintiff's claim of assault and told Plaintiff to "write a letter to the deputy of security." (*Id.* at 92–94).

Samolis has submitted a declaration explaining that on September 30th he conducted initial security interviews of the inmates transferring into Clinton, and it was his duty to determine whether the inmates could be placed in general population or needed specialized housing. (Dkt. No. 103-38, ¶¶ 7, 10). Samolis stated that he "filled out an Initial Security Interview form," as he interviewed Plaintiff, and that that the form "required" Samolis to ask Plaintiff "personal questions, such as whether [Plaintiff] ... was a victim of abuse." (*Id.* ¶¶ 9, 13; Dkt. No. 103-39). Samolis stated that at "no time during [his] evaluation of [P]laintiff on September 30, 2013 did he allege that he had been physically and sexually assaulted at Upstate." (Dkt. No. 103-38, ¶ 15). During the interview Somalis gave Plaintiff a Prison Rape Elimination Act ("PREA") orientation packet, which "contained information on how to report sexual abuse of any kind." (Dkt. No. 103-38, ¶ 11; Dkt. No. 126, ¶ 86).

**\*9** Adams, Waldron, and Samolis each stated that this was the first time they had ever had contact with Plaintiff. (Dkt. No. 103-33, ¶ 7; Dkt. No. 103-35, ¶ 7; Dkt. No. 103-38, ¶ 6). Departmental policy and procedure would have required Adams, Samolis, and Waldron to report Plaintiff's alleged complaints of abuse to their superiors. (Dkt. No. 126, ¶ 100).

## G. Dr. Adams' Review of Plaintiff's Prescriptions

The next day, October 1st, Adams reviewed Waldron's request regarding Plaintiff's prescription renewals. (*Id.* ¶ 88). Adams states that he renewed Plaintiff's prescriptions for three medications because they treat acid reflux and glaucoma. (Dkt. No. 103-33 ¶ 25). Adams, however, declined to renew Plaintiff's Naproxen and Neurontin prescriptions. (Dkt. No. 126, ¶ 91). According to Adams, the Naproxen was

not renewed because it can worsen conditions such as acid reflux, which Plaintiff had. (*Id.* ¶ 92; Dkt. No. 103-33, ¶ 26). He further stated that he decided not to renew the Neurontin because in his earlier evaluation of Plaintiff, he found Plaintiff was "seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that it therefore should not be prescribed until Plaintiff "was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27).

### H. Letters and Grievances Regarding the Alleged Assault and Discontinuation of Medication

Plaintiff sent letters dated October 10th regarding the alleged September 30th assault to several individuals, including DOCCS officials and United States District Judge Charles Siragusa. (Dkt. Nos. 124-14–18). Judge Siragusa sought follow up from the New York State Attorney General's office on the matter. (Dkt. No. 124-19, at 1–2).

Plaintiff also filed a grievance, dated October 12th, relating to the alleged assault. (Dkt. No. 124-8). In the grievance, Plaintiff stated that he was assaulted, beaten up, and sodomized by Ripa and an officer inside the ID room. (*Id.*). He further stated that the "assaults" "and rape" were witnessed and observed by several officers and inmates, including the area sergeant supervisor and that it was "recorded by the surveillance cameras in the ID room." (*Id.*). He further stated that he was taken in a wheelchair to the emergency room at both Upstate and Clinton and returned "without received [sic] any medical attention or treatments to [his] internal and external injures that [he] sustained." (*Id.*). He further stated that he reported the assault to various employees, including "the transferred [sic] officers," Waldron and "Sgt. Samos III" [19] and that "to date" he has not received "medical attention or treatments to [his] injuries." (*Id.*).

[19]    This presumably refers to Samolis.

Plaintiff filed another grievance dated October 16th complaining that his "pain medication has been discontinued by Dr. Adams." (Dkt. No. 124-31). Plaintiff appears to further state that he was ordered and directed to file sick calls, which he stated that he has "been doing ... every sick call day since then." (*Id.*). He further stated that he requires these medications to control his "chronic back and knee pains caused by a spine disk degenerate disease condition" and that he enclosed a copy of an MRI. (*Id.*).

### I. Investigation of Plaintiff's Sexual Assault Allegation

### 1. Initiation of the Investigation

**\*10**    On October 17th, Anthony Misercola, a senior investigator in DOCCS's sex crimes unit the Office of Special Investigations [20] ("OSI"), received one of Plaintiff's letters. (Dkt. No. 124-32, at 1; Dkt. No. 103-8, at 21; Dkt. No. 124-33; Dkt. No. 103-29, ¶ 6). Misercola's duties included conducting investigations under PREA. (Dkt. No. 103-8, at 10).

[20]    This entity was formerly called the Office of the Inspector General. (Dkt. No. 126, ¶ 100).

Oropallo provided a statement dated October 18, 2013, stating that on September 30th Plaintiff never made any statements to him about "allegedly being assaulted or sodomized" but that Plaintiff did report "having chest pains." (Dkt. No. 124-11). Oropallo stated that he notified the medical department and that Plaintiff was "escorted via wheelchair to the infirmary for assessment" and that "approximately 10 minutes later [Plaintiff] was escorted back to the draft area and cleared for his transfer." (*Id.*). Oropallo stated that he interviewed "all named staff in this inmate's complaint and all staff have submitted written responses denying all allegations." (*Id.*).

### 2. Subsequent Evaluation by Clinton Medical Staff

On October 20th, Misercola contacted Lieutenant Martin Snow and requested that Plaintiff "be interviewed by a security supervisor and evaluated by medical." (Dkt. No. 124-32, at 1). Medical records and declarations from medical staff reflect that Plaintiff was brought to medical for an examination. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 124-32, at 1).

Waldron examined Plaintiff and completed an inmate injury report. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 103-36, at 9–10). She noted that Plaintiff alleged that he was "sexually assaulted and beat up by Upstate officers on 9/30/13" and that he alleged he had "blood [in his] stool and [was] cough[ing] up blood" since September 30, 2013. (Dkt. No. 103-35, ¶¶ 36–37; Dkt. No. 103-3, at 9; Dkt. No. 124-39, at 55). Waldron apparently examined Plaintiff while he was "in shorts" and noted that there was "no visible blood at this time" and that she would have Plaintiff evaluated by a "provider as a follow up – slip given." (Dkt. No. 103-36, at 9–10). Waldron states that she gave Plaintiff a slip to be seen the next day by Adams. [21]    (Dkt. No. 103-35, ¶ 42).

An Interdepartmental Communication signed by Waldron to a Lieutenant Matott, dated October 20, 2013, states that at no time "during the draft interview" conducted on September 30th did Plaintiff "tell [Waldron] he was sexually assaulted or beat up by Upstate officers." (Dkt. No. 103-37, at 1).

21    Waldron further testified that if a translation service is used when medically evaluating a prisoner, that would be documented. (Dkt. No. 124-39, at 71). During her deposition, Waldron testified that she could not see anything on the document to indicate that a translator was used. (*Id.* at 72).

Plaintiff testified that on October 20th, Waldron did not record all of his symptoms and that she "didn't write anything" except for some writing "in the middle of the page" and that she did not write down everything she observed or that Plaintiff told her. (Dkt. No. 103-2, at 106–08). Plaintiff did not provide specifics as to what Waldron omitted from her description of the alleged sexual assault and beating. (*Id.*).

**11** Plaintiff further testified that he did not have bruising on him that day and that he would not have had bleeding, as he reportedly told Waldron, because he had "changed [his] clothes already." (*Id.* at 108). Plaintiff testified that he "went to see [Adams] on the next day" and that "[t]he doctors" interviewed him through a "phone interpreter" and that he was not given any treatment.[22]

22    No records, including Plaintiff's health services referral history, indicate that Plaintiff was seen by Adams or any provider the next day. (*See* Dkt. No. 103-36, at 12).

### 3. Interviews and Review of the Surveillance Footage

On November 5, 2013, Misercola—with the assistance of an interpreter—interviewed Plaintiff as part of his investigation into Plaintiff's alleged assault. (Dkt. No. 124-32, at 1).[23] According to Misercola's report, Plaintiff alleged that he was taken "into the ID room in the draft area at Upstate" where he was "beaten by several unknown officers and rendered unconscious." (*Id.*). When Plaintiff "regained consciousness his pants and underwear were around his ankles." (*Id.*). Misercola's report then states that "as a result," Plaintiff was "placed in a wheelchair and taken to medical for evaluation where he reported the alleged assault and sexual assault" and that Plaintiff "claimed his complaint was ignored and he did not receive any medical care." (*Id.*). Following Plaintiff's transfer to Clinton, according to the report, Plaintiff said that he "reported the alleged sexual assault to Officers D. Jock, William Nelson and RN Rebecca Waldren [sic]." (*Id.*). The report appears to note that each of those individuals denied that Plaintiff reported the alleged assault to them. (*Id.*).

23    Misercola used an interpreter because Plaintiff said that he does not speak English. (Dkt. No. 124-32, at 1).

The report further states that Plaintiff provided the name of an inmate "as a witness to the alleged sexual and physical assaults." (*Id.*). In addition, the report states that Misercola interviewed several inmates "that were in the same holding cell with inmate Encarnacion" at Upstate." (*Id.* at 2). According to the report, those inmates' statements were "inconsistent with [Plaintiff's] claims." (*Id.*). A witness provided by Plaintiff[24] "denied witnessing any staff physically or sexually assaulting [Plaintiff] in the draft area." (*Id.*). Plaintiff told that inmate "that he was having chest pains and reported that to the sergeant" and, as a result Plaintiff was "taken to medical via wheelchair." (*Id.*). According to the report, the witness stated that Plaintiff "never made any statements about being sexually or physically assaulted." (*Id.*). Misercola interviewed other inmates "assigned to work in Draft"; they "denied witnessing any staff person assaulting any inmate in any way." (*Id.*). Those inmates explained that the draft room is "an open area and there is no way to assault someone without everyone else witnessing it." (*Id.*). Misercola reported interviewing all thirteen prison officers, including Ripa and Oropallo, who were in draft on September 30; each denied "physically or sexually assaulting [Plaintiff]."[25] (*Id.*). The report indicates that Misercola reviewed the surveillance footage. (*Id.*).

24    It is unclear whether this is the same inmate witness that Plaintiff provided described previously because the inmate names are redacted. (*See* Dkt. No. 124-32).

25    It appears Misercola did not interview any of the medical staff at Upstate to whom Plaintiff allegedly first reported the assault. (Dkt. No. 124-32, at 1; *e.g.*, Dkt. No. 103-8, at 25–28, 52, 61, 69–70).

**12** Misercola testified that on November 5th, Plaintiff provided a pair of white boxers for DNA testing. (Dkt. No. 103-8, at 96, 126). Plaintiff testified that the boxers had blood on them because, according to him, those were the underpants

he was "wearing the day of the assault" and that blood got on them because after the assault, "they pull[ed] up [Plaintiff's] pants and underpants." (Dkt. No. 103-2, at 109). According to the forensic report, DNA testing on the boxer shorts revealed the presence of blood and seminal fluid. (Dkt. No. 124-30, at 1–2). Miscercola testified at his deposition that the underwear had no "John Doe DNA on them." [26] (Dkt. No. 103-8, at 131–32).

[26]    Neither that lab report nor Misercola's notes reflecting the results of that report are in the record.

#### 4. The Investigation's Conclusion

Based upon his review of the video and the statements of staff and inmates, Miscercola concluded that Plaintiff had not been assaulted by Upstate staff that day. (Dkt. No. 103-29, ¶ 16; Dkt. No. 124-32, at 2). On January 3, 2014, Miscercola wrote Plaintiff a misbehavior report "charging him with providing false statements or information to an officer." (Dkt. No. 103-29, ¶ 17; Dkt. No. 124-32, at 2). On January 15th and 16th, a Tier III hearing was held regarding this misbehavior report, and Plaintiff was found guilty. (Dkt. No. 126, ¶¶ 104–05; Dkt. No. 1-1, at 38).

#### IV. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

#### V. DISCUSSION

#### A. Administrative Exhaustion Regarding the Alleged May 28, 2013 Excessive Force Incident

 **\*13**    Defendants argue that Plaintiff's May 28, 2013 excessive force claims against Spinner and Soucia following Plaintiff's disciplinary hearing are subject to dismissal because Plaintiff failed to exhaust his administrative remedies and has failed to establish that administrative remedies were unavailable to him. (Dkt No. 103-41, at 5; Dkt. No. 130, at 7–8). Plaintiff contends that he should be excused from exhaustion because his efforts to do so were stymied, (Dkt. No. 125, at 22–25), and alternatively, that the Court should hold an evidentiary hearing on the issue of exhaustion. [27] (*Id.* at 24).

[27]    *See generally Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011).

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, —— U.S. ——, 136 S. Ct. 1850, 1854–55, 195 L.Ed.2d 117 (2016). "[E]xhaustion is mandatory under the PLRA and ... unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

"[T]he PLRA requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). Exhaustion "demands compliance with an agency's deadlines and other critical procedural rules." *Id.* (quoting *Woodford*, 548 U.S. at 90, 126 S.Ct. 2378). "[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Id.* (citing *Woodford*, 548 U.S. at 89–90, 126 S.Ct. 2378). Exhaustion is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Thus, Defendants "bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross*. *Ferrer v. Racette*, No. 14-cv-1370, 2017 WL 6459525, at *12, 2017 U.S. Dist. LEXIS 206983, at *35 (N.D.N.Y. Dec. 18, 2017) (citation omitted).

In *Ross*, the Supreme Court explained that:

> [t]he exhaustion requirement hinges on the "availabl[ity]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

136 S. Ct. at 1858–59 (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)) (citations omitted).

In *Ross*, the Supreme Court highlighted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). First, "an administrative remedy may be unavailable when 'it operates as a simple dead end —with officers unable or consistently unwilling to provide

any relief to aggrieved inmates.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at 123–24 (quoting *Ross*, 136 S. Ct. at 1859). Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

**\*14** In support of their motion, Defendants submit declarations from grievance coordinators, which describe DOCCS's administrative exhaustion process. (Dkt. No. 103-13, at 1–3; Dkt. No. 103-16, at 2–3; Dkt. No. 103-20, at 2–3). Each grievance coordinator states that Plaintiff never filed a grievance for the May 28, 2013 use-of-force incident, (Dkt. No. 103-13, ¶ 20; Dkt. No. 103-20, ¶¶ 13– 18), including while Plaintiff was temporarily held at Attica. (Dkt. No. 103-16, ¶¶ 14–20; Dkt. No. 103-20, ¶¶ 13–18). *See* 7 N.Y.C.R.R. § 701.5(a) (explaining that to initiate the exhaustion process, an "inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form"). Defendants also submit a document showing Plaintiff's extensive grievance-filing history. (Dkt. No. 103-21). With these submissions, Defendants have met their initial burden. *Hubbs*, 788 F.3d at 59; *see also Bennett v. Onua*, No. 09-cv-7227, 2010 WL 2159199, at *3, 2010 U.S. Dist. LEXIS 51986, *9– 10 (S.D.N.Y. May 26, 2010) (finding that the defendants "adequately supported the affirmative defense of failure to exhaust" where "a search of the grievance log records ... did not reveal any record of a grievance" filed by the plaintiff).

The burden shifts to Plaintiff to establish that remedies were unavailable to him. Plaintiff argues that he filed a grievance, but his grievance was ignored. (Dkt. No. 125, at 24–25). For support, Plaintiff cites his deposition testimony that he submitted a grievance about the May 28th incident while in the SHU. (Dkt. No. 103-2, at 55, 58). After sustained questioning on the issue, however, Plaintiff testified that he "always [files grievances] but in this situation not sure. My first intention was to receive medical attention." (*Id.* at 68). Then, when asked whether it was possible he did not file a grievance over this incident, Plaintiff responded, "That's not correct. I always report." (*Id.*). Plaintiff was also shown a grievance filed on June 11th, (Dkt. No. 103-15; Dkt. No. 103-21, at 2), and dated May 29, 2013 (the day after the alleged assault), relating to a separate incident that allegedly took place on May 12th in which Plaintiff makes no mention of the alleged May 28th incident. (Dkt. No. 103-2, at 61–62).

Plaintiff testified that he did not recall receiving a response to his grievance, and that "they always throw it away, dump it when it's a kind of complaint like this." (*Id.* at 67).

Plaintiff's evidence is insufficient to withstand summary judgment. "[M]ere threadbare allegations that [Plaintiff's] grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances" are insufficient to create a dispute of fact as to whether Plaintiff exhausted his administrative remedies. *See Belile v. Griffin*, No. 11-cv-0092, 2013 WL 1776086, at *8, 2013 U.S. Dist. LEXIS 47137, at *26–27 (N.D.N.Y. Feb. 12, 2013), *report and recommendation adopted*, 2013 WL 1291720, 2013 U.S. Dist. LEXIS 43217 (N.D.N.Y. Mar. 27, 2013). Here, Plaintiff does not offer evidence beyond his conclusory testimony to show that he filed a grievance or that anyone tampered with his grievance. *Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file."). When Plaintiff testified to this allegation and was asked to name who would discard his grievances, he referred to those "who receive the letters and who read the letters." (Dkt. No. 103-2, at 57). *See Nunez v. Goord*, 172 F. Supp. 2d 417, 428–29 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff alleged, in the alternative, that his failure to file grievances was due to "the practice of certain officers" to destroy them or that they were "lost at the Grievances Committee Office" without evidentiary support). Moreover, Plaintiff *did* mention the alleged May 28th incident in his subsequent July 23rd grievance, (Dkt. No. 103-19, at 4; Dkt. No. 103-16, ¶¶ 15–16), at which point the allegations stemming from the alleged May incident were denied as untimely. (Dkt. No. 103-22, at 1).

**\*15** Finally, Plaintiff points to letters Plaintiff sent to various individuals, including the DOCCS Commissioner, regarding the alleged May 28th incident. (Dkt. No. 125, at 25 (citing Dkt. No. 124-22)). Plaintiff's argument is unavailing and fails to create a genuine material dispute of fact as to whether he properly exhausted and complied with DOCCS's "deadlines and other critical procedural rules." *Woodford*, 548 U.S. 81 at 90, 126 S.Ct. 2378, 165 L.Ed.2d 368. At summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S.Ct. 1348. Because Plaintiff has failed to raise a genuine dispute of fact as to whether he exhausted his administrative remedies, his

request for an evidentiary hearing is denied. The Court grants summary judgment on Plaintiff's Eighth Amendment claim against Spinner and Soucia for the alleged May 28th use of force incident.

### B. Procedural Due Process

Defendants move for summary judgment on Plaintiff's procedural due process claim against Spinner, stemming from Plaintiff's May 2013 Tier II hearing regarding the scratched cell window, arguing that the sentence imposed did not implicate a protected liberty interest and that, even if it did, Plaintiff received due process. (Dkt. No. 103-41, at 7–16). Finally, Defendants argue that even if Plaintiff's procedural due process rights were violated, they are entitled to qualified immunity. (*Id.* at 16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

As a preliminary matter, Plaintiff had " 'no right to due process [at his hearing] unless a liberty interest' was infringed." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (alteration in original) (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer*, 364 F.3d at 64 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer*, 364 F.3d at 64 (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)). There is no "bright-line rule as to how

lengthy a SHU confinement will be considered atypical and significant." *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000).

### 1. Sentence Aggregation

It is undisputed that Plaintiff spent at least 122 consecutive days in SHU confinement following the May 2013 hearing. [28] (Dkt. No. 124-6; 130-1, ¶ 11). However, a majority of that sentence stemmed from Spinner's decision to reinstate a prior, unrelated three-month disciplinary sentence that had been suspended. Defendants maintain that the sentences should not be aggregated because: (1) the sentences were imposed by different hearing officers and (2) the hearings related to "completely separate offenses and were conducted at different facilities." (Dkt. No. 103-41, at 9). Plaintiff contends that courts aggregate sentences "even if the hearing officer was not responsible for imposing the previous SHU sentence." (Dkt. No. 125, at 29).

[28]     Plaintiff asserts that he served 126 consecutive days in the SHU. (Dkt. No. 103-2, at 114).

**\*16** The Second Circuit has "suggested" that "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims*, 230 F.3d at 23); *see also Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999) (finding an officer responsible for 101 aggregated days that a prisoner was confined in SHU even though the officer had only assigned the prisoner to 83 days in SHU); *Gibson v. Rosati*, No. 13-cv-00503, 2017 WL 1534891, at *10–11, 2017 U.S. Dist. LEXIS 35524, at *26 (N.D.N.Y. Mar. 10, 2017) (citing, inter alia, *Giano*, *Sims*, and *Sealy* to reject the defendants' argument that the plaintiff's "sentences should not be considered in the aggregate" because each sentence "stemmed from an unrelated disciplinary hearing involving separate incidents") (quotation marks omitted); *Bunting v. Nagy*, 452 F. Supp. 2d 447, 457 (S.D.N.Y. 2006) (aggregating three sentences, each from unrelated incidents, that resulted in 365 days of consecutive keeplock confinement).

In this case, after finding Plaintiff guilty on May 28, 2013, Defendant Spinner invoked Plaintiff's December 19, 2012 suspended sentence, which included three months of SHU confinement, and imposed an additional sentence, which included thirty days of keeplock. (Dkt. No. 126, ¶¶ 43-44). In accord with this determination, Plaintiff was to serve his three-months SHU time, and then his thirty-days in keeplock. There is no suggestion that this was not a sustained period of confinement. Thus, the Court finds it appropriate to aggregate Plaintiff's confinement in the SHU to the 122 days that Plaintiff served.

### 2. *Sandin* Inquiry

Next, the Court must consider whether Plaintiff's SHU confinement constituted an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer*, 364 F.3d at 64 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293). Defendants limit their liberty interest argument to the 30-day keeplock sentence. (Dkt. No. 103-41, at 9–10). Plaintiff argues that "[c]onfinements ... such as Mr. Encarnacion's sentence, have been found to implicate a constitutionally protected liberty interest." (Dkt. No. 125, at 28). Under Second Circuit caselaw, confinement between "101 and 305 days" qualifies as an "intermediate duration" that requires " 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions." *Palmer*, 364 F.3d at 65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)).

Plaintiff testified to the following conditions during his time in the SHU. Sometimes the toilet and sink in his cell did not work because the guards would turn the water on "as they please[d]," (Dkt. No. 103-2, at 114–15), although most of the time the water was turned on. (*Id.* at 115, 126 S.Ct. 2378). He was permitted showers "[t]wice a week" but that there were weeks during which he was only permitted to shower once. (*Id.* at 119, 126 S.Ct. 2378). Plaintiff did not indicate how many weeks he was only able to shower once. Plaintiff testified that he generally remained in his cell for 23 hours per day with one hour for recreation; however, at the same time Plaintiff testified that he was denied his one hour of recreation time the "majority of the time that [he] was" in the SHU. (*Id.* at 115–116, 126 S.Ct. 2378). *See Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004) (finding allegations that the plaintiff, "for at least part of his confinement, ... was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering '*for weeks at a time*' ... could establish conditions in SHU 'far inferior,' to those prevailing in the prison in general" (quoting *Palmer*, 364 F.3d at 66)) (emphasis added).

**\*17** Plaintiff testified that the officers who delivered his food "spit on [his] meals." (Dkt. No. 103-2, at 118). Plaintiff

testified that, "[a]t times," instead of a meal, he was just given an empty plate. (*Id.* at 118, 126 S.Ct. 2378). When asked how many times he was "denied meals," Plaintiff testified "many times, lots of times," and then when asked if he was given "no meal," he testified that he would eat only "the fruit or whatever [on the plate] was sealed" because there was spit on the "food that was open." (*Id.* at 118–119, 126 S.Ct. 2378). *Headley v. Fisher*, No. 06-cv-6331, 2010 WL 2595091, at *4, 2010 U.S. Dist. LEXIS 63836, at *10 (S.D.N.Y. June 28, 2010) ("[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.") (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). Plaintiff also stated that he was not permitted to have a comb or shaving cream in his cell. (Dkt. No. 103-2, at 119). *Palmer*, 364 F.3d at 66 (considering plaintiff's assertion that he was denied, inter alia, hygienic products in the *Sandin* analysis).[29]

[29]   The parties have not addressed the comparability of these conditions to the normal conditions of SHU confinement, the general population, or administrative confinement. *Kalwasinski v. Morse*, 201 F.3d 103, 107 n.6 (2d Cir. 1999); *see also, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 7, § 302.2(c) (listing "plastic comb" as one of the "toilet articles" to be provided inmates in SHU; *id.*, at § 303 (providing that shaving cream will be "issued only during shower").

Defendants argue that Plaintiff's conclusory allegations are insufficient to establish an atypical or significant hardship. (Dkt. No. 130, at 9). While Plaintiff's allegations are, at times, conclusory and inconsistent, Defendants have not contradicted or otherwise addressed these allegations. Recognizing that "[d]isputes about conditions may not be resolved on summary judgment," and construing the evidence in the light most favorable to the Plaintiff, the Court finds that he has raised genuine questions of material fact as to whether the conditions he experienced in SHU confinement constituted "an atypical and significant hardship." *Palmer*, 364 F.3d at 65 (citing *Wright*, 132 F.3d at 137–38).

### 3. Adequate Process

Defendants argue that Spinner is entitled to summary judgment because he satisfied the requirements of procedural due process. (Dkt. No. 103-41, at 10–16). "Although prison inmates necessarily have their liberty severely curtailed

while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004); *see also Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935, (1974). An inmate is entitled to (1) "advance written notice of the charges against him"; (2) "a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence"; (3) "a fair and impartial hearing officer"; and (4) "a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d at 69.

Here, Plaintiff alleges three due process violations during his May 2013 hearing; specifically, Plaintiff alleges that (1) he was "not given assistance," (2) he was denied the right to call witnesses, (3) he was denied the opportunity to present rebuttal evidence, and (4) Spinner was "clearly biased." (Dkt. No. 125, at 31). The Court considers each contention.

#### a. Assistance and Opportunity to Call a Witness

There is no right to counsel at a disciplinary hearing, and "an inmate's right to assistance is limited." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). The Second Circuit has, however, "held ... that in certain circumstances an inmate will be unable to 'marshal evidence and present a defense,' without some assistance." *Id.* (quoting *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988)). For example, the "inmate might be illiterate, confined to ... SHU, or unable to grasp the complexity of the issues." *Id.* In such circumstances, "an assistant must be assigned to the inmate to act as his *surrogate*—to do what the inmate would have done were he able." *Id.* "[A]ny violations of this qualified right are reviewed for 'harmless error.'" *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (quoting *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

*18   There is no allegation that an assistant was necessary due to illiteracy, confinement in SHU, or complexity of the issues. Defendants argue that Plaintiff was provided "adequate assistance during his Tier II hearing." (Dkt. No. 103-41, at 11). First, they note that Plaintiff did not "specifically request an assistant or object that he was not provided an assistant before the hearing." (*Id.*). Second, they note that Plaintiff was provided a "Spanish-speaking interpreter who was present during all testimony and acted as [Plaintiff's] assistant throughout the hearing by, *inter alia*,

requesting witnesses and documents on Plaintiff's behalf and translating." (*Id.*). Although Plaintiff testified in his deposition that he requested an assistant, (Dkt. No. 103-2, at 110), he did not state when he made that request or cite to any record evidence reflecting any such request. Plaintiff did not appear to make any such request during the hearing, or raise any objection based on a failure to provide an assistant when he was repeatedly asked if he had any procedural objections. (*See* Dkt. No. 124-4).

The parties dispute Plaintiff's proficiency in English. Although Spinner states that Plaintiff did not need an assistant because Plaintiff "understood English," Plaintiff has adduced evidence indicating that speaks very little English. *See Powell v. Ward*, 487 F. Supp. 917, 932 (S.D.N.Y. 1980) ("Unless Spanish speaking inmates understand and can communicate with the hearing board, they are being denied the due process protections guaranteed in *Wolff*."). While Plaintiff had a Spanish-speaking interpreter at the hearing, Plaintiff asserts that he was not provided with a meaningful opportunity to call a witness. Plaintiff testified that he sought to call the prisoner who had occupied the cell at issue prior to Plaintiff, to testify that the "damage on the window was there before while he was living in that cell [and] [that inmate] had submitted a complaint to be fixed." (Dkt. No. 103-2, at 111).

A prisoner "facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963. However, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable. *Scott v. Kelly*, 962 F.2d 145, 146 (2d Cir. 1992) "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Id.* at 147 (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)). If a prisoner "would have been found guilty ... and confined to SHU even if his witnesses had been called, his confinement in SHU must be considered a justified deprivation of liberty, not a deprivation caused by the State's failure to permit him to call those witnesses." *Patterson v. Coughlin*, 905 F.2d 564, 568 (2d Cir. 1990). "The burden is not upon the inmate to prove the official's conduct was

arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingsley*, 937 F.2d at 30–31.

On this record, assuming, as Plaintiff asserts, that he speaks little English, and construing the evidence in the light most favorable to Plaintiff, he has raised a question of fact as to whether the interpreter's assistance was sufficient to effect Plaintiff's right to call witnesses. Based on the transcript of the hearing, it is not apparent whether the interpreter made clear to Spinner that Plaintiff wanted the prior occupant of cell, who presumably would have had firsthand knowledge of the cell's condition, to testify regarding the condition of the cell window. (*See* Dkt. No. 124-4, at 7, 12).

**\*19** At the hearing, the interpreter told Spinner that Plaintiff wanted to call a witness. (Dkt. No. 124-4, at 6). The transcript then reflects the following conversation between Spinner and Plaintiff, as translated by the interpreter: When Spinner asked, "what's [the witness] going to testify to?" Plaintiff said, "he was confined in that cell and he knows it was the last (inaudible)." (*Id.* at 7). Spinner then asked, "what was inside the cell," and Plaintiff (without the interpreter) said, "mirror." (*Id.*) Spinner responded, "[t]he mirror? We are not talking about a mirror," and denied the witness. (*Id.*). Later during the hearing, when Spinner asked whether Plaintiff had "[a]ny other defense or witnesses," Plaintiff said, "No you denying the witness he is (inaudible)." (*Id.* at 10). Plaintiff then requested the "video of when he moved to the cell," and moments later said he would "just assume [sic] have the witness." (*Id.* 10–11). Plaintiff said "[w]ants to know how the window's scratched" and "wants to know about the mirror inside the cell." (*Id.* at 11–12). When Spinner again explained that he is "not here for a mirror," Plaintiff said that both "had a scratch." (*Id.* at 12). Spinner then responded: "Well at this point the only thing I know about is the window and that's why we are here." (*Id.*). Spinner then denied Plaintiff's witness request, explaining that the witness "would have no relevant testimony to the cell window." (*Id.*).

Here, according to Plaintiff, the witness he requested was directly relevant to Plaintiff's claim that the allegation against him was false because the cell window was scratched when he moved in. (Dkt. No. 103-2, at 111). *See Kelly*, 962 F.2d at 147. While a scratch to a mirror inside the cell was not relevant, a scratch on the window would have been relevant. Viewing all of the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has raised a material issue of fact on his due process claim with respect to assistance and the

opportunity to call a witness.[30] Thus, summary judgment is denied on this issue.

[30]    Plaintiff also argues that during his Tier II hearing he "requested copies of the cell inspection manual." (Dkt. No. 125, at 38). However, when Spinner asked Plaintiff what manual he was requesting, Plaintiff responded, according to the interpreter, that he was requesting a manual "[f]or inspection cells." (Dkt. No. 124-4, at 8). Plaintiff then asserts, without evidentiary support, that the manual "could have revealed prior inspections that showed scratches on the window." (Dkt. No. 125, at 38). Defendants argue that no such manual exists. (Dkt. No. 103-41, at 12). Further, according to the hearing transcript, it appears Plaintiff was provided with a copy of the "cell inventory checklist" albeit in English. (Dkt. No. 124-4, at 8). In any event, this argument is unavailing. *See Rodriguez v. Lindsay,* No. 09-cv-2915, 2011 WL 2601448, at *4, 2011 U.S. Dist. LEXIS 70505, at *10 (E.D.N.Y. June 30, 2011), *aff'd,* 498 F. App'x 70 (2d Cir. 2012) ("The Court has found no authority for the proposition that an inmate is entitled, as a matter of course, to physical or documentary evidence in defending against prison disciplinary charges.").

**b. Bias**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer "is one who does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson,* 905 F.2d at 569–70.

Plaintiff asserts that Spinner's bias "is evident from even a cursory review" of the hearing transcript. (Dkt. No. 125, at 37). The Court disagrees. There is no evidence to suggest that Spinner "decide[d] the disposition of [Plaintiff's hearing] before it was heard." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir. 1989) (citing *Crooks v. Warne,* 516 F.2d 837, 840 (2d Cir. 1975)). It appears that Spinner decided the case based on the evidence that was presented at the hearing—Officer Schrader's testimony, her written report, the cell inspection sheet signed by Plaintiff, and photos of the cell showing the scratches. (Dkt. No. 124-4, at 25; Dkt. No. 103-23, ¶ 40). The hearing transcript does not reflect a lack of impartiality. Thus,

summary judgment is granted on Plaintiff's due process claim alleging Spinner's bias.

**4. Qualified Immunity**

**\*20** Defendants argue that, even if Spinner violated Plaintiff's Fourteenth Amendment rights, he is nevertheless entitled to qualified immunity. (Dkt. No. 103-41, at 16). Plaintiff does not respond to this argument apart from passing references in the standard of review section and when discussing Plaintiff's September 30th assault claim. (*See* Dkt. No. 125, at 13, 15–16; *see also* Dkt. No. 130, at 10 (noting that Plaintiff "offered no opposition to [D]efendants' qualified immunity argument")).

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford,* 884 F.3d 351, 367 (2d Cir. 2018). Defendants devote one parenthetical citation to their qualified immunity argument, stating that "that qualified immunity protects a hearing officer who could reasonably conclude that some evidence supports that officer's prison disciplinary determination." (Dkt. No. 103-41, at 16 (citing *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir. 1992)). The Court disagrees. In *Zavaro,* the court "conclude[d] that [an] inmate's right not to be adjudicated guilty without some evidence to support that finding was clearly established by 1988." 970 F.2d at 1152. Here, however, Plaintiff has not challenged the lack of evidence; he asserts that he was denied the opportunity to call a witness. *Zavaro* does not protect a hearing officer from § 1983 liability whenever "some evidence supports" the guilty determination. Accordingly, the Court rejects this argument.

**C. Excessive Force and Sexual Assault – September 30, 2013**

Defendants argue that summary judgment is proper on Plaintiff's excessive force claim against Ripa because "nothing in the record" supports Plaintiff's allegations that he was subjected to excessive force and sexually assaulted on September 30, 2013, "aside from the plaintiff's own contradictory and incomplete testimony" such that "no reasonable person" could credit Plaintiff's testimony. (Dkt. No. 103-41, at 17 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005))). Plaintiff responds that the credibility dispute between Plaintiff and Ripa "alone justifies" denying summary judgment. (Dkt. No. 125, at 17).

2020 WL 2838559

In addition, Plaintiff notes that "a range of circumstantial evidence" supports his claim. (*Id.*).

When a prisoner claims "that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Id.*; *see also Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "The subjective component ... requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999)). "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7, 112 S.Ct. 995). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Id.* (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. 995).

**\*21**  In *Jeffreys,* the Second Circuit explained that, while there were many "material issues of fact," the "inquiry focuse[d] on whether ... upon review of the record as a whole" those material disputes were "*genuine.*" 426 F.3d at 554. That is, "even after drawing inferences in the light most favorable to [the plaintiff], no reasonable jury could have issued a verdict in his favor." *Id.* There, the court held that summary judgment was proper where the plaintiff's testimony "was largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *See id.* at 555.

### 1. Evidence Beyond Plaintiff's Testimony

Plaintiff contends that the following evidence supports his allegation: (1) the two witness statements submitted in the course of the investigation into Plaintiff's alleged assault;

(2) the letters dated October 10th that Plaintiff wrote to various officials; (3) the absence of medical records memorializing Plaintiff's visit to Upstate; and (4) a forensic report that detected blood on Plaintiff's underwear. As set forth below, the Court finds that Plaintiff's testimony is largely unsubstantiated.

### a. The Witness Statements

Plaintiff points to statements provided by two prisoners in the course of the investigation in Plaintiff's alleged assault. (Dkt. Nos. 124-20, 124-21). The first witness "couldn't see into the ID room" and did not "see anyone assault or sexually assault" Plaintiff. (Dkt. No. 124-20, at 1, 3). He stated that he heard a "commotion" while Plaintiff was in the ID room and that Plaintiff returned complaining of pain in his ribs and chest. (*Id.* at 1). However, in the surveillance video, there appears to be no sign of any commotion—and no reaction to that effect from the officers milling around the draft room or the prisoners in the holding cell next to the ID room —while Plaintiff is in the ID room. [31] (Dkt. No. 103-9, 06:27:18-06:28:47).

[31]  While Plaintiff is in the ID room, a cart rolls into the table in the middle of the draft room. (Dkt. No. 103-9, 6:28:06). The video does not have sound, so it is impossible to assess how loud of a sound that made.

While the second witness testified that he saw an officer, whom he could not identify, "swing his arm" and that he "assume[d] that [the officer] was hitting" Plaintiff, (Dkt. No. 124-21, at 2), the witness's description of how he could have been in a position to see that is not consistent with the video. The witness stated that "when [Plaintiff] was done in the ID room he came into the holding cell I was in." (Dkt. No. 124-21, at 2). The video makes clear, however, that after Plaintiff exited the ID room, he was placed in the holding cell next to the ID room and that from there, the witness could not have seen into the ID room. [32]

[32]  The witness's description is not consistent with the video in several additional respects. First, the witness described that, after his own strip frisk, he was placed in the holding cell *across* from Plaintiff and that, at this point, Plaintiff was "in a cell right next to the ID room." (Dkt. No. 124-21,

at 1) (emphasis added). However, the surveillance video shows that once prisoners exited the strip frisk room, they were placed in the holding cell *next to* the ID room. (*See generally* Dkt. No. 103-9). And, contrary to the witness's statement, Plaintiff was not taken into the ID room from the cell *next to* the ID room; he entered the ID room from the strip frisk room. (Dkt. No. 103-9). Finally, the witness stated that Plaintiff was in the ID room for "about fifteen minutes," but the video shows that Plaintiff was in the ID room for approximately 90 seconds. (*Compare* Dkt. No. 124-21, at 2 *with* Dkt. No. 103-9, 06:27:16-06:28:49).

**b. Medical Records**

**\*22** Plaintiff cites to the absence of medical records reflecting Plaintiff's undisputed trip to the medical unit at Upstate as evidence that Plaintiff's "efforts to report his sexual assault were not taken seriously by anyone at DOCCS." (Dkt. No. 125, at 18–19; Dkt. No. 103-9; Dkt. No. 130-1, ¶¶ 15–16). However, it would be a stretch to find that the absence of a medical record memorializing this ten-minute visit during which he apparently was cleared for transport to Clinton, supports Plaintiff's allegation of a sexual assault.

**c. Plaintiff's Letters Dated October 10, 2013**

Plaintiff further argues that "there is no question that [Plaintiff] complained about" the September 30th assault, pointing to the letters dated October 10, 2013 that Plaintiff sent to various officials. (Dkt. No. 125). While these letters document Plaintiff's complaint, they do not contain evidence beyond the Plaintiff's own claims.

**d. Forensic Report**

Plaintiff also points to the forensic report that showed traces of blood and seminal fluid in his underwear. (Dkt. No. 125, at 20; Dkt. No. 124-30, at 1–2). Misercola collected the underwear as part of his investigation. (Dkt. No. 103-8, at 126). However, the only evidence suggesting that Plaintiff was actually wearing that underwear on the day of the assault comes from Plaintiff's own deposition testimony. (Dkt. No. 103-2, at 109). Furthermore, Defendants note—and Plaintiff

does not dispute—that the results of the DNA test showed "no John Doe DNA on them." (Dkt. No. 103-8, at 132).

**2. Plaintiff's Testimony**

Next, the Court must decide whether Plaintiff's testimony is "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys,* 426 F.3d at 555. The Court finds that it is, for several reasons.

First, as Defendants note, Plaintiff claims that he was struck once in the stomach, "fell down to the floor unconscious," and that when he "recovered consciousness" he had his pants and underwear "by [his] knees," was "picked up" by Ripa and another officer who also "pick[ed] up" [his] pants, felt wetness and "pain in [his] anus," and that he then walked out of the ID room—all in the span of approximately 90 seconds. (Dkt. No. 103-2, at 72–82; Dkt. No. 103-9, 06:27:16–06:28:49). It is highly unlikely that this series of events occurred in such a short span of time.

Plaintiff further testified that all the inmates in the draft room "saw everything" and told Plaintiff "what happened." (Dkt. No. 103-2, at 82). This is inconsistent with the witness statements provided by Plaintiff, neither of which supports that assertion. (Dkt. No. 124-20, at 1).

Plaintiff further testified that staff and other prisoners could see the assault occur because the door to the ID room was open. (Dkt. No. 103-2, at 83, 89). Indeed, the surveillance video appears to show that the door to the ID room was open when Plaintiff was inside, as it appears that movement from within the ID room is visible. (Dkt. No. 103-9, 06: 28:16). This, however, only adds to the improbability of Plaintiff's account. No one in the draft room, including officers standing just a few feet from the ID room's entrance, appear to react to an assault. (*Id.*). [33] The casual pace of the officers moving throughout the draft room does not change while Plaintiff is in the ID room, or while Plaintiff is moved from the ID room to the holding cell. Furthermore, as Defendants also note, Plaintiff exhibits no sign of injury after he exits the ID room. (*Id.* at 06:28:49). He similarly exhibits no sign of injury as he later walks to the holding cell across from the ID room. (*Id.* at 06:50:23).

33   The Court notes that the Defendants and non-party witnesses all deny that they saw any assault or that Plaintiff contemporaneously reported that he had been assaulted. That includes evidence submitted by Samolis, (Dkt. No. 103-38, ¶ 15), Oropoallo, (Dkt. No. 124-11; Dkt. No. 103-32, ¶ 21), Ripa, (Dkt. No. 124-38, at 67–68), non-party witness Sergeant Gill (Dkt. No. 124-36, at 31–32), and the numerous officials and prisoners who were in the draft room that Miser,cola interviewed in the course of his investigation. (Dkt. No. 124-32, at 2).

**\*23**  Plaintiff's assertion that he reported a sexual assault upon arriving at Clinton is inconsistent with all of the contemporaneous records at Clinton that day, including the medical record of his visit to the emergency room, (Dkt. No. 103-34, at 5), the medical record from his evaluation later that day, (*id.* at 1), the health screening form documenting his "current health problem[s] or complaint[s]," (*id.* at 3), and the initial screening interview, (Dkt. No. 103-39), none of which reflects that Plaintiff reported either an assault or any of the injuries he attributes to the assault.

Plaintiff contends that the video does not "capture what happened in the minutes that [Plaintiff and Ripa] were in the identification room." (Dkt. No. 125, at 17). To be sure, the video does not show much of what occurred inside the ID room; nevertheless, the Court finds that even drawing all inferences in Plaintiff's favor, in light of the video evidence and the inconsistencies and contradictions in Plaintiff's version of the events, no reasonable person could credit Plaintiff's allegation of assault. *Jeffreys*, 426 F.3d at 555. "[V]iewing the video footage together with the other evidence, no reasonable fact-finder could conclude that [Ripa] used [excessive] force" against Plaintiff. *McKinney v. Dzurenda*, 555 F. App'x 110, 111–12 (2d Cir. 2014) (affirming summary judgment in an excessive force case based upon video evidence); *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (reversing a denial of summary judgment where a "videotape quite clearly contradict[ed] the version of the story told by respondent and adopted by the Court of Appeals"); *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Accordingly, summary judgment is granted to Ripa on Plaintiff's Eighth Amendment excessive force claim as to the alleged September 30, 2013 assault.

### D. Failure to Intervene Against Defendant Oropallo

Defendants argue that because Plaintiff fails to establish an underlying constitutional violation—his Eighth Amendment excessive force claim against Ripa—his claim against Oropallo fails as a matter of law. (Dkt. No. 103-41, at 20). The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Kee v. Hasty*, No. 01-cv-2123, 2004 WL 807071, at \*26, 2004 U.S. Dist. LEXIS 6385, at \*86 (S.D.N.Y. Apr. 14, 2004). For Plaintiff to succeed on his failure to intervene claim, he must show that the officer (1) "observe[d] or ha[d] reason to know" that "excessive force [wa]s being used" and that (2) the officer had "a realistic opportunity to intervene to prevent the harm from occurring." *Branen*, 17 F.3d at 557.

As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was subjected to excessive force on September 30, 2013, his failure to intervene claim against Oropallo necessarily fails. *Simcoe v. Gray*, 670 F. App'x 725, 727 (2d Cir. 2016) ("[A]bsent a constitutional violation on the part of any of the officers, [the plaintiff's] failure-to-intervene claim necessarily fails."); *see also Addona v. D'Andrea*, 692 F. App'x 76, 78 n.2 (2d Cir. 2017) ("Because we conclude that the force used was not unreasonable, there was no constitutional violation, and the District Court correctly granted summary judgment on the plaintiff's failure to intervene claim."); *Jackson v. Vill. of Ilion*, No. 6:14-cv-563, 2016 WL 126392, at \*8, 2016 U.S. Dist. LEXIS 2794, at \*23 (N.D.N.Y. Jan. 11, 2016) (dismissing the plaintiff's failure to intervene claim where "no reasonable juror could conclude" that two individual defendant officers "violated plaintiff's federal constitutional rights"). Thus, summary judgment is granted on Plaintiff's failure to intervene claim against Oropallo.

### E. Retaliation

**\*24**  To establish a First Amendment retaliation claim, the plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). In the prison context, "adverse action" is conduct "that would

deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). This inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them are considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

"Once the plaintiff carries his initial burden, 'the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct.' " *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (internal quotation marks omitted)). Because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," prisoners' claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

### 1. Defendant Ripa

Defendants argue that summary judgment on Plaintiff's claim that Ripa subjected him to excessive force and sexual assault in retaliation for Plaintiff's filing of grievances against him is warranted because no reasonable jury could find that Ripa sexually assaulted Plaintiff and "[t]hus, plaintiff has failed to demonstrate any adverse action by Ripa." (Dkt. No. 103-41, at 21). The Court agrees. As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was assaulted by Ripa on September 30th, Plaintiff's retaliation claim necessarily fails because he cannot show that he was subject to adverse action. *See Smolen v. Dildine*, No. 11-cv-6434, 2014 WL 3385209, at *7, 2014 U.S. Dist. LEXIS 93318, at *22 (W.D.N.Y. July 9, 2014) (explaining that a prisoner's retaliation claim stemming from an alleged assault failed as to a defendant where the plaintiff "did not come forward with evidence to refute [the defendant's] affidavit"). Thus, summary judgment is granted as to Plaintiff's retaliation claim against Ripa.

### 2. Defendants Adams and Waldron

Plaintiff's retaliation claims against Waldron and Adams—that they discontinued his medication in retaliation for his reports of sexual assault—also fail as a matter of law. For the reasons described above, no reasonable juror could conclude that Plaintiff had been sexually assaulted, and for many of those same reasons, it is questionable whether a reasonable juror could conclude that he had reported that he had been sexually assaulted before his medications were discontinued. *See Smith v. Fischer*, No. 07-cv-1264, 2009 WL 632890, at *8, 2009 U.S. Dist. LEXIS 129478, at *38 (N.D.N.Y. Feb. 2, 2009), *report and recommendation adopted*, 2009 WL 5449125, 2009 U.S. Dist. LEXIS 18153 (N.D.N.Y. Mar. 9, 2009) (dismissing retaliation claim where the alleged adverse action occurred before the plaintiff's protected conduct).

**\*25** Nevertheless, even assuming Plaintiff reported a sexual assault to Waldron and Adams prior to the discontinuation of his medications, his retaliation claim still fails. As to Waldron, Plaintiff does not contest that, as a nurse, she did not have the authority to discontinue his medications. (Dkt. No. 103-35, ¶ 32). Accordingly, she could not have taken the adverse action he alleges.

As for Adams, Plaintiff has failed to raise an issue of fact as to a causal connection. "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). A plaintiff "must aver some 'tangible proof' demonstrating that [his] protected speech animated" the adverse action. *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004) (quoting *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004)). A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011). Here, Plaintiff does not point to any statements by Adams indicating retaliatory intent. *See, e.g., Shariff v. Poole*, 689 F. Supp. 2d 470, 479 (W.D.N.Y. 2010) (explaining that, inter alia, "statements by the defendant regarding his motive" provide support for a causal connection between protected conduct and adverse action (citing *Colon*, 58 F.3d at 872–73)). Further, Plaintiff's evidence "fails to establish" that Adams "had a motive to retaliate arising" from Plaintiff's alleged report of sexual assault at a separate correctional facility. *Hare v. Hayden*, No. 09-cv-3135, 2011 WL 1453789, at *4, 2011 U.S. Dist. LEXIS 40683, at *12–13 (S.D.N.Y. Apr.

14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.").

Moreover, Defendants have established that Adams "had legitimate non-retaliatory reasons" for discontinuing Plaintiff's medications. *Vail v. Lashway*, No. 9:12-cv-1245, 2014 WL 4626490, at *19, 2014 U.S. Dist. LEXIS 129516, at *49 (N.D.N.Y. July 16, 2014), *report and recommendation adopted*, 2014 WL 4626490, 2014 U.S. Dist. LEXIS 128506 at *2 (N.D.N.Y. Sept. 15, 2014). Specifically, Adams stated that he discontinued the Naproxen prescription because "it can aggravate the stomach and worsen" Plaintiff's acid reflux. (Dkt. No. 103-33, ¶ 26). He further stated that he discontinued the Neurontin because it was Adams's "clinical impression" that Plaintiff "was seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that the Neurontin "should not be prescribed until plaintiff was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27). *See Graham*, 89 F.3d at 81 ("[The plaintiff's] version of events would be insufficient as a matter of law even if true (even if the defendants were retaliating against protected conduct) if there were proper, non-retaliatory reasons for his punishment."). Thus, summary judgment is granted to Adams and Waldron on Plaintiff's retaliation claims.

#### F. Deliberate Indifference to Medical Needs

Defendants Adams, Waldron, and Samolis argue they are entitled to summary judgment on Plaintiff's claim that they denied him treatment for sexual assault. (Dkt. No. 103-41, at 27). To establish "an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* To satisfy the objective prong, "the alleged deprivation must be ... 'sufficiently serious.' " *Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway*, 37 F.3d at 66). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "[N]on-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delayed medical care." *Crandell v. Ross*, 19-cv-6552, 2020 WL 134576, at *4, 2020 U.S. Dist. LEXIS 5484, at *11 (W.D.N.Y. Jan 13, 2020) (quoting *Starling v. Syracuse Police Dep't*, No. 19-cv-1458, 2019 WL 6974731, at *5, 2019 U.S. Dist. LEXIS 218968, at *8 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted*, 2020 WL 1140664, 2020 U.S. Dist. LEXIS 40178 (N.D.N.Y. Mar. 9, 2020)).

**\*26** Plaintiff's medical indifference claims against Adams, Waldron, and Samolis fail because he cannot establish that he was sexually assaulted, which is his alleged serious medical need. *See Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' " (quoting *Chance*, 143 F.3d at 702)); *see also, e.g., Davidson v. Scully*, 155 F. Supp. 2d 77, 90 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff did "not suffer from a serious medical need to which defendants [were] deliberately indifferent"). Accordingly, summary judgment is granted on Plaintiff's Eighth Amendment medical indifference claims against Adams, Waldron, and Samolis.

### VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **DENIED** as to Plaintiff's procedural due process claim with respect to assistance and the opportunity to call a witness; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is otherwise **GRANTED** and all causes of action, with the exception of the above-described due process claim, are **DISMISSED with prejudice**; and it is further

2020 WL 2838559

**ORDERED** that Defendants Ripa, Oropallo, Adams, Waldron, Soucia, and Samolis are **DISMISSED** from the case.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 2838559

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1420916
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark James BROWN, Sr., Plaintiff,

v.

Kory KEEFER, Defendant.

9:20-CV-1192 (GLS/ATB)
|
Signed January 13, 2023

**Attorneys and Law Firms**

MARK JAMES BROWN, SR., Plaintiff, pro se.

CORY J. SCHOONMAKER, ESQ., for defendant Keefer.

## REPORT-RECOMMENDATION and ORDER

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States Senior District Judge. On September 29, 2020, plaintiff commenced this civil action against, *inter alia*, Jefferson County Sheriff's Deputy Kory Keefer ("Deputy Keefer"). (Complaint ("Compl.")) (Dkt. No. 1). By Decision and Order dated January 4, 2021, Judge Sharpe dismissed several defendants and causes of action pursuant to 28 U.S.C. §§ 1915, 1915A. (Dkt. No. 8). The complaint was thereafter dismissed as against defendant Guilfoyle Ambulance Service, Inc. ("Guilfoyle Ambulance"), pursuant to Judge Sharpe's July 13, 2021 order. (Dkt. No. 28). Accordingly, the only remaining defendant in this action is Deputy Keefer.

Presently before this court is Deputy Keefer's motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the complaint as against him. (Dkt. No. 46). Plaintiff has not filed a response to Deputy Keefer's motion, despite being afforded an extension of time to do so. (Dkt. No. 48). For the reasons set forth below, I recommend that the district court grant Deputy Keefer's motion for summary judgment and dismiss the surviving Fourth Amendment excessive force claim and Fourteenth Amendment deliberate medical indifference claim against him.

## I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Local Rules of the Northern District of New York require that a motion for summary judgment be accompanied by a statement of material facts which sets forth, in numbered paragraphs, "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Local Rule 56.1(a). [1] The same rule requires the opposing party to file a response to the moving party's statement of material facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issues arise. Local Rule 56.1(b). The rule specifically provides that "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

[1]    Previously Local Rule 7.1(a)(3).

**\*2** Credibility assessments and the choice between conflicting versions of a story are generally for a jury to

resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit … his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

## II. Factual Allegations

The relevant facts as stated in plaintiff's complaint have been summarized in several of the court's prior orders. (Dkt. Nos. 8 at 3-5; 27 at 2-3). The court will briefly review the facts as necessary to discuss the causes of actions asserted against Deputy Keefer.

On July 5, 2019, plaintiff ran a red light and immediately noticed that a police vehicle had turned on its lights behind him, signaling for plaintiff to stop. (Compl. at 9). Plaintiff stopped his vehicle and began to flee on foot. (*Id.*). He was eventually apprehended "with [his] hands behind [his] head[,]" and "complied to lay facedown." (*Id.*). Plaintiff alleges that Deputy Keefer, one of the officers giving chase, proceeded to "aggressively place[ ] his knee on [plaintiff's] back and started to yell 'stop resisting.' " (*Id.*). Plaintiff responded, "I'm not resisting." (*Id.*). Plaintiff further contends that "when other officers arrived [he] felt several blows to [his] upper body and head." (*Id.*). "An officer" then proceeded to "aggressively and with excessive force" twist plaintiff's arm, while he was face down and with both hands behind his back." (*Id.*). Plaintiff "heard three distinct cracks in his arm and was on the point of unconsciousness[.]" (*Id.*).

Plaintiff was then transported to Jefferson County Jail. (*Id.* at 10). There, he asked Deputy Keefer "why did he break [plaintiff's] arm[?]" (*Id.*). Deputy Keefer responded, "because

[plaintiff] ran." (*Id.*). Within one hour of arriving to the Jefferson County Jail, Guilfoyle Ambulance "arrived and examined [plaintiff's] arm and determined there were no abnormalities." (*Id.*). Plaintiff has attached to his complaint a patient care report describing the extent of treatment provided by the Guilfoyle Ambulance paramedics, which indicates plaintiff's refusal to be taken to the hospital. (Dkt. No. 1-1 at 4-6). In a sworn deposition attached to the complaint, and in a handwritten note on the Guilfoyle Ambulance report, plaintiff denies that he ever refused medical treatment. (*Id.* at 1, 6). Plaintiff alleges that he stated multiple times over the course of two hours that his "arm is broke[.]" (Compl. at 9).

## III. Fourth Amendment Excessive Force

### A. Legal Standards

The "Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "The Fourth Amendment test of reasonableness 'is one of objective reasonableness,' " *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (quoting *Graham*, 490 U.S. at 399). As such, "the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)). In balancing those interests, the Court considers "at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).

**\*3** To determine whether a use of force is reasonable, the Court evaluates the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (quoting *Graham*, 490 U.S. at 396). Moreover, the Court must "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Id.* (quoting *Graham*, 490 U.S. at 397). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth

2023 WL 1420916

Amendment." *Graham*, 490 U.S. at 397 (internal quotations and citation omitted).

### B. Analysis

Plaintiff alleges that he was injured during the course of his arrest on July 5, 2019. Specifically, plaintiff claims that, subsequent to the foot chase and after complying with the officers' directives to lay "face down," Deputy Keefer "aggressively placed his knee on [plaintiff's] back." (Compl. at 9). Plaintiff then describes feeling "several blows to [his] upper body and head," and states that his arm was "aggressively" twisted behind his back, causing "three distinct cracks." (*Id.*). The complaint, however, does not identify which officer or officers delivered the alleged blows to plaintiff's body, nor does it identify who twisted plaintiff's arm behind his back. In a sworn deposition taken by the Jefferson County Sheriff's Office on or about July 25, 2020, plaintiff recounted the facts leading up to and describing his arrest, but failed to identify what officers were effecting "blows" to his body, or twisted his arm. (Dkt. No. 1-1 at CM/ECF p. 1).

In seeking summary judgment, defendant Deputy Keefer has submitted a sworn affidavit describing his role in plaintiff's arrest on July 5, 2019. In relevant part, Deputy Keefer confirms that plaintiff was fleeing the police and that he "gave chase on foot." (Affidavit of Deputy Sheriff Kory Keefer ("Keefer Aff.") at ¶¶ 6-9) (Dkt. No. 46-2). During the chase, Deputy Keefer heard an impact that he later learned was plaintiff being struck by a vehicle as he ran across the street. (*Id.* at ¶ 9). Ultimately, "with the assistance of other officers," Deputy Keefer cornered plaintiff. (*Id.* at ¶ 10). They proceeded to "br[ing] plaintiff to the ground and attempted to effectuate [the] arrest," however plaintiff "squirmed and attempted to avoid being placed in handcuffs." (*Id.*). While the officers were attempting to restrain him, plaintiff was lying face down on the ground. (*Id.*). Deputy Keefer describes his subsequent, physical contact with the plaintiff as follows:

> I positioned myself above [plaintiff's] head and placed both my hands on his head in a "head control" maneuver that resembled a diamond push-up. As part of this maneuver, the balls of my feet were my only points of contact with the ground, and my hands were my only point of contact with

Plaintiff.... This maneuver permits an officer to control the movement of the subject's head or neck but does not involve a neck or carotid restraint or any obstruction of the airway. It involves utilizing my body weight to immobilize a suspect's head without causing injury or restraint to his neck. It has the additional benefit of leaving room for other officers to restrain the rest of the suspect's body, if needed.

(*Id.* at ¶¶ 11-12). Deputy Keefer states that he "never made contact, either intentionally or unintentionally, with plaintiff's arms during his arrest," and that other officers restrained plaintiff's arms and placed him in handcuffs. (*Id.* at ¶ 13). He further maintains that he "never placed a knee on plaintiff's back," and "never struck plaintiff at any time." (*Id.* at ¶¶ 14, 15). Deputy Keefer states that "holding down plaintiff's head was the only physical contact" he made with the plaintiff while restraining him, and such contact was "necessary due to plaintiff's resistance." (*Id.* at ¶ 15). According to Deputy Keefer, plaintiff was "resisting so strenuously that he injured one of the arresting officers" by "flail[ing]" his handcuffed wrist, ultimately striking and cutting another officer's arm. (*Id.* at ¶ 16).

**\*4** Plaintiff was ultimately restrained and in custody by approximately 5:45 p.m. (*Id.* at ¶ 17). A different officer, not Deputy Keefer, took custody of plaintiff and placed him in the back of a police vehicle. (*Id.* at ¶ 18). Deputy Keefer did not participate in escorting plaintiff to the police vehicle, nor did he transport him to the Jefferson County Jail. (*Id.* at ¶¶ 18, 19).

Based on the foregoing, there is no genuine issue of material fact as to whether Deputy Keefer violated plaintiff's Fourth Amendment right to be free from the use of excessive force. With respect to plaintiff's arm injury and the "blows" to his body, plaintiff has failed to specifically identify any officer, much less Deputy Keefer, as the individual responsible for causing these alleged injuries during the course of his arrest. The complaint and the exhibits attached thereto merely describe these injuries as having occurred at the hands of an "officer," and the record otherwise lacks an identification in this regard. In addition, plaintiff has not opposed Deputy Keefer's motion for summary judgment. Thus, having been presented with Deputy Keefer's undisputed affirmation that he

Brown v. Keefer, Slip Copy (2023)

2023 WL 1420916

did not make contact with plaintiff's arm, or deliver "blows" to plaintiff's body at the time of plaintiff's arrest, the court concludes that summary judgment is appropriate with respect to these use of force claims.

To the extent plaintiff has alleged that Deputy Keefer "aggressively placed his knee on plaintiff's back," this is also an insufficient basis to maintain plaintiff's excessive force claim. Deputy Keefer denies having any contact with plaintiff's back throughout the course of plaintiff's arrest - he maintains that his only physical contact with plaintiff throughout the incident was his hands on plaintiff's head. A supporting deposition prepared by another officer with respect to plaintiff's arrest supports Deputy Keefer's contentions, to the extent it states that Deputy Keefer "kept control of the [plaintiff's] head area," while other officers were responsible for controlling plaintiff's legs and attempting to pull plaintiff's hands out from under his body. (Dkt. No. 1-1 at CM/ECF pp. 2-3). Ordinarily, conflicting accounts such as that of plaintiff and Deputy Keefer might preclude a finding of summary judgment as to whether the defendant's conduct constituted actionable, excessive force. However, in this case even if Deputy Keefer did place his knee on plaintiff's back, the defendants have established that this act was not only reasonable under the circumstances, but did not produce an injury for which plaintiff is seeking damages. The court recognizes that the " 'core judicial inquiry' in assessing plaintiff's excessive force claim under the Fourth Amendment is 'not whether a certain quantum of injury was sustained,' but rather whether unreasonable force was applied given the circumstances[.]" *Barcomb v. Kraeger*, No. 3:14-CV-1159, 2016 WL 2644885, at *4 (D. Conn. May 5, 2016) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (internal quotation marks omitted)). However, in this case plaintiff has not alleged that he sustained any injury to his back, or as a result of Deputy Keefer allegedly placing his knee on him. *See Williams v. Nat'l R.R. Passenger Corp. (Amtrak)*, 830 F. App'x 46, 49 (2d Cir. 2020) (considering the plaintiff's lack of pain or injury, or complaints of discomfort, in concluding that use of force was objectively reasonable and granting summary judgment); *Forbes v. City of Rochester*, No. 6:18-CV-06700, 2020 WL 1963139, at *4 (W.D.N.Y. Apr. 6, 2020) (recognizing that in order to establish a Fourth Amendment violation, "a plaintiff must allege that he sustained an injury.").

**\*5** Moreover, the undisputed circumstances surrounding plaintiff's arrest as described by Deputy Keefer suggest that, had Deputy Keefer briefly placed his knee on plaintiff's back, it would have been objectively reasonable for him to do so. By the time Deputy Keefer made physical contact with plaintiff, plaintiff had already evaded arrest once and was in the process of actively fleeing from the police in a foot chase, before finally being cornered. (Keefer Aff. ¶¶ 6-10). Plaintiff had to be brought to the ground, where he continued to actively resist arrest. (Keefer Aff. ¶¶ 10, 15-16; Dkt. No. 1-1 at CM/ECF p. 3). Plaintiff's conduct proved to be a risk to the arresting officers, as illustrated by the fact that one officer sustained a cut on his arm from being struck by the partially attached handcuff plaintiff was flailing around in resistance to being arrested. (Keefer Aff. ¶16; Dkt. No. 1-1 at CM/ECF p. 3). Accordingly, Deputy Keefer's purported act of "aggressively" putting his knee on plaintiff's back did not amount to a constitutional violation, where no injury was sustained and his conduct was objectively reasonable under the circumstances. *See Mongeau v. Jacksonville Sheriff's Office*, 197 Fed. App'x 847, 851 (11th Cir. 2006) (finding that an officer's placement of his knee on an arrestee's back to subdue him was objectively reasonable given the arrestee's previous resistance and risk of flight); *see also Style v. Mackey*, No. 20-2165, 2021 WL 5022657, at *1 (2d Cir. Oct. 29, 2021).

### IV. Deliberate Indifference to Medical Needs

#### A. Legal Standard

Plaintiff's medical care claim is governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d. Cir. 2017) (citation omitted). The Supreme Court has distinguished between Eighth and Fourteenth Amendment excessive force claims, holding that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. *See Kingsley v. Hendrickson*, ⎯⎯ U.S. ⎯⎯, 135 S. Ct. 2466, 2470-71 (2015).

In *Darnell*, the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell*, 849 F.3d at 35. District courts in this circuit have since applied the *Kingsley* standard to claims of deliberate indifference to serious medical needs brought under the Fourteenth Amendment. See *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs"); *Lloyd v. City of New York*,

246 F. Supp. 3d 704, 718 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"); *Torrez v. Semple*, No. 17-CV-1211, 2017 WL 3841686, at *3 (D. Conn. Sept. 1, 2017) ("[F]or a claim of deliberate indifference to mental health needs or unconstitutional conditions of confinement under the Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants 'knew, or should have known, that the condition posed an excessive risk to health or safety' "). The court agrees that the *Kinglsley/ Darnell* standard should be applied to an arrestee alleging deliberate indifference to a serious medical need. *See Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018).

In order to state a claim based on constitutionally inadequate medical treatment, a plaintiff must satisfy a two-prong test. *Darnell*, 849 F.3d at 29. The first element is objective and "considers whether the alleged deprivation of adequate medical care [was] sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006))(quotation marks omitted). [2] The second, 'mental' element [3] ensures that the defendant acted with at least deliberate indifference to the challenged conditions. *See Darnell*, 849 F.3d at 29; see also *Bell v. Carson*, No. 9:18-CV-783 (MAD/ATB), 2018 WL 5993686, at *2 (N.D.N.Y. Nov. 15, 2018).

[2]     Although the Supreme Court, in *Kingsley*, altered the standard for deliberate indifference claims, the objective prong remains the same whether analyzed under the Eighth or Fourteenth Amendments. *Figueroa v. Cty. of Rockland*, No. 16-CV-6519, 2018 WL 3315735, at *4 (S.D.N.Y. July 5, 2018).

[3]     In *Darnell*, the Second Circuit cautioned that this element, commonly referred to as the "subjective prong," was better classified as a "*mens rea* prong" or "mental element prong." The Court reasoned that the term "subjective prong" might be a misleading description because "the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Darnell*, 849 F.3d at 29 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)). After the Second

Circuit concluded that deliberate indifference should be defined objectively for a claim of a due process violation, other courts in this circuit have adopted the phrase "mental element prong" to more appropriately describe the relevant standard. *See Durham*, 2019 WL 1103284, at *4; *Richardson v. Corr. Medical Care, Inc.*, No. 9:17-CV-0420 (MAD/TWD), 2018 WL 1580316, at *5-6 (N.D.N.Y. Mar. 28, 2018).

### 1. Objective Element

**\*6** In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Mental Element

Under the second prong of the deliberate indifference analysis, the court must consider whether defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. "As a consequence, the relevant *mens rea* is recklessness, which, for present purposes, 'more closely resembles recklessness as the term is used in the civil context' and 'does not require a defendant to be subjectively aware of the harm resulting from his acts or omissions.' " *Singletary v. Russo,* No. 13-CV-04727, 2019 WL 1929819, at *10 (E.D.N.Y. Feb. 22, 2019) (citing *Feliciano v. Anderson,* No. 15-CV-4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017)) (citations omitted). Under this standard, "a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the [plaintiff] would occur." *Feliciano,* 2017 WL 1189747, at *13 (citing *Darnell,* 849 F.3d at 35).

### B. Analysis

Plaintiff's surviving claim against Deputy Keefer for deliberate indifference to his medical care is limited to the alleged three-hour delay in medical treatment between the time plaintiff was arrested and when he received medical treatment at the Jefferson County Jail. (Dkt. No. 8 at 10-13). Plaintiff alleges that when the "officers" who were involved in his arrest took him to the ground and applied handcuffs, an unidentified officer twisted plaintiff's arm behind his back, at which point plaintiff heard three distinct cracks in his arm. (Compl. at 9). Plaintiff further alleges that "over the next two hours," he "stated multiple times" that he broke his arm. (*Id.* at 9-10). Plaintiff maintains that he was finally transported to Jefferson County Jail, where he received medical treatment within an hour from Guilfoyle Ambulance. (*Id.*). Plaintiff alleges that although the paramedics determined there were no abnormalities with respect to his arm, subsequent x-ray imaging revealed that plaintiff suffered a fractured elbow. (Compl. at 10; Dkt. No. 1-1 at CM/ECF p. 7).

**\*7** Defendant Deputy Keefer disputes plaintiff's characterization of the events as they occurred immediately after plaintiff's arrest. Specifically, Deputy Keefer maintains that no more than forty-five minutes elapsed between plaintiff's arrest and the medical examination performed by Guilfoyle Ambulance. It is undisputed that plaintiff was arrested and in the custody of the Jefferson County Sheriffs

at or about 5:45 p.m. on July 5, 2019. (Compl. at 9; Keefer Aff. ¶ 17). According to Guilfoyle Ambulance's records, as produced by plaintiff with his complaint, and Deputy Keefer's sworn affidavit, Deputy Keefer called the paramedics on behalf of plaintiff by 6:26 p.m. (Dkt. No. 1-1 at CM/ECF p. 4; Keefer Aff. ¶ 20). Thus, plaintiff's allegation of a three-hour delay between his arrest and his medical treatment is patently unsupported, and plaintiff has not disputed the defendants contention that, in fact, the time elapsed between injury and the request for treatment on his behalf was no more than forty-five minutes.

Moreover, the defendants have established that the forty-five minute period in which plaintiff alleges he was in pain does not represent a deliberate delay in medical treatment on the part of Deputy Keefer. In his sworn affidavit, Deputy Keefer states that after plaintiff was arrested, a different officer drove plaintiff to the Jefferson County Jail, and Deputy Keefer drove there separately. (Keefer Aff. at ¶ 18). Plaintiff was already in a holding cell when Deputy Keefer next encountered him after the arrest. (*Id.* at ¶ 19). As Deputy Keefer avers, he finally spoke to plaintiff at the Jefferson County Jail at approximately 6:25 p.m., and although plaintiff denied medical assistance, Deputy Keefer nevertheless perceived that plaintiff was in pain and called Guilfoyle Ambulance immediately. (*Id.* at ¶¶ 20-21). Thus, based on the defendant's representations, virtually no time elapsed between the moment Deputy Keefer had reason to know that medical attention was necessary, and when he did in fact procure medical treatment for plaintiff.

Although plaintiff alleges, generally, that he complained for two hours after his arrest that his arm was broken, he makes no specific allegation of specifically informing Deputy Keefer that he required medical treatment at the scene of the arrest, or anytime prior to 6:25 p.m. Furthermore, plaintiff has failed to produce any evidence in opposition to the defendant's motion for summary judgment sufficient to raise a genuine question of material fact as to this issue. [4] Accordingly, Deputy Keefer's delay, if any, in seeking medical treatment on behalf of plaintiff was so temporary that it did not amount to deliberate indifference. *See Pateman v. City of White Plains*, 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases).

[4]     As noted above, patient care report described the extent of treatment provided by the Guilfoyle Ambulance paramedics and indicated that plaintiff refused to be taken to the hospital. Plaintiff's unsupported allegations of neglect of

his complaints of injury do not create a material dispute of fact given the contradictory documentary evidence. *See, e.g., Brown v. White*, No. 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention to plaintiff is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record) (citing inter alia, *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[M]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

## V. Qualified Immunity

### A. Legal Standards

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990)).

**\*8** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendants'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 224 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it

should no longer be regarded as mandatory in all cases"). The court may also examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

### B. Analysis

Defendant Deputy Keefer alternatively argues that he should be awarded summary judgment because he is entitled to qualified immunity. As previously set forth, the court is recommending that plaintiff's claims against Deputy Keefer do not rise to violations of constitutional proportions. In the absence of any constitutional violations by the defendant, the court need not proceed any further with the qualified immunity analysis, and dismissal of the complaint is appropriate. *See Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022) ("A defendant official's motion for dismissal on this ground as a matter of law should be granted if either the facts do not support a finding that the plaintiff's federal rights were violated, or the plaintiff's right not to be subjected to the defendant's challenged conduct was, at that time of that conduct, not clearly established."); *Sanchez v. Chapman*, No. 3:19-CV-1314, 2022 WL 657621, at *4 (D. Conn. Mar. 4, 2022) ("If a court determines that one prong establishes that a defendant is entitled to qualified immunity, then 'it need not reach the other' prong.") (quoting *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014)).

**WHEREFORE**, based on the above, it is

**RECOMMENDED**, that defendant Kory Keefer's motion for summary judgment (Dkt. No. 46) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**, and it is further

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of*

2023 WL 1420916

*Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2023 WL 1420916

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1421170
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark James BROWN, Sr., Plaintiff,

v.

Kory KEEFER, Defendant.

9:20-cv-1192 (GLS/ATB)
|
Signed January 31, 2023

**Attorneys and Law Firms**

FOR THE PLAINTIFF: Mark James Brown, Sr., Pro Se, 10305 State Highway 37, Lisbon, NY 13658.

FOR THE DEFENDANT: BRITTANY LEE HANNAH, ESQ., PAUL V. MULLIN, ESQ., CORY JOHN SCHOONMAKER, ESQ., Sugarman Law Firm LLP, 211 West Jefferson Street, Syracuse, NY 13202.

### ORDER

Gary L. Sharpe, Senior District Judge

 **\*1**  The above-captioned matter comes to this court following A Report-Recommendation and Order (R & R) by

Magistrate Judge Andrew T. Baxter, duly filed January 13, 2023. (Dkt. No. 49.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the R & R for clear error, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 49) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendant Kory Keefer's motion for summary judgment (Dkt. No. 46) is **GRANTED**; and it is further

**ORDERED** that plaintiff's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 1421170

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

2018 WL 1750320
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anthony ARRIAGA, Plaintiff,

v.

Dr. Dana GAGE (N.Y.S. D.O.C.C.S. Sing Sing C.F.
Health Care Provider) Individual and Official Capacity;
Dr. Razia K. Ferdous (N.Y. D.O.C.C.S. Sing Sing
C.F. Facility Health Services Director) Individual
and Official Capacity; C.O. Alvarado (Sing Sing C.F.
Correction Officer) Individual and Official Capacity; Dr.
Joshua Vernatter (Montefiore Mount Vernon Hospital
Doctor) Individual and Official Capacity, Defendants.

16-cv-1628 (NSR)
|
Signed 04/06/2018

**Attorneys and Law Firms**

Anthony Arriaga, Ossining, NY, pro se.

Bruce J. Turkle, David John Galalis, New York State Office
of the Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Anthony Arriaga ("Plaintiff"), proceeding *pro
se*, commenced this action on March 3, 2016, pursuant to
42 U.S.C. § 1983 for alleged Eighth and First Amendment
violations, (*see* Complaint ("Compl."), (ECF No. 2) ), against
Defendants Dana Gage ("Dr. Gage"), Razia K. Ferdous
("Dr. Ferdous"), Corrections Officer Alvarado ("Alvarado")
(collectively, the "State Defendants"), and Joshua Vernatter
("Dr. Vernatter"), (*id.*)

Presently before the Court are four motions: (1) the State
Defendants' motion to dismiss for lack of subject matter
jurisdiction and for failure to state a cause of action pursuant
to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),
respectively; (2) Dr. Vernatter's motion to dismiss for failure
to state a cause of action pursuant to Federal Rule of Civil
Procedure 12(b)(6); (3) Plaintiff's motion for a preliminary
injunction; and (4) Plaintiff's motion for sanctions. (*See* The
State Defendants' Brief in Support of the Motion to Dismiss

("State Defs.' Br.") (ECF No. 39), at 3-4; Dr. Vernatter's
Brief in Support of the Motion to Dismiss ("Def. V. Br.")
(ECF No. 47), at 1; Plaintiff's Brief in Support of the Motion
for Injunctive Relief ("Plf. Mot.") (ECF No. 56), at 2;
Plaintiff's Not. of Motion for Sanctions (ECF No. 65), at
5.) For the following reasons, the State Defendants' motion
is GRANTED in part and DENIED in part, Dr. Vernatter's
motion is GRANTED, and Plaintiff's Motions for Injunctive
Relief and Sanctions are DENIED.

**FACTUAL BACKGROUND**

**A. Facts Related to the Motions to Dismiss**

The following facts are taken from Plaintiff's Complaint and
are accepted as true for purposes of this motion.[1]

[1] The Court assumes the truth of the facts alleged in
Plaintiff's Complaint for purposes of this motion
only. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff is a *pro se* inmate housed at Sing Sing Correctional
Facility ("Sing Sing"), a prison within the New York State
Department of Corrections and Community Supervision
("DOCCS"). Plaintiff initiated this action on or about March
3, 2016, for alleged violations of his Eighth and First
Amendment rights to adequate medical care and to be free
from retaliation, respectively. (*See* Compl. at 2-7.)[2] The
conduct that forms the basis of Plaintiff's Complaint occurred
between March 2015 and January 2016. (*Id.*)

[2] As Plaintiff is proceeding *pro se* and his Complaint
is the standard, fillable form amended complaint,
all citations thereto will be to pages, not paragraphs.

Plaintiff alleges that he suffers from herniated and bulging
discs that cause him extreme back pain, for which he was
originally prescribed Naproxen. (*See* Compl. at 3, 7.) In early
April of 2015, Plaintiff began complaining of his back pain
to the nurses at sick call and was prescribed 200mg tablets
of Ibuprofen, which he alleged to be insufficient. (*Id.*) At
some unspecified time thereafter, Plaintiff sent letters to his
health care provider at the time, Dr. Ferdous, which went
unanswered. (*Id.*) In a grievance regarding this failure to
respond to his letters, Plaintiff took issue with Dr. Ferdous's
position of not entertaining inmate letters and recommending
that they go to sick call instead. (*Id.* at Ex. C.)

2018 WL 1750320

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 238 of 273

**\*2** On April 6, 2015, Plaintiff's pain became so intolerable that he was transferred outside of the facility to Montefiore Mount Vernon Hospital ("Montifiore") where he was admitted for three days, unable to move. (*Id.* at 3.) During his hospitalization, Plaintiff was treated by Dr. Vernatter and underwent a CAT Scan, blood tests, and was prescribed Percocet and Baclofen for the pain. (*Id.* at Ex. A.) Dr. Vernatter informed Plaintiff that he would be "given a shot due to [his] back spasm", but ultimately Plaintiff was discharged on April 9, 2015 without having received the shot or a discharge plan. (*Id.* at 3, Ex. A.)

When he returned to Sing Sing on April 9, 2015, Plaintiff was admitted to the facility's infirmary until April 22, 2015. (*Id.* at 3.) Upon his discharge, Dr. Muthra [3] issued Plaintiff a medically prescribed pass ("medical pass") which permitted him daily showers, the use of a cane, and relief from work and sports. (*Id.* at 3.) That pass expired on April 27, 2015, and in the days preceding its expiration, Plaintiff unsuccessfully attempted to meet with medical staff to have it renewed. (*Id.* at 4.) On May 1, 2015, Plaintiff was scheduled to see Dr. Ferdous, but that appointment was cancelled and Plaintiff filed a grievance. (*Id.* at 4, Exs. B-C.) On May 4, 2015, Plaintiff went to sick call regarding his medical passes, but "nothing was ever done." (*Id.* at 4.)

[3]     Dr. Muthra is not a party to this action.

In early May of 2015, Plaintiff was treated by Dr. John Galeeno, an outside orthopedic specialist, who discussed treatment options including "foot insoles, orthopedic sneakers, orthopedic boots, physical therapy", cortisone injections, and a double/medical mattress. (*Id.* at 5.) Plaintiff sent a letter to Dr. Gage, Facility Health Services Director ("FHSD") at Sing Sing, requesting this treatment, and Dr. Gage purportedly told Dr. Ferdous to inform Plaintiff that "security denied [his] medical mattress for security reasons", a statement Plaintiff believes was fabricated. (*Id.*) In response, Plaintiff filed a grievance and a complaint with the New York State Department of Health ("DOH") against Dr. Gage on May 6, 2015. (*Id.* at 4, Ex. D.) He also filed a "Reasonable Accommodations Request" to L. Malin (Deputy Superintendent for Programs) asking that Malin consult with Dr. Galeeno regarding the treatment. (*Id.* at 4, Ex. F.) Plaintiff alleges his request was denied when "Ms. Malin chose to consult with Dr. Gage." (*Id.*)

The day after Plaintiff filed the grievance against Dr. Gage, Dr. Ferdous authored a medical pass for Plaintiff that would include a bus pass, and permission to take daily showers, carry a cane, receive feed-up (where food is brought to the inmate's cell), and wear transition lenses. (*Id.* at 4.) As with his others, this medical pass required the approval of Dr. Gage. (*Id.*) Instead of immediately signing this medical pass—as was her custom—Dr. Gage purportedly stated that she would "think about signing the pass", (*id.*) and ultimately, on May 15, 2015, issued a medical pass for the use of a cane only, (*id.* at Ex. H; *see also* Declaration of Jeffrey Hale in Support of the State Defendants' Motion to Dismiss ("Hale Decl.") (ECF No. 37), at Ex. A.) [4] Plaintiff alleges that this conduct was done to deny and interfere with his medical treatment, (*id.* at 4), and in retaliation for filing a grievance, (*id.* at 4, Ex. H.)

[4]     The court is permitted to consider this document without converting this to a motion for summary judgment, as it is "integral" to Plaintiff's Complaint; indeed, an incomplete copy was attached thereto. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Chamberlain v. White Plains*, 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013).

**\*3** In November of 2015, Dr. Gage was purportedly demoted from the position of FHSD and assigned as Plaintiff's primary health care provider. (*Id.* at 6.) While in this position, during the months of December 2015 and January 2016, Dr. Gage gave Plaintiff "medical call out every week" for appointments with her. (*Id.*) During every single call out, Plaintiff would arrive and wait for hours, "causing severe back pain due to sitting on hard benches and standing." (*Id.*) Eventually, a corrections officer would approach Plaintiff and say that Dr. Gage "doesn't know when she's going to see you." (*Id.*) Dr. Gage did not see Plaintiff during any of these visits. (*Id.*)

With respect to Alvarado, Plaintiff alleges that he deliberately interfered with his medical treatment on two occasions. (*Id.* at 6-7.) On May 25, 2015, Alvarado confiscated Plaintiff's cane and cane pass while Plaintiff was attempting to walk through the metal detector. (*Id.* at 6.) Alvarado claimed to have authority from medical staff to do so. (*Id.*) On December 14, 2015, Alvarado confiscated Plaintiff's medically prescribed glasses during a search and wrote "a false misbehavior report against" Plaintiff. (*Id.* at 7.) In response to both instances, Plaintiff filed grievances, (*see id.* at Exs. K, L), alleging that Alvarado was interfering with his medical treatment and that his conduct was done "for purposes of harassment; and retaliation...." (*Id.*)

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 239 of 273

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

**B. Facts Related to the Motion for Injunctive Relief**

Plaintiff's motion asserts that on April 25, 2017, a facility search was conducted and his "mattress and pillow were confiscated." (*See* Plf. Mot. at 2.) The mattress was returned on April 27, 2017, and on that day Plaintiff reportedly "sent in a sick call slip" but was not called to see a doctor until the following day. (*Id.* at 3.) During his visit on April 28, 2017, Plaintiff reportedly informed someone[5] that his back pain was "severe due to his mattress and pillow being wrongfully confiscated", that his medical pass was due to expire on May 3, 2017, that two of his prescriptions needed refills, and he needed to see an ophthalmologist for new lenses and frames. (*Id.*) He was informed that his concerns would be relayed to his health care provided "on that day." (*Id.*) During his visit, Plaintiff received the requested medication refills.

[5]     Plaintiff does not identify who he spoke with on April 28, 2017 at sick call.

On May 1, 2016 and May 3, 2016, Plaintiff sent slips to sick call regarding his medical passes and pillow. (*Id.*) He was called to sick call on May 4, 2017 and spoke with an unidentified nurse regarding the expiration of his medical pass and the fact that he still had no pillow. (*Id.*) Thereafter, on May 7, 2017, Plaintiff wrote to Dr. Ferdous regarding the expiration of his medical pass, the unreturned pillow, and other medical issues. (*Id.* at 4.) Plaintiff filed this motion on May 15, 2017, requesting a preliminary injunction ordering Dr. Ferdous to issue "a *temporary* medical pass for: bus pass, cane pass, daily showers, feed-up, and transition lenses to not expire until a disposition of this case is rendered." (*Id.*) Plaintiff did not file any grievances with respect to this request or otherwise avail himself of any administrative remedies. (*See* Plaintiff's Reply in Support of the Motion for an Injunction ("Plf. Reply") (ECF No. 65), ¶ 6.)[6] Ultimately, Plaintiff admits that his medical pass was renewed on May 31, 2017. (*Id.* ¶ 1.)

[6]     This document was not filed on ECF as a reply in further support of the motion for an injunction, but is indeed Plaintiff's Reply and is hereby deemed as such.

**DISCUSSION**

**I. Standard of Review**

**A. Rule 12(b)(6)**[7]

[7]

In opposition to both motions, Plaintiff repeatedly refers to the summary judgment standard, arguing that a grant of summary judgment to the Defendants, in absence of discovery would be unjust. (*See* Plaintiff's Opp. to State Defs. Mot. (ECF No. 41), ¶¶ 4-7; Plaintiff's Opp. to Dr. Vernatter's Mot. (ECF No. 78), ¶¶ 1-2.) The Defendants have filed pre-answer motions to dismiss, not for summary judgment. The Court is not considering a summary judgment standard at this time. The Court further notes that Plaintiff's Opposition to Dr. Vernatter's motion should have been, but was not, filed by Dr. Vernatter along with the other motion papers. Accordingly, the Court had it filed on April 6, 2018.

**\*4**  On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

Courts must construe *pro se* pleadings in a particularly liberal fashion, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them "to raise the strongest arguments that they suggest," *Harris v. City of N.Y.,* 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). Nevertheless, a *pro se* plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level," *Jackson v. N.Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it," *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)
2018 WL 1750320

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 240 of 273

A court's review is typically confined to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Where materials outside of the Complaint are offered in support of or opposition to the motion to dismiss, the Court has a choice to make: "either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ) (internal quotations omitted). If the Court chooses the former approach, it must adhere to it strictly and not consider "affidavits and exhibits submitted" or "factual allegations contained in legal briefs or memoranda." *Id.* (quoting *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999); *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) ). Nevertheless, a court may consider documents attached to a motion to dismiss provided they are documents that are integral to the complaint without converting to a summary judgment motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Chamberlain v. White Plains*, 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013).

Accordingly, the Court declines to convert this into a motion for summary judgment and will therefore only consider the factual allegations in Plaintiff's Complaint, the documents attached thereto, and the grievance attached to the Hale Declaration, as it is integral to Plaintiff's Complaint. The Court will consider no other documents or factual allegations *not* asserted in Plaintiff's Complaint.

### B. 12(b)(1)

**\*5** A challenge to a federal court's subject matter jurisdiction is properly raised by way of a 12(b)(1) motion. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010); *Alliance for Envt'l Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006). Without jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case." *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). It is well-settled that the "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Luckett v. Bure*, 290 F.3d 493, 497

(2d Cir. 2002) ). If an official or entity is entitled to sovereign immunity, a court has no subject matter jurisdiction to hear the case. *See Cooper v. N.Y. State Dep't of Mental Health*, No. 01-CV-943 (AGS), 2001 WL 456348, at *1 (S.D.N.Y. May 1, 2001); *see also Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 37-38 (2d Cir. 1977).

### II. Eleventh Amendment Immunity

The State Defendants move to dismiss all claims asserted against them in their official capacity. (*See* State Defs. Br. at 14.) Absent abrogation by Congress, a state is immune from suit in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-56 (1996); *see also Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990). This immunity extends to "arms of the state," which includes "officers employed by agencies such as" the DOCCS. [8] *Dube*, 900 F.2d at 594-95 (finding SUNY institution entitled to sovereign immunity); *see also Matteo v. Perez*, No. 16-CV-1837(NSR), 2017 WL 4217142, at *7 (S.D.N.Y. Sept. 19, 2017). Section 1983 claims against state officers in their official capacity are ripe for dismissal, as those officials are not considered "person[s] within the meaning of the statute." *Id.* (citing *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012); *Koehl v. Dalsheim*, 85 F.3d 86, 88-89 (2d Cir. 1996) for proposition that Section 1983 claims based on official capacity "barred by sovereign immunity"). Consequently, the Eighth Amendment claims against the State Defendants in their official capacity are hereby dismissed and the motion is granted in this regard.

[8]    Plaintiff's claims would not fall into the *Ex Parte: Young*, 209 U.S. 123 (1908), exception to the Eleventh Amendment as Plaintiff has not pled an "ongoing violation of federal law" seeking injunctive relief. *Aiken v. Nixon*, 80 Fed.Appx. 146 (2d Cir. 2003) (summary order). Though part of the requested relief is injunctive, Plaintiff's Complaint alleges facts related to separate instances of alleged constitutional conduct and does not amount to allegations of ongoing violations. (*See* Compl. at 3-7); *compare with Corbett v. Annucci*, No. 16-CV-4492(NSR), 2018 WL 919832, at *8 (S.D.N.Y. Feb. 13, 2018); *Jude v. New York*, No. 07-CV-5890(RJS), 2009 WL 928134, at *5 (S.D.N.Y. Mar. 30, 2009).

### III. Eighth Amendment Deliberate Indifference to Medical Needs [9]

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

9
Plaintiff asserts various other allegations of alleged deliberate indifference, including that he was given Ibuprofen instead of Naproxen (*see* Compl. at 3), that he was not provided a legible copy of his medical records (*id.* at 5), and that someone interfered with his physical therapy treatment (*id.* at 5-6.) Such allegations give rise to no colorable claims. First, Plaintiff has wholly failed to demonstrate that an alleged deprivation of legible medical records constitutes a constitutional violation. *Doe v. Conn. Dep't of Child and Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990); *Patterson v. City of New York*, No. 11-CV-7976(DLC), 2012 WL 3264354, at *4 (S.D.N.Y. Aug. 9, 2012) (noting that violations of regulations, alone, insufficient for constitutional violation). Further, in order to state a cognizable section 1983 claim, Plaintiff was required to plead personal involvement of each of the named Defendants, *see Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994), and has failed to state how, if at all, any of the Defendants were involved in these alleged deprivations; indeed, Plaintiff fails to even identify the individuals who allegedly interfered with his physical therapy or prescribed him Ibuprofen instead of Naproxen.

**\*6** A claim for inadequate medical care is born out of the Eighth Amendment's protection against cruel and unusual punishment. *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (citing *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ). To be entitled to relief, a plaintiff must plead and prove "deliberate indifference to his serious medical needs." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("*Hathaway II*") (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ) (alterations omitted).

Deliberate indifference is a dual-pronged analysis requiring proof of both an objective and subjective prong. *Hathaway II*, 37 F.3d at 66. The objective prong mandates the deprivation be, "in objective terms, sufficiently serious." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations omitted). To satisfy the subjective prong, the official must act with "a sufficiently culpable state of mind," *see Wilson v. Seiter*, 501 U.S. 294, 298 (1991), in that the official "must know of and disregard an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ).

### A. Objective Prong

The objective prong requires a two part inquiry. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). First, there must be an actual "deprivation of adequate medical care," *id.* at 279; reasonable care is not a deprivation, *see Farmer*, 511 U.S. at 844-47. Then, the Court must determine whether that deprivation is sufficiently serious, which requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("*Hathaway III*") ).

#### 1. State Defendants

Drawing all possible inferences from his Complaint, Plaintiff asserts both a denial of treatment and inadequate care provided. [10] (*See* Compl. 4-6.) For the categorical denial of treatment, the Court must examine whether the "medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. Plaintiff has alleged severe back pain which results from his herniated and bulging discs, (*see* Compl. 3, 7), a sufficiently serious condition; such condition is associated with extreme pain and leads to degeneration. *See Ceparano v. Suffolk Cty. Dep't of Health*, 485 Fed.Appx. 505 (2d Cir. 2012) (summary order) (Eighth Amendment pled where deliberate indifference to "severely herniated spinal discs"); *Dobbin v. Artuz*, 143 F. Supp. 2d 292, 302 (S.D.N.Y. 2001); *Williams v. Smith*, No. 02-CV-4558(DLC), 2009 WL 2431948, at *8 (S.D.N.Y. Aug. 10, 2009) (noting persistent back pain sufficiently serious). Plaintiff's allegations that Dr. Gage participated in the denial of Plaintiff's request to obtain the treatment recommended by his orthopedic specialist, Dr. Galeeno and made Plaintiff wait for hours once a week without ever actually providing treatment during the months of December 2015 and January 2016, are sufficient for an actual deprivaiton. (*See* Compl. at 4-6.) The objective prong is satisfied.

10
Plaintiff's allegations regarding the issuance of a medical pass for a cane only, amount to inadequate care provided. (*See* Compl. at 4-5.) Such a claim requires a narrow approach, focused on "the challenged" interference or deprivation, rather than the nature of the condition. *Salahuddin*, 467 F.3d

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00665-MAD-TWD    Document 43    Filed 02/08/23    Page 242 of 273

2018 WL 1750320

at 280. Defendants are correct in arguing that Plaintiff has failed to plead how this amounts to an objectively serious deprivation. Indeed, on the facts alleged, the conduct may amount to a difference of opinion between medical doctors, *see Chance*, 143 F.3d at 703 (noting difference between deliberate indifference and difference of opinion in matter of medical judgment); *Woods v. Goord*, No. 01-CV-3255(SAS), 2002 WL 31296325, at *5 (S.D.N.Y. Oct. 10, 2002) (same true as between doctors), which is insufficient for deliberate indifference, though sufficient in this case for retaliation, *see infra* IV.

**\*7** The central claim against CO Alvarado is that he interfered with Plaintiff's medical treatment when he confiscated Plaintiff's cane despite his having a medical pass for it. (*See* Compl. at 6-7.) In other words, by confiscating the cane, Alvarado denied him medical treatment. Accordingly, the question is whether the condition and deprivation were sufficiently serious. *Salahuddin*, 467 F.3d at 280. The Court need not linger on this issue; it has already determined that a herniated disc is sufficiently serious, and the denial of a medically prescribed cane constitutes an actual deprivation. [11]

[11]    The allegations regarding Alvarado's confiscation of the glasses do not meet the objective prong. Plaintiff has failed to demonstrate that the interference or his medical condition related to his vision were sufficiently serious; indeed, he does not even describe what his medical condition is.

As to Dr. Ferdous, Plaintiff explicitly states that he was "completely denied treatment", (*see* Plf. Opp. ¶ 18.) Plaintiff however, cannot sustain a claim for deliberate indifference against Dr. Ferdous. It is well settled that where an inmate has received adequate care, he has no Eighth Amendment claim. *Salahuddin*, 467 F.3d 279 (noting that initial inquiry is whether there was an actual deprivation). There was no deprivation here. The following are the only allegations related to Dr. Ferdous: (1) Plaintiff wrote letters to Dr. Ferdous that were unanswered, (*see* Compl. at 3); (2) Plaintiff was scheduled to see Dr. Ferdous on May 1, 2015, but his appointment was cancelled, (*id.* at 4, Ex. C); and (3) on May 7, 2015, Dr. Ferdous wrote a medical pass that was ultimately denied by Dr. Gage for "bus pass, cane, shower, feed-up, and transition lens[es]," (*id.*) There is no doubt that unanswered letters cannot give rise to a constitutional violation, particularly where Plaintiff does not identify how

many letters were sent or over what period of time they were sent *and* in light of the fact that Plaintiff was able to meet with Dr. Ferdous in person. Additionally, Plaintiff may be upset that Dr. Ferdous cancelled one appointment, but the doctor met with him less than a week later, ultimately amounting to a six day delay, already established by this Court as insufficient for deliberate indifference. *See Munoz v. Eliezer*, No. 16-CV-6049(NSR), 2018 WL 1626170, at *6 (S.D.N.Y. Mar. 30, 2018). Finally, Plaintiff's final allegation clearly does not assert a deprivation whatsoever, as Plaintiff was provided with a broad medical pass by Dr. Ferdous, to which he admits consenting. (*See* Compl. at 4.) Plaintiff's claims against Dr. Ferdous must be dismissed with prejudice.

*2. Dr. Vernatter* [12]

[12]    Dr. Vernatter does not work for DOCCS; he is a doctor at Mount Vernon Hospital. Dr. Vernatter does not to contest his ability to be sued under Section 1983 for constitutional violations as a state actor, so the Court assumes the same.

Plaintiff's claims against Dr. Vernatter allege that Dr. Vernatter violated his rights when he failed to administer a shot for Plaintiff's back spasm and failed to provide him with a discharge plan upon exiting Montifiore. (*See* Compl. at 3, Ex. A.) Where, as here, the allegations claim inadequate medical treatment provided, the inquiry focuses on the alleged inadequacy "rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280.

Plaintiff alleges that he was suffering from "a severely painful paralyzing" pain radiating down the left side of his body on April 6, 2015, for which he was transferred to Montifiore for treatment. (*See* Am. Compl. at 3.) Plaintiff was admitted to the hospital and received treatment from Dr. Vernatter for the next three days. (*Id.*) During this time, Plaintiff underwent a CAT Scan, had his blood tested, and was administered Percocet and Baclofen for the pain. (*Id.* at Ex. A.) Dr. Vernatter told him he would receive a shot for his back spasm, but never administered it and Plaintiff was discharged from the hospital without a discharge plan. (*Id.*) This treatment was not inadequate. He went to the hospital complaining of severe pain and was ultimately monitored for three days and prescribed pain medication. The fact that Dr. Vernatter chose not to give Plaintiff the shot for his alleged back spasm or a discharge plan are not sufficiently serious deprivations. *See Charles v. County of Orange*, no. 16-CV-5527(NSR), 2017 WL 4402576, at *11 (S.D.N.Y. Sept. 29, 2017) (finding deprivation of discharge plan not sufficiently serious); *see*

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 243 of 273

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

*also Farmer*, 511 U.S. at 844-47 (noting that reasonable care is not a deprivation). [13]

13    At best, the failure to administer the shot was a decision of medical judgment, not recoverable under the Eighth Amendment, *see Estelle*, 129 U.S. at 107, and at worst constitutes negligence or medical malpractice, equally insufficient for deliberate indifference purposes, *see Hill*, 657 F.3d at 123; *see also Williams v. Wright*, 162 Fed.Appx. 69, 71 (2d Cir. 2006) (summary order) (citing *Estelle*, 429 U.S. at 107) (internal quotations omitted); *see also Hill*, 657 F.3d at 123; *Rush v. Fischer*, No. 09-CV-9918(JKG), 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) (collecting cases and noting that "decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference....").

### B. Subjective Prong

**\*8** Where deliberate indifference is concerned, negligence or medical malpractice will not "rise to the level of a constitutional violation unless the malpractice involves culpable recklessness." *Hill*, 657 F.3d at 123 *citing Chance*, 143 F.3d at 703) (internal quotations and alterations omitted). Relatedly, so long as a prisoner "receives adequate treatment", he "does not have the right to choose" the treatment he receives. *Id.* (citing *Estelle*, 429 U.S. 97); *see also Chance*, 143 F.3d at 703 (noting that a prisoner's preference for different treatment does not rise to the level of an Eighth Amendment violation).

### 1. State Defendants

Plaintiff has pled Dr. Gage's relevant mental state. Where there are allegations that the prison official knew of and disregarded the plaintiff's serious medical needs, the requisite mental state has been pled. *Farmer v. Brennan*, 511 U.S. at 837. The State Defendants' contention that Dr. Gage's decision to deny the treatment recommended by Dr. Galeeno constitutes an exercise in medical judgment is unavailing. While it is true that a disagreement in treatment, even between a prison doctor and outside specialist, typically reflects medical judgment, not deliberate indifference, *see Williams*, 2009 WL 2431948, at *9, Plaintiff's allegations call that standard into question. Considering all of the facts, including

that Dr. Gage wanted Plaintiff to believe security would not permit a double mattress, (*see* Compl. at 5), Plaintiff has pled sufficient facts from which the inference can be drawn that the decision to deny the recommended treatment was not predicated on medical judgment, but on something more—a deliberate choice to deny the treatment.

Further, Plaintiff's allegations with respect to Dr. Gage's conduct in December of 2015 and January of 2016 are sufficient. Construing the Complaint liberally, as this Court must, Dr. Gage, who was originally the FHSD but since demoted and assigned Plaintiff's primary care provider, (*see* Compl. at 6), undoubtedly knew of Plaintiff's extreme pain associated with his herniated and bulging discs and that making Plaintiff wait hours for treatment could cause his condition to deteriorate, but ignored that risk when she called Plaintiff to sick call to wait for hours, (*id.*) The contention that this is no different than private individuals who must wait for physician care, (*see* State Defs. Br. at 10), grossly misconstrues the allegations and dismisses a key allegation which illuminates Dr. Gage's intentions; Plaintiff did not wait hours to be treated by Dr. Gage—Plaintiff waited hours, once a week, only to be told that Dr. Gage *could not* see him. (*See* Compl. at 6.) Plaintiff has met his burden.

Plaintiff has failed, however, to allege sufficient facts for Alvarado's mental state. While deliberate indifference can be manifested "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed," *Estelle*, 429 U.S. 97, 104-05 (1976), such is true where, unlike here, there is no cause to interfere, *see Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors"); *Covington v. Westchester Cnty. Jail*, No. 96-CV-7551(SAS), 1997 WL 580697, at *3 (S.D.N.Y. Sept. 18, 1997) (confiscation without cause violates constitution), and the conduct occurs more than once, *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 270 (noting that a single occurrence likely is not sufficient). Plaintiff makes clear that Alvarado confiscated the cane because he was authorized to do so by medical staff, (*aee* Compl. at 6, Ex. K), and this interference only happened once. The claim must be dismissed. [14]

14    In a letter received by the Court on February 17, 2017, (ECF No. 43), which this Court deems Plaintiff's sur-reply to the State Defendants' motion to dismiss, Plaintiff alleges additional facts that Alvarado did not have authorization from medical

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 244 of 273

*Arriaga v. Gage, Not Reported in Fed. Supp. (2018)*
2018 WL 1750320

staff to confiscate his cane or glasses. (*See* ECF No. 43, ¶ 2). These facts were not asserted in his complaint and thus cannot be considered in deciding the motion. *See LLM Bar Exam, LLC v. Barbri, Inc.*, No. 16CV3770, 2017 WL 4280952, at *21 (S.D.N.Y. Sept. 25, 2017) ("[A] complaint cannot be amended by the briefs in opposition to a motion to dismiss."); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *Williams v. Rosenblatt Secs. Inc.*, 136 F. Supp. 3d 593, 609 (S.D.N.Y. 2015). Since Plaintiff's failure amounts to a failure to plead enough facts, he will be granted leave to re-plead these claims against Alvarado.

### 2. Dr. Vernatter

**\*9** If the medical deprivation by Dr. Vernatter was considered sufficiently serious, Plaintiff's claim still fails to allege any facts whatsoever from which an inference can be drawn that Dr. Vernatter knew of a serious risk to Plaintiff's health and disregarded that risk. Deliberate indifference has not been established. Further, the decision not to administer the shot amounts to, at most, malpractice, as discussed *supra* III.A.2.

In consideration of the foregoing, the State Defendants' motion to dismiss the Eighth Amendment claims is granted in part and denied in part. The claims against Dr. Gage are the only to withstand the motion. Additionally, Dr. Vernatter's motion is granted. [15]

[15]   Plaintiff also alleges violations of various state regulations resulting in a failure to provide legible medical records and a failure to receive a discharge plan prior to his exit from Montifiore. (*See* Compl. at 3, 5.) It is well settled that violations of state regulations, alone, do not raise a right to relief under Section 1983. *Doe v. Conn. Dep't of Child and Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990); *Patterson v. City of New York*, No. 11-CV-7976(DLC), 2012 WL 3264354, at *4 (S.D.N.Y. Aug. 9, 2012). Further, as evidenced above, the conduct which is alleged to violate these regulations, considered separate and apart from its categorization *as* a violation, is insufficient to give rise to a claim for deliberate indifference.

### IV. Retaliation

Construing the Complaint liberally, as this Court must, Plaintiff appears to assert a claim for retaliation against Dr. Gage—an issue addressed by the State Defendants in a footnote. (*See* State Defs. Br. at 9.) [16] Prison officials shall not retaliate against prisoners for exercising their constitutional rights. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Nevertheless, courts should consider retaliation claims with skepticism, *see Turner v. Sidorowicz*, No. 12-CV-7048(NSR), 2014 WL 641454, at *10 (S.D.N.Y. Feb. 18, 2014), as they are "prone to abuse since prisoners can claim retaliation for every decision they dislike," *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ) (internal quotations omitted). Contrary to the State Defendants' contention, while Plaintiff did not assert retaliation as a separate claim, the pleading is not wholly conclusory.

[16]   Some of the statements in the grievances attached to Plaintiff's Complaint regarding Defendant Alvarado's conduct appear to allege that Alvarado confiscated his belongings for "harassment" or retaliation purposes. (*See* Compl. at Ex. K.) These allegations are "wholly conclusory" and cannot support a retaliation claim. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (noting that "complaint of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone").

A claim for retaliation is properly pled by allegations:"(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) ). It is well settled that "the filing of prison grievances is a constitutionally protected activity", *see id.*; thus, Plaintiff's allegations that he filed grievances against Dr. Gage that were met with retaliation satisfy the first prong.

### A. Adverse Action

**\*10** Plaintiff has pled adverse action. To be adverse, the retaliatory conduct must be such to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights;" if not, "the retaliatory act is simply *de minimis*...." *Davis*, 320 F.3d at 353. This test is objective and applies "even where[, as here,] a particular plaintiff was not himself subjectively deterred." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). In retaliation cases, plaintiffs

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)
Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 245 of 273
2018 WL 1750320

must demonstrate harm, and where a prisoner is concerned, "the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks." *Id.* at 383.

Plaintiff's numerous allegations that Dr. Gage interfered with his medical passes, (*see* Compl. at 4-5), outright denied his requests for treatment recommended by Dr. Galeeno, (*id.*), and denied Plaintiff any treatment while forcing him to wait at sick call once a week for two months, which exacerbated his back pain, (*see id.* at 6), are sufficient for adverse action. *See Williams v. Fisher*, No. 02-CV-4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (finding revocation of necessary medical rehabilitative treatment enough for adverse action). Such conduct would be enough to deter a similarly situated individual of "ordinary firmness" from filing future grievances, despite not deterring Plaintiff from doing so.

### B. Causal Connection

Finally, Plaintiff has pled sufficient facts from which a causal connection between the filing of the grievance and the adverse action can be inferred. There must be facts suggesting that "the protected conduct was a substantial motivating factor in the prison official's decision to take action against" the plaintiff. *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009). Factors courts consider in determining whether a retaliatory motive has been pled include: "(i) the temporary proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Id.* at 367.

Considering the totality of Plaintiff's Complaint, he has met his burden. First, Plaintiff alleges that, on May 6, 2015, he filed a grievance and complaint with the New York State Department of Health against Dr. Gage. (*See* Compl. at 4, Ex. E.) The very next day, Dr. Ferdous authored a broad medical pass that required authorization by Dr. Gage who indicated that she would "think about signing the pass" and ultimately issued a pass for a cane only, on May 12, 2015, not even a week after Plaintiff filed his grievance. (*See* Compl. at 4, Ex. H; *see also* Hale Decl., Ex. A.) The short temporal distance between the filing of the grievance and Dr. Gage's conduct, *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (causal connection pled through demonstration that "protected activity was close in time to the adverse action"); *see also Turner*, 2014 WL 641454, at *11 (finding causal connection where "alleged retaliatory action was taken directly in response to a grievance"), coupled with allegations

that Dr. Gage typically "just sign[s] the pass", (*see* Compl. at 4), suggest a causal connection.

As further evidence of retaliatory motive, Plaintiff alleges two important facts with respect to the denial of the treatment recommended by Dr. Galeeno. Specifically, Dr. Gage told Dr. Ferdous to lie to Plaintiff, stating that security would not permit a double mattress in the facility, (*see* Compl. at 5, Ex. D,) and to bolster that allegation, Plaintiff contends that other inmates in the facility had double mattresses, (*id.*)

*11 Moreover, after Dr. Gage's demotion, she was assigned as primary care provider for Plaintiff, an inmate who had filed numerous grievances against her. (*See* Compl. at 5, Exs. D-H.) Plaintiff's allegations that, thereafter, he was made to appear at sick call, under the guise of having appointments with Dr. Gage, and forced to wait for hours, ultimately receiving no treatment whatsoever, (*see* Compl. at 6), are further evidence of retaliation. *Compare with Burton*, 664 F. Supp. 2d at 368 (causal connection pled where sufficient facts to "imply a retaliatory motive")

### V. Qualified Immunity

The Court need only consider qualified immunity for Dr. Gage, in light of its decision to dismiss all claims against Dr. Ferdous with prejudice and permit Plaintiff leave to re-plead claims against Alvarado.

State officials are entitled to qualified immunity provided "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Morgan v. Ward*, 14-CV-7921(GHW), 2016 WL 427913, at *7 (S.D.N.Y. Feb. 2, 2016) (citing *Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000) ); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Granting a 12(b)(6) motion for qualified immunity is appropriate where "the facts supporting the defense appear on the face of the complaint," *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998) ), *and* "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief," *id.* (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) ).

In finding that Plaintiff has properly pled claims for deliberate indifference and retaliation against Dr. Gage, this Court has decided that Plaintiff has established the potential violation of a clearly established constitutional right. Further, the State

Defendants argue that Dr. Gage could "have reasonably believed that granting Plaintiff use of a cane to move about the facility did not violate any clearly established federal right." (*See* State Defs. Br. at 14.) This argument ignores the remainder of allegations against Dr. Gage. Considering the totality of allegations, it is evident that Dr. Gage knew the severity of Plaintiff's herniated discs, and at the very least, could not have considered it reasonable to force Plaintiff to wait for hours, once a week and receive no treatment. Further, as to retaliation, the allegations that Dr. Gage made false statements during the grievance process are sufficient. *See Turner*, 2014 WL 641454, at *12 (noting "clearly established that prison personnel may not submit false reports in retaliation against prisoners").

### VI. State Law Claims

The Court need not linger on whether to assert supplemental jurisdiction over Plaintiff's state law claims. To the extent that any state claims are cognizable on the facts of the Complaint, they are barred against all Defendants in their official capacity. *See Parris*, 947 F. Supp. 2d at 365; *Baker v. Coughlin*, 77 F.3d 12, 15-16 (2d Cir. 1996) (state law claims arising "from acts or omissions within the scope of their employment at DOCCS" dismissible for lack of subject matter jurisdiction); *see also* N.Y. Corr. Law § 24 (requiring that lawsuits related to DOCCS employees' conduct within the scope of their employment, be brought in New York Court of Claims against the State).

 *12 Further, insofar as Plaintiff attempts to allege state law claims for negligence against the Defendants in their individual capacity, these claims too must fail as the Court has already determined that the Section 1983 claims are ripe for dismissal. *See Crique v. Magill*, No. 12-CV-3345(PAC) (GWG), 2013 WL 3783735, at *1, 4 (S.D.N.Y. Jul. 9, 2013) (adopting report and recommendation in entirety, including recommendation to not to "exercise supplemental jurisdiction over any state law claims for medical malpractice in light" of dismissal of 1983 claims). Such claims are dismissed without prejudice, and to the extent Plaintiff can cognizably plead same, he can do so in state court. [17]

[17] Even under the most liberal reading, Plaintiff asserts no state law claims in the Complaint against Dr. Gage, the only Defendant against whom any Section 1983 claims remain.

### VII. Leave to Amend

Though "[l]eave to amend should be freely granted," this Court declines to allow Plaintiff leave to amend his claims against Dr. Vernatter and Dr. Ferdous, as an amendment would be futile. *See Nognou v. Mayrose*, 400 Fed.Appx. 617, 620 (2d Cir. 2010)(summary order) (quoting *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ). As in *Nognou*, Plaintiff's claims against Dr. Vernatter, if anything, amount to no more than negligence and malpractice, thus no amendment could render their conduct actionable. *See id.* (affirming denial of leave to amend on ground that "negligence and medical malpractice" not recoverable under Section 1983). Further, as stated, *supra*, there are no cognizable claims against Dr. Ferdous and this Court will grant Plaintiff leave to re-plead the claims against Alvarado.

### VIII. Plaintiff's Motion for Injunctive Relief [18]

[18] Plaintiff also filed a second reply in support of his motion, a document entitled "Reply After Receiving Medical Documents" ("Plf. Reply 2") after he allegedly received certain medical records. (*See* ECF No. 66.) This Court has not been provided copies of any of these medical records, and nevertheless would not consider them in determining the merits of the motion for injunction, since Plaintiff has failed to exhaust his administrative remedies, as discussed *infra* VII.A. This Court has reviewed this second reply and finds that it fails to alter the result.

Plaintiff also moves for injunctive relief; specifically, requesting that this Court compel Dr. Ferdous to "issue a *temporary* medical pass for: bus pass, cane pass, daily showers, feed-up, and transition lenses" not to expire until a disposition of this matter. (*See* Plf. Mot., at 2.) In opposition, the State Defendants argue that the motion should be dismissed for failure to exhaust administrative remedies and that Plaintiff has otherwise failed to meet his burden of establishing entitlement to an injunction. (*See* The State Defendants' Opposition to Plaintiff's Motion ("Defs. Opp.") (ECF No. 58), at 1-2.) [19]

[19] In his reply, Plaintiff makes the following additional assertions: (1) "Defendant's [sic] should automatically schedule follow-up appointments prior to the expiration of medical passes and prescriptions for known medical concerns/issues that can cause extreme pain", (*See* Plaintiff's Reply

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

in Support of Motion for Injunction ("Plf. Reply") (ECF No. 65), ¶ 2); (2) "Plaintiff was left without ... Naproxen and Claritin until June 20, 2017....", (*id.* ¶ 3); (3) "[t]here have been serious issues in Sing Sing C.F. when officer's [sic] get involved by interfering with prisoner's [sic] medical care and failing to perform specific job duties including coercion and retaliation by medical staff.... [and t]hree inmates have passed away in Sing Sing C.F. in the span of one week" (*id.* ¶ 5). The Court will not consider these assertions to the extent that they attempt to raise claims not asserted in the Complaint and are wholly unrelated to the conduct giving rise to the request for injunctive relief in the opening papers. See *United States v. East River Housing Corp.*, 90 F. Supp. 3d 118, 162 (S.D.N.Y 2015) (collecting cases noting that new arguments raised in reply papers will not be considered).

**\*13** Injunctive relief is "an extraordinary remedy", only appropriate in limited circumstances. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Where, as here, the injunctive relief requested is mandatory, in that it seeks compulsion of positive action, the standard is particularly high. *Almontaser v. New York City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where ... an injunction will alter ... the status quo, ...."). To be entitled to relief, the proponent must show, in addition to irreparable harm in absence of relief, a "clear or substantial showing" of entitlement to the relief requested, or that "extreme or very serious damage will result from a denial of preliminary relief." *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003).

Further, it is well settled in this Circuit that an inmate must exhaust all of his administrative remedies for every claim asserted. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see also Richardson v. Hillman*, 201F. Supp. 2d 222, 228 (S.D.N.Y. 2002) (citing *Porter v. Nussle*, 534 U.S. 516 (2002) for proposition that any and all claims related to prison life must be exhausted). Indeed, exhaustion is required for claims for damages and claims for injunctive relief alike. *Amador v. Andrews*, 655 F.3d 89, 95 (2d Cir. 2011).

## A. Exhaustion [20]

[20] Defendants also argue that Plaintiff's Motion is moot because his previous medical passes were renewed on May 31, 2017. (*See* Defs. Opp., at 3-4.) At the time Defendants opposed Plaintiff's motion, the existence of the issued medical pass did in fact moot the motion. Nevertheless, the new pass would have long expired by now and the larger issue is one of exhaustion, which this Court must address.

Contrary to Plaintiff's unsupported assertion that exhaustion is not necessary for injunctive relief, (*see* Plf. Reply ¶ 6), the motion is ripe for dismissal for lack of exhaustion. It is axiomatic that a prisoner alleging claims pursuant to 42 U.S.C. § 1983 must first exhaust all available administrative remedies before filing a lawsuit. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

Preliminarily, Plaintiff cannot rely on exhaustion of his claims in the Complaint as a means to say he has exhausted the claims in his motion for injunctive relief. While the claims alleged in the Complaint relate to deliberate indifference, the conduct alleged in support of the motion occurred at least a year after the conduct in the Complaint; thus, by definition they are unrelated to one another. If this Court granted this relief, it would in effect be permitting Plaintiff to proceed on a theory not alleged in the Complaint and subvert the exhaustion requirement. *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) (noting that "party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed" in the motion and conduct in the complaint); *Grullon v. Reid*, No. 97-CV-7616(RWS), 2000 WL 648891, at \*1 n.1 (S.D.N.Y. May 19, 2000) (same); *see also Dorsey v. Artus*, No. 9:09-CV-1011(GLS/DEP), 2013 WL 5463720, at \*4 (N.D.N.Y. Sept. 30, 2013) (denying motions for injunction unrelated to the allegations in the complaint). The fact that the conduct was unrelated leads to the conclusion that Plaintiff was required to exhaust his claims for this separate, unrelated conduct before requesting relief in federal court. See *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes ..."). Plaintiff has plainly admitted that he has not done so. His motion must be denied. See *Royster v. Spitzer*, No. 05-CV-6635(JSR)(LMS), 2011 WL 2020442, at \*3 (S.D.N.Y. Mar. 28, 2011) (denying motion for injunction for failure to exhaust administrative remedies). [21]

Arriaga v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 1750320

21     Plaintiff filed subpoenas duces tecum contemporaneously with his Reply. (*See* ECF No. 65.) Read in context with the Reply, Plaintiff appears to be requesting certain documents to rebut the contentions made by Sergeant John Ruane and Sergeant Gina Shibah in opposition to this motion. (*See* Plf. Reply, ¶¶ 12, 18.) Having decided Plaintiff's Motion without reference to the Declarations of either sergeants, this Court hereby declines to issue Plaintiff's subpoenas. To the extent the issuance of such subpoenas will prove fruitful in discovery, Plaintiff is permitted to request issuance of them at such time.

 **\*14** Plaintiff is thus advised to address the issue of the renewal of his medical pass, to the extent it persists as an issue, through the available administrative procedures and then request an opportunity to amend the complaint, or file a separate action where appropriate.

This Court declines to consider the merits of Plaintiff's motion as exhaustion is a necessary prerequisite. The Court nonetheless notes that the motion would also fail on the merits because Plaintiff's medical pass was ultimately renewed on May 31, 2017, precluding his ability to demonstrate imminent, irreparable harm. *Compare Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (noting that, typically, pleading a constitutional violation suffices) *with McKenna v. Wright*, No. 01-CV-6571(WK), 2002 WL 338375, at \*4 (S.D.N.Y. Mar. 4, 2002) (noting that imminent requirement compels courts to look beyond past injury).

### IX. Plaintiff's Motion for Sanctions

While not filed as a motion, Plaintiff seeks sanctions. (*See* Plf. Reply in Further Support of Motion for Injunction (ECF No. 65), at 5; *see also* ECF No. 68.) Plaintiff merely filed a "Notice of Motion" for sanctions which requests relief pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. (*Id.*) The motion fails for multiple reasons.

First, Rule 11(c)(2)'s safe harbor provision requires a twenty-one day window between service of the motion and filing, within which the party against whom sanctions is requested can withdraw or correct "the challenged paper, claim, defense, contention or denial." *See* Fed. R. Civ. P. 11(c)(2). Failure to adhere to the safe harbor provision mandates denial of a motion for sanctions. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995); *Johnson v. Wolan*, No. 10-CV-1622(RJH), 2010 WL 5076821, at \*5 (S.D.N.Y. Dec. 13, 2010). Plaintiff's notice of motion was dated July 6, 2017 and filed on July 10, 2017; Defendants were not provided the twenty-one days required by Rule 11. Plaintiff's July 24, 2017 notice of motion for sanctions, (*see* ECF No. 68), fares no better. It is dated on July 24, 2017 and received by the Court on July 28, 2017. Both must be denied.

Second, a Rule 11 motion "must be made separately from any other motion...." *See* Fed. R. Civ. P. 11(b); *see also Avent v. Solfaro*, 223 F.R.D. 184, 187 (S.D.N.Y. 2004). Plaintiff not only moves contemporaneously under Rule 11 and 28 U.S.C. § 1927, but also incorporates the motion for sanctions into his reply in support of his motion for an injunction; warranting denial. *See Avent*, 223 F.R.D. at 187 (denying motion where plaintiff "filed his Rule 11 motion in conjunction with a motion pursuant to 28 U.S.C. § 1927"); *Johnson*, 2010 WL 5076821, at \*5 (denial where motion for sanctions made along with a motion to dismiss); *see also Eady v. Lappin*, No. 05-CV-0824, 2007 WL 1531879, at \*4 (N.D.N.Y. May 22, 2007).

Any motion pursuant to 28 U.S.C. § 1927 is equally unavailing. The statute permits sanctions against "any attorney" or other admitted individual "who so multiplies the proceedings in any case unreasonably and vexatiously...." *See* 28 U.S.C. § 1927. Plaintiff simply makes no claims that Defense counsel unreasonably or vexatiously multiplied the proceedings. *Compare with Avent*, 223 F.R.D. at 188 (properly asserted under § 1927 where alleged that defendants made "false and groundless motions during discovery" and that such conduct "caus[ed] delay and multipl[ied] the proceedings"). Plaintiff's motion for sanctions is denied.

### CONCLUSION

 **\*15** In light of the foregoing, the Court hereby resolves each of the motions as follows:

The State Defendants' motion to dismiss Plaintiff's Complaint is hereby **GRANTED** in part and **DENIED** in part. The motion is denied as to the claims against Dr. Gage since Plaintiff has alleged claims for deliberate indifference and retaliation for which Dr. Gage is not entitled to qualified immunity. The motion is granted as it relates to Dr. Ferdous and CO Alvarado and the Complaint is hereby dismissed against these Defendants. Plaintiff is granted leave to re-plead his claims against Alvarado. The motion is also granted insofar as it seeks dismissal of claims against the

Case 9:20-cv-00665-MAD-TWD   Document 43   Filed 02/08/23   Page 249 of 273
Arriaga v. Gage, Not Reported in Fed. Supp. (2018)
2018 WL 1750320

State Defendants in their official capacities, by operation of sovereign immunity.

Dr. Vernatter's motion to dismiss is **GRANTED** and Plaintiff's Complaint as against him is dismissed with prejudice.

Plaintiff's Motion for a Preliminary Injunction is **DENIED** for failure to exhaust administrative remedies.

Plaintiff's Motion for Sanctions is **DENIED**.

This Court further notes that Plaintiff's motion for injunctive relief represents the third time Plaintiff has attempted to seek this Court's intervention for alleged constitutional violations unrelated to the conduct asserted in the Complaint. (*See* ECF Nos. 73 and 77.) On each occasion, the Court has had to remind Plaintiff of his obligation to exhaust all administrative remedies before asserting claims in federal court. (*Id.*) Plaintiff is cautioned to refrain from requesting further intervention from the Court that is unrelated to the conduct alleged in the Complaint. Any other alleged constitutional violations Plaintiff suffers must be asserted

through the appropriate administrative channels before he can seek legal redress in a court of law.

Only the Eighth Amendment claim for deliberate indifference and the First Amendment claim for retaliation against Dr. Gage remain; he is thus directed to Answer the Complaint on or before May 4, 2018. Plaintiff may re-plead his claims against Alvarado. If he fails to do so on or before May 7, 2018, the claims against Alvarado will be dismissed with prejudice. The Court will thereafter set a schedule for the completion and submission of a case management plan. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 33, 45, and 56. The Clerk of Court is further respectfully directed to terminate Defendants Joshua Vernatter and Razia K. Ferdous, as all claims against them are dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1750320

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2682307
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Alex VEGA, Plaintiff,

v.

Mr. LAREAU, Corrections Sergeant; G.
Labonte, Corrections Officer; and Mr.
Garbera, Corrections Counselor, Defendants.

No. 9:04–CV–0750 (GTS/ATB).
|
March 16, 2010.

**Attorneys and Law Firms**

Alex Vega, pro se.

Charles J. Quakenbush, AAG, for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Due to Judge Di Bianco's retirement on January 4, 2010, the case was reassigned to me. (Dkt. No. 70).

In his amended civil rights complaint, plaintiff alleges that he was harassed and discriminated against by defendants because of what defendants perceived to be plaintiff's sexual orientation. (Amended Complaint (AC)) (Dkt. No. 30). Plaintiff also alleges that, after he filed grievances regarding the harassment and discrimination, defendants retaliated against him by filing false misbehavior reports, not allowing him to attend his assigned program, and threatening to transfer plaintiff out of protective custody and into general population at another correctional facility. (Id.) Plaintiff seeks substantial monetary relief.

Presently before the court is a motion for summary judgment pursuant to FED. R. CIV. P. 56 submitted by defendants Lareau, LaBonte, and Garbera. [1] (Dkt. No. 66). Defendants assert that plaintiff cannot substantiate his claims of retaliation or equal protection and, even if he could substantiate his claims, that qualified immunity precludes liability for damages. (Id.) Plaintiff has responded in opposition to the motion. (Dkt. No. 68). Defendants have filed a reply. (Dkt. No. 69). For the following reasons, this Court will recommend that defendants' motion for summary judgment be granted.

[1]   The defendants' names are spelled as set forth in defendants' Declarations. (See Dkt. Nos. 66–4, 66–6, and 66–8). The Clerk of the Court has corrected the docket report accordingly. As discussed below, plaintiff has withdrawn his claims against defendants Garbera and Lareau.

**DISCUSSION**

**I.** *Facts*

Plaintiff Alex Vega commenced this action under 42 U.S.C. § 1983, alleging deprivation of his civil rights. The facts and procedural history of this case are set forth more fully in the Decision and Order of United States District Judge Suddaby filed on March 26, 2009, familiarity with which is assumed. (See Dkt. No. 65). In that Decision and Order, all defendants were dismissed except defendants Lareau, LaBonte, and Garbera, and all claims were dismissed except those alleging (1) retaliation by defendants LaBonte, Garbera, and Lareau and (2) violation of plaintiff's right to equal protection by defendant LaBonte. (Id. at 31–32). The facts pertinent to defendants' present motion for summary judgment are related herein in the light most favorable to plaintiff as the non-moving party.

**A. Uncontested Facts** [2]

[2]   These facts were set forth in defendants' Statement of Material Facts provided in accordance with Local Rule 7.1(a)(3) of the Northern District of New York. The facts set forth as uncontested were included in defendants' Rule 7.1 Statement, supported by record citations, and admitted by plaintiff in his response to defendants' Rule 7.1 Statement. (See Dkt. No. 66–3 ("Defendants' Rule

7.1 Statement"); Dkt. No. 68 at 1–2 ("Plaintiff's Response to Defendants' Rule 7.1 Statement")).

During the times relevant to this action, plaintiff was housed in the Assessment and Program Preparation Unit ("APPU") at Clinton Correctional Facility ("Clinton"). (*See generally* AC; Defs.' Rule 7.1 Statement ¶ 2; Dkt. No. 66–4 ("Garbera Declaration") ¶ 10). The Clinton APPU is a transitional unit at which inmates receive counseling and services in order to prepare them for longer-term residence at other prison facilities. [3] (Defs.' Rule 7.1 Statement ¶ 3; Gabrera Decl. ¶ 10). While housed at Clinton APPU, plaintiff was assigned to the church cleaning work detail which was usually supervised by defendant LaBonte. (Defs.' Rule 7.1 Statement ¶¶ 4, 9; Dkt. No. 66–6 ("LaBonte Decl.") ¶¶ 4–6, 21; AC ¶¶ 3(f), 8–9).

[3]     APPU is also "a unit for those inmates who are considered 'victim prone' for various reasons." *Lewis v. Brooks,* 9:00–CV–1433, 2005 WL 928617, at *3 (N.D.N.Y. Mar. 10, 2005).

**\*2** Inmate Brooks was also incarcerated at Clinton during the time period relevant to plaintiff's claims. (Defs.' Rule 7.1 Statement ¶ 6; AC ¶¶ 8, 12, 21–22; LaBonte Decl. ¶¶ 9–11). As discussed below, defendant LaBonte and others suspected that plaintiff and Brooks were homosexual partners, which plaintiff disputes. Under Department of Correctional Services ("DOCS") Standards of Inmate Behavior, inmates are forbidden to engage in, encourage, solicit or attempt to force others to engage in sexual acts. (Defs.' Rule 7.1 Statement ¶ 7; 7 N.Y.C.R.R. § 270.2 (Disciplinary Rule 101.10)).

In January 2004, plaintiff was a low-ranking inmate on the Clinton church cleaning crew, in terms of seniority. (Defs.' Rule 7.1 Statement ¶ 10; LaBonte Decl. ¶¶ 6, 16). On January 28, 2004, plaintiff appeared before the APPU program committee and was advised that he and inmate Brooks would not be allowed to work together in a work assignment. (AC ¶¶ 14–25). On January 29, 2004, [4] plaintiff filed a grievance describing a conversation that he had with defendant LaBonte on or about January 15, 2004 and complaining of statements made by members of the APPU committee members during the January 28, 2004 meeting. (Defs.' Rule 7.1 Statement ¶ 15; AC ¶¶ 20–23). The January 29, 2004 grievance did not mention defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 17; Dkt. No. 66–9 ("Quakenbush Decl."), Ex. A).

[4]     While it appears that the grievance dated January 29, 2004 was not actually "filed" until February 2,

2004, in keeping with plaintiff's allegations as set forth in his amended complaint, the Court will refer to this grievance as the January 29, 2004 grievance. (*See, e.g.,* AC ¶¶ 23, 53).

During the winter and spring of 2004, there were occasions when plaintiff was not brought to his job with the Clinton church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 19; AC ¶ 85; LaBonte Decl. ¶¶ 14, 16–22). Even on the days when he was not allowed to attend his church work program, plaintiff received full pay for those days. (Defs.' Rule 7.1 Statement ¶ 22; LaBonte Decl. ¶ 23). On April 16, 2004, defendant Lareau issued a misbehavior report, charging plaintiff with giving items of personal property to inmate Brooks without first obtaining the required authorization. (Defs.' Rule 7.1 Statement ¶ 26; Dkt. No. 66–8 ("Lareau Decl.") ¶ 6; Quakenbush Decl., Ex. B).

On April 16, 2004, correctional officer Charland searched plaintiff's cell and found a pair of scissors, which Charland believed to be contraband, and therefore he issued plaintiff a misbehavior report. (Defs.' Rule 7.1 Statement ¶ 27; Quakenbush Decl., Ex. B). On April 22, 2004, at a Tier II hearing conducted by Lt. Lacy, the charges against plaintiff regarding the scissors were dismissed, and plaintiff entered a plea of guilty to the unauthorized exchange of property charge filed by defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 28; Quakenbush Decl., Ex. B). Plaintiff was sentenced to 15 days keeplock and 15 days loss of privileges. (*Id.*)

In the spring of 2005, plaintiff was transferred from Clinton to the Upstate Correctional Facility CADRE program. (Defs.' Rule 7.1 Statement ¶ 23; Garbera Decl. ¶¶ 10–14). The transfer came about via DOCS administrative processes over which none of three remaining defendants had any control. (Defs.' Rule 7.1 Statement ¶ 24; Garbera Decl. ¶¶ 13–16). At Upstate, plaintiff was placed in a selective and advantageous work program, for which plaintiff had to voluntarily sign a participation agreement. (Defs.' Rule 7.1 Statement ¶ 25*I* Garbera Decl. ¶¶ 14–15). [5]

[5]     In addition to the facts outlined herein, Defs.' Rule 7.1 Statement includes the following recitation: "There is no competent, relevant, admissible evidence in the record that C.O. LaBonte, Counselor Garbera, or Lt. Lareau were motivated by a grievance to inflict any adverse retaliatory action against the plaintiff." Rule 7.1 Statement ¶ 18. While plaintiff admits the information set forth,

(*see* Dkt. No. 68, ¶ 3), the Court will not consider this statement to be an uncontested fact, especially since retaliation is at the center of plaintiff's claims.

### B. Plaintiff's Additional Facts [6]

[6] This version does not include the uncontested facts set forth above.

**\*3** On January 15, 2004, defendant LaBonte told inmate Peter Grieco, plaintiff's co-worker, that (1) LaBonte believed plaintiff was a homosexual because plaintiff associated with inmate Mark Brooks, and (2) plaintiff and Brooks would not be allowed to work in the same program at the same time. (AC ¶ 8). After inmate Grieco told plaintiff about Grieco's conversation with defendant LaBonte, plaintiff confronted LaBonte about the conversation, whereupon LaBonte repeated the statements to plaintiff, adding that "as long as plaintiff is assigned at the Church, inmate Brooks will 'NEVER' be assigned, for fear of 'homosexual acts' being committed between plaintiff and inmate Brooks." (*Id.* ¶¶ 9–11). In response, plaintiff told LaBonte that he was not homosexual; he had no record of homosexual acts in his file; and was only friends with Brooks. (*Id.* ¶ 12).

When plaintiff appeared before the APPU program committee on January 28, 2004, defendant Garbera told plaintiff that they all knew about plaintiff and inmate Brooks "being an[ ] item," and that plaintiff could not change his work program to be closer to Brooks. (AC ¶¶ 15, 16). Plaintiff told the committee that inmate Brooks was on the waiting list for the church and plaintiff was trying to leave his church job. (*Id.* ¶ 18). Moreover, while plaintiff made it clear to the committee members that he was not and never had been a homosexual, defendants Facteau, Ward and Garbera told plaintiff that he was *"guilty by association"* of being a homosexual, because plaintiff associates and is friends with a 'known' homosexual (inmate Brooks), so get use[d] to being treated like a homosexual is treated in prison." (*Id.* ¶¶ 21, 22). On January 29, 2004, plaintiff filed a grievance against defendants LaBonte, Facteau, Ward, and Garbera concerning LaBonte's statements of January 15, 2004 and the statements and actions of Facteau, Ward, and Garbera on January 28, 2004. (*Id.* ¶ 23). Plaintiff alleges that after these incidents and the filing of the January 29, 2004 grievance, he was subjected to several retaliatory acts, including the loss of his work assignment and four false misbehavior reports, before he was transferred to Upstate in March 2005.

On February 9, 2004, plaintiff wrote to Berg, Assistant Superintendent of Clinton, complaining that plaintiff was not being taken to his church job as a form of retaliation by defendant LaBonte. (AC ¶ 36). On the morning of February 18, 2004, plaintiff was not taken to his job at the church because he "was on call out, as an 'ADD ON' for the A.P.P.U. Law Library." (*Id.* ¶ 38). While at the library, plaintiff and inmate Brooks submitted a request for Brooks to assist plaintiff with his legal work. (*Id.* ¶ 38). While they were still in the library, they were informed by law library officer McLain that their request was denied pursuant to instructions from defendant Garbera that plaintiff and Brooks could not be on library call-out at the same time. (*Id.* ¶ 39). After the conversation between McLain, plaintiff, and Brooks was complete, Garbera stood at the law library window taunting plaintiff and Brooks. (*Id.*) Later that morning, while plaintiff was in line leaving the law library, defendant Garbera approached him and said "GOT YA." (*Id.* ¶ 42).

**\*4** On the afternoon of February 18, 2004, defendant LaBonte did not take plaintiff to his assigned church job. (*Id.* ¶ 43). Plaintiff found out later that day that he had been placed on keeplock as a result of his being "out of place" in the law library. (*Id.* ¶¶ 44–45). Plaintiff claims that proper procedures for placing him in keeplock were not followed. (*Id.* ¶ 45). On February 18, 2004, plaintiff wrote a letter of complaint to Artus, the Superintendent of Clinton, and Berg outlining "the facts of incidents that occurred earlier in the day," claiming that the actions taken were harassment and retaliation for his January 29, 2004 grievance. (*Id.* ¶ 46). In response to that letter, Berg told plaintiff, among other things, that Berg could not control defendant Garbera's actions, and that law library officer McLain had given plaintiff false information about what Garbera had said about plaintiff and inmate Brooks. (*Id.* ¶ 49).

On February 19, 2004, plaintiff was served with a misbehavior report written by correctional officer Mayo charging plaintiff with, among other things, being out of place and violating rules related to inmate movement. (AC ¶ 47). At the subsequent Tier II hearing, defendant LaBonte testified that he did not take plaintiff to his assigned program that day because plaintiff was listed as an "ADD ON" for the law library for the day in question and was called out of the law library for a meeting with his counselor. (*Id.* ¶ 51). As a result of LaBonte's testimony, plaintiff was found not guilty of the charges contained in the misbehavior report. (*Id.*) Plaintiff wrote to Berg on March 1, 2004 requesting the status of his January 29, 2004 unlawful discrimination grievance

Vega v. Lareau; Not Reported in F.Supp.2d (2010)

2010 WL 2682307

against LaBonte, Facteau, Ward, and Garbera which had been pending for 31 days. (*Id.* ¶ 53).

On March 27, 2004, plaintiff was not taken to his church job, although three other members of the church crew were. (AC ¶ 63). On March 29, 2007, when plaintiff asked defendant LaBonte why plaintiff was sometimes not taken to his church job, LaBonte said "because you are not allowed to work inside the Church and will only be used for outdoor work. Faggots, Queers, Homosexuals and Transsexuals are not allowed inside a house of God, and you surly [*sic* ] are one of those, since you are a friend with inmate Brooks." (*Id.* ¶ 64). On April 7, 2004, while plaintiff was working at the church, defendant LaBonte told plaintiff that he didn't want plaintiff working at the church and stated " 'I won't fire you, I won't refer you to the program Committee. You will resign before I do any of that.' " (*Id.* ¶ 68).

On April 16, 2004, plaintiff was placed on keeplock status for two misbehavior reports. (AC ¶ 71). Plaintiff was then called to defendant Lareau's office, and accused of purchasing items for inmate Brooks. (*Id.* ¶¶ 72, 73). Plaintiff claims that defendant Lareau intimidated plaintiff into admitting that he made purchases for inmate Brooks. (*Id.* ¶ 74). When plaintiff returned to his cell, it was being searched. (*Id.* ¶ 75). Defendant Lareau informed plaintiff that inmate Brooks was told that plaintiff "snitched" on him, and Lareau threatened plaintiff with a transfer to Southport Correctional Facility Special Housing Unit. (*Id.* ¶ 76). Both plaintiff and inmate Brooks were keeplocked pending an investigation of the matter. (*Id.* ¶ 77). On April 17, 2004, plaintiff received two misbehavior reports. (*Id.* ¶ 78). On April 22, 2004, plaintiff was found guilty of purchasing items for inmate Brooks. (*Id.* ¶ 79). The hearing officer told plaintiff that he would not lose his church job as a result of the disciplinary hearing. (*Id.*)

**\*5** On April 23, 2004, defendant LaBonte came to plaintiff's cell to retrieve the inclement weather clothing that plaintiff was issued for his church job; LaBonte demanded that plaintiff give him the winter gloves; plaintiff told defendant LaBonte that the gloves were at the church. (AC ¶ 81). LaBonte told plaintiff that he would have to pay for the gloves. (*Id.* ¶ 82). When plaintiff asked LaBonte if he was fired from his church job, LaBonte said "yes." (*Id.* ¶ 83). Plaintiff asked LaBonte if he was being terminated from his job because of his recent disciplinary proceeding or because LaBonte didn't want him working there. (*Id.*) LaBonte replied "I don't want you there, no faggots, queers or transsexuals work at [his] church area or in a house of God, and the ticket

just gives me a reason to get rid of you." (*Id.*) LaBonte also threatened that he could have plaintiff transferred at any time. (*Id.* ¶ 84).

Beginning on January 29, 2004, defendant LaBonte did not allow plaintiff to attend his church job for 23 out of 36 working days. (AC ¶ 85). On May 4, 2004, plaintiff appeared before the APPU program committee and was told that he would not be assigned to any program except tailor shop, and therefore he should not ask to be re-assigned to the church. (*Id.* ¶ 89). Plaintiff claims that the church was understaffed, but there was a waiting list of six months to a year for the tailor shop. (*Id.* ¶¶ 90–91).

On October 28, 2004, plaintiff again appeared before the APPU program committee and was told that he would begin a new work program in the tailor shop on November 1, 2004. (AC ¶ 125). Plaintiff was warned that they would not tolerate any trouble from him at the tailor shop "like Plaintiff caused trouble at the Church Job," and plaintiff would be removed from the tailor shop if he caused trouble "and [would be] sent to SHU/Box for longer than he thought possible." (*Id.*) Prior to being assigned to work in the tailor shop, plaintiff was without programming for eight months. (*Id.* ¶ 126). On January 5, 2005, plaintiff appeared before the Clinton APPU Assessment Committee and was asked if he wished to be transferred out of Clinton APPU. (*Id.* ¶ 128). Because he had a list of more than twenty enemies, plaintiff stated that he did not want to be transferred out of APPU. (*Id.*) On January 5, 2005, defendant Garbera told plaintiff " 'You don't file law suits in my jail and expect not to have your ass thrown out of here by us Counselors.' " (*Id.* ¶ 133). On January 12, 2005,[7] Garbera told plaintiff " '[y]ou can't stop my method of getting you out of here, I Win.' " (*Id.* ¶ 135). Plaintiff was transferred to Upstate on March 16, 2005. (*See* Dkt. No. 37).

[7]    While plaintiff's amended complaint states that Garbera's statement was made on January 12, 200**4,** given the sequence of events set forth in plaintiff's amended complaint, it appears that this statement was made on January 12, 200**5.**

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary

2010 WL 2682307

judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

**\*6** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

### III. *Retaliation*

Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in and of itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988). In order for plaintiff's retaliation claim to survive summary judgment, plaintiff must establish that

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

**\*7** The court must keep in mind, however, that claims of retaliation are " 'easily fabricated' " and " 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration' " and thus, plaintiff must set forth non-conclusory allegations. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (quoting *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

### A. Defendants Lareau and Garbera

In his opposition to Defendants' motion for summary judgment, plaintiff states that he is withdrawing all claims against Lareau and Garbera. (Dkt. No. 68 ¶ 2). Therefore, with respect to all of the claims against Garbera and Lareau, defendants' motion for summary judgment should be granted. *See e.g. Rosen v. City of New York,* No. 07 Civ. 6018, 2009 WL 3489986, at \*2 (S.D.N.Y. Oct. 28, 2009) (granting summary judgment with respect to claims withdrawn by plaintiff).

### B. Defendant LaBonte

Plaintiff states that he filed a grievance on January 29, 2004 against defendant LaBonte complaining of comments made by defendant LaBonte on January 15, 2004 regarding plaintiff's sexual orientation, comments which plaintiff believed to be discriminatory. (AC ¶¶ 8–12, 22; *see also* Dkt. No. 66–10 at 12–14) ("January 29, 2004 grievance")). [8] Defendants have submitted a copy of the January 29, 2004 grievance. (Dkt. No. 66–10 at 12–14). Plaintiff captioned the grievance *"UNLAWFUL DISCRIMINATION GRIEVANCE AGAINST: SGT. FACTO, COUNSELOR GARBERRA & MR. WARD."* (*Id.* at 12). At first glance, the grievance does not appear to be filed against defendant LaBonte. (*Id.*) However, the body of the grievance does recount statements by defendant LaBonte as well as a conversation that plaintiff had with defendant LaBonte, clearly suggesting that plaintiff believed that defendant LaBonte was discriminating against plaintiff on the basis of what LaBonte perceived to be plaintiff's sexual orientation. (*Id.*) Moreover, Defendants' Rule 7.1 Statement concedes that plaintiff filed the January 29, 2004 grievance against LaBonte. (*See* Defs .' Rule 7.1 Statement ¶ 15). Therefore, despite its caption, the Court will consider the January 29, 2004 grievance to have been filed against defendant LaBonte. On February 9, 2004, plaintiff also submitted a letter to Berg complaining that defendant LaBonte was not taking plaintiff to his church job in "retaliation." (AC ¶ 36).

[8] The grievance is actually dated January 28, 2004, however, for sake of consistency the Court will still refer to it as the January 29, 2004 grievance. (*See* Dkt. No. 66–10 at 12).

There is no dispute that plaintiff's complaint and grievance constitute protected activity. *See Davis,* 320 F.3d at 352–53 (filing a prison grievance is a constitutionally protected activity). *See also Chavis v. Struebel,* 317 F.Supp.2d 232, 237–38 (N.D.N.Y.2004) (finding that letter of complaint could be basis for retaliatory conduct). Therefore, plaintiff meets the first prong of the test for retaliation. Plaintiff must further show that he suffered adverse action, and that there was a causal connection between that adverse action and the protected activity. If plaintiff can make these two showings, the court must determine whether defendants have established that they would have taken the same action even in the absence of the protected conduct.

**\*8** Plaintiff claims that, in retaliation for plaintiff's grievance and complaint against defendant LaBonte, LaBonte reduced the number of hours plaintiff was allowed to work at his

church job. [9] (AC ¶ 85). Construing plaintiff's amended complaint with great liberality, plaintiff may also allege that defendant LaBonte had plaintiff terminated from his church job in retaliation for plaintiff's grievance against LaBonte. (AC ¶ 83). Neither party has addressed this claim in their papers in support of or in opposition to the present motion. Plaintiff has, however, provided the Court with a copy of DOCS Directive # 4803, Inmate Program Placement. (Dkt. No. 68 at 11–13). That directive provides that the Program Chairperson of the Inmate Program Assignment Committee "shall be responsible for all program assignments and removals." (*Id.* at 12). Since defendant LaBonte is not alleged to be the Program Chairperson of the Inmate Program Assignment Committee, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job.

[9] In his amended complaint, plaintiff also alleged that defendant LaBonte retaliated against plaintiff by issuing plaintiff a false misbehavior report on April 24, 2004. (AC ¶ 86). LaBonte's misbehavior report claimed that plaintiff lost state issued gloves. (*Id.*) Plaintiff admitted that he lost the gloves and entered a plea of guilty to the charge. (*Id.* ¶ 95). In his March 26, 2009 Decision and Order, District Judge Suddaby noted that "[w]hen it is undisputed that an inmate has in fact committed prohibited conduct, no retaliatory discipline claim can be sustained." (Dkt. No. 65 at 25) (citing *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Since Plaintiff admitted that he lost the state issued gloves, Defendant LaBonte would have taken the adverse action even in the absence of the protected conduct, and that portion of plaintiff's retaliation claim against LaBonte was dismissed by Judge Suddaby. (Dkt. No. 65 at 25).

Plaintiff alleges that, beginning on January 29, 2004, defendant LaBonte refused to let plaintiff attend his church job for a total of 23 out of 36 working days. (AC ¶ 85). As discussed below, on some of those occasions, plaintiff did not attend due to reasons beyond defendant LaBonte's control. Further, defendant LaBonte points out that plaintiff received full pay even on the days that he was held back from his job. (LaBonte Decl. ¶ 22).

A job reassignment or termination can under certain circumstances constitute adverse action necessary to support a claim of retaliation. *Gill v. Mooney,* 824 F.2d 192, 194

(2d Cir.1987) ("[A] claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights."); *Baker v.. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his [or her] legal rights ..."); *Gill v. Calescibetta,* No. 9:00–CV–1553, Report and Recommendation, 2009 WL 890661, at *11–12 (N.D.N.Y. Mar. 11, 2009) (Peebles, M.J.), *adopted* 2009 WL 890661, at *1–4 (N.D.N.Y. Mar. 31, 2009) (Suddaby, J.) (the termination of a job assignment can constitute adverse action for purposes of a retaliation analysis). As noted, defendant LaBonte was not in a position to terminate or change plaintiff's job assignment. This court doubts that plaintiff could establish that periodically keeping him from attending a job, with no monetary or other apparent penalty, constitutes the type of "adverse action" that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. We need not resolve whether plaintiff has demonstrated the existence of a genuine issue of material fact as to whether defendant LaBonte took adverse action against plaintiff because, as discussed below, summary judgment can be predicated more securely on other grounds.

**\*9** To show retaliation in violation of the First Amendment, a plaintiff must demonstrate that constitutionally protected conduct was a substantial or motivating factor for a prison official's adverse action. *Bennett,* 343 F.3d at 137. Plaintiff claims that because LaBonte's adverse actions began *after* plaintiff filed a grievance against him, the actions were in retaliation for the grievance.

However, more than conclusory allegations [of a causal connection] are required to survive a summary judgment motion. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Bartley v.. Collins,* No. 95 Civ. 10161, 2006 WL 1289256 (S.D.N.Y. May 10, 2006). Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives. *Colon,*

58 F.3d at 872–73;*Bartley,* 2006 WL 1289256, at *8.

*Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007) (Hurd, J.). Plaintiff asserts that because defendant LaBonte began excluding him from his assigned church job *immediately* after plaintiff filed a grievance against him, "it is clear that the only reason why plaintiff was excluded from the work crew was because of the grievance that he filed against Officer LaBonte." (Dkt. No. 68 at 7).

In this case, plaintiff filed a grievance against defendant LaBonte on January 29, 2004. (AC ¶ 23). Beginning on that date, plaintiff claims that defendant LaBonte did not take plaintiff to his church job for 23 out of the next 36 working days. (*Id.* ¶ 85). The close proximity in time between the filing of grievance and LaBonte's action in not taking plaintiff to his assigned job is evidence which could lead a reasonable factfinder to conclude that LaBonte's actions were causally related to plaintiff's grievance against him. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). *See also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation).

Plaintiff argues further that defendant LaBonte's conduct was retaliatory because "just prior to the grievance being filed" plaintiff had received "positive evaluations" from defendant LaBonte with respect to plaintiff's work at the church. (Dkt. No. 68 at 7). While evidence of plaintiff's *"prior* good discipline" might suggest that LaBonte's actions subsequent to the grievance were be retaliatory, in this case, one of the evaluations submitted by plaintiff was actually dated February 12, 2004—after plaintiff filed a grievance against LaBonte. (*Id.* at 9). Defendant LaBonte's February 12, 2004 evaluation actually praises plaintiff's work performance and in fact recommends that plaintiff receive a pay increase. (*Id.*) This evidence suggests that defendant LaBonte was *not* taking retaliatory action against plaintiff. If defendant LaBonte was truly intent on retaliating against plaintiff and keeping him from his church job for improper motives, LaBonte could have issued plaintiff an unsatisfactory evaluation and would not have recommended a pay increase.

2010 WL 2682307

**\*10** Plaintiff's own statements provide further evidence to undercut his argument that LaBonte was retaliating against plaintiff on account of his January 29, 2004 grievance. When appealing another grievance, plaintiff stated that his misbehavior report for being "out of place" in the law library "was dismissed ONLY after Corrections Officer G. LaBonte, appeared at [plaintiff's] hearing and stated that [plaintiff] DID IN FACT" have library call out on the day in question. (Dkt. No. 66–10 at 10). LaBonte's conduct in this instance-in February 2004–is totally opposite to an act of retaliation.

This court doubts that, despite the evidence of temporal proximity, plaintiff could persuade a reasonable factfinder that his grievance against LaBonte was a substantial or motivating factor in LaBonte's decision to exclude plaintiff from the church work program. Again, however, we need not resolve this issue and will recommend summary judgment on other grounds.

Even though plaintiff has arguably presented some evidence to establish a link between the protected activity and the alleged retaliation,

> [a] defendant is entitled to summary judgment on a retaliation claim "if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," for two reasons. *Graham [v. Henderson],* 89 F.3d [75,] 79 [2d Cir.1996]. First, "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* Second, "we have been cautioned to recognize that prison officials have broad administrative authority." *Id.*

*Miller v. Loughren,* 258 F.Supp.2d 61, 62 (N.D.N.Y.2003) (Munson, S.J.). *See also Bennett,* 343 F.3d at 139 (Once plaintiff produces evidence sufficient to raise a material question of fact as to retaliation, the burden shifts to the defendant to demonstrate through admissible evidence that the challenged actions would have occurred in any event.).

The record contains the affidavit of defendant LaBonte wherein he asserts that plaintiff was not taken to his assigned job on numerous occasions for legitimate administrative reasons. *See generally* LaBonte Decl. Defendant LaBonte was the officer primarily charged with supervising the church work crew. (LaBonte Decl. ¶ 4; Defs.' Rule 7.1 Statement

¶ 4). Defendant LaBonte states, and plaintiff concedes, that plaintiff was a low-ranking inmate on the church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 10; Pl.'s Response to Defs.' Rule 7.1 Statement ¶ 3). In fact, LaBonte states that plaintiff was "one of the least senior members of the church crew, if not the lowest ranking." (LaBonte Decl. ¶ 6). As the supervising officer for the church work crew, it was LaBonte's responsibility to determine on a day to day basis how many inmates were needed to complete jobs at the church on any given day. (LaBonte Decl. ¶ 17). This determination was made based upon the amount of work to be done on a particular day. (*Id.*) If there were insufficient jobs to be completed on any given day, plaintiff, "[a]s the junior member of the church detail ... would be the first to be cut." (*Id.*)

**\*11** Defendant LaBonte further states that during the period in question, plaintiff did not attend his work program at the church for various reasons beyond LaBonte's control. (LaBonte Decl. ¶¶ 21–22). For example, plaintiff missed some days because he had signed up to attend library call out. (*Id.* ¶ 21). In February 2004, plaintiff was keeplocked as a result of a disciplinary report issued by correctional officer Mayo. (*Id.*) On April 2, 2004, plaintiff had a medical call out; on April 8–9, 2004, the church crew did not work because the church was used for religious observances; and on April 16, 2004 plaintiff was keeplocked. (*Id.*) On other days, when defendant LaBonte was not scheduled to work, LaBonte's relief officer decided whether or not plaintiff attended his church job. (*Id.* ¶ 22). Defendant LaBonte points out that plaintiff received full pay for the days he was not included in the church work crew. (*Id.* ¶ 23).

LaBonte further states that "[t]ensions had developed between [plaintiff] and other church crew inmates because of the situation with inmate Brooks." (LaBonte Decl. ¶ 18; *see also* Dkt. No. 68 at 9 (Inmate Progress Report dated February 12, 2004 wherein LaBonte noted that "Inmate Vega has had minor disagreements with coworkers, but has been able to work through them.")). LaBonte states that members of the church crew reside in the same cell block, and other members of the crew were aware of Brooks' attempt to join the crew, and "resented that an inmate 'couple' might become part of their work crew." (LaBonte Decl. ¶ 12). Because plaintiff was attempting to get his friend Brooks assigned to the church crew, LaBonte believed that the other members of the church work crew felt that plaintiff "was pushing to get a benefit which other prisoners knew better than to seek." (*Id.* ¶ 13). Tensions among inmates present security concerns because they can give "rise to an increased potential for violence

during work at the church" and present "a danger to inmates as well as to the single security officer attending the work detail." (*Id.* ¶ 18). Because of this tension, LaBonte states that "if the church job could be done with one less inmate [he] would choose to leave [plaintiff] behind." (*Id.*)

LaBonte states that, based upon his observations of the behavior of plaintiff and Brooks, as well as upon reports from security staff and other inmates, he believed that plaintiff and Brooks might be involved in a homosexual relationship. [10] (LaBonte Decl. ¶ 7). The existence of such a relationship is not relevant; rather, LaBonte's and Garbera's statements are evidence of LaBonte's state of mind or perception. The fact that LaBonte ***perceived*** that such a relationship may have existed between plaintiff and Brooks demonstrates only the ***reasonableness*** of LaBonte's actions and his concern that the security of the facility could be implicated by such a perceived relationship. [11]

[10]   Defendant Garbera, a Corrections Counselor at Clinton, has stated that during the time relevant to plaintiff's allegations, he "recall [ed] noting that [plaintiff's] attentive behavior toward inmate Brooks—who was making overt efforts to present himself as female—suggested [plaintiff's] interest in a homosexual relationship. Not only would this violate DOCS regulations, it carried a potential for physical danger. We were aware of the facts of the plaintiff's Broome County conviction, an extremely violent rape and homicide. We had to be concerned about the possibility of similar behavior." (Garbera Decl. ¶ 19).

[11]   A fact is "material" only if it has some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.*See also Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248

**\*12** Defendant LaBonte has thus provided permissible reasons for keeping plaintiff from his job assignment-namely staffing and security concerns. [12] *See, e.g., Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." (internal

quotation marks and citation omitted). Plaintiff has not submitted sufficient evidence to raise a question of fact as to the reasonableness of defendant LaBonte's actions, but relies only upon his own conclusory statement that "[b]ecause of the positive Work Performance Evaluations that plaintiff received during his period assigned to the Cleaning Crew, there is no other plausible excuse for LaBonte to hold back" plaintiff from the church cleaning crew except in retaliation for plaintiff's grievance against LaBonte. (Dkt. No. 68 at 5). Plaintiff's statement that there is no "other plausible excuse" for defendant LaBonte's actions is contradicted by the actual facts in this case, and plaintiff's retaliation claim fails because LaBonte has produced sufficient evidence that he would have taken the same action for valid reasons. *See Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996) (finding that even assuming that a retaliatory motive existed, defendant would still be entitled to summary judgment because there are "proper, non-retaliatory reasons" for the actions taken). *See also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (A finding of sufficient permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.") (quotation marks omitted).

[12]   Defendant LaBonte's decision to have only enough inmates present at the church on a given day to complete the required jobs is reasonable. It is also reasonable to assume that idle inmates would present more of a security concern than inmates who are kept busy performing required tasks.

Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the retaliation claim against defendant LaBonte. Thus, plaintiff's claim that defendant LaBonte retaliated against plaintiff for filing a grievance or complaint should be dismissed.

## IV. *Equal Protection*

Plaintiff claims that defendant LaBonte denied him equal protection by not allowing plaintiff to attend his prison job because the defendant LaBonte believed plaintiff to be a homosexual.

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.* 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with

other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.' " Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (emphasis in original) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)).

**\*13** "Sexual orientation has been held to be a basis for an equal protection claim under Section 1983." *Emblen v. Port Authority of New York/New Jersey,* No. 00 Civ. 8877, 2002 WL 498634, at \*7 (S .D.N.Y. Mar. 29, 2002) (citing *Quinn v. Nassau County Police Dep't,* 53 F.Supp.2d 347, 356–57 (E.D.N.Y.1999) (noting that the Supreme Court has found that government discrimination against homosexuals, in and of itself, violates the Equal Protection Clause) (citing *Romer v. Evans,* 517 U.S. 620 (1996)). *See also Holmes v. Artuz,* 95 CIV. 2309, 1995 WL 634995, at \*1 (S.D.N.Y. Oct. 27, 1995) (removal from a prison job because of declared sexual orientation may state a claim under Section 1983) (citing *Kelley v. Vaughn,* 760 F.Supp. 161, 163 (W.D.Mo.1991) (denying motion to dismiss on ground that inmate who claims his bakery prison job was terminated solely because of sexual orientation may have a valid equal protection claim)); *Howard v. Cherish,* 575 F.Supp. 34, 36 (S.D.N.Y.1983) (recognizing in dicta that complaint might state claim under § 1983 if it alleged that individual was discriminated against solely because of sexual orientation).

Defendant LaBonte correctly contends that plaintiff has no right to his prison job. *See Gill v. Mooney,* 824 F.2d at 194. However, that is not the question presented on this equal protection claim. Instead, the question is whether plaintiff was protected from discrimination based upon his perceived sexual orientation. In this respect, District Judge Suddaby has already concluded that plaintiff stated an equal protection claim sufficient to survive a motion to dismiss or for judgment on the pleadings. [13] (Dkt. No. 65 at 24–25). *See also Bussey v. Phillips,* 419 F.Supp.2d 569, 588 (S.D.N.Y.2006) ("A '[p]laintiff has no right to any particular prison job, but prison officials cannot discriminate against him on the basis of [an impermissible consideration] in work assignments.' ") [14] (quoting *LaBounty v. Adler,* No. 89 Civ. 4242, 1999 WL 961776, at \*2 (S.D.N.Y. Oct. 21, 1999) (other citation omitted).

[13]    Despite the fact that plaintiff's equal protection allegations survived the pleading stage, the standard of proof at summary judgment is more demanding; plaintiff's allegations "must be supported by specific facts raising a genuine issue for trial." *Bussey,* 419 F.Supp.2d at 582.

[14]    In *Bussey,* the impermissible consideration was race. *Id* .

Plaintiff has alleged that defendant LaBonte did not allow plaintiff to attend his church job on multiple occasions, even though other inmates were taken to their church job on those days, because LaBonte perceived plaintiff to be homosexual. (AC ¶¶ 36, 52, 53, 63, 64, 83, 85). The fact that plaintiff asserts that he is not homosexual is irrelevant to his equal protection claim. *See Emblem,* 2002 WL 498634 at \*7 (when plaintiff alleges denial of equal protection on the basis of homosexuality, the fact that plaintiff is not a homosexual is "irrelevant").

In *Romer v. Evans,* the Supreme Court, without specifically examining whether homosexuals are a suspect class, used the rational basis test to invalidate an amendment to the Colorado constitution prohibiting all governmental action designed to protect homosexuals from discrimination. *Romer,* 517 U.S. at 631–35.*See also Anderson v. Branen,* 799 F.Supp. 1490, 1492 (S.D.N.Y.1992) ("An equal protection analysis of discriminatory acts against homosexuals must be conducted pursuant to a rational basis test."). Thus, in order to establish an equal protection violation, plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation and internal quotations omitted)

**\*14** As stated above, defendant LaBonte has set forth numerous legitimate penological reasons supporting his decision to exclude plaintiff from the church work crew on multiple occasions, the most important being the need to maintain prison security and order. *See Hudson,* 503 U.S. at 6 (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)).

[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require

limitation or retraction of the retained constitutional rights of ... convicted prisoners .... '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'

...

Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel .... Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

*Bell v. Wolfish,* 441 U.S. 520, 546–47 (1979) (internal citations and footnote omitted). *See also Griffin v. Donelli,* No. 05–CV–1072, Report–Recommendation and Order, 2010 WL 681394, at *11 (N.D.N.Y. November 24, 2009) (Homer, M.J.), *adopted* on *de novo* review, 2010 WL 681394, at *1 (N.D.N.Y. Feb. 24, 2010) (McAvoy, S.J.) (finding that "[o]rder [and] security ... are valid and substantial penological interests that staff in a prison environment are entitled to, and are in fact required to act upon.").

Based upon his observations of interactions between plaintiff and inmate Brooks as well as reports from security staff and other inmates, defendant LaBonte was concerned that conflicts might arise between plaintiff and other members of the church crew. (LaBonte Decl. ¶ 12–13). Defendant LaBonte's concerns were validated by LaBonte's receipt of a letter from inmate Brooks indicating that a member of the church work crew (not plaintiff) had made sexual advances to Brooks which were refused. (*Id.* Ex. A). A reasonable factfinder could conclude that this letter, coupled with LaBonte's suspicion that plaintiff and inmate Brooks might be involved in a relationship, provided a reasonable basis for LaBonte to believe that plaintiff's presence in the church work crew could present safety concerns.

Apart from defendant LaBonte's reasons for excluding plaintiff from his assigned job, plaintiff's own statements are fatal to his claim that defendant LaBonte discriminated against him on the basis of plaintiff's perceived sexual preference. In his January 29, 2004 grievance, plaintiff stated that "I was soon to learn that it *WAS NOT* Officer LaBonte who was DISCRIMINATING against me and Inmate Brooks, but a Superior Officer, who gives the orders. (Dkt. No. 66–10 at 13) (emphasis in original).

*15 Based upon the evidence, a reasonable factfinder could conclude that defendant LaBonte's concern for institutional safety, his attempt to maintain staffing on the church work crew at reasonable levels, and his policy of cutting the hours of more junior members of the work crew first, all suffice to satisfy the rational basis test and constitute legitimate reasons to exclude plaintiff from the church work crew on various days. Moreover, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job. Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the equal protection claim against LaBonte. Thus, plaintiff's claim that defendant LaBonte violated plaintiff's right to equal protection should be dismissed.

## V. *Qualified Immunity*
In the alternative, defendants argue that they are entitled to qualified immunity with respect to plaintiff's claims that he was retaliated against for engaging in a protected activity in violation of the First Amendment and denied equal protection in violation of the Fourteenth Amendment. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), *modified by Pearson v. Callahan,* ––– U.S. ––––, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). The Court may also examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. Since the Court has concluded in this case that no First or Fourteenth Amendment violations occurred, the Court need not address qualified immunity.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the motion for summary judgment filed on behalf of defendants Lareau, LaBonte, and Garbera (Dkt. No. 66) be **GRANTED** and the amended complaint be **DISMISSED WITH PREJUDICE AS TO ALL REMAINING DEFENDANTS AND CLAIMS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written

2010 WL 2682307

objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of*

*Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2682307

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2645124
Only the Westlaw citation
is currently available.
United States District Court,
N.D. New York.

Harold MOODY, Plaintiff,
v.
Dr. Robert F. PICKLES, et al., Defendants.

Civ. Action No. 9:03-CV-850 (DEP).
|
Sept. 13, 2006.

**Attorneys and Law Firms**

Menter, Rudin Law Firm[1], Steven B. Alderman, Esq., Roger Bennett, Esq., Syracuse, NY, for Plaintiff.

Eliot Spitzer, Attorney General, Ed J. Thompson, Esq., Albany, NY, for Defendants.

*DECISION AND ORDER*

DAVID E. PEEBLES, Magistrate Judge.

**\*1** Plaintiff Harold Moody, a former New York State prison inmate who until recently was proceeding *pro se* and *in forma pauperis* but is now represented by *pro bono* counsel, commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his constitutional rights. Plaintiff's claims, as narrowed by earlier decisions from this court, include a cause of action alleging deliberate indifference to his serious medical needs by virtue of a failure by one of the defendants to follow instructives from a medical colleague

to order magnetic resonance imaging ("MRI") testing of Moody's knee and place him in the prison infirmary, in violation of his Eighth Amendment rights, and his assertion that defendants' ongoing failure to properly treat his knee condition was motivated out of retaliatory animus based upon complaints registered regarding his treatment, thus infringing upon his First Amendment rights.

A non-jury trial was held before me in connection with this action on August 14, 2006.[2] This decision represents my findings of fact and conclusions of law, based upon the evidence adduced during that trial.

I. *BACKGROUND*

At the times relevant to his claims, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's incarceration stemmed from a conviction for weapons possession and attempted robbery, resulting in the imposition of a determinate, ten year sentence.

On December 21, 2002, while confined within the Oneida Correctional Facility ("Oneida"), Moody was seen by a nurse at the facility's infirmary, complaining of a right knee injury suffered when standing up from his dormitory room bed on the previous day. Although plaintiff reported experiencing both discomfort and swelling, no swelling, bruising or discoloration was observed by the nurse during that visit. Following an examination of his knee, plaintiff was given an Ace wrap and a one day excuse from mess hall duty, and was

instructed to sign up for sick call on December 23, 2002.

Plaintiff returned to the clinic, as instructed, on December 23, 2002 and was seen by another nurse on that occasion. Once again, no swelling was discerned during the course of that visit. Plaintiff was advised by the examining nurse to rest and apply ice to his knee, and was given a work excuse for the day as well as an analgesic balm, to be applied as needed. [3]

Although the records are somewhat equivocal on this score, in that there is no record of the visit, it appears based upon a subsequent AHR entry that plaintiff was taken to the prison clinic by van for treatment of his knee on December 25, 2002. On that date, plaintiff was advised to continue using ice and taking Motrin, and to elevate his knee, but was told that there was nothing more that could be done until his condition was evaluated by a doctor.

Plaintiff was next seen at the Oneida infirmary for his right knee condition on January 2, 2003, again by a registered nurse. During her examination the nurse observed some swelling of the inner aspect of plaintiff's right knee, as well as tenderness in the patella region. An x-ray of plaintiff's knee was ordered, and he was given an elastic knee support and permit for its use until April 2, 2003. Moody was also advised during that session to apply ice or warm, moist soaks, and was again provided with an analgesic balm to apply as needed. [4] Plaintiff was advised during that visit to return to the clinic as needed for further treatment.

**\*2** An x-ray was taken on January 2, 2003 of plaintiff's right knee. The results of that x-ray reflected that "[b]ones and joints are within normal limits. There is no joint effusion."

On January 14, 2003, Moody was seen at the Oneida clinic by defendant Gloria Janicki, a nurse practitioner. At the time Janicki, together with two DOCS physicians, Dr. Robert F. Pickles and Dr. Raja Mara, were assigned primary responsibility to see and treat inmates at Oneida with medical conditions. Those duties were apportioned among Dr. Mara, Dr. Pickles and Nurse Practitioner Janicki based upon the days of the week, with Dr. Pickles generally on duty on Tuesdays and Wednesdays, and defendant Janicki ordinarily covering Thursdays and Fridays.

After experiencing some difficulty in performing the requisite tests on plaintiff's right knee, as a result of Moody's weight, Nurse Practitioner Janicki requested that Dr. Pickles assist in the examination. [5] During his brief examination of plaintiff's knee on that occasion, Dr. Pickles observed some positive valgus stress, and noted that medial collateral ligament strain should be ruled out. Following the examination plaintiff was again provided with an Ace wrap and knee brace, as well as a cane for ambulation, and was excused from participation in programs. Plaintiff was advised to return to the clinic in one week, and an appointment for January 21, 2003 was accordingly scheduled.

Central to plaintiff's claims is his contention that he was a patient of Dr. Pickles, who during the January 14, 2003 examination directed Nurse Practitioner Janicki to order immediate MRI testing of plaintiff's knee, and to place him in the infirmary in order

to immobilize the affected knee. [6] Having considered carefully the testimony of Nurse Practitioner Janicki and Dr. Pickles, as well as that of the plaintiff, I find that both during and following that examination, plaintiff was regarded as defendant Janicki's patient. In addition, I find that no such directions were given by Dr. Pickles during that brief session. As Dr. Pickles explained, an MRI is an expensive procedure which he would order done only if surgical intervention were warranted. According to Dr. Pickles, surgery, in turn, would only be considered by him as a treatment option in the event of immobility of the knee, something which the doctor did not observe in the plaintiff's case. Given these circumstances, and the finding that Dr. Pickles regarded Moody as defendant Janicki's patient, I reject as implausible plaintiff's contention that those two instructives were given by Dr. Pickles on January 14, 2003, as alleged.

Although there is no AHR entry for this date, it appears that plaintiff returned to the clinic, as directed, on January 21, 2003, continuing to complain of knee pain, and again was seen by Nurse Practitioner Janicki. While plaintiff contends that he also saw Dr. Pickles on that occasion, Dr. Pickles recalls seeing the plaintiff only once, and there is no written record to support this contention . [7] During that visit, plaintiff complained of experiencing continued difficulties, including with respect to walking and climbing stairs, and asked to be excused from his mess hall work assignment. Plaintiff's request for a work excuse was denied by Nurse Practitioner Janicki, due in part to the fact the he was able to ambulate through use of a cane.

**\*3** On February 22, 2003 plaintiff was seen by a registered nurse at the Oneida clinic after having reportedly slipped on water on the mess hall floor and fallen, twisting his right knee. The examining nurse noted that plaintiff already had been provided with a knee support and a cane permit, and that an MRI was scheduled for plaintiff's knee on February 24, 2003. A report of the injury was completed and filed, and plaintiff was given a work excuse through February 25, 2003.

On February 24, 2003, plaintiff underwent an MRI examination of his right knee, conducted by After-Hours Mobile Imaging, located in Hunt, New York. [8] That MRI revealed some moderate joint effusion, a medial meniscal tear involving body/posterior horn, and some bone contusion of the medial tibial plateau.

Plaintiff was seen on February 25, 2003 by Nurse Practitioner Janicki, principally for a skin condition. In her AHR entry relating to that visit, defendant Janicki noted that plaintiff had undergone an MRI of his right knee, and was scheduled for an orthopedic consultation concerning his knee, and that Moody reported that he "tires of any long distance walking." A request for orthopedic consultation was submitted by Nurse Practitioner Janicki to appropriate DOCS personnel on February 25, 2003.

On April 2, 2003 plaintiff was again seen by Nurse Practitioner Janicki for complaints associated with his right knee condition. On that date, plaintiff for the first time reported experiencing throbbing pain at night. [9] As a result of that complaint plaintiff was placed in the prison infirmary, and corrections

officers were dispatched to Moody's dormitory to retrieve his medications, including the previously-prescribed Motrin. [10] Plaintiff was again seen by Nurse Practitioner Janicki on April 11, 2003, complaining of continued throbbing pain in certain positions. During that examination, plaintiff expressed a desire to leave the infirmary, but was nonetheless kept there in light of his pain complaints.

Plaintiff was examined by Dr. Thomas Smallman, an orthopedic consultant, on April 16, 2003. Based upon his examination Dr. Smallman diagnosed plaintiff as suffering from a medial meniscus tear, and recommended that he undergo arthroscopic surgery to repair the damage.

Plaintiff was next seen at the clinic for his knee condition by Nurse Janicki on April 18, 2003. At that time, Moody appeared to be ambulating without difficulty and related that he could walk for short periods without experiencing problems, and that it was only when he walked long distances that his knee bothered him. Nurse Practitioner Janicki noted in her AHR entry from that date that plaintiff was not any longer using his cane.

Plaintiff was again seen by Nurse Practitioner Janicki on April 21, 2003, asking that he be allowed to return to the general population. During that visit plaintiff reported feeling good and not experiencing pain, and stated that he was able to ambulate with no difficulty, and without the use of a cane. It was noted in the AHR entry from that date that plaintiff requested transfer into a "flat facility" which would obviate the need to use stairs. [11] Reports of subsequent visits by plaintiff to see medical

personnel at Oneida on April 25, 27, and 30, 2003, as well as on May 5, 2003, make no mention of plaintiff's knee condition.

**\*4** Arthroscopic surgery was subsequently performed by Dr. Smallman at the State University of New York at Upstate, located in Syracuse, New York, on May 27, 2003 to repair plaintiff's knee. There is no indication from the testimony adduced at trial or in his medical records that plaintiff's condition worsened, or that the surgery was made more difficult, as a result of the intervening period between December 21, 2002, when Moody first reported his symptoms, and the date upon which the operation was performed.

Over the course of time plaintiff expressed concerns and registered complaints with various prison officials, both directly and through the established grievance process, concerning his medical treatment. [12] On February 20, 2003 plaintiff filed a grievance with the facility's inmate grievance review committee ("IGRC") complaining of the delay in receiving an MRI and the failure of prison officials to provide him with adequate treatment for his knee injury. Following an investigation, that grievance was accepted in part by the facility superintendent, who on February 26, 2003 noted that plaintiff had received an MRI two days previously and was "receiving appropriate care." That determination was affirmed on appeal to the Central Office Review Committee ("CORC") on April 23, 2003, with a notation that the plaintiff had been referred for surgery on his knee, concluding that plaintiff's "medical concerns had been addressed by medical staff."

On February 24, 2003, shortly before receiving the superintendent's response to his grievance, plaintiff wrote to defendant Peter Behrle, who at the time was the Deputy Superintendent for Administration of Oneida, complaining of the delay in receiving treatment. [13] Copies of that letter were forwarded by the plaintiff to Nurse Administrator Moon and Dr. Mara, a physician at the facility. In response to his letter, Deputy Superintendent Behrle wrote to the plaintiff on March 3, 2003 noting that an MRI had been completed on February 24, 2003, and that upon receipt of its results his situation would be reviewed with him by a physician.

Plaintiff again wrote to Deputy Superintendent Behrle on March 23, 2003, inquiring about delays in being seen by a doctor or nurse practitioner following a request for such an appointment, and additionally on March 26, 2003, pointing out that although it had been three and one-half weeks since his MRI was administered, he had yet to be apprised of the results. [14] Deputy Superintendent Behrle responded to plaintiff's letters of March 23, 2003 and March 26, 2003, pointing out that Moody was scheduled to be seen by an orthopedic specialist in April of 2003 to review his MRI test results and discuss the issue of what, if any, additional treatment was required, noting that in the interim plaintiff had been temporarily placed in the infirmary and was receiving appropriate care.

A second inmate grievance was filed by Moody on April 2, 2003, addressing the delay in receiving testing and treatment for his knee condition. That grievance was denied by the facility superintendent, who in his response noted that discretion is used by medical personnel in the scheduling of appointments, and that the interval between the date of plaintiff's initial visit and his scheduled appointment with Nurse Practitioner Janicki on January 14, 2003 "was appropriate and within the acceptable timeframes given assessment at that time." That determination was upheld on appeal by decision rendered by the CORC on May 21, 2003.

**\*5** On April 7, 2003, plaintiff authored yet another letter to Deputy Superintendent Behrle, continuing to complain of the delay in receiving treatment and requesting that he not be placed into general population. That letter was referred to the facility's Deputy Superintendent for Programs, W.F. Hulihan, who on April 9, 2003, responded, noting that plaintiff was scheduled to go to a clinic for treatment "in the near future" and that according to medical staff he would be permitted to remain in the infirmary until then, and consequently would not be required to participate in prison programs.

## II. *DISCUSSION*

As the result of the issuance by me of a report and recommendation dated January 23, 2006, Dkt. No. 47, and its acceptance by Chief District Judge Norman A. Mordue on February 14, 2006, Dkt. No. 48, as well as the entry of judgment as a matter of law at trial dismissing all claims asserted by the plaintiff against Nurse Administrator Moon, the remaining issues in the case surround Nurse Practitioner Janicki's alleged refusal to comply with directives of Dr. Pickles, on January 14, 2003 and again on January 21, 2003, to order an immediate MRI and place the plaintiff in the infirmary, and claims of retaliation by Nurse Practitioner Janicki in response to

complaints lodged by the plaintiff regarding her conduct. Also implicated are plaintiff's claims against Deputy Superintendent Behrle, based principally upon his failure to intercede and prevent those constitutional violations, despite his awareness of them. [15]

### A. *Deliberate Indifference*

Plaintiff's medical indifference claim is appropriately analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment proscribes the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia,* Estelle). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

### 1. *Serious Physical Injury*

**\*6** In order to prove an Eighth Amendment violation based upon indifference to an inmate's medical requirements, a plaintiff must establish a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary

in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. ⚑ *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance).* Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

The medical condition at issue in this case consists of a knee injury diagnosed principally as medial meniscal tear, with joint effusion. There is no evidence that as a result of the injury plaintiff's knee was rendered immobile, and in fact the evidence establishes that, to the contrary, plaintiff was able to ambulate, both with and without a cane at various times, despite his injury.

To the extent that plaintiff claims to have suffered "excruciating pain" as a result of his injury, such claims are not supported by the chronology of events and the relevant entries in his prison health records. While it is clear that plaintiff did complain of knee pain, his injury was not immobilizing, and his visits to the Oneida clinic with complaints of knee pain were sporadic, with intervals of up to one month or more between some of those visits. Indeed, plaintiff's AHR reflects several visits by him to the clinic during the relevant time frame complaining of other conditions, with no mention of his knee, even in passing. *See, e.g .,* AHR entries dated 1/13/03 (dandruff),

1/16/03 (medication renewal), 2/18/03 (stuffy nose), 4/14/03 (ear pain), and 4/15/03 (skin condition).

While, undoubtedly, plaintiff's knee injury caused him some modicum of pain, for which he was provided treatment, albeit conservative at the outset, and medication, the proof fails to establish the existence of a serious physical condition of constitutional proportion. In that regard, I note that courts in this circuit have almost uniformly found similar knee injuries to be insufficient to trigger Eighth Amendment protection and to support a deliberate indifference claim. *See, e.g., Williamson v. Goord,* No. 9:02-CV00521, 2006 WL 1977438, at *9-* 16 (N.D.N.Y. July 11, 2006) (Sharpe, J. & Lowe, M.J.) (plaintiff's injuries, including arthrosis, degenerative joint disease in both knees, and a partially torn anterior cruciate ligament did not impose the risk of death or degeneration, or inflict severe pain, sufficient to satisfy the serious medical condition test); *Taylor v. Kurtz,* No. 00-CV-700, 2004 WL 2414847, at *1-*4 (W.D.N.Y. Oct. 28, 2004) (where plaintiff complained of failure to perform knee surgery until nine months after discovering the tear of a previously repaired anterior cruciate ligament, a torn lateral meniscus, and degenerative arthritis, plaintiff's injury found not to be sufficiently serious to satisfy the Eighth Amendment standard); ⚑ *Espinal v. Coughlin,* No. 98 CIV. 2579, 2002 WL 10450, at *1-*5 (S.D.N.Y. Jan. 3, 2002) (ruptured anterior cruciate ligament did not constitute severe injury for purposes of the Eighth Amendment despite a three year delay in performing surgery while more conservative treatment was attempted); *see also Culp v.*

*Koenigsmann,* No. 99 Civ. 9557, 2000 WL 995495, at *4, *9-*10 (S.D.N.Y. July 19, 2000) (no Eighth Amendment violation where plaintiff suffered from a torn medial meniscus and experienced a one-year delay from injury to surgery).

 **\*7** Since the proof at trial failed both to distinguished plaintiff's knee condition from those found by this and other courts not to trigger Eighth Amendment protection, and to establish that his injury imposed risk of death or degeneration, or resulted in severe pain, I find that Moody did not suffer from a constitutionally significant serious physical need. Plaintiff's deliberate indifference claim is therefore subject to dismissal on this basis.

### 2. *Deliberate Indifference*

In addition to demonstrating the existence of a serious physical need, to prevail on his medical indifference claim plaintiff must additionally establish that defendants were deliberately indifferent to that condition. Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer*); *Waldo,* 1998 WL 713809, at *2 (same).

It is well established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff contends that deliberate indifference has been established based upon proof of Nurse Practitioner Janicki's intentional disregard for his medical condition, manifested by his failure to follow instructives of Dr. Pickles issued on January 14, 2003 and again, he contends, on January 21, 2003, that immediate MRI testing of his right knee be conducted and that he be placed in the prison infirmary. In this regard I credit the testimony of Dr. Pickles and Nurse Practitioner Janicki, to the effect that an MRI was not ordered on January 14, 2003, nor did Dr. Pickles instruct Nurse Practitioner Janicki on that or any other occasion to place Moody in the infirmary. Dr. Pickles testified to the expense associated with an MRI and his practice not to order such testing when there is no knee immobilization noted and immediate surgical intervention was not contemplated. Dr. Pickles also convincingly testified that he would not have given such instructives to Nurse Practitioner Janicki since, although she has less medical training than a prison physician, he

regarded her as a colleague and that the plaintiff was her patient, noting that he was asked to examine Moody only because of the difficulty which defendant Janicki was experiencing in administering the appropriate testing.

**\*8** I also accept the testimony of Dr. Pickles and Nurse Practitioner Janicki, which reflects their professional beliefs that resort to the more conservative course of treatment initially offered to the plaintiff was a reasonably prudent first step. During that interim period leading up to Moody's surgery a non-invasive approach was taken to address his knee condition, and he was provided with Ace wraps, an elastic knee brace, pain medication, and a cane to assist him to ambulate. When ambulation became difficult plaintiff was placed in the prison infirmary, and taken off his work assignment and other prison programming. Finally, when it was determined that plaintiff's condition had not improved appreciably despite those measures, an orthopedic consultation was ordered, and surgery was ultimately performed.

The court has carefully considered the chronology of relevant events and the delay in providing MRI testing and surgical intervention. Delays and interruptions in medical treatment of an inmate's medical condition, however, do not necessarily provide a basis for an Eighth Amendment claim. *See* Smith v. Carpenter, 316 F.3d 178, 184-87 (2d Cir.2003). Where a plaintiff complains of delays or interruptions in providing needed medical treatment, the court should consider the severity of the "challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in determining whether plaintiff has shown

the existence of a sufficiently serious medical need. Smith, 316 F.3d at 185 (emphasis in original). Although a delay or interruption in medical care may amount to deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a "life-threatening and fast-degenerating" condition for three days, or delayed major surgery for over two years. Liscio v. Warren, 901 F.2d 274, 277 (2d Cir.1990); *Hathaway,* 841 F.2d at 50-51; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir.1984). The evidence presented at trial, fell well short of meeting this requirement.

In sum, even had plaintiff been able to establish the existence of a serious medical condition of constitutional significance, the evidence at trial failed to establish that either Nurse Practitioner Janicki or Dr. Pickles was deliberately indifferent to plaintiff's condition. And, since plaintiff's deliberate indifference claims against defendant Behrle hinge upon proof of indifference on the part of one or both of those defendants and his failure to intercede, Moody's claims against him are also subject to dismissal.

### B. *Retaliation*

Although not containing a discrete cause of action denominated as such, I have generously construed plaintiff's complaint, and in particular its reference to the First Amendment, to include a claim of unlawful retaliation. To the extent that that retaliation claim is asserted based upon actions taken by defendant Moon, that portion of it has been dismissed. The remaining element of that claim

relates to Nurse Practitioner Janicki's alleged refusal to provide plaintiff with requested treatment for his knee in retaliation for his having registered complaints regarding her care and treatment.

**\*9** In order to state a *prima facie* claim under 🏳 section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. 🏳 *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); 🚩 *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct ." 🏳 *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. 🏳 *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

While it is clear that Moody did complain of treatment rendered by defendant Janicki, and thus engaged in activity protected by the First Amendment, 🏳 *Graham,* 89 F.3d at 80, the trial record contains no evidence of any adverse actions taken by Nurse Practitioner Janicki against the plaintiff as a result of

his complaints. Instead, at trial defendants convincingly established that Moody received the care and treatment which would have obtained, regardless of whether or not such complaints were registered. Under these circumstances, I find that plaintiff has not demonstrated the existence of retaliation by a fair preponderance of the evidence, and that in any event defendant Janicki has carried her burden of proving that regardless of any retaliatory animus he received the same treatment as would have been provided even absent such motivation.

III. *SUMMARY AND CONCLUSION*

Based upon the evidence at trial I find that plaintiff has failed to carry his burden of demonstrating either the existence of a serious medical need or deliberate indifference on the part of the remaining defendants in the action to any such need, and therefore will direct dismissal of plaintiff's Eighth Amendment deliberate indifference claim. Similarly, I find no basis to conclude that adverse action was taken against the plaintiff by Nurse Practitioner Janicki based upon plaintiff's complaints regarding her care and treatment of his knee, and therefore will order dismissal of plaintiff's retaliation claim as well.

Based upon the foregoing it is hereby

ORDERED, that the clerk enter judgment in defendants' favor DISMISSING plaintiff's remaining claims in all respects.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2645124

# Footnotes

1    The Menter Rudin firm was assigned to represent the plaintiff in this matter *pro bono.*
     The court appreciates the extensive energy and effort expended on plaintiff's behalf
     by the attorneys designated by that firm to handle the case.

2    The parties have consented to my jurisdiction to address the dispositive aspects of
     the case, pursuant to ⚑ 28 U.S.C. § 636(c). *See* Dkt. No. 61. Additionally, although
     jury demands were initially filed by both sides, the parties later stipulated to a bench
     trial. Dkt. No. 65. These agreements by the parties were confirmed on the record
     at the outset of the trial.

3    It was also noted in an entry from that date recorded in plaintiff's Ambulatory
     Health Record ("AHR"), a compilation of medical records maintained by the DOCS
     with respect to each inmate, that Moody was already on Motrin, which had been
     prescribed on October 28, 2002 for unrelated pain symptoms.

4    It was again noted in the entry regarding that visit that plaintiff had a prescription
     from October 28, 2002 for Motrin 600 mg.

5    At the time of that examination, plaintiff weighed nearly 300 pounds.

6    The fact that January 14, 2003 was a Tuesday is to some degree supportive of
     plaintiff's contention that he was a patient of Dr. Pickles, rather than of Nurse
     Practitioner Janicki, a claim which is somewhat pivotal to his deliberate indifference
     cause of action. No explanation appears in the record, however, of the need for
     defendant Janicki's involvement in plaintiff's examination, if that were the case, given
     the system in place at the facility's infirmary. Dr. Pickles also noted that although
     she is a nurse practitioner and he is a physician, he views defendant Janicki as a
     co-equal rather than considering himself as her superior when it comes to treating
     patients, adding that his assistance was elicited in plaintiff's case solely as a result of
     Nurse Practitioner Janicki's inability to perform the requisite testing due to plaintiff's
     size and weight.

7    Since plaintiff saw Nurse Practitioner Janicki on that date, and no reason has been
     offered or appears from plaintiff's records for another consultation with Dr. Pickles
     at the time, I do not credit plaintiff's statements in this regard.

8    It is unclear from the record where the MRI was administered. Dr. Pickles stated
     that while there is an x-ray machine in Oneida, the facility does not have MRI
     capabilities. During his testimony Dr. Pickles noted his belief that in 2003 there was
     MRI testing equipment located in the Walsh Regional Medical Center, within the
     Marcy Correctional Facility and adjacent to Oneida. The report completed by Dr.

Victor Regenbogen regarding plaintiff's MRI, however, fails to disclose where the testing was administered.

9  Nurse Practitioner Janicki's AHR entry from that date characterizes this as a new development, noting that plaintiff's previous complaints involved pain experienced when walking for any distances.

10 Although his AHR does not reflect this fact, according to the plaintiff he was admitted into the Oneida infirmary on March 28, 2003.

11 Plaintiff was subsequently transferred into the Marcy Correctional Facility, a single level prison, on or about May 7, 2003.

12 Some of those complaints also addressed alleged harassment of the plaintiff by defendant Moon, who has been identified by Moody as a nurse administrator at the facility. Since judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure was entered at the close of plaintiff's case dismissing Moody's claims against defendant Moon, those allegations will not be described or addressed in this decision.

13 Defendant Behrle has since been promoted, and is currently the superintendent at another DOCS prison facility.

14 During her testimony, Nurse Practitioner Janicki candidly stated that she has voiced concerns over the length of time it customarily takes to receive reports back of such MRI testing.

15 In their summary judgment motion defendants argued that dismissal of plaintiff's claims was warranted based upon his failure to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), before commencing this action. See 42 U.S.C. § 1997e(a). The portion of defendants' summary judgment motion seeking dismissal on this basis was denied in light of the court's finding of the existence of triable issues of material fact regarding the defense. At trial defendants did not press their argument regarding plaintiff's alleged failure to exhaust. In any event, it appears from the evidence adduced that plaintiff did satisfy his obligation under the PLRA to fully exhaust his claims, and this defense is therefore rejected.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.